**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

LITTLE ROCK SCHOOL DISTRICT                                    PLAINTIFF

V.                              No. 4:82CV00866 WRW/JTR

PULASKI COUNTY SPECIAL SCHOOL
DISTRICT NO. 1, ET AL.                                        DEFENDANTS


MRS. LORENE JOSHUA, ET AL.                                    INTERVENORS


KATHERINE KNIGHT, ET AL.                                      INTERVENORS


## ORDER DECLARING THE LITTLE ROCK SCHOOL DISTRICT UNITARY

### I.  Introduction[1]

In early 1998, the Little Rock School District ("LRSD") and the Joshua Intervenors[2]

("Joshua") negotiated and voluntarily entered into the Revised Desegregation and Education Plan

(the "Revised Plan"),[3] as a way of settling what was then over forty years of more or less continuous

desegregation litigation.[4]  On April 10, 1998, the Court approved the Revised Plan,[5] which required

LRSD to substantially comply with hundreds of desegregation obligations in order to achieve unitary

---

[1]I once again note that United States Magistrate Judge Joe Thomas Ray has done a tremendous  amount of work on this case throughout -- for which I am profoundly thankful.

[2]The Joshua Intervenors are a group of African-American school children, some of whom are enrolled in each of the three Pulaski County school districts.  Thus, Joshua serves as the class representative for all African-American students enrolled in LRSD, the Pulaski County Special School District ("PCSSD"), and the North Little Rock School District ("NLRSD").  Joshua's Petition to Intervene in this action was granted on May 24, 1984.  (Doc. No. 565.)

[3]Doc. No. 3107, Ex. A.

[4]The complete history of this desegregation litigation is set forth in *LRSD v. PCSSD, et al.*, 237 F. Supp. 2d 988, 997-1020 (E.D. Ark. 2002) ("*LRSD I*").

[5]Doc. No. 3144.

status and release from court supervision.[6]  Many of these obligations go well beyond what either

the United States Supreme Court or the Eighth Circuit Court of Appeals has held is constitutionally

required in order for a school district to be deemed unitary.  Nevertheless, by voluntarily entering

into the Revised Plan, LRSD became *contractually bound* to satisfy all of the specified

desegregation obligations.[7]

Since the meaning of some of the terms of the Revised Plan were questioned by the Eighth

Circuit Court of Appeals in its 2006 decision,[8]  I quote, as background for the following discussion,

the Restatement of Contracts:

> (1) Where the parties have attached the same meaning to a promise or agreement or
> a term thereof, it is interpreted in accordance with that meaning.[9]

### A.      LRSD's March 15, 2001 Application for Unitary Status

On March 15, 2001, LRSD moved for unitary status on the ground that it had substantially

complied with all of the obligations in the Revised Plan.[10]  On June 25, 2001, Joshua filed an

Opposition to LRSD's Compliance Report[11] which argued that LRSD was not in substantial

compliance with most of the obligations in the Revised Plan.  On March 15, 2002, LRSD filed a

---

[6]The Eighth Circuit has repeatedly recognized that the Revised Plan represents a settlement
agreement which contractually obligates LRSD to fulfill the specified desegregation obligations.
*LRSD v. PCSSD*, 83 F.3d 1013, 1017 (8th Cir. 1996).  In *Knight v. PCSSD*, 112 F.3d 953, 955 (8th
Cir. 1997), the Court characterized the settlement agreement as "a particularization of federal
[desegregation] law applicable to these parties."

[7]*LRSD v. PCSSD*, 83 F.3d 103, 1017 (8th Cir. 1996).

[8]*LRSD v. NLRSD, et al.*, 451 F.3d 528 (8th Cir. 2006).

[9]RESTATEMENT (SECOND) OF CONTRACTS § 201 (1981).

[10]Doc. No. 3410.

[11]Doc. No. 3447.

Motion for an Immediate Declaration of Unitary Status.[12]   On May 30, 2002, Joshua filed a

Response[13] opposing that Motion.

I conducted a series of unitary status hearings during the second half of 2001 and the first

half of 2002.  During these hearings, over forty witnesses testified, and the parties introduced into

evidence thousands of pages of exhibits.

On September 13, 2002, I entered a Memorandum Opinion (the "September 2002 Decision")

finding that LRSD had substantially complied with all of its obligations in the Revised Plan except

those specified in § 2.7.1.[14]   Section 2.7.1 of the Revised Plan obligated LRSD to satisfy the

following obligations:

> LRSD shall assess the academic programs implemented pursuant to § 2.7 after each
> year in order to determine the effectiveness of the academic programs in improving
> African-American achievements.  If this assessment reveals that a program has not
> and likely will not improve African-American achievement, LRSD shall take
> appropriate action in the form of either modifying how the program is implemented
> or replacing the program.[15]

I found that, while LRSD had implemented numerous § 2.7 programs designed to improve the

academic achievement of African-American students, the evidence established that it had done very

little to assess the effectiveness of those programs, on a year-to-year basis, as required by § 2.7.1.

The Findings of Fact in *LRSD I* discussed the substantial evidence which revealed that

LRSD's top administrators and Joshua *both* construed § 2.7.1's requirement that LRSD "shall *assess*

the academic programs implemented pursuant to § 2.7 after each year" to mean that LRSD must

---

[12]Doc. No. 3580.

[13]Doc. No. 3604.

[14]*LRSD I*, 237 F. Supp. 2d 988.

[15]Doc. No. 3107, Ex. A

perform "program assessments" *and* "program evaluations."[16]   Witnesses for LRSD and Joshua testified that both parties understood the term "assess," as used in § 2.7.1, to be a term of art requiring LRSD to prepare annual assessments *and evaluations* of the § 2.7 programs.  While § 2.7.1 does not mention the word "evaluation," the evidence established beyond peradventure that LRSD clearly understood that its obligation to *assess* the § 2.7 programs required it to prepare not only program assessments but also program evaluations in order to determine the effectiveness of those programs in improving the academic achievement of African-American students.

### B.      The 2002 Compliance Remedy

In subpart A of the 2002 Memorandum Opinion, I tracked the language the parties used in § 2.7.1 and required LRSD *to assess* each of the programs implemented under § 2.7 to improve the academic achievement of African-American students during the entire 2002-03 school year and the first semester of the 2003-04 school year.  I did not spell out that LRSD was required to prepare evaluations of specific § 2.7 programs because the testimony of the parties during the 2002 unitary status hearing made it clear that they understood the term "assess" to include both assessments and evaluations of the § 2.7 programs.  Therefore, to comply with subpart A of the 2002 Compliance Remedy, LRSD was expected to continue to prepare program assessments *and* to prepare program evaluations of the most promising § 2.7 programs that it planned to implement during the 2002-03 school year and the first semester of the 2003-04 school year.

Subpart B required LRSD to maintain written records documenting how it had gone about assessing the § 2.7 programs.

---

[16]*LRSD I*, 237 F. Supp. 2d at 1076-77. ("Not to put too fine a point on it", but since there appears to be some confusion about the required "evaluations", this order will be quite redundant on this point).

Subpart C required LRSD to complete and file program evaluations on the fourteen § 2.7 programs listed on page 148 of LRSD's Final Compliance Report. This Final Compliance Report,[17] filed on March 15, 2001, detailed everything that LRSD had done to meet its compliance obligations under each section of the Revised Plan. Importantly, this Final Compliance Report reflects precisely how LRSD construed its desegregation obligations under each section of the Revised Plan. On page 148, under the heading "Section H Program Evaluation," LRSD cited "Section 2.7.1" as creating the obligation to prepare fourteen *program evaluations* of § 2.7 programs. Since 1998, Dr. Steven Ross has worked extensively with PRE to improve the program evaluation process. LRSD accepted his recommendation and hired Dr. John Nunnery, who was supposed to prepare most of the evaluations of the fourteen specifically identified § 2.7 programs.[18] In the March 15, 2002 Final Compliance Report, LRSD *unequivocally admits* that it knew, understood, and construed the obligation in § 2.7.1 to *assess* the § 2.7 programs as requiring it to prepare *evaluations* of some of the § 2.7 programs.[19]

In the Final Compliance Report, LRSD stated that, as of March 15, 2001, PRE[20] staff and Dr. Nunnery had prepared evaluations on all fourteen of the § 2.7 programs identified on page 148. During the 2002 unitary status hearings, however, LRSD administrators admitted that only six of the fourteen evaluations actually had been completed. These fourteen evaluations of specific § 2.7 programs were supposed to have been prepared during the 1999, 2000, and 2001 school years (at

---

[17]Doc. No. 3410.

[18]*See* LRSD's Final Compliance Report at page 148 (Doc. No. 3410).

[19]Consistent with LRSD's explicit acknowledgment of this obligation in subpart H of the Final Compliance Report, Dr. Bonnie Lesley and other top LRSD administrators testified during the 2002 unitary status hearing that they understood § 2.7.1's obligation to *assess* the § 2.7 programs as requiring LRSD to perform annual evaluations of some of the § 2.7 programs.

[20]PRE stands for Planning, Research, and Evaluation.

the rate of approximately four per year) *using testing and performance data generated during those three school years*. Subpart C of the 2002 Compliance Remedy required LRSD to prepare the eight missing program evaluations from the three previous school years. Everyone understood that, in preparing these evaluations, LRSD would use student testing and performance data from the 1999 through 2001 school years to determine the effectiveness of those § 2.7 programs during those school years. Thus, subpart C of the 2002 Compliance Remedy required LRSD to catch up on the annual § 2.7 program evaluations, for the previous three years, which the Final Compliance Report erroneously stated LRSD had already prepared.

So, subpart A of the 2002 Compliance Remedy required LRSD to prepare assessments and evaluations of § 2.7 programs during the 2002-03 school year and the first semester of the 2003-04 school year. Because subpart C of the 2002 Compliance Remedy required LRSD to prepare evaluations of § 2.7 programs to determine their effectiveness in school years *before* the 2002-03 school year, everyone understood that the eight page-148 program evaluations required in subpart C could *not* be used by LRSD to satisfy the program evaluation obligation in subpart A, which required it to prepare evaluations of the § 2.7 programs during the 2002-03 school year and the first six months of the 2003-04 school year.[21] On the record this admits of no doubt.

Finally, LRSD was given until March 15, 2004, to demonstrate that it was in substantial compliance with § 2.7.1, as outlined in subparts A, B, and C of the 2002 Compliance Remedy.[22]

---

[21]This explains why, *after* it prepared the eight evaluations required by subpart C, LRSD proceeded to prepare two global evaluations of its Literacy and Math and Science curricula for the 2002-03 school year and the first semester of the 2003-04 school year. These two global evaluations were clearly intended to satisfy LRSD's obligation under subpart A of the 2002 Compliance Remedy.

[22]*LRSD I,* 237 F. Supp. 2d at 1087-88.

### C.      The Eighth Circuit Affirms the September 2002 Decision

Joshua appealed the September 2002 Decision to the Eighth Circuit Court of Appeals.  On March 2, 2004, the Court entered an opinion affirming the September 2002 Decision.[23]  Because LRSD did not cross-appeal, it gave up any right to complain about the obligations imposed on it in subparts A, B, and C of the 2002 Compliance Remedy.

### D.      LRSD's March 12, 2004 Application for Unitary Status

On March 12, 2004, LRSD filed a Compliance Report[24] seeking unitary status on the ground that it had substantially complied with § 2.7.1 of the Revised Plan and subparts A, B, and C of the 2002 Compliance Remedy.  On April 15, 2004, Joshua filed papers[25] opposing LRSD's request for unitary status.

On June 14 and 15, 2004, a unitary status hearing was held.  During this hearing, it was revealed that, shortly after I entered the 2002 Compliance Remedy, numerous top LRSD administrators had resigned, including the Superintendent; Dr. Bonnie Lesley, the Associated Superintendent in charge of Curriculum and Education; and most of the rest of the employees in the PRE Department.  LRSD's remaining administrators testified at the hearing that because of this mass exodus they were unsure about how LRSD should go about satisfying subpart A of the 2002 Compliance Remedy.  This was not brought to my attention until the 2004 hearing.  Inexplicably, LRSD decided it could satisfy subpart A of the 2002 Compliance Remedy by preparing two "global evaluations" of LRSD's Literacy Curriculum and its Math and Science Curriculum.

As previously mentioned, subpart A of the 2002 Compliance Remedy used the *same language* contained in § 2.7.1 of the Revised Plan, and required LRSD to *assess* the § 2.7

---

[23]*LRSD v. Armstrong*, 359 F.3d 957 (8th Cir. 2004).

[24]Doc. No. 3837.

[25]Doc. Nos. 3856 and 3857.

programs.[26] After the September 2002 Decision, LRSD's administrators decided the obligation to assess § 2.7 programs could be satisfied by preparing *only two* "global evaluations" of LRSD's Literacy curriculum and Math and Science curriculum. *This establishes clearly that LRSD construed the phrase "assess § 2.7 programs," as used in § 2.7.1, to mean that it was required to prepare program evaluations -- not just program assessments.*

On June 30, 2004, I entered a Memorandum Opinion (the "June 2004 Decision"), holding that these two global evaluations fell far short of § 2.7.1's requirement that LRSD must annually assess *specific § 2.7 programs* in order to determine their effectiveness in improving the academic achievement of African-American students.[27] The best way to understand the shortcomings of LRSD's "global approach" to complying with § 2.7.1 is through a concrete example of what the plain language of § 2.7.1 and subpart A of the Compliance Remedy actually obligated LRSD to do.

During the 2002-03 and 2003-04 school years, LRSD implemented numerous § 2.7 programs to improve the academic achievement of African-American students. One such program, which was implemented in elementary schools throughout the district, was the Pre-K Literacy Program. During the 2002 and 2004 unitary status hearings, testimony established that the Pre-K Literacy Program was one of LRSD's most promising § 2.7 programs. If LRSD had hired Dr. Ross or some other similarly qualified consultant to perform evaluations of the Pre-K Literacy program and three or four other *specific* § 2.7 programs, during the 2002-03 school year and the first semester of the 2003-04

---

[26]During the 2002 unitary status hearing, LRSD's witnesses made it clear that they knew and understood the word "assess," as it was used in § 2.7.1, to mean that LRSD must prepare *assessments* and *evaluations* as part of its obligation to "assess" the § 2.7 programs. This is also precisely how LRSD had construed its obligation under § 2.7.1 in the years following its execution of the Revised Plan in 1998, as evidenced by page 148 of LRSD's Final Compliance Report filed on March 15, 2001. Thus, I felt sure LRSD understood that the obligation to *assess* the § 2.7 programs meant that it must prepare both assessments and evaluations of specific § 2.7 programs.

[27]*LRSD v. PCSSD, et al.*, No. 4:82CV00866, 2004 WL 5187587 (E.D. Ark. June 30, 2004) ("*LRSD II*").

school year, I would have had no difficulty finding that it had substantially complied with the program evaluation obligation contained in § 2.7.1 and subpart A of the 2002 Compliance Remedy.

Instead of evaluating *specific* § 2.7 programs, however, LRSD's administrators tried to satisfy § 2.7.1 by hiring Dr. Ross and another outside consultant to perform "global evaluations" of LRSD's overall Literacy Curriculum and its Math and Science Curriculum.  These evaluations amounted to nothing more than a survey of LRSD's complete program curricula in the areas of literacy, math, and science.  Neither evaluation attempted to address the effectiveness of *any* of the specific § 2.7 programs implemented to improve the academic achievement of African-American students.  As a result, these global evaluations provided *no useful guidance* on how any of the specific § 2.7 programs were working to improve African-American achievement.  During the June 2004 evidentiary hearing, Dr. Ross, himself, (and the other experts who prepared the two global evaluations) admitted that these "step 1" global evaluations did *not* satisfy the plain language of § 2.7.1 (which, as noted above, required LRSD to prepare "step 2" evaluations of specific § 2.7 programs to determine their effectiveness in improving the academic achievement of African-American students).

As was set forth in the June 2004 Decision, the obligations in § 2.7.1 go to the very heart of what Joshua contracted to receive from LRSD in agreeing to the Revised Plan:

> It is impossible to overstate the importance of § 2.7.1 to LRSD's African-American students.  Unless something is done to improve their academic achievement, many of them, who do not possess proficient skills in reading and math, will face difficult and uncertain futures.  Because 70% of its students are African-American, LRSD should be devoting a substantial percentage of its educational resources to solving this crucially important problem that will burden the lives and career trajectories of so many of its students.  It is my fervent hope that LRSD's administrators and its Board realize that LRSD must make the long-term commitment to solve this problem, *not* because a federal court says that it must, but because it is the right thing to do.[28]

---

[28]*LRSD II*, 2004 WL 5187587, at *20 (emphasis in original).

Based on the evidence introduced during the evidentiary hearing on June 14 and 15, 2004, I was at a loss to understand how LRSD could have concluded that the two "global evaluations" substantially complied with § 2.7.1 of the Revised Plan and subpart A of the 2002 Compliance Remedy. Accordingly, I denied LRSD's request for unitary status.[29]

During the June 14 and 15, 2004 unitary status hearing, LRSD administrators complained that, because subpart A of the 2002 Compliance Remedy did not spell out precisely what they were supposed to do to satisfy the obligations in § 2.7.1, they were unsure of how to proceed. I was puzzled by this professed confusion so, to avoid any future confusion about what the language in § 2.7.1 required, the 2004 Compliance Remedy spelled out the specific obligations that LRSD must meet in order to satisfy the requirements of § 2.7.1 of the Revised Plan.[30] However, I did so with some reluctance and only because I was genuinely concerned that, unless I restated those obligations in very specific terms, LRSD might once again fail to substantially comply with § 2.7.1:

> In the [2002] Compliance Remedy, I was reluctant to set forth too much detail about how LRSD should structure its program assessment process. Professional educators ought to be able to do a better job than I could in formulating and implementing this process; but LRSD is found wanting in its handling of its duties under subparts A and B of the Compliance Remedy.[31]

### E.    The Eighth Circuit Affirms the June 2004 Decision

LRSD appealed the June 2004 Decision to the Eighth Circuit Court of Appeals. Ironically, on appeal, LRSD argued, among other things, that the 2004 Compliance Remedy was too specific and imposed obligations that went beyond what it had agreed to do under § 2.7.1 of the Revised Plan. On June 26, 2006, the Eighth Circuit entered its opinion affirming the June 2004 Decision.[32]

---

[29]*Id* at **20-29.

[30]*Id.* at **32-35.

[31]*Id.* at *22.

[32]*LRSD v. NLRSD, et al.*, 451 F.3d 528 (8th Cir. 2006).

However, both the majority and dissent expressed concern that some aspects of the 2004 Compliance Remedy may have gone beyond the obligations LRSD agreed to undertake in § 2.7.1 of the Revised Plan.

**F.      LRSD's October 16, 2006 Application for Unitary Status**

On October 16, 2006, LRSD filed a Compliance Report[33] detailing everything that it has done to satisfy the 2004 Compliance Remedy and § 2.7.1 of the Revised Plan.  LRSD asserts that, because it has now substantially complied with the 2004 Compliance Remedy, it should be declared unitary and released from court supervision and monitoring.  On November 16, 2006, Joshua filed Objections to LRSD's Compliance Report and Opposition to LRSD's Request for Unitary Status.[34]

On January 20, 21, and 27, 2007, I conducted another unitary status hearing.  LRSD called fifteen witnesses who testified about LRSD's substantial compliance with § 2.7.1 of the Revised Plan, as those obligations are contained in the 2004 Compliance Remedy.  Joshua called nineteen witnesses who testified that LRSD needed to do more still in order to comply with its obligations. The parties again introduced into evidence thousands of pages of exhibits.

Because the Eighth Circuit's recently expressed concerns about whether the 2004 Compliance Remedy imposed obligations on LRSD that went beyond those contained in § 2.7.1, I believe it is important for me to address that issue before I reach the merits of LRSD's substantial compliance.

---

[33]Doc. No. 4050.

[34]Doc. No. 4058.

**II.     LRSD's Obligations Under The 2004 Compliance Remedy And Why It Was Required By § 2.7.1 of the Revised Plan**

**A.      LRSD Must Reestablish Its PRE Department**

As previously discussed, between mid-2002 and June of 2004, LRSD allowed its PRE Department to collapse.[35]  During the June 2004 unitary status hearing, Mr. Dennis Glasgow, who in June of 2003 was appointed Interim Associate Superintendent of Instruction and Curriculum to replace Dr. Lesley, testified that:

> PRE was short of personnel . . . and . . . he intended to propose to the Board that it set a high priority on hiring a team of well qualified and experienced professionals capable of reinvigorating PRE.[36]

In section A of the 2004 Compliance Remedy, I required LRSD to hire the well qualified and experienced team of professionals that according to Mr. Glasgow was *necessary* to reestablish an effective PRE Department.  I required that this group of professionals include: (1) a director comparable to former director Dr. Lease, someone who had a Ph.D. and experience in designing, preparing, and overseeing the preparation of formal program evaluations, and in formulating a comprehensive program assessment process to determine the effectiveness of the § 2.7 programs

---

[35]Dr. Kathy Lease, the director of PRE, left LRSD in the fall of 2002.  Three statisticians and several other support staff left PRE in 2002 and 2003.  *None of these employees had been replaced at the time I conducted the June 2004 unitary status hearing*.  At that time, PRE was being run by one statistician, who had no real experience in performing program assessments or preparing program evaluations.

Dr. Bonnie Lesley, LRSD's Associate Superintendent of Instruction and Curriculum, who had considerable knowledge and experience with the program assessment and evaluation process, left LRSD in 2003.  She was replaced, on an interim basis, by Dennis Glasgow, who had almost no experience with the program assessment and program evaluation process.  *LRSD II*, 2004 WL 5187587, at *21.

In *LRSD II*, I found that the collapse of the PRE Department explained in large part why LRSD's remaining administrators, who had little knowledge about the program assessment and evaluation process, mistakenly determined that two global evaluations of LRSD's overall program curriculum could somehow satisfy the obligations in § 2.7.1, which required LRSD to evaluate *specific § 2.7 programs*.  For a complete discussion of how LRSD allowed the PRE Department to fall apart, *see LRSD I* at 1077-81 and *LRSD II*, 2004 WL 5187587, at **9-10, *21.

[36]*LRSD II*, 2004 WL 5187587, at *21.

-12-

designed to improve the academic achievement of African-American students; (2) experienced statisticians like those who had worked under Dr. Lease; and (3) other appropriate support personnel necessary to operate an effective PRE Department.

As indicated above, Section 2.7.1 required LRSD to *assess*, on an *annual basis*, the § 2.7 programs to determine their effectiveness in improving the academic achievement of African-American students.  And, as I have previously explained, LRSD and Joshua both interpreted the term *assess* in § 2.7.1 to be a term of art that required LRSD to perform annual program assessments and program evaluations of the § 2.7 programs to determine their effectiveness.[37]  Finally, this is precisely how LRSD construed § 2.7.1, as evidenced by page 148 of the March 15, 2001 Final Compliance Report and in its decision to prepare two global evaluations to satisfy subpart A of the 2002 Compliance Remedy.[38]

_____

[37]During the 2002 unitary status hearing, Dr. Lesley's testimony  made it very clear that LRSD and Joshua both knew the definitions of and distinctions between a "program assessment" and a "program evaluation."  Dr. Lesley defined a *program assessment* as something that is "dynamic, it is interactive, it's ongoing, it happens frequently, and it is a measurement, along with the analysis that you would make of whatever results are available."  *LRSD I*, 237 F. Supp. 2d at 1077.  In contrast, she defined a *program evaluation* as "more long term, it may consider observations or measurements in addition to test scores, and is guided by a set of research questions that are usually provided by whoever the consumer is of that report."  *Id.*  In *LRSD II*, 2004 WL 5187587, at *2, I summarized the distinction Dr. Lesley made between a program assessment and a program evaluation as follows:

> [A] program assessment is a relatively informal process that may not result in much documentation, while a program evaluation is a formal process that always involves the preparation of an often lengthy written program evaluation which is centered around carefully prepared research questions that the evaluation is designed to answer.

[38]In the Eighth Circuit's June 26, 2006 decision, neither the majority nor the dissent addressed the undisputed fact that LRSD and Joshua have always interpreted the word "assess," as used in § 2.7.1, to mean that LRSD must perform *both* informal program assessments *and* the far more rigorous program evaluations in order to determine the effectiveness of § 2.7 programs.  As a result, the panel erroneously construed § 2.7.1 as requiring LRSD to perform program only assessments -- not evaluations -- of the § 2.7 programs.  *LRSD v. NLRSD*, 451 F.3d 528, 536-37 (majority), 542 (dissent).

In the same vein, the Eighth Circuit suggested that "this litigation has been complicated by

Similarly, while nothing in the Revised Plan explicitly required LRSD to have a PRE Department, it appears that it would have been *impossible* for LRSD to discharge its program assessment and program evaluation obligations under § 2.7.1 without one.  By the time of the 2004 unitary status hearing, LRSD's PRE Department was no longer functioning and had only one employee, a statistician.  By ordering LRSD to reestablish its PRE Department with an experienced and qualified staff, I was requiring LRSD only to restore the *status quo ante* regarding PRE

---

the shifting terminology employed by LRSD, Joshua, and the district court" in the use of the terms "assessment," "evaluation," "program" and "key program."  *LRSD v. NLRSD*, 451 F.3d at 531-536.  I respectfully disagree.

From the first unitary status hearings in 2002, LRSD, Joshua, and I have all understood exactly what the term "assess" means in § 2.7.1.  We all know that this term, which is a term of art, required LRSD to perform *both* assessments *and* evaluations of the § 2.7 programs.  Similarly, we all understand what a § 2.7 program *is* and which of the § 2.7 programs are the *key* or most important programs.

When I required LRSD to "assess" the § 2.7 programs in subpart A of the 2002 Compliance Remedy, LRSD, Joshua, and I all understood this would require LRSD to prepare assessments of many of the § 2.7 programs *and* evaluations of some of the most important § 2.7 programs.  This explains why LRSD construed subpart A of the Compliance Remedy, which mentioned nothing about program evaluations and required LRSD only to "assess" the § 2.7 programs, to mean that it must prepare two global evaluations.

During the 2004 unitary status hearing, Dr. Lesley back-tracked from her earlier testimony in the 2002 unitary status hearing and stated that she did not believe § 2.7.1 and subpart A of the 2002 Compliance Remedy required LRSD to perform any evaluation of the § 2.7 programs.  However, she could provide no explanation for why, if she was correct, LRSD had expended hundreds of thousands of dollars to perform evaluations of the § 2.7 programs in order to satisfy its obligations under § 2.7.1 as documented in the March 15, 2001 Final Compliance Report and the March 12, 2004 Application for Unitary Status.  Finally, Dr. Ross offered compelling testimony explaining why, as a long time consultant to LRSD, he and top LRSD administrators had always construed § 2.7.1's obligations "to assess the § 2.7 programs" as requiring LRSD also to prepare evaluations of those programs.  *LRSD II*, 2004 WL 5187587, at *27.

As the finder of fact in the 2004 unitary status hearing, I had an opportunity to closely observe Dr. Lesley and to assess her credibility.  In my 2004 Findings of Fact, I stated the following:

> I do not put much stock in Dr. Lesley's testimony at this last hearing.  (Her testimony in the unitary status hearings in 2002 was quite helpful.)  Her answers to pointed questions were often indirect and marked by semantics.  I got the distinct impression that she wanted to avoid giving answers that would be harmful to LRSD's position.

Since I found Dr. Lesley's testimony on this point was not to credible, there is *no evidence* in either the 2002 or 2004 unitary status hearing to support the notion that § 2.7.1 required LRSD to perform only program assessments.  On the other hand, there is a mountain of evidence which establishes that both LRSD and Joshua have always interpreted "assess," as it was used in § 2.7.1, to be a term of art that required LRSD to perform program assessments and program evaluations.

Department staffing and operations -- something that was *essential* if LRSD ever expected to meet its obligations under § 2.7.1. I do not believe that section A of the 2004 Compliance Remedy imposed a single new obligation on LRSD that was not part of what it originally agreed to do in order to discharge its obligations under § 2.7.1 of the Revised Plan.[39]

I hark back to § 201 of the Restatement of Contracts quoted in the introduction.

### B.    LRSD Must Create and "Deeply Embed" a Comprehensive Program Assessment Process

Section B of the 2004 Compliance Remedy,  required LRSD to use its PRE Department, in consultation with Dr. Ross, to devise a "comprehensive program assessment process" and then to "deeply embed" that process as a permanent part of LRSD's curriculum and instruction program. I defined "comprehensive program assessment process" to mean and include both "formal evaluations" of key § 2.7 programs and "informal program assessments."[40]

During the June 2004 unitary status hearing, LRSD witnesses testified that, each school year, LRSD implemented numerous § 2.7 programs to improve the academic achievement of African-American students.  Some of those programs were pilot projects that were only offered at one school to a relatively small number of students.  Other § 2.7 programs had been used for several years in numerous schools and were regarded as key § 2.7 programs that appeared to offer the most promise in improving the academic achievement of African-American students.  The testimony during the

---

[39]In *LRSD v. NLRSD*, 451 F.3d at 542, the dissent characterized my requiring LRSD to hire a new team for PRE as a "significant abuse of discretion."  Based on the entire record -- which reflects the clear, abiding understanding of the parties before the 2004 hearing -- I do not agree.

[40]In *LRSD II*, I explained that "[t]he comprehensive program assessment process must include formal step 2 evaluations of certain key § 2.7 programs . . . [and] preparing informal program assessments that involve interviews with teachers, informal evaluations of test scores, and the other things normally associated with the more dynamic program assessment process."  *LRSD II*, 2004 WL 5187587, at *32.  Thus, in requiring LRSD to devise and implement a comprehensive program assessment process, section B of the 2004 Compliance Remedy merely spelled out for LRSD what it knew and understood § 2.7.1 to mean.

June 2004 unitary status hearing made it clear that LRSD and Joshua both had a good understanding

what the *key* § 2.7 programs were.  I do not believe that requiring LRSD to evaluate only *key* § 2.7

programs is a new obligation under § 2.7.1, especially since LRSD had been performing annual

evaluations on its most important or key § 2.7 programs since it entered the Revised Plan in 1998.

The dissent in *LRSD v. NLRSD, et al.*[41] discussed at length the reasons why requiring LRSD

to "deeply embed" its program assessment process as a permanent part of LRSD's curriculum and

instruction program imposed a new contractual obligation on LRSD that was not contained in §

2.7.1. of the Revised Plan.  The dissent pointed out that:  (1) I did *not* "identify any objective

standards by which [I intended] to measure whether LRSD had succeeded in meeting this "deeply

embedded" requirement"; (2) the "deeply embedded" requirement was "impossibly subjective"; and

(3) I created "the unworkably subjective 'deeply embedded' standard . . . out of whole cloth in the

2004 Remedy."[42]

Upon mature reflection, I wholeheartedly agree with the dissent's criticism of my decision

to require LRSD to "deeply embed" the program assessment process as a permanent part of its

curriculum and instruction program.  Section 2.7.1 of the Revised Plan and subpart A of the 2002

Compliance Remedy required LRSD to create and implement a program assessment process capable

of allowing it to prepare annual program assessments and program evaluations of the § 2.7

programs as a way of determining the effectiveness of those programs in imposing the academic

achievement of African-American students.  Nothing in either § 2.7.1 or the 2002 Compliance

Remedy can fairly be construed to mean that LRSD must "deeply embed" the program assessment

---

[41]451 F.3d at 541-543.

[42]*Id.* at 542-43.

process as a permanent part of its curriculum and instruction program.[43]  Additionally, as the dissent

points out, trying to apply an entirely subjective "deeply embedded" standard is a bridge too far --

like trying to reach the mirage in the desert.

In § 2.1 of the Revised Plan, LRSD agreed to act in "good faith":

> LRSD shall in good faith exercise its best efforts to comply with the Constitution, to remedy the effects of past discrimination by LRSD against African-American students, to ensure that no person is discriminated against on the basis of race, color, or ethnicity in the operations of LRSD and to provide an equal educational opportunity for all students attending LRSD schools.[44]

In the 2002 Memorandum Opinion, I found that, in the areas in which LRSD was held to be unitary,

it had "complied with its obligations under § 2.1 of the Revised Plan and that, in the future, it could

be trusted to follow the Covenants and the Constitution."[45]

I now realize that, in section B of the 2004 Compliance Remedy, I should have adopted the

"good faith" compliance standard imposed under § 2.1, rather than crafting a "deeply embedded"

compliance standard "out of whole cloth."[46]  The language I should have used in section B, rather

than the "deeply embedded" standard, is as follows:  LRSD must act in good faith (as explicitly

required by § 2.1 of the Revised Plan) to implement the program assessment process required by §

2.7.1 of the Revised Plan.[47]  In the Findings of Fact, I will use this "good faith" compliance standard

---

[43]In hindsight, I probably imposed this new obligation on LRSD because I believe it is so important for LRSD to honor the commitment it made in § 2.7 and § 2.7.1.  Of course, my personal feelings are irrelevant with respect to the plain meaning of § 2.7.1.

[44]Doc. No. 3107, Ex. A.

[45]*LRSD I*, 237 F. Supp. 2d at 1046.

[46]*LRSD v. NLRSD*, 451 F.3d at 542.

[47]While I have acknowledged my error in imposing on LRSD the "deeply embedded" obligation, I hope LRSD realizes the need for making the program assessment process a permanent part of its curriculum -- not because a federal judge thought it was a good idea, but because it is the right thing to do to help improve the academic achievement.

to determine whether LRSD has substantially complied with section B of the 2004 Compliance Remedy, rather than the "deeply embedded" compliance standard contained in the June 2004 Decision.

### C.   LRSD Must Prepare Eight Evaluations of Key § 2.7 Programs Over Two Academic School Years (2004-05 and 2005-06)

As I have previously explained, on March 15, 2002, a number of months *before* I began the 2002 unitary status hearing, LRSD filed a Final Compliance Report which documented everything it had done to satisfy all of the obligations in the Revised Plan.  On page 148 of that document, LRSD stated that, over the last three years, it had prepared program *evaluations* on fourteen specifically identified § 2.7 programs to satisfy part of its obligations under § 2.7.1.  However, during the subsequent unitary status hearing, testimony established that, by June 1, 2002, LRSD had prepared only six of the fourteen program evaluations.

Once again, it is important to remember that LRSD's 2002 Final Compliance Report set forth the things LRSD had done to substantially comply with its understanding of the obligations in the Revised Plan.  Page 148 of that document makes it crystal clear that LRSD construed § 2.7.1's obligation to *assess* the § 2.7 programs as requiring it to prepare fourteen program evaluations, over three school years (1999 through 2001).  To comply with *its own interpretation* of § 2.7.1, LRSD should have prepared approximately four program evaluations during each of those three years.[48]

_____

[48]In subpart C of the 2002 Compliance Remedy, I required LRSD to prepare the eight missing evaluations of the specifically identified § 2.7 programs using testing and performance data generated during the three *previous* school years when LRSD should have prepared those evaluations.  Contrary to the Eighth Circuit's characterization of subparts A and C of the 2002 Compliance Remedy, there was nothing "bifurcated" or inconsistent about those respective remedies, both of which were based on the identical interpretation of LRSD's obligations under § 2.7.1 of the Revised Plan.  *LRSD v. NLRSD*, 451 F.3d at 536.  Similarly, there is nothing in the record from the 2002 and 2004 unitary status hearings which supports the Eighth Circuit's statement that: "Subpart C of the 2002 Remedy exceeded the scope of the Revised Plan, which lacked any requirement for program evaluations."  *Id.* at 537.

In the 2004 unitary status hearing, Dr. Ross testified that he believed a school district the size of LRSD should be expected to prepare four or five § 2.7 programs evaluations each year in order to comply with its § 2.7.1 obligation to assess the effectiveness of the § 2.7 programs.  This number of annual program evaluations coincided almost exactly with the average number of annual program evaluations LRSD had earlier determined that it was required to prepare, over the 1999 to 2001 school years, in order to comply with its obligations under § 2.7.1.[49]

Using LRSD's own construction of the number of program evaluations it should prepare each year to satisfy its obligations under§ 2.7.1, I specified in section C of the 2004 Compliance Remedy that LRSD must prepare program evaluations on *four* key § 2.7 programs during both the 2004-05 and 2005-06 school years.  Thus, section C of the 2004 Compliance Remedy did *not* impose any  obligations on LRSD that were not contained in § 2.7.1, as LRSD had construed and attempted to implement those obligations since the time it agreed to the Revised Plan in 1998.  Rather, it only required LRSD to prepare the *same number* of annual evaluations of § 2.7 programs that: (1) it believed it was required to prepare in order to satisfy its own understanding of its obligation under § 2.7.1, as acknowledged on page 148 of LRSD's 2002 Final Compliance Report; and (2) its own long-time consultant testified was reasonable for a school district the size of LRSD.

Finally, I suggested that LRSD use Dr. Ross to prepare as many of the eight evaluations as possible.  As I pointed out in the 2004 Memorandum Opinion, a number of years ago, Joshua agreed, in writing, that Dr. Ross possessed the qualifications necessary to prepare program evaluations and to act as a  consultant for LRSD in its efforts to comply with its obligations under the Revised Plan.[50] Since that time, LRSD has regularly used the services of Dr. Ross, and he is thoroughly familiar with LRSD's compliance efforts under the Revised Plan. I suggested that LRSD continue to use

---

[49]*See* page 148 of LRSD's March 15, 2002 Final Compliance Report (Doc. No. 3410).

[50]*LRSD II*, 2004 WL 5187587, at *9.

Dr. Ross only because I was concerned that, if LRSD selected another consultant to prepare the program evaluations, Joshua would challenge the new consultant's qualifications, and I would be required to referee another contentious dispute.

### D.      The General Organization and Content of the Eight Program Evaluations

During the June 2004 unitary status hearing, the parties introduced into evidence Regulation IL-R1, which the LRSD Board of Directors approved shortly after I filed the September 2002 Decision.  Regulation IL-R1 established the criteria that LRSD developed and agreed to follow in preparing the program evaluations necessary to satisfy its obligations under subpart A of the 2002 Compliance Remedy.[51]

Section D of the 2004 Compliance Remedy contains obligations that I took directly from Regulation IL-R1.  LRSD voluntarily adopted Regulation IL-R1 to govern the organization and content of the program evaluations it prepared to satisfy § 2.7.1 and subpart A of the 2002 Compliance Remedy.  In section D of the 2004 Compliance Remedy, I incorporated most of the requirements in Regulation IL-R1.[52]  In doing so, there were no *new* obligations imposed on LRSD that went beyond what it had already agreed was required to do.

### E.      Record Keeping Obligations

As a way of *relieving* LRSD of the record keeping obligations in subpart B of the 2002 Compliance Remedy, section E of the 2004 Compliance Remedy required the outside consultants who were selected to prepare the eight § 2.7 program evaluations to discharge all of the record keeping obligations that were previously imposed on LRSD.  Obviously, nothing in section E imposed any new contractual obligations on LRSD.

---

[51]*LRSD II*, 2004 WL 5187587, at *7.

[52]On December 16, 2004, LRSD replaced Regulation IL-R1 with Regulation IL-R.  As will be discussed later, Regulation IL-R is a significant improvement over Regulation IL-R1.

### F.      Obligation to Keep ODM and Joshua Informed

Section F required LRSD to provide the Office of Desegregation Monitoring ("ODM") and Joshua: (1) with the names of the eight § 2.7 programs that PRE and Dr. Ross selected for evaluation; and (2) a copy of the comprehensive program assessment process adopted by LRSD's Board of Directors.  Numerous sections of the Revised Plan obligated LRSD to keep ODM and Joshua informed of its progress in complying with its desegregation obligations.  Section F merely continued that policy, without imposing any new obligations on LRSD.

### G.      The Role of ODM

Section H reiterated ODM's role in assisting LRSD to meet its obligations under the 2004 Compliance Remedy.  The Eighth Circuit ordered the creation of ODM and charged it with the duty of monitoring and assisting the three Pulaski County school districts to meet their respective desegregation obligations.  There is nothing in section H that imposed any new obligations on LRSD.

### H.      The Role of Joshua

In section I, I restated that Joshua was expected "to fulfill its traditional role of monitoring LRSD's compliance obligations."  There is nothing in section I that imposed any new obligations.

### I.      Deadlines for Filing Program Evaluations

Section J required LRSD to file the four program evaluations for the 2004-05 school year no later than October 1, 2005.  The four program evaluations for the 2005-06 school year were required to be filed no later than October 1, 2006.

### J.      Deadline for Filing Compliance Report

Section K gave LRSD until October 15, 2006, to file its Compliance Report "documenting its compliance with its obligations under § 2.7.1 of the Revised Plan, as specified in this Compliance Remedy."

K.       **No New Obligations**

In this section, I made it clear that the 2004 Compliance Remedy was *not* intended to impose any new obligations on LRSD but only to state with greater specificity the obligations I thought LRSD understood it was required to meet in order to satisfy subparts A and B of the 2002 Compliance Remedy. Because of the Eighth Circuit's concerns about the scope of the 2004 Compliance Remedy, I believe this section deserves to be quoted in full:

> L. This Compliance Remedy is intended to supersede and replace the *identical compliance obligations* that I imposed on LRSD, albeit with less specificity, in subparts A and B of Section VII of the September 13 [2002] Decision.[53]

As I have previously acknowledged, section B of the 2004 Compliance Remedy added a significant new obligation, not found in § 2.7.1 or the 2002 Compliance Remedy, which required LRSD to *deeply embed* the comprehensive program assessment process as a permanent part of its curriculum and instruction program. However, with that exception, I am satisfied that the remainder of the 2004 Compliance Remedy fairly met *LRSD's request* that I specify in greater detail the obligations that LRSD and Joshua both knew and understood to be contained in § 2.7.1 and subparts A and B of the 2002 Compliance Remedy.

III.   **Findings Of Fact And Conclusions of Law**

A.       **Burden of Proof**

1.       In my Findings of Fact and Conclusions of Law in the June 30, 2004 Order,[54] I explained why LRSD had the burden of proving its substantial compliance with the 2004 Compliance Remedy.

---

[53]*LRSD II*, 2004 WL 5187587, at *33 (emphasis added).

[54]*LRSD II*, 2004 WL 5187587, at *19.

2.      I incorporate and adopt my previous analysis of the burden of proof issue in *LRSD II* as my conclusion of law on that point for purposes of the current unitary status hearing.

**B.      LRSD's Substantial Compliance with Each Section of the 2004 Compliance Remedy**

**1.      Section A: Hire a Team of Professionals to Reinvigorate PRE**

1.      After I entered the June 2004 Compliance Remedy, LRSD acted in a timely manner to hire a highly qualified director of PRE, as well as three statisticians, two testing assistants, and a full time secretary.  Dr. Sharon DeJarnette, the new director of PRE, obtained her masters degree from Columbia University and her Ph.D. from UCLA.  The topic of her dissertation was the preparation and use of program assessments to gauge the progress of English language learners.  Prior to being hired by LRSD, she had over five years of experience preparing program evaluations of comprehensive school improvement programs as the Research Director for the Galef Institute.

2.      During the January 2007 unitary status hearings, I heard testimony from Dr. DeJarnette and three statisticians in PRE, Dr. Ed Williams, Ms. Mareso Robinson, and Mr. Jim Wohlleb.  All four of these employees were knowledgeable, competent, and well educated, with considerable training and experience in statistics.  All four of these employees were also quite knowledgeable about preparing and using assessments and evaluations to determine the effectiveness of academic programs designed to improve the academic achievement of students.

3.      Dr. DeJarnette began working as the director of PRE in October of 2004.  In December, mandatory downsizing of all of LRSD's administrative departments caused her to lose her secretary.  Additionally, one of her testing coordinators left for a position in the PCSSD.  Because these positions remained vacant for several months, Dr. DeJarnette complained that it was harder for PRE to perform its work and forced the remaining staff to work longer hours.  These positions have been restored now and PRE is back to its original seven person staffing level.

4.      Dr. Ed Williams, a statistician who has the longest tenure in PRE, testified that, after one of the testing coordinators left in 2005, he temporarily assumed those duties, in addition to his duties as a statistician.  In November 2005, Arthur Oles was hired to fill this test coordinator position.  Mr. Oles left the position in September of 2006, and Dr. Williams again assumed those duties until the position was filled on October 26, 2006.  According to Dr. Williams, throughout the time PRE was required to discharge obligations under the 2004 Compliance Remedy, it was adequately staffed.  I fully credit Dr. Williams's testimony and find that LRSD adequately staffed PRE during the relevant compliance period.  The temporary vacancies in PRE were simply the result of normal attrition or downsizing that routinely occurs in organizations the size of LRSD.  It was never my intention to require LRSD to meet its obligations in the 2004 Compliance Remedy with "mathematical precision."  Rather, consistent with the language in the Revised Plan, I expected LRSD to substantially comply with its obligations.  The evidence during the January 2007 unitary status hearings fully supports my finding that LRSD has substantially complied with all of its obligations in section A of the 2004 Compliance Remedy.

### 2.      Section B:  Act in Good Faith to Devise and Implement a Comprehensive Program Assessment Process

1.      Shortly after entry of the 2004 Compliance Remedy, LRSD began work to satisfy its obligations under section B.  Dr. DeJarnette, Dr. Olivine Roberts,[55] and Dr. Ross worked together to devise a comprehensive program assessment process.  I find all three of these individuals are very knowledgeable in preparing and using program assessments and program evaluations.  And all three are qualified to devise and implement a comprehensive program assessment process for LRSD.

---

[55]LRSD's Director of Curriculum and Instruction.

2.      Together Drs. DeJarnette, Roberts, and Ross devised a comprehensive program assessment process for LRSD, which was set forth in Regulation IL-R.[56]  Importantly, this regulation, in conjunction with LRSD Policy IL,[57] makes it clear that LRSD agrees to prepare all future program evaluations in accordance with the standards developed by the national Joint Committee on Standards for Educational Evaluation.  During the numerous unitary status hearings held since 2002, Dr. Ross and several other witnesses have testified that these are the highest and most rigorous standards for preparing a program evaluation.  I find that Regulation IL-R, in conjunction with Policy IL, substantially complies with the obligation in section B that LRSD devise a comprehensive program assessment process.

3.      Baker Kurrus and several other members of the LRSD Board testified that, on December 16, 2004, LRSD's Board unanimously approved Regulation IL-R.  To date, LRSD's Board has approved Program Evaluation Agendas annually requiring four programs to be evaluated during the 2004-05, 2005-06, and 2006-07 school years.  The first eight of those evaluations were required by section C of the 2004 Compliance Remedy.  LRSD's Board *voluntarily elected* to evaluate four § 2.7 programs during the 2006-07 school year.  LRSD Board members testified that LRSD intends to continue this practice for the foreseeable future.

4.      During the 2002 unitary status hearing, Dr. Bonnie Lesley[58] testified that PRE had done a good job of preparing annual assessments of the § 2.7 programs.  According to Dr. Lesley, an "assessment" was much more informal and "dynamic" than a "program evaluation."  She also made it clear that § 2.7.1 of the Revised Plan required LRSD to prepare both assessments and evaluations on the § 2.7 programs.  The evidence in the 2002 and 2004 unitary status hearings

---

[56]*See* Joshua's Exhibit 6.

[57]*See*e Joshua's Exhibit 4.

[58]LRSD's Associate Superintendent of Curriculum.

established that PRE has generally performed well in preparing the program assessments required by § 2.7.1.

5.      In section B of the 2004 Compliance Remedy, at footnote 39, I explained that the "comprehensive program assessment process" required LRSD: (a) to prepare formal evaluations of some of the key § 2.7 programs; *and* (b) to prepare informal program assessments of other § 2.7 programs.   The evidence during the 2004 unitary status hearing established that LRSD failed to satisfy its program evaluation obligations under § 2.7.1 -- not its program assessment obligations. Thus, sections B and C of the 2004 Compliance Remedy primarily focused on the things LRSD needed to do to satisfy its program evaluation obligation under § 2.7.1.   This explains why Regulation IL-R primarily discussed the criteria to be followed in preparing formal program evaluations.   However, it also specifically provided that LRSD was obligated to prepare "summative" or formal evaluations; informal assessments; less rigorous formative evaluations; and fast or brief "snapshots" of programs.   Regulation IL-R noted: "As rigor and formality diminish along the range of review, fewer standards apply."[59]

6.      On November 16, 2006, LRSD's Board approved a Resolution which states its intention: (a) to "continue to assess LRSD programs, particularly those [§ 2.7] programs designed to improve and remediate the achievement of African-American students"; and (b) "to continue to follow the comprehensive program assessment process approved by the Board on December 16, 2004, even after LRSD is released from federal court supervision."[60]  By approving Regulation IL-R and the November 16, 2006 Resolution, LRSD's Board has acted in good faith to implement the program assessment process required by § 2.7.1 of the Revised Plan.

---

[59] *See* Joshua's Exhibit 6 at p. 1.

[60] *See* LRSD's Exhibit 5.

7.      Dr. Olivine Roberts, Dr. Ed Williams,[61] and Dr. Hugh Hattabaugh[62] all testified at length about how LRSD has acted in good faith to implement the comprehensive program assessment process.  Dr. Roberts testified that, since the adoption of Regulation IL-R, PRE has made an annual recommendation to the Board that it adopt a program assessment agenda and the Board has always approved that agenda.  Using those annual agendas, LRSD has prepared the program evaluations that I required in section C of the 2004 Compliance Remedy, as well as additional voluntary evaluations of other § 2.7 programs -- including the Voyager Reading program and the Transition to Advanced Math program.  LRSD has also evaluated several § 2.7 initiatives including Avid, an in-school support system for college bound African-American students, and another initiative designed to increase the number of African-American students enrolled in advanced placement courses.  Finally, Dr. Roberts testified about how LRSD has performed annual program assessments -- which are more informal and dynamic than program evaluations -- of other § 2.7 programs.

8.      Dr. Roberts testified that the program evaluations LRSD was required to prepare in order to satisfy sections B and C of the 2004 Compliance Remedy greatly helped LRSD to identify the § 2.7 programs that were actually working to improve the academic achievement of African-American students.  LRSD Board member Baker Kurrus testified that, even though LRSD appealed the June 2004 Decision to the Eighth Circuit, he believed the Compliance Remedy was very helpful and set forth a "very positive approach" for LRSD to follow in meeting its obligations under § 2.7.1. Dr. Katherine Mitchell, the current chair of the Board, also testified that the 2004 Compliance Remedy contained the elements LRSD needed to satisfy in order to meet its obligations under § 2.7.1.  As noted earlier, the Eighth Circuit ultimately affirmed the 2004 Compliance Remedy, but

---

[61]A PRE statistician.

[62]LRSD's Deputy Superintendent.

it questioned the need for the prescribed remedy and criticized a number of its requirements as going beyond what LRSD agreed to do in § 2.7.1.  I am pleased that LRSD's top administrators and Board members recognized the soundness of the 2004 Compliance Remedy and why the specific requirements were necessary to address the shortcomings in LRSD's initial attempt to satisfy its obligations under § 2.7.1, as those obligations were more generally described in the 2002 Compliance Remedy.

9.      Dr. Roberts made it clear that the eight § 2.7 program evaluations prepared by Drs. Ross and Catterall[63] were beneficial to LRSD in determining the effectiveness of those programs in improving the academic achievement of African-American students.  In addition, she testified that LRSD has agreed to implement *all* of the changes and modifications to those eight programs that were recommended by Drs. Ross and Catterall.

10.     The evaluations of the Pre-K program, the Smart Thrive program, the Reading Recovery program, the Year Round Education program, and the A Plus program demonstrated that all five of those § 2.7 programs are improving the academic achievement of African-American students.  While the evaluations of the Read 180 program, the 21st Century program, and the Compass Learning program demonstrated no statistical benefits in improving the academic achievement of African-American students, the evaluators believed that, after making changes in these three programs, they also should show a statistical benefit in improving the academic achievement of African-American students.  Therefore, LRSD has implemented, or is in the process of implementing, all of the recommended changes and is continuing all eight of those programs during the current school year.  Finally, LRSD has performed, or intends to perform, follow-up annual evaluations on these eight programs to determine their effectiveness after all of the recommended changes have been implemented.

---

[63]An expert who, in addition to Dr. Ross, conducted program evaluations.

11.     Dr. Roberts testified that LRSD is in the process of completing a "Data Warehouse" where all district, school, and student data will be maintained in a central data storage facility that will be accessible to authorized personnel, such as PRE employees.   LRSD has elected to use Business Objects software to develop this data warehouse.   Before the 2004 Compliance Remedy, LRSD had used Business Objects software to manage its financial data for a number of years.   In 2005, LRSD administrators decided to use this same software to create the Data Warehouse, which will eventually contain *all* of LRSD's data -- including district, school, and student data.   LRSD administrators chose to use Business Objects software, rather than competing software sold by TetraData.   Dr. Roberts saw the competing presentations on the Business Objects software and the TetraData software, and she believes the Business Objects software can access and configure the data needed by PRE to prepare future program assessments and program evaluations.   Assuming the Data Warehouse performs as expected, this will make it much easier for PRE to perform program assessments and gather the data needed to prepare the more rigorous and expensive program evaluations.

12.     Dr. Roberts testified that, once the Data Warehouse is complete, PRE should be able to access by computer all of the information needed to prepare assessments and evaluations of § 2.7 programs.   As explained by Dr. Roberts, all students who have participated in any of the § 2.7 programs are "tagged" in the Data Warehouse so that PRE can pull up a tagged student's name to see how many § 2.7 programs he or she has participated in, as well as the standardized test scores and grades for the student both before and after exposure to § 2.7 programs.   This will also allow PRE to track the tagged students over time to assess how they are performing after completing each specific § 2.7 program.   This should allow PRE to gauge the effectiveness of the § 2.7 programs on a more expedited basis.

13.     According to Dr. Roberts, LRSD has used the Data Warehouse to create overall Curriculum Maps that will provide the infrastructure upon which School Portfolios will be constructed at all elementary, middle, and high schools.  Dr. Roberts believes these Curriculum Maps are necessary before LRSD can build School Portfolios in the Data Warehouse.  Eventually, these School Portfolios will contain all of the relevant performance data for students in a particular school and can be used to determine how well a school has implemented a § 2.7 program, as well as how students are performing, on a school-by-school basis, in those § 2.7 programs.  LRSD intends to begin implementing School Portfolios at ten schools during the 2007-08 school year and complete the process over the following two school years.

14.     Dr. Roberts, Dr. Williams, and Mr. Kurrus all testified at length about why they believed LRSD had "deeply embedded" the comprehensive program assessment process in Regulation IL-R as a permanent part of its curriculum.  I have already explained why I should not have used such a subjective standard to determine whether LRSD had met its compliance obligations. Nevertheless, after hearing everything that has been done to make the comprehensive program assessment process a permanent part of LRSD's curriculum, as explained by Drs. Roberts, Williams, and Mr. Kurrus, I believe it would be hard to find that it has not been "deeply embedded."

15.     Dr. Williams testified that, in July 2006, LRSD began "live training" with its employees on how to using and accessing data from the Data Warehouse.  While there are still some data points that need to be added to the Data Warehouse, Dr. Williams believes it will meet PRE's needs in accessing the data required to prepare program assessments and evaluations.

16.     Dr. DeJarnette[64] and Jim Wohlleb[65] were critical of LRSD's decision to use Business Objects software.  Both testified that TetraData was superior software that was specifically designed

---

[64]Director of PRE.

[65]A PRE statistician.

to configure data for use in preparing program assessments and program evaluations.  They were critical of the amount of training they had received in using the Business Objects software and believed that the Data Warehouse contained too many errors and was still too incomplete to allow PRE to use it as a source for preparing assessments and evaluations of the § 2.7 programs.  Both testified that, only a few days before the commencement of the January 2007 unitary status hearing, they tried to access the Data Warehouse to get the student data needed to prepare a hypothetical assessment of one of the § 2.7 programs.  They testified that, because so few of the students in the § 2.7 programs have been tagged, they could get only one of the eight data points necessary to prepare the hypothetical assessment.  Finally, they testified that they had invited a representative of ODM and Joshua to view the inadequacies of the Business Objects software and the Data Warehouse.  Dr. DeJarnette also criticized LRSD's delay in implementing the School Portfolios and in creating an unreliable Data Warehouse that she may not be able to use to prepare future program assessments and program evaluations.

17.    Dr. Hugh Hattabaugh testified that LRSD decided to use Business Objects software because it can be used to access financial and budget data, as well as the student data needed by PRE. According to Dr. Hattabaugh, TetraData cannot be used to access financial and budget data. Additionally, Business Objects software allows LRSD to create a Data Warehouse on its own servers, which allows it to own and control the data.[66]

18.    I fully credit Dr. Hattabaugh's explanation of why LRSD elected to use Business Objects software, rather than TetraData software, to create the Data Warehouse.  I find that LRSD acted in good faith when selecting the Business Objects software, which Drs. Roberts, Williams, and

---

[66]TetraData requires school districts that use its software to store all of their data on its server in North Carolina.  School districts are then charged an annual per student fee to access information from TetraData's server.

Hattabaugh all believe will fully meet the needs of PRE in preparing program assessments and evaluations.

19.     LRSD hired the Janis Group to create the Data Warehouse using the Business Objects software.  Mr. Larry Naeyaert , the director of business intelligence for the Janis Group, was assigned the LRSD Data Warehouse project in 2005.  For most of 2005 and all of 2006, he worked essentially full-time in Little Rock installing the Business Objects software and creating the Data Warehouse. As a former employee of Business Objects, Mr. Naeyaert is thoroughly familiar with the operation of that software.  He also is a specialist in setting up business intelligence systems and data bases.

20.     Mr. Naeyaert testified in detail about how: (a) student testing, performance, demographics, scheduling, and observational data were entered into the Data Warehouse; (b) security features have been installed to protect student data; (c) data have been "normalized" to make it available in a common format, which can be matched to a particular student's name; (d) errors have been corrected in the testing and achievement data and a computer program developed to check each night for any input errors that may have occurred earlier in the day; (e) individual student "data marts" were created that include all of the data that PRE employees said they needed to prepare program assessments and evaluations; (f) a student tagging system was developed to track all of the students who have been in any of the § 2.7 programs; and (g) five full days of training were provided to all PRE employees.[67]

21.     Mr. Naeyaert testified that LRSD's Data Warehouse is almost complete, although it will be necessary to update it on a continuing basis with  new data.  The only incomplete data, not yet in the system, are the past school year's achievement data, teacher certification data, and "perception" data.  Mr. Naeyaert testified that, in July and October of 2006, he performed multiple

---

[67]Dr. DeJarnette attended only a little over one day of that training.

live demonstrations using the Data Warehouse for PRE employees, and the Business Objects software was able to access the requested information from the Data Warehouse.

22.     LRSD recalled Mr. Naeyaert, as a rebuttal witness, to controvert the testimony of Dr. DeJarnette and Mr. Wohlleb that, shortly before the January 2007 unitary status hearing, they were unable to access the Data Warehouse and obtain the data they needed for a hypothetical program assessment.  Mr. Naeyaert demonstrated how he was able to access the Data Warehouse and obtain all of the data that Dr. DeJarnette and Mr. Wohlleb testified they were unable to access.

23.     Dr. DeJarnette, Mr. Wohlleb, Dr. Roberts, Dr. Williams, and Mr. Naeyaert all agreed that LRSD maintains "data silos" (individual servers) in numerous departments, which contain *all* of the information PRE needs to prepare program assessments and evaluations.  To access these data silos, PRE sends a "radar request" to LRSD's information technology department. Data specialists then go to the data silos and assemble the requested data.  Dr. DeJarnette and Mr. Wohlleb testified it usually takes two days or less for the data specialists to provide PRE with all of the requested data. Thus, even if the Data Warehouse failed to provide PRE with the data it needed, it could still prepare program assessments and evaluations using radar requests to access the data from the decentralized data silos where it is also maintained.  The software concerns about perceived problems with the Data Warehouse represent a difference of opinion and preference, but the choice of Business Objects in no way indicates that LRSD has failed to comply with its obligations.

24.     Dr. DeJarnette testified that the Data Warehouse was necessary in order to deeply embed Regulation IL-R.[68]  She also believes that the creation of School Portfolios is required under Regulation IL-R.  However, Regulation IL-R, which sets forth LRSD's comprehensive program assessment process, says nothing about LRSD's agreeing to create a "Data Warehouse," nor does

---

[68]Joshua's Exhibit 6.

it mention "School Portfolios."[69]  In short, there is nothing in the 2004 Compliance Remedy or Regulation IL-R which obligates LRSD to create a Data Warehouse or School Portfolios or to accomplish those two objectives before the comprehensive program assessment process could be deemed to be "deeply embedded."  Clearly, LRSD administrators voluntarily decided to create a Data Warehouse and School Portfolios, in part, to make it easier for PRE to have access to the data it needed to perform assessments and evaluations.  While this decision may be a good one, it was *not* required by § 2.7.1, the 2004 Compliance Remedy, nor Regulation IL-R.

25.     According to Dr. DeJarnette, on December 1, 2006, LRSD Superintendent Roy Brooks suspended her, and a short time later she was notified that she had been discharged.  On January 8, 2007, LRSD's Board heard Dr. DeJarnette's appeal and reinstated her as director of PRE, effective January 10, 2007.  According to Dr. DeJarnette, Dr. Brooks discharged her because, contrary to his orders, she informed LRSD Board members in early November 2006 of perceived problems with LRSD's compliance efforts.  Dr. Brooks and Dr. Hattabaugh testified that Dr. DeJarnette was discharged because she had become openly defiant to her superiors and did not go through the proper chain-of-command when she communicated directly with LRSD's Board members.  Both denied that she was discharged because she believed LRSD had not met its obligations under the 2004 Compliance Remedy.

26.     The facts surrounding Dr. DeJarnette's discharge and reinstatement are *irrelevant* to whether LRSD has substantially complied with the 2004 Compliance Remedy.  Nevertheless, because Dr. DeJarnette's discharge and reinstatement may be raised on appeal, I will review briefly the relevant facts, which are essentially undisputed:

---

[69]The only time that phrase is even mentioned is on page 2, under one of the headings on a checklist that reads "Formative Evaluation Process (School Portfolios)."

(a)      By December of 2004, a few months after she was hired, Dr. DeJarnette had a dispute with her direct supervisor, Dr. Roberts, about a district-wide downsizing that caused her to believe she might lose one of her test administrators and her secretary.  Following this dispute, Dr. DeJarnette began complaining to Dr. Brooks about how Dr. Roberts was impeding the work of PRE.  Dr. DeJarnette asked Dr. Brooks to allow her to report directly to him, but he refused.

(b)      During 2005 and 2006, Dr. DeJarnette began to meet with Joy Springer, Joshua's primary monitor, without LRSD's attorney present.   She also began sharing with Ms. Springer draft documents of LRSD's compliance efforts, even though LRSD's attorney had explicitly directed her not to do this.

(c)      In August of 2006, PRE sent LRSD's attorney the final draft of the final quarterly update, which was dated September 1, 2006.[70]  In this update, Dr. DeJarnette raised what she thought were a number of problems with LRSD's efforts to comply with the 2004 Compliance Remedy.  All of the "compliance problems" raised by Dr. DeJarnette involve obligations that go beyond what was required under § 2.7.1 and the 2004 Compliance Remedy.

(d)      LRSD's attorney deleted almost all of Dr. DeJarnette's remarks in section D of the September 1, 2006 update, which criticized LRSD's efforts to comply primarily with the "deeply embedded" obligation in section B of the 2004 Compliance Remedy.[71]  This upset Dr. DeJarnette, who believed that LRSD's attorney was trying to keep the Board in the dark about potential problems with LRSD's compliance efforts.

---

[70]*See* Joshua's Exhibit 24.

[71]*See* LRSD's Exhibit 2H.

(e)      Sometime in October of 2006, one or more Board members found out about LRSD's attorney deleting a portion of PRE's draft of the September 1, 2006 quarterly update and asked Dr. Roberts to have Dr. DeJarnette advise the Board of what happened.  Dr. DeJarnette sent each Board member a letter dated November 3, 2006, along with a document captioned "PRE Compliance History 2004-2006."[72]

(f)      On December 1, 2006, Dr. Brooks suspended Dr. DeJarnette and, a short time later, fired her.  On January 9, 2006, the Board heard Dr. DeJarnette's appeal and voted 4-3 to reverse Dr. Brooks's decision and to reinstate Dr. DeJarnette.

27.     I fully credit Dr. Roberts's testimony detailing the long list of things LRSD did to implement and embed the comprehensive program assessment process contained in Regulation IL-R. I credit the testimony of Dr. Roberts, Dr. Williams, and Mr. Naeyaert on the current status of the Data Warehouse and School Portfolios, and the suitability of Business Objects software as a platform for accessing the information in the Data Warehouse.  I find that much of Dr. DeJarnette's and Mr. Wohlleb's criticism of the Data Warehouse, School Portfolios, and the Business Objects software lacks objectivity.

28.     I find that LRSD's administrators have substantially complied with their obligations in section B of the 2004 Compliance Remedy by implementing a comprehensive program assessment process as a permanent part of LRSD's curriculum.  I further find that, in implementing the comprehensive program assessment process, LRSD has acted in good faith.

29.     LRSD has gone the extra mile to ensure that its program assessment process is and will continue to be a permanent part of its curriculum.  I would be hard pressed not to conclude that LRSD has now "deeply embedded" that process as a permanent part of its curriculum, although this standard is now abandoned.

---

[72]*See* Joshua's Exhibit 31.

3.      **Section C: Prepare Four Evaluations of Key § 2.7 Programs During Each of the Next Two Academic Years (2004-05 and 2005-06)**

1.      To comply with section C of the 2004 Compliance Remedy, LRSD hired Dr. Ross and Dr. James S. Catterall.  Dr. Ross prepared evaluations of six key § 2.7 programs: (1) Reading Recovery;[73] (2) Compass Learning;[74] (3) Smart/Thrive;[75] (4) 21st Century Community Learning Centers;[76] (5) Read 180;[77] and (6) Pre-K Literacy.[78]  Dr. Catterall, another highly qualified consultant, prepared evaluations on two key § 2.7 programs:  (1) Year Round Education;[79] and (2) A+ Education.[80]

2.      For the 2004-05 school year, Drs. Ross and Catterall prepared evaluations of Reading Recovery, Compass Learning, Smart/Thrive, and Year Round Education.  LRSD timely filed these four evaluations with the Court on February 6, 2006.[81]

3.      For the 2005-06 school year, Drs. Ross and Catterall prepared evaluations of 21st Century Community Learning Centers, A+ Education, Read 180, and Pre-K Literacy.  The first three evaluations were filed on November 17, 2006, and the last evaluation was filed on December 15,

---

[73]LRSD Exhibit 1A.

[74]LRSD Exhibit 1B.

[75]LRSD Exhibit 1C.

[76]LRSD Exhibit 1E.

[77]LRSD Exhibit 1G.

[78]LRSD Exhibit 1H.

[79]LRSD Exhibit 1D.

[80]LRSD Exhibit 1F.

[81]*See* Doc. No. 3985.

2006. All four program evaluations were filed within the time limit specified in section J of the 2004 Compliance Remedy, as extended by my Order dated August 1, 2006.[82]

4.      LRSD used Dr. Ross to assist in identifying the eight key § 2.7 programs that were to be evaluated. Consistent with section F of the 2004 Compliance Remedy, LRSD provided timely written notice to the ODM and Joshua of the names of the eight key programs selected for evaluation. ODM and Joshua agreed to the eight key § 2.7 programs that were eventually selected for evaluation.

5.      In his evidentiary deposition,[83] Dr. Ross testified that the six evaluations he prepared met all of the requirements contained in the 2004 Compliance Remedy. He also testified that all six of these evaluations were "good evaluations," in that they accurately answered the research questions and reached statistically valid conclusions which demonstrated four of the programs[84] were working to improve the academic achievement of African-American students, and two of the programs[85] did not appear to be working. However, Dr. Ross testified that, after LRSD implemented recommended changes, these two programs should show a statistically significant benefit in improving the academic achievement of African-American students. Dr. Ross recommended that LRSD continue to offer all six of these § 2.7 programs. Since Dr. Ross's recommendation, LRSD has implemented the recommended changes in those two programs and plans to perform a follow-up evaluation to determine if, after the changes, the programs are now working. After reading all eight of these step 2 evaluations, I find that they comply, in all respects, with the 2004 Compliance Remedy.

---

[82]Doc. No. 4035.

[83]Court's Exhibit A.

[84]Reading Recovery, Smart/Thrive, Read 180, and Pre-K Literacy.

[85]Compass Learning and 21st Century Learning Centers.

6.      Dr. Ross testified that PRE provided him with all of the data he needed to prepare these six evaluations of § 2.7 programs.  While Dr. Ross identified several discrete problems with some of the data, he did not assert that these problems affected the validity or utility of the evaluations.  He also made it clear that "School Portfolios" were *not* necessary in order to access the data required to prepare accurate and reliable program evaluations.

7.      In his deposition,[86] Dr. Catterall testified that PRE provided him with all of the data he needed to prepare evaluations of the Year Round Education program and the A+ Education program.  He stated that the data he received from LRSD was better than the data he received from most school districts.  Dr. Catterall also indicated that the evaluations he prepared of these two § 2.7 programs complied with all of the requirements of the 2004 Compliance Remedy.  Finally, Dr. Catterall testified that School Portfolios were *not* needed in order to prepare program evaluations.

8.      In her evidentiary deposition,[87] Dr. Victoria Bernhardt, an outside consultant with expertise in using TetraData to construct Data Warehouses and School Portfolios for school districts, also confirmed that Data Warehouses and School Portfolios were *not* necessary in order to prepare a program evaluation.  Dr. Bernhardt believed TetraData software was easier to use than Business Objects software, and TetraData software was specifically developed to create Data Warehouses for school districts, unlike Business Objects software.  Finally, Dr. Bernhardt acknowledged that she owns stock options in TetraData.

9.      During the January 2007 unitary status hearings, Joshua offered little testimony challenging whether these eight evaluations of key § 2.7 programs satisfied the requirements in section C of the 2004 Compliance Remedy.  Dr. DeJarnette testified that one of the high school

[86]Court's Exhibit B.

[87]Court's Exhibit C.

principals, who had students participating in the 21st Century Community Learning Centers program, administered 120 end-of-course algebra exams but failed to have 40% of the exams graded. Dr. DeJarnette believed this may have affected the accuracy of Dr. Ross's evaluation of that program. She also testified that Dr. Ross did not receive all of the data from all of the schools participating in the Read 180 program because some of the servers containing that test score data were dismantled before that data could be given to Dr. Ross. She believed this loss of data may have limited the use of the Read 180 evaluation. In criticizing the accuracy of a small part of the data used in two of the program evaluations, Dr. DeJarnette makes too much of a small glitch. Her testimony falls well short of establishing any substantial problems with the data used in those evaluations sufficient to create a question concerning whether LRSD complied with the requirements in section C of the 2004 Compliance Remedy.

10.     In Joshua's November 15, 2006 Objections to LRSD's Compliance Report,[88] the only challenge it makes to any of the eight program evaluations is in paragraph 5, which contains the following cryptic statement: "[T]he evaluations of the Read 180 program and the 21st Century Community Learning Centers program contain insufficient descriptions of the program being evaluated to meet LRSD's own standards and the Court's Order."[89] To the extent that Joshua was serious about challenging sufficiency of how these two programs were described, they failed to present any evidence to support this argument during the January 2007 unitary status hearing. Accordingly, I find that LRSD has substantially complied with all of its obligations under section C of the 2004 Compliance Remedy.

---

[88]Doc. No. 4058.

[89]*Id.*

4.      **Section D:  Content and Organization of the Eight Evaluations of Key § 2.7 Programs**

1.      Each of the eight evaluations was designed to answer the following research questions: "Has the § 2.7 program being evaluated improved the academic achievement of African-American students, as it has been implemented in schools throughout the district?"  And each of these evaluations is organized and written in a way that makes the information readily understandable to a lay person such as I.

2.      Dr. Ross and Dr. Catterall both testified that PRE provided them with all of the support and assistance they needed to prepare the eight evaluations.  Dr. DeJarnette made it clear in the quarterly updates and in her testimony in the January 2007 unitary status hearing that she and the PRE department supervised the preparation of the eight evaluations and worked closely with Drs. Ross and Catterall to provide them with the data and other assistance they needed.  Dr. Williams also testified that PRE fulfilled its duties in overseeing the preparation of these eight evaluations and working closely with Drs. Ross and Catterall to provide the support and assistance they requested.

3.      I find that LRSD has substantially complied with all of the obligations in section D of the 2004 Compliance Remedy.

5.      **Section E: Record Keeping Obligation**

1.      After reviewing the eight step 2 evaluations, I find that Dr. Ross and Dr. Catterall performed all of the record keeping obligations required in section E of the 2004 Compliance Remedy.  In addition, during the January 2007 unitary status hearing, Joshua did not offer any arguments or testimony directed at challenging the obligations imposed under this section of the remedy.

2.      LRSD has substantially complied with all of the obligations in section E of the 2004 Compliance Remedy.

-41-

6.      **Section F: Notice Obligations**

1.      As I have previously stated, PRE timely provided ODM and Joshua with written notice of the eight key § 2.7 programs that PRE and Dr. Ross identified for program evaluations. PRE also provided ODM and Joshua with a final draft of the comprehensive program assessment process more than thirty days before it was presented for approval to the LRSD Board.  LRSD's Board approved the comprehensive program assessment process set forth in Regulation IL-R on December 16, 2004, well before the December 31, 2004 deadline.  Finally, during the January 2007 unitary status hearing, Joshua did not offer any evidence challenging LRSD's compliance with any of the obligations in this section of  the remedy.

2.      LRSD has substantially complied with all of the obligations in section G of the 2004 Compliance Remedy.

7.      **Section G: Quarterly Updates**

1.      LRSD timely filed the eight quarterly updates required by this section of the remedy. LRSD also provided ODM and Joshua with copies of these quarterly updates when each update was filed.

2.      The only contested aspect of LRSD's preparation of the quarterly updates concerns Joshua's assertion that LRSD's counsel improperly deleted information from section B of the final draft of the September 1, 2006 update that Dr. DeJarnette believed should have been included.  As previously explained, in section B of the final draft of the September 1, 2006 update, Dr. DeJarnette raised compliance concerns involving: (a) the Data Warehouse and School Portfolios; (b) errors and inaccuracies in some of the data contained in the Data Warehouse; and (c) the delay in completing both of those projects, which still had work that remained to be done, as of September 1, 2006.[90] Dr. DeJarnette believed the completion of both the Data Warehouse and School Portfolios were a

---

[90]*See* Joshua's Exhibit 24.

necessary and essential part of "deeply embedding" the comprehensive program assessment process as a permanent part of LRSD's curriculum.  She testified that, by editing out her criticism of LRSD's compliance efforts in section B of the September 1, 2006 quarterly update, LRSD's attorney was preventing LRSD's Board and the Court from receiving crucial information.

3.      As I have previously explained, nothing in the 2004 Compliance Remedy obligated LRSD to install a Data Warehouse or to create School Portfolios.  Similarly, Regulation IL-R does not mention the Data Warehouse or School Portfolios.  Finally, Dr. Ross and Dr. Barnhardt both testified that a school district could embed a comprehensive program assessment process, as a permanent part of its curriculum, without creating a Data Warehouse or School Portfolios.

4.      The information LRSD's attorney deleted from Dr. DeJarnette's final draft of the September 1, 2006 Quarterly Update has no bearing on the question of whether LRSD has substantially complied with the obligations contained in section B of the 2004 Compliance Remedy.

5.      I find that LRSD has substantially complied with all of the obligations in section G of the 2004 Compliance Remedy.

### 8.      Section H: The ODM

1.      During the 2007 unitary status hearing, Joshua called Gene Jones, one of the ODM monitors, to offer testimony regarding LRSD's alleged noncompliance.  While Mr. Jones conceded that the term "deeply embedded" has never been defined, and that he was not sure what that term meant, he nevertheless, stated that he did not believe that LRSD had "deeply embedded" the comprehensive program assessment process as a permanent part of its curriculum. Be that as it may, "deeply embedded" is no longer required.

2.      Mr. Jones also testified that, at Dr. DeJarnette's request, he was in PRE's office several days before the commencement of the January 2007 unitary status hearing to observe alleged failure of the Data Warehouse (to provide seven of the eight points of data she needed to prepare her

hypothetical program).  Mr. Jones did not indicate that he had taken an independent look at section B of the 2004 Compliance Remedy to determine whether it required LRSD to create a Data Warehouse and School Portfolios.  (It does not.)

### 9.     Section I: Joshua's Monitoring Obligations

1.     The 2004 Compliance Remedy reads:

> I want to be very clear on this point–if compliance problems arise, the parties must immediately bring them to my attention so that I can resolve them while there is still time for LRSD to make "mid-course corrections."[91]

2.     On June 26, 2006, the Eighth Circuit entered its decision affirming the June 2004 Compliance Remedy.[92]  The Court agreed that "Joshua had not waived its right to challenge either LRSD's interpretation of the 2002 Remedy or LRSD's claim that it had substantially complied with the requirements of that remedy."[93]   However, the Court went on to say:

> Nevertheless, in light of its failure to call to the district court's attention its disagreement with LRSD's interpretation of the 2002 order, it would ill behoove Joshua to raise any further technical complaints about LRSD's efforts to comply with the 2002 order.[94]

3.     Two days after the Eighth Circuit issued its June 26, 2006 decision Joshua filed an affidavit by Ms. Joy Springer.

4.     Ms. Springer is a long-time paralegal for Joshua's counsel.  She has considerable experience and has developed considerable expertise in the monitoring process.

---

[91]*Id.*.

[92]*LRSD v. NLRSD, et al.*, 451 F.3d 528 (8th Cir. 2006).

[93]*Id.* at 539.

[94]*Id.*

5.      During the January 2007 unitary status hearing, Ms. Springer testified, in a six-page affidavit dated June 28, 2006,[95] that she had brought to the attention of LRSD's Board her concerns about LRSD's compliance with its obligations under the 2004 Compliance Remedy.  Mr. Kurrus and several other LRSD Board members testified that this was their first notice that Joshua had any concerns about LRSD's compliance efforts.  This was less than 120 days before the deadline for LRSD to file its Final Compliance Report and twenty-one months into LRSD's compliance efforts.  On August 17, 2006, Ms. Springer wrote a letter to LRSD's attorney[96] detailing additional concerns that she had about LRSD's compliance efforts.

6.      Most of the alleged compliance problems noted by Ms. Springer in her affidavit arose during the 2005 school year.  The affidavit's list of problems include: inadequate professional development in the area of program assessments and evaluations; a delay in the use of questionnaires as part of the program assessment process; delays in the completion of the Data Warehouse; Drs. Brooks and Roberts "de-emphasiz[ing] the importance of PRE and the compliance remedy," by seldom, if ever, attending "PRE meetings" or "evaluation team meetings," and reducing or failing to fill positions in PRE; and LRSD's alleged failure to meet its obligation of "embedding program assessments" into its curriculum and instruction program.

7.      I would be hard pressed to find that Joshua's objections were timely filed in view of the Eighth Circuit language, quoted above, and in view of the language in the 2004 Compliance Remedy.[97]  Be that as it may, most compliance issues raised in the affidavit deal with matters that are clearly *not* required by the 2004 Compliance Remedy ("deeply embedding" is no longer required).  My previous findings make it clear that I reject Ms. Springer's view of the alleged

---

[95]Joshua's Exhibit 18.

[96]Joshua's Exhibit 19.

[97]*See LRSD II*, 2004 WL 5187587, at *34.

-45-

compliance problems which are covered by the 2004 Compliance Remedy.  Accordingly, I do not credit them in determining whether LRSD is in compliance.

### 10.    Section J:  Deadline for LRSD to File Program Evaluations

1.    As previously explained, LRSD filed the eight evaluations of key § 2.7 programs within the times specified in section K, as extended by my later orders, and has substantially complied with its obligations under section J.

### 11.    Section K:  Deadline for LRSD to File Final Compliance Report

1.    LRSD filed its Final Compliance Report[98] on October 16, 2006.  Joshua filed objections[99] on November 15, 2006.

2.    Thus, I find that LRSD has substantially complied with its obligations under section K.

### C.    Miscellaneous: The Quattlebaum, Grooms, Tull & Burrow ("QGTB") Report

1.    On October 3, 2006, Dr. DeJarnette filed a grievance with the LRSD Human Resources Department alleging, among other things, that certain LRSD senior administrators had created a hostile work environment by directing her to withhold information from the LRSD Board, ODM, and Joshua, and by advising her that, if she did not withhold this information, she would be discharged.

2.    On November 6, 2006, LRSD retained the law firm of QGTB to conduct an independent investigation of the facts surrounding Dr. DeJarnette's grievance and her allegations that she was ordered to withhold certain information concerning LRSD's efforts to comply with the 2004 Compliance Remedy.  On November 9, 2006, LRSD's Board approved hiring QGTB and directed QGTB to continue its investigation and prepare a written report.  On November 21, 2006,

---

[98]Doc. No. 4050.

[99]Doc. No. 4058.

QGTB presented LRSD's Board with a report entitled "Independent Investigation Report to the Board of Directors of LRSD" (the "QGTB Report").

3.      During the January 2007 unitary status hearing, LRSD introduced the QGTB Report[100] into evidence for the limited purpose of establishing LRSD's good faith in responding to Dr. DeJarnette's grievance alleging a hostile work environment.

4.      As I have previously explained, I find Dr. DeJarnette's discharge and later reinstatement as Director of PRE to be a personnel issue that has nothing to do with whether LRSD has substantially complied with its obligations under the 2004 Compliance Remedy.  I further find that none of the facts contained in the QGTB Report are admissible in this case to prove the truth of any of the matters asserted in that document.

**D.      Impact of September 2006 School Board Elections**

1.      From the time LRSD entered the Revised Plan in 1998 until the September 2006 school board elections, Caucasians have held the majority of seats on LRSD's Board.  This changed after the September elections, and LRSD's Board is now composed of four African-Americans and three Caucasians.

2.      During the January 2007 unitary status hearing, the three Caucasian Board members, Mr. Kurrus, Mr. Larry Berkley, and Ms. Melanie Fox, all testified that LRSD had deeply embedded the comprehensive program assessment process and substantially complied with all of the other obligations in the 2004 Compliance Remedy.

3.      The African-American Board members are Chairperson Dr. Katherine Mitchell, Mr. Robert Daughtery, Mr. Charles Armstrong, and Ms. Diane Curry.  They testified that they either did not believe, or did not have enough information to know if, LRSD had "deeply embedded" the comprehensive program assessment process as a permanent part of its curriculum.  They also

---

[100]LRSD Exhibit 6.

expressed concerns about whether LRSD had substantially complied with its other obligations under the 2004 Compliance Remedy.  Some of the African-American Board members also expressed reservations about whether it was in LRSD's best interest to be declared unitary because LRSD could lose millions of dollars of state funding that it now receives under the settlement agreement with the State of Arkansas.

4.      Because the "deeply embedded" language has been struck as too subjective, the opinions of the Board members on the question of whether LRSD has "deeply embedded" the comprehensive program assessment process is not relevant.  I do not find the concerns expressed by some Board members regarding the effect of LRSD's substantial compliance with the 2004 Compliance Remedy on other obligations to be at issue now.  It is understandable that Board members would be concerned over a potential loss of state funding, but that is not, and cannot be, an appropriate consideration in determining whether the District is unitary.  I do not fault the new board members for their doubts.  It seems to me that these doubts reflect a heathy skepticism, rather than negative attitudes.  This is to be expected of new members while they are getting their sea legs.

5.      All seven Board members agreed that improving the academic achievement of African-American students is of great importance, and that  the District will need to continue to implement, assess, and evaluate § 2.7 programs for the foreseeable future.  They support Regulation IL-R and believe that it must be made a permanent part of LRSD's curriculum.  They believe PRE plays a crucial role in overseeing the implementation, assessment, and evaluation of § 2.7 programs.  By finding common ground on these four important priorities, I am optimistic that the Board will continue to ensure that the comprehensive program assessment process remains a permanent part of LRSD's curriculum for as long as it takes to improve the academic achievement of African-American students.

### IV.  Conclusion

Nine years after executing the March 15, 1998 Revised Plan, LRSD finally has achieved unitary status by substantially complying with all of the obligations contained in that document. This means that LRSD is no longer under any supervision and monitoring obligations from me, ODM, or Joshua.  LRSD's Board can now operate the district as it sees fit; answerable to no one except LRSD's students and patrons and the voters who elected them to office. While the road has been long and at times frustrating -- for LRSD and for me -- I want to express my heartfelt best wishes as LRSD begins to operate, as our Founders intended, under control of the citizens of the City of Little Rock.

IT IS THEREFORE ORDERED that LRSD be and hereby is declared completely unitary in all aspects of its operations.

IT IS FURTHER ORDERED that LRSD is released from all further supervision and monitoring from the Court, ODM, and Joshua based upon its having substantially complied with all of its obligations under the Revised Plan, the September 2002 Compliance Remedy, and the June 2004 Compliance Remedy.

DATED this 23d day of February, 2007.

/s/ Wm. R.Wilson,Jr.
UNITED STATES DISTRICT JUDGE