**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**LITTLE ROCK SCHOOL DISTRICT**                                             **PLAINTIFF**

**V.**                                        **NO. 4:82CV00866BSM/HDY**

**PULASKI COUNTY SPECIAL SCHOOL
DISTRICT NO. 1, ET AL.**                                              **DEFENDANTS**

**MRS. LORENE JOSHUA, ET AL.**                                      **INTERVENORS**

**KATHERINE KNIGHT, ET AL.**                                        **INTERVENORS**

<u>**PULASKI COUNTY SPECIAL SCHOOL DISTRICT'S
PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW**</u>

**INTRODUCTION**

The Pulaski County Special School District ("PCSSD") is submitting comprehensive and detailed proposed findings.  It has noted in certain instances those findings which transcend the actual requirements of *Plan 2000*.  However, in many other instances, proposed findings are submitted which actually go well beyond the tasks or activities set out in *Plan 2000* or cover areas in which the District has been previously declared unitary.  Given the Court's approach to allowing all parties to "make their record" the PCSSD believes it better to be over inclusive than skimp on submitting proposed findings, particularly since many cover areas that were not seriously or effectively opposed in the case.

Further, the PCSSD has declined to develop findings relating to those witnesses called to present individual grievances or individual complaints regarding employment matters or their non specific and statistically unsupported views on hiring, discipline and related matters.  Rather, the District believes such matters were appropriately objected to and that the Court's order dated

1

May 27, 2010 regarding the effort of certain individuals to intervene charts the correct approach

for disregarding these individualized matters.  (See Docket #4449 & 4450)

Further, some redundancies in proposed findings may appear to exist.  Given the span of

time involved (over 10 years) and the fact that some of the topics which appear and reappear

were described by different witnesses for different timeframes during the last decade, it seemed

better to restate them and link them with the witnesses and exhibits supporting them.

The PCSSD has endeavored to present, to the extent practicable, single item proposed

findings.  Perhaps this will facilitate the Court's work in evaluating and accepting particular

proposed findings.  A diskette is being provided in addition to this hard copy.

**GENERAL FINDINGS**

1.      In March of 1996 the PCSSD achieved release from court supervision and

monitoring in the following areas:

- o       Library Media Program

- o       Vocational Educational Program

- o       Guidance and Counseling Program

- o       Elementary School Gifted and Talented Program

- o       Staffing of Elementary Classroom Teachers

2.      Accordingly, even though the PCSSD continued to monitor itself in at least three

of these areas and even though these monitoring documents and certain testimony were

presented as part of the unitary case, the court recognizes that it has relinquished jurisdiction

regarding these specific areas.

3.      The PCSSD moved for complete unitary status on October 29, 2007.  (Docket

#4159-4160)

4.      Both the Joshua Intervenors and Knight Intervenors filed belated responses to the

PCSSD Motion for Unitary Status.  (Docket #4184-4185 (Joshua); Docket #4175 (PACT))

5.      No other party filed an opposition to the PCSSD Motion for Unitary Status.

6.      A hearing on the Motion for Unitary Status began March 1, 2010, ended March

19, 2010, and the record was formally closed on May 7, 2010.

## PLAN 2000 SECTION (A) Scope of This Plan

7.      Section A of *Plan 2000* describes the scope of *Plan 2000*.  (Plan p.1)

8.      *Plan 2000* supersedes and extinguishes all prior agreements and orders with the

exceptions set out in subsections (a) through (e).  (Plan p.1)

9.      The exceptions cover:

(a)     The Pulaski County School Desegregation case "Settlement
        Agreement" as revised on September 28, 1989;

(b)     The Magnet School Stipulation dated February 27, 1987;

(c)     Order dated September 3, 1986, pertaining to the Magnet
        Review Committee;

(d)     The M to M Stipulation dated August 26, 1986; and

(e)     Orders of the district court and the court of appeals
        interpreting or enforcing sections (a) through (d) above to
        the extent not inconsistent with this Plan.

10.     *Plan 2000* was jointly submitted by the PCSSD and Joshua on November 17,

1999, (Docket #3309) and was approved by this Court on February 22, 2000.  (Docket #3337)

11.     No party to this case opposed this submission of *Plan 2000*.

## PLAN 2000 SECTION (C) Student Assignment

12.     Section C (1) of *Plan 2000* was timely completed and provided to Joshua.

(Bowles, Tr. 1033)

13.     Exhibit 85(a), one of the ODM racial balance reports, accurately describes the test for racial balance in the PCSSD.  (Bowles; Tr. 1101)

14.     It is possible that a PCSSD school that was outside the target range one year could have an identical enrollment the following year and be within the acceptable range.  (ODM Report December 11, 2009, p.3)

15.     The District presented two reports and testimony from Dr. David J. Armor, Ph.D. in support of its positions regarding student assignment and racial balance among its certified teaching force.  (Dr. Armor's reports are dated October 24, 2008 and December 12, 2009 and were respectively received as PCSSD Ex. 7 and 7(a))

16.     Judge Susan Webber Wright presided over this case from July 6, 1990 to January 3, 2002.  (Docket #1374 & #3569)

17.     *Plan 2000* was negotiated between Joshua and the PCSSD.  Based on Joshua's previous declarations and the fact that the proposed plan arose from joint efforts of both Joshua and PCSSD, the Court found that the parties agreed that the District's then existing desegregation plan should be replaced with a more effective plan, *Plan 2000*.  (*Id.*)

18.     Judge Wright approved *Plan 2000* on February 22, 2000.  (Docket #3337)

19.     During the pendency of this case and prior to the development of *Plan 2000*, Judge Wright invited Dr. Armor to testify in this case as the Court's witness and he did so on May 14, 1996 and May 15, 1996.  (Docket #2693 & #2694)

20.     This Court judicially notices the previous testimony of Dr. Armor.  (Armor; Tr. 10-11)

21.     Dr. David J. Armor, Ph.D. received a bachelor's degree in mathematics and sociology at the University of California at Berkeley and a Ph.D. in sociology from Harvard University.  (Armor; Tr. 17)

22.     Dr. Armor was hired by the Arkansas Attorney General's office to assist in the unitary status hearing regarding student racial balance and teacher assignment.  (Armor; Tr. 19)

23.     After seven years as an assistant and then associate professor at Harvard University and a year at UCLA, he joined the Rand Corporation where he researched education and desegregation issues, among other areas, for a number of years.  (Armor; Tr. 20)

24.     Rand Corporation is a "think tank" that provides contract research specializing in both military and domestic research.  After ten years at Rand, Dr. Armor started his own consulting business.  (Armor; Tr. 21)

25.     Dr. Armor was elected to the Los Angeles Board of Education and was involved with setting policy for the 700,000 student Los Angeles Unified School District, which is the second largest school district in the United States.  (*Id.*)

26.     Dr. Armor left the school board to take a position at the Department of Defense as Principal Deputy to the Assistant Secretary for military manpower, and later became acting Assistant Secretary for that division, which is a major part of the Defense Department.  He was appointed by the Secretary of Defense to be Principal Deputy to chair the Advisory Council for Overseas Schools.  At the time the Department of Defense ran the tenth largest school system in the country.  (Armor; Tr. 22)

27.     While Dr. Armor was at the Pentagon, the Advisory Council he chaired served as a school board and recommended policies to the Secretary of Defense.  (*Id.*)

28.     After the Pentagon, when  George Mason University became a school of public

policy in 1999 he joined as a full professor of public policy and continues today to teach and to conduct research.  (Armor; Tr. 22-23)

29.    Dr. Armor has taught courses that examined the history of desegregation and the interplay between court decisions and social science research.  He is extensively published in that area.  (Armor; Tr. 24)

30.    Dr. Armor started in the field of education, academic achievements, desegregation and civil rights related issues in the late 1960s.  (*Id.*)

31.    As a graduate student, Dr. Armor was asked by Professor James Coleman, (who was the author of the *Coleman Report*, one of the first attempts on a national level to examine the factors in schools and family that affect achievement), to assist on the report regarding the quality of educational opportunity.  (*Id.*)

32.    METCO, a voluntary metropolitan busing program in Boston, invited Dr. Armor and others to evaluate the effectiveness of the busing program to voluntarily bus black inter-city Boston students to predominantly white suburban schools outside Boston.  One aspect of the study was student academic achievement.  The team of researchers was surprised to find no significant achievement changes.  That led Dr. Armor to a lifelong pursuit of the question of the educational impact of desegregation.  (Armor; Tr. 25-26)

33.    Dr. Armor authored a controversial essay titled *The Evidence on Busing*.  Ninety percent of the researchers at that time believed that desegregation was the pathway to changing the opportunity structure to create quality in educational outcomes.  The researchers were surprised to learn this was not the case.  (*Id.*)

34.    While researchers and professors had written reports, they chose not to publish them when they learned the busing programs did not have the expected effects on academic

6

achievement or race relations.  (Armor; Tr. 27)

35.     Dr. Armor then compiled the studies and published his essay, *The Evidence on Busing*, which essentially stated it did not appear that implementation of the *Brown* decision was having the educational effects that most had hoped.  (*Id.*)

36.     It is Dr. Armor's belief that researchers should not withhold findings just because the findings were unpopular or contrary to projected belief when they involved an issue that was extremely important.  (*Id.*)

37.     Dr. Armor published a book in 1996 called *Forced Justice: School Desegregation and the Law* which memorialized his conclusions.  He continues to publish in similar areas.  He collaborated with Dr. Christine Rossell in publishing *School Desegregation in the 21st Century* updating a variety of desegregation issues.  (*Id.*)

38.     Dr. Armor published *Maximizing Intelligence* in 2003 explaining the factors that he believed impacted academic achievement while the question of why desegregation itself did not have a major impact on closing the achievement gap remained unanswered.  He believes the achievement gap stems from differences in the circumstances of families.  (Armor; Tr. 28-29)

39.     Dr. Armor assisted in *Freeman v. Pitts*, which involved facts similar to the PCSSD case, including student assignment and teacher assignment.  The case went to the Supreme Court and the court accepted the standards he advocated as tests for racial balance. (Armor; Tr. 30)

40.     To clarify the plus or minus 20% standard, a person takes the percentage minority for each school level and that  school level would be considered racially balanced if it fell within plus or minus 20 percentage points.  For instance, if the secondary level of a school had a 40% black population it would be racially balanced if it fell between 20% and 60% black.  (Armor;

Tr. 37)

41.     These plus/minus standards have been used since the 1990s.  (Armor; Tr. 31)

42.     *Freeman v. Pitts* was the first major Supreme Court decision holding that school districts are not responsible for demographic change.  (Armor; Tr. 32)

43.     The PCSSD should not be responsible for demographic change.  Once it attained desegregation status the District does not have to change boundaries year after year.  (Armor; Tr. 33)

44.     How long a district should sustain desegregation has been debated since the time the Office of Civil Rights mentioned five years.  While Dr. Armor decided to use that standard some schools have been declared unitary after shorter periods of successful desegregation.  (Armor; Tr. 34)

45.     The important issue is that the causation chain be broken particularly in the south where there were white schools and black schools when the desegregation plans were first implemented.  Such a break in causation shows that the school board acted in good faith to significantly change the pattern.  It should be maintained long enough that a reasonable person would say you have accomplished what you set out to do.  (Armor; Tr. 35)

46.     Dr. Armor has worked on 20 to 30 unitary cases.  (*Id.*)

47.     It is not uncommon for courts to exempt outlying areas such as rural areas that are far from population centers.  Some schools are simply too far away to make desegregation feasible.  (Armor; Tr. 37)

48.     Dr. Armor was initially hired to design a desegregation plan for a smaller school district in Savannah.  The District had been under a mandatory busing/student reassignment policy that had not succeeded.  The district judge ordered the District to develop a new plan.  Dr.

Armor and Dr. Rossell designed a voluntary Magnet and M to M options plan for the District. (Armor; Tr. 38)

49.     Approximately five years later Dr. Armor was called on to evaluate whether the Savannah district had earned unitary status regarding student assignment. (Armor; Tr. 39)

50.     Dr. Armor used the plus/minus 20% standard for student assignment and found that the school district had succeeded in desegregating nearly all schools by that standard.  (*Id.*)

51.     The judge accepted the testimony and declared Savannah unitary.  (*Id.*)

52.     There were several schools that remained just outside the goals.  As this was a district that had already failed to desegregate using mandatory assignment methods, it was determined that the district had reached the maximum feasible desegregation obtainable. (Armor, Tr. 40)

53.     The federal judge accepted Dr. Armor's testimony and declared Savannah unitary. (Armor, Tr. 39)

54.     One of the most significant school cases in which Dr. Armor was employed was in Charlotte-Mecklenburg County, North Carolina.  It produced the *Swan* decision that articulated the first racial balance requirements. (Armor; Tr. 41)

55.     After the Supreme Court approved the plan for racially balancing schools in *Swan* it became the standard for racial balance that federal courts looked to.  (*Id.*)

56.     In *Swan* Dr. Armor used his plus/minus standards for teacher and student assignments, and the district court declared Charlotte-Mecklenburg unitary.  (Armor; Tr. 42)

57.     Another major case involving Dr. Armor was the Hillsborough County, Tampa, Florida case where the plus/minus standards for teacher and student assignments were accepted by the Court.  (*Id.*)

58.     Racially balanced schools generally mean that the student body in each school reflects the racial composition of the district within some reasonable allowance for variation. (Ex. 7)

59.     These guidelines vary from case-to-case, but most courts require schools to be within a range of plus or minus 15 or 20 percentage points from the percent black of the total district at each grade level.  (Ex. 7)

60.     A range of plus or minus 20% (or more) is the most common standard reflected by a national survey of school desegregation plans.  (Ex. 7)

61.     As reflected in my conclusions of law, school districts are not responsible for changes in a school's racial composition when this results from demographic changes over which the district has no control.  (Ex. 7 at p.2)

62.     The racial composition of PCSSD's student population has changed considerably over the past 20 years, from 25% black in 1988 to 44% black in 2007.  (*Id.*)

63.     It is difficult to maintain racial balance standards in schools that are affected by demographic shifts.  (*Id.*)

64.     The Court agrees with Dr. Armor that in the area of student assignment good faith is generally suggested by the duration of an implementation plan although no specific minimum has been established by any court.  There is, however, some consensus that maintaining an effective desegregation plan for at least five years before seeking unitary status is an indicator of good faith.  (*Id.*)

**School Racial Balance**

65.     The PCSSD Desegregation Plan implemented in 1992 called for a guideline of a minimum 20% black population in each school with an upper limit equal to the district

percentage black multiplied by .25.  This is the "Plan Definition" for a desegregated school under the 1992 Plan.  (*Id.*)

66.     This Plan Definition is very strict compared to allowable variations adopted by most other courts, particularly for a school district with widely dispersed schools and experiencing substantial demographic changes.  (*Id.*)

67.     For example, when the elementary population was 32% black in the mid-1990's, the upper limit for a desegregated school would only be plus 8% black.  Even when the elementary population reached 40% black in 2006, the Plan Definition allowed only plus 10% to qualify as "desegregated."  (*Id.*)

68.     However, using Dr. Armor's plurality of plus or minus 20% for defining a desegregated school, the outcomes change.  (*Id.*)

69.     Dr. Armor testified without contradiction that in every case in which he has testified the court has accepted his plus/minus 20% standard even if a desegregation plan used a narrower definition.  (*Id.*)

70.     The Court finds that this standard is a reasonable one.

71.     Bayou Meto Elementary School is exempt from the District enrollment guidelines because of its isolated status.  (*Id.* at 3)

72.     Baker, one of the interdistrict schools, is exempt from the interdistrict school requirements but must maintain a black enrollment of 20% black.  (*Id.*)

73.     Clinton and Crystal Hill interdistrict schools should have an enrollment as close to 50/50 as possible.  (*Id.*)

74.     Of the 24 elementary schools open during the 2007-2008 school year, 19 met the Plan Definition of desegregation for six or more years.  (*Id.*)

75.     Of these, 17 were desegregated for 10 or more years.  Only five, Bates, College Station, Harris, Jacksonville and Lawson failed to meet the Plan Definition for at least five years.

76.     However, Bates met the plus/minus 20% standard for 10 years beginning in the fall of 2000.  (*Id.*)

77.     Further, Bates has now met the Plan Definition for the 2008-2009 and 2009-2010 school years.  (Ex. 7(a) at p.2)

78.     College Station met the Plan Definition in 1992 and 2000 and missed the definition by only one percentage point between 1995 and 1998.  College Station met the plus/minus 20% standard for 14 of the 16 years missing it only during 2002 and 2007.  (*Id.*)

79.     Jacksonville met the Plan Definition between 1992 and 1994.  Even though demographic changes in this area of the county increased its black population, Jacksonville met the plus/minus 20% standard for 15 of 16 years and during the year it missed the standard this was by only two tenths of one percent.  Jacksonville also met the Plan Definition for 2008-2009.  (Ex. 7(a) at p.2)

80.     Pinewood and Taylor Elementary schools met the Plan Definition for 15 and 10 consecutive years respectively.  Pinewood continued to meet the plus/minus 20% standard through the 2009-2010 school year and Taylor met this same standard until the 2009-2010 school year.  (Ex. 7(a) at p.2)

81.     These two schools, as are most of the schools in the Jacksonville area, are being affected by the continuing demographic increase in black population and decrease of white population in that area of the PCSSD.  (*Id.*)

82.     The western part of the PCSSD is experiencing demographic growth, mostly white, but with some black growth as well.  Only one school has opened in this area recently.

There have been no school closings.  (*Id.*)

83.     When Chenal Elementary was opened students were drawn from the attendance zones of Baker, Lawson and Robinson Elementary schools.  There was no significant impact on the racial composition of any of these schools and their enrollments remained within range.  (*Id.*)

84.     Chenal opened at 33% black and remains at 30% black for the 2009-2010 school year.  Chenal enrolls 150 black students.  (*Id.*)

85.     Lawson had a low black enrollment until recently.  However, it has met the minimum standard for three of the last four years and is likely to remain above this threshold for the foreseeable future.  Lawson is also located in a remote area of the county and perhaps should have been given a similar exemption such as the one accorded Bayou Meto.  Further, in his supplemental report Dr. Armor noted that Lawson indeed met the Plan Definition for the last two years.  (Ex. 7(a) at p.2)

86.     Harris is the only elementary school that has failed to meet the Plan Definition since 1992.  It did meet the Plan Definition between 1988-1989 and 1990-1991.  (*Id.*)

87.     The Harris percentage also exceeds the plus/minus 20% standard.  Because of demographic changes in this area of the PCSSD and the increasing black enrollment of all the elementary schools in this area, there may be no feasible option for racially balancing Harris.  (*Id.*)

88.     Six of the District's seven middle schools have met the Plan Definition for five or more years.  The sixth school, Maumelle Middle, is new, opened in 2005 and has met the Plan Definition for each of the three years it has been open.  (*Id.* at 5)

89.     Five of the six high schools have met the Plan Definition for all sixteen years.  (*Id.*)

13

90.     Mills High School met the Plan Definition for the years 2000 and 2005. However, Mills has met the plus/minus 20% standard for all sixteen years.

91.     College Station and Harris had majority white populations during the late 1980's and 1990's.  The original chain of causation was broken and demographic changes rather than their historical status as historically black schools are bringing these schools back to majority black status.  (*Id.* at 5)

### Dr. Armor's Analysis of Student Transfers

92.     *Plan 2000* provides for several types of student transfers to enhance desegregation.  (*Id.*)

93.     One of these is the interdistrict program known as the Majority to Minority Program which allows black students from Little Rock and North Little Rock to transfer to PCSSD schools.  (*Id.*)

94.     Another program is a within district transfer program which allows PCSSD students to transfer to other PCSSD schools for purposes of desegregation.  (*Id.*)

95.     For the 2007-2008 school year, there were approximately 3,200 total transfers. About 1137 were black students from Little Rock and North Little Rock transferring into PCSSD.  Approximately 400 of them attend the interdistrict schools Baker, Clinton and Crystal Hill.  Maumelle Middle, Robinson High and Sylvan Hills High also attracted more than 100 interdistrict transfers each.  (*Id.*)

96.     There were approximately 2000 within district transfers evenly divided between black and white students for the 2007-2008 school year.  (*Id.*)

97.     A majority of both black and white transfers were for desegregation purposes.  Of the 500 white students who transferred the largest number transferred to Clinton.  Others transferred to Arnold Drive, College Station, Fuller Middle, Lawson, Sylvan Hills Elementary

14

and Taylor.  (*Id.* at 5-6)

98.     Dr. Armor conducted an analysis of the effect of the student transfers.  He concluded that the effects were overwhelming positive in terms of desegregation and were significant at 18 schools.  (*Id.* at 8)

99.     Significant negative effects were observed for only three schools.

100.     The remaining 16 schools showed no significant effects from the transfers.  (*Id.*)

101.     Dr. Armor further analyzed the transfers in terms of calculating a dissimilarity index ranging from 0-100.  Zero means each school is identical to the composition of the district as a whole; one hundred means that all schools are either all black or all white.  (*Id.* at 8)

102.     His calculations showed that the index for 2007-2008 was 21points indicating substantial racial balance.  When he calculated the index with all students placed back into their assigned school or district, the index rose to 30 points or a considerable gain.  Thus, the transfer program is having a positive effect on desegregation overall.

103.     Based in part upon the testimony of Dr. Armor the Court finds that the PCSSD has adopted and implemented a desegregation plan that has been effective in meeting the requirements for unitary status that courts have established in the area of student assignment. (Ex. 7 at p.1, Ex. 7(a) at p.1, Tr. 96)

104.     As part of its monitoring, the District does two reports a year for student assignment.  (Bowles; Tr. 1084)

105.     These reports track all of the transfers, permits granted and other options and ways that students can come to or leave the PCSSD.  (*Id.* at 1085)

106.     These reports contain much of the information relied upon by Dr. Armor in his testimony concerning student assignments.  (*Id.* at 1086)

107.   Act 947 of the Arkansas Legislature also poses challenges to maintaining racial balance since it permits children of employees who do not reside in Pulaski County to bring their children to school with them.  (*Id.* at 1087)

108.   The District monitors trends in school enrollments and makes adjustments when it can.  (*Id.* at 1088-1089)

109.   As of 2009, the ODM reported that the 25 PCSSD elementary schools were only 63% full.  (ODM Report December 11, 2009; p.3)

110.   The schools with the highest proportional enrollments were Baker at 114% of capacity and Pine Forrest at 100%.  (*Id.* at 63)

111.   Adkins at 18% and Harris at 20% operate at the lowest capacity.  (*Id.* at 63)

112.   Overall the secondary schools are 65% full with Maumelle Middle School at 84% of capacity and Oak Grove Junior Senior High School at 35% of capacity.  (*Id.* at 63)

113.   As a whole the District is operating at only 64% of its total capacity having 10,121 vacant classroom seats.  (*Id.* at 66)

114.   The District has 5,680 vacant elementary seats and 4,441 vacant secondary seats. (*Id.*)

**The Sherwood Area**

115.   From 1980 to 1990 the population of Sherwood increased from 10,586 to 18,893. (ODM Report January 14, 2004, p.3)

116.   According to the 2000 Census, Sherwood reached a population of 21,511 by 2000.  (ODM Report January 14, 2004, p.3)

117.   Sherwood's racial composition changed significantly as well.  In 1980 African-American comprised only 2% of Sherwood's population.  By 2000, African-Americans made up

10% of the population.  (*Id.*)

118.    Thus, Sherwood does not have the segregated black enclaves characteristic of many urban areas.  (*Id.*)

**The Harris Area**

119.    Harris is located outside Sherwood but near the predominately African-American community of McAlmont.  (ODM Report January 14, 2004, p.4)

120.    Harris is located in an area known as McAlmont, an unincorporated settlement along Highway 161.  McAlmont covers 1.7 square miles yet its boundaries are indeterminate. The other small hamlets of Rixie, Valentine and Booker are collectively known as McAlmont. (ODM Report March 15, 2004, p.3)

121.    For years the attendance zone around Harris had been used to help desegregate Sherwood schools.  Previously, the PCSSD sought to promote desegregation by assigning black students from McAlmont to Sherwood schools and white students in Sherwood to Harris.  This assignment plan became increasingly unpopular in both Sherwood and McAlmont and at the same time Harris was an unattractive old building that had not been updated in many years.  (*Id.* at 4)

122.    All of this may have been a contributing factor to the enrollment decline in this area of schools during the 1990s, ironically at a time of substantial population growth in Sherwood itself.  (*Id.*)

123.    Black enrollment is growing while non-black enrollment is declining.  (Bowles; Tr. 896)

124.    Between 1990 and 2000, enrollment in the five elementary schools in the area declined by 16%.  A 34% drop in white students was partially offset by a 46% increase in black

students.  (ODM Report March 15, 2004; p.4)

125.    However, private schools in the area were gaining students during this period.  In 1990 only 12% of school age children in Sherwood attended private schools; this number reached 26% by 2000.  (*Id.*)

126.    Also, by then home schooling had become more popular in Pulaski County.  (*Id.* at 5)

127.    There are over a thousand students being home schooled in PCSSD.  (Bowles; Tr. 897)

128.    Another factor affecting the area schools as well as other schools in the PCSSD were interdistrict transfers.  Many Sherwood and McAlmont students opted to attend magnet schools or to transfer as majority to minority students to eligible schools in Little Rock or North Little Rock.  (ODM Report March 15, 2009; p.5)

129.    On January 28, 2003, this Court approved PCSSD's motion to redesign Harris Elementary School and to rezone several schools in or near Sherwood, including Harris.  The objectives of the redesign and rezoning plan which was submitted in agreement with the Joshua Intervenors were to:

> o    Maintain an educational presence in the predominantly African-American McAlmont community, in keeping with the District's desegregation plan commitment not to close schools located in predominantly African-American areas;
>
> o    Improve the educational quality of offerings available in the McAlmont area;
>
> o    Help racially balance the other schools in the northern section of Pulaski County;
>
> o    Reduce the disparate transportation burdens borne by African-American children; and

o    Attract students from home schooling and private schools to PCSSD schools in the Sherwood area.  (ODM Report, *Update on the Redesign of Harris Elementary School and the Rezoning of Schools in the Sherwood Area of the PCSSD,* July 30, 2003, Introduction Background Section).

**The Harris Plan**

130.    In response to all of this, the PCSSD developed a new attendance plan, having conducted a series of community meetings in 2002-2003.  (ODM Report January 14, 2004; p.7)

131.    The parents wholeheartedly favored high educational standards but also wanted school assignments that kept their children within their immediate neighborhood.  (*Id.*)

132.    The District thus devised a rezoning plan for 2003-2004 to place more students in schools closer to their homes.  The plan would also reduce the busing burden.  (*Id.*)

133.    While the plan would maintain racial balance in the Sherwood schools it would greatly increase the proportion of black students at Harris.  The District also committed to promote desegregation at Harris by redesigning the school to make it more attractive and serviceable.  (*Id.*)

134.    The PCSSD clearly met the objective of reducing the transportation burden for black students in the McAlmont area.  (*Id.* at 10)

135.    The PCSSD includes part of four other different counties and parts of the towns of England, Scott, Cabot and Bryant.  Students choose where they are going to school.  (Bowles; Tr. 898)

136.    Because of understaffing the PCSSD cannot enforce "boundary crossing" to attend other school districts.  (*Id.*)

137.    State School Choice allows students to transfer; other choices such as charter schools, magnet and M to M transfers are made by students.  (Bowles; Tr. 899)

138.    Non-black students can transfer from the District into Little Rock and North Little Rock.  The District accepts Little Rock and North Little Rock black students.  (*Id.*)

139.    The Office of Equity and Pupil Services maintains a large book of statistics by school.  (Bowles; Tr. 900)

140.    Part of the PCSSD ACSIP process is to monitor the data from individual schools and evaluate trends in the District by organizational level.  (Bowles; Tr. 901)

**One Race Classes**

141.    Section C (2) lists required reports that are provided each semester by the directors of elementary and secondary education. (Bowles; Tr. 1033)

142.    PCSSD Exhibit 5A is a copy of the 2002 racial isolation report for secondary students.  (PCSSD Ex. 5A, Tr. 1033).

143.    PCSSD Exhibit 5H is a one-race report for 2008 that identifies the schools and grade levels that either have a class that is one race or reflects gender isolation.  (PCSSD Ex. 5H, Tr. 1034)

144.    To reduce isolation, if only two female or two black or non-black students are in a grade, the two students are kept in the same class instead of separating them, thus creating a one race class.  (Bowles, Tr. 1036)

145.    If there are only two students of a particular race in a grade and the parents do not want them to be separated/isolated, the parents can choose to keep them in the same class, causing a one-race class in that grade.  (*Id.*)

146.    A class may have only two black or non-black students.  If one moves this causes a one race class. (*Id.*)

147.    Bayou Meto is a remote isolated majority white school exempt from the racial

balance requirements; it has only a 2% African-American population, so most of the classes are one race.  (*Id.*)

148.    Bayou Meto has been exempt from racial balance standards by court order since the early days of this case.  (Bowles, Tr. 1037)

149.    Sometimes resource classes that are self-contained (CVI) may be one-race classes.  (Bowles, Tr. 1038)

150.    The District has an auto lab/car shop class that is selected primarily by non-black students.  (*Id.*)

151.    An English Second Language (ESL) class may be all Hispanic.  (Bowles, Tr. 1039)

152.    If there is a reason for a one-race class the District includes a written narrative in the report listing the causal factors. (Bowles, Tr. 1040)

153.    The District monitors one-race classes, writes a report for each semester and provides it to all parties.  (*Id.*)

**Enrollment Trends**

154.    The PCSSD continues to "bleed" students.  While black enrollment has increased by 42% since 1988-1989 white enrollment has dropped approximately 40%.  (ODM Report December 11, 2009; p.67)

155.    The PCSSD has become progressively more black since the *en banc* decision. Individual school ratios which offended the district court and the Court of Appeals in the early 1980's no longer exist within the PCSSD.  For instance, in discussing what the Court then considered "schools remote from centers of black population," the district court singled out, and the Court of Appeals acknowledged that:

> "After 1973, PCSSD continued to close schools in black neighborhoods and to build new schools in distant suburbs that were the developing areas of white population.  584 F.Supp. at 346.  Many of the new schools are over ninety percent white.  *Id.* For example, Northwood Junior High School was opened in 1980 in a remote location far from a black residential area and has a student enrollment which is only eight percent black.  North Pulaski was built in 1977, remote from any black residential areas in the furthest reaches of Pulaski County, and in 1983, had a black student enrollment of about six percent.  Cato Elementary School was built in 1975, again in a remote area and in 1983, it had a student population which was less than ten percent black.  Robinson Middle School was built in 1981 and, in 1983 had a black student population of slightly over eleven percent.

778 F.2d 404 at 421.

156.    In contrast today, Northwood Junior High School now Northwood Middle School, has a population that is 42.76 percent black and 57.24 percent other, North Pulaski is 38.70 percent black and 61.30 percent other, Cato is 28.31 percent black and 71.69 percent other and Robinson Middle School is 42.97 percent black and 52.03 percent other.

157.    The total student population and individual school populations within the PCSSD have changed dramatically since this case was filed.

158.    In addition to the finding of unitary status prompted by the analyses and testimony of Dr. Armor, the Court finds that the PCSSD has substantially complied with the student assignment provisions of *Plan 2000*.

## PLAN 2000 SECTION (D) Advanced Placement, Gifted and Talented and Honors Programs

159.    The PCSSD has maintained its Advanced Placement and Gifted and Talented programs since ODM's 2003 positive status report without substantial change in the structure and practices of the programs.  (ODM Report August 16, 2006 p.4)

160.    In the summer of 2005, the District received the designation "Outstanding Gifted

Program" by the Governor's Advisory Council for the Education of Gifted and Talented
Children.  (*Id*. at 4)

161.    In the fall of 2005, the District employed a black female administrator to direct its
studies for gifted students, the first time in district history the program has been directed by a
minority administrator.  (*Id.* at 4)

162.    Mills University Studies High School was named by *Newsweek* magazine as one
of the nation's best high schools, largely on the basis of the number of AP exams taken by its
students.  In 2004-05, Mills students took 684 AP exams, which was 46% of the total number of
exams taken district wide.  (*Id.* at 5)

163.    Enrollment in pre-AP and AP classes increased substantially in all six of the
District's high schools between 2001-2002 and 2005-2006.  Robinson increased enrollment by
294 students, a 141% increase while Jacksonville had an increase in enrollment of 372 students,
a 114% increase.  (*Id.* at 5)

164.    PCSSD continues the high quality Advanced Placement (AP) and gifted and
talented program described in previous ODM reports.  (ODM Report September 17, 2008, p.7)

165.    The number of students enrolled in AP and Pre-AP courses in PCSSD's six high
schools has remained consistently high with only minor variations from year to year.  Enrollment
in the six high schools totaled 1644 during the 2006-2007 school year and reached 1013 in the
fall of 2007.  (*Id.* at 7)

166.    PCSSD students completed 1,397 AP exams in 2007, a slight decline of 83 exams
from ODM's report in 2006.  (*Id.* at 7)

167.    PCSSD offers a large number of AP courses at Mills University Studies High
School to attract students from other attendance zones as part of the effort to desegregate the

school.  (*Id.* at 7)

**Advanced Placement Courses and AP Exams**

168.     Recruiting minority students into the college level AP classes is a continuing activity.  (ODM Report August 16, 2006; p.4)

169.     At the end of each course, students are encouraged to take the AP exam.  A satisfactory grade allows students to earn college credit and many students earn as much as a full semester college credit while still in high school.  (*Id.*)

170.     The state of Arkansas began funding the costs of the AP tests in 2005 and as a result many more PCSSD students took the exams.  (*Id.*)

171.     The ODM reported in 2003 that 383 students took AP exams during 2002 but that number grew to 730 for the 2004-2005 school year.  (*Id.*)

172.     Of those, black students increased from 85 to 239, a 181% increase.  (*Id.*)

173.     Based upon the foregoing, the Court finds that the PCSSD has substantially complied with the requirements of Section (D) of *Plan 2000.*

**Laura Shirley**

174.     PCSSD provided the standards required by Plan 2000, Section D; Advanced Placement, Gifted and Talented and Honors Programs ("GT/AP).  (Shirley; Tr. 144)

175.     Laura Shirley, as director of the GT/AP programs, provides a comprehensive annual report. (Shirley; Tr. 145)

176.     Kids who start GT/AP programs in elementary grades have a tendency to choose not to participate in the middle school and high school levels.  (Shirley; Tr. 148-149)

177.     Enrollment as of October 1, 2009 indicated that district black student enrollment totaled 44% and non black 56%; black GT/AP students totaled 37% and non-black totaled 63%.

There was a 7% difference between black student enrollment and black student GT/AP participation. (Shirley; Tr. 150)

178.     Each year Shirley submits a program for approval to the State Department of Education, which outlines all pertinent information by race.  The state monitors all aspects of the program every five years.  (Shirley; Tr. 151)

179.     The PCSSD uses an 8% indicator in its Monitoring and Compliance Report as a guide.  The 8% indicator is not in any state regulation.  It has been used as a guide to determine how consistent the district is with enrollment for GT/AP.  (Shirley; Tr. 152)

180.     The Compliance Report is another monitoring report used by the district. (Shirley; Tr.154)

181.     PCSSD Exhibit 87 sets out the rules and guidelines of the Gifted and Talented program.  Comparing this document with what was submitted by PCSSD pursuant to *Plan 2000* shows there have been no significant changes in the rules from 10 years ago.  The PCSSD director of the GT/AP programs is required by the state to follow the standards and guidelines. (Shirley; Tr. 157)

182.     The standards address the purpose of the program and such matters as identification of potentially Gifted and Talented students.  (*Id.*)

183.     PCSSD operates pursuant to the standards.  The Annual Report is PCSSD's own self-critique and monitoring of standard compliance.  (Shirley; Tr. 158)

184.     The types of information included in the Annual Report are AP exam score results, the number of courses offered and the number of exams being taken by students.  (*Id.*)

185.     Director Shirley believes the report shows that PCSSD  has met the Gifted and Talented standard and that PCSSD  is compliant.  (*Id.*)

186.     PCSSD Exhibit 86 is a program guide that outlines the practices and procedures that are followed by teachers, counselors, administrators and others helping to recruit student for advanced placement and to assure open enrollment with no barriers to students who choose Pre-AP and AP courses. (Shirley; Tr. 160)

187.     Any student who wants to be in Advanced Placement courses can participate. (*Id.*)

188.     As director of the Advanced Placement program Ms. Shirley believes that PCSSD is in compliance with the Advanced Placement Program Handbook and Guidelines and that we continue to follow it.  (Shirley; Tr. 162)

189.     There are more students taking the AP exam than in the past because the state pays for the exam.  (Shirley; Tr. 191).

190.     Every school in PCSSD offers Pre-AP and AP programs in the middle school. (Shirley; Tr. 192)

191.     She collaborated with Dr. Bowles to develop a remediation plan in schools that were below the 8% district standard.  The plan was developed to increase black student participation pursuant to what I presented to Dr. Kenneth James on December 15, 2008. (Shirley; Tr. 194)

192.     She assisted principals in particular schools with developing plans to increase black student participation in their schools.  (Shirley; Tr. 195)

193.     The district continues to monitor a host of things that are not required by *Plan 2000*.  (Shirley; Tr. 201)

194.     The GT/AP handbook was designed to remove barriers that would exclude African-American students, or any student from taking a course.  The booklet is intended to

inform parents and students about the Pre-Advanced Placement Program in the PCSSD. (Shirley; Tr. 203)

195.    In the booklet under "Rationale" it states "students are encouraged to enroll in Pre AP and AP courses to enhance their thinking and writing skills."  (Shirley; Tr. 203)

**PLAN 2000 SECTION (E) Student Assignment:  Interdistrict Schools**

196.    Majority to minority transfers are among the transfers permitted in this case. Generally, because the PCSSD remains majority white, African-American students from North Little Rock and the Little Rock School District may transfer to qualifying PCSSD schools. (Bowles Tr. 1058)

197.    The PCSSD reserves seats for these transfer students at certain of its interdistrict schools.  (*Id.*)

198.    The PCSSD interdistrict schools include Baker, Clinton and Crystal Hill.  (*Id.* at 1056)

199.    These schools were set up to help desegregate areas in the county that were then majority white.  A certain number of seats were allocated originally to the Little Rock School District.  (*Id.* at 1056-1057)

200.    The Little Rock stipulation magnet schools have both a designated attendance area around the school for Little Rock students and then a certain number of seats are reserved for qualifying transfer students from both the county and North Little Rock school districts.  The students who attend magnet schools are not considered M to M students.  (*Id.* at 1057)

201.    The county schools remain eligible to receive M to M students from the other districts until the county schools selected become majority African-American.

202.     Section D of *Plan 2000* provided that any new school built in Chenal Valley would be an interdistrict school and that up to one-half the seats would be reserved for LRSD black students.  (Bowles Tr.1061)

203.     When Chenal opened, the District reserved 100 seats for transferring Little Rock students and projected 238 total students for the first year of operation.  (*Id.*)

204.     The 100 seats were never completely filled.  (*Id.*)

205.     Although questions were raised concerning Chenal, the fact is 100 reserved seats is included within the requirement of reserving "up to" one-half of the seats.  It is significant to note that even the 100 seats were not all filled.  (*Id.* at 1061; PCSSD Ex. 103)

206.     Since it opened, the number of M to M transfer students enrolled at Chenal Elementary has decreased to 77.  The District believes this decline is in part because of transportation rules that prevail in the Little Rock School District.  (Bowles; Tr. 1095)

207.     The PCSSD does not have any control over the transportation rules and deadlines set by the Little Rock School District.  (*Id.* at 1096)

208.     50-50 is the target for racial balance at the interdistrict schools although Baker Elementary is exempt from the standard under *Plan 2000*.  (*Id.* at 1067)

209.     Baker, however, actually has a total population of 51% nonblack with a large percentage of Asian and Indian students.  (*Id*. at 1068)

210.     In the PCSSD the ideal composition for an interdistrict school is to be as close to 49% black as possible.  (ODM Report December 11, 2009, p.67)

211.     Despite enrollment gains, Chenal at 30% black and Crystal Hill at 38% black fell below that target recently.  (*Id.* at 67)

212.    The Court finds that the PCSSD has substantially complied with its obligations regarding its interdistrict schools, Baker, Crystal Hill, Clinton and Chenal Elementary.

213.    The District introduced "annual recruitment reports" for all the years covered by *Plan 2000* and they were received as PCSSD Ex. 8(a) through 8(c).

214.    These reports document interdistrict recruitment and annual totals of students attending schools in the other districts as M to M students.  (Bowles Tr.1064)

215.    For instance, Exhibit 8(c) shows that for the 2008-2009 school year 1,117 students from North Little Rock and Little Rock attended the PCSSD as M to M students with 867 from Little Rock and 250 from North Little Rock.  (Bowles Tr.1064)

216.    During the 2008-2009 school year, a total of 598 students from Little Rock and North Little Rock were recruited as new M to M students which was an increase from the prior year by 277 new students.  (*Id.*)

217.    Table 1 of these exhibits shows the new majority to minority students coming from North Little Rock and Little Rock to the PCSSD.

218.    Table 2 shows the M to M transfers from 2008-2009 from the PCSSD to North Little Rock and Little Rock numbering 261 and 135 respectively.  (*Id.* at 1065)

219.    Table 3 shows the stipulation magnet students reflecting new students during the 2008-2009 school year.  (*Id*. at 1065-1066)

220.    As in past years, the PCSSD continues to receive the greatest number of majority to minority transfer students across district lines.  When M to M and magnet transfers are combined the PCSSD also sends out the largest numbers of transfers because the six stipulation magnet schools are located in the LRSD.  (ODM Report December 11, 2009; p.67)

221.    But for interdistrict transfers, black students would compromise 38% of the

District's enrollment rather than the 44% reported by ODM for 2009-2010.  (*Id.*)

222.    The District's specialty schools are in predominately African-American communities and have special themes and programs to attract nonblack students.  The District provides transportation to those programs.  These were originally established as part of the 1992 Plan and carried forward in *Plan 2000*.  (Bowles; Tr. 1077)

223.    The District has more M to M students transferring across district lines than either of the other two districts.  The PCSSD has the largest number of transfers when magnets and M to M students are combined.  (*Id.* at 1082)

224.    While the College Station specialty program has declined in enrollment over the past several years, Fuller Middle School, which is fed by College Station, has maintained its enrollment.  Fuller Middle in turn feeds Mills University Studies High School.  (*Id.* at 1089-1090)

225.    Of the District's specialty schools only two were above the guidelines for 2009-2010 those being College Station and Harris.  (ODM Report December 11, 2009 p.67)

226.    However, when Mills was 48% black, the interdistrict transfers rule still required it to accept black transfer students from the Little Rock School District.  (Bowles; Tr. 1090)

227.    The transfer options available under the federal program "No Child Left Behind" are starting to pose challenges for maintaining school racial balance.  (*Id.* at 1080)

228.    Act 284 of 1991 is the Arkansas Public School Choice Act.  It permits white students to transfer out of the Pulaski County Special School District to other school districts. (*Id.* at 1092)

229.    The way choice works, a white student cannot transfer from the County to the Cabot School District but could transfer to Little Rock, North Little Rock or even the Pine Bluff

School District.  (*Id.* at 1094)

230.    The District tracks students transferring pursuant to the School Choice Act.  (*Id.*)

231.    The Court finds that the PCSSD has substantially complied with all aspects of Section (E) of *Plan 2000*.

## PLAN 2000 SECTION (F) Discipline

### Dr. Christine Rossell

232.    The PCSSD called Dr. Christine H. Rossell of Boston University as an expert witness in the area of discipline.  Her report is dated December 23, 2009 and was received into evidence as PCSSD Exhibit 10.

233.    Dr. Rossell has spent 36 years researching the impact of school desegregation plans, 30 years consulting for school districts regarding educational equity, 23 years designing and analyzing surveys, 23 years designing and analyzing school desegregation plans and 35 years teaching courses on school desegregation, educational policy, public policy and research methods.  (Ex. 10 at p.2)

234.    For her work in this case, Dr. Rossell analyzed ODM Reports, district and school documents, court documents and reports submitted by the PCSSD to the court concerning enrollment, suspensions, expulsions, free and reduced lunch eligibility, and administrative staff data provided by school and by race spanning the period 2000 through 2009.  (*Id.* at 2)

235.    Dr. Rossell also relied on data from the office for civil rights, IES, court orders from other cases, legal briefs, the common core of data, and reports and articles on the subject of discipline.  (*Id.* at 2-3)

236.    Dr. Rossell toured all secondary schools in the PCSSD and a sample of elementary schools during the week of October 12, 2009.  She engaged in discussions with

principals, the assistant principals, guidance counselors and District administrators.  (*Id.* at 3)

237.    Dr. Rossell opined that the PCSSD had done an extraordinary job in creating a clear and fair district wide Discipline Management Plan and the Parent/Student Handbook for Student Conduct and Discipline for both elementary and secondary schools.  (*Id.*)

238.    Dr. Rossell emphasized in particular that part of the handbooks which require acknowledgement that:

> We have received the PCSSD Handbook for Student Conduct and Discipline and although we may not agree with all the regulations, we understand that the student must adhere to them while he is at school, on the bus, at the bus stop, or in attendance at school sponsored activities.  In the event that we are not entirely certain of some aspect of school policy, we will contact the principal for clarification within one (1) week after receipt of that policy.

(*Id.* at 3)

239.    Dr. Rossell believes that the handbook is clearly written and detailed, describing the levels of infractions from the least severe to the most severe and the punishment for each infraction.  (*Id.* at 4)

240.    The court agrees with the opinions expressed by Dr. Rossell regarding the District's Parent/Student Handbook for Student Conduct and Discipline.

241.    Dr. Rossell testified there are two ways to determine racial disparity in school discipline.  One is to calculate the ratio of the percentage of black students who are suspended to the percentage of nonblack students who are suspended.  If the ratio is 1.0 it is presumed that black and nonblack students are suspended or expelled at the same rate.  (*Id.* at 4)

242.    Dr. Rossell explained that students who are suspended or expelled are sometimes suspended or expelled more than once.  Using this index, if 10 black students are suspended twice and 10 nonblack students are suspended more than once and the population of each group

is 100 then 10% of black students and 10% of nonblack students would be counted as suspended resulting in the ratio of 1.0.  This suggests no racial disparity.  (*Id.*)

243.    A second way to determine racial disparity is to calculate the percentage of the suspensions of one race and divide by their percentage of the school enrollment.  If 50% of the enrollment is black then 50% of the suspensions should be black.  In this example 20 out of 30 suspensions were black compared to 100 out of 200 students and 66% divided by 50% results in a ratio of 1.3.  (*Id.* at 4-5)

244.    Dr. Rossell explained that the reports generated by the ODM and the school district itself suggested that racial disparities were greater among males.  This was not true during the period of time studied by Dr. Rossell and in fact the racial disparity was slightly greater for females than for males.  (*Id.* at 5)

245.    Dr. Rossell prepared Figure 1 showing the ratio of the percentage of black students suspended as compared to the percentage of nonblack students suspended from 2000 through 2009.  The ratio varied from 1.6 to 2.4.  (*Id.* at 5)

246.    When Dr. Rossell compared these outcomes to the nation as a whole, the comparison demonstrated that nationally the trend is higher averaging approximately three times the percentage of blacks suspended as non blacks.  She thus concluded this is a nationwide phenomenon not limited to PCSSD.  (*Id.*)

247.    Dr. Rossell developed Figure 2 which utilized her second index which showed that in 2008-2009 the black suspension rate was 69% as compared to a population of 44% for that year.  This resulted in a ratio still much lower than the United States as a whole which has a ratio of 2.2.  (*Id.*)

248.    In October 2008, African-American free lunch qualifiers at the elementary and

secondary levels were almost double the non-black qualifiers.  (Bowles; Tr. 888)

249.    Dr. Rossell developed Figure 3 showing the trends in expulsion from 2000-2009 in the PCSSD and in the U.S.  She concluded that the PCSSD closely tracks national trends. (PCSSD Ex. 10 at 6)

250.    Dr. Rossell next examined the role of poverty in discipline pointing out that poor students come to school with many problems at home and within their community that may cause them to violate student rules.  (*Id.* at 7)

251.    She developed Figure 6 which showed the percentage of black students eligible for free lunch is roughly twice that of the percentage of nonblack students eligible for free lunch creating an index of approximately 2.0 which is very similar to the racial disproportionality in suspensions she explained in earlier analyses.  (*Id.*)

252.    Dr. Rossell also studied the suspension rates of both white and black principals in the PCSSD.  Figures 7 and 8 indicated that black principals suspend a higher percentage of black students using the first index.  The second index showed the suspensions rates were approximately the same for both races of principals.  (*Id.* at 7)

253.    Dr. Rossell came to similar conclusions regarding expulsion rates and concluded there was no evidence of racial prejudice on the part of nonblack principals in either suspensions or expulsions.  (*Id.* at 8)

254.    Dr. Rossell developed Appendix 2 showing two equations predicting the black-nonblack suspension ratio.  She controlled for the black-nonblack poverty ratio, the racial percentage of the student body, whether the school was secondary or elementary, the school size and the percentage black of the administrators.  She explained that these control variables are those factors that also affect student discipline outcomes independent of racial discrimination.

255.     Dr. Rossell described her findings as unequivocal.  She found that the black-nonblack poverty ratio is the strongest influence on the black-nonblack suspension ratio in both tables and in every equation.  (*Id.*)

256.     Dr. Rossell further explained that in solving equation 1 in Appendix 2 for equal poverty rates between black and nonblack students the equation predicted that slightly more nonblack students would be suspended than black students as shown in Figure 9.  She further explained that if the black-nonblack poverty ratio is increased to 2.0, which is in fact the average in the PCSSD, and maintaining the other variables, then the predicted black-nonblack suspension ratio increases to 3-1 which is in fact the average in the PCSSD.  If the poverty ratio is increased to 3.0 the black-nonblack ratio increases to 6.7.  (*Id.* at 9-10)

257.     In sum, Dr. Rossell concluded that the disproportionality in suspensions in the PCSSD is completely driven by the disproportionality in poverty ratios, a matter outside the control of the schools and the District.  (*Id.* at 10)

258.     Dr. Rossell also developed Figure 11 showing that the PCSSD has done better than most school districts that have obtained unitary status in reducing disproportionality in student discipline.  (*Id.*)

259.     Poverty level is strongly associated with discipline.  Just as with achievement and other areas where disparity exists, SES, rather than race, is the primary explanatory variable.  (NLRSD Ex. 6 at p.183)

260.     In sum, Dr. Rossell's conclusions are that:

(1)     The racial disparity in suspensions in the PCSSD is almost entirely caused by the differences in rates of poverty between the races, a factor that is outside the control of the PCSSD schools;

(2)     there is no evidence of racial discrimination on the part of white administrators;

(3)     racial disparities in the PCSSD are less than most school districts that have attained unitary status; and

(4)     the PCSSD has complied with the discipline requirements of its court orders to the extent practicable and thus should attain unitary status in this area.

(PCSSD Ex. 10 p.2)

261.     Based upon the analyses and testimony of Dr. Rossell, the Court finds that the PCSSD is unitary with regard to discipline.

262.     On August 29, 2000 the PCSSD presented a set of documents to Joshua entitled *Identifying Teachers and Staff members Experiencing Problems Which Require Attention; Identifying Schools with Atypically High Discipline Rates; and Identifying Schools with Atypically High Racial Disparities in Discipline.* (ODM Report September 17, 2008; p.12)

263.     Although Joshua had 21 days to respond, it never did.  (Powell; Tr. 2363-2364)

264.     The list of teachers identified by the criteria from Section F (1) of *Plan 2000* is not required to be published.  (Bowles; Tr. 365)

265.     In its 1998 review of discipline in the PCSSD, the ODM found that while the raw numbers of disciplinary sanctions in the PCSSD were high they did not indicate that the schools were an unsafe environment for children.  The ODM never found that safety was an alarming issue in the District and in fact ODM at that point had never received a complaint about safety in the PCSSD.  (ODM Report March 18, 1998; p.101)

266.     As early as 1998, the ODM recognized that the schools alone cannot remedy discipline problems.  The ODM concluded that parents must send their children to school better prepared with the proper social skills needed to participate in the school culture, with a desire to learn and be successful, and with the willingness to become positive contributors to society.  (*Id.*)

36

267.     In the 2002 report, the ODM confirmed that the PCSSD had devised a means identified in a document entitled *Identifying Schools with Atypically High Discipline Rates* that employs a rolling district average of discipline sanctions.  During the early meetings of the Discipline Study Committee, ODM reported that Joshua repeatedly voiced concerns about these assessment formulas and other means developed by PCSSD to identify schools and personnel with atypically high discipline statistics.  However, other than expressing concern during these early meetings, the ODM found no evidence that Joshua made a formal opposition to the developed criteria, as might be contained in a court filing, although *Plan 2000* provided that Joshua would have 21 days in which to comment.  (ODM Report May 31, 2002; pp.6-7)

268.     Further complicating the discipline process outlined in *Plan 2000*, these criteria were also met with suspicion, confusion and resistance by the Committee's teacher and support staff members in addition to the Joshua Intervenors.  Disagreement over the criteria and their application was pronounced between members who were district administrators versus those who represented teachers and support staff.  Although the committee eventually voted unanimously to approve the identification measures, teacher and support staff representatives continued to voice serious reservations, even after the vote.  (*Id.* at 7)

269.     The Discipline Study Committee was supposed to be populated with representatives appointed one half by the Joshua Intervenors and one half by PACT and PASS. (*Plan 2000* Section F(4) p.3) (PACT is the teacher union; PASS is the Support Staff Association.)

270.     The only representatives from Joshua who attended the committee meetings were Joy Springer and John Walker.  (Springer; Tr. 2463)

271.     In 2006, the ODM reported that the Director of Pupil Services and Athletics who

chaired the Discipline Study Committee had retired and the Assistant Superintendent for

Desegregation had been sidelined with health problems.  In March of 2006, the then Director of

Equity and Multicultural Education took on the task of revitalizing the discipline committee. The

committee was reformed and reconstituted as the District Discipline Committee.  (ODM Report

August 16, 2006; p.12)

272.    The Director of Equity completely revised the District's DMP.  The revised user-

friendly manual provides a framework for schools to develop site-based discipline programs that

apply to each school's unique discipline challenges.  Each plan must be reviewed and approved

by the central office.  (ODM Report August 16, 2006; p.19)

273.    By 2008, the ODM was able to report that the discipline report had improved over

the past three years providing more commentary and analysis of discipline data; that schools are

linked to the central office through a computer data base that enables school personnel to access

complete profiles of their students.  The purpose of this link is to help in recording and

addressing discipline related problems at the building level.  (ODM Report September 17, 2008;

p.10)

274.    The PCSSD along with committee members from PACT, PASS, and Joshua and

with the assistance of the University of Arkansas at Little Rock developed a survey to elicit

feedback from secondary students addressing discipline.  All secondary students completed the

survey.  (*Id.* at 13)

275.    The Director of Pupil Services set up a computer program tying discipline

referrals to GPA's to determine any relationship between unmet academic needs and discipline.

(*Id.*)

276.    The District incorporated discipline into its ACSIP plans because it believed that

the data driven structured nature of ACSIP would lead to less subjectivity in discipline

assessments and remedies.  (*Id.* at 14)

277.    In its 2008 report, the ODM reiterated the continuation and development of the

DMP, the multi-age classroom, and SAC classes.  (*Id.*)

278.    The 2008 report of the ODM stated that "Rule 1" (refusal to follow school and/or

classroom rules) violations had decreased steadily from 2005-2006 to the date of the report.  (*Id.*)

279.    In 2006-2007 violations dropped from 7,974 to 5,513 and in 2007-2008 a further

decrease of 301 violations was documented.  (*Id.*)

280.    While the PCSSD did not implement a discipline initiative as required within 150

days pursuant to *Plan 2000*, nevertheless, from 2000-2006 the District chose to comply with the

*Plan 2000* initiative through its ACSIP plans.  Beginning in 2006 the District developed a

specific initiative to reduce discipline via the revised Discipline Management Plan.  (*Id.* at 15)

281.    In its 2008 report, the ODM reconfirmed that the Handbook Committee composed

of principals, certified and support staff, parents, union representatives and a student, meet each

year to review and revise the handbooks.  In 2006 the District successfully aligned the student

handbook with the Discipline Management Plan which was intended to provide clear guidelines

for expected student behavior while allowing some flexibility for mitigating circumstances.  (*Id.*

at 15)

282.    The District's hearing Officer has worked closely with school administrators so

that students receive due process when they are involved in any disciplinary actions.  (*Id*. at 15)

283.    Based upon the information and conclusions reached by Dr. Rossell the Court

finds the PCSSD is unitary in the area of discipline.

284.    Dr. Brenda Bowles currently heads up the PCSSD discipline initiatives.  She

assumed responsibility in the 2005-2006 school year.  (Bowles; Tr. 340-341)

285.    The criteria in *Plan 2000* Section F (2) were developed and reduced to writing and submitted to the parties. Dr. Clowers prepared the criteria.  (Bowles; Tr. 343)

286.    At the time she became the person primarily responsible for discipline, a committee was formed to revise the Discipline Management Plan ("DMP").  Committee members included Margie Powell of ODM, PACT and PASS representatives, several administrators and Joy Springer from Joshua.  (Bowles; Tr. 343).

287.    The District successfully revised and updated the Discipline Management Plan ("DMP") and the PCSSD Board approved it in the spring of 2005-06.  District-wide training took place in August prior to the opening of school for the new DMP document.  (Bowles; Tr. 344)

288.    The DMP is a resource for teachers, administrators and students to assist with classroom management.  (Bowles; Tr. 345)

289.    The DMP explains the rights and responsibilities of students for an education, the expectations for the students, parents, teachers and administrators.  It holds everyone accountable for the management of students in the schools.  (Bowles; Tr. 345)

290.    The DMP addresses Plan section (1) by listing other strategies including Saturday school, the nature and types of discipline that are imposed and alternative ways to discipline other than exclusion from school.  (Bowles; Tr. 346)

291.    Pursuant to Plan Section F (1) Dr. Bowles is responsible for storing and keeping disciplinary records and imposition of discipline for each student in the District.  The records are kept for more than 10 years.  (Bowles; Tr. 346)

292.    Many of the disciplinary records are stored electronically in the District's computer instructional software system (SASI) data base.  (Bowles; Tr. 347)

293.    The DMP is interconnected with Plan Section F (2) because it is a tool to help teachers and to help reduce some of the high discipline rates and possible alternatives to referrals, suspensions and expulsions.  It discusses disparity in discipline and how culture can impact the way students act in school.  (Bowles; Tr. 348)

294.    ASCIP is a state-developed, state-mandated instructional strategy for improvement.  While it was not conceived by the state as a component of desegregation plans, the PCSSD took the ACSIP concept and, with the state's permission, integrated various portions of *Plan 2000* into it.  (Bowles; Tr. 352-353)

295.    Regarding Plan Section F (3), discipline was infused into ACSIP because Dr. Bowles wanted it to act as a natural connection to matters already in place as opposed to creating another layer of programs.  (Bowles; Tr. 349)

296.    Dr. Bowles is responsible for "Criteria 3: school climate" a part of ACSIP as it relates to discipline.  (*Id*. at 350)

297.    Discipline used to be punitive.  Dr. Bowles wanted to make it more holistic by having a school climate conducive to learning, safety and order and that held everyone accountable for learning as explained in the DMP.  (Bowles; Tr. 351)

298.    Each school already had an ASCIP plan requiring goals, benchmarks and actions, including how the three would relate and produce a positive school climate with a discipline component.  (*Id*.)

299.    Each school had to have within its Discipline Management Plan actions and interventions that dealt with equity.  If there was a disparity in how each school imposed discipline or if schools had high rates of suspensions or referrals for certain populations Dr. Bowles' division used that data, counseled with them and assisted them using the school's data

to develop actions to support what their data was suggesting.  This was then monitored.  (*Id.*)

300.    This was done by school because each school has its own unique culture and population.  It was an improvement process that created ownership in the school.  The teachers and administrators were using their own data based on their students to develop plans and interventions to improve achievement, discipline, safety and order.  (Bowles; Tr. 352)

301.    Dr. Stephen Ross was a professor at the University of Memphis, Center of Research and Policy, with whom the District contracted to develop the *Plan 2000* education plan and components which included improving discipline and achievement in the District.  The Ross plan is attached to *Plan 2000.*  (Bowles; Tr. 354)

302.    Criteria 3:  School Climate Checklist is a checklist for the principals.  It includes a rubric and questions for interviews with each school.  Each school is visited and discipline data collected.  (Bowles; Tr. 355-356)

303.    The discipline data profile for each school includes demographics, attendance, suspensions, referrals, girls, boys, non black, black, and the top ten most frequent referrals.  The District provides the principal with this information and its use is discussed.  The process also includes an evaluation of the school's DMP.  (Bowles; Tr. 356)

304.    The teachers meet each spring and vote to formalize consistent school-wide rules, all part of the DMP.  (*Id.*)

305.    The District has a district-wide handbook that a committee of teachers, parents, administrators and support staff develop.  While each school has its own handbook, the school handbooks must align with the District's handbook.  (Bowles; Tr. 358)

306.    Each school's Discipline Management Plan addresses level 1 school wide rules. The teachers in each school can determine classroom management actions and consequences for

level 1 rule infractions.  This empowers teacher responsibility for classroom management.  Level 1 rules do not pertain to serious classroom issues such as fighting.  (Bowles; Tr. 358)

307.    The DMP is developed each year at each school. The teachers sign off to document completion of this task.  (Bowles; Tr. 360-361)

308.    The District offers a mental health provider for each school who deals with 'multiple offender students" who have more severe issues.  The mental health providers may go to the student's home, may write the families and sometimes offer summer programs or assign mentors.  (Bowles; Tr. 361)

309.    Another intervention for severe behavior or disruptive issues in secondary schools or for multiple referrals or suspensions is the Student Assessment Center ("SAC") program that is free to the students.  It is staffed by trained social workers and behaviorists who provide assessment services.  Students can be sent to this "in school suspension" where they have an opportunity to make up their work as an alternative to "out of school suspension."  (Bowles; Tr. 363-364)

310.    After tracking discipline data for three years and applying the data in  Plan Section F (2) to identify and train school-wide this process became more productive because everyone was involved, not just one or two people.  (Bowles; Tr. 369)

311.    The Pathwise process was invoked to train teachers, staff and administrators school-wide and offers training in classroom management, culture, student background and prior knowledge.  (*Id.*)

312.    Pathwise is a training program that the state uses for new teachers and has been in place for 6 or 7 years.  It is about building a relationship with students to promote learning in the classroom and to set consistent standards for classroom behavior.  (Bowles; Tr. 373)

313.   Pathwise also deals with equity, fairness, environment, and school climate for students.  (Bowles; Tr. 376)

314.   Dr. Bowles did not disagree with anything that Dr. Rossell said about the student handbooks (Plan Section F (6). (Bowles; Tr. 377)

315.   The District has a single hearing officer as required by the handbook.  (*Id.*)

316.   To comply with Plan Section F (4) Dr, Bowles examined the Welch/UALR survey and revised and updated the DMP.  The District has mental health providers to deal with students.  (Bowles; Tr. 378-379)

317.   The Welch/UALR Survey was completed pursuant to Section F (4).  (Bowles; Tr. 383)

318.   The Welch/UALR Survey provided good information, and was used with other documents for student assignment and discipline issues.  (Bowles; Tr. 384)

319.   Dr. Bowles wrote programs for and developed computer based multicultural/multi-age classrooms which assist children with unmet needs at the elementary level.  It is an academic and social intensive intervention.  (Bowles; Tr. 384)

320.   The Multi-age program is in five schools where mental health providers work with multiple referral/disciplinary problem children.  It involves intensive tutoring with those students.  (Bowles; Tr. 384)

321.   The multi-age classes are composed of students who are falling through the cracks and need to be reengaged into school.  Harris is one of the schools, and many of these students are now back in the same classroom and school where they were earlier having problems. (Bowles; Tr. 385)

322.   In several schools this multi-age class of kids went from non-proficient to 100

points above advanced on a revision test.  In many schools these students scored higher than the other regular classroom students.  (*Id.* at 350)

323.    The District has partnered with Pfeifer Camp and other locations for students with problems.  These students are reconnecting.  The District is teaching them to play a game called school.  (Bowles; Tr. 386)

324.    The District wanted to see if students could rise above problems at home, learn and be successful.  The goal is to increase their scores by one year, and for the most part, it has worked.  There are individualized studies for fourth and fifth graders; their lives have changed in many instances.  (*Id.*)

325.    Referrals and suspensions are going down, teachers are able to teach without disruption and everybody is learning.  (*Id.*)

326.    Regarding *Plan 2000* Section F (5) the Discipline Management Plan, the mental health providers, the multi-age classrooms and the SAC classrooms in every secondary school all play a role in reducing discipline.  (Bowles; Tr. 389)

327.    The Criteria 3: School climate comes into play in F (5).  (*Id.*)

328.    The District is working on student IDs this year at a middle and high school level so it can distinguish students from non-students on campus.  (Bowles; Tr. 390)

329.    The IDs will be integrated with food service so the ID card can be scanned.  If the student is on free and reduced lunch, no one will know.  F (5) (*Id.*)

330.    Except for fighting, most of the top ten rules violations will not result in suspension for the first infraction.  Fighting is a middle school thing; high schools do not have as high an incidence of fighting as middle schools.  (Bowles; Tr. 880)

331.    Many of the level 1 rule infraction referrals are for rudeness.  If a student

accumulates four or five infractions this can lead to a suspension.  (Bowles; Tr. 881)

332.    The staff writes referrals, the student goes to the principal's office, and either the principal or assistant principal makes a decision whether the offense warrants suspension. (Bowles; Tr. 885)

333.    The principal or assistant principal has the latitude to determine if the student can be sent to D-Hall, can be placed in in-school suspension, or can be put back in the class.  (*Id.*)

334.    If parents have a problem with the determination, there is a grievance process or they can appeal to the principal.  If they do not like the principal's decision, the next step is to visit Dr. Brenda Bowles' office.  (*Id.*)

335.    Dr. Bowles' office conducts an investigation to determine whether the suspension was fair or not.  (*Id.*)

336.    Dr. Bowles' office can and does overrule the school's determinations from time to time.  (*Id.*)

337.    With expulsions, *Plan 2000* calls for a single designated hearing officer.  He is assigned in Dr. Bowles' division and he hears expulsion cases and determines due process.  (*Id.*)

338.    The main reasons for suspensions that are appealed are for cell phones and other electronic devices confiscated from the students.  (Bowles; Tr. 886)

339.    Most parents delay an appeal until a child is recommended for expulsion.  (*Id.*)

340.    The parent/student handbook for student conduct and discipline provides that parents are to be involved in the suspension process.  (Bowles; Tr. 887)

341.    The student appeal rights are in the handbook at the "student complaint" section. There is a separate "recommendation for expulsion" section.  (*Id.*)

342.    There is a difference in the number of total versus actual suspensions.  (Bowles; Tr. 891)

343.    Total suspensions are the total number of suspensions received for the school district while actual is the total number of students who have received at least one suspension. (*Id.*)

344.    Most of the students expelled are because neither they nor their parents requested a hearing.  The District sends a certified letter and calls to see if they are coming to the hearing. If they do not come to the hearing the District calls and gives them another chance.  (Bowles; Tr. 893)

345.    The total number for expulsions for 2008-2009 was 34, but only four students out of the total were actually expelled by the hearing officer.  The others failed to attend a hearing and were automatically expelled.  (Bowles; Tr. 893)

346.    A chart containing a nine-year suspension history tracks enrollment.  The end of the nine-year period shows the District is now dealing with an economically different group of students.  (Bowles; Tr. 895)

347.    Monitoring by schools with the top five or ten most frequent discipline infractions/referrals (but not suspensions) allow the identification of trends in the District. (PCSSD Ex. 126, Tr. 901)

348.    The term "Referrals" means a student was written up and sent to the office. (PCSSD Ex. 126; Tr. 903)

349.    The extracted data is from the discipline SASI database.  (PCSSD Ex. 126; Tr. 906)

350.    The top five infractions in all middle schools are defiant behavior, failure to

follow rules, fighting, profanity and possession of electronic devices.  (Bowles; Tr. 908)

351.    That middle school student's hormones are raging can be seen in the discipline data. (Bowles; Tr. 909)

352.    Part of the middle school concept is to organize students in teams to reduce some of the misbehaviors by working in smaller groups.  (*Id.*)

353.    Fighting is the only first time suspendible offense.  Profanity is suspendible if it is directed at staff.  (Bowles; Tr. 910)

354.    In high schools fighting is not normally seen in the top five lists of infractions. Instead, one sees defiant behavior, cell phones, tardy and disorderly conduct.  "No cell phones" is a state law.  (Bowles; Tr. 911)

355.    The Learning Academy is working more on behavioral than social issues. (Bowles; Tr. 912)

356.    The District has discovered that a majority of the students in the Learning Academy could not read above the second or third grade level.  (*Id.*)

357.    A lead teacher curriculum specialist was hired to work on "Reading 180," which is a nationally research-based program to implement reading at the middle school level.  (*Id.*)

358.    Computers were replaced with hands-on activities and individualized teaching to seek more success.  The focus was on reading, literacy and writing. (*Id.*)

359.    Next year work will start on alternative schools as a place for successes, not just a location to place students who are not functioning in a traditional environment.  (Bowles; Tr. 912-913)

360.    Alternative school students are provided counseling and mental health providers; expectations are set out.  A dress code was put in place as a part of expectations; sagging pants

are not acceptable regardless of race.  It is not just an African-American phenomenon.  (Bowles; Tr. 913)

361.    An annual discipline report summary, the first semester discipline report and the board of director's report are prepared to comply with *Plan 2000*.  (Bowles; Tr. 919)

362.    The reports are distributed to all parties including the Office of Desegregation Monitoring and the Joshua Intervenors.  (*Id*.)

363.    Pursuant to suggestions from the ODM, the PCSSD has incorporated additional information in sections of the annual reports to show whether discipline referrals or other such events have increased or decreased from year to year.  (PCSSD Ex. 76-H; Tr. 920)

364.    A major goal of the PCSSD is to continue to reduce school referrals, suspensions and expulsions.  (*Id*.)

365.    The PCSSD has Saturday school which shows progress.  Each secondary school has its own Student Assistant Center on campus to provide in school suspension.  The students are allowed to make up work as an alternative to out of school suspension.  (*Id*.)

366.    Level 1 Rule 1 infractions have been tracked through the Discipline Management Plan during a four-year period and the infractions have been reduced from 7,974 to 4,452.  (*Id*.)

367.    The District produced graphs that show the total number of discipline referrals decreased from 29,235 to 27,919 by 2008-2009.  The ten most frequent disciplinary infractions are listed for the last three years.  (PCSSD Ex. 76-H Table 3, Tr. 921)

368.    When the yearly graph numbers first indicated a spike in defiant behavior the issue was addressed with principals and the referrals began to decrease.  (*Id*. at 921)

369.    A GED program for 16 and 17 year olds was implemented because a number of junior and senior students lacked the requisite number of credits to graduate.  This provided

another intervention to succeed.  (*Id*. at 921)

370.    As a further intervention students were referred to Pulaski Tech's GED program so they could enter junior college when not successful in the traditional school environment. (PCSSD Ex. 76-H, Tr. 922)

371.    A district-wide school climate committee was formed to address ways to modify the climate in the district schools.  (*Id*.)

372.    ID cards, a pathfinders program, and standardized SAC programs were results of the school climate committee considerations.  (*Id*.)

373.    Yearly referrals are declining each year.  A note from a teacher is a referral that explains the infraction.  The building level administrator determines the consequence.  Each rule has a state determined minimum and maximum consequence.  (Bowles Tr. 924)

**Plan 2000 Section F (6)**

374.    The District takes the school discipline data, the DMP and the rubric and visits each school.  This takes a lot of time to share the information, but within a week of the school visit, Dr. Bowles makes recommendations to the school.  (Bowles; Tr. 394)

375.    The District discusses goals and whether the school met its goals or not.  A two page rubric addresses the school's goals and the school observation measures (SOMS) which are 50 minute walk through "snapshots" done by retired teachers observing what is occurring in the classroom.  (Bowles; Tr. 395-396)

376.    The District addresses three actions in the school climate plan: action for parent engagement, order and discipline and professional development.  The District secures data from three sources to support the discipline plan and makes sure the data is updated.  (Bowles; Tr. 397-398)

377.   The District includes positive rewards as an incentive for appropriate behavior. (Bowles; Tr. 399)

378.   The District sends out indicators from Dr. Bowles' office quarterly.  If a school had 22 referrals but increases to 50 an adjustment is considered.  (Bowles; Tr. 400)

379.   FEPSI Benchmarks, the CSRD benchmarks and the DMP are revised annually. (Bowles; Tr. 401)

380.   The School Climate checklist is done by Dr. Bowles' office.  They visit the schools to ensure compliance with the ACSIP.  It is data driven and is revisited each year to see if changes have occurred.  (Bowles; Tr. 404)

381.   The School Climate checklist is the documentation part of the school review.  The consensual nature of the DMP is confirmed and that all teachers participated is documented by a sign-in sheet with participation.  This indicates the staff reached consensus.  (Bowles; Tr. 405)

382.   This exercise is done with each school annually.  (Bowles; Tr. 406)

383.   All DMPs deal with Rule 1, Level 1 infractions, but the objectives and activities may differ by school.  Each school states objectives for reducing Level 1, Rule 1, referrals and they determine their own activities to address student understanding and behavior.  (Bowles; Tr. 410)

384.   The DMP's are faxed and furnished to the Joshua Intervenors.  (Bowles; Tr. 413)

385.   At the beginning of the school year the teacher sets forth her expectations for achievement and social and climate expectations.  The school rules are posted on the wall.  The students are rewarded for appropriate behaviors with rewards such as extra recess time. (Bowles; Tr. 417-418)

386.   The District spends a lot of time addressing inappropriate behavior actions.  This

is an effort to reward students for appropriate behavior.  (Bowles; Tr. 417-418)

**PLAN 2000 SECTION (G) Multicultural Education**

387.    Multicultural texts, trade books, visuals, and supplemental learning materials are more readily available than ever before.  (ODM Report August 16, 2006; p.23)

388.    The District's Learning Services division has engaged teachers more in the textbook selection process, and teaming at the middle school level has afforded teachers more time to peruse new learning materials for purchase.  (*Id.*)

389.    At the individual school level, teachers are more cognizant of student diversity and the concomitant instructional knowledge and skills necessary to meet the needs of that population.  (*Id.*)

390.    Additionally, committee reports through the years reflect increased sensitivity to diversity in school environments.  Classroom visuals and instructional materials reflect more diversity and an increased sophistication on the part of teachers on how to use those materials more effectively to benefit students academically and socially.  (*Id.*)

391.    The scoring that the multicultural committee uses when it goes to the schools is not mentioned in *Plan 2000*.  (McCraney; Tr. 760)

392.    The scoring is not borrowed from No Child Left Behind and is not part of state law or regulations.  It is a standard our very actively engaged committee in the District came up with to monitor itself and to judge itself.  (McCraney; Tr. 760-761)

393.    When reports conclude the District is not in compliance, this means it is not in compliance with its own self developed standard that it uses to judge itself.  (*Id.*)

**Dr. Brenda Bowles**

394.    Brenda Bowles was coordinator of multicultural curriculum development from

2000 until 2006.  (Bowles; Tr. 1428)

395.    The District complied with *Plan 2000* Section G (1) and (2).  (*Id.*)

396.    In the first years a multicultural curriculum committee and local school committees, and the directors of secondary and elementary education were responsible for monitoring multicultural infusion.  (Bowles; Tr. 1430)

397.    Observation sheets recording on-site observations and a multicultural observation measure documented infusion in the local schools.  (*Id.*)

398.    There is no black or white math, but "problems" are developed to reflect things students see in everyday life.  (Bowles; Tr. 1434-1435)

399.    Dr. Bowles sat on all curriculum writing teams and a committee would work to develop the curriculum to identify multicultural opportunities.  (Bowles; Tr. 1436)

400.    Dr. Bowles monitored all phases of multicultural responsibilities by submitting audit questions to all curriculum coordinators and reviewing the responses.  (*Id.*)

401.    Dr. Bowles sat through the text book selection process and looked through all the proposed textbooks along with the multicultural committee and the curriculum coordinators. (Bowles; Tr. 1437)

402.    Teachers who taught certain subject matters sat on the committees for textbook selections in those subject areas.  (*Id.*)

403.    All staff had a role in assuring that multicultural infusion occurred in the classrooms.  (*Id.*)

404.    Committee meetings were documented by sign-in sheets.  (Bowles; Tr. 1438)

405.    Instructional activities geared toward serving as a resource to teachers were provided. (Bowles; Tr. 1439)

406.    The District employed Teacher Expectations for Student Achievement (TESA) models in multicultural infusion.  (*Id.*)

407.    Copies of prior infusion monitoring documents were provided to new teachers. (Bowles, Tr. 1440)

408.    Vocational classes were monitored and the teachers reported on infusion. (Bowles; Tr. 1441)

409.    All teachers submitted their resource guides to the coordinator of multicultural infusion and a book of the reports was kept to document compliance with *Plan 2000*.  (Bowles; Tr. 1442)

410.    The documents in PCSSD Exhibit 20 evidence monitoring of multicultural education beginning in 1989.  (Bowles; Tr. 1446)

411.    An audit instrument was created and used to chart what had been done and what was left to do and how the reports monitoring and implementing multicultural education were to be developed. (Bowles; Tr. 1447)

412.    The audit instrument was completed and presented to the assistant superintendent for student equity and services as a prototype for complying with these components of *Plan 2000*.  (*Id.*)

413.    Multicultural education continues to be implemented in the PCSSD schools and continues to be monitored and documented in the office of multicultural services pursuant to *Plan 2000*, Section G (1) & (2).  (McCraney; Tr. 735)

414.    There are core curriculum coordinators who formulate the curriculum guides. (*Id.*)

415.    A committee of approximately15 teachers from all grade levels examines the

curriculum guides to identify multicultural opportunities and to avoid biases as part of Section G (1).  (*Id.*)

416.    There is a rubric used in every school to evaluate the lesson plans.  A copy with comments is left at the school as part of Section G (2).  (McCraney; Tr. 736)

417.    Multicultural committee teams visit each school to check environment, teacher-to-student interaction, student-to-student interaction and bulletin boards as part of Section G (1 & 2).  (*Id.*)

418.    Multicultural education is an interdisciplinary concept with strategies to infuse not just one culture, but all cultures so that all students will have someone or something to relate to. (*Id.*)

419.    The District is infusing multicultural concepts and strategies into lessons so students can relate to these and can see themselves becoming successful as mathematicians or poets or authors.  (McCraney; Tr. 737)

420.    There is no black or white way of teaching.  The District considers student backgrounds and infuses them into lessons so the students will want to stay in school; so they will want to learn.  (McCraney; Tr. 737-738)

421.    When the adoption committee adopts a textbook, it determines there are no "isms," genderism, racism, and biases, reflected in the book.  (McCraney; Tr. 738-739)

422.    Since library media was granted unitary status in 1996, it is no longer a part of multicultural education monitoring.  (McCraney; Tr. 740)

423.    The multicultural committee conducts a classroom walk-through to confirm no race or gender isolation as there was 20 years ago.  (McCraney; Tr. 742)

424.    In checking the lesson plan books the District decided to highlight multicultural opportunities ("MCO") and code them as RD-racial discrimination; IM – immigration; IC intercultural competence; S-socialization and ED –ethnicity in culture.  If a teacher states in a lesson plan that the kids are in the centers, the District knows that is a group activity, so that can be coded that "S" for socialization.  (McCraney; Tr. 743)

425.    The last three years the multicultural committee has visited all schools. (*Id.*)

426.    All of the foregoing persuades the Court that the PCSSD has substantially complied with the multicultural provisions of *Plan 2000* for an extended number of years.

**PLAN 2000 SECTION (H) School Facilities**

427.    Clinton and Crystal Hill were the first new schools built in the PCSSD after this lawsuit was filed in 1982.  (Bowles; Tr. 1073)

428.    It is undisputed that Crystal Hill was built in 1992 and Clinton was built in 1994. (*Id.* at 1073)

429.    The next new school built was Bates Elementary.  It was not built until *Plan 2000* was approved.  (*Id*. at 1073)

430.    The next school built was Maumelle Middle School.  If is currently 41% black and will be the only feeder school for the new Maumelle High School.  (Bowles Tr. 1074-1075)

431.    While Joshua objected to the building of Maumelle High School in a letter dated December 22, 2007, it did not accept the invitation of Judge Wilson to file a formal motion to pursue its objection.  (Holder; Tr. 2523)

432.    Chenal Interdistrict is the newest school that has been completed.  (*Id.*)

433.    All of these schools are and have been racially non-identifiable and have consistently had student populations that were at least 30% African-American.  (Bowles: Tr.

1074-1075)

434.    Sylvan Hills Middle School has been slated for replacement.  It is currently 49% African-American.  (*Id.* at 1075)

435.    A scatter plot was created by Dr. Clowers which demonstrated that black students are not concentrated at the older schools.  Exhibit 92 shows there is no statistical significance for black enrollment in the District's schools based on the age of the school.  (PCSSD Ex. 92, Tr. 1216)

436.    The PCSSD delivered a copy of a report entitled *Facility Evaluation*, prepared by the M.B. Kahn Construction Company of South Carolina to the Joshua Intervenors within the timeframe specified in *Plan 2000*.  Joshua did not respond to the study.  (ODM Report September 17, 2008; p.18)

437.    The District continued to use the Kahn study as a guide for meeting the most critical facility needs of district schools through 2006.  (*Id.* at 18)

438.    By legislative action, all District schools underwent a formal study of their facilities in 2004.  (*Id.* at 18)

439.    The District involved the Joshua Intervenors on the Harris Steering Committee, thus providing the Intervenors access to information and opportunities for input into the renovation project at that elementary school.  (*Id.* at 29)

440.    A 1999 facilities evaluation conducted by the PCSSD indicated the inadequacies of the Harris physical plant were legion.  In June 2003, and thanks to the efforts of district construction workers, Central Office Administration and the school staff, Harris was transformed.  (ODM Report July 30, 2003; p.11)

441.    The District made genuinely substantial improvements to the Harris buildings

rather than simply superficial alterations.  (*Id.*)

442.    According to the ODM Report of July 30, 2003 students at Harris were benefiting from an enriched academic experience in the curricular areas of science and physical education/health/wellness.  They had weekly access to a well equipped science laboratory and the services of a fulltime science specialist.  A fulltime health specialist provides physical education classes twice each week and health education instruction once a week.  Both specialists work closely with the classroom teachers to assure students of a well coordinated cohesive academic experience.  (ODM Report July 30, 2003; p.20)

443.    The District hired Kahn Construction Company to do the study required in Section H-1 of *Plan 2000*.  (Holder; Tr. 1188)

444.    The Kahn study provides that because of the age of many PCSSD schools it is important to consider the high costs of upgrading them for code compliance before deciding to invest in the renovation of an existing older facility.  (*Id.* at 1188-1189)

445.    The Kahn study has been periodically updated.  (*Id*. at 1189)

446.    The Kahn study was designed as an overall facility evaluation to determine upgrades, additional permanent space and what general improvements were needed so that the District facilities provided adequate space for the instructional programs offered, a physical environment adequate for learning and a safe environment for students.  (*Id.* at 1190)

447.    The Kahn study goes on to provide that it should be viewed not as the sole solution but as a tool for addressing then current needs while also exploring new solutions for the years to come.  It should periodically be reevaluated and revised to reflect the changing needs of the school district.  Community involvement in the evaluation and updating process would help develop the public support necessary to provide funding for needed renovations and new

facilities.  (*Id.* at 1190)

448.    The Kahn report projected over $200,000,000 in costs so phases were developed with Phase I being approximately $110,000,000.  A millage was sought for Phase I; there was millage campaign but the millage failed.  (*Id.* at 1191)

449.    The Kahn report is Exhibit 21.

450.    The Court recognizes that after the Kahn study the PCSSD found itself in a dilemma, particularly with the failure of the millage campaign.  It could elect on one extreme to build no new schools but yet be able to demonstrate in court that all of its schools were equally old and inferior or it could make choices about which new schools to bring online first and endure the inevitable criticism and jealousy that their selection would engender.  The Court does not fault the PCSSD for electing the latter course even though the Court might have made different decisions or set different priorities if it had been assigned that role by Plan 2000.  It was not.

451.    The information in the original Kahn report is at least 10 years old.  (PCSSD Ex. 21; Kahn Report Introduction at PCSSD Bates #00360)

452.    The District is consistent with maintenance, housekeeping, etc., district wide. (Holder; Tr. 1199)

453.    Mr. Holder believes that all of the buildings in the District are safe and structurally sound.  (*Id.*)

454.    As a result of the Lakeview case, districts are required to develop "10 year plans." (*Id.*)

455.    These are plans requiring school districts to evaluate their needs for the next 10 years and develop design projects to meet those.  (*Id.* at 1200)

456.    Exhibit 145 demonstrates that between 2008-2010 the following projects with the following costs were completed at Mills High School:  (Holder; Tr. 2512)

>   (a)    Installed new carpeting in the auditorium, three computer labs, main office, counselors area, security office, coaches dressing area, sound room – $14,942.00 / fall 2008;
>
>   (b)    Renovated all student restrooms – $349,000.00 / summer 2008;
>
>   (c)    Re-roofed main building area and gym roofs, water proof exterior walls – $241,000.00 / fall 2008;
>
>   (d)    Replaced wooden bleacher boards on football stadium bleachers with aluminum – $60,000.00 / summer 2008;
>
>   (e)    Supplied paint and materials to paint all of inside of main building – $2,500.00 / summer 2008
>
>   (f)    Installed two new 20 ton HVAC units in auditorium – $24,978.00 / fall 2009;
>
>   (g)    Bat removal in auditorium – $4,500.00 / 2009
>
>   (h)    Constructed ADA wooden ramp football stadium – $3,000.00 / 2009
>
>   (i)    Replace culvert in back parking area – $1,500.00 / 2010
>
>   (j)    Installed new doorway to Principal's office – $1,300.00 / 2010

457.    Exhibit 148 indicates that the following projects were done at the following costs at Harris Elementary between 2000 and 2010:

>   **2002-2003**    Repair outside wall of room 9 in building A; asbestos abatement building A; cafeteria and kitchen new floor tile in building A; cafeteria and kitchen replaced roof on building A; media center painted entire facility interior and exterior; replaced roof top heat and air ducts; remodeled all bathrooms (new partitions, commodes, faucets, flush valves, sinks and cabinets); electrical upgrades in all buildings; new carpet and floor tile throughout the buildings; build display cabinets for science room; repaired all exterior brick; repaired concrete block wall in room 9; and new concrete over the breezeway area.  (completed 92 work orders)
>
>   **2003-2004**    Installed new roof on the gym; new school sign with marquee for activities; installed new flagpole; painted gym interior, media center, cafeteria, front office; remodeled counselor's office; installed concrete pad for backflow preventer;

painted exterior of building B; constructed new computer lab tables; painted and striped fire lane, handicapped areas, parking spaces and crosswalks; constructed new concrete block storage building; installed a new entry with columns and metal roof; installed a back flow preventer; new sink and cabinet in pre-K building; installed new gym features; installed new playground equipment; new concrete sidewalk to playground equipment; and new washer and dryer for building B.  (completed 88 work order)

**2004-2005**     Completed gym floor; installed new gym bleachers; installed two new backboards and goals in the gym; two new water fountains in the gym; door locks and hardware in the gym dressing room; and removed old playground equipment from front and rear of school.

**2005-2006**     Installed wooden chips in the playground area; and repaired three inch water line in front of the building.

**2006-2007**     Installed new water heater; installed new electrical panel for washer and dryer; and repaired stage flooring.

458.     Exhibit 147 is a recent video of Harris Elementary which indicates that the facility is in reasonably good condition.

459.     Exhibit 149 indicates that a "mold condition" described by one witness at Harris Elementary was remediated by the PCSSD as of August 24, 2009.

460.     Exhibit 150 indicates that after the mold remediation the building received "clearance" by a company called EMTEC.

461.     While a portion of the property involving the new Maumelle High School was characterized as a "donation" in the closing documents, nevertheless, the District paid $3,200,000 for the property as a whole.  (Holder; Tr. 2522; Ex. 153-157)

462.     In April 2008, the PCSSD developed the *Districtwide Facility Condition and Educational Suitability Cost Summary*, combining the results of the Kahn Study with those from the state.  (ODM Report September 17, 2008; p.18)

463.     The District's construction committee prioritized school improvements by starting with facilities that the committee deemed were in the worst shape.  The committee deemed roof

repairs as the most critical.  (*Id.* at 18)

464.    Citing a lack of funds to build new classrooms, the Executive Director for Support Services (the position was changed in 2006 from Assistant Superintendent by the superintendent) noted that the PCSSD had added several portables throughout the District.  (*Id.* at 18)

465.    In most of the elementary schools, the multipurpose rooms have been converted to regular classrooms, yet the schools must provide state-mandated programs such as music, art, and PE, leaving the District with little choice but to use portables.  (*Id.* at 18)

466.    The PCSSD has been emphasizing "curb appeal" to encourage parents and students to visit district schools.  (*Id.* at 18)

467.    Handicapped accessibility has been addressed in all PCSSD schools.  Every school has curb cuts and ramps.  (*Id.* at 18).

468.    The Assistant Superintendent for Support Services developed a *Three-Year Facilities Improvement Plan* in 2004.  Based on the original Kahn study findings and a more current internal assessment of district facility needs, the three-year plan identified key building and renovation projects and their costs.  (*Id.* at 18)

469.    Additionally, during the summer of 2004, a team of architects and engineers representing the state of Arkansas' Task Force to the Joint Committee on Educational Facilities assessed each PCSSD school as part of a statewide effort to identify the condition and adequacy of all school facilities.  The final state report for PCSSD identified specific deficiencies in each of the district's schools as well as the repair costs and priority for addressing each deficiency. (ODM Report August 16, 2006; p.27)

470.    The District notified Joshua of plans to construct a new Maumelle middle school in the Crystal Hill and Maumelle area, plans that Joshua initially opposed.  The District invited

Joshua to sit on the schools' Site Selection Committee, but no Joshua representative attended a meeting of this group.  (*Id.* at 29)

471.    The state findings reflect many of the Kahn study findings and include additional concerns that may have developed since the District adopted the Kahn report in 2000.  (*Id.* at 27)

472.    In 2003 ODM reported the PCSSD had identified property, secured $15 million in funding, and received Court approval to build a middle school within the Maumelle city limits. The PCSSD completed the Maumelle Middle School in time for the start of the 2005-2006 school year at a cost of approximately $16 million.  (*Id.* at 29)

473.    During the 2005-2006 school year, Maumelle Middle School had an enrollment of 447 students in Sixth and Seventh grades.  At 42% African-American, the school was within the PCSSD's compliance range for racial composition.  (*Id.* at 29)

474.    In May of 2003, the ODM reported the District's intention to upgrade rather than close Harris Elementary, a school in the largely African-American McAlmont community.  By late August of 2003, Harris Elementary School re-opened as Harris Elementary Health and Science Specialty School.  During the intervening months the District spent $900,000 completely renovating Harris' 60's era physical plant.  (*Id.* at 29)

475.    Serial Exhibit 22 demonstrates that Joshua was informed pursuant to *Plan 2000* each time the PCSSD decided to build a new school, add on to existing schools or utilize portable buildings if they would have the effect of increasing capacity.

476.    Exhibit 146 is a recent video of Jacksonville Middle School which shows that the school is in reasonably good condition.

477.    Exhibit 158 is a set of minutes from the PCSSD Board of Directors confirming that replacement of the roofs at Crystal Hill and Clinton Elementary Schools were necessary.

478.    Given all of the foregoing the Court finds that the PCSSD has substantially complied with Section (H) School Facilities of *Plan 2000*.

## PLAN 2000 SECTION (I) Scholarships

479.    The Board passed a Board Policy on April 20, 2003 establishing a policy for scholarships.  (Bowles; Tr. 1369)

480.    The Committee mentioned in *Plan 2000* met and the Board Policy was a product of that Committee.  (*Id.* at 1368-1369)

481.    The policy was written.  The District did not have the funds to fund scholarships but said it would do so when funds were available.  (*Id*. at 1372)

482.    Although the Court is disappointed and somewhat irritated that the District has not followed through to make any real efforts to fund the scholarships it elected to create as Board Policy, nevertheless, the District literally complied with this section of *Plan 2000* by timely creating the committee to consider the scholarship issue.  Thus, the Court finds that PCSSD substantially complied with this section but at the same time exhorts the District to comply with the policy it enacted.

## PLAN 2000 SECTION (J) School Resources

### Robert Clowers

483.    Dr. Robert Clowers helped implement Section J, School Resources by conducting one of two school resource studies done regarding pupil/teacher ratio, pupil/staff ratio, square feet per pupil, percentage of staff with a master's degree and nine or more years of experience, among other criteria.  (Clowers; Tr. 1204)

484.    The first study was conducted as part of *Plan 2000* by Dr. Herts in May, 2001, and covered most factors included in *Plan 2000*, although Plan Section J did not specify the

precise factors to be covered.  (PCSSD Ex. 25, Tr. 1204)

485.    The study conducted in 2003-2004 by Dr. Clowers covered all items set out in Section J of *Plan 2000*.  (PCSSD Ex. 26, Tr. 1205)

486.    The conclusion of both studies was that there was no disparity based on the percent of black enrollment regarding the study variables; or in statistical terms "no significant findings."  (PCSSD Ex. 26, Tr. 1206)

487.    The study methodology was selected based on a similar study conducted by the LRSD that was filed with the court and accepted by Joshua without comment or complaint.  (*Id.*)

**Margie Powell**

488.    The ODM agreed that two school resource studies were done by the PCSSD. (Powell; Tr. 2364)

489.    The Court is persuaded that the PCSSD substantially complied with Section (J) School Resources.

## PLAN 2000 SECTION (K) Special Education

490.    As of the August 16, 2006 update, the PCSSD continued to maintain a Special Education Program that operated within the acceptable guidelines established by state and federal authorities.  (ODM Report August 16, 2006; p.32)

491.    As of May 4, 2000 the Director of Special Education had provided a description of the Special Education standards and materials outlined in *Plan 2000* to Joshua.  This met the 45 day timeframe cited in the Desegregation Plan.  (ODM Report September 17, 2008, p.20)

492.    As of the last ODM Report of September 17, 2008 the PCSSD continued to maintain a Special Education Program operating within the acceptable guidelines established by state and federal authorities.  (*Id.* at 20)

**Brenda Hiegel**

493.    The source of standards, rules and regulations for special education in Arkansas is from the federal law titled *Individuals with Disabilities Education Act*.  (Hiegel; Tr. 951)

494.    An annual report is submitted by the District's department of special education.  (*Id.*)

495.    Joshua does not controvert the ODM's September 17, 2008 report which concluded that the District has complied with *Plan 2000* Section K-1 provisions for special education.  The ODM report noted that on May 4, 2000, the director of special education provided a description of special education standards and materials outlined in *Plan 2000* which was forwarded to Joshua, meeting the *Plan 2000* deadlines.  (Hiegel; Tr. 952)

496.    The District takes the percentage of its black special education population, subtracts the regular education percentage of black students from that and then further deducts an 8.3 % standard deviation to determine whether the District has disproportionality regarding its African-American representation in special education.  (*Id.*)

497.    That numerical benchmark is a guideline for over-representation or disproportionality.  (Hiegel, Tr. 954)

498.    That process and the resultant percentage is state monitored.  (*Id.*)

499.    The District has had no citations for noncompliance with this standard.  (*Id.*)

500.    The District gets an annual report from the state verifying that the District did not "trigger" in this area.  (Hiegel, Tr. 955)

501.    The District's annual monitoring report and a monitoring plan reveals a lot of information to show compliance with state and federal regulations and to demonstrate the District is meeting its desegregation responsibilities as required by *Plan 2000*.  (PCSSD Ex. 75-J,

Tr. 955-956)

502.    Any schools having disproportionate numbers of African-American students in special education are monitored throughout the school year.  (PCSSD Ex. 75-J, Tr. 957)

503.    When the state standard deviation was adjusted in 2008 from 8.3% to13.1% the District had only two schools that barely exceed the proportion.  (PCSSD Ex. 75-J, Tr. 957-958)

504.    The data is collected from the state through APSCN.  (Hiegel; Tr. 958)

505.    The District has had no warning letters from the state regarding proportionality. (*Id.*)

506.    Page 10 of the annual report is the monitoring task timeline used throughout the year and setting out activities that the District completes to meet its desegregation responsibilities.  (PCSSD Ex. 75-J)

507.    Twenty-three items apply to compliance with Section K-(2) of *Plan 2000* including preparation of a year-end summary report, monitoring plan timelines, and reviewing rules and regulations and District policies which are approved annually through the state department of education.  (PCSSD Ex. 75-J, Tr. 959-960)

508.    The District also discusses non discrimination issues at staff meetings in the schools, develops a review plan to ensure nondiscrimination requirements, has screening plans on file for each year to assure modifications are in place in schools, and monitors schools for their 80% referral-to-diagnosis rate, a pre-established criterion set forth pursuant to the government standards referred to in *Plan 2000*.  (Hiegel; Tr. 959-960)

509.    Each year the District collects data from principals regarding racial composition, placement type and special education teachers by race.  (*Id.*)

510.    The District monitors, analyzes and maintains data for students during the school

year as well as any identification of one-race classes.  (*Id.*)

511.    The District has seven coordinators who are assigned by school feeder patterns. The coordinators assist administrators throughout the school year with technical assistance regarding all phases of special education referral and program components.  (*Id.*)

512.    The racial composition report is monitored and analyzed through the year 13.  The District collects data on suspensions.  (*Id.*)

513.    A review committee analyzes reports and maintains the special education referral evaluation placement data to assure the referrals are proper.  (PCSSD Ex. 75-J, Tr. 961)

514.    The District conducts numerous staff development in-services for regular education staff regarding procedures, including 504 procedures for designees in schools. (Hiegel; Tr. 961)

515.    All procedures are on-going throughout the year to assure the District is meeting all guidelines referenced in *Plan 2000*, Section K.  (*Id.*)

516.    The special education state regulations and eligibility criteria provided by the State are posted throughout the District and in the Central office.  (NLRSD Ex. 31-33, Tr. 963)

517.    On the first page of the special education annual report the District's enrollment by race and special education enrollment by race is documented; the District then calculates the difference in percents utilizing the 8.3% standard deviation as a guide to demonstrate compliance with the special education component of desegregation as well as state regulations.  (PCSSD Ex. 75, Tr. 965)

518.    From 2000 through 2009 the district-wide totals have been at or below the standard deviation in special education except for one year.  (*Id.*)

519.    The special education annual reports and plans are presented to and approved by

the school board of directors and are mailed to all parties including Joshua Intervenors.  (Hiegel; Tr. 966)

520.     Whether a school's numbers change varies each year because special education students enter and leave the District through transfers or by moving away.  New placements are made and some students are dismissed from Special Ed.  (Hiegel; Tr. 979)

521.     Nothing prohibits changes in the special education reporting format.  (Hiegel; Tr. 980)

Special education compliance with Section (K) of *Plan 2000* is described in the monitoring plan. (*Id.*)

522.     The Court finds that the PCSSD has substantially complied with Section (K) Special Education.

**PLAN 2000 SECTION (L) Staffing**

523.     During his testimony Dr. Armor explained he was asked to evaluate teacher assignments and whether they met the requirements of unitary status.  (Armor; Tr. 97)

524.     Dr. Armor concluded that PCSSD has maintained a high degree of teacher racial balance and qualified for unitary status in the area of teacher assignment.  (*Id.* at 97-98)

525.     Dr. Armor testified that he was made aware that the PCSSD had been declared unitary as regards the assignment of elementary teachers.  He explained that he evaluated all instructional levels regardless even though elementary may not have been an issue.  Since the District continued to keep statistics and make reports, he had the data to make an assessment. (*Id.* at 98)

526.     Dr. Armor testified consistent with his reports that he applies a plus/minus 15% standard and that he prepared a table to show any deviations for the past five years.  This refers

to Table 6 of his first report.  (*Id.* at 99)

527.    Table 6 lists all the district schools including the elementary schools.  It provides the percentage of black teachers and then applies the plus/minus 15% deviation.  (*Id.* at 100)

528.    A few of the schools are outside the deviation for one or two or three years including College Station, Harris and Jacksonville Boys School.  (*Id.* at 103)

529.    However, Dr Armor testified that these outcomes demonstrate compliance with maintaining racial balance regarding teachers.  He further explained that even though some schools fall outside the range it is not consistent.  In the next year or subsequent years they fall back within the range.  He likewise explained that if a district has a small school a change of just one teacher would cause a school to fall outside of a range.  (*Id.* at 103)

530.    He found no long term trends of imbalance.  (*Id.* at 104)

531.    Dr. Armor's analysis of teacher assignments in the PCSSD actually examined the more rigorous requirements of the 1992 Plan and Exhibit 7 and 7(a) make this clear.  Of course, this indicates substantial compliance with *Plan 2000* which has no such statistical requirements.

532.    There was nothing about those outcomes that changed his opinion that the District had obtained the racial balance in teacher deployment necessary for unitary status.  (*Id.* at 106-107)

533.    Dr. Armor also explained that he had never studied a district that had every school racially balanced each and every year.  The PCSSD is very similar to other districts that have been declared unitary in that respect.  (*Id.* at 107)

534.    The requirement for attaining unitary status in teacher assignment is similar to that for students. Dr. Armor explained that teachers should be assigned to schools so that the composition at each school is similar to the racial composition of all district teachers at that

grade level.  (Ex. 7 at p.13)

535.    "Similar" is not explicitly defined; however the Supreme Court has typically allowed variations on the order of plus or minus 10 to 15 percentage points from the district-wide racial composition.   Since Dr. Armor has used plus or minus 15 percent with court approval in most of the unitary cases he has evaluated as an expert witness, he adopted that standard for his evaluation of the PCSSD.  (*Id.*)

536.    Using data going back to the 2000-2001 school year, Dr. Armor found that the PCSSD has maintained substantial and consistent teacher racial balance at nearly all of its schools for the past eight years.  Only two schools, College Station and Jacksonville Boys Middle, have been outside a plus/minus 15% allowance for more than one year during the past five years.  (*Id.*)

537.    Dr. Armor stated, "In my opinion, the PCSSD has maintained substantial racial balance in its teacher assignments for an extended period of time, and therefore I believe it has met the requirements for unitary status in the area of teacher assignment."  (*Id.*)

538.    In his 2008 report he opined that, "The PCSSD has adopted and implemented a desegregation plan that has been effective in meeting the requirements for unitary status that courts have established in the areas of student and staff assignment."  In his updated opinion he reviewed supplemented data and made analyses that found that there was no reason to alter his original professional opinion.  (Ex. 7 at p.1)

539.    In his supplemental report regarding "Teacher Assignment," Dr. Armor noted that in 2008-2009, no school had a faculty composition that fell outside the plus/minus 15% deviation range.  In 2009-2010, both Fuller middle and Harris elementary fell outside the range.  It was the first time Fuller fell outside the standard in seven years of data collection, and Harris was outside

the range only one other year out of seven.  (Ex. 7(a) at p.3)

540.     The Supreme Court approved the standard he advocated for teacher assignment, plus or minus 15%.  (Armor; Tr. 37)

541.     In clarifying the plus or minus 15% percentage points in teacher assignment, if a hypothetical school district had an average of 20% African-American teachers, the school could range from 5% to 35% black.  (Armor; Tr. 36)

542.     His testimony regarding student and teacher assignment and demographic changes were accepted not only by the presiding judge in *Freeman v. Pitts* but by the Supreme Court as well.  (*Id.*)

543.     Based upon Dr. Armor's analyses, opinions and testimony the Court finds that the PCSSD is unitary as regards its remaining responsibilities in the Staffing (Section L) area.

544.     According to the ODM's September 17, 2008 report, the District continues to meet its goal of maintaining a ratio of black administrators in proportion to the ratio of black certified personnel in each preceding year.  (ODM Report September 17, 2008; p.21)

545.     All secondary schools have at least one black administrator.  (*Id.*)

546.     The PCSSD strives to maintain a black certified population that is "in proportion to their availability in the relevant labor market."  (*Id.*)

547.     Some certified vacancy positions are held open longer to give administrators the opportunity to interview and hire black candidates.  (*Id.* at 22)

548.     In some cases the District hires only temporary staff until a position can be filled by an African-American.  (*Id.*)

549.     The superintendent may reassign a teacher in an effort to improve racial diversity in a school.  (*Id.*)

**Debbie Coley**

550.     Debbie Coley has been the assistant superintendent for human resources since July, 2006.  (Coley; Tr. 982)

551.     Human Resources annually receives a listing of minority graduates from Arkansas colleges provided by the Arkansas Department of Education.  (Coley, Tr. 984)

552.     Human Resources oversees approximately 1,500 teachers and as many support staff.  (Coley; Tr. 987)

553.     Regarding *Plan 2000*, Staffing, Section L, human resources complies with sections 1-4 of *Plan 2000*.  (*Id.*)

554.     Ms. Coley did not disagree with any of expert David Armor's testimony, opinions or conclusions regarding staffing. (Coley; Tr. 988)

555.     The District was declared unitary regarding elementary staffing in 1996, even though some elementary data still appears in reports for the District.  (*Id.*)

556.     PCSSD Exhibit 28 is a typical job posting for PCSSD.  (PCSSD Ex. 28, Tr. 989)

557.     All job postings are sent to Dr. Bowles to assess for compliance with *Plan 2000*.  (*Id.*)

558.     Human Resources prepares an annual report entitled the Deployment Report. (Coley; Tr. 990)

559.     The Board of Directors has a non discrimination policy which states, "Further, the District will make special efforts to employ and advance women, blacks, and handicapped persons."  (PCSSD Ex. 30, Tr. 991)

560.     PCSSD Exhibit 30(A) states, "The purpose of this policy is to designate personnel and operational guidelines for implementing equal employment opportunity practices and the

District's plan to employ and advance women, blacks and handicapped persons." (PCSSD Ex. 30, Tr. 992)

561.     Board policy GB-K Exhibit 31 outlines steps for the guidelines and procedures that an administrative staff person with a complaint would follow.  (PCSSD Ex. 31, Tr. 993)

562.     The steps include a complaint then an informal meeting between the complainant and his immediate supervisor to seek resolution.  If that fails a formal grievance process occurs with the immediate supervisor, then a meeting with the superintendent, and last a meeting with the Board of Education.  (PCSSD Ex. 31, Tr. 994)

563.     All administrative employees with a grievance can proceed through the board process.  (*Id.*)

564.     If the employee is not satisfied with the outcome he can sue the District.  (*Id.*)

565.     The board policies have been adopted and revised between 1999 and 2002.  (*Id.*)

566.     PCSSD Exhibit 32 addresses complaints, concerns and grievance policy for support staff.  (PCSSD Ex. 32, Tr. 995)

567.     This policy covers custodial staff, maintenance staff and secretarial staff; all staff that do not require an Arkansas teaching certificate. (*Id.*)

568.     The policy describes all procedural levels with level three being the school board. (*Id.*)

569.     This policy is currently in effect. (*Id.*)

570.     In a past grievance regarding minority staff it was contended that the District violated the master contract by reserving openings for minority staff.  (PCSSD Ex. 34, Tr. 996)

571.     The grievance was denied and the practice of reserving openings for minority staff was upheld.  (PCSSD Ex. 34, Tr. 997)

572.   *Plan 2000* Section L (3) deals with categories of teachers.  (Coley; Tr. 997)

573.   PCSSD Exhibit 69 identifies the number of African-American teachers as a whole, as well as those in secondary math and secondary science.  Secondary math, science, English and social studies teachers are considered core teachers.  (Coley; Tr. 998-999)

574.   Areas that *Plan 2000* requires the District to emphasize core teachers in math, science, social studies and English.  (Coley, Tr. 1000)

575.   PCSSD Exhibit 77-J is the latest annual personnel hiring and deployment report submitted by the HR department.  (*Id.*)

576.   This is one of the enumerated reports in Plan Section N that the District is committed to develop and produce yearly.  (PCSSD Ex. 77-J, Tr. 1001)

577.   The report goes before the board of directors for approval and is then provided to all parties by Dr. Bowles.  (*Id.*)

578.   Some sections of the annual report include employee groups or categories that are not mentioned in *Plan 2000*.  The District has goals in certain areas in addition to those set out in *Plan 2000*.  (PCSSD Ex. 77-J, Tr. 1002)

579.   Goal 1 in the deployment report is: "To attain a ratio of black administrators in the PCSSD in proportion to the ratio of black certified personnel in the District in the preceding year.  The District continues to recruit, employ and promote blacks in administrative positions."  The District exceeds that goal.  (PCSSD Ex. 77-J, Tr. 1002-1003)

580.   Goal 2 is: "To employ at least one black administrator in each secondary school."  This is a goal set by the District.  The District's track record for meeting this goal is positive.  (*Id.*)

581.   The human resources report is both a deployment and recruiting report.  (*Id.*)

582.    *Plan 2000* does not mention support staff, but the District has a goal to increase recruiting efforts with agencies where minority applicants may be located.  Support staff is at 42.5% African-American.  (PCSSD Ex. 77-J, Tr. 1004)

583.    An appendix to the annual reports analyzes teachers by race and gender, analyzes teachers by core areas, analyzes administrative staff by race and gender and identifies certified elementary, middle /secondary school and high school staff by race and gender.  (PCSSD Ex. 77-J, Tr. 1004-1008)

584.    Appendix IX summarizes certified employment from 1984-2010.  (*Id.*)

585.    The reports establish that the current core of district black teachers exceeds the percentages who graduate from Arkansas colleges each year.  (*Id.*)

586.    The percentage of district black teachers under contract for this school year is above the state-wide average and has been for the last 10 years.  (PCSSD Ex. 77-J, Tr. 1009)

587.    *Plan 2000* does not have statistical goals or quotas, but does speak of a racially diverse pool of applicants for both administrators and teachers.  The District exceeds the state average and has for the last 10 years.  (PCSSD Ex. 77-J, Tr. 1010)

588.    Appendix X is a separate report that describes the recruiting activities of the PCSSD for minority teachers and administrators and specifically speaks to *Plan 2000*'s requirement that the District recruit so that new teachers are selected from a racially diverse pool of applicants.  (PCSSD Ex. 77-J, Tr. 1011)

589.    If a particular applicant pool is not racially diverse the District re-advertises the position an additional five days.  If the pool remains non-diverse the position is filled as a temporary position only.  (Coley; p. 1011)

590.    An emergency posting is placed if the applicant pool is not diverse or no qualified

applicants apply.  (Coley; Tr. 1016)

591.    The posting states, "The District will make special efforts to employ and advance women, blacks and handicapped persons."  (*Id.*)

592.    A grievance procedure negotiated with the teacher's organization has informal levels:  level I is principal or immediate supervisor, level II is the superintendent and thereafter arbitration.  (Coley, Tr. 1017-1018)

593.    There are no policies or practices that would result in an upper limit on the number of black teachers hired in the PCSSD.  (Coley; Tr. 1029)

594.    In 2007 a total of only109 black graduates from Arkansas colleges and universities had education degrees.  (NLRSD Ex. 99)

595.    From 2003 to 2007 there were on average approximately 89 black graduates from Arkansas colleges and universities each year with education degrees.  (See Thompson at NLRSD Tr. 352)

596.    There are approximately 287 school districts in Arkansas.  (See Thompson at NLRSD Tr. 351)

597.    As of November 2009 fewer than 10% of licensed teachers in Arkansas were African-American.  (See Thompson at NLRSD Tr. 352; NLRSD Ex. 101 and see also Court Ex. 1)

598.    Newly hired black teachers ranged from 5.3% to 9.3% statewide during the same period (Court Ex. 1 at 2) and African-Americans with new teacher certifications had declined from 8.1% to 6.1% statewide from 2006-2007 to 2008-2009.  (*Id*. at 3)

599.    The PCSSD adopted NLRSD Ex. 20 the "Welch Study."  The Welch Study found the relevant labor market for these districts to be the entire state not just Pulaski and Saline

counties.  (PCSSD Ex. 33)

600.    The Welch Study found that the pool of qualified black applicants in PCSSD's relevant labor market was 11.9%.  (PCSSD Ex. 33)  Today, that has declined to 9%.  (Court Ex. 1 at 1)

601.    Since 1998 the availability of African-American educators has declined and the pool of qualified black applicants in PCSSD's relevant labor market today is less than 10%. (Court Ex. 1)

602.    The number of African-American graduates with education degrees is declining. (Court Ex. 1 at 4)

603.    Given all of the foregoing information, testimony and exhibits the Court finds that the PCSSD has substantially complied with its remaining staffing obligations contained in *Plan 2000*.

## PLAN 2000 SECTION (M) Student Achievement / Education Plan

### Initial Implementation of the Ross Education Plan

604.    Dr. Bowles testified about the early years of implementation of the Ross Education Plan.  (Bowles; Tr. 1252)

605.    Her title then was Coordinator of Multicultural Curriculum Development and she became Director of Multicultural Education and Equity.  (*Id.*)

606.    Dr. Bowles began working on implementation of the Ross Education Plan after *Plan 2000* was approved by Judge Wright.  (*Id.* at 1253)

607.    She developed a PowerPoint which was received into evidence as Exhibit 35. This PowerPoint was used to educate the principals and directors of instruction and the leadership teams for each school.  (*Id.* at 1253-1254)

608.     The PowerPoint was used to explain the importance of the SOMS and FEPSI data.  This was the beginning of the implementation of the FEPSI process.  (*Id.* at 1254)

609.     Dr. Bowles explained how it was determined to use the Ross Education Plan with the ACSIP Plan.  (*Id.* at 1255)

610.     Dr. Bowles was the person initially in charge of teaching how to benchmark, how to write the benchmarks and how to set up the SOMS.  She worked closely with Dr. Ross and the University of Memphis and with the school teams.  (*Id.* at 1255)

611.     The initial pilot schools for the program were determined in coordination with Dr. Ross.  (*Id.*)

612.     The initial schools selected had the very highest poverty rates.  (*Id.* at 1256)

613.     Exhibit 35 is a copy of Dr. Bowles PowerPoint which explains the District's initial implementation of the Ross Educational Plan.  (*Id.* at 1256)

614.     Exhibit 40 explains phase two of the process and when phase three would commence.

615.     Exhibit 50 demonstrates the status of implementation of the Ross Plan in the PCSSD as of 2002.  (*Id.* at 1258)

616.     It emphasizes student achievement and the other correlates or strategies for implementation.  It began the incorporation of discipline as part of the education plan and demonstrates how all components interconnect with ACSIP.  (*Id.* at 1258)

617.     Exhibit 50 confirms that one of the strategies was to decrease the performance gap between white and African-American students.  (*Id.* at 1259)

618.     Dr. Bowles explained how a rubric, a scoring device, was designed and used to evaluate the action plans.  A committee of administrators would go from school to school and

"score" each schools action plan.  (*Id.* at 1260)

619.    Dr. Bowles remained involved with the Ross Education Plan during 2004.  (*Id.* at 1262)

620.    The District established that Mills High School and Fuller Middle School have African-American students successful in high level mathematics.  These are students who live in the shadow zones of these schools.  (Bowles; Tr. 1316)

621.    In further discussing the early years of implementation of the Ross Education Plan and in monitoring it in later years, Dr. Bowles explained that the achievement gap decreased in math by 9% from 2005-2009.  (Bowles; Tr. 1323)

622.    In 2005 38% of the PCSSD black students scored proficient on the benchmark in math.  In 2009, 63% of the PCSSD black students scored proficient in math.  (*Id.*)

623.    In literacy, the achievement gap decreased by 6% from 2005 to 2009.  (*Id.* at 1324)

624.    The achievement gap has decreased by 25 points to 19 points.  (*Id.* at 1325)

625.    Looking at grade four mathematics as of 2009 the achievement gap decreased from 28 points to 21 points.  In literacy, the gap decreased by 4% from 2005 to 2009.  (*Id.* at 1328)

626.    The achievement gap at sixth grade decreased in math by 8% from 2005 to 2009. (*Id.* at 1331)

627.    For seventh grade mathematics, the achievement gap decreased by 4% from 2005 to 2009.  (*Id.* at 1332)

628.    Ms. Joy Springer was a member of the committee for implementing the Dr. Ross Plan.  (*Id.* at 1338)

**Jack Strahl of CREP**

629.     *Plan 2000*, Section M states that:  "PCSSD shall implement plans designed to improve student achievement recommended by Dr. Steven Ross and shall work with Dr. Ross in their implementation."

630.     Dr. Ross was the director of the CREP center until he retired a year ago.  (Strahl; Tr. 682)  Jack Strahl is employed by the Center for Research and Educational Policy at the University of Memphis.  (Strahl; Tr. 682)

631.     PCSSD Exhibit 39 is the original plan that Dr. Ross proposed to the District.  (PCSSD Ex. 39; Tr. 684)

632.     The Education Plan, @ "*Note*, this plan deals with the education interventions only.  It is drafted to invite commentary by PCSSD and Joshua case Intervenors for revision and expansions."  (PCSSD Ex. 39; Tr. 734)

633.     SOMS is "School Observation Measure."  It is one of three measures that provide classroom data regarding the PCSSD to cross-check against what teachers say is going on versus what the observers observe.  (Strahl; Tr. 686)

634.     Currently, there are three instruments used in the District by CREP; they are a school climate inventory survey that teachers take; a second survey teachers take regarding school-wide programs, and the "observation."  CREP takes data from all three instruments and forms a "picture" of what is going on in the school.  (Strahl; Tr. 686-687)

635.     To use the SOMS the observer must be trained by CREP using the SOMS manual to do classroom observations.  (PCSSD Ex. 41; Tr. 688)

636.     Observers go into one classroom every 15 minutes and fill out a note sheet.  This is done for three consecutive hours – that constitutes a SOMS observation.  (Strahl; Tr. 688)

637.    Exact definitions of terms observers use when coding their sheets must be the same or the instrument is invalid.  Terms include activities of the teacher, classroom organization, technology, whether students are engaged or if it is highly focused education time. (PCSSD Ex. 41; Strahl; Tr. 689)

638.    CREP has been collecting data from the District since 1999.  (Strahl; Tr. 689)

639.    CREP was brought in to help the PCSSD use data to track its implementation of the education improvement plan and to see where the District was and how to reach its goals as it related to the desegregation order.  (*Id.*)

640.    The SOMS data summary form is used to summarize the note sheets from the individual 15 minute observations.  (PCSSD Ex. 42, Tr. 691)

641.    The SOMS form contains a scale.  Particular instructional orientation can be marked as observed by the classroom observer between a scale of "extensively" to "not observed at all."  (*Id.*)

642.    Definitions of each observation scale levels are set out in the rubric for the SOMS scoring instrument.  (*Id.*)

643.    Observations are only coded if they are observed during the 15 minutes the observer is in the classroom.  (*Id.*)

644.    The observers are typically retired educators.  (PCSSD Ex. 42, Tr. 692)

645.    All the observations from each school are reported individually in a report that goes directly to each school and are also reported to the District in aggregate.  (*Id.*)

646.    The second page of PCSSD Exhibit 42 is the note sheet used by the observer to record each 15-minute period.  (*Id.*)

647.    The observers are not simply "looking around", they are specifically looking for a

set of actions that have been highly defined during the training process.  (Strah; Tr. 693)

648.     The next part of the SOMS instrument is the school climate inventory survey that is used to gather the perceptions of the teachers, staff and the individual school climate such as whether community businesses are active in the school or if teachers are using a variety of teaching strategies or if student behavior interferes with the teaching process.  (Strahl; Tr. 694)

649.     A positive school climate is important to learning and creates an atmosphere for positive learning.  It is graded on a five-point scale from 1 to 5.  (*Id.*)

650.     Exhibit 42 is the school-wide teacher questionnaire within which the teachers' perceptions concerning initiatives within the school are sought.  (PCSSD Ex. 42, Tr. 694-695)

651.     Student testing outcomes were transmitted to CREP early on by Dr. Clowers for CREP to use as a context and baseline for future work.  Strahl explained that one must know where you are before measuring can begin.  (Strahl; Tr. 696-697)

652.     FEPSI is an acronym for Formative Evaluation Process in School Improvement. (Strahl; Tr. 698)

653.     The crux of the formative evaluation is comparing data to make decisions for future school improvement.  (*Id.*)

654.     The guidebook/manual is designed for school teams to consider and interpret the data, then plan forward for improvement where needed.  (*Id.*)

655.     The guidebook gives the school instructions on how to interpret the data, how to pick the most important to them, how to recognize the strongest and weakest areas, and then prompt discussion of leadership/school teams to attack the areas of concern. (PCSSD Ex. 49, Tr. 700)

656.     Strategies are created based on the SOMS to improve low scores.  If the data

657.    Pages 32 and 33 in the guidebook give teachers a way to isolate data to focus on the highest gains and the lowest gains.  This is the data they most need to consider when considering their achievement action plan.  (PCSSD Ex. 49, Tr. 702-703)

658.    The aggregate report to the PCSSD is the result of its contract with CREP to obtain collected formative evaluation data in schools implementing school-wide programs. (PCSSD Ex. 56, Tr. 704)

659.    The aggregate report provides confidential reports to each school for use in school improvement planning.  The overall purpose is to provide formative evaluation data to participating schools to provide a basis for improvement planning and to document accomplishments and demonstrate progress.  (*Id.*)

660.    A confidential individual school report goes out to each school.  (Strahl; Tr. 704)

661.    An aggregate report which is a report of all schools rolled into one that goes to the District, but no individual schools are identified in the report. (PCSSD Ex. 56, Tr. 704-705)

662.    The aggregate report has seven inventory dimensions:  collaboration, environment, expectations, instruction involvement, leadership and order.  (*Id.*)

663.    The aggregate report gives longitudinal data for four years that can be compared year by year.  (PCSSD Ex. 56, Tr. 708)

664.    The report shows the staff shares a sense of commitment to the schools goals (86% to 90%).  (PCSSD Ex. 56, Tr. 709)

665.    The last item is the teachers' open-ended responses to the climate inventory. These are not confined to a particular parameter for the answer given.  (PCSSD Ex. 56, Tr. 710)

666.     Both negative and positive responses are given.  (*Id.*)

667.     All comments are included in the form and are hand transcribed; they are not "cleaned up."  (PCSSD Ex. 56, Tr. 711)

668.     The last section reports the school-wide observations.  (PCSSD Ex. 56, Tr. 713)

669.     Twenty-four different strategies were presented and schools could evaluate actual observed classroom practices within the context of instructional goals.  (PCSSD Ex. 56, 713-714)

### Charles Nowak of the Arkansas Department of Education

670.     Charles Nowak is an ACSIP supervisor with the Arkansas Department of Education ("ADE").  His responsibilities are to assist schools in writing individual ACSIP plans and to evaluate the plans to assure they meet the minimum state and federal qualifications. (Nowak; Tr. 570)

671.     Mr. Nowak prepared a PowerPoint presentation for the 36 PCSSD schools to assure they received consistent information for writing their ACSIP plan.  (PCSSD Ex. 95; Tr. 571-572)

672.     The ADE provides a consolidated state application that informs school districts of accountability for adequate yearly progress for students.  (PCSSD Ex. 62; Tr. 574)

673.     There are certain required state tests used by school districts to compare them nationally.  (PCSSD Ex. 68; Tr. 74)

674.     Arkansas Comprehensive School Improvement Plan ("ACSIP") sets out the Districts' goals for student learning improvement.  (PCSSD Ex. 95; Tr. 576)

675.     The Districts' schools are required by law to write an ACSIP plan.  The plan drives instruction at each school location.  (PCSSD Ex. 95; Tr. 577)

676.    The state requires that math, literacy and wellness be priorities.  The District can add as many priorities as necessary.  For instance, if a school has been determined to over-identify special education students, it is required to have a priority to reduce the over-identification problem.  (*Id*.)

677.    If a school in the district has a scholastic audit in the building, it must have a priority which talks about how to implement the scholastic audit recommendations.  (*Id*.)

678.    The plan is prepared with the federal coordinator, the Title I coordinators for the district, and with Mr. Nowak.  It is then presented to all principals.  (Nowak; Tr. 578)

679.    ACSIP is an evolution from COE, CCOE into ACSIP.  The ACSIP plan sets out priorities that are designed to improve student learning and teacher instruction in the classroom. (Nowak; Tr. 579)

680.    It is designed to improve student achievement as measured by the state's test standards.  (*Id*.)

681.    The schools look at all data sources and trends of the District to see whether the school is improving each year.  (PCSSD Ex. 95; Tr. 581)

682.    Schools may not be reaching Adequate Yearly Progress ("AYP") due to the state continually increasing the AYP goals.  (*Id.*)

683.    Exhibit 62 contains a chart beginning at page 51 that sets out the growth school districts must achieve.  These are the "No Child Left Behind" federal guidelines, as amended, and now referred to as the *Elementary and Secondary Education Act*.  (PCSSD Ex. 62; Tr. 582)

684.    "No Child Left Behind" contained a policy that by 2014 all children would be proficient in math and literacy.  (PCSSD Ex. 62; Tr. 583)

685.    AYP is the progress a student has to make to increase to 100% proficient.

(Nowak; Tr. 584)

686.     There are seven sub-populations including Caucasian, African-American, Hispanic, English Second Language, special education, and economically disadvantaged. Schools not only have to meet 40% proficiency in the school as a whole, but each identified sub-population in the schools has to meet 40% proficiency within the identified group.  Schools can have from zero to seven identified sup-populations.  (Nowak; Tr. 584-585)

687.     As the ACSIP plan is developed each school should identify whether the schools are in school improvement or if they have sub-populations, in order to meet the needs of all students.  (Nowak; Tr. 586)

688.     Data from ADE shows that the PCSSD has improved the learning of black students every year and in some cases have out performed the state in certain areas.  (Nowak; Tr. 586-587)

689.     Data also shows that the gap between blacks and non-blacks has decreased every year in the PCSSD.  (*Id.*)

690.     The District's goal is for achievement to go up and for the achievement gap between black and non black students to close.  The data shows to varying degrees both are happening in the PCSSD.  (Nowak; Tr. 587)

691.     A criterion-referenced test ("CRT") was developed and identified by cutoff scores for each level of achievement identified as "advanced," "proficient," "basic" and "below basic." (PCSSD Ex. 95; Tr. 588)

692.     Norms testing compares state students to other students around the country. (PCSSD Ex. 95; Tr. 589)

693.     All data including scholastic data, the attendance rate, behavior data, perceptual

data such as SOMS and FEPSI, help define the needs of each school.  (PCSSD Ex. 95; Tr. 590)

694.    FEPSI is "Formative Evaluation Process for School Improvement."  (*Id.*)

695.    ACSIP first requires individual school priority goals that are narrowed to a specific weakness designated for improvement.  (*Id.*)

696.    At the conclusion of the needs assessment within all sub-parts of ACSIP, a goal statement is written.  (PCSSD Ex. 95; Tr. 591)

697.    Finally, a benchmark statement is written to establish the school's adequate yearly progress as measured by the appropriate assessment.  (*Id.*)

698.    The benchmark statement identifies where the school begins and establishes a set improvement goal for school year end.  (*Id.*)

699.    The proficiency score is a moving number because if a school has fifth graders who are 40% proficient, the next year the same school will have a new group of students and will start over.  They are not the same fifth graders.  (Nowak; Tr. 592)

700.    The "No Child Left Behind" legislation was passed after *Plan 2000* was developed.  (*Id.*)

701.    A benchmark statement is also done for each subgroup that is identified in the school.  (PCSSD Ex. 95; Tr. 593)

702.    Each school writes its own ACSIP plan.  (*Id.*)

703.    Literacy and math are the two main priorities that are evaluated for the plan.  (*Id.*)

704.    An "intervention" is an educational practice strategy or process that helps to positively impact student achievement.  (PCSSD Ex. 95; Tr. 594)

705.    The District requires each school to have four interventions: core curriculum, remediation, closing the achievement gap and supplemental programs.  (PCSSD Ex. 95; Tr. 93)

706.     Schools develop the core curriculum building improvement plan, train teachers through professional development, and evaluate whether it is working.  (PCSSD Ex. 95; Tr. 595)

707.     Schools should involve parents in the process including PTO, PTA or assign a parent facilitator in the school.  (Nowak; Tr. 96)

708.     To remediate students who did not meet AYP the District teachers write an academic improvement plan for each student who did not meet AYP and involve the student's parents in the plan.  (*Id.*)

709.     The schools provide intensive reading instruction in K through 2nd grades for students below benchmark.  (*Id*.)

710.     Schools cannot spend federal funds to remediate the AYP because it is a state required goal.  (PCSSD Ex. 95; Tr. 598)

711.     Closing the achievement gap is a separate part of the plan.  Federal funds can be used for such interventions for after school tutoring programs such as "Gear Up" or Upper Bound".  (*Id.*)

712.     The Learning Institute conducts intermittent tests aligned to benchmark exams to evaluate the students.  The tests identify areas to be re-taught so students are better prepared for Benchmark exams at year end.  The after school tutoring interventions are not a one shot remediation.  (Nowak; Tr. 601)

713.     The state uses a form to evaluate the ACSIP plans to see if they meet the minimum requirements of the state and federal government.  The form addresses all aspects of each school's ACSIP plan.  (PCSSD Ex. 96; Tr. 607)

714.     Schools are classified for improvement based on student performance.  (PCSSD Ex. 96; Tr. 610)

715.     Districts are classified for improvement based on how the schools and students in the district perform district-wide.  If a district gets a check mark in all three grade areas (K-5, 6-8; 9-12) it is deemed a district in improvement.  (*Id.*)

716.     If a district goes two years in a row without check marks, it is out of improvement.  (PCSSD Ex. 96; Tr. 611)

717.     All grade proficiency scores demonstrate a constant upward trend for improvement on the state level and in the PCSSD student scores.  (PCSSD Ex. 102; Tr. 617)

718.     The PCSSD is decreasing its achievement gap.  (*Id.*)

719.     The District's achievement gap is lower than the state average. (*Id.*)

720.     PCSSD Exhibit 102A is a summary of the charts in Exhibit 102.  (Nowak; Tr. 617)

721.     Schools in school improvement are not unique in Arkansas.  (Nowak; Tr. 671)

722.     In 1996 between 16% and 18% of the state's fourth graders were proficient in literacy.  By 2007 60% of the students were proficient statewide.  (Nowak; Tr. 674)

723.     While the students were improving their test scores over the 1996 to 2007 time span, the state was tweaking the test and making it harder.  (*Id.*)

**Debbie Goodwin of Cedar Ridge School District**

724.     Debbie Goodwin was called as a witness by the Joshua Intervenors.

725.     The District approved a request from Dr. Brenda Bowles, Assistant Superintendent for Equity and Student Services, to hire The Research Group to conduct an analysis to assess where the District was with regard to implementation of *Plan 2000* in 2006. The Research Group was given raw data and reached its own independent conclusions. (Goodwin; Tr. 2211)

90

726.     The District later requested The Research Group to provide suggestions for the District to better implement *Plan 2000*.  (*Id.*)

727.     After issuing its report in 2006, the Research Group had no further contact with the District and had no information regarding the status of implementation of its suggestions. (Goodwin; Tr. 2212)

728.     The Research Group report to PCSSD is dated December 1, 2006 and titled *Implementation and Progress Toward Attainment of Plan 2000 Education Plan Goals.* Beginning on page 65 it stated: "Pulaski County Special School District schools have the opportunity to become such a beacon in the state of Arkansas, should the District choose to accept the Challenge.  The fact that the District has increased the percentage of students scoring proficient or above on all tests in both literacy and math provides a good starting point that should spark the District to strive for even greater success for all students in the PCSSD." (Joshua Ex. 11-1, Tr. 2209)

729.     The qualitative data that concluded with the 2004-05 ACSIP plans was a snapshot of achievement data and suspension data showing a three year trend.  (Goodwin; Tr. 2209)

730.     The ACSIP plans were first implemented in the 1999-2000 school year. (Goodwin; Tr. 2210)

731.     The Research Group's first recommendation was to shift focus from increasing the number of students who are proficient, to meeting the learning needs of the diverse learners in the classroom.  (*Id.*)

732.     That suggestion included tailoring an education initiative to the deficiencies identified for a particular student or a small group of students, and to address the goal for the needs of the learners specifically identified.  (Goodwin; Tr. 2212-2213)

733.    The first step toward the goal of creating a positive climate was to assess and measure the existing climate at a particular point in time, and to have the climate assessment include teachers, students and parents.  (Goodwin, Tr. 2213-2214)

734.    Interventions come into play when a student is not performing at the desired classroom level and the teachers do an intervention in small groups.  (Goodwin, Tr. 2215)

735.    If that fails the student is given one on one intervention followed by the student being re-evaluated.  Pre-tests and post tests reveal if the interventions are successful.  (*Id.*)

736.    Interventions would vary according to the cultural background of the students. The percent of low socioeconomic subpopulations are different at each school; cultural and academic issues are based on the needs of each particular population.  (Goodwin, Tr. 2216)

737.    Despite the issues perceived by The Research Group it nevertheless determined that by 2006 there had been a steady decrease in the percentage of students scoring below proficient and a steady increase in the percentage of students scoring proficient and above on the benchmark or end of course exams in the three years examined before 2006.  (*Id.*)

738.    Contrary to the assertions of Joshua, The Research Group believes that comparing both African-American and non-African-American populations together to chart the percentage proficient and advanced is the appropriate way to make an achievement comparison.  It is the way The Research Group makes the comparison and the way the comparisons are made on the state level. (Goodwin; Tr. 2217)

739.    In reviewing the data from 2004 through 2006, even with the deficiencies that existed in the focus of the ACSIP plans, The Research Group still determined that for that period of time, African-American students who scored proficient in math increased by 8.47% and those who scored proficient in literacy increased by 8.52%.  (Goodwin; Tr. 2218)

740.    The Research Group's involvement was for the period from 2004 through 2006. Ms Goodwin is not aware how the ACSIP plans in the District schools have changed or how FEPSI has been infused from 2006 forward.  (Goodwin; Tr. 2222)

741.    As explained below, the PCSSD demonstrated that it thereafter implemented (or had already implemented) the recommendations of the Research Group.

**Janice Walker Elementary Principal**

742.    Janice Walker has been an elementary principal with the District for 11 years. (Walker; Tr. 774)

743.    Principal Walker is also the Command Sergeant Major with the 489th Engineer Battalion at Camp Robinson.  (Walker; Tr. 775)

744.    She explained that Charles Nowak from the Department of Education presented an instructional PowerPoint presentation regarding ACSIP and personally assisted principals with state directives and compliance regarding school ACSIP plans.  (*Id*.)

745.    She confirmed that Mr. Nowak offers feedback and suggestions to improve the school plans that will enhance student achievement.  (*Id*.)

746.    The PCSSD uses SOMS and the FEPSI guidebook throughout the school year as was discussed by Dan Strahl regarding the ACSIP plan.  (Walker; Tr. 776-777)

747.    Data is received from Strahl/CREP of Memphis that is infused in the school ACSIP plan.  All information links back to student achievement. (Walker; Tr. 777)

748.    The schools in the District receive data from FEPSI that is used to develop the benchmarks.  The data is infused into such areas as leadership and curriculum, instruction and organization which drives the ACSIP plans.  (*Id*.)

749.    PCSSD Exhibit 47 is a list of explanations for the school acronyms.  (PCSSD Ex.

47; Tr. 778)

750. ACSIP is at the top of the flow chart marked as PCSSD Exhibit 46. (PCSSD Ex. 46; Tr. 778)

751. Ms. Walker explained that the "Education Plan" referenced on the ACSIP flow chart is the education plan written by Dr. Steven Ross, University of Memphis, that is part of *Plan 2000*. (*Id.*)

752. FEPSI is the Formative Evaluation Process for School Improvement. Data is returned by CREP to each school after the school submits its School Climate Survey and the school-wide teacher survey. (Walker; Tr. 779)

753. To set the benchmarks the District covers areas such as curriculum, leadership, and organization which drives the teacher instruction. (Walker; Tr. 780)

754. The district schools use this data to develop the school priorities for literacy, math, and school climate. (*Id.*)

755. In addition to the FEPSI data the school also uses its formative assessments tests that are given in modules every three to four weeks for math and literacy, the classroom walk-through, spot checks, criterion referenced tests, the norm-referenced tests data, and the building audit feedback to determine how to correctly plan student instruction. (Walker; Tr. 781)

756. The School Climate is a component of the ACSIP priorities and is an important part of the Ross Plan. To have a positive impact on student achievement, students have to be in an environment is conductive to learning. (*Id.*)

757. School climate allows teachers and administrators to evaluate student behavior and provides parental involvement so that students are more likely to stay in school and achieve. (*Id.*)

758.    All the components listed on Exhibit PCSSD 46 form the ACSIP plan which ties directly into the Ross Education Plan as components that support the Ross Plan. (Walker; Tr. 782)

759.    The ACSIP plan should meet the needs of the total child in all areas; academic, social and emotional.  (Walker; Tr. 782-783)

760.    Instruction is planned to meet the needs of all students, including the subpopulations, to assure they all receive adequate instruction based on data reflecting how the student is progressing.  (*Id.*)

761.    The ACSIP plan is a living, flexible document.  It is reviewed at least twice a year to determine whether the school is on track.  (PCSSD Ex. 57, Tr. 782-784)

762.    All information on the Comprehensive School Reform Design (CSRD) is tailor-fit to the needs of each particular school because each school is different.  (*Id.*)

763.    All goals are designed on the CSRD to lead to student achievement. (PCSSD Ex. 57, Tr. 786)

764.    The goals address whether the school is providing adequate professional development for the staff to deliver a quality instructional program for all students.  (*Id.*)

765.    Technology is reviewed as well as parental and community involvement.  (*Id.*)

766.    All information in the CSRD is based on live data.  As the student population changes the dynamics that form their education change as well.  (PCSSD Ex. 57, Tr. 787)

767.    The FEPSI guidebook is a valuable tool.  When school staff receive the data it uses the guide to analyze the data to show areas of strength and weakness to determine goals to improve the school climate overall.  (PCSSD Ex. 49, Tr. 789)

768.    The guidebook also covers curriculum, professional development and technology

and is included in the ACSIP plan.  (*Id*.)

769.     The schools provide the data to the District to show how they are implementing the data.  (*Id*.)

770.     This process dates back to the 1999-2000 timeframe.  (Walker; Tr. 790)

771.     Exhibit 60 shows the individual school data that is provided each year by CREP to each school individually.  This is separate from the aggregate report that is provided to the District and contains an overall summary of all schools.  (PCSSD Ex. 60; Tr. 790)

772.     The report contains perceptual data representing the school climate and provides the responses to the teacher-wide questionnaire covering seven areas.  (PCSSD Ex. 60; Tr. 791)

773.     The information tells the school where it is and where it needs to go in instruction and curriculum.  (*Id*.)

774.     The school climate sections addressed are collaboration, environment, expectations, instruction, involvement and leadership.  (*Id*.)

775.     All data is reviewed in each school program to see if programs are working and if concerns are being addressed.  All information is used to improve each school-wide program to make a positive impact on the students.  (PCSSD Ex. 60; Tr. 792)

776.     The Learning Institute (TLI) SARs information provides schools with disaggregated student data that provides predicators of how well individual students will perform on the norm-referenced tests.  (PCSSD Ex. 94; Tr. 795)

777.     The SARs information contains information by individual student so that the District can use each student's data to plan just for that particular student.  (*Id*.)

778.     It shows how the student performed the year before, if they were proficient or did not meet growth, and then forecasts how that student will likely perform in the current school

year and what areas may require special attention.  (*Id.*)

779.    The SARs data is derived from ACTAAP, SAT-10 and individual module testing throughout the year for each individual student who has taken a module test in literacy or math. (*Id.*)

780.    The SARs data not only gives a forecast, but it breaks down by skill what should be taught first, second or third to promote learning.  (*Id.*)

781.    Having information by student helps determine weaknesses and strengths which promotes closing the achievement gap.  (PCSSD Ex. 94; Tr. 797)

782.    There is an academic improvement plan for all students who are performing at basic or below.  The parents are involved in developing the academic plan.  (*Id.*)

783.    Teachers can use different instructional strategies to meet the needs of that particular student.  (*Id.*)

784.    Teachers utilize a "response to intervention" (RTI) to provide opportunities for learning so students do not have to be referred for Special Ed.  (*Id.*)

785.    The District uses professional learning communities "PLCs" and uses Title I math and literacy facilitators who help with feedback concerning how best to meet the needs of students.  (Walker; Tr. 797-798)

786.    Teachers assess low scoring students, indentify their learning style and remediate by using small-group instruction, by manipulatives and by using peer tutoring to help each student understand what is being taught.  Remediation takes at least three weeks.  (Walker; Tr. 799)

787.    Parent-teacher conferences allow the District to explain to parents the information in the SARs.  (Walker; Tr. 801)

788.    Backpacks with information are sent home with the students after the teachers work with the parents to make sure they understand how to utilize the packets.  (*Id.*)

789.    There are graphs in the SARs that show where the child is performing, where they should be for proficient and basic, and shows each child's status based on adequate yearly progress "AYP."  (PCSSD Ex. 94; Tr. 802)

790.    The documentation also contains the student's learning expectations, how they performed on a particular test and areas in need of remediation.  (Walker; Tr. 802)

**Jackie Smith Master Principal**

791.    Jackie Smith is the principal at Taylor Elementary School in Jacksonville.  She was present during the testimony of Charlie Nowak, Jack Strahl from the University of Memphis and for the testimony of Janice Walker.  There was nothing about the testimony of Janice Walker with which she disagreed.  (Smith; Tr. 1231-1232)

792.    She paid particular attention to the testimony of Mr. Nowak and agreed with his testimony.  She had actually been in a meeting where Mr. Nowak presented his PowerPoint.  (*Id.* at 1232)

793.    Jackie Smith holds the designation of "master principal."  It is conferred by the Arkansas Leadership Academy which consists of three phases.  There are at most nine master principals in the state of Arkansas.  (*Id.* at 1233-1234)

794.    At her school they employ the strategies, devices and instruments described by Mr. Strahl.  Referring to Exhibit 93, Ms. Smith described the use her school makes of the information available for each student at her school.

795.    As Ms. Walker explained, all this information is used to drive instruction.  It is calculated to positively impact achievement and to positively impact achievement disparity.  (*Id.*

at 1236)

796.    When she was principal at other district schools over the past several years she used the same information, that being the data from the school observation measure (SOMS), data from the school climate inventory and from the SWPTQ and they developed benchmarks. Those were infused into her school climates in literacy and math.  This was the same process at each school at which she taught.  (*Id.* at 1241)

797.    Each of those plans referred to the achievement gap.  (*Id.*)

**June Elliott Assistant Superintendent for Learning Services**

798.    PCSSD Exhibit 63 is part of Dr. Bowles audit created to monitor compliance with *Plan 2000* and the Education Plan.  The questions for this section of the audit were provided by Dr. Bowles and the responses were prepared by Ms. Elliott.  (PCSSD Ex. 63, Tr. 2022)

799.    Education, learning services and student achievement are included in Ms. Elliott's job description.  (Elliott, Tr. 2027)

800.    Exhibit 63 relates to the Ross Education Plan and the questions address the goals of the education plan.  (*Id.*)

801.    Exhibit 63 addresses issues such as decreasing the performance gap between white and African-American students.  It provides statistical outcomes relating to impacts on the achievement gap, including where the gap has been positively impacted and where it has stayed the same.  (PCSSD Ex. 63, Tr. 2024)

802.    ACSIP includes components of the education plan including literacy and math, the school climate, wellness and restructuring.  (PCSSD Ex. 63, Tr. 2025)

803.    Literacy, math and wellness are priorities required by the state; the District requires school climate which includes the FEPSI information.  (*Id.*)

804.    FEPSI information also covers interventions in math and literacy with action planning to implement interventions for student improvement.  (*Id.*)

805.    The achievement gap is the difference in student achievement between African-American, Latino, Native America, and low socioeconomic students when compared with many of their white, Asian, and economically advantaged peers.  (Goodwin; Tr. 2224)

806.    The task to close the achievement gap is made more challenging by how children in poverty, whatever their race, reach the schoolhouse door for the first time.  (Goodwin, Tr. 2225)

807.    PCSSD Exhibit 102A is a study that compares the most recent four years of data from the third grade through eighth grade benchmarks in mathematics and literacy; and also includes algebra and geometry at 11th grade end of course testing.  (PCSSD Ex. 102A, Clowers; Tr. 1207)

808.    The study compared the four years District level scores to state outcomes. (PCSSD Ex. 102A, Clowers; Tr. 1208)

809.    The State of Arkansas and the PCSSD have made gains with both black and non-black students during the last four years.  (*Id.*)

810.    The achievement gap in PCSSD was then compared to the state; the District's achievement gap was less than that of the state as a whole during the last four years.  (*Id.*)

811.    An example from the list shows the PCSSD third grade literacy achievement gap of 19 points while the state's literacy gap is 29%.  (PCSSD Ex. 102A, Clowers; Tr. 1209)

812.    Dr. Clowers worked in his capacity as Director of Educational Accountability to combine Dr. Ross's Education Plan elements with information from the PCSSD superintendent to shape the District's educational efforts and created a PowerPoint in that regard to share with

administrative staff during a workshop.  (PCSSD Ex. 38A, Tr. 1210-1211)

813.    The presentation was given by Dr. Steven Ross to train administrators regarding the Ross Education Plan.  (*Id.*)

### ACSIP Assessment by the ODM

814.    ACSIP is the Arkansas Consolidated School Improvement Process.  (ODM Report September 17, 2008; p.3)

815.    This is a state mandated plan for improving schools that includes elements of school climate, academics, and discipline that schools use to assess and improve all aspects of their operations.  (*Id.*)

816.    The Ross improvement plan that is part of *Plan 2000* was originally entitled Formative Evaluation Program for School Improvement or FEPSI.  (ODM Report September 17, 2008; p.23)

817.    The Ross Plan was merged with the ACSIP model required by the Arkansas Department of Education.  (*Id.*)

818.    However, the schools continue setting benchmarks for each goal in the improvement plan as required by FEPSI.  (*Id.*)

819.    The state requires each school to set improvement goals in literacy, math and wellness.

820.    Because discipline is deemed an issue in PCSSD, school climate improvement is a goal for all schools in the district although not required by the state.  Individual schools are permitted to establish goals for improvement in other areas as well.  (*Id.*)

821.    The District continues to use Dr. Ross's services (University of Memphis Center for Research and Educational Policy) to analyze the data and give feedback to the schools.  (*Id.*)

822.    A specific goal of the FEPSI plan was to decrease the learning disparity between white students and African-American students.  (*Id.*)

823.    The District documented decreases in the learning disparity in several categories in student testing between 2006-2008.  (*Id.*)

**FEPSI Assessment by the ODM**

824.    Data collection for FEPSI includes teacher questionnaires, teacher focus groups, principal interviews, school observation measures (SOMS), student test scores and other data chosen by each school improvement committee such as attendance records.  (ODM Report August 16, 2006; pp.36-37)

825.    To collect the SOMS, trained observers visit multiple classrooms in each school several times and record the teaching activities being conducted during 15 minute visits.  (*Id.*)

826.    When tallied, the SOMS gives a school the percentage of time spent on each of 25 different teaching strategies during the observations.  (*Id.*)

827.    Teachers can use the data to determine the amount of time spent on direct instruction as compared to cooperative learning or other strategies.  (*Id.*)

828.    In the spring of 2006, a new head of learning services conducted a peer review of school improvement plans, including FEPSI so that principals could critique the plans of another school using the District's rubric for school improvement planning.  This activity was positively received.  (*Id.* at 37)

829.    In comparing the 2001 scores in the District to 2004 every school in the District increased the percentage of students scoring proficient or advanced in literacy.  All schools except Adkins increased the percentage of students proficient or advanced in math.  (*Id.* at 39)

830.    Charts produced by the ODM demonstrate gains for all groups.  (*Id.* at 41)  While

none of the charts during this earlier period indicated significant progress toward decreasing the performance gap, substantial improvement in the performance of both races is evident. (*Id.*) The state increased the score requirements for 2005 which make direct comparisons thereafter difficult. (*Id.*)

831.   Based upon the extensive testimony and record developed covering the past 10 years, the Court finds that the PCSSD has substantially complied with the implementation of the Education Plan. This conclusion and finding is made in the context of the record previously made in this case as discussed below.

**The Previous Record and Opinions Expressed Based Upon It**

832.   In May of 1996, the Court engaged Dr. David Armor and Dr. Herbert Walberg, noted researchers in the areas of desegregation and education, to provide their opinions to the Court regarding the impact of socioeconomic factors on learning and achievement. (NLRSD Ex. 5 at 17; see also Walberg, NLRSD Ex. 6 at 29 and Docket #2692)

833.   One of the reasons the Court requested these opinions related to a school district's ability to reduce the achievement gap between black and white students. The Court noted in prelude to Dr. Armor's testimony, "[T]here are parts of the plan that concern the Court. Specifically, with respect to your area of expertise, I asked you to testify about what you know about the efforts across the country to reduce the achievement disparity gap . . . ." (NLRSD Ex. 5 at 17; see also Walberg, NLRSD Ex. 6 at 29, 32; NLRSD Ex. 5 at 18)

834.   The gist of the testimony of both Dr. Armor and Dr. Walberg on the achievement disparity was that it is well-established that the primary variable explaining differences in achievement is family SES and not race. As Dr. Armor testified,

> "I think from the Coleman Report on, including research that I
> am doing right now sponsored by the Department of Education,

> there has been consensus, I think, among social scientists that
> socioeconomic status plays a very major role in determining
> academic performance. It's one of those things, in fact, it's
> almost so basic in social science research and educational research
> that it's almost taken for granted."

(NLRSD Ex. 5, at 30-31)

835.    Likewise, Dr. Walberg testified that, as one controls more for SES, the gap

between blacks and whites has been known to approach zero.  (NLRSD Ex. 6 at 82)  This

is still their conclusion.  D. Armor, *School Desegregation in the 21st Century: Chapter

6, Desegregation and Academic Achievement* at 148, 179, 184- 85 (2002); *see also* R. Rothstein,

*Class and Schools: Using Social, Economic, and Educational Reform to Close the Black-

White Achievement Gap* (Economic Policy Institute 2004)

836.    In his testimony in 1996, Dr. Armor went on to note:

> "[By socioeconomic status I mean] things such as family
> educational attainment, income levels, poverty levels,
> possibly, you know, family structure in the sense of how many
> children, size of family ...And the reason why SES has a strong
> impact on education has to do with child rearing practices,
> emphasis upon how much time and resources are devoted in
> the very early years of a child, and emphasizing academic skills
> . . .. [T]his is not a racially specific issue. People in poverty,
> whether white or black or Hispanic, often have less resources, less
> time to spend with their children, often vying to simply keep up
> with putting food on the table."

(NLRSD Ex. 5 at 31-32)

837.    Higher SES African-Americans achieve better than lower SES white

students in the same school district.  (*Id.* at 120-22)  Dr. Walberg's testimony was in accord.

(NLRSD Ex. 6 at 83)

838.    Dr. Armor went on to state that in his own studies, he has found that from 80% to

as much as 96% of achievement disparity has been explained by SES (NLRSD Ex. 5 at

117, 164, 191-92), and there is no desegregation plan of which he is aware that has ever overcome the achievement disparity between black and white students. (*Id.* at 152-53).

839.    Like achievement, SES is also the primary explanation for disparities in Special Education placement, Gifted and Talented placement, dropouts, and discipline. (NLRSD Ex. 6 at 176-77, 183-84, 185; NLRSD Ex. 5 at 206)

840.    The impact of low SES is well-established long before students start school. (NLRSD Ex. 5 at 32-33; NLRSD Ex. 6 at 54-58)  Thus, the gap is something that children bring with them when they start school for the first time. It is not something created by the actions of the school. (NLRSD Ex. 5 at 32- 33, 117-18, 153-54)  Moreover, the ability of schools to impact such an established gap is limited considering only 10% of a child's time is actually spent in school, (NLRSD Ex. 6 at 33), and the learning consequences of low SES have not changed. Without any targeted interventions, the advantages associated with higher SES would result in an *increase* in the achievement gap between lower and higher SES students once students begin school. (NLRSD Ex. 6 at 57, 68)

841.    The intractable nature of the impact of SES on achievement was recognized by Judge William R. Wilson during proceedings involving LRSD's compliance with its plan: "[T]he current socioeconomic differences between African-American and whites make it impossible to eliminate the achievement gap." *See Little Rock School Dist. v. Pulaski Co. Special School Dist. No. 1,* 237 F.Supp.2d 988, 1074 (E.D. Ark. 2002)

**LaJuana Green Home Schooling**

842.    LaJuana Green currently oversees the Home School Counseling Program for PCSSD.  Consistent with *Plan 2000* M (2) the District continues to implement the Home School Counseling Program.  (Green; Tr. 337)

843.    The PCSSD has eight elementary and four secondary level home school counselors/consultants.  (*Id.*)

844.    The program was expanded to Bates, College Station, and Landmark when their populations increased to over 50% African-American.  Twenty years ago the program was conceived to serve students and parents in the southeast sectors.  (Green; Tr. 337)

845.    The home school counselor acts as a bridge between the home and school, helping students and parents, the faculty and administrators to help students be successful in any way they can, such as academically, socially, personally; providing any type of service needed to help students stay in school and be successful.  (Green; Tr. 338)

846.    The Home School Counseling Program is the only program of its kind in the state.  (*Id.*)

847.    The Court finds that the PCSSD has substantially complied with the implementation requirements of its Home School Counseling Program.

## PLAN 2000 SECTION (N) Monitoring

The Court finds that the District prepared and furnished the reports required by *Plan 2000* Section N to the ODM and the Joshua Intervenors.

848.    The PCSSD furnished the following reports to Joshua and the ODM on or near their due dates.

849.    Racial Isolation/Single Race Classes Reports; Racial/Gender Composition Reports, 2001 through 2010.  (PCSSD Ex. 5 A-J)

850.    Annual Recruitment Reports, 2006 through 2008.  (PCSSD Ex. 8 A-C)

851.    Interdistrict Equity & Pupil Services Annual Survey, (Magnet/ M to M counts), 2001 through 2008.  (PCSSD Ex. 9 A-H)

852.     Counseling Services Reports for Home School Counselors, 2000 through 2009. (PCSSD Ex. 66 A-G)

853.     Monitoring & Compliance Reports 2000 through 2009.  (PCSSD Ex.72 A-H)

854.     Monitoring & Compliance Summaries 2000 through 2009.  (PCSSD Ex. 73 A-H)

855.     Talented and Gifted Enrollment Reports 1999 through 2010.  (PCSSD Ex. 74 A-K) (Limited to Secondary)

856.     Special Education Desegregation Monitoring Reports, 1999 through 2009. (PCSSD Ex. 75 A-J)

857.     Annual Discipline Reports 2000 through 2009.  (PCSSD Ex. 76 A-H)

858.     Hiring and Deployment Reports 2000 through 2010.  (PCSSD Ex. 77 A-J) (Limited to Secondary)

859.     School Administration Race and Gender 1999 through 2009.  (PCSSD Ex. 78)

**Marjorie Powell**

860.     The District has done all of the reports outlined in Section N of *Plan 2000*. (Powell; Tr. 2362)

861.     Mr. Horace Smith actually had principal responsibility for monitoring the PCSSD and he went to work for the Arkansas School Boards Association sometime ago.  (*Id.*)

862.     Exhibit 133 is a revised version of the audit instrument prepared by counsel for the PCSSD which, though initially criticized, actually covers everything in *Plan 2000* item by item.  (Powell; Tr. 2365)

863.     This version was received in October of 2003.  (Powell; Tr. 2366)

864.     The Court finds that the PCSSD substantially complied with Section (N) Monitoring of *Plan 2000*.

**Conclusions of Law**

837.    The releases granted as part of the 1989 Settlement Agreement have significant

legal implication for analyses in this case.  The Settlement Agreement included releases among

all of the parties:  They provide in pertinent part that:

> Joshua releases the Districts of all liability for issues which
> have been raised, or could have been raised, in this Litigation and
> commits that there will be no further litigation among or between
> Joshua, Knight and any of the Districts, <u>other than proceedings to
> enforce the terms of this settlement or the terms of the Plans</u>.

> The undersigned parties do hereby release, acquit and
> forever discharge the PCSSD . . .  of and from any and all actions,
> causes of action, claims and demands which the undersigned now
> have or may hereafter have arising out of or in any way related to
> any acts or omissions of any and every kind to the date of the
> execution of this release by the released parties which in any way
> relate to racial discrimination, segregation in public education, or
> to violations of other constitutional or statutory rights of school
> children, based on race or color, in the three school districts in
> Pulaski County.

> [emphasis supplied]

838.    It is further understood and agreed that the litigation now pending in the United

States District Court for the Eastern District of Arkansas, Western Division, entitled *Little Rock

School District vs. Pulaski County Special School District No. 1, et al*, No. LR-C-82-866 <u>and

cases consolidated therein and their predecessors (including, but not limited to, *Zinnamon v.

Pulaski County School District*, LR-C-68-154) (the "Litigation") is to be dismissed with

prejudice as to the PCSSD</u> and the former and current members of its board named in the

Litigation.  This dismissal is final for all purposes except that <u>the Court may retain jurisdiction to

address issues regarding implementation of the Plans</u>.  [emphasis supplied]

839.    This Court has given the following guidance regarding the test for "substantial

compliance.":  "[I]n order to determine if a party is in 'substantial compliance' with a consent

decree, the trial court must examine whether any of the alleged violations of the consent degree 'were serious enough to constitute substantial noncompliance' and 'to cast doubt on defendant's future compliance with the constitution.' . . . [A] Party can be in 'substantial compliance' with a consent decree even if it has committed violations that are 'inconsequential' in light of the party's overall performance." *Little Rock School Dist. v. Pulaski Co. Special School Dist. No. 1*, 237 F.Supp.2d 988, 1027 (E.D. Ark 2002), citing *Cody v. Hillard*, 139 F.3d 1197, 1199-1200 (8th Cir. 1998)

840.    Further, the traditional analyses for unitary status remain viable in assessing the attainment of unitary status based upon the authorities relied upon by Dr. Armor and Dr. Rossell. Thus, both "substantial compliance" and traditional determinations of unitary status are alternatively available to the Court in this case.

841.    The PCSSD utilizes one of the most narrow and difficult to attain and maintain student racial balance guidelines in the country.  However, it is important to note that the *en banc* decision (778 F.2d 404 at 435) actually authorized a much more flexible test in 1985.  The Court of Appeals required all three districts to revise their student attendance zones to reflect the racial composition of the Districts after the boundary line adjustments were made.  The Court specified that school districts were permitted to depart from remedial guidelines so that "school enrollments may over – or under represent blacks <u>or whites</u> by as much as one-fourth of the remedial guideline <u>for either race</u>." *Id*. at 435.  [emphasis added]

842.    Because PCSSD has always hosted other minority groups (a number that continues to grow) it has measured racial balance in terms of black and "other."  It has tested racial balance by applying the one-fourth guideline to the "other" category and not to the black category.  However, logically and mathematically, deployment of the "either race" measure for

testing student racial balance would at various times in the distant and recent past place even

more PCSSD schools within the category of compliant as authorized by the *en banc* decision.

843.    The United States Supreme Court has held that despite the fact that communities

do not remain demographically stable that "[n]either school authorities nor district courts are

constitutionally required to make year-by-year adjustments of the racial composition of student

bodies once the affirmative duty to desegregate has been accomplished and racial discrimination

through official action is eliminated from the system." *Swann v. Board of Ed.,* 402 U.S. 1, 31-32

(1971)

844.    In *Pasadena City Board of Ed. v. Spangler,* 427 U.S. 424, 440 (1976), the United

States Supreme Court held that the school district was entitled to relief from an injunction that

required the district to alter school attendance zones in response to shifts in demographics within

district boundaries after the district proved that it had complied with the student

assignment portion of its desegregation plan and that it will continue to comply with the

Constitution after being released from court supervision.

845.    In determining whether there is an underutilization of African-Americans as

teachers and administrators, the statistical comparison of the percentage of black *teachers* in

a district to the percentage of black *students* in the district has been rejected as irrelevant; the

proper comparison is to the percentage of black educators in the relevant labor market area.

*Hazelwood School Dist. v. U.S.,* 433 U.S. 299, 304-310, 97 S. Ct. 2736, 2740-2743 (1977).

846.    Any suggestion that the proportion of African-American educators should reflect

the proportion of African-American students has been repeatedly and emphatically rejected by

this Court, the Eighth Circuit, and the Supreme Court.  As this Court held, the "proper

[statistical] comparison . . . was between the racial composition of [the school's] teaching staff

847.    In *Wygant v. Jackson Bd. Of Ed.,* 476 U.S. 267, 276, 106 S. Ct. 1842, 1848 (1986), the Supreme Court also noted that "[c]arried to its logical extreme, the idea that black students are better off with black teachers could lead to the very system the Court rejected in *Brown v. Board of Ed,* 347 U.S. 483 (1954) (Brown I)."

848.    The United States Supreme Court has also noted that comparing the percentage of minority teachers in a district to the number of minority students would allow a district to "engage in discriminatory hiring and layoff practices long past the point required by any legitimate remedial purpose" and that "tying the required percentage of minority teachers to the percentage of minority students . . .would require[] just the sort of year-to-year calibration the Court stated was unnecessary in *Swann v. Charlotte-Mecklenburg Bd. of Ed,* 402 U.S. 1, 31-32, 91 S. Ct. 1276, 1283-84 (1970)."  *Wygant v. Jackson Bd. Of Ed.,* 476 U.S. 267, 275, 106 S. Ct. 1842, 1848 (1986).

849.    In 1988-1989, when the Welch Associates study was completed the number of black certified personnel in the relevant labor market was 11.9% (PCSSD Ex. 33 at 12), and the percentage of black teachers in PCSSD was 19.4% with certified black administrators at 29.5%. (PCSSD Ex. 77-J App. IX)

850.    In 2010, African-Americans comprised less than 10% of the certified personnel in the State, which has remained the relevant labor market for the PCSSD.  (*See* Court Ex. 1 at 1)

851.    ODM has recognized that "the disproportionate number of African-American students suspended or expelled from school is a nationwide phenomenon . . . and pointed out that the way students behaved in school was affected by a host of factors that were beyond the influence of school personnel, 'such as home environment, family values, and the level of socialization prior to starting school. . . ."  *See Little Rock School Dist. v. Pulaski Co. Special School Dist. No. 1,* 237 F. Supp. 2d 988, 1020 (E.D. Ark. 2001).  This Court has likewise stated, "[i]t is universally recognized that a host of racially neutral socioeconomic factors account for much of the nationwide racial disparity in student discipline."  (*Id.* at 1055)

852.    This Court has previously noted that "socioeconomic factors are the root cause for most, if not all, of the achievement gap."  *Little Rock School Dist. v. Pulaski Co. Special School Dist. No. 1,* 237 F.Supp.2d 988, 1036-40 and 1074 (E.D. Ark. 2001).  It noted that even well-implemented educational programs will not reduce the achievement gap because they will raise the scores of both blacks and whites.  (*Id.* at 1039-1040)

853.    LRSD voluntarily committed to decreasing the achievement gap in its original settlement plan, and was held responsible for doing so, despite the fact that experts established that socioeconomic differences "make it virtually impossible for schools to eliminate the achievement gap."  *Little Rock School Dist. v. Pulaski County Special School Dist. No. 1, et al.*, 470 F.Supp.2d 963, 984 and 1000-01 (E.D. Ark. 2004), citing *Little Rock School Dist. v. Pulaski Co. Special School Dist. No. 1,* 237 F.Supp.2d. 988, 1073-74 (E.D. Ark. 2001).

854.    This Court discussed then that "other courts have recognized that the academic achievement gap, which is a nationwide phenomenon, should not prevent a school district from being declared unitary, unless there is evidence this achievement gap was caused by *de jure* segregation."  *See Berry v. School Dist. of City of Benton Harbor,* 195 F. Supp. 2d 971, 996

(W.D. Mich. 2002); *see also Coalition to Save Our Children v. State Board of Ed. of Delaware,* 901 F. Supp. 784, 819 (D. Del. 1995); *Keyes v. Congress of Hispanic Educators,* 902 F. Supp. 1274, 1300 (D. Colo. 1995); *Tasby v. Woolery,* 869 F. Supp. 454, 477 (N.D. Tex. 1994); and *People Who Care v. Rockford Board of Ed.,* 246 F. #d. 1073, 1076-77 (7th Cir. 2001).

855.    The purpose of court supervision was to create a unitary school system from what was once a "dual school system," establishing and maintaining a school district in which the interests of both black and white students were equal by involving black representatives into policy-making and administration.  For the past 10 years three of the District's seven board members have been African-American, black administrators are well represented at every central office level and the proportion of principals remains at a very high level while certified teachers continue to substantially exceed their availability in the relevant labor market.

856.    Federal judicial supervision of school systems was intended as a "temporary measure" [and the] ultimate objective [is] to return school districts to the control of local authorities.  *Little Rock School Dist. v. Pulaski County Special School Dist. No. 1, et al.,* 237 F. Supp. 2d 988, 1027 (E.D. Ark. 2002), quoting *Freeman v. Pitts,* 503 U.S. 467, 489 (1992).  Accordingly, supervising courts "must . . . provide an orderly means for withdrawing from that control when it is shown that the school district has attained the requisite degree of compliance.  (*Id.*)

857.    Whether measured by "substantial compliance" or the traditional tests for unitary status based upon the entire relevant record made in this case, the Court finds that the PCSSD is unitary and should be released from further monitoring by this Court.

Respectfully submitted,

MITCHELL, WILLIAMS, SELIG,
  GATES & WOODYARD, P.L.L.C.
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Telephone:  (501) 688-8800
Facsimile:  (501) 688-8807
E-mail:   sjones@mwlaw.com


 /s/ M. Samuel Jones, III
M. Samuel Jones III (76060)

*Attorneys for Pulaski County Special School
District*


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 24, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to the following:

- **Mark Terry Burnette**
  mburnette@mbbwi.com
- **John Clayburn Fendley , Jr**
  clayfendley@comcast.net
- **Christopher J. Heller**
  heller@fec.net
- **Office of Desegregation Monitor**
  paramer@odmemail.com
- **Scott P. Richardson**
  scott.richardson@arkansasag.gov,agcivil@arkansasag.gov
- **John W. Walker**
  johnwalkeratty@aol.com,lorap72297@aol.com,jspringer@gabrielmail.com


 /s/ M. Samuel Jones, III

I hereby certify that on June 24, 2010, I mailed the document by United States Postal

Service to the following non CM/ECF participants.

Mr. Robert Pressman
22 Locust Avenue
Lexington, Massachusetts 02173

Judge H. David Young
C255 Richard Sheppard Arnold U. S.
Courthouse
500 West Capitol Avenue
Little Rock, Arkansas  72201

 _/s/ M. Samuel Jones, III_
M. Samuel Jones III (76060)
Attorneys for Defendant PCSSD
MITCHELL, WILLIAMS, SELIG, GATES &
WOODYARD, P.L.L.C.
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Telephone:  (501) 688-8800
Facsimile:   (501) 688-8807
sjones@mwlaw.com