FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAY 1 9 2011

JAMES W. McCORMACK, CLERK
By:_____ DEP CLERK

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

**LITTLE ROCK SCHOOL DISTRICT et al.**                                    **PLAINTIFF**

v.                                  **CASE NO. 4:82cv00866 BSM**

**PULASKI COUNTY SPECIAL
SCHOOL DISTRICT et al.**                                        **DEFENDANTS**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The North Little Rock School District ("North Little Rock") is petitioning for a declaration of unitary status and release from court supervision [Doc. No. 4141], and the Pulaski County Special School District ("Pulaski County") is petitioning for a declaration of unitary status [Doc. No. 4159]. The Joshua Intervenors ("Joshua") object to both petitions.

Extensive hearings were conducted in both cases. After viewing the witnesses in open court and listening to their testimony, and reviewing the exhibits offered into evidence, North Little Rock's petition is granted in the areas of: (1) special education; (2) compensatory education; (3) compensatory programs aimed at dropout prevention; (4) extracurricular activities; (5) discipline, expulsions and suspensions; (6) secondary gifted and talented education; (7) school construction and facilities; and (8) desegregation monitoring. The petition is denied in the area of staff recruitment.

Pulaski County's petition is granted in the areas of: (1) student assignment: interdistrict schools; (2) multicultural education; and (3) school resources. The petition is denied in the areas of: (1) student assignment; (2) advanced placement, gifted and talented and honors programs; (3) discipline; (4) school facilities; (5) scholarships; (6) special

education; (7) staff; (8) student achievement; and (9) monitoring.

## I. INTRODUCTION

Two hearings were conducted, one on North Little Rock's petition and one on Pulaski County's petition, and each posed a number of challenges. In both hearings, a number of the witnesses seemed to view the judge's role as that of Harry Bailey, the innkeeper in Geoffrey Chaucer's book, The Canterbury Tales. That book gives the fictional account of twenty-nine pilgrims traveling to pay homage to Saint Thomas Becket, the Archbishop of Canterbury, on the anniversary of his death. While dining at the Tabard Inn, Bailey suggests, and the pilgrims agree, that whomever tells the best story on the road to and from Canterbury will receive a free meal at Bailey's inn. Bailey had the job of determining who told the best story.

Although the parties were reminded a number of times that the only determination to be made is whether the districts acted in good faith and substantially complied with their desegregation plans, several witnesses seemed intent on telling the most interesting stories or, at the least, the ones they felt the court most wanted to hear. For example, one witness testified that North Little Rock has done all it can to teach black kids how to read and speak English correctly. The witness supported this proposition by noting that teachers let their students rap in class. Although, at first blush, it might seem understandable for this witness to assume that a middle aged black judge would find this appealing, that presumption is simply untrue. In fact, it was appalling, especially considering that all one has to do is listen to the interviews of many rap artists to realize that knowing how to rap does not necessarily

2

lead to literacy nor does it aid one in speaking English correctly. Indeed, after viewing a number of rap music videos or listening to interviews of rap artists, one could easily be left with the sincere impression that rappers, as a group, are some of the most illiterate and ignorant sounding people society has to offer.

On the other hand, many of the witnesses offered by Joshua said little that was relevant to the issues at hand; however, some of them attempted to tell interesting stories. For example, one black basketball coach testified that he suffered grave discrimination at the hands of North Little Rock when he was first given a 200-day contract which was later increased to a 217-day contract, while the newly hired white football coach received a 240-day contract. In that teachers are paid by the day, this caused the less experienced football coach to be paid more than the basketball coach.

This testimony, which seemed to be quite interesting to some of the people in the courtroom, and which took up a substantial amount of time, added nothing to the case because it was based on flawed logic and inaccurate analysis. This is true because, unlike basketball coaches who begin practice after the start of the school year, football coaches are required to work during the summer because that is when football practice starts. Therefore it is customary in Arkansas for football coaches to have contracts that reflect that, in addition to the normal school year, they work extra days during the summer. This truth, however, did not stop minute after grueling minute of mindless testimony about the injustice suffered by the basketball coach.

There are many other examples of witnesses who attempted to tell the most interesting stories and who seemed to simply enjoy hearing themselves talking. Those examples and the stories told can be found in the extensive record of the proceedings.

## II. BACKGROUND

Desegregation in education; what a concept. During one hearing, the lawyers were asked whether either North Little Rock, Pulaski County, or the Little Rock School District ("Little Rock") denied any black students the right to attend any of the public schools in those districts. The answer, of course, was no. The lawyers were also asked whether black students are guaranteed a better education by merely being placed in classrooms with white students. In essence, the question is whether the mere presence of white students guarantees that black student achievement will rise? Of course no lawyer was willing to answer yes to that question. It seems that no one associated with the case truly believes that black children learn through osmosis and that black student achievement will be increased by the presence of white students or by the mystical power of whiteness.

That being the case, the question then becomes, "so what are we fighting about?" It seems that the answer to that question is that desegregation does not mean what many of us think it means. Desegregation does not mean that black families should be free to send their children to their neighborhood schools. This case does not involve a Linda Brown who has to walk past her neighborhood school, which is all white, to attend a segregated black school that is farther away from her home. Desegregation now seems to mean racial equity in

4

education or the notion that the schools black children attend should have the same facilities, the same quality of instruction and the same quality of extracurricular programs that the schools attended by white children have.

After reading the briefs, the transcripts from the various hearings, and the scores of exhibits filed herein, it is very easy to conclude that few if any of the participants in this case have any clue how to effectively educate underprivileged black children. It is cause for great concern that a number of the various participants in this case seem to believe there is some magic spell that will do the trick, such as some special racially-based formula or program. Even more concerning, however, is that it seems that some of the participants do not really care.

A.    School Desegregation History

*Brown v. Board of Education* is the pivotal case in desegregation litigation. 347 U.S. 483 (1954). This case has become an integral part of American history and established that separate does not mean equal, explicitly rejecting *Plessy v. Ferguson*, 163 U.S. 537 (1896). "[I]n the field of public education, the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal." *Brown*, 347 U.S. at 495. The task of carrying out school desegregation was delegated to district courts in the follow-up case, *Brown v. Board of Education*, referred to as "*Brown II*." 349 U.S. 294, 299 (1955). The Court directed that desegregation was to occur "with all deliberate speed." *Id.* at 301. Because an exact deadline was not set, however, school districts took advantage of this language and took

minimal steps towards desegregation.

Believing it sufficient to simply give black children the option to attend white schools, many school districts implemented freedom of choice plans. These plans allowed white and black children to choose what schools they wanted to attend. Freedom of choice plans did little to integrate schools. Few children chose to attend schools in which they would be in the minority race. *Green v. County School Board of New Kent County*, 391 U.S. 430 (1968), specifically addressed such a situation. The Supreme Court acknowledged that following *Brown II*, the "principal focus was on obtaining for those Negro children courageous enough to break with tradition a place in the 'white' schools." *Green*, 391 U.S. at 436. The Court went on to state, however, that "Under *Brown II* that immediate goal was only the first step . . . . The transition to a unitary, nonracial system of public education was and is the ultimate end to be brought about." *Id.* Accordingly, desegregation plans became more complex, encompassing many aspects of the education system, in order to establish "a unitary, nonracial system of public education."

In *Green*, the Court recognized specific components of school systems that must be free from racial discrimination before finding a school district unitary: student assignment, faculty and staff assignment, transportation, extracurricular activities, and facilities. *Id.* at 435. As this court has previously recognized, the desegregation plans of North Little Rock and Pulaski County go beyond the factors established in *Green*. Therefore, by complying with their desegregation plans, they are complying with *Green*.

Acknowledging the efforts to delay desegregation, the Supreme Court also addressed the "deliberate speed" language in *Brown II*. "The time for mere 'deliberate speed' has run out . . . . The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work now." *Id.* at 438-39 (internal citations omitted).

These cases provide the backdrop to the desegregation of schools in Pulaski County, Arkansas. Because this history has been thoroughly recounted in previous orders by Judge Henry Woods and Judge Billy Roy Wilson, it will not be fully described here. *See LRSD v. PCSSD*, 584 F. Supp. 328 (E.D. Ark. 1984); *LRSD v. PCSSD*, 237 F. Supp. 2d 988 (E.D. Ark. 2002). The key events, however, will be discussed.

B.     The History of This Case

The case currently before the court, filed on November 30, 1982, is the product of many years of desegregation litigation involving the Little Rock School District. The initial lawsuit against Little Rock can be traced back to the events that took place at Central High School in 1957. Following *Brown*, Little Rock developed plans to desegregate. Much resistance was met from the state, and in particular Governor Orval Faubus. In the fall of 1957, nine black students were registered to attend the formerly all white Central High School. On the first day of class, however, Governor Faubus enlisted the Arkansas National Guard to block the entrance to the school. A lawsuit was quickly filed and U.S. District Judge Ronald Davies enjoined the actions taken by Governor Faubus. *Aaron v. Cooper*, 156 F.

7

Supp. 220, 226 (E.D. Ark. 1957). The Eighth Circuit affirmed. *Faubus v. United States*, 254

F.2d 797, 808 (8th Cir. 1958). Federal troops were sent by President Eisenhower to enforce

the injunction and to protect the nine black students.

Following these events, Little Rock continued to develop plans for the desegregation

of Little Rock. The school board, however, continued to face great resistance from the state

and Governor Faubus, resulting in more litigation. *See, e.g., Aaron v. McKinley*, 173 F. Supp.

944 (E.D. Ark. 1959). A desegregation plan for grades 6-12 was finally created, and

approved by the Eighth Circuit in 1971. *Clark v. Bd. of Educ. of the LRSD*, 449 F.2d 493 (8th

Cir. 1971). In 1983, a desegregation plan for the elementary grades was approved. *Clark v.*

*Bd. of Educ. of the LRSD*, 465 F.2d 1044 (8th Cir. 1983). Eventually it was realized,

however, that without some interdistrict action, Little Rock could not maintain an integrated

school system. Little Rock was becoming more black and the neighboring school districts

were becoming more white. In 1982, Judge William R. Overton acknowledged this when he

wrote that "[a]ll of the persuasive evidence indicates the school district will have an

enrollment which is essentially all black, particularly in the elementary grades, within the

next few years." *Clark v. Bd. of Educ. of the LRSD*, No. LR 64 C 155, p. 4 (E.D. Ark. July

9, 1982). Shortly following this order, in an effort to obtain an interdistrict remedy, Little

Rock filed this suit against North Little Rock, Pulaski County, the State of Arkansas, and the

Arkansas Department of Education ("Department of Education").

The suit filed by Little Rock, however, was not the first time North Little Rock and

Pulaski County were involved in desegregation litigation. Indeed, North Little Rock adopted a freedom of choice plan in 1964. The freedom of choice plan did little to integrate the schools and a lawsuit was initiated. *See Graves v. Bd. of Educ. of the NLRSD*, 299 F. Supp. 843 (E.D. Ark. 1969). North Little Rock developed a desegregation plan for the 1969-1970 school year, but the plan was not approved. *Id.* at 851 (E.D. Ark. 1969). North Little Rock quickly submitted an amended plan and it was approved for one year. The amended plan, however, only addressed attendance zones, and the court informed North Little Rock that it would have to desegregate other areas. *Graves v. Bd. of Educ. of the NLRSD (Graves II)*, 302 F. Supp. 136 (E.D. Ark. 1969). The "Storm" plan, which was named after a member of the North Little Rock school board, was soon developed and was approved by the Eighth Circuit in 1971. *Davis v. Bd. of Educ. of the NLRSD*, 449 F.2d 500, 501 (8th Cir. 1971). Implementation of the plan began in the 1972-1973 school year.

In 1968, a private desegregation suit, *Zinnamon v. Board of Education of the PCSSD* (1968), No. LR-68-C-154, was brought against Pulaski County. This litigation led Pulaski County to file a desegregation plan for the 1971-1972 school year. The plan was approved by District Judge J. Smith Henley. Judge Henley's decision was appealed but the appeal was dismissed by the Eighth Circuit. The parties in *Zinnamon* entered into a consent decree in 1973, which is referred to as the *Zinnamon* decree. In a 1984 order determining the appropriateness of an interdistrict remedy, Judge Woods stated that "[Pulaski County] has failed to demonstrate any efforts or intentions to comply with the directives of the *Zinnamon*

9

decree or to eliminate the last vestiges of segregation." *LRSD v. PCSSD*, 584 F. Supp. 328, 337 (E.D. Ark. 1984).

In 1984, a trial was held in Little Rock's case against North Little Rock, Pulaski County, the State of Arkansas, and the Department of Education. In his findings of fact and conclusions of law, Judge Woods found that North Little Rock, Pulaski County, and Arkansas were in violation of the Constitution by creating "racial isolation between and among the districts." *Id.* at 349. Specifically, Judge Woods found that North Little Rock had committed the following acts of segregation:

(1) failed to assign blacks to its central administration or to high school principalships and coaching positions;

(2) concentrated whites in schools north of Interstate 40 and blacks in schools south of it;

(3) assigned students to special education classifications on a discriminatory basis; and

(4) failed to apportion the burdens of transportation equally on black and white students.

*Id.* at 353. Judge Woods found that Pulaski County had also committed acts of segregation, including:

(1) failing to adhere to the requirements of the *Zinnamon* decree;

(2) constructing schools in locations which ensured that they would be racially identifiable schools;

(3) failing to apportion the burdens of transportation equally on black and white students;

(4)     refusing to hire and promote black faculty and staff;

(5)     refusing to allow deannexation to or consolidation with the other two districts;

(6)     failing to assign students to schools in such a way as to maximize desegregation;

(7)     assigning students to special education classifications and gifted programs on a discriminatory basis;

(8)     assigning black principals to schools with high black enrollments;

(9)     creating and maintaining a racial imbalance in almost half its schools; and

(10)    closing and downgrading schools in black neighborhoods and failed to build new schools there.

*Id.* Judge Woods's findings not only meant that an interdistrict remedy would be required, but also that the school districts would have to implement plans to desegregate their individual school districts. The Eighth Circuit approved the individual desegregation plans of the school districts as well as the interdistrict desegregation plan on December 12, 1990. *LRSD v. PCSSD*, 921 F.2d 1371, 1394 (8th Cir. 1990). In the years following this approval, the plans were modified. These modifications were allowed as long as they did not affect the "major substantive commitments to desegregation" embodied in the plans. *Appeal of LRSD*, 949 F.2d 253, 256 (8th Cir. 1991).

Pulaski County filed its first motion to withdraw from court supervision on August 23, 1995. In this motion, Pulaski County asked that court supervision end in three areas of the plan: library media services, staff development, and counseling services. The same day,

11

North Little Rock filed a motion for partial release from court supervision, asking to be released in the areas of student assignment, gifted and talented programs, and extracurricular activities. Hearings on the motions were conducted by Judge Susan Webber Wright on August 30, 31, and September 1, 1995. An order was issued by Judge Wright on September 18, 1995, granting North Little Rock's motion with respect to student assignments. A stipulation was filed by Little Rock, North Little Rock, Pulaski County, Joshua, and Knight Intervenors on February 9, 1996, addressing which areas of the districts' desegregation plans could be released from court supervision. The stipulation allowed for Pulaski County to be released in the areas of the library media program, the vocational education program, the guidance and counseling program, the elementary school gifted and talented program, and the staffing of elementary classroom teachers. It also allowed for North Little Rock to be released in the area of elementary gifted and talented. Judge Wright approved the stipulation on March 27, 1996.

A second motion for release from court supervision was filed by Pulaski County on October 14, 1997, and a hearing was held on March 24, 1998. Having been informed that a settlement had been reached between Pulaski County and Joshua, the court declined to rule on the motion. The parties were instructed to submit a modified plan according to the settlement. The settlement, however, was unsuccessful and another hearing on Pulaski County's motion was conducted from June 29 to July 1, 1998. Again the court was informed that the parties were interested in settlement discussions. An order was entered on September

12

28, 1998, denying the motion for release from court supervision, citing possible settlement. Again, a settlement was not reached.

Pulaski County filed a third motion for release from court supervision and post-unitary commitments on March 25, 1999, seeking complete unitary status. Judge Wright entered an order on July 19, 1999, denying Pulaski County's motion and directing it to submit an amended desegregation plan. The amended desegregation plan ("Plan 2000") was submitted for court approval on November 17, 1999. The plan was approved by Judge Wright on March 20, 2000.

Subsequent motions for declaration of unitary status were not filed until 2007, following Judge Wilson's finding that Little Rock was unitary. As stated above, North Little Rock's petition for declaration of unitary status and release from court supervision was filed on September 21, 2007. One month later, on October 29, 2007, Pulaski County filed its motion for a declaration of unitary status.

## III. CONCLUSIONS OF LAW

The standard used to evaluate the efforts made by school districts to desegregate has changed during the history of desegregation litigation. In *Green v. County School Board of New Kent County*, 391 U.S. 430, 438 (1968), the Court stated that discrimination must be "eliminated root and branch." This high standard was tempered by the Court in *Board of Education v. Dowell*, 498 U.S. 237, 239-50 (1991), in which the Court held that a determination should be made "whether the Board had complied in good faith with the

desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." This standard is still used today in many school desegregation cases.

In this litigation, that standard is slightly different, although the core requirements remain. Evaluating the unitary status of North Little Rock and Pulaski County involves a two-part determination: (1) the good-faith implementation of the terms of the desegregation plans; and (2) substantial compliance with the terms of the desegregation plans. This standard is a combination of constitutional and contract law. In school desegregation cases, perhaps the greatest emphasis has been placed on the good faith of school districts in achieving integration. In *Brown II*, the Court noted that "courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles." 349 U.S. at 299. Specifically addressing consent decrees, the Court stated in *Board of Education of Oklahoma City Public Schools, Independent School District No. 89 v. Dowell*, that "[t]he District Court should address itself to whether the Board has complied in good faith with the desegregation decree since it was entered." 498 U.S. 237, 249-50 (1991). Good faith was emphasized again in *Freeman v. Pitts*, in which the Court held that, in determining the unitary status of a school district, the district court should examine

> [W]hether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance.

14

503 U.S. 467, 491 (1992). In *Missouri v. Jenkins*, the Court solidified the importance of good-faith compliance. 515 U.S. 70 (1995). "The ultimate inquiry is whether the constitutional violator has complied in good faith with the decree since it was entered." *Id.* at 89 (internal quotations omitted). Therefore, the first determination that must be made is whether each school district has implemented its respective plan in good faith.

North Little Rock and Pulaski County have reached settlement agreements with Little Rock and Joshua. These agreements were approved by the court and therefore became consent decrees. In deciding whether the school districts have achieved unitary status, contract law is also used. "In this case we are applying the terms of a contract between the parties to facts that have arisen since its creation. . . . This case is governed by the terms of the Settlement Agreement. We thus apply the terms of the Settlement Agreement to each of the sets of facts before us." *LRSD v. PCSSD*, 83 F.3d 1013, 1017 (8th Cir. 1996). Like the constitutional standard applicable to this case, contract law requires that a consent decree be implemented in good faith. In addition, contract law requires that the consent decree be substantially complied with.

> Thus, it is said that the law looks to the spirit of a contract and not the letter of it, and that the question therefore is not whether a party has literally complied with it, but whether he has substantially done so. . . . Accordingly, the courts now state that substantial, and not exact, performance accompanied by good faith is all the law requires in the case of any contract to entitle a party to recover on it.

*Carney-Reeves v. Ney*, No. CA 98-825, 1999 WL 286629, *4 (Ark. App. May 5, 1999) (quoting 17A Am. Jur. 2d *Contracts* § 631 (1991)).

The good faith and substantial compliance standard has been used throughout this litigation. Little Rock specifically set this standard out in its desegregation plan, and Judge Wilson found Little Rock unitary under this standard. Although the standard is not cited in the plans of North Little Rock and Pulaski County, it is the standard to be used in determining their unitary status. "It is black letter law that a school district seeking an end to court supervision has the burden of proving substantial compliance with the judicially imposed remedy." *LRSD v. PCSSD*, 470 F. Supp. 2d 963, 984 (E.D. Ark. 2004).

While good faith is a familiar term and standard used in many areas of the law, what constitutes substantial compliance with consent decrees in desegregation cases has proved more difficult to define. Judge Wilson addressed this issue in his 2002 order declaring Little Rock partially unitary. Discussing the Eighth Circuit's decision in *Cody v. Hillard*, Judge Wilson stated

> The Court in *Cody* made it clear that, in order to determine if a party is in "substantial compliance" with a consent decree, the trial court must examine whether any of the alleged violations of the consent decree "were serious enough to constitute substantial noncompliance" and "to cast doubt on defendants' future compliance with the constitution."

*LRSD v. PCSSD*, 237 F. Supp. 2d 988, 1035 (E.D. Ark. 2002). Judge Wilson also noted that *Cody* "recognized that a party can be in 'substantial compliance' with a consent decree even if it has committed violations that are 'inconsequential' in light of the party's overall performance." *Id.*

Proving good faith and substantial compliance is the burden of the school districts.

16

In *Jenkins v. Missouri*, the Eighth Circuit held that "the burden of proving unitariness rests on the constitutional violator." 216 F.3d 720, 725 (8th Cir. 2000). North Little Rock and Pulaski County must prove by a preponderance of the evidence that they have substantially complied in good faith with each section of their respective plans. *See LRSD v. PCSSD*, 470 F. Supp. 2d 963, 984 (E.D. Ark. 2004).

## IV. FINDINGS OF FACT

The desegregation plans of North Little Rock and Pulaski County are the products of more than twenty years of negotiations, modifications, and settlements. Both school districts have been released from court supervision in certain areas of their plans. North Little Rock has been released in the areas of student assignment and elementary gifted and talented. Pulaski County's Plan 2000 reflects that Pulaski County has been released in the areas of library media, vocational education, guidance and counseling, elementary school gifted and talented, and staffing of elementary classroom teachers.

North Little Rock is still under court supervision in the areas of: (1) staff recruitment; (2) special education; (3) compensatory education; (4) compensatory programs aimed at dropout prevention; (5) extracurricular activities; (6) discipline, expulsions and suspensions; (7) secondary gifted and talented education; (8) school construction and facilities; and (9) desegregation monitoring. Pulaski County is still under court order in the areas of: (1) student assignment; (2) advanced placement, gifted and talented and honors programs; (3) student assignment: interdistrict schools; (4) discipline; (5) multicultural education; (6) school

facilities; (7) scholarships; (8) school resources; (9) special education; (10) staff; (11) student achievement; and (12) monitoring.

A.      North Little Rock School District

North Little Rock's petition is denied in the area of staff recruitment and granted in the areas of special education; compensatory education; compensatory programs aimed at dropout prevention; extracurricular activities; discipline, expulsions and suspensions; secondary gifted and talented education; school construction and facilities; and desegregation monitoring.

### 1.  Staff Recruitment

The primary objective of the staff recruitment section of the plan is to increase the number of black teachers, principals and administrators in the North Little Rock School District. Although this is the case, the evidence indicates that the percentage of black teachers has actually gone down in the district. For example, in the 1984-1985 school year, twenty percent (104 of 519) of the district's teachers were black, while in the 2009-2010 school year, approximately 14.5 percent (111 of 766) of the district's teachers were black. North Little Rock Exs. 20, 25. And this was not an aberration for there were at least two school years (2006-2007 and 2007-2008) in which the percentage of black teachers dropped to as little as thirteen percent. Joshua Exs. 1-2, 1-3.

Of course, raw numbers alone do not tell the entire tale as to whether North Little Rock has acted in good faith. Indeed, North Little Rock's witnesses testified that the district

18

has gone to great lengths to recruit black teachers, principals and administrators and that it notifies and encourages black people to apply to vacancies. The district's assistant superintendent, Bobby Acklin ("Acklin"), who is black, testified that he has personally recruited black college students for teaching positions in the district and has personally recruited black administrators, but that the district has difficulty recruiting black teachers because many recent black college graduates do not want to teach in North Little Rock due to the lower salaries offered by North Little Rock and because many do not want to move to Arkansas.

Although the testimony indicated that North Little Rock may have taken steps to recruit black teachers, principals and administrators, the district did not adequately document these efforts and therefore the witnesses based their testimony on personal recollections and anecdotal evidence. For instance, although Acklin testified that he attempted to recruit black teachers but was routinely turned down, he did not know how many black teachers he actually recruited or how many times he made recruiting trips. He also did not know how many black recruits actually turned down offers. He could only say that he tried but was unsuccessful, and this is simply not enough to satisfy the district's burden.

While it is hereby specifically found that the district has failed to satisfy its burden in proving that it complied with its plan obligations relating to minority recruitment, it is also hereby specifically found that the district is directed to maintain records indicating its recruitment efforts and to present those records to the Office of Desegregation Monitoring

19

("ODM"). If the district provides adequate proof of its efforts for twenty-four months, this finding will be reconsidered.

## 2. Special Education

It was determined in 1984 that black students in North Little Rock were over-represented in special education classes. In viewing the records, it seems that North Little Rock was having difficulty in determining how to compensate for the lack of skills possessed by its black students when they were first enrolled in the district, so the district simply placed those students in special education classes and left them there. To remedy this, the district agreed to properly evaluate all of its students and maintain records showing that it performs appropriate student assessments and that students are being properly assigned. These records require the district to show the race of the students being assessed so that a determination can be made as to which students are being labeled as special needs students.

The evidence shows that North Little Rock adopted policies and procedures to avoid misidentifying students as special education students. Since implementing these policies and procedures, there has been a somewhat consistent decrease in the number of black students placed in special education classes. For instance, in the 1987-1988 school year, approximately twenty percent of black students were placed in special education while in the 2009-2010 school year approximately twelve percent were so placed. North Little Rock Exs. 118, 119, 122.

These policies and procedures have also lead to a decrease in the number of black

students who are labeled mentally retarded. For instance, in 1990 approximately four percent (168 of 4,279) of black students were classified as mentally retarded while, in the 2009-2010 school year, approximately one percent (77 of 5,678) of black students were so classified. *Id.*

There is no question that North Little Rock still has an overrepresentation of black students in its special education classes. It is also without question that North Little Rock failed to submit annual reports of its efforts to reduce the representation of black students in special education. These factors, however, are not totally dispositive because the question is not whether North Little Rock has solved the problem but whether it made good-faith efforts and has substantially complied with its plan. Based on the evidence adduced at trial and the entire record, it is hereby found that North Little Rock has complied with its plan obligations and should therefore be released from court monitoring.

### 3. Compensatory Education

Standardized testing has become extremely important in identifying the skills possessed by students. Indeed, it is what is used to determine whether the students attending various schools from around the country are actually learning the necessary skills to compete in a world economy.

Compensatory education describes programs that are supplemental to regular curriculum which are designed to meet the remedial needs of students and increase achievement, as is ultimately tested on the various standardized tests. Compensatory education is so important that it comprises the largest portion of North Little Rock's

desegregation plan. This section requires the school district to implement specific programs and to otherwise take the necessary actions to address early childhood education, intensified instruction, basic skills instruction, pupil services, learning resources, summer learning programs, parental and community involvement, and staff development.

As detailed below, North Little Rock has presented enough evidence showing that it has acted in good faith and has substantially complied with the compensatory education section of its plan.

a.      Early Childhood Programs

The plan requires that North Little Rock establish kindergarten programs at each elementary school and implement diagnostic tests for kindergarten students. Data from the diagnostic tests must be used to design prescriptive learning programs for each student. North Little Rock presented evidence that kindergarten programs have been established at each elementary school. Additionally, the Boehm-R Test of Basic Concepts ("Boehm") and the Early Prevention of School Failure Test were administered to all kindergarten students. These tests have since been replaced by more sophisticated tests: Qualls Early Learning Inventory ("Qualls") and Metropolitan Achievement Test 8 ("MAT 8"). The data from these tests have been used to establish prescriptive learning programs for each student. These prescriptive learning programs are implemented through large-group instruction, small-group instruction or individual instruction.

The plan also requires that North Little Rock establish a pre-kindergarten program to

prepare children in lower socio-economic attendance zones for kindergarten. Specifically, the plan requires that a Home Instruction for Pre-school Youngsters ("HIPPY") program be established. North Little Rock presented a great amount of evidence on the HIPPY program in the district. Through the HIPPY program, North Little Rock attempts to provide less affluent children with the skills required to begin kindergarten. There are currently 28 HIPPY classrooms in North Little Rock.

      b.     Intensified Instruction

The plan requires North Little Rock to use teaching assistants and paraprofessionals to provide additional instruction to students in kindergarten, first, second and third grade who struggle in reading, language and basic concepts. North Little Rock presented evidence that it has employed instructional assistants and paraprofessionals to do exactly this. Data from the Boehm and Early Prevention of School Failure Test were used to identify the students. Since the Boehm and Early Prevention of School Failure Test are no longer in use, North Little Rock now uses data from Qualls and MAT 8 to identify students in need. The intensified instruction occurs in small groups or on a one-to-one basis in kindergarten, first, second and third grade.

      c.     Basic Skills Instruction

The plan requires North Little Rock to develop a Practical Approach to Curriculum and Instructional Renewal ("PACIR") program, provide additional reading instruction to those students in need, and use state performance tests to create individual academic skills

development plans for students in third, sixth and eighth grade. PACIR is a program for curriculum design. North Little Rock established a PACIR program to develop curriculum and establish a diagnostic and prescriptive learning system. The school district employed teaching assistants and paraprofessionals to provide supplemental reading instruction to first, second and third grade students in need. Reading groups have been established for all elementary students in need of supplemental reading instruction. These groups are flexible, and students can move in and out of the groups as their particular needs change. North Little Rock has also implemented a Reading Recovery program.

Additional reading instruction is provided at the middle school and high school levels as well. North Little Rock submitted evidence that remedial reading classes were established at the middle school level and staffed by reading specialists but that a separate remedial reading class was no longer in place because it was impossible to fit into a curriculum day. Additional time for reading instruction is therefore provided in the standard classroom environment. Intensive reading instruction is, however, still provided at the middle school level. Specific programs used include Ramp Up, Boost, AIR and Literacy Navigator. Each middle school has a literacy instructional facilitator.

At the senior high school level, North Little Rock implemented the Principles of the Alphabet Literacy System ("PALS"). This program specifically targets students ages seventeen to eighteen. Also implemented was a system of computer-based instruction with eight stations that address multiple reading skills. A program for non-readers was established

24

at North Little Rock High School's West Campus. A program called CCVE, targeting ninth and tenth graders, was implemented at North Little Rock High School's East Campus. At the senior high school level, North Little Rock currently uses programs like Read 180, Apex Learning and Skills Tutor, to name a few.

North Little Rock used the state's Minimum Performance Test ("MPT") to create individual academic skills development plans for students in the third, sixth and eighth grades who did not demonstrate mastery on the MPT. PACIR was used in conjunction with the MPT to create the plans. The plans were used throughout the year to direct the instruction of the students. The 1993-1994 school year was the last year the MPT was used by the state. Following this, North Little Rock used the Stanford Achievement Test 8 ("SAT 8") and tests provided in the basic skills computer labs to identify and address the needs of students. Because of the nature of these tests, North Little Rock was unable to create individual academic skills development plans. In 1999, however, the state began using Benchmark Examinations. Like the MPT, the Benchmark Examinations allowed for the creation of individual academic skills and development plans.

Supplementary instruction at the elementary level is also required by the plan. North Little Rock is required to provide additional reading and mathematics instruction to students who score below the twentieth percentile on standardized tests in first through sixth grade. The additional instruction must be provided by reading and math specialists. North Little Rock provides this supplemental instruction in the computer labs with a certified teacher and

paraprofessional. This was in addition to the regular classroom instruction. Currently, North Little Rock uses math and literacy facilitators, as well as interventionists, in its elementary schools.

      d.    Pupil Services

This section requires North Little Rock to provide guidance counselors to students at the elementary and secondary levels. At the elementary level, the district must provide one counselor for every 600 students. At the secondary level, North Little Rock must provide one counselor for every 450 students. North Little Rock has met this goal. At the elementary level, it provides one counselor for every 450 students, and at the secondary level, it provides one counselor for every 300 to 350 students. Most of North Little Rock's elementary schools have a full-time guidance counselor.

North Little Rock must also use various assessments to plan compensatory programs and services for first through eleventh grade students. North Little Rock has used Boehm, Early Prevention of School Failure, Qualls, MAT 8, SAT, Benchmark Examinations, intensified instruction using PACIR, and basic skills computer labs to plan the compensatory programs and services.

The plan requires that North Little Rock employ a half-time social worker to assist students who have issues with school adjustment. North Little Rock, however, employs a full-time social worker in this role. It also has three human services workers that are placed in the district by the Arkansas Department of Human Services.

Homebound teaching services are required to be provided to students with medical conditions that prevent them from attending classes. North Little Rock employs two teachers full-time to assist homebound students. If needed, the school district contracts with additional teachers to provide evening services.

The plan requires that North Little Rock develop and assess achievement data by race for each school by grade. This part of the plan is discussed below.

North Little Rock was required to provide up to $5,000 to assist disadvantaged youth in paying for college entrance testing. According to the testimony presented by North Little Rock, this was done.

e.     Learning Resources

The learning resources section of the plan focuses on computer laboratories. It requires the district to set up computer laboratories in each school, to provide computer assisted instruction to students in need, and to use specific software to aid diagnostic and prescriptive services. North Little Rock provided evidence that a full media program has been developed for kindergarten through the twelfth grade. Each school has a media center and media specialist. Basic skills computer laboratories have been provided in every school except Belwood Elementary. The testimony was that Belwood Elementary is not large enough for a basic skills computer laboratory. Each classroom at Belwood Elementary, however, is equipped with four computers. Even in the schools with basic skills computer labs, computers are provided in the classrooms. The equipment in labs and classrooms has

been replaced three or four times since the plan has been in effect. Through the computer laboratories and computers in the classrooms, computer assisted instruction is provided to students in need.

The plan specifically references use of the curriculum management software created by IBM. It required North Little Rock to use this software, or a comparable alternative, to create individual education plans ("IEPs"). The IBM curriculum management software was never developed. North Little Rock was therefore unable to create a computerized plan for each student. Through PACIR, reports from computer labs and the Benchmark Examinations, however, North Little Rock was able to assess and address the individual needs of students. It now creates academic improvement plans ("AIPs") and intensive reading inventories ("IRIs"). AIPs are used in literacy, math and some sciences, and remain in effect until the teacher has documented that the student has mastered the content. IRIs are for students who have failed to show proficiency in reading in kindergarten, first or second grade.

f.    Summer Learning Experiences

The plan requires the district to establish summer programs for elementary and secondary students. In response, the district established summer school for elementary and middle school students who have failed to master the basic skills curriculum. A summer school program is also offered by North Little Rock for secondary students in which emphasis is placed on helping students with credit deficiencies. It is tuition-based for students who can afford it, and free for students qualifying for free or reduced-price lunch.

Scholarships are provided to students in need of financial assistance and transportation is provided.

As required, a pilot project for eighth grade students was established with funds from the Job Training Partnership Act ("JTPA"). The program specifically addressed the MPT, and eighth graders had the option of retaking the MPT at the end of the summer program. The plan only required that the Pilot Project be continued for as long as it was funded by the JTPA. JTPA funds are no longer available, and therefore the pilot project no longer exists.

g.    Parental/Community Involvement

The plan requires North Little Rock to encourage parent involvement in the education of their children. North Little Rock provided evidence that parent involvement has been encouraged through a parent teacher association ("PTA") at every school, a Chapter 1 Parent Advisory Committee (now referred to as the Community and Family Involvement Committee), district committees such as curriculum and textbook committees, six-year planning committees (now referred to as Arkansas Comprehensive School Improvement ("ACSIP") teams), and North Central Association ("NCA") self-study committees. As required, the committees are biracial.

In compliance with the plan, North Little Rock employs a full-time coordinator to work with Volunteers in Public Schools ("VIPS"). Each school has a parent facilitator and resources for parents to become more involved in the education of their children. Some schools have a full-time staff person who works with parent involvement. North Little Rock

also provided evidence of other programs implemented to foster parent involvement. One such program, Families Building Better Readers, was presented at Eastgate Terrace, a housing project, to reach out to parents who are unable to attend programs presented at the schools. North Little Rock also provides family literacy and math nights.

Parent-teacher conferences occur at least twice each year for parents of elementary students, and at least once each year for parents of secondary students. North Little Rock carefully tracks the attendance of parents at parent/teacher conferences. Some parent/teacher conferences are held in neighborhoods where students live, as opposed to at the school. If a parent cannot attend a conference, she may be contacted by phone, or a teacher may schedule a home visit. Conferences may be held more frequently if a student has issues that need to be promptly addressed. North Little Rock issues report cards at the end of each nine week grading period. Parents also have access to Edline, an online program through which they can monitor their child's classroom activities and grades, among other things.

The plan requires North Little Rock to extend the Classmates Program, a program that facilitates business involvement with the education of the students of the community. This program is now called "Partners in Education." Each school has at least one business partner, and most have multiple.

h.    Staff Development

The staff development section of this part of the plan requires North Little Rock to use multiple programs to train its teachers and the record indicates that North Little Rock

teachers are trained by each program prescribed by the plan. For example, North Little Rock initially trained its certified staff members using the Program for Effective Training ("PET"), and then evaluated them yearly to determine if the staff members were implementing PET principles. North Little Rock later instituted the Instructional Design program, which utilizes the same concepts as PET.

In addition to PET and Instructional Design training, teachers have been trained in classroom management. Indeed, this training is ongoing because Arkansas requires teachers to receive yearly training in classroom management to maintain their certification.

North Little Rock also provides its teachers with Pathwise mentoring. New teachers are required to have a trained mentor. This mentor must have at least twenty hours of contact per year with their mentee.

As required by the plan, North Little Rock teachers receive Teacher Expectations and Student Achievement ("TESA") training. All teachers received TESA training by the sixth year of the plan. At some point, North Little Rock discontinued training its teachers in TESA but restarted TESA training in 2008. Some testimony suggested that TESA was never entirely abandoned by North Little Rock because many of the teachers were already trained.

In addition to these programs, North Little Rock provides other forms of diversity training to its teachers. Specifically, North Little Rock has provided, or currently has scheduled, programs from Glenn Singleton, the author of Courageous Conversations About Race; Larry Bell, an expert on closing the achievement gap; Robin Fogarty; and Robert

Marzano. It has also conducted teacher professional development using Dr. Ruby Payne's

("Payne") research on understanding poverty and its affect on education. Key components

of TESA are included in Payne's research.

     i.     State Monitoring

This section of the plan requires that the state monitor North Little Rock's

implementation of compensatory education programs, and that nothing in the plan limit this

monitoring. The state continues to monitor the implementation of compensatory education

programs without hindrance.

     j.     Achievement Disparity

Although not a separate topic under the compensatory education section of the

desegregation plan, the achievement disparity between black and white students is mentioned

throughout this section and was an issue of particular importance during the hearing. The

introduction to the compensatory education section states, "[t]he District also recognizes that

achievement disparity does exist between the black and white student population. Addressing

the disparity issue may start with the development of disparity plans at each campus unit."

Under learning resources, the plan states that the goal is to "[p]rovide technology based

remedial skills instruction to reduce the achievement disparity between black and non-black

students." Under pupil services, the plan states that the goal is "[t]o assess student

achievement and monitor the reduction of achievement disparity between black and non-

black students." This part requires that "[a]chievement data by race will be developed for

each school by grade. These data will be analyzed each year to determine program efficacy and in developing achievement components of each school's annual School Improvement Plan." Under basic skills instruction, the plan states that the goal is to "[p]rovide remedial instruction for basic skills mastery to reduce achievement disparity between black and non-black students."

North Little Rock's desegregation plan does not require that the achievement disparity be reduced. It recognizes that there is a disparity, that the disparity needs to be addressed, and prescribes various programs and actions in an effort to reduce the disparity. Certainly, reducing the achievement disparity is an important goal. Indeed, one could argue that it is what this case is all about. An absolute reduction in the achievement disparity, however, is not required by the plan and, as demonstrated above, North Little Rock has met its obligation to implement the processes and actions prescribed by the plan.

Although the plan does not specifically require North Little Rock to wipe out the disparity in achievement, its witnesses affirmed the district's commitment to attempting to reduce the disparity. North Little Rock admitted multiple times during the hearing that it is not satisfied with the current achievement disparity. Data presented by North Little Rock showed that although the disparity has been reduced at some grade levels, the rate of reduction is slow. North Little Rock Ex. 13. Indeed, at some grade levels the achievement disparity has increased. *Id.* Although it is the hope of all involved that the disparity be reduced, and reduced quickly, this is not a requirement of the plan. In his September 13,

33

2002, order finding Little Rock partially unitary, Judge Wilson found that what was required of Little Rock when it came to the achievement disparity was effort. The same is required of North Little Rock, and it has met this obligation. Additionally, North Little Rock has stated its intention to meet the goal set forth in No Child Left Behind that by 2014 all students will score proficient on state standardized tests.

As required by the plan, North Little Rock has developed achievement data broken down by race and grade. Originally this data was created through disparity plans written for each school in which there was an achievement disparity. The district then moved to comprehensive outcome education ("COE") plans and enhanced COE plans. Eventually the district began using ACSIP plans. North Little Rock Ex. 47. Each school is required to submit an ACSIP plan annually. The plans analyze the standardized test scores of students, breaking them down by grade and ethnic group. Teachers at each school are trained in how to work with and disaggregate the achievement data.

Joshua maintained throughout the hearing that North Little Rock has not met its obligations to use the disaggregated data to monitor the achievement disparity and assess program efficacy in reducing the achievement disparity. Throughout the hearing, Joshua repeatedly pointed out North Little Rock's lack of written documents addressing these two areas. North Little Rock points to each school's ACSIP plan as evidence that it has sufficiently monitored the achievement disparity and assessed programs. Joshua responds that the ACSIP plans are not specifically tailored to North Little Rock's desegregation plan, and

therefore cannot be used by North Little Rock to fulfill its obligations of monitoring and assessment. Joshua is correct that the ACSIP plans were not specifically developed for North Little Rock's desegregation plan.

The data provided by the ACSIP plans, however, allow North Little Rock to monitor the achievement disparity and assess the efficacy of its compensatory programs. Each plan provides achievement data for three consecutive years, allowing North Little Rock to monitor the achievement disparity. The plans set priorities and goals for each school, sometimes specifically targeting one group of students. They also direct that certain programs or actions be evaluated and monitored. The impact of actions and programs on student achievement is a common theme in the ACSIP plans. For all of these reasons, the ACSIP plans are appropriately used by North Little Rock to evaluate and assess student achievement and compensatory programs. Through the ACSIP plans, North Little Rock has met its obligations under this part of the plan.

North Little Rock has presented enough evidence to find that it has substantially complied with the compensatory education section of its plan. Indeed, in some areas of the compensatory education section, it has gone beyond what is required. Further, the testimony presented by North Little Rock established that North Little Rock has taken the steps necessary to provide all of its students with the tools necessary to excel in elementary and secondary school regardless of its obligations under the plan. The evidence also shows that North Little Rock has taken steps to increase the achievement of its black students. For these

reasons, North Little Rock's substantial compliance was done in good faith.

### 4. Compensatory Programs Aimed at Dropout Prevention

The plan requires North Little Rock to implement programs aimed at reducing the

dropout rate of black students. In compliance with this requirement, the district implemented

the Argenta Academy, an alternative learning environment that helps students, who are

deficient in credits, catch up. It also helps students with attendance problems and behavioral

issues stay in school by providing individualized instruction. In addition to the Argenta

Academy, the district has implemented an infant and toddler program aimed at encouraging

young parents to stay in school.

Although the district has implemented programs to prevent students from dropping

out due to pregnancy, credit deficiencies, attendance problems and behavioral problems,

Joshua argues that the district has not done enough. As proof, Joshua points out that there is

still a persistent disparity between the number of black and white students who drop out. This

point is well made and is very concerning, but it is a problem that is not confined at all to

North Little Rock. Indeed, it is a national phenomenon and North Little Rock cannot be held

to a standard that requires it to solve the problem. It can only be required to implement

programs that give a second chance to those students who really want to stay in school and

get an education. It is hereby found that North Little Rock has met its burden on this issue.

### 5. Extracurricular Activities

The testimony clearly showed that North Little Rock substantially complied in good

faith with its obligations regarding extracurricular activities. It seems that, prior to implementation of the plan, North Little Rock failed to allow racially equal participation in extracurricular activities. Therefore, the plan requires the district to communicate the availability of extracurricular activities to black students and to give equal access to those activities.

North Little Rock now has biracial committees that monitor participation in extracurricular activities. The assistant superintendent monitors and attends extracurricular activities that require tryouts to ensure that the selection process is fair. The district also removes the financial burden to poor children by paying for transportation to all extracurricular events, purchasing band instruments for those who cannot afford them, paying for sports physicals, and paying for field trips upon request of the students.

### 6. Discipline, Expulsions and Suspensions

This portion of the hearing was very interesting. On one hand, the district's witnesses testified that they are at their wits' end trying to provide a quality education to students who want to learn while having to correct the behavior of unruly children, many of whom are black. On the other hand, Joshua, through cross examination, tried to show that the district treats offenses committed by black children more harshly than it does offenses committed by white children. The district's witnesses testified that it treats all students equally and that, if black children receive more discipline, expulsions and suspensions, it is simply because they are the ones who commit most of the offenses. In response to this, Joshua, again through

37

cross examination, tried to show that black children receive more discipline, expulsions and suspensions because they are black. At the core of the evidence presented by Joshua was that neither the black nor the white teachers understand how to deal with black youth and therefore refer them for discipline far more often than they refer white children.

Although there is a clear disparity in the discipline, expulsions and suspensions meted out to black and white children, the question is whether the district has acted in good faith and has substantially complied with its obligations under the desegregation plan. The answer is yes on both accounts.

As with all of the other plan provisions, the goal of this section of the plan is to ensure that white and black students are treated fairly when discipline is handed out. The testimony shows that the district has taken this requirement seriously and has implemented a number of processes to ensure fairness. First, the parents and students are notified of the behavior that is expected of the district's students and they are notified of the students' rights to due process in the event that a student is disciplined. Second, the district has an exhaustive progressive discipline plan requiring the district to give a number of warnings to a student before discipline is handed out. Third, all discipline in which a disciplinary form is created is reviewed by the assistant superintendent for desegregation, the director of elementary or secondary education, and then the superintendent, all of whom have authority to investigate, cancel or modify the proposed discipline.

Joshua attempted to show that the district has failed to implement any plan to deal

38

with the disparity in discipline, or at least, the district's plans have been miserable failures. Indeed, Joshua correctly points out that a grave disparity persists between the number of black children and the number of white children disciplined. Although this argument, and the data upon which it is based, is somewhat compelling, it does not warrant a finding that North Little Rock has failed to meet its burden. Without question, Bobby Acklin, the assistant superintendent, was extremely credible on this issue. In explaining why he was credible, it must first be pointed out that Acklin is a black man who Joshua essentially tried to portray as an Uncle Tom who was willing to shuck and buck for the school district. Not only was this portrayal misguided, but in characterizing him as such, Joshua presented Acklin with an opportunity to speak from the heart and with unbridled passion in explaining how hard he has worked to assure that all of the children in North Little Rock receive equal, and quality, education. There was no witness presented by Joshua who was more believable than Acklin.

Finally, Acklin was very believable when he explained that black children are not being treated unfairly but that they receive discipline in proportion to the number of offenses they commit. Although that might be difficult for some to accept, nothing presented at the hearing or in the record indicates that it is inaccurate. For all of the reasons set forth above, North Little Rock has met its burden in showing that it has acted in good faith and has substantially complied with the plan in this area.

### 7. *Secondary Gifted and Talented Education*

The testimony regarding secondary gifted and talented education was typical of the

39

testimony regarding the other areas of the plan in that it seemed that one of the key witnesses overstated things in an effort to advance her side's position. In this instance, North Little Rock's former gifted and talented coordinator, Ann Kincl, testified that acceptance into the gifted and talented program is not an honor, but that this program is merely for those students who do not respond well to the normal curriculum and who need an outlet for their creativity. It seemed her testimony was meant to lead one to believe that being accepted into gifted and talented classes is the same as being placed in special education or resource classes, and this is just not the case.

Although it might be true that gifted and talented classes serve highly creative students who may be under-served by traditional classes, it is without question that many students and parents view acceptance into gifted and talented as an honor. Indeed, much of the testimony in this area indicated that students go to great lengths to gain acceptance into gifted and talented classes. The district also put on a great amount of evidence showing that it employs affirmative action to ensure that otherwise unqualified black students are accepted into its gifted and talented classes. Although, at first blush this might seem to be a harsh characterization of the district's evidence, the district's evidence regarding admission into gifted and talented classes had all of the hallmarks of an affirmative action plan. For instance, among other things, when selecting students for gifted and talented classes, the district administers a "giftedness" test to determine whether the student taking the test has enough "giftedness" to be accepted. The district, however, while asserting on one hand that its

40

"giftedness" test is racially and culturally neutral, maintained on the other hand that it does not have a cut-off test score to determine who will be accepted into the program, because utilizing such a cut-off score would exclude many black students. The district also took great pride in its efforts to reach out to black students by receiving non-traditional, multiple source, referrals to the gifted and talented program. Finally, the district monitors the records of its gifted and talented students, and if it determines that there is a racially uneven number of referrals, it carefully searches the files of its black students to see if there is anyone who would be appropriate for the program. This is done in an effort to even out the number of black and white students in gifted and talented classes.

While no credit is given to North Little Rock's position that acceptance into gifted and talented classes is not an honor, credit is given to the district for its effort to improve the number of black students enrolled in gifted and talented classes. In addition to providing evidence of the above-referenced affirmative action plan to increase the number of black students taking gifted and talented classes, the district also put on evidence that there are some cultural barriers that limit the number of black students enrolled in gifted and talented classes. The district's witness testified that a larger number of black students participate in gifted and talented classes in primary school but that, due to peer pressure, many drop from gifted and talented classes when they reach secondary school.

Although they make a number of arguments, Joshua's chief response to North Little Rock's position that it has acted in good faith and has substantially complied with the plan,

is that the numbers do not support North Little Rock's position. Joshua notes that, while 55 percent of North Little Rock's secondary students were black in 2003, only 31 percent of its black students (both primary and secondary) were placed in gifted and talented classes. Joshua Ex. 0-2. In 2004-2005, 55.9 percent of the district's secondary students were black, while only 31.7 percent of the secondary students in gifted and talented were black. Joshua Exs. 0-5, 7-1. In 2008-2009, 56.7 percent of North Little Rock's secondary students were black, while only 28.1 percent of its secondary students enrolled in gifted and talented classes were black. Joshua Exs. 0-5, 7-2. In 2009-2010, 56.6 percent of North Little Rock's secondary students were black, while only 30.5 percent of the secondary students enrolled in gifted and talented classes were black. Joshua Exs. 0-6, 7-3.

This issue is very difficult because the numbers indicate that there is a grave disparity in the number of black and white students enrolled in gifted and talented classes. While this is true, it is evident that North Little Rock has attempted to reach out to black students to enroll them in these classes. Although Joshua points out that the criteria by which the district selects students is a moving target that works against black students, the evidence actually shows that the target moves in order to bring in more black students. While this is a very difficult decision, there is sufficient evidence to show that, while a great disparity in the number of black and white students enrolled in gifted and talented classes persists, North Little Rock has acted in good faith and has substantially complied with its plan obligations on this issue.

### 8. School Construction and Facilities

North Little Rock has acted in good faith and has substantially complied with its plan obligations regarding the school construction and facilities. The evidence indicates that, since adoption of its plan, North Little Rock has received court approval to close, open, and/or add to its facilities. Further, no new school has been built since 1969 and all students in the district attend the same high schools: ninth and tenth graders attend the East Campus, while all eleventh and twelfth graders attend the West Campus. Finally, the district met its burden of proving that it does not discriminate between the level of maintenance provided for the schools in the black neighborhoods and the level of maintenance provided for the schools in the white neighborhoods.

### 9. Desegregation Monitoring

It was definitely clear that North Little Rock acted in good faith and substantially complied with its obligation to monitor its desegregation efforts. Although there was much cross examination on this point, nothing came close to controverting this finding.

B.   Pulaski County Special School District

Pulaski County's present desegregation plan is referred to as Plan 2000 and it amends its previous desegregation plan which was established in 1992. Pulaski County has petitioned to be removed from court supervision as to all of the sections of Plan 2000.

Pulaski County's petition is granted in the areas of student assignment: interdistrict schools; multicultural education; and school resources. The petition is denied in the areas of

student assignment; advanced placement, gifted and talented and honors programs; discipline; school facilities; scholarships; special education; staff; student achievement; and monitoring.

In listening to Pulaski County's witnesses, it seems that Pulaski County has given very little thought, and even less effort, to complying with its desegregation plan. Complying with its plan obligations seems to have been an afterthought. Additionally, Pulaski County is an unwieldy district. It covers a large amount of area and has schools located in various towns that seem at odds with one-another.

### 1. Student Assignment

Section C of Plan 2000 addresses student assignment and it merely continues the standards established in the 1992 desegregation plan. Under this section of the plan, Pulaski County is required to assure that black students comprise at least twenty percent of the population of each of its schools. The maximum percentage of black students allowed to be enrolled differs between elementary and secondary schools. This is because the maximum limit is set at a 25 percent variance from the annual percentage of black enrollment at the elementary and secondary levels. These guidelines are referred to as the "plan standard." The plan also provides for exceptions to the "plan standard." For example, Bayou Meto is exempt from the plan standard because it is located in a remote location that is racially isolated. Interdistrict schools are also evaluated under different standards. Student assignment in interdistrict schools is discussed below. *See* Student Assignment: Interdistrict Schools,

Section IV.B.3.

During the hearing, Pulaski County presented testimony from Dr. David Armor ("Armor") concerning this section of the plan. Armor explained that the plan standard is much narrower than that used by other school districts under desegregation orders. He stated that in desegregation plans he has helped draft, and in his own analysis of the desegregation efforts in other school districts, he has used a twenty percent standard. This twenty percent standard allows for a twenty percentage point variance from the annual percentage of black enrollment at the elementary and secondary levels. As an example, if at the secondary level black enrollment is at forty percent, a secondary school would meet student assignment requirements if it had twenty percent to sixty percent black enrollment. Pulaski County requests that this standard be used in lieu of the plan standard.

The twenty percent standard will not be used to evaluate Pulaski County's compliance with the student assignment section of Plan 2000. Plan 2000 is a settlement agreement between Pulaski County and Joshua. Its terms were established by Pulaski County and Joshua. While the plan standard may be narrow, Pulaski County agreed to it.

ODM maintains reports of racial composition for Pulaski County, as well as Little Rock and North Little Rock. The first report was issued on March 29, 2000. Pulaski County Ex. 85S. These reports track racial composition for each Pulaski County school, breaking the numbers down between black, white and other. The percentage of black students attending each school is given, and this number is used to determine whether Pulaski County has met

the plan standard. The reports also highlight the years that an individual school may be outside of the plan standard, and depending on the color of highlight, indicate whether the school is over the maximum allowable or under the minimum required. These reports track racial composition beginning with the 1988-1989 school year.

The December 11, 2009, racial composition report prepared by ODM analyzes the racial composition of twenty-six elementary schools. Pulaski County Ex. 85A. They are Adkins Elementary, Arnold Drive Elementary, Baker Elementary, Bates Elementary, Bayou Meto Elementary, Cato Elementary, Chenal Elementary, Clinton Elementary, College Station Elementary, Crystal Hill Elementary, Dupree Elementary, Fuller Elementary, Harris Elementary, Jacksonville Elementary, Landmark Elementary, Lawson Elementary, Oak Grove Elementary, Oakbrooke Elementary, Pine Forest Elementary, Pinewood Elementary, Robinson Elementary, Scott Elementary, Sherwood Elementary, Sylvan Hills Elementary, Taylor Elementary, and Tolleson Elementary. Baker Elementary, Chenal Elementary, Clinton Elementary and Crystal Hill Elementary are interdistrict elementary schools. Their assignment numbers, therefore, will be analyzed under Student Assignment: Interdistrict Schools, Section IV.B.3. Beginning with the 2006-2007 school year, Adkins Elementary was reorganized as an early childhood center. Its assignment numbers will only be analyzed from the 2000-2001 school year to the 2005-2006 school year. Fuller Elementary was closed before Plan 2000 came into effect. Its student assignment numbers will not be addressed. Additionally, as stated above, Bayou Meto is exempt from the plan standard.

According to the December 11, 2009, report, ten elementary schools have met the plan standard every year since Plan 2000 came into effect. *Id.* They are Arnold Drive Elementary, Cato Elementary, Dupree Elementary, Oak Grove Elementary, Oakbrooke Elementary, Pine Forest Elementary, Robinson Elementary, Sherwood Elementary, Sylan Hills Elementary, and Tolleson Elementary. *Id.* Two elementary schools, Landmark Elementary and Scott Elementary, have met the plan standard for nine of the ten years since Plan 2000 came into effect. *Id.* Lawson Elementary and Pinewood Elementary have met the plan standard for seven of the ten years since Plan 2000 came into effect. *Id.* Bates Elementary and Taylor Elementary have met the plan standard for four of the ten years since Plan 2000 came into effect. *Id.* College Station Elementary has met the plan standard for one of the ten years since Plan 2000 came into effect. *Id.* Harris Elementary and Jacksonville Elementary have never met the plan standard. *Id.* Adkins Elementary failed to meet the plan standard for the years it was under the Plan 2000 assignment requirements. *Id.*

The December 11, 2009, racial composition report also analyzes the racial composition of fourteen secondary schools. Data is not provided, however, for Alpha Academy, which is an alternative school attended by students who have been referred for disciplinary or some other reason. Students at Alpha Academy are counted at the schools they normally attend. Of the thirteen schools for which data is provided, ten have met the plan standard since Plan 2000 came into effect. *Id.* They are Jacksonville Middle Boys, Jacksonville Middle Girls (Jacksonville Middle Boys and Jacksonville Middle Girls were

combined in the 2009-2010 school year to become Jacksonville Middle), Jacksonville High, North Pulaski High, Northwood Middle, Oak Grove Junior and Senior High, Robinson Middle, Robinson High, Sylvan Hills Middle and Sylan Hills High. *Id.* Maumelle Middle opened in the 2005-2006 school year, and has met the plan standard every year it has been open. *Id.* Fuller Middle has met the plan standard for six of the ten years since Plan 2000 came into effect. *Id.* Mills High has met the plan for three of the ten years since Plan 2000 came into effect. *Id.*

The student assignment section also requires that Pulaski County create reports on one-race classes. These reports are to be submitted by October 15 of each school year. For each one-race class, the report must indicate the school, the class including the grade level, the racial make-up of the class, a description of steps taken to eliminate the particular one-race class and the reasons why it was infeasible to eliminate the one-race class. By March 1 of each school year, Pulaski County must submit a supplemental report on one-race classes.

Pulaski County has been successful in meeting the plan standard for student assignment required under this section. Although the numbers are not perfect, Plan 2000 does not require that they be so. The majority of elementary and secondary schools have met the plan standard for seven or more years since Plan 2000 came into effect.

The one-race class reports presented by Pulaski County during the hearing are inadequate. *See* Pulaski County Exs. 5A-J. Although many reports were submitted, they fail to meet the requirements of the desegregation plan. First, it should be noted that a number

48

of reports are missing. Second, the majority of reports fail to include a description of steps taken to eliminate one-race classes or the reasons it may be infeasible to eliminate such.

Due to the deficiencies of the one-race class reports, a finding of substantial compliance in good faith under this subsection is not possible. Pulaski County is directed to maintain one-race class reports that meet all of the requirements of Plan 2000 and present them to the ODM. If such reports are maintained for forty-eight months, this finding will be reconsidered.

### 2. Advanced Placement, Gifted and Talented, and Honors Programs

Section D of Plan 2000 governs the areas of Advanced Placement (AP), Gifted and Talented (GT), and Honors Programs. It requires that:

> Not later than 45 days after the court's approval of this Plan, the PCSSD shall provide to the Joshua Intervenors the standards then in place for selecting secondary students for and educating them in advanced placement, gifted and talented, and honors programs, including standards to promote racial diversity in these programs. The PCSSD shall include in this submission notices which are used to inform staff members of the relevant standards.

The vast majority of the testimony concerned the current status of Pulaski County's AP, GT, and Honors programs. When read in conjunction with the Student Achievement and Implementation sections, Section D is part of a broader framework requiring Pulaski County to integrate its AP, GT, and Honors programs. If Section D were read in a vacuum, it would create a bizarre scenario whereby Pulaski County could be deemed unitary by simply turning over standards that were in place at the time Plan 2000 was adopted. It is without question that Pulaski County was required to implement the standards in good faith and work toward

the educational goal of increasing the number and proportion of black students participating in AP, GT, and Honors programs at the secondary level.

Although it was unclear which documents actually embodied the "standards then in place," there are only two serious candidates: Pulaski County's 1998-1999 Advanced Placement Guidelines [Appendix to Pulaski County Ex. 74B] or the 1999 revision of Arkansas Department of Education's Gifted and Talented Program Approval Standards [Pulaski County Ex. 87]. The most logical conclusion is that both documents taken together expressed Pulaski County's policies and standards regarding AP, GT, and Honors programs with the former governing the details of Pulaski County's offerings and the latter setting forth statewide standards to which the district adhered.

The only person to testify on these matters, Laura Shirley ("Shirley"), the director of GT and AP programs since 2005, did not have personal knowledge of the status quo in 2000. Her testimony was limited to the last five academic years. Although there has been some measurable progress in these programs during Shirley's tenure, there is still significant racial disparity in enrollment. Furthermore, this disparity was even more pronounced in recent years. Such recent and incomplete progress does not suggest that the district has acted in good faith concerning its obligations in these areas.

The district standards in place at the time Plan 2000 was adopted were the 1998-1999 Advanced Placement Guidelines. Appendix to Pulaski County Ex. 74B. These guidelines contain a document entitled "Pre-AP and AP Recruitment Strategies, Procedures, and

Documents." The stated goal of this document was to make the pre-AP and AP program more inclusive and to increase the number of black students participating in the program. It lists eight recruitment strategies ranging from the recruitment of promising sixth-grade students into pre-AP courses to the placement and retention of high school students in AP courses. Although it was not discussed during the hearings, this document has survived more than a decade and remains verbatim in the district's current Advanced Placement Program Handbook and Guidelines. Pulaski County Ex. 6.

It is undisputed that Pulaski County was aware of its duty to implement those goals. In Shirley's first annual enrollment report, dated October 31, 2005, she stressed that although the guidelines were being utilized at all schools, strategic plans aimed at improving student recruitment efforts were necessary. Pulaski County Ex. 74G. Each fall thereafter, she prepared similar reports that compiled and analyzed district-wide data on its pre-AP and AP programs. Pulaski County Exs. 74H-K. Each report tends to show that although the district was making some progress, substantial racial disparities remained. The question then becomes: What specific steps did Pulaski County take to eradicate these disparities?

Despite the thorough analysis provided by Shirley, the district simply has not shown what steps it has taken to implement the eight goals set forth in the 1998-1999 guidelines. Rather, much of the testimony concerned the mysterious eight percent benchmark. The eight percent benchmark is used by Pulaski County as a bright-line standard to determine when the enrollment of a particular group is disproportionately high. If a group's enrollment in pre-AP

51

or AP courses, when measured as a percentage of total enrollment in those programs, is eight percent or more higher than its overall enrollment percentage in that school, then that group is disproportionally enrolled in those programs. For example, if the racial composition of a given school were sixty percent white and forty percent black, then its pre-AP and AP enrollment should be no more than 67 percent white, or, stated another way, at least 33 percent black. Though many district documents state that the eight percent benchmark sets a "minimum standard," in reality it is a "maximum variance" whereby the racial composition of pre-AP and AP programs may vary somewhat from the racial composition of the school, so long as that variance does not reach eight percent or higher.

The eight percent benchmark is also best viewed as an aspirational goal rather than a hard-and-fast standard. If it were such, then the district could merely set a quota to ensure racial parity. Therefore, the district's failure to meet its eight percent benchmark is not in itself dispositive of the question whether it substantially complied in good faith, but is a factor in that analysis.

As of the 2008-2009 academic year, a substantial portion of Pulaski County's secondary GT, pre-AP, and AP programs were "disproportionately" white. For example, that year Sylvan Hills Middle School was 52 percent black, yet its pre-AP courses were 67 percent white and its GT courses were 72 percent white. Pulaski County Ex. 72H. Thus, the pre-AP program had a nineteen percent variance while the GT program had a 24 percent variance. In 2008-2009, Jacksonville High School was also 52 percent black, yet its AP

52

courses were 68 percent white. *Id.* This represents a twenty percent variance. Although these figures represent the most extreme disparities in Pulaski County, many other schools failed to stay within the 8 percent benchmark. *Id.* For example, in the 2008-2009 academic year, none of the six high schools had a variance below eight percent in their AP courses. *Id.*

Now, in determining whether Pulaski County has substantially complied in good faith with its plan obligations, one cannot simply look at the hard data. One must also examine the processes Pulaski County has enacted to attempt to erase the disparities in the number of white and black students participating in GT, pre-AP, and AP courses. As stated before, the district simply failed to show that it has done anything to implement the eight goals set forth in the 1998-1999 Guidelines and has failed to show that it acted in good faith or substantially complied with its plan obligations. Indeed, although the goals of both the 1998-1999 Advanced Placement Handbook and the Ross Education Plan set a clear course for improvement, it is clear that the district has taken no meaningful steps to reach those goals.

### 3. Student Assignment: Interdistrict Schools

Section E of Plan 2000 addresses interdistrict schools. Pulaski County has substantially complied in good faith with its obligations regarding interdistrict schools. Pulaski County currently operates four interdistrict schools: Baker Elementary, Chenal Elementary, Clinton Elementary and Crystal Hill Elementary. These schools accept students from other districts in what are considered majority to minority ("M-to-M") transfers, wherein a student who is in a racial majority in one school district may transfer to an

53

interdistrict school in another district in which she will be in the racial minority. Interdistrict schools reserve a certain number of seats for these transfer students.

Pulaski County's interdistrict schools draw black students from Little Rock School District and North Little Rock School District through M-to-M transfers. Pulaski County is majority white, and Little Rock and North Little Rock are majority black. Therefore, white Pulaski County students can transfer to Little Rock and North Little Rock, and black Little Rock and North Little Rock students can transfer to Pulaski County. These students attend the interdistrict schools.

The plan requires that Clinton Elementary and Crystal Hill Elementary maintain a racial composition "as close to 50%-50% as possible with the majority race of the host district remaining the majority race" at each school. Baker Elementary is not held to this standard. It is, however, required to meet the twenty percent minimum plan standard established for non-interdistrict schools. Plan 2000 further requires that Pulaski County reserve at least 200 seats at Clinton Elementary for interdistrict transfers and up to 399 seats at Crystal Hill Elementary for interdistrict transfers.

Although not built at the time Plan 2000 was approved, the operation of Chenal Elementary as an interdistrict school was contemplated. The plan requires that Pulaski County reserve up to half of the seats at Chenal Elementary for Little Rock black students. This section also requires that Pulaski County implement programs at the interdistrict schools "designed to attract interdistrict transfer students and to work cooperatively to recruit

interdistrict transfer students to interdistrict schools." Pulaski County is obligated to open its interdistrict schools to students from outside of Pulaski County if "the transfer will assist the interdistrict school in achieving its ideal racial composition." It must also provide transportation to students transferring from Pulaski County to interdistrict schools.

Perhaps Pulaski County's largest obligation under this section is maintaining a specific racial composition at its interdistrict schools. As the data below reflect, Clinton Elementary has remained within a little over five percentage points of the Plan 2000 standard for the last ten years.

Clinton Elementary

| School Year | # Black Students | # White Students | # Other Students | Percentage Black |
|---|---|---|---|---|
| 2000-2001 | 352 | 347 | 27 | 48% |
| 2001-2002 | 328 | 295 | 22 | 51% |
| 2002-2003 | 333 | 251 | 24 | 55% |
| 2003-2004 | 340 | 270 | 25 | 54% |
| 2004-2005 | 337 | 269 | 36 | 52% |
| 2005-2006 | 346 | 289 | 37 | 51% |
| 2006-2007 | 367 | 303 | 41 | 52% |
| 2007-2008 | 421 | 293 | 51 | 55% |
| 2008-2009 | 414 | 291 | 54 | 55% |
| 2009-2010 | 398 | 322 | 69 | 50% |

Pulaski County Ex. 85A. From 2000-2001 to 2007-2008, Crystal Hill Elementary remained

within four percentage points of the Plan 2000 standard. From 2007-2008 to 2009-2010,

Crystal Hill experienced an eight percent drop in black students attending.

Crystal Hill Elementary

| School Year | # Black Students | # White Students | # Other Students | Percentage Black |
|---|---|---|---|---|
| 2000-2001 | 354 | 396 | 6 | 47% |
| 2001-2002 | 372 | 361 | 11 | 50% |
| 2002-2003 | 360 | 393 | 11 | 47% |
| 2003-2004 | 394 | 385 | 22 | 49% |
| 2004-2005 | 401 | 395 | 18 | 49% |
| 2005-2006 | 370 | 403 | 21 | 47% |
| 2006-2007 | 375 | 414 | 25 | 46% |
| 2007-2008 | 358 | 409 | 18 | 46% |
| 2008-2009 | 283 | 402 | 25 | 40% |
| 2009-2010 | 277 | 420 | 32 | 38% |

*Id.*

Although not held to the "50%-50%" standard, Baker Elementary must maintain a racial composition of at least twenty percent black students. According to enrollment numbers, Baker Elementary has met the twenty percent standard for seven of the last ten years. *Id.* From 2000-2001 to 2002-2003, Baker Elementary maintained a racial composition of sixteen percent to seventeen percent black students. *Id.*

During her testimony, Dr. Brenda Bowles ("Bowles"), the assistant superintendent for

equity and pupil services, established that Pulaski County reserves the required number of

seats for interdistrict transfers at Clinton Elementary and Crystal Hill Elementary. These

numbers, however, did change following Pulaski County's transition to a middle school

system. Both Clinton Elementary and Crystal Hill Elementary lost their sixth grade classes

to middle schools. The number of seats reserved at each school was therefore decreased

proportionally and compensated for at the middle school level.

Chenal Elementary opened for the 2008-2009 school year. At that time, Pulaski

County reserved 100 seats for Little Rock black students. As an interdistrict school, Chenal

Elementary is held to the same "50%-50%" standard as Clinton Elementary and Crystal Hill

Elementary. For 2008-2009 and 2009-2010, Chenal Elementary's numbers have been far

below this standard.

Chenal Elementary

| School Year | # Black Students | # White Students | # Other Students | Percentage Black |
|---|---|---|---|---|
| 2008-2009 | 143 | 292 | 15 | 32 |
| 2009-2010 | 151 | 337 | 21 | 30 |

*Id.*

Each interdistrict school has an individualized instructional program meant to attract

interdistrict students. Baker Elementary has an economics theme. Clinton Elementary's

program places particular emphasis on speech communications and technology. The program

at Crystal Hill Elementary is one focused on written, oral and visual communications. A

program focusing on creative expression and the environment has been implemented at Chenal Elementary. Bowles testified that Pulaski County takes part in magnet fairs and advertises seats available for interdistrict transfers. She also stated that Pulaski County has remained open to students outside of Pulaski County and provides transportation to Pulaski County interdistrict transfer students.

Pulaski County has substantially complied in good faith with this section of Plan 2000. Taking into account all of the impediments to student transfers, such as the Arkansas School Choice Act and No Child Left Behind, Pulaski County has successfully met the Plan 2000 standards for racial composition at Clinton Elementary and Crystal Hill Elementary. Baker Elementary has also been successful in meeting the Plan 2000 standards.

During the hearing, Joshua argued that Pulaski County was in violation of Plan 2000 by reserving only 100 seats for Little Rock black students at Chenal Elementary. Joshua's argument is not persuasive because Plan 2000 requires only that Pulaski County reserve *up to* half of the seats for Little Rock black students. For the 2008-2009 school year, Chenal Elementary had a total of 450 students attending. Therefore, Pulaski County could reserve *up to* 225 seats for Little Rock black students. It was within the requirements of Plan 2000 to reserve only 100 seats, and, given the fact that the 100 reserved seats were never completely filled, it seems that this argument is a non-starter.

Although Chenal Elementary has been out of compliance with Plan 2000 racial composition standards for the last two years, this fact is not enough to find that Pulaski

County did not substantially comply in good faith with this section. Chenal Elementary is a new interdistrict school that became operational less than three years ago. The racial composition numbers of Chenal Elementary do not outweigh the successes achieved in racial composition at Baker Elementary, Clinton Elementary and Crystal Hill Elementary. Pulaski County should be aware, however, that in the future it should place a specific focus on increasing the number of black students at Chenal Elementary.

### 4. Discipline

Section F of Plan 2000 addresses discipline. The testimony and exhibits introduced at the hearing regarding Pulaski County's discipline methods was very interesting. If one word could describe the hearing evidence, it would be sad.

The evidence presented by Joshua focused on a white teacher who appeared in a surveillance video pushing a black student into a locker. The testimony indicated that the conflict between the teacher and student began when someone in the student's family died and the student came to school feeling sad and put his head on his desk. The teacher, not knowing what was wrong, had choice words for the student. The student's mother met with the principal, who was also black, and had the student assigned to another teacher.

At some later point, the teacher confronted the student in the hallway. This confrontation escalated until the conduct, which was caught on video, occurred.

It would be enough if that were the end of the story, but it got worse. The principal attempted to discipline the teacher for her actions in the hallway and the teacher requested

a hearing before the school board. A white member of the school board got involved and not only suggested that the principal should be disciplined and not the teacher, but also began to demean the character of the student, both verbally and in writing. Despite the board member's attempt to discredit the student, the evidence showed that the student had an exemplary discipline record, was a very good student, served on the student council, was a football letterman, and was a member of the glee club.

Although much of the evidence regarding the shoving of the student was superfluous, it was with this backdrop that all of the other evidence regarding discipline was received. And, after listening to the testimony while looking the witnesses in their faces, and reviewing the exhibits, it is clear that Pulaski County has not substantially complied in good faith with this section of the plan. The discipline section of Plan 2000 has multiple subsections, each requiring Pulaski County to take specific actions. While Pulaski County may have implemented some portions of the discipline section of Plan 2000, the efforts made fall short of substantial compliance in good faith.

To support its contention that it should be found unitary in the area of student discipline, Pulaski County relies heavily on the testimony of Dr. Christine Rossell ("Rossell"). Pulaski County hired Rossell to report on the racial disparity in discipline among Pulaski County schools. Rossell's report is entitled "An Analysis of Racial Disparities in Student Discipline in the Pulaski County Special School District, Arkansas." Pulaski County Ex. 10. In the report, Rossell makes the following conclusions:

(1)    the racial disparity in suspensions in the PCSSD is almost entirely caused by the differences in rates of poverty between the races, a factor that is outside the control of the PCSSD schools;

(2)    there is no evidence of racial discrimination on the part of white administrators;

(3)    racial disparities in the PCSSD are less than most school districts that have attained unitary status; and

(4)    the PCSSD has complied with the discipline requirements of its court orders to the extent practicable and thus should attain unitary status in this area.

*Id.* Included in her report are interesting statistical analyses represented by various charts. During her testimony, Rossell emphasized that racial disparity in discipline is caused by racial disparity in poverty. Indeed, she believes, and maintains that she is supported by her statistics, that poverty is the most important variable for racial disparity in discipline. Rossell also testified that Pulaski County's racial disparity numbers are better than the United States as a whole. When questioned by Joshua on whether she thought it important to assess whether Pulaski County had completed the required tasks under Plan 2000 as to student discipline, Rossell maintained that she did not find it important. According to Rossell, what is important is the outcome. If Pulaski County's numbers for racial disparity in student discipline are good, then it does not matter if it completed the tasks required by Plan 2000.

Although Rossell's analyses may very well show that Pulaski County is doing better than other districts regarding the racial disparity in discipline, this is not enough to find Pulaski County unitary on this issue. The terms of the settlement plan are in fact important.

A determination must be made as to whether Pulaski County substantially complied in good faith with the terms of its plan. As discussed below, it did not with respect to student discipline. If it is currently in a good position with respect to racial disparity in student discipline, then certainly more can be accomplished by following the terms of its plan.

a.      Subsection One: Data Collection

Subsection one requires that Pulaski County maintain data on discipline, which would allow it to analyze the progress made in reducing the racial disparity in discipline. Pulaski County must identify each student receiving discipline and document the student's race, the student's sex, the teacher giving the discipline, the type of discipline administered, and the school in which the discipline is administered. Bowles testified that all of these records are kept by Pulaski County. She stated that her office stores each student's disciplinary records for ten years. Additionally, the school administrative student information ("SASI") database maintains individual student discipline records.

Pulaski County has used these records to create annual discipline reports beginning with the 2000-2001 school year. Pulaski County Exs. 76A-H. These reports provide data on the number of suspensions, expulsions, bus suspensions, and Saturday school for each school. They further organize the data by race and sex. Beginning with the 2004-2005 school year, the reports began including additional data, data analysis and recommendations.

Joshua argues that Pulaski County has complied with this subsection, with the exception of maintaining data regarding students receiving "in-school" or "in-house"

suspensions. While in-school suspensions are indeed a type of discipline and should be included in the data collected, their exclusion does not require a finding that Pulaski County failed to implement this subsection of Plan 2000. Pulaski County has maintained the requisite records and data on discipline since 2000.

      b.      Subsection Two: Criteria for Identifying Discipline Issues

Subsection two requires that Pulaski County submit to Joshua within 45 days of Judge Wright's approval of Plan 2000, proposed criteria for identifying, from the data collected: (1) teachers and other staff members who are experiencing problems which require attention; (2) schools that have atypically high discipline rates; and (3) schools that have atypically high racial disparities in discipline. Upon submission of the criteria, Joshua would be given 21 days to comment. Following the commenting period, Pulaski County was required to complete the criteria.

Although Pulaski County did not meet the 45 day deadline, criteria for identifying the three categories listed above were developed and provided to Joshua. Joshua acknowledges this in its proposed findings of fact and conclusions of law. Joshua Exhibit 4-7 contains three reports prepared by Dr. Robert Clowers ("Clowers"), Pulaski County's director of educational accountability. Each report addresses one of the categories listed above. Pulaski County's compliance with this subsection is echoed in other exhibits. *See* Joshua Exs. 4-6, 4-13.

c.      Subsection Three: Goals to Eliminate Disparities

The third subsection of this part of Plan 2000 requires that

The assistant superintendent for desegregation and the assistant superintendent for pupil personnel shall thereafter provide for and participate in specific efforts to work with teachers and other staff members and the personnel of schools, identified pursuant to the criteria set forth in paragraph 2, to promote achievement of the goal of eliminating racial disparities in school discipline The assistant superintendent for desegregation shall maintain records showing the specific steps undertaken.

The positions of assistant superintendent for desegregation and assistant superintendent for pupil personnel no longer exist. They have been combined into the position of assistant superintendent for equity and pupil services.

During her testimony, Bowles stated that Pulaski County meets the requirements of this subsection through the individual school ACSIP plans. In addition to the requirements of the state, Pulaski County requires that each school's ACSIP plan address a third criteria, school climate. Bowles testified that each school's ACSIP plan is required to set benchmarks and goals with respect to discipline, identify schools and teachers with atypically high discipline rates, and set out plans to address discipline issues. She uses the information gathered through the school climate criteria to identify schools with problems and address those problems with each specific school.

Pulaski County has also created a district-wide discipline management plan ("DMP") [Pulaski County Ex. 13] as well as individual school DMPs [Pulaski County Ex. 19]. The district-wide DMP was originally created in 1991-1992 and finally revised and re-

implemented in 2005-2006. It addresses Level 1, Rule 1 violations and sets general guidelines to positively impact discipline. Level 1, Rule 1 violations are violations of school or classroom rules. For Level 1, Rule 1 violations, it provides options for consequences that do not involve a "severe disruption of educational services." It also outlines a discipline data analysis to be conducted by the Office of Equity and Pupil Services that specifically addresses the racial disparity.

Schools are instructed to use the district-wide DMP to develop their own individual DMPs. At the hearing, Pulaski County provided the individual school DMPs for the 2006-2007 school year from Arnold Drive Elementary, Cato Elementary, Crystal Hill Elementary, Joe T. Robinson Elementary, Oakbrooke Elementary, Jacksonville Middle School, Northwood Middle School, Sylvan Hills Middle School, Jacksonville High School, and Sylvan Hills High School. Pulaski County Ex. 19. The school DMPs set specific objectives with the goal to reduce Level 1, Rule 1 violations. They list activities that will help meet each objective, the person responsible for each activity, and evidence that establishes the activity was accomplished.

Bowles also testified that since 2006, Pathwise programs are implemented in schools with the highest discipline rates. Pathwise is a program used by the state to train new teachers. Pulaski County uses Pathwise to address four specific domains: (1) organizing content knowledge for student learning; (2) creating an environment for student learning; (3) teaching for student learning; and (4) teacher professionalism.

The efforts made by Pulaski County to comply with this subsection are inadequate. Although the school climate criteria of the ACSIP plans may address discipline issues, they are not specifically focused on disparities in discipline. And while the district-wide DMP states that it "is a specific initiative to address the District's goal of eliminating racial disparities in school discipline," the plan is not tailored to that focus. On its face, Pathwise seems to be a beneficial program, but it fails to specifically address the issue of discipline disparity. Additionally, even if the actions taken by Pulaski County through ACSIP plans, DMPs, and Pathwise were enough, the implementation of these actions has been too brief to find Pulaski County unitary under this section. For the first five years of Plan 2000, Pulaski County did little to nothing to comply with this subsection.

Further, as Joshua points out, neither the ACSIP plans, the district-wide DMP, nor the individual school DMPs discuss or identify individual teachers or staff members with problems involving discipline. Bowles maintained that she relies on school principals to discuss discipline issues with individual teachers or staff members. Pulaski County, however, provides no guidance on how to do this. It is clear that very little is being done to identify and meet the issue of individual teachers and staff members with problems in discipline.

d.    Subsection Four: Comprehensive Study

The fourth subsection requires Pulaski County to conduct a comprehensive study of the disciplining of black students, with particular attention to black male students at the secondary level. Suggestions for prevention and intervention measures are to be included in

the study. The study was to be completed within 150 days of the approval of Plan 2000.

Pulaski County presented the Discipline Study Narrative as evidence of its compliance with

this subsection. Pulaski County Ex. 12. The Discipline Study Narrative was completed by Dr.

Jerry Welch ("Welch"), the former director of student services and athletics, and submitted

on February 23, 2004. Pulaski County also seems to assert that it has complied with this

subsection through its DMP.

The Discipline Study Narrative is a comprehensive study of the disciplining of black

students, with some emphasis on black males. While it gathers a great deal of data on the

issue of student discipline, it is virtually void of suggestions for prevention and intervention

measures. This is perhaps because this study is only a draft. In the memorandum attached to

the study, Welch states, "A draft of the Discipline Study Narrative is attached. I will explain

[what] remains to be done and my vision for this document." Although not dispositive of the

issue of whether Pulaski County has complied with this subsection, this draft was completed

almost four years after Plan 2000 was approved. A draft study narrative that lacks

suggestions and intervention measures does not satisfy Pulaski County's obligations under

this subsection. Pulaski County's DMP also fails to meet the requirements of this subsection.

The DMP is not a comprehensive study of the disciplining of black students. Pulaski County

has not complied with this subsection.

    e.    Subsection Five: Initiative to Reduce Discipline

Under the fifth subsection of discipline, Pulaski County was required to "develop a

specific initiative to reduce the rates of discipline in PCSSD shown in ODM's report dated March 18, 1998." The initiative had to be implemented within 150 days of the approval of Plan 2000. As evidence of its compliance, Pulaski County cites the district-wide and individual school DMPs, mental health providers, multi-age classrooms, student assessment center ("SAC") classrooms, ACSIP plans, student identification cards, and the Learning Academy. All of these initiatives are intended to reduce the rates of discipline. Pulaski County has not complied with this subsection of Plan 2000. Although it has implemented multiple initiatives to address student discipline, the implementation has been anything but quick. In fact, it took nearly six years following approval of Plan 2000 for many of these initiatives to be carried out. This long delay prevents a finding of compliance with this subsection.

      f.    Subsection Six: Handbook Policies

The final subsection under the discipline portion of Plan 2000 requires that Pulaski County follow the policies in the Handbook for Student Conduct and Discipline. Specifically, this subsection references the appeal process, and states that "[t]he assistant superintendent for pupil personnel shall be responsible for determining the fairness of student disciplinary decisions." Additionally, "[h]e will delegate the student hearing function to a single hearing officer." Bowles testified that she and a single hearing officer, Mr. Whitfield, hear all disciplinary appeals. She also stated that Pulaski County follows the policies of the Handbook for Student Conduct and Discipline. Pulaski County has complied with this

subsection. Its efforts, however, with respect to a number of the other subsections are inadequate. Pulaski County has failed to substantially comply in good faith with the discipline section of Plan 2000.

### 5. *Multicultural Education*

Section G of Plan 2000 concerns multicultural education. To get to the heart of the reasons why the plan contains a multicultural education requirement, the parties were asked questions to get their thoughts regarding the necessity of multicultural education. For example, what exactly is multicultural math or multicultural science? Neither party could answer these questions, which led to the next question which was, in areas other than literature and history, does multicultural education really mean anything or is it just a phrase that is thrown about to make people feel good?

Despite receiving no answer, it is without question that Section G of Plan 2000 requires that Pulaski County "[c]ontinue its efforts to infuse multicultural instruction in all curriculum areas. All phases of a school's environment (e.g., instructional materials, lesson plans and lessons, library contents, bulletin boards, extracurricular activities, school assemblies, speaker programs, and food services) shall reflect the system's Plan to [sic] multicultural education." Further,

> A principal activity of the Coordinator for Multicultural Education and the Coordinator's office shall be on-site visits to individual schools to determine whether the system's policy and the provisions of this Plan are being implemented in fact. The Coordinator shall maintain records permitting an evaluation of the status of implementation at each school visited.

69

Pulaski County presented the testimony of two witnesses on the issue of multicultural education: Bowles and John McCraney ("McCraney"). Bowles was the coordinator for multicultural education from the time Plan 2000 was approved until 2006. McCraney took over the position in 2006. Bowles's testimony consisted mainly of an explanation of Pulaski County Exhibit 20. Pulaski County Exhibit 20 is a collection of multicultural education documents dating from 1994.

During the hearing, Joshua asserted that the documents dated prior to the approval of Plan 2000 cannot support a finding of compliance with Plan 2000. Although this is technically true, documents dated prior to Plan 2000's approval, when reviewed in combination with subsequent documents, suggest a continuity in action with regard to multicultural education and therefore are important as to the issue of good faith.

The documents contained in Pulaski County Exhibit 20 include responses from school administrators to audits performed by Bowles, rubrics for monitoring and evaluating progress made in multicultural infusion, departmental meeting record sheets addressing multicultural education, and instructions on multicultural infusion from Bowles to school administrators. Bowles testified that during her tenure as coordinator for multicultural education she worked with curriculum writing teams to develop multiculturally infused curriculums. This was done by identifying multicultural curriculum opportunities and including them in the curriculums. Bowles also reviewed all textbooks prior to their adoption to ensure cultural diversity. The multicultural committee aided her in this process. While acting as coordinator of

multicultural education, Bowles conducted on-site visits to schools. It was through these visits that she was able to create findings on multicultural education in Pulaski County's monitoring and compliance reports. Pulaski County Exs. 72A-H.

McCraney testified that she works with core curriculum coordinators to formulate curriculum guides. She reviews curriculum guides for biases. Teacher lesson plans are reviewed by the multicultural committee. In previous years, lesson plans were reviewed for their inclusion of multicultural opportunities ("MCOs"). Today, however, the multicultural committee uses the acronym, RIISE, to monitor and evaluate lesson plans. RIISE stands for racism discrimination ("RD"), immigration ("I"), intercultural competency ("IC"), socialization ("S"), and ethnicity in culture ("EC"). When one of these categories is represented in a lesson plan, that section of the lesson plan is highlighted in yellow and the letters of the category are denoted. The multicultural committee documents its review of lesson plans through the multicultural observation measurement. Joshua Exs. 5-2, 5-3.

According to McCraney, the multicultural committee breaks up into teams to conduct on-site school visits. Specific rubrics are used to monitor and evaluate multicultural infusion at schools. When visiting schools, the committee looks at student-to-student interaction, teacher-to-student interaction and bulletin boards, among other things, to determine the level of multicultural infusion. The multicultural committee has performed an on-site visit in every school. McCraney further testified that she reviews textbooks and examines school lunch menus for multicultural infusion.

71

Joshua asserts that Pulaski County has not complied with this subsection because the internal evaluations conducted by Pulaski County demonstrate noncompliance. During its cross-examination of McCraney, Joshua presented Pulaski County's own findings for four high schools based on monitoring for the 2006-2007 school year. Joshua Ex. 5-4. All four schools were found to have insufficient evidence of compliance in multiple categories of evaluation. Further, in its own compliance reports [Pulaski County Exs. 72A-H], Pulaski County has acknowledged schools that are out of compliance under multicultural education. Joshua also maintains that Pulaski County failed to present any evidence during the hearing of actions taken with regards to multicultural infusion in extracurricular activities, school assemblies or speaker programs.

Although Pulaski County has found some of its schools out of compliance with multicultural education, this does not affect Pulaski County's unitary status under this section. This section of Plan 2000 requires that Pulaski County take action with respect to multicultural education in all phases of a school's environment and conduct on-site visits to schools to determine whether they are successful in multicultural infusion. Records documenting these on-site visits are to be kept. Although it is the hope and goal that the highest level of multicultural infusion be reached, it is not required. Furthermore, the standards created by Pulaski County are internal checks and are not required under this section.

Joshua is correct that Pulaski County did not present evidence showing it ensures

multiculturalism in extracurricular activities, school assemblies or speaker programs. Neither Bowles nor McCraney testified as to efforts made in extracurricular activities. School assemblies and speaker programs were addressed only by documents and actions taken in the 1990s. This is not sufficient to show action taken with respect to extracurricular activities, school assemblies and speaker programs following approval of Plan 2000. Pulaski County's failures to act in these areas, however, does not necessitate a finding that it has failed to substantially comply with this section in good faith.

The evidence indicates that Pulaski County has made efforts towards multicultural infusion in the areas of instructional materials, lesson plans and lessons, bulletin boards, student-to-student interaction, student-to-teacher interaction and food services. On-site visits have been conducted at Pulaski County schools and records have been kept documenting the observations of these visits. Pulaski County has substantially complied in good faith with this section of Plan 2000.

### 6. School Facilities

Section H of Plan 2000 requires Pulaski County to do four things concerning school facilities: (1) develop a master plan to ensure that existing schools are clean, safe, attractive, and equal; (2) build an elementary school around 145th Street in Little Rock and a middle school or junior high school in the Crystal Hill/Maumelle area; (3) agree not to close schools located in predominantly black neighborhoods absent reasons of compelling necessity; and (4) notify Joshua of all plans to construct new schools or add capacity to existing schools and

73

receive Joshua's input concerning such proposals. For the following reasons, the district did not substantially comply with this section in good faith.

To address the first requirement, the district commissioned a study by Kahn Construction Company of Columbia, South Carolina, which is referred to as the Kahn study. Pulaski County Ex. 21. The Kahn study analyzed the district's enrollment trends and the individual schools that were open at the time of the study. Each school building was studied as to its suitability for instruction, the quality of its physical plant, and its conformance with safety and health codes. Additionally, each building was checked for compliance with the Americans with Disabilities Act ("ADA").

Based on these findings, the study made specific recommendations regarding each building. These recommendations included a list of major concerns and the estimated costs to address those concerns broken down by the categories of instructional improvements, physical improvements, safety and code improvements, and ADA improvements. The study noted when the cost of improvements in a given school approached the cost of building a new school, and it recommended the building be replaced. The Kahn study ultimately recommended the replacement of nine schools and that two more be closed and replaced by a single school. Of the eleven schools having such major concerns that replacement was warranted, four were located in Jacksonville and two more were historically black schools. The study projected the total cost of replacing these schools to be $233,670,480.

The district decided on a phased approach to making the improvements, with the first

phase costing approximately $110,000,000. A millage was sought for this phase but was not approved by Pulaski County voters. Since that time, three new schools have been built: Daisy Bates Elementary, Maumelle Middle School, and Chenal Elementary School. The former two schools satisfy the second requirement of Section H, while the latter is an interdistrict school envisioned by Section E. Bates Elementary opened in the 145th Street area in the 2000-2001 school year with a capacity of 863 students. Joshua Ex. 6-5. The facility itself cost $6,291,462, and its equipment cost $740,000. *Id.* This resulted in a cost per student of $8,147.69. Chenal Elementary opened in the Chenal Valley area the 2008-2009 school year with a capacity of 550 students. *Id.* The facility itself cost $13,002,063, and its equipment cost $984,000. *Id.* This resulted in a cost per student of $25,429.20. This juxtaposition was discussed during the hearing, when Bowles contrasted the Bates and Chenal facilities in terms of automobiles and homes. She stated that Chenal, which was built like a Mercedes-Benz, was like a $250,000 house whereas Bates was like a $100,000 house. Maumelle Middle opened in the 2005-2006 academic year with a capacity of 840 students. *Id.* The facility itself cost $16,717,259, and its equipment cost $1,703,772. *Id.* This resulted in a cost per student of $21,929.79.

Although all three schools serve a significant number of black students, Chenal Elementary and Maumelle Middle rely on majority to minority transfers from the Little Rock School District to keep them racially balanced. For example, in the 2009-2010 academic year, Maumelle Middle and Chenal Elementary enrolled 106 and 100 black students

respectively via M-to-M transfer. Joshua Ex. 6-7. Given that these two schools are located in very affluent, predominantly white communities, and that their black student population is artificially inflated by M-to-M transfers, the disparately high amount of money spent on the facilities begins to erode one's confidence that the district has tried to fairly allocate its limited resources.

Adding to this sense is the district's decision to construct a $58,000,000 high school in Maumelle to replace Oak Grove Junior/Senior High School. Joshua Ex. 6-4. The Kahn study found that although significant renovations were needed at Oak Grove, the facility was adequate for instructional purposes. Furthermore, in recent years, the student population at Oak Grove was declining. In the 2005-2006 academic year, 627 students attended the school. Pulaski County Ex. 85A. In the 2009-2010 academic year, that number was down to 391. *Id.* Nevertheless, the district has proceeded with plans to construct a high school in Maumelle with a planned capacity of 1,500 students. Joshua Ex. 6-4.

The decision to build a state-of-the-art high school in Maumelle while other schools in less affluent communities languish in relatively poor condition was not justified during the hearings. It was very obvious that the conditions of these schools necessitated remedial action. The testimony of Rizelle Aaron ("Aaron") was particularly indicative of the disparities in facility quality and its affect upon students. Aaron testified that the conditions of several schools in Jacksonville included broken commodes, falling ceiling tiles, holes in the ceiling, exposed wiring, and an unsound stage floor. Aaron further testified that, instead

of building or repairing the schools in Jacksonville, Pulaski County has installed a number of "portable classrooms," which are essentially trailers without wheels.

The discretion of the district's use of portable buildings in Jacksonville is contrasted by Pulaski County's recent proposal to build a new wing on Pine Forest Elementary in Maumelle using federal stimulus funds. The stated purpose of the new wing is to "eliminate the current use of portables." Other schools, however, continue to make considerable use of portables. Moreover, given the deteriorating facilities in Jacksonville, it seems Pulaski County does not care whether it provides equal facilities to all of the students in the district.

Simply put, the facilities in Pulaski County are not equal. Children who live in predominantly black zones of the district attend older and smaller schools that are less instructionally functional and are less aesthetically attractive. Yet children from the Maumelle and Chenal Valley area are privileged to attend newer, state-of-the-art schools. Although the district argues that those schools serve a substantial number of black students, those black students are overwhelmingly interdistrict M-to-M transfers. Without those transfers, the schools in Maumelle and Chenal would be overwhelmingly white.

The Kahn study clearly laid out priorities for the district to follow in upgrading its facilities to ensure that all students learned in safe, positive physical environments. Pulaski County urges that it has done the best it can, given the lack of funding. It argues that it has made difficult choices with the best intentions.

Pulaski County's position, however, is just not credible in light of the evidence

presented. Accordingly, Pulaski County failed to act in good faith and has not substantially complied with this obligation of Plan 2000.

### 7. Scholarships

Section I of Plan 2000 required Pulaski County to establish a scholarship program providing college scholarships to designated students within thirty days from the date that the Little Rock School District established a scholarship program. Little Rock established a scholarship program in April 1999. Almost three years later, in March 2002, Pulaski County designated a committee to draft a scholarship policy. Pulaski County's scholarship policy was adopted almost a year later, in April 2003. As of the date of the hearing, not a single scholarship has been awarded.

It seems that the district had no intention of complying with either the letter or the spirit of Section I. The purpose of Section I was to establish a scholarship program to assure that students would have access to college. This would serve as a carrot to students who may believe that college was unattainable. Pulaski County, however, not only failed to ever hand out a scholarship, but it failed to even form a committee to develop a "scholarship policy" until almost three years after the time that it was supposed to establish a scholarship program. Accordingly, Pulaski County has simply failed to demonstrate that it substantially complied in good faith with the dictate of this section of Plan 2000.

### 8. School Resources

Pulaski County acted in good faith and substantially complied with its obligations

under Section J of Plan 2000, requiring it to study whether the district allocates school resources fairly. Indeed, Joshua offered no evidence showing that Pulaski County failed to meet its obligations under this section.

Section J of Plan 2000 requires Pulaski County to conduct a study of the fairness of its allocation of school resources. The district was required to consult with Joshua both as to the design and execution of the study. Among the resources to be assessed were student-to-teacher ratios, student-to-staff ratios, square feet per student, percentage of staff with masters degrees and nine or more years of experience, the turnover rate of certified staff, school size, computer-to-student ratio, per student expenditures, volunteer hours per student, and donations per student. Further, the district was required to include appropriate recommendations to address any problems identified by the study.

In May 2001, Pulaski County conducted a study to assess school size, student-to-teacher ratios, square feet per student ratios, the percentage of staff with master's degrees, the percentage of new teachers, computers-to-students ratios, per student expenditures, volunteer hours per student ratios, school age, and teacher absenteeism. That study concluded that there was no significant relationship between the racial composition of a school and the amount of resources allocated to it. Pulaski County Ex. 25.

In the 2003-2004 academic year, the district undertook another study. Pulaski County Ex. 26. The 2003-2004 study was prepared by Clowers and surveyed many of the same variables as the 2001 study, but also included an assessment of student absences and

tardiness as well as the percentage of new teachers to a building. The former were deemed

relevant to missed instructional time and systemic disciplinary concerns, while the latter was

deemed relevant to teacher turnover and systemic "school climate" issues. The goal of

Clowers's study was to discern whether there was a statistically significant relationship

between the presence of black children in a school and the allocation of important resources

to that school. Ultimately, his study found that there was no such relationship and that there

was no disparate allocation of resources based on the percentage of black enrollment.

### 9. Special Education

Section K of Plan 2000 concerns special education. It requires that Pulaski County

provide to Joshua within 45 days of approval of Plan 2000, the standards for:

> (1) stressing intervention strategies and regular class modifications in an effort
> to prevent inappropriate referrals of black males and kindergarten students; (2)
> monitoring the folders of all kindergarten students and black students who are
> being considered as in need of special education under IDEA and Section 504
> to insure [sic] nondiscrimination in evaluation and placement.

Materials used "to inform staff members of the relevant standards" were to be included in

the submission. This section further required that the director of special education "develop

a specific plan for additional monitoring each year, by his/her staff, of schools where there

are atypically high racial disparities in special education classification, generally or as to

black male students." This plan, as well as the criteria used in identifying schools with

atypically high racial disparities, was to be submitted to Joshua.

Joshua acknowledges that it received the standards required to be submitted by Pulaski

County within 45 days of Plan 2000 approval. *See* Joshua Ex. 9-1. It contends, however, that

Pulaski County has not complied with the second part of this section requiring the director

of special education to develop plans to address schools with atypically high racial

disparities.

At the hearing, Pulaski County submitted the testimony of Brenda Hiegel ("Hiegel").

Hiegel is the special education coordinator for Pulaski County, and has held the position for

six years. Her testimony began with an explanation of the state benchmark for determining

disparity in special education classification. When Plan 2000 was approved, the state allowed

for an 8.3% standard deviation. To determine if there was racial disparity, the percentage of

enrollment of black students, at the school or district level, was compared to the percentage

of black students in special education, at the school or district level. To meet state guidelines,

the percentage difference between enrollment of black students and black students in special

education could not be more than 8.3 percent. The state later changed the allowable standard

deviation to 13.152 percent, but Pulaski County continued to operate under the 8.3 percent.

Hiegel maintained that Pulaski County has not had any citations from the state for not

meeting this state benchmark. Pulaski County relies on this as evidence of compliance with

its special education obligations under Plan 2000.

As evidence of compliance with the second part of this section, Hiegel referenced

Pulaski County's annual desegregation monitoring reports and plans. *See* Pulaski County

Exs. 75A-J. The monitoring plans list specific actions to be taken by Pulaski County with

respect to special education. These actions include, among others, requesting screening plans from each school, collecting data from principals on racial composition of students by disability and placement type, and providing technical assistance and support to help schools with every phase of special education, from referral to programming.

Joshua asserts that Pulaski County's compliance with the 8.3 percent state standard deviation is not proof positive of its compliance with the second part of this section. Joshua references the standards originally provided to them by Pulaski County. *See* Joshua Ex. 9-2. In the standards submitted, Pulaski County states that it will identify schools falling below the 80 percent referral diagnosis rate and schools that are above the 8.3% standard deviation. Once these schools are identified, they will receive written notification and corrective action will be taken or justification plans submitted. Joshua maintains that no action has been taken with regard to individually identified schools. During the hearing, Pulaski County was unable to provide any proof that such actions were taken. A 2010 document was referenced, which established steps to be taken with respect to individual schools over the 13.152 percent standard deviation. This document, however, was never received into evidence. Even if Pulaski County had submitted this document, it would not be sufficient to establish that Pulaski County addressed individual schools with racial disparities.

Pulaski County seems to argue that nowhere in Plan 2000 is it prevented from changing its own standards with regard to special education. Therefore, its failure to follow the standards submitted to Joshua is not determinative of its compliance. While this may be

true, Pulaski County was required to address individual schools not only under its self-imposed standards, but also under Plan 2000. The second part of this section requires that plans be established for additional monitoring of schools with atypically high racial disparities in special education. The actions listed by the monitoring plans address the issue of racial disparity only generally. Multiple schools each year are above the 8.3 percent standard deviation; however, no action has ever been taken with respect to these individual schools. Pulaski County has therefore simply failed to act in good faith and has failed to substantially comply with this section of Plan 2000.

### 10. Staff

Section L of Plan 2000 addresses the racial composition of Pulaski County's professional staff. Of the four specific mandates set forth in this section, the first two focus specifically on recruiting practices while the latter two focus more on racially balancing the faculties and administrations of the district's schools. Subsection (1) requires the district to recruit applicants for administrative positions "in a manner designed to communicate, broadly, [their] availability and to develop a racially diverse pool of applicants." These applicant pools were to be scrutinized by the assistant superintendent for desegregation who, upon consultation with the assistant superintendent for personnel, could require additional recruitment prior to offering the position to a particular applicant. Subsection (2) requires the district to hire new teachers from racially diverse applicant pools and ensure that no "policy, practice, or custom has the purpose or the effect of imposing an upward limit on the

proportion of black teachers." Subsection (3) requires the district to "implement programs, policies, and/or procedures" that would add more black early childhood, primary, and secondary core teachers and assign those teachers to schools with the greatest need for diverse faculties. Finally, subsection (4) requires the district to allocate its professional staff in such a way that no school would be racially identifiable. For the reasons set forth below, the district has not shown that it substantially complied with these requirements in good faith.

    a.    Subsection One: Recruitment for Administrative Positions

The subsection dealing with the recruitment of administrators specifically requires Pulaski County to recruit both external and internal candidates. Pulaski County has not identified how it sought to increase the number of black administrators hired from outside the district nor has it shown the steps it has taken to groom promising black teachers for administrator positions.

Deborah Coley ("Coley"), assistant superintendent for human resources, testified as to the district's recruitment practices. Coley is the highest ranking officer of the district's human resources department and has been in that position since 2006. When asked whether she was aware of any district policies or standards implementing the subsection on recruiting black administrators, she was not. Coley also admitted that the district did not use consistent, objective guidelines to determine whether candidate pools were diverse.

One of Joshua's monitors, Joy Springer ("Springer"), testified that several of Pulaski County's former superintendents lacked enthusiasm for the idea of increasing the number of

black administrators. Given the informal and unspecific nature of the district's hiring policies and practices, Springer surmised that achieving racially diverse applicant pools for administrator positions was simply not a high priority. Indeed, Springer stated that when she was able to review applicant pools for administrator positions, the pools were not racially diverse.

For these reasons set forth herein, Pulaski County has failed to show that it substantially complied with this subsection in good faith.

 b. Subsection Two: Recruitment of Teachers

The subsection on teacher recruitment requires Pulaski County to cultivate a racially diverse pool of applicants and to extensively monitor the entire recruitment process. The mandate specifically requires the district to ensure that no "upward limit" is placed on the number of black teachers employed. Between academic years 2004-2005 to 2008-2009—after ODM's admonishment to formally monitor staff desegregation and adopt consistent measuring criteria to do so—the percentage of black faculty ranged from 19.5 percent to 20.7 percent. Because the data confirms the existence of an upward limit on the number of black teachers, the district must show the steps it took to address the problem. It is not enough that Pulaski County hired 41 new black teachers for the 2009-2010 academic year, because, as previously noted throughout this order, such belated success does not demonstrate good-faith compliance. Moreover, this subsection specifically requires the district to affirmatively monitor black teacher recruitment. This is not accomplished simply

by hiring a large number of black teachers in a single year, rather the district must come forth with some tangible evidence that it collected and analyzed data on minority recruitment strategies and sought to implement those findings.

Coley testified that the district recruits new teachers at Philander Smith College and the University of Arkansas at Pine Bluff, both predominantly black colleges. Although campus job fairs held at historically black schools would tend to diversify applicant pools, the district has not shown how it attempted to increase the number of lateral hires of experienced teachers. Furthermore, Coley was unaware of a specific monitoring strategy used by the district to combat upward limits or of an objective standard used to ensure that applicant pools are racially diverse.

This subsection specifically requires affirmative monitoring of teacher recruitment. Therefore, to substantially comply in good faith, the district must produce some tangible evidence that it collected and analyzed data on minority recruitment strategies and sought to implement those findings. It has not done so.

    c.    Subsection Three:  Address Disparities in Specialty Areas

The objective of this subsection is to increase the proportion of black teachers in the following instructional areas: early childhood education, primary-grade classroom, and secondary core subjects (which includes math, English, science, and social studies). Accordingly, the plan directs the district to offer incentives to black teachers to obtain certification in these areas and then assign those teachers to the schools most in need of such

teachers. To show compliance with this directive, the district advances its tuition reimbursement program and its offering of "quality enhancement" grants. It also points out that it provides hiring incentives and relocation packages to prospective black teachers. These programs and offerings had a decidedly modest impact. More importantly, however, there is simply no evidence in the record showing that the district analyzed staffing requirements in these areas and altered its recruitment strategies accordingly.

According to the district's "affirmative action" chart for years 2000-2001 through 2008-2009, the concentration of black elementary and secondary math teachers actually declined during the pendency of the plan. Joshua Ex. 10-4. The sole bright spot was secondary science, where the proportion of black teachers increased from 9.8 percent to 14.5 percent. *Id.* What is more troubling, however, is the utility of the report itself. In addition to not providing data on all core-subject teachers at the secondary level, the chart also fails to show the proportion of black early childhood education teachers. During the hearings, Coley could not establish that the district's metrics sufficiently dissected the data. This admission confirms the criticisms made by ODM in its 2003 and 2006 reports that the district was not making sincere and reasonable efforts to increase the number of black teachers in the specialty areas.

As part of its annual monitoring, ODM compiled the following statistics relevant to this subsection. The data show virtually no improvement in identifying and addressing the disproportionately low number of black teachers in the enumerated priority areas.

87

In 2003-2004, the district employed 21 black full-time equivalent teachers ("FTEs")
in early childhood positions and 24.5 FTEs by 2005-2006. Joshua Ex. 0-9. Despite this
increase in raw numbers, however, the number of black early childhood teachers when
expressed as a percentage of early childhood teachers overall actually declined from 21
percent to nineteen percent. *Id.* In 2003-2004, the district employed 36 black FTEs in primary
classroom positions and 41 by 2005-2006. *Id.* This represents a two percent increase in the
ratio of black primary classroom teachers relative to the total number of primary classroom
teachers. *Id.* In 2003-2004, the district employed 38.45 black FTEs in secondary core
positions and 44.66 by 2005-2006. *Id.* This also represents a two percent increase in the ratio
of black secondary core teachers relative to the total number of secondary core teachers. *Id.*
Combining these three specialty areas, the district added 14.71 black FTEs from the 2003-
2004 academic year to the 2005-2006 academic year. *Id.*

When viewed at the building level, however, the picture was even less encouraging
during these years. For example, as late as the 2005-2006 school year, several individual
schools lacked even a single black teacher in the elementary specialty areas. For example,
Adkins, Dupree, Scott, and Tolleson elementary schools had no black early childhood
teachers at all during the 2003-2004 to the 2005-2006 academic years. *Id.* In fact, Scott
Elementary did not have any black primary classroom teachers during this time period either.
*Id.*

At the secondary level, the picture was more mixed. From 2003-2004 to 2005-2006,

a good number of the district's secondary schools hired more black teachers in the core

subject areas. For example, in 2003-2004 there were four black FTEs teaching core subjects

at Jacksonville High School, equating to eighteen percent of Jacksonville High's secondary

core faculty. *Id.* By 2005-2006, however, there were 7.83 black FTEs, equating to 24 percent.

*Id.* This is a raw gain of almost four black teachers and a representational increase of 33

percent. *Id.* Not all secondary schools fared so well, however. For example, in 2003-2004

there were 4.33 black FTEs teaching core subjects at Oak Grove High School, equating to

20 percent of Oak Grove's secondary core faculty. *Id.* By 2005-2006, however, there were

2.84 black FTEs, equating to 15 percent. *Id.* This is a raw loss of almost two black teachers

and a representational decrease of 25 percent. *Id.*

Although not dispositive by themselves, these numbers are telling. They demonstrate

a complete lack of commitment to creating more parity in the identified teaching areas. This

is confirmed by a record devoid of meaningful attempts to address the situation. Pulaski

County has clearly not met its burden to show that it substantially complied with this

subsection in good faith.

d.      Subsection Four: Allocating Teachers to Avoid Racially Identifiable Schools

This subsection requires Pulaski County to ensure that the number of black faculty at

each building be generally proportional to the overall number of black teachers in the district.

The purpose of subsection four is to prevent certain schools from being identified as black

schools while other schools would be identified as white schools.

At the time Plan 2000 was adopted, Pulaski County had in place a policy, adopted in 1987, that aimed to reduce the number of racially identifiable schools. That policy provided a "target staffing range" for each building wherein the number of black teachers at each school, when expressed as a percentage, should be somewhere between 25 percent below to 25 percent above the overall percentage of black teachers at the relevant organizational level (elementary or secondary) during the previous academic year. For example, if during year one, 25 percent of the district's secondary teachers were black, then in year two, the faculty at each secondary building could be no less than 18.75 percent black and no more than 31.25 percent black.

In the early years of Plan 2000, one-third of the district's schools fell outside the target staffing range. Yet the district produced no evidence that it sought to improve the racial balance of each building's faculty. At some point in the mid-2000s, the district abandoned the target staffing range policy and replaced it with an informal goal of having each school's faculty be at least 20 percent black.

It appears the district has not seriously sought to comply with subsection four which requires Pulaski County to "allocate teachers and other professional staff in a manner that *avoids racial identification of schools*." (emphasis added). The twenty percent minimum standard target surely does not meet the standard required by the plan. This is true because the goal of having at least twenty percent black teachers at any given school bears no relationship to the requirement that the black faculty at each building be generally

proportional to the overall number of black teachers in the district. Indeed, on its face, the present policy would permit a school to have 100 percent black faculty. Such a school, however, would certainly be "racially identifiable" as the school with all black teachers.

It appears that, to address its failure to articulate and implement a reasonable definition of "racially identifiable schools," the district advanced the testimony of Dr. David Armor. Armor testified at length regarding the allocation of black teachers throughout the district. His reports study the racial make-up of the district's faculty since the 2003-2004 academic year and determine whether each school's percentage of black teachers is within fifteen percent of the district average for that organizational level (elementary, middle, or high school). The fifteen percent standard was ascertained from Armor's analysis of various desegregation rulings. Armor concluded that the district generally met this standard during the academic years 2003-2004 through 2009-2010. Consequently, Pulaski County asserts that it has achieved unitary status in the area of staffing.

The district's argument is unpersuasive. To begin, it should be noted that the specific provisions set forth in the plan govern this case. Therefore, Armor's suggestion that generally accepted principles adopted in other cases will suffice in this case was not well received. It was Pulaski County's duty to define what a "racially identifiable" school was in order to show that it acted in good faith to avoid such an outcome. This is not to say that Armor's plus or minus 15 percent metric is a poor measure of fair staff allocation; it might very well be a good one. The important point is that Pulaski County cannot now, at the eleventh hour, find

an expert to testify that the district was generally compliant with a widely accepted standard that was neither provided by the plan itself nor implemented by the district at any time. Had Armor been hired as a consultant shortly after plan adoption and approval to study and make recommendations for improvement in the areas of concern set forth in subsection four, then his analysis would be far more probative and compelling on the question of compliance. Neither Armor's testimony nor his reports, however, satisfy Pulaski County's burden of showing that it acted in good faith and substantially complied with subsection four.

For all of these reasons, the district has not proved that it recruited and allocated black teachers and administrators in accordance with the plan. If one piece of evidence can summarize the enduring state of affairs regarding staffing in Pulaski County, it would surely be the district's own report entitled "Appendix IX to the 2009-10 Annual Personnel Hiring and Deployment Report." Pulaski County Ex. 77J. The data show that in 1984-1985, the earliest dates of record, Pulaski County's student enrollment was 23.6 percent black and its professional staff was 21.7 percent black. *Id.* Over twenty-five years later, the district is 44 percent black. *Id.* Yet the percentage of black professional staff remains at 21.1 percent. *Id.*

### *11. Student Achievement*

Section M of Plan 2000 concerns student achievement. Pulaski County has failed to substantially comply in good faith with this section of the plan. This section has two subsections requiring Pulaski County to: (1) continue with its "home-school counselor program" and (2) implement a plan designed by Dr. Stephen Ross ("Ross") to improve

student achievement ("the Ross Plan"). Although Pulaski County has continued its home-school counselor program, it has not implemented the Ross Plan.

Pulaski County submitted data on its "home-school counselor program" that demonstrates it continues to utilize the program. Pulaski County Ex. 66. Although the number of students involved has decreased over time, the desegregation plan did not set specific benchmarks for the numbers of students that must participate and did not require expansion of the program. The decrease in involvement from approximately 1,500 students to approximately 1,300 students does not show a lack of good faith on the part of Pulaski County.

The evidence is less compelling regarding Pulaski County's obligations under subsection two, which concerns student achievement more generally. Student achievement is a broad and complex topic, and no single program provides an easy solution for the persistent lack of achievement by certain students. The factors at play in determining whether and to what extent a student will succeed encompass every aspect of her educational experience from the quality of the facilities and the culture of her school to the dedication and skill of her instructors. Moreover, the influences on a student's achievement are not simply held in abeyance at the doors of the school. A student's upbringing, social life, home life, and health can all exert strong positive and negative influences on her ability to learn.

Considering all of these influences on student achievement, it is not surprising that the education plan devised by Ross to meet the student achievement requirement includes a

number of general educational goals dealing mainly with factors over which the district has

direct control. The goals most specifically related to student achievement and racial inequity

are:

> To improve educational achievement by all students, with special attention to
> African-American students and others who are at-risk of academic failure due
> to socioeconomic disadvantages, or other factors.

*******************

> To decrease the performance gap between white students and African-
> American students through the systematic design/selection and implementation
> of intervention programs that provide effective remediation and/or adaption to
> individual or group needs.

According to these goals, Pulaski County must in good faith implement and comply with

a plan to improve general educational achievement while making good-faith efforts to close

the achievement gap between white and black students. As such, the plan requires Pulaski

County to do more than simply increase student achievement across the board; instead it

requires Pulaski County to pay specific attention to its black students and the achievement

disparities that attain between them and white students.

The Ross Plan required each school in Pulaski County to prepare a school-wide plan

for increasing student achievement and closing the achievement gap. These school wide

plans were referred to as Formative Education Plans for School Improvement ("FEPSI").

FEPSI were supposed to address a number of school functions, among which were goal

setting, curriculum, teaching, climate, discipline, and equity. In practice, however, the

FEPSI ended up functionally resembling the ACSIPs required by the Department of Education. In light of this functional similarity, Pulaski County determined that each school should develop a single school improvement plan that infused elements of the FEPSI into the ACSIP.

Although Pulaski County's ACSIP plans were not specifically created to implement the Ross Plan, their focus on data, monitoring, and school improvement makes them a viable apparatus for Pulaski County to meet its obligations under the desegregation plan. Yet, simply because Pulaski County schools have ACSIPs does not mean that the school district is meeting its obligations under the desegregation plan. Pulaski County must show that its ACSIPs specifically or effectively addressed the general goals set forth in the Ross Plan, and these goals include targeting black students specifically to decrease the achievement gap.

Unlike North Little, Rock Pulaski County did not submit its ACSIPs for review. It is therefore necessary to rely on other evidence to determine the content of the ACSIPs and their conformity to the goals of the Ross Plan.

The most probative piece of evidence submitted by the parties is a study undertaken at the request of Pulaski County by The Research Group, an independent group hired to assess the implementation of the Ross Plan throughout the district. Pulaski County Ex. 64. After examining the ACSIPs at each of the Pulaski County schools, The Research Group found that the ACSIPs addressed student achievement generally but did not contain the focus on black students mandated by the Ross Plan. The group concluded that Pulaski

County was not adequately addressing the goals set forth in the Ross Plan and not successfully infusing the FEPSI process into the ACSIPs.

The Research Group also assessed Pulaski County's effectiveness at reducing the achievement gap. The group found that, although Pulaski County had increased student performance across the board, the achievement gap in proficiency on Benchmark and end of course exams had actually grown from 2004 to 2006. These conclusions call into question Pulaski County's good-faith efforts to comply with the specific terms of the Ross Plan.

In response, Pulaski County proffered a report, prepared in 2009, purporting to show that it has focused special attention on black students and actually lowered the achievement gap. Pulaski County Ex. 63. The report presented data showing, at least in some grade levels and subject areas, that the number of black students scoring proficient on the Benchmark Exam increased at a greater rate between 2005 and 2009 than the number of non-black students. The report also points to a number of programs that Pulaski County claims to have been successful at reducing the achievement gap. These programs include: home-school counselors, after-school programs (academic), Math Academy, math and literacy labs, Transition Camp, Freshman Academy, Response to Intervention, ELA/Effective Literacy, Calendar Math, Cognitive Guided Instruction, and Odyssey.

Joshua asserts, as it did in the North Little Rock hearing, that the data presented in the 2009 report does not show that Pulaski County is actually lowering the achievement gap. It states that by focusing exclusively on the number of students considered "proficient" by

the Department of Education, the data actually masks ongoing and pervasive gaps in student achievement. This is because two students who score proficient on the benchmark may still be separated by a dramatic achievement gap in terms of their mastery of the Arkansas frameworks. Proficiency on the benchmark exam encompasses a broad range of actual scores on the test and likewise a broad range of framework mastery. A student who scores at the bottom of the proficient range may have a dramatically different score from a student who scores at the top of the proficient range and may actually be closer, in terms of mastery, to a student scoring in the basic range.

Joshua also asserts that Pulaski County's data ignores the continuing achievement disparities between students who score proficient and advanced and likewise between students who score basic and below basic. In many cases these disparities are greater than those between students who score basic and proficient. Data that simply distinguishes between proficient and not proficient is too narrow to independently demonstrate that Pulaski County is addressing the achievement gap. It is just as important to narrow the achievement gap between a student performing at proficient and a student performing at advanced as it is to narrow the achievement gap between a student performing at basic and a student performing at proficient. To this end, one of the recommendations made by The Research Group in their 2006 report was: "The education focus [at Pulaski County] needs to shift from 'increasing the number of students proficient' to meeting the needs of the diverse learners in the classroom." Pulaski County Ex. 64. Pulaski County needs to take this

recommendation seriously.

Consistent with the holding on North Little Rock, it would be unreasonable to hold Pulaski County to the standard put forward by Joshua. Yet, Pulaski County has failed to show that it acted in good faith because the programs mentioned in its 2009 report fail to demonstrate a good-faith effort to lower the achievement gap between black students and white students. At least two of these programs, Summer Transition and Freshman Academy, were not even implemented until after or right at the time Pulaski County moved for unitary status. Other programs involved a very limited number of participants and, despite being labeled as a success, were never expanded. Math Academy, for example, was used by Pulaski County for over ten years, and even though it was considered a successful program, Pulaski County never expanded it beyond thirteen or fourteen students. Still other programs existed prior to the implementation of Plan 2000 and were not specifically generated or used to meet the goals of the plan.

The examination of Pulaski County's witnesses gave an abiding impression that Pulaski County decided to apply for unitary status and then simply looked around for existing programs that it could point to in order to prove that it was meeting the goals of the desegregation plan. Indeed, the impression given by Pulaski County was that it really did not care whether it complied with the terms of the plan, and its witnesses did not indicate a good-faith effort to comply with the terms of the Ross Plan. The Ross Plan specifically required the district to design and implement programs to narrow the achievement gap

between white and black students, including specific interventions targeted at individual and group needs.

Overall, the data and testimony indicate that Pulaski County is increasing student achievement across the board, which means it is meeting one of the goals set by the Ross Plan. The data and the testimony, however, do not indicate that Pulaski County is making a good-faith effort to specifically target the achievement gap between black students and white students. In order to comply with the terms of the Ross Plan, Pulaski County needs to focus on implementing and documenting intervention programs that are specifically targeted at narrowing this achievement gap.

In many ways, it appears that Pulaski County lost the Ross Plan amidst the requirements of the Department of Education, as if desegregation became just an afterthought. For example, the FEPSI plans were folded into the ACSIP plans, the scope of student achievement narrowed to simple proficiency, and SOMs, which were supposed to be taken at every school, were only being taken at schools deemed by the state as in need of school improvement. This does not show a good-faith effort to comply with the Ross Plan. Pulaski County needs to refocus its efforts on narrowing the achievement gap. It needs to consider the specific requirements of the Ross Plan, and it needs to specifically design and implement programs to address those requirements. It cannot take for granted that it is complying with the desegregation plan by simply meeting the demands that the Department of Education has put in place for all school districts across the state.

In addition to focusing specifically on student achievement, the Ross Plan requires Pulaski County to increase the participation of black students and other disadvantaged students participating in extracurricular activities, gifted programs and honors, enriched and advanced placement courses. The evidence does not indicate that Pulaski County has substantially complied with these requirements.

Pulaski County's efforts to increase the participation of black students and other disadvantaged students in gifted and talented and advanced placement is discussed at length in Section IV.B.2 of this order. In order to avoid unnecessary redundancy, it is sufficient here to simply point out that Pulaski County has failed to demonstrate that it has taken the necessary steps to satisfy the goals set forth in the Ross Plan and likewise that GT, pre-AP, and AP programs remain disproportionately white across the district.

The evidence presented also fails to demonstrate that Pulaski County has made a good-faith effort to increase participation by black students and other disadvantaged students in extracurricular activities. Pulaski County presented almost no testimonial evidence to show its efforts to achieve this goal. Examining the exhibits, the study conducted by The Research Group in 2006 found that only Robinson High School mentioned in its ACSIP the need to increase the number of students in extracurricular activities, and Robinson's ACSIP only dealt with the issue in general terms and did not specifically address the need to increase the participation rates of black students and disadvantaged students. Pulaski County Ex. 64. Additionally, the School Equity Monitoring

Summaries submitted from 2002 to 2009 evince a pronounced lack of change and even general indifference in Pulaski County's policies toward increasing participation in extracurricular activities. Pulaski County Exs. 73A-G. Seven years of reports concerning many Pulaski County schools read almost universally

> Participation in extracurricular activities generally reflects the school population. The principal and sponsors monitor participation in extracurricular activities. School personnel encourage students to participate in extracurricular activities. Advance written notice is sent out to all students and their parents to inform them of the selection process for extracurricular activities.

*Id.* Of the hundreds of entries in the monitoring and compliance reports describing extracurricular activities in the Pulaski County schools over seven years, few deviate from this generic format. These generic entries are not sufficient to show that Pulaski County is meeting its requirements under the Ross Plan. Pulaski County needs to document its specific efforts to increase participation by black students and other disadvantaged students in extracurricular activities.

In the 2007-2008 School Equity Monitoring Summaries, Northwood Middle School added the following language to the generic section on extracurricular activities: "Business partners provide money for those unable to afford physicals." Pulaski County Ex. 73F. This sort of documentation is a step in the right direction. Even if other schools are not able to secure the same type of assistance, they must still document what they are doing to improve participation in extracurricular activities and what impact their efforts are having on rates of participation.

The Ross Plan also requires Pulaski County to increase student attendance and reduce suspension and grade retentions for all students, regardless of race or background. Again, the evidence does not demonstrate that Pulaski County has substantially complied with this requirement of the Ross Plan.

Pulaski County's district-wide DMP sets out some of the strategies used to address absenteeism and ensure regular school attendance. Pulaski County Ex. 13. These strategies include: attendance counseling, home visits, identification of contributing health problems, parent conferences, and referrals to outside agencies. Yet none of the individual school discipline plans submitted into evidence incorporate these strategies, and Pulaski County presented almost no testimony regarding the implementation of these strategies in individual schools across the district. Additionally, the 2006 study conducted by The Research Group found that only 24 percent of elementary schools, 59 percent of middle schools, and 50 percent of high schools addressed increasing attendance and reducing suspensions in their ACSIPs. Pulaski County Ex. 64. Pulaski County needs to present evidence that individual schools are takings the steps set out in the district-wide DMP.

The Research Group's 2006 study also found that not a single Pulaski County school mentioned reducing grade retentions in their ACSIP. *Id.* Aside from this report, Pulaski County submitted no data to demonstrate that it is reducing grade retentions. Pulaski County has the burden to prove substantial compliance and it has not met this burden.

Pulaski County's efforts to address suspensions are discussed at length in Section IV.

B.4. In order to avoid unnecessary redundancy it is sufficient here to simply point out that Pulaski County substantially delayed its efforts to address student discipline in the district. This long delay does not demonstrate a good-faith effort to comply with the terms of the Ross Plan.

Finally, the Ross Plan requires Pulaski County to establish a system to monitor and assess the progress made towards the educational goals. Pulaski County's monitoring efforts are discussed at length in Section IV.B.12 of this order. It is once again sufficient to note that Pulaski County failed to demonstrate good faith in adopting and implementing a comprehensive evaluation program. Further, the long delays and continued disregard for the recommendations of the ODM do not demonstrate substantial compliance with the monitoring requirements.

Monitoring, of course, is of particular importance to student achievement because it is what allows Pulaski County to assess the effectiveness its strategies. Simply implementing programs to address the achievement disparity is not sufficient to demonstrate a good-faith compliance with the Ross Plan. Any program that is implemented must also be monitored and revised in light of its successes and failures. In the end, however, Pulaski County failed to do both.

### 12. Monitoring

Section N concerns monitoring. Subsection one of that section requires Pulaski County's assistant superintendent for desegregation to develop a plan that focuses her

monitoring and compliance efforts on the specific elements of the desegregation plan and to provide to Joshua a list, geared to the subsections of the plan, that identifies the staff member responsible for implementing each subsection of the plan.

According to an ODM report dated May 8, 2003, Pulaski County quickly fell behind on the deadlines mandated by subsection one. Joshua Ex. 0-4. Instead of thirty days, it took them almost five months to give Joshua the required list of staff members responsible for implementing each subsection of the plan. It then took the district over two years to develop a monitoring plan, a plan that ODM eventually dismissed as wholly inadequate to meet the requirement of Plan 2000. By 2006, only a year before requesting a declaration of unitary status, the district still had not produced a satisfactory monitoring instrument. By this point in time, Pulaski County had produced only one comprehensive monitoring report and that report had been prompted by the request of a legislative subcommittee. It was not until 2007-2008 that Pulaski County finally produced a report that ODM noted was a "distinct improvement over its previous monitoring reports." Joshua Ex. 0-12.

Although the parties disagree about whether they ultimately agreed on a satisfactory monitoring instrument and whether that instrument complied with the recommendations of the ODM, it is clear that Pulaski County has not complied in good faith with the requirements of subsection one. This is the case because it failed to timely submit the required documents to Joshua; it took more than two years to adopt a monitoring plan, and the monitoring plan it finally submitted was rejected outright by the ODM as woefully

104

inadequate. Joshua Ex. 0-4. In addressing the original monitoring plan, the ODM provided specific methods for approving the plan, but Pulaski County failed to take any steps to improve its monitoring plan for more than four years. *Id.* Indeed, it failed to do so until it applied for unitary status. This is not evidence of a good-faith effort to comply with subsection one. Pulaski County therefore failed to act in good faith and failed to substantially comply with this subsection.

Subsection two of this section requires Pulaski County to allow Joshua to examine and secure copies of all records relating to Pulaski County's compliance with the plan and to allow Joshua an opportunity to meet with the assistant superintendent for desegregation or staff members responsible for implementing particular sections of the plan. Bowles testified that the district has complied with requests for documentation by Joshua and has been responsive to requests for meetings regarding implementation of the plan. This testimony went unchallenged. It appears that Pulaski County acted in good faith and substantially complied with this subsection. This does not, however, relieve Pulaski County of its duty to continue implementing this provision in good faith until it is declared entirely unitary and excused from supervision.

Subsection three requires Pulaski County to submit statistical reports showing:

(a)     the enrollment in each school by race;

(b)     the enrollment in gifted and talented programs, honors programs, and advanced placement classes, by school and by race;

(c)     the make-up of special education programs: (i) by disability category,

105

including Section 504, by race, and by sex; and (ii) by school, by race and by sex; provided that the system may comply with this reporting requirement by providing copies of materials submitted to ADE, as long as they include all information designated in this paragraph;

(d)     For each school and the system, the number of instances of each form of discipline, by race and by sex; for each school and the system, the number of students receiving each form of discipline, by race and sex;

(e)     the racial make-up, in each school, of (i) the administrators, (ii) the faculty, (iii) other professional staff, and (iv) support staff;

(f)     the racial make-up, by category, of the various categories of administrators, faculty, support staff, and other workers employed in the PCSSD.

The evidence demonstrates that Pulaski County has acted in good faith and has substantially complied with this subsection because it made a good-faith effort to track and make available all the required data.

The School Equity Monitoring Summaries prepared by Bowles track most of the required data from 2002-2009. Pulaski County Exs. 73A-G. These reports show the enrollment in each school by race, the number of suspensions and expulsions by race, the number of students receiving special education services, the racial make-up of the school staff, and the number and racial make-up of students enrolled in talented and gifted programs, advanced placement, and pre-advanced placement courses.

Pulaski County also prepared separate and specific reports to track a variety of data across the district. The reports on gifted and talented programs and advanced placement programs track the racial make-up of students involved in these programs across the district.

Pulaski County Exs. 74A-K. The reports on special education data track the racial and gender make-ups of students involved in special education and the racial make-up of the district special education staff. Pulaski County Exs. 75A-J. The discipline reports track data on specific types of discipline and the total instances of each form of discipline as well as the race of the students disciplined. Pulaski County Exs. 76A-H. The Annual Personnel Hiring and Deployment reports track the race and gender of Pulaski County administrators, teachers, and staff across the district and other reports track specifically the data on administrators. Pulaski County Exs. 77A-J, 78.

The reports provided by the ODM indicate that Pulaski County has submitted this data on time and in good faith. *See, e.g.*, Joshua Ex. O-8. The evidence thus indicates that Pulaski County is unitary with respect to subsection three. This does not, however, relieve Pulaski County of its duty to continue implementing this provision in good faith until it is declared entirely unitary and excused from court supervision.

## V.  RESOLUTION

After listening to weeks of testimony regarding these school districts' desegregation efforts and reading thousands of pages of court submissions and filings, it is clear that one of the problems with this case is that the State of Arkansas pays millions of dollars to these districts, along with the Little Rock School District, to aid their desegregation efforts. The districts plow these funds into programs that are supposedly used to desegregate.

The problem with this process is that it results in an absurd outcome in which the

107

districts are rewarded with extra money from the state if they fail to comply with their desegregation plans and they face having their funds cut by the state if they act in good faith and comply. Indeed, if a district fails to comply and remains under court supervision, it stands the chance that it will continue to obtain millions of dollars in additional state funds to pay for various programs. If a district actually complies with its desegregation obligations and is found unitary, it faces the likelihood that the state will ask the court to discontinue the state's obligation to pay for the various programs that are funded with desegregation funds.

It seems that the State of Arkansas is using a carrot and stick approach with these districts but that the districts are wise mules that have learned how to eat the carrot and sit down on the job. The time has finally come for all carrots to be put away. These mules must now either pull their proverbial carts on their own or face a very heavy and punitive stick. For these reasons, the State of Arkansas is hereby released from its obligation to pay for any and all of the North Little Rock School District's, the Pulaski County Special School District's, and the Little Rock School District's desegregation efforts, except for those associated with M-to-M transfers. Further, Little Rock, North Little Rock and Pulaski County are hereby ordered to show cause why the State of Arkansas should not be ordered to stop funding for M-to-M transfers. Each district has thirty days from the entry of this order to file a ten page brief on this issue.

Those reading this order should not mistake the court's opinion. In no way is the

108

State of Arkansas given credit or "brownie points" for providing funds to the districts to help them desegregate. Further, no sympathy is given the state for having to pay the funds that it has paid. It must be clear that the State of Arkansas has unclean hands. Its history is steeped in segregation of schools as well as other public accommodations. Indeed, but for the discriminatory actions of the State of Arkansas and Governor Faubus, the school districts at issue would be much further along the road to fully desegregating.

Notwithstanding these points, this court is confronted with determining the most prudent course that must be taken to assure that these districts desegregate. And, it seems that it is time to move in a different direction; toward punishing dilatory behavior and away from rewarding it.

## VI. CONCLUSION

For all of the reasons set forth above, North Little Rock's petition is granted in the areas of: (1) special education; (2) compensatory education; (3) compensatory programs aimed at dropout prevention; (4) extracurricular activities; (5) discipline, expulsions and suspensions; (6) secondary gifted and talented education; (7) school construction and facilities; and (8) desegregation monitoring. The petition is denied in the area of staff recruitment.

Pulaski County's petition is granted in the areas of: (1) student assignment: interdistrict schools; (2) multicultural education; and (3) school resources. The petition is denied in the areas of: (1) student assignment; (2) advanced placement, gifted and talented

and honors programs; (3) discipline; (4) school facilities; (5) scholarships; (6) special education; (7) staff; (8) student achievement; and (9) monitoring.

The State of Arkansas is hereby released from its obligation to pay for any and all desegregation efforts of the North Little Rock School District, the Pulaski County Special School District, and the Little Rock School District, except for those associated with M-to-M transfers.

IT IS SO ORDERED this 19th day of May, 2011.

_Brian S. Miller_
UNITED STATES DISTRICT JUDGE