IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JAN 1 7 2013

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

LITTLE ROCK SCHOOL DISTRICT,
*et al.*

PLAINTIFFS

v.                    No. 4:82-cv-866-DPM

NORTH LITTLE ROCK SCHOOL
DISTRICT, *et al.*

DEFENDANTS

LORENE JOSHUA, *et al.*

INTERVENORS

ARKANSAS VIRTUAL ACADEMY, *et al.*

INTERVENORS

ORDER

Reasonable people of good will disagree about the wisdom and efficacy

of charter schools.  Those issues are not before this Court.  The Little Rock

School District and the Joshua Intervenors make no facial challenge to the

Arkansas Charter Schools Act of 1999, as amended.  LRSD and Joshua argue,

instead, that the State, acting through the Department of Education, has

broken the parties' 1989 Settlement Agreement in applying the Act to open-

enrollment charter schools in Pulaski County.  These new schools, the

argument runs, have grown with the State's blessing to the point where they

are substantially interfering with desegregation efforts.  The parties'

Settlement Agreement is a contract, which this Court approved and adopted as part of its consent decrees governing how the State, LRSD, PCSSD, and the North Little Rock School Districts would remedy their constitutional violations. Has the State broken the parties' contract in implementing the Charter Schools Act in Pulaski County? And can the Court decide on the record compiled by the parties or does there need to be a trial to resolve genuine disputes about important facts? These are the main questions presented.

    **1. Procedural Background and Posture.** In 2010, the Little Rock School District, joined eventually by the Joshua Intervenors, moved to enforce the parties' 1989 Settlement Agreement. This branch of the case was dormant for some time while the parties and the Court focused on unitary-status issues involving the Pulaski County Special School District and the North Little Rock School District. After those issues had been decided, 2011 WL 1935332 (E.D. Ark. 19 May 2011), the Court turned back to the motion to enforce. The Court denied the motion as to educational adequacy/transportation issues arising under *Lake View* and related Arkansas law; as the State pointed out, no subject-matter jurisdiction existed over those issues. The Court allowed some

discovery, and requested further briefing, about charter schools and the remediation of achievement disparities between black students and non-black students. *Document No. 4608, at 8.*

A group of open-enrollment charter schools moved to intervene. The Court agreed, and granted permissive intervention, FED. R. CIV. P. 24(b)(1) & (3). The Court rejected the charter schools' request to reorient the case immediately toward what might be called the *Parents Involved* issues, but welcomed their participation on the already-joined issue that affected them: whether the State had violated the Settlement Agreement in chartering and overseeing these schools. *Document No. 4690.* The charter schools filed their complaint in intervention, and have participated fully in discovery, briefing, and oral argument.

LRSD and Joshua seek judgment as a matter of law, or a trial, on their motion to enforce. They have also moved for summary judgment. The State and the Charter Intervenors seek denial of the motions and judgment as a matter of law that the State has not violated the Settlement Agreement. The Pulaski County Special School District and North Little Rock School District have not taken a position. At the day-long oral argument in March, all the

parties agreed that judgment as a matter of law one way or the other, or a trial, were the Court's procedural options.   In this regard, the Court has been helped by the parties' cross-statements of material facts that are and are not disputed, in particular the State's amended response, *Document No. 4719*, which lists material facts, sometimes with differing perspectives, and the post-hearing notice, *Document No. 4734*, which pins down some student numbers.

**2.  Remedying the Achievement Gap, Monitoring, and Retaliation.** The Court denies without prejudice the LRSD/Joshua motions on these issues.  The several alleged retaliatory acts by the State were not raised in the motion to enforce and did not come into the current papers until the motion for summary judgment.  *Compare Document No. 4440 with Document No. 4704.* No pointed discovery was done on retaliation.  LRSD and Joshua mentioned State monitoring in passing in their motion to enforce, but it has now grown into a full-fledged claim.  Monitoring, the Court concludes, is intertwined with whether the State has fulfilled the Settlement Agreement regarding programs on remedying the achievement gap.  The State's obligations under the Settlement Agreement on both monitoring and remedying the achievement gap, however, are better addressed as part of the State's pending

-4-

motion for release from the Agreement. *Document No. 4723.* In a companion Order that will be filed today, the Court has taken up the motion for release. LRSD and Joshua may, at their choice, pursue these arguments in responding to the motion for release.

**3. Charter Schools.** This Court's job is to enforce the parties' Settlement Agreement. *Knight v. PCSSD*, 112 F.3d 953, 954 (8th Cir. 1997). It is a contract become consent decree with this Court's imprimatur. As with any contract, interpretation presents questions of law, absent some ambiguity that must be resolved based on disputed extrinsic evidence. *Compare LRSD v. PCSSD*, 83 F.3d 1013, 1017 (8th Cir. 1996), *with LRSD v. PCSSD*, 60 F.3d 435, 436 (8th Cir. 1995). In resolving the charter-school issues, this Court must "apply[] the terms of a contract between the parties to facts that have arisen since its creation." 83 F.3d at 1017. "The meaning of the terms in the Settlement Agreement, and their application to the facts in this case, are legal questions . . .." *Ibid.* The Court therefore agrees, procedure-wise, with the initial positions of LRSD, Joshua, the State, and the Charters: no genuine issues of material fact exist, and this Court can and should decide the charter-school issues as a matter of law.

The Settlement Agreement does not mention charter schools. This is common ground among the parties. The Agreement predates the Arkansas Charter Schools Act by a decade. Indeed, the parties settled this case some two years before the first charter-school law was passed anywhere in the nation. KERN ALEXANDER & M. DAVID ALEXANDER, AMERICAN PUBLIC SCHOOL LAW 43 (6th ed. 2005). The Settlement Agreement's silence weighs heavily against any argument that the Charter School Act violated the Agreement. And LRSD and Joshua make no such argument. They've been clear that they challenge how the State has implemented the Act: the State, they say, was in material breach in about 2008-2009, based on the number of open-enrollment charter schools authorized in Pulaski County and the number of students those schools could enroll by that point.

**a. The Jacksonville Analogy.** LRSD and Joshua argue, first, that the open-enrollment charters in Pulaski County are the functional equivalent of the proposed Jacksonville splinter district, which this Court (speaking through my Brother Wilson) rejected in 2003. *Document No. 4440–9, LRSD Ex. 7.* No one appealed that decision. It became, as LRSD and Joshua say, the law of the case. The law they extract from this ruling is sweeping: "the consent

decree prohibits the removal of students from the interdistrict system of school choice governed by the [majority-to-minority] and magnet stipulations without Court approval." *Document No. 4705, at 3, LRSD/Joshua Brief Supporting Summary Judgment.* The Court disagrees—both on what law is embodied in this Court's 2003 ruling and on the soundness of the analogy between the Jacksonville-splinter effort and the open-enrollment charters in Pulaski County.

The Court there construed a specific provision of the Settlement Agreement that guaranteed the integrity of the PCSSD and NLRSD until they became unitary. Judge Wilson was clear about the Court's holding:

> Thus, in my opinion the State Board of Education's vote to allow an election to create a new school district in northeast Pulaski County unquestionably violated the [S]tate's obligation under Section II(J)[*] of the 1989 settlement agreement to preserve the independence and sovereignty of the Pulaski County Special School District until such time as it ha[s] fulfilled all of its desegregation obligations and achieved unitary status.

---

[*]Recognition of Autonomy
The State, Joshua and LRSD recognize that PCSSD and NLRSD are independent, sovereign desegregating school districts operating pursuant to court orders and agreements and that this agreement is both necessary and desirable to facilitate their desegregation activities as well as their cooperative desegregation activities with the LRSD and others. *Document No. 4440-3, at 13.*

*Document No. 4440–9, at 7, LRSD Ex. 7.* The Court also noted the precedent in this case on "the procedure that should be followed in order to change the geographic boundaries among the three Pulaski County school districts." *Ibid.* Of course the Court was concerned about the potential effects of any boundary change on the districts' abilities to pursue their desegregation obligations—that was, most likely, the driving purpose of § II(J). *Document No. 4440–9, at 3–4, 9–11, 13.* The law of the case from the 2003 ruling is this: § II(J) means what it says; PCSSD and NLRSD are autonomous and independent districts whose geographic boundaries may not be changed, absent Court approval, until they achieve unitary status.

The factual analogy has a surface appeal—the proposed Jacksonville district would have served about 6,000 former PCSSD students, while the open-enrollment charters currently serve about 4,400 students in Pulaski County. *LRSD Ex. 76; Document No. 3761, PCSSD Ex. 15, at 9–13.* But the analogy fails on scrutiny. These charters have not removed any land from LRSD. They have not taken over any LRSD buildings or infrastructure. They have not altered LRSD's tax base. Perhaps most importantly, the harmful effects of detaching the Jacksonville area on the PCSSD's desegregation efforts

in 2003 were obvious; any similar effects of these charter schools on the stipulation magnet schools and M-to-M transfers are elusive at best. Some of the students now attending open-enrollment charters in Pulaski County probably would be attending LRSD schools if the charters did not exist. State dollars follow the students. But the resulting marginal decrease in general State funding to LRSD, which has been completely unitary for five years, simply does not equal the kind of anti-desegregation impact that the proposed Jacksonville district would have had on PCSSD almost a decade ago. And LRSD and Joshua make no such contention.

**b. The Parties' Agreements.** LRSD and Joshua argue next that (considered as a whole) the Settlement Agreement, the M-to-M stipulation, and the magnet stipulation "unambiguously prohibit the State from creating a competing system of interdistrict magnet schools in Pulaski County in the form of open-enrollment charter schools." *Document No. 4705, at 5–6, LRSD/Joshua Brief Supporting Summary Judgment.* The State should have, they continue, worked through the magnet review committee, and ultimately this Court, before authorizing all these schools. The Court agrees that it should consider the whole of the Settlement Agreement, informed by the districts' M-

to-M stipulation and their magnet stipulation, on which the Settlement Agreement is partly premised and incorporates in part. *LRSD v. NLRSD*, 148 F.3d 956, 966 (8th Cir. 1998); *LRSD v. PCSSD*, 83 F.3d at 1017–1020. The Court also agrees with Joshua and LRSD that this interpretive effort must be "a practical enterprise, influenced, perhaps, by technical rules of construction, but not controlled by them." *LRSD*, 60 F.3d at 436. Their "competing interdistrict magnets" argument, however, is almost the same as arguing that there can be no open-enrollment charter schools in Pulaski County. It is an as-applied challenge that is facial in breadth. The Court is persuaded that the parties' Settlement Agreement does not contain the categorical ban (absent Court approval) urged by LRSD and Joshua.

First, LRSD and Joshua's argument here is at war with their core position. The violation of the Settlement Agreement, they confirmed at the oral argument, allegedly occurred in 2008-2009 when the number and size of the open-enrollment charters reached a certain point. This is when, they say, the State was in material breach. LRSD and Joshua disavowed any facial challenge to the Charter Schools Act or any as-applied challenge in its early years of operation. Their argument that these schools are essentially

interdistrict magnets that needed prior approval from the magnet review committee and this Court, however, challenges all these entities at the door. While parties may, of course, make inconsistent arguments, they may not do so after having disavowed one of them.

Like PCSSD's argument in 1996 that this Court had to enjoin a teachers' strike because not holding school would imperil PCSSD's fulfillment of its desegregation obligations, LRSD and Joshua's argument that these open-enrollment charter schools have been *ultra vires* from the day they opened proves too much. *Knight*, 112 F.3d at 955. It would prove that their as-applied challenge is not about what happened after 2008, but is instead about what happened when the first open-enrollment charter started in Pulaski County. LRSD and Joshua might well respond that, though there was a breach when the school opened, it did not become material until the impact reached a certain level. That possibility, which the Court views as the core of LRSD and Joshua's challenge, will be addressed below.

Second, the text of the parties' various agreements does not support LRSD and Joshua's reading of them. Again, the Settlement Agreement contains no bar against charter schools in Pulaski County. The provision

-11-

guaranteeing PCSSD's and NLRSD's autonomy and integrity is pointedly silent about LRSD's future. This silence is striking because the provision does mention LRSD's desegregation activities. *See note \*, supra at page 7.* And as the State points out, several provisions about State funding contain a pregnant parenthetical — desegregation dollars due LRSD must keep flowing to "any successor district or districts to which students residing in territory now within LRSD may be assigned or for the benefit of such students if the State or any other entity becomes responsible for their education[.]" *Document No. 4440–3, at 10, 26 & 28, LRSD Ex. 3, 1989 Settlement Agreement at §§ II(F), VI(A) & VI(B).* LRSD may be correct that these provisions were meant to guarantee desegregation funding to students then being served by LRSD no matter what entity was educating them. But the premise of this guarantee is that some entity other than LRSD might be doing so.

The PCSSD/NLRSD autonomy and LRSD funding guarantees, taken together, mean that the parties agreed that LRSD has no perpetual monopoly on students residing within the district. LRSD said at the oral argument that its lack of a boundary guarantee was intentional; this omission was negotiated because the District was playing offense, still hoping to expand its boundaries

(short of full consolidation) with Court approval.  That may well be so.  But under the parties' Agreement, the field is open both ways: LRSD could play offense, but it might have to play defense too.

LRSD and Joshua invoke in particular the State's unequivocal promise in the Settlement Agreement of cooperation in district desegregation efforts and the magnet stipulation.  The latter provides for six interdistrict stipulation magnet schools until the magnet review committee recommends, and the Court directs, otherwise.  The Eighth Circuit has noted the importance of this number of stipulation magnets more than once.  *E.g., LRSD v. PCSSD*, 921 F.2d 1371, 1389 (8th Cir. 1990).  These parts of the parties' Agreements, and the Court's resulting orders, however, do not carry the weight of a presumptive bar against open-enrollment charters situated in the LRSD.

In the 1989 Agreement, the State promised to work together with LRSD, PCSSD, and NLRSD in pursuing desegregation and educational excellence.

F. Commitment to Principles

The State remains committed to the following principles:

. . .

    c.  The [Arkansas Department of Education] and the Districts should work cooperatively to promote the desegregation goals of the State and the Districts and to ensure educational excellence in the public schools in Pulaski County and throughout the State.

*Document No. 4440–3, at 19, LRSD Ex. 3, 1989 Settlement Agreement III(F)(c).*
This is an important commitment. It is, though, made in general terms. The
provision lacks, for example, the specificity of the State's promise not to
reduce State funding for any district program except as part of fair and
rational adjustments to the State's funding formula that apply generally to all
districts in the State. *Document No. 4440–3, at 8–9 & 14, LRSD Ex. 3, 1989
Settlement Agreement § II, paragraphs E(6) & L.* These provisions were at issue
when the State changed the way it paid for workers-compensation insurance
and loss-funding, a subsidy for declining enrollment. *LRSD*, 83 F.3d at
1017–20.

Agreeing to cooperate in principle toward certain goals is, as LRSD and
Joshua argue, akin to the duty of good faith and fair dealing present in every
contract. But Arkansas law is clear that this duty does not support an
independent cause of action; non-cooperation—or competition from open-
enrollment charters, as LRSD and Joshua characterize the circumstances
—"remains nothing more than evidence of a possible breach of contract
between parties." *Arkansas Research Medical Testing, LLC v. Osborne*, 2011 Ark.
158, at 6, 2011 WL 1423993, at *3 (14 Apr. 2011).

-14-

LRSD and Joshua's argument from the magnet stipulation gets no further. Approximately two years before the 1989 Settlement Agreement, the parties made this stipulation, and the related M-to-M stipulation, and this Court approved both. *LRSD v. PCSSD*, 659 F. Supp. 363 (E.D. Ark. 1987). The Settlement Agreement does not incorporate either stipulation completely. Both were part of the background circumstances of the Agreement, wherein the State promised generous funding to support the stipulation magnets and transportation of participating M-to-M students. *Document No. 4440–3, at 6–10, LRSD Ex. 3, 1989 Settlement Agreement § II(A)–(E); Document No. 4440–1, LRSD Ex. 1, M-to-M Stipulation; Document No. 4440–2, LRSD Ex. 2, Magnet Stipulation.* LRSD and Joshua's argument for a presumptive bar from the magnet stipulation therefore begins with a stretch—it reaches behind the terms of the parties' 1989 Settlement Agreement to premises which the parties did not explicitly incorporate.

There is a deeper, and unbridgeable, gap in this argument. LRSD and Joshua equate open-enrollment charter schools with the stipulation magnets. They are somewhat similar: both kinds of schools draw students from across district lines. The similarity ends there.

In their essence, these are different kinds of schools. Open-enrollment charter schools are, as their name says, open to all students. State and federal law requires this. ARK. CODE ANN. § 6-23-306(6); 20 U.S.C. § 7221i(1)(G) & -(H); 34 C.F.R. § 100.3. Residence is immaterial. So is race. The stipulation magnets, on the other hand, limit enrollment to students residing in LRSD, PCSSD, and NLRSD; further, enrollment is allocated by fixed percentages of students from each district. *LRSD*, 659 F. Supp. at 371. And race determines who gets a seat: the schools strive to achieve a 50/50 balance between black students and non-black students, though percentages ranging between there and 45/55 have been approved as racially balanced by this Court. *Ibid.*; *LRSD v. PCSSD*, 839 F.2d 1296, 1312 (8th Cir. 1988).

Because the open-enrollment charters are essentially different from the stipulation magnets, the process for creating them is not governed by the Settlement Agreement or the magnet stipulation. The parties agreed to, and the Court approved, the process for creating and supervising interdistrict magnets where residence and race determine enrollment. This process does not extend to charter schools where enrollment is open irrespective of residence or race. The magnet stipulation, as the State contends, creates a

limited system of interdistrict choice.   It does not cover the field of possibilities.  The stipulation therefore does not support a presumptive bar against open-enrollment charter schools in Pulaski County.   LRSD and Joshua's entitlement to relief on the charter issues must turn, instead, on the effect of these schools on the stipulation magnets and M-to-M transfers.

**c. Laches.**  If the Court has misunderstood the parties' intentions and various agreements, LRSD and Joshua's effort to argue that the State violated the parties' contracts when it embarked on the charter-schools experiment in Pulaski County would still not succeed.   The Charter Intervenors and the State are correct here: laches prevents rewinding the situation to 2001 when the first open-enrollment charter based in Pulaski County was being considered by the State Board of Education.   The laches defense requires "a detrimental change in the position of [the State and the Charter Intervenors], as well as an unreasonable delay by [LRSD and Joshua]."   *Summit Mall Co., LLC v. Lemond*, 355 Ark. 190, 206, 132 S.W.3d 725, 735 (2003).   Laches is an issue of fact.  *Royal Oaks Vista, LLC v. Maddox*, 372 Ark. 119, 124, 271 S.W.3d 479, 483 (2008).  But as with any fact, where reasonable minds could not differ after viewing the record in the light most favorable to LRSD and Joshua, the

issue becomes one of law.

For about nine years, insofar as the record reveals, LRSD and Joshua made no argument to the State Board or this Court that the open-enrollment charters required this Court's approval or they would violate the Settlement Agreement.   In proceedings before the Board, LRSD opposed most of the applications, though it did approve at least two.   LRSD repeatedly expressed concern about the impact of these new schools on desegregation efforts.  This is not the same, however, as arguing that the Settlement Agreement had been and was being violated.

The State and the Charter Intervenors changed their positions — the State by chartering and paying hundreds of thousands of dollars to fund these schools, and the charters by securing facilities, hiring faculty and staff, enrolling children and doing all that was required to educate children.  The numbers are undisputed.  Eleven of the seventeen currently operating charter schools are in Pulaski County.  *Document No. 4719, at 14*.  These schools were authorized to enroll 5,518 students in the 2011–2012 school year; and they did

enroll 4,398 the fall of 2011.  *Document No. 4719, at 18–19.*** Thus, more than 4,000 students, black and non-black, currently attend open-enrollment charters in Pulaski County.  *Document No. 4704–2, at 2, LRSD Ex. 76.* Expectations settled.

If LRSD and Joshua believed that the 1989 Settlement Agreement required this Court to give or deny prior approval to all these schools no matter what, they should have spoken up sooner.  LRSD and Joshua's delay in making any categorical challenge to the State's implementing the Act in Pulaski County was unreasonable as a matter of law.  If LRSD and Joshua believed that these schools were competing interdistrict magnets, which fell foul of the Settlement Agreement in principle no matter what their actual effect turned out to be, then LRSD and Joshua should have sought this Court's intervention long before 2010.  Laches bars any across-the-board challenge divorced from any actual adverse impact on M-to-M transfers and the stipulation magnets.  *Summit Mall*, 355 Ark. at 206-08, 132 S.W.3d at 735–36.

---

**These numbers exclude a virtual school, the School for Integrated Academics and Technologies.  No party quarrels with this exclusion.

**d. Effects.** LRSD and Joshua's motions boil down to what effect the open-enrollment charter schools in Pulaski County have had on desegregation efforts, and in particular on M-to-M transfers and the stipulation magnet schools. The record provides only one answer: very little, if any. No reasonable fact finder could conclude otherwise.

This Court has jurisdiction to consider the possible effects and whether the schools violate the Settlement Agreement and related agreements and Orders. Of course, not everything that affects LRSD, PCSSD, or NLRSD is, or should be, a part of this case. It is settled law, for example, that enjoining a garden-variety teacher's strike is beyond the Court's reach, just as a hypothetical dispute with a water company that threatened to shut down a school district would be. *Knight*, 112 F.3d at 955. As the Court of Appeals also made clear, though, action "pointedly aimed at interfering with desegregation as such (to use another extreme example in order to make a point)[,]" could be addressed by this Court. *Ibid.* LRSD and Joshua's challenge to the charters falls between these two extremes. The motions are rooted in good-faith arguments from the Settlement Agreement, the two stipulations, and various approving Orders. And this dispute is about the

kinds of schools (and their students) in Pulaski County, the hub of the case. Issues that affect every employer, such as labor problems and water bills, are not involved.  As it did in the dispute about the State paying for worker's compensation and loss funding, this Court has jurisdiction to resolve the charter issues. *LRSD*, 83 F.3d at 1015–20.

LRSD and Joshua analyze the effects issue in terms of an alleged material breach. *E.g., Roberts Contracting Co., Inc. v. Valentine–Wooten Road Public Facility Board,* 2009 Ark. App. 437, at 8, 320 S.W.3d 1, 7.  The Court agrees that this is an acceptable analytic method.  It assumes, of course, that the whole of the parties' stipulations and agreements and this Court's orders impose an obligation on the part of all parties, including the State, not to interfere materially with the interdistrict remedy.  But that is a reasonable assumption for purposes of assessing LRSD's and Joshua's argument about the allegedly untoward effects of the open-enrollment charter schools.

"A material breach is a failure to perform an essential term or condition that substantially defeats the purpose of the contract for the other party." *Ibid.; see generally* RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981) *and AMI Civ.* 2427 (2012).  According to LRSD and Joshua, by the 2008-2009 school

-21-

year, the cumulative effect of the open-enrollment charter schools in Pulaski County had diminished, and substantially so, the available pool of students for the stipulation magnets and M-to-M transfers. This competition, LRSD and Joshua contend, is undermining the interdistrict remedy. For several reasons the Court disagrees. Any effect is marginal, not material. No reasonable fact finder could conclude based on the record evidence that the open-enrollment charters have substantially defeated the relevant purposes of the Settlement Agreement, stipulations, and related Orders.

First consider the numbers. They are undisputed. *Document Nos. 4719, at 20–21 & 4734 at 1–3.* From the 2005–2006 school year until the 2010–2011 school year, 324 students transferred from the stipulation magnets to open-enrollment charter schools in Pulaski County. This number covers students from all three districts in Pulaski County—LRSD, PCSSD, and NLRSD. *Document No. 4734, at 2–3.* During the same period, 109 students transferred the other way—from the charters to the stipulation magnets. The net lost by the stipulation magnets through transfer to the charters is 215 students, approximately 36 students a year. According to the Office of Desegregation Monitoring's latest report, across this six-year period, the stipulation magnets

have enrolled an average of 3,741 students a year. *Document No. 4806, at 40* (average of 2005–2006 through 2010–2011 school years). The net loss of students to charter schools is at the margin. The agreed numbers show no substantial defeat of the purposes of the parties' arguments or this Court's Orders about the stipulation magnet schools.

The State and the Charter Intervenors say a further refinement, where the numbers are likewise undisputed, makes the point even plainer. *Document No. 4719, at 20–21 & 4734, at 1–3.* Many of the students who transferred one way or the other had to leave their schools because they graded out: fifth graders at one of the four elementary stipulation magnets had to find a middle school for sixth grade; eighth graders at one of the open-enrollment charters had to find a high school. Backing all these students out of the calculation further diminishes the demonstrated effect of the charter schools: the net loss to the stipulation magnets from transfer is 115 students across six years, an average of about 19 students a year. Given the procedural posture of the issues, the Court discounts this part of the analysis. Even though the progressing students could not have stayed in their current stipulation magnet schools, the Court cannot say, as a matter of law, that none

of them would have attended a stipulation magnet middle school or high school if the charter option had not been available. Still and all, looking back at the total net of lost students from all three Pulaski County districts, LRSD and Joshua have demonstrated only a marginal effect.

Second, consider the stipulation magnet schools. Depositions given by principals from three of them are in the record. Each principal was asked how his or her school was performing. Each testified that his or her school was functioning well. *Document No. 4704-25, at 74–77, LRSD Ex. 100; Document No. 4704–26, at 14, LRSD Ex. 101; Document No. 4704–27, at 61–62, LRSD Ex. 102.* LRSD and Joshua have pointed to no evidence that the system of stipulation magnet schools has been hampered, much less hobbled, by competition from the open-enrollment charters.

It is true that total enrollment at all the stipulation magnets has declined some in the last few years. Enrollment started around 3,800 in 2000–2001, peaked around 3,900 in 2006–2007, and is around 3,400 for 2012–2013. *Document No. 4806, at 40.* But LRSD and Joshua have produced no evidence, beyond the transfer numbers discussed earlier, tending to show that open-enrollment charter schools have caused the decline. "After the fact, therefore

because of the fact," is not sound in logic or law.  Given the undisputed transfer numbers and the undisputed testimony from the principals, LRSD and Joshua have not created a genuine issue of material fact on causation.

There was an early suggestion that the charters were cherry-picking the best students, especially non-black students, thereby impairing the magnets' operation.  The evidence of record does not support this suggestion.  The principals did not so testify.   The transferring students are, by race, approximately 43% black and approximately 57% non-black.  *Document No. 4719, at 20*.  The passing assertion that these schools are, at bottom, merely "white flight" schools cannot overcome this agreed fact.  LRSD and Joshua point to the respective percentages of free-and-reduced-lunch students: LRSD had approximately 71% of these students; the open-enrollment charters have an average of 46%, though the actual number varies widely by school, from 100% on the high side to about 30% on the low side.  All these numbers are undisputed too.  *Document No. 4719, at 19–20*.  It has therefore been proved the LRSD serves more poor students than most of the open-enrollment charter schools.  That fact, however, does not demonstrate that the State has violated the Settlement Agreement or the magnet stipulation.

Third, consider M-to-M transfers.   Here again, the numbers are undisputed. *Document No. 4719, at 21.*   During the relevant six-year period, a total of 20 M-to-M students transferred from LRSD to an open-enrollment charter school.   About half of these 20 students graded out, but again, the Court does not weigh this fact against LRSD and Joshua.   All 20 leaving M-to-M students were non-black.   As the State notes, though, because LRSD may receive only non-black M-to-M students, every student who transferred to a charter school would necessarily be non-black.   The undisputed record shows, in any event, an average of about 3 M-to-M students lost each year to a charter school.   This is *de minimis.*   During the six school years between 2006–2007 and 2011–2012, an average of approximately 2,049 M-to-M transfers occurred each year. *Document No. 4806, at 43.*   LRSD cannot, and does not, argue on these numbers that any material breach has occurred.

Fourth, consider the intradistrict desegregation situation for each of the three Pulaski County districts. LRSD has been completely unitary since 2007; it has been unitary for a decade in every area except determining the effectiveness of programs aimed at improving black students' academic achievement. *LRSD v. PCSSD*, 237 F. Supp. 2d 988 (E.D. Ark. 2002), *aff'd sub.*

*nom., LRSD v. Armstrong*, 359 F.3d 957 (8th Cir. 2004); *LRSD v. PCSSD*, 2007 WL 624054 (E.D. Ark. 2007), *aff'd sub nom., LRSD v. NLRSD*, 561 F.3d 746 (8th Cir. 2009).  NLRSD is completely unitary.  2011 WL 1935332, at *9–22; *LRSD v. Arkansas*, 664 F.3d 738, 745–48 (8th Cir. 2011); *Document No. 4758*.  PCSSD still has work to do in nine areas.  *LRSD v. Arkansas*, 664 F.3d at 749–57.

LRSD and Joshua say that the three districts' intradistrict desegregation successes do not answer whether the State violated the Settlement Agreement and stipulations in authorizing open-enrollment charters in Pulaski County. This is correct.  But the landscape within each district is relevant in evaluating the effect of the State's actions across all three districts and whether any material breach occurred.  Recall the textual root of LRSD and Joshua's argument from the 1989 Settlement Agreement: they say the State has, through the charter schools, not cooperated in the Districts' desegregation efforts.  But two of the three districts have fulfilled all their internal desegregation obligations with some State help.  The undisputed fact that LRSD and NLRSD have been unitary in terms of student assignment for many years is important context for the State's challenged actions about charter schools.

Fifth, and finally, it bears mention that the Charter Schools Act is not silent about desegregation. The Act requires all parties to consider "the potential impact" of a charter application on school districts' efforts "to comply with court orders and statutory obligations to create and maintain a unitary system of desegregated public schools." ARK. CODE ANN. § 6-23-106(a). The State Board of Education must try to measure the likely impact of a proposed charter school on districts' desegregation efforts. ARK. CODE ANN. § 6-23-106(b). The State Board, moreover, may not approve a charter application that "hampers, delays, or in any manner negatively affects the desegregation efforts of a public school district or public school districts in this [state]." ARK. CODE ANN. § 6-23-106(c).

The State's compliance with its statutory obligations is a matter of Arkansas law, which is beyond this Court's reach in the circumstances, and not dispositive on LRSD and Joshua's motions. The State Board's staff has prepared desegregation-impact reports through the years. *Document No. 4713–23, State's Ex. 23.* Some are more thorough than others. Under Arkansas law, the State Board carries the ultimate responsibility for making a careful decision on this issue, application by application. It is enough to note here

that the State has recognized the potential for anti-desegregation impact and obligated itself to remain vigilant against that possibility. This important and continuing state-law obligation is consistent with the State's cooperation obligation under the parties' Settlement Agreement.

To sum up, LRSD and Joshua's motions fail because, after considering the undisputed facts, and considering those that are disputed in LRSD and Joshua's favor, no reasonable fact finder could conclude that the State is in material breach of the parties' 1989 Settlement Agreement as to open-enrollment charter schools in Pulaski County. The proof of any adverse effect beyond the margin on either the stipulation magnet schools or M-to-M transfers has not materialized. The cumulative effect of open-enrollment charter schools in Pulaski County on the stipulation magnet schools and M-to-M transfers has not, as a matter of law, substantially defeated the relevant purposes of the 1989 Settlement Agreement, the magnet stipulation, or the M-to-M stipulation. *Roberts Contracting*, 2009 Ark. App. 437, at 8, 320 S.W.3d at 7.

**4. Disposition.** LRSD and Joshua's motions to enforce and for summary judgment, *Document Nos. 4440 & 4704*, are denied without prejudice on all issues except charter schools and denied with prejudice on that issue. The State and the Charter Intervenors have prevailed on whether the State has violated the 1989 Settlement Agreement in authorizing open-enrollment charter schools in Pulaski County. In the Court's judgment, as a matter of law, the State did not do so. The Court expresses its thanks to the Charter Intervenors, and their counsel, for helpful participation. The charter issues having been resolved, the Intervenors' complaint is dismissed, and the Charters are discharged as parties. If any appeal is taken on the charter-school issues, however, the Charter Intervenors may participate.

So Ordered.

D.P. Marshall Jr.
United States District Judge

17 January 2012

-30-