**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**LITTLE ROCK SCHOOL DISTRICT**                                        **PLAINTIFF**

**V.**                                      **NO. 4:82CV00866DPM**

**PULASKI COUNTY SPECIAL SCHOOL**
**DISTRICT NO. 1, ET AL.**                                      **DEFENDANTS**

**MRS. LORENE JOSHUA, ET AL.**                              **INTERVENORS**

**KATHERINE KNIGHT, ET AL.**                                **INTERVENORS**

**BRIEF OF PCSSD REGARDING STAFFING PROCEDURES**

Comes now the Pulaski County Special School District ("PCSSD"), by Whitney F. Moore, one

of its attorneys, and for its Brief Regarding PCSSD Staffing Procedures, states:

**Introduction**

The Court requested briefs to assist it as it provides clarification to PCSSD, JNPSD, and

Joshua on three issues.  The first is whether the Superintendent of PCSSD is "the captain of the

ship" for the purposes of issues arising from this litigation until JNPSD becomes a fully

independent entity.  The second is whether the terms of the various agreements and Court orders

in this case control personnel matters, including but not limited to Plan 2000.  That is, are the

court-ordered and/or court-sanctioned affirmative action provisions of the plans and agreements

"valid under Title VII and the Equal Protection Clause." *Humphries v. Pulaski County Special*

*School District*, 580 F.3d 688, 694 (8th Cir. 2009).  The third is how the hiring process operates

in PCSSD and what the results of that process have been in recent years.

I.    **All Parties Have Agreed that the PCSSD Superintendent Has Both the Ultimate Responsibility for Attaining Unitary Status and the Final Say in Key Staff Appointments**

The terms and consequences of the separation of JNPSD from PCSSD are governed by a number of documents.  The most important for current purposes is the Post-Creation Agreement executed by PCSSD and JNPSD.  *See* Document 5080-1 ("Post-Creation Agreement").  That Agreement was approved by this Court on December 22, 2014, *see* Document 5088, Order, at 3-4, and by the State Board of Education on February 20, 2015.

The Agreement states quite clearly that JNPSD "shall continue to be operated under the administration of PCSSD during a transition period not to exceed two consecutive years."  Post-Creation Agreement, ¶ 1.  That period includes the 2015-16 school year.  *Id.*  During that time the "superintendent of PCSSD shall continue to be the chief executive of the single unit reporting to the Commissioner as the PCSSD school board equivalent."  *Id.* ¶ 2.  The notionally two districts are then, for certain key purposes, actually one:  "The essence of the administration contemplated by this agreement is that the new district and PCSSD shall operate as a single unit under Arkansas law in the same manner as before the creation of JNPSD."  *Id.* ¶ 1.  Thus, as a general matter, the PCSSD Superintendent is the chief executive and operating officer of the JNPSD through the end of the 2015-16 school year.

The commitment that "the superintendent of PCSSD shall . . . be the chief executive of the single unit," *id*. ¶ 2, is subject to one possible exception, the apparent power of the Commissioner

> with the advice and consultation of the initial JNPSD board of directors [to] select persons to be employed as the superintendent-designate and other personnel as needed to assist the superintendent-designate by performing tasks in areas of responsibility directed by the superintendent-designate, and identify those persons to the PCSSD Superintendent.

2

*Id*. ¶ 7.   Even here, however, this authority is subject to a key qualification: "the PCSSD superintendent [shall] in all matters related to the desegregation litigation be deemed free to act for and on behalf of PCSSD without consultation with the Commissioner specifically, and the State of Arkansas generally."   *Id.* ¶ 4.   See also id. ¶ 5 ("Dr. Jerry Guess, in his capacity as PCSSD superintendent, continues to act in this litigation for and on behalf of PCSSD with no obligation to consult with, or report to, the Commissioner in regard to desegregation issues.").   That power was vested in Dr. Guess at the suggestion of the Court and "[a]ll parties to the desegregation litigation agreed without objection."   *Id.* ¶ 4.

The question is then whether an appointment like the proposed hire of an Assistant Superintendent for Human Resources and Support Services is an example of "personnel . . . needed to assist the superintendent-designate."[1]   Is such an appointment within the purview of the Commissioner?   Or is it "related to the desegregation litigation" and, accordingly, within the sole province of Dr. Guess?

A second document provides the answer.   *See* Document 5145-1, Agreement between PCSSD and JNPSD Concerning the Detachment of JNPSD from PCSSD (July 29, 2015) ("Detachment Agreement").   It makes it clear that the Commissioner's appointment authority is limited, extending only to "a superintendent-designate for JNPSD, a chief of staff, and legal counsel."   Detachment Agreement, ¶ 3.   The Post-Creation Agreement in turn makes it clear that

---

[1]   This position is used for illustrative purposes and reflects two realities.   The first is the nature of the position, which is an important and highly visible administrative slot in the first iteration of the JNPSD hierarchy.   The second is the reality that the first attempt to fill that job has proven controversial.   That dispute has been rendered moot by Bobby E. Lester's decision to "decline the generous invitation" to accept the offer of employment and "continue my state level work on behalf of Arkansas schools and students."   Letter from Bobby E. Lester to Bobby G. Lester (June 19, 2015), in Document 5130-1, at 10.

decisions about the appointment of other administrative staff reside with Dr. Guess.  It states that "JNPSD shall be considered non-unitary in all those subject matter areas in which PCSSD has not been declared unitary."  Post-Creation Agreement, ¶ 6.  In those areas, it is "Dr. Guess, or his successor, [who] shall be obligated to continue maximum effort to the end of attaining full unitary status for *both* PCSSD and JNPSD prior to the end of the transition period."  *Id.* (emphasis added).

Both the District Court and the Court of Appeals for the Eighth Circuit agree that PCSSD and, by necessary extension, JNPSD have not attained unitary status in the area of staff.  *See Little Rock School District v. State of Arkansas*, 664 F.3d 738, 755 (8th Cir. 2011) ("we affirm the denial of unitary status for PCSSD in the area of staff."); *Little Rock School District v. Pulaski County Special School District*, 2011 WL 1935332, at * 41-46 (E.D. Ark., May 19, 2011) (discussing and denying unitary status in the areas of "staff" and "staff recruitment").

The August 14, 2014 letter regarding possible PCSSD unitary status as to staffing does not change this analysis.  *See* Document 5058-1, Letter from Whitney F. Moore to John W. Walker (Aug. 14, 2014) ("Moore Letter").  That letter states that at that point in time "PCSSD believe[d] it [wa]s in compliance with Section L of Plan 200 regarding staffing."  *Id.* at 1.  But the actual attainment of unitary status in any area is "subject to consultation with Joshua and ultimate approval by the Court."  Post-Creation Agreement, ¶ 9.  Joshua did not accede to PCSSD's declaration, stating they preferred to wait until staffing decisions about the Jacksonville district were made as the detachment process unfolded.  Document 5065, Joshua Intervenors' Report to the Court Re PCSSD's Request for Referral of Staffing to Magistrate, at 1.  Pursuant to Joshua's request to delay consideration of unitary status regarding staffing, the Court has not acted on the Moore Letter. Document 5058-1 dealt with unitary status within the

4

existing PCSSD, pre-detachment.  It did not make any claims or offer any analysis of staffing matters in the future JNPSD.

Staffing decisions that impact unitary status properly belong to Dr. Guess: the individual "[a]ll parties to the desegregation litigation agreed without objection" should "be deemed free to act for and on behalf of" the districts in areas where they have not attained unitary status.  Post-Creation Agreement ¶ 4.[2]

The State Commissioner of Education agrees.  In his June 19, 2015 letter to Dr. Guess regarding the proposed Bobby E. Lester hire, Commissioner Key specifically acknowledged that "[o]ne of your primary tasks is to work to achieve full unitary status for the Pulaski County Special School District."  Document 5130-1, at 9.  He stressed that "the long-maintained arrangement of the Arkansas Department of Education and my office . . . allows you to manage and comply with the desegregation-related obligations of the PCSSD."  *Id.*  Indeed, his deference to Dr. Guess in such matters is so pronounced that he made it clear that it extended even to the appointment of the superintendent-designate, Tony Wood.  *Id.*

Dr. Guess's authority is not absolute.  Starting in 2015-16, the Post-Creation Agreement states that "the superintendent-designate shall initially make . . . decisions [involving employees assigned to schools physically located in JNPSD] in consultation with the PCSSD superintendent."  Post-Creation Agreement, ¶ 9.  Those decisions are "subject to ultimate review

---

[2]  That authority continues through the full transition period, i.e., through the end of the "2015-16 school year."  Post-Creation Agreement, ¶ 1.  It will terminate "on the first day PCSSD's administration ends and JNPSD becomes fully operational."  *Id.* ¶ 10.  The transition to full, independent status will not, however, end JNPSD's obligations under Plan 2000: "As contemplated by the 2014 settlement agreement, JNPSD will assume all of PCSSD's desegregation obligations in the establishment and operation of the new district."  Document 5088, Order, ¶ 1.  Those obligations include the need to achieve unitary status in staffing.

by the Commissioner." *Id.* But even here, that power excludes "all such personnel decisions . . . directly impacting unitary status and other desegregation issues," which remain "within the purview and discretion of PCSSD and its superintendent, subject to consultation with Joshua and ultimate approval by the Court." *Id.*

Two overarching concerns should inform these inquiries. The first is the history of this litigation. The second is the special need to "keep faith with this Court's Orders." Document 5088, Order, ¶ 1. Taken together, these counsel that particular care be taken when personnel decisions are made that speak to "openness and inclusion." *Little Rock School District v. Pulaski County Special School District No. 1*, 584 F. Supp. 328, 347 (E.D. Ark. 1984). The importance of these decisions, and the degree to which they fall within the exclusive authority of Dr. Guess, will vary. To the extent they impact unitary status, however, it is clear that they belong to Dr. Guess.

Each of these decisions, and in particular those that set up the analytic baseline for JNPSD, should take into account the paramount need to promote both excellence and trust in the process. One of the goals of affirmative action is to insure that the corrosive influence of "connections" does not lead to "affirmative action for the privileged." Anthony Lewis, *Abroad at Home; Handcuffs on Learning*, N.Y. TIMES, Mar. 22, 1996, at A27. Dr. Guess's oversight and occasional control in such matters, given his long experience and paramount responsibility for attaining unitary status, is an essential means to that important end.

## II.    The "Affirmative Action" Provisions of Plan 2000 Are Remedial and Narrowly Tailored to Achieving Unitary Status in Staffing

The second question is whether the "affirmative action" policies set forth in Section L of Plan 2000 are valid in the face of any possible claims that their application constitutes invidious

discrimination in violation of either Title VII or the Equal Protection Clause.

As a threshold matter, it is important to recognize that "no one questions that the obligation to disestablish a school system segregated by law can include race-conscious remedies – whether or not a court had issued an order to that effect." *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 703, 737 (2007). That is, to the extent that Section L of Plan 2000 requires race-conscious hiring, it falls squarely within a long and unchanged line of Supreme Court decisions recognizing that "[n]otwithstanding" the general ban on "treat[ing] whole classes of persons differently based . . . on race" the "allocation of benefits and burdens through individual racial classification [has been] found sometimes permissible in the context of remedies for *de jure* wrong." *Id.* at 795-96 (Kennedy, J., concurring). *See also id.* at 796 (Kennedy, J., concurring) ("Where there has been *de jure* segregation, there is a cognizable legal wrong, and the courts and legislatures have broad power to remedy it."); *id.* at 823 (Brewer, J., dissenting) (noting that a "longstanding and unbroken line of legal authority tells us that the Equal Protection Clause permits local school boards to use race-conscious criteria to achieve positive race-related goals").

There is no possible dispute. This litigation is about massive, invidious *de jure* discrimination and its consequences, which persist to this day. The focus for current purposes is on a series of "court orders requiring the District to desegregate and implement procedures that would make the District attractive to minority students, teachers, and administrators." *Humphries*, 580 F.3d at 691. The goal is to fashion "a complete cure for all interdistrict violations" and to "prescribe[] 'a full and sufficient correction of wrongs done in the past.'" *Little Rock School District v. Pulaski County Special School District No. 1*, 912 F.3d 1371, 1377 (8th Cir. 1990) (quoting *Little Rock School District v. Pulaski County Special School District No.*

7

*1*, 805 F.2d 815, 816 (8th Cir. 1986)).  Those violations expressly included the "perpetuat[ion] of segregation through . . . the . . . failure to meet staff hiring goals."  *Little Rock School District v. Pulaski County Special School District No. 1*, 778 F.2d 404, 427 (8th Cir. 1985).

The sole question is then whether any given aspect of Section L of Plan 2000 is valid within the parameters outlined by the Court of Appeals when it held that "a challenged adverse employment action *may* constitute direct evidence of unlawful discrimination."  *Humphries*, 580 F.3d at 694 (emphasis added).  The majority there believed that section L(1) ran only to process, not to the actual hiring decision.  Plan 2000 does admittedly speak of the need "to attain a racially diverse applicant pool for administrative positions" and does not expressly "set hiring goals."  *Id.* at 696.  But, at the risk of repetition, it is important to keep in mind a reality the *Humphries* panel itself identified: that the Court of Appeals had "affirmed the district court's finding that the District acted to perpetuate segregation by, among other things, failing to meet staff hiring goals." *Id.* at 691 (citing *LRSD*, 778 F.2d at 427-28).

In his original findings of fact Judge Henry Woods stressed that the "absence of role models in teaching *and* administration" and the "total absences of blacks at levels of decision making are all factors which discourage minorities from moving to Pulaski County Special School District because there is no indication that they will be treated fairly or with openness and inclusiveness."  *LRSD*, 584 F. Supp. at 347 (emphasis added).  He noted that "[t]he Pulaski County Special School District has never had a black in a top level administrative position" and that "[b]lacks are underrepresented in the administrative offices of the Pulaski County Special School District."  *Id.* at 348.

These and similar observations over the thirty-plus years this case has run were captured eloquently by Judge Melloy when he stressed "the historically pervasive discrimination in the

District has been subject to decades of litigation, and desegregation of the administrative staff has long been considered integral to the broader desegregation goals." *Humphries*, 580 F.3d at 698 (Melloy, J., concurring). The ongoing nature of the problem is, in turn, illustrated by findings issued by this Court and the Office of Desegregation Monitoring. *See, e.g.*, Document 5020, Update on the Status of the Pulaski County Special School District's Implementation of its Desegregation Plan (June 3, 2014), at 26 (noting the 2011 Court finding that "[the district had failed to recruit and allocate black teachers and administrators in accordance with its plan" and that "[s]ince 2010-2011, the number of black administrators in the central office has steadily declined").

Section L of Plan 2000 bears all the hallmarks of "narrow tailoring" as described by the Court of Appeals. It was crafted in the light of judicial findings of fact that "identified a 'manifest imbalance' in the work force." *Humphries*, 580 F.3d at 695 (quoting *Maitland v. University of Minnesota*, 155 F.3d 1013, 1016 (8th Cir. 1998)). It was "implemented 'in adherence to a court order, whether entered by consent decree or after litigation.'" *Id.* (quoting *Donaghy v. City of Omaha*, 933 F.2d 1448, 1459 (8th Cir. 1991)). Given its clear remedial purpose, it does "not '*unnecessarily* trammel' the rights of non-minorities." *Id.* at 695-96 (quoting *Maitland*, 155 F.3d at 1016) (emphasis added). And, especially as applied to JNPSD – where such appointments are by their very nature ones that create the initial workforce – it is "'intended to attain a balance, not to maintain one.'" *Id.* at 696 (quoting *Maitland*, 155 F.3d at 1016).

Section L(1)'s focus on process cannot be divorced from the wider purposes it was crafted to serve. "The express terms of Plan 2000 provide the starting point for this analysis, but they do not provide the ending point." *Id.* (Melloy, J., concurring). It is, for example, certainly

necessary to have a fair and open procedure that produces the best possible pool of applicants and, as part of that process, "develop a racially diverse pool of applicants."  Plan 2000, § L(1). Process is undoubtedly important, especially when it can provide a means to combat any possible perception that "the good old boy ethic is perfectly acceptable and even desirable."  *Gray v. University of Arkansas at Fayetteville*, 883 F.2d 1394, 1407 (8th Cir. 1989) (McMillian, J., concurring in part and dissenting in part).  The federal courts, as Judge McMillian emphasized, "should not play a part in condoning or perpetuating such attitudes."  *Id.*  *See generally* Stephen Reinhardt, *Remarks at UCLA Law School Forum on Affirmative Action: "Where Have You Gone, Jackie Robinson?"*, 43 UCLA L. REV. 1731, 1736 (1996) (describing affirmative action as a response to historic hiring practices that "frequently involved family or social standing").

In a context where the violation that led to the remedy included the exclusion of individuals from positions of authority on the basis of their race, a full and appropriate remedy cannot and should not be limited to simple process.  It must take into account actual results, a reality that informed the requirement that "PCSSD shall submit statistical reports" documenting "[t]he racial make-up, by category, of the various categories of administrators, faculty, support staff, and other workers employed by PCSSD."  Plan 2000, § N(3)(f).  The goal is two-fold: to identify and secure the best qualified candidates but, where an individual is clearly qualified, to occasionally opt for race-conscious hiring in the name of "openness and inclusiveness."  *LRSD*, 587 F. Supp. at 487.

It is important to remember that affirmative action policies serve both symbolic and instrumental purposes.  The messages such policies send are especially important.  As Justice O'Connor has stressed, "[i]n order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified

10

individuals of every race and ethnicity.  All members of our heterogeneous society must have confidence in the openness and integrity of the educational institutions that provide this training." *Grutter v. Bollinger*, 539 U.S. 306, 332 (2003).  All staffing decisions are important in an environment where the long-term goal is to achieve unitary status.  Initial appointments to key leadership positions in JNPSD, in turn, carry great symbolic weight.

On the instrumental side, affirmative action policies provide a necessary remedial tool.  Such policies do not "insulate individual[s] from comparison with all other candidates for the available [position]." *Regents of the University of California v. Bakke*, 438 U.S. 265, 317 (1978).  They do "permit[] consideration of race as a 'plus' factor in any given case while still ensuring that each candidate 'compete[s] with all other qualified applicants.'" *Grutter*, 539 U.S. at 335 (quoting *Johnson v. Transportation Agency, Santa Clara County*, 480 U.S. 616, 638 (1987)).

Section L(1) of Plan 2000 is squarely within these parameters.  Its goal is a fair and open process within which individuals are assessed on the basis of their qualifications.  Its implementation may occasionally lead to a race-conscious decision.  But that reality is dictated by the history of intentional, invidious discrimination that created significant racial imbalances in the administrative cadre throughout the Pulaski County schools.  Additional protections for "the rights of nonminorities," *Humphries*, 580 F.3d at 695-96, are in turn provided by a system within which the default rule is to "offer the position to the applicant receiving the highest score from the interview committee" and, in the wake of "close votes," to use "additional interviews for the narrowly separated applicants."  Document 5130-1, at 8, Letter from Jerry Guess to Johnny Key

(June 19, 2015).[3]

Special care should be taken when the focus is an administrative appointment in JNPSD.

As Justice O'Connor has admonished:

> Context matters when reviewing race-based governmental action under the Equal
> Protection Clause. . . . [S]trict scrutiny must take "'relevant differences' into
> account." . . . Indeed . . . that is its "fundamental purpose." Not every decision
> influenced by race is equally objectionable, and strict scrutiny is designed to
> provide a framework for carefully examining the importance and the sincerity of
> the reasons advanced by the government decisionmaker for the use of race in that
> particular context.

> *Grutter*, 539 U.S. at 327 (quoting *Adarand Constructors v. Pena*, 515 U.S. 200, 228

(1995)).

This is not, of course, a case in which the rigors of traditional strict scrutiny apply. The

allusion to "narrow tailoring" in *Humphries*, 580 F.3d at 695, is not offered as an element of

strict scrutiny, but rather as a reminder that a reviewing court must pay careful attention to

"whether 'a purported affirmative action plan is bona fide,' that is, whether it 'is indeed

remedial.'" *Maitland*, 155 F.3d 1016 (quoting *Donaghy*, 933 F.2d at 1458). If it is, "compliance

with a valid remedial consent decree is a complete defense to claims for individualized relief."

*Humphries*, 580 F.3d at 697 (Melloy, J., concurring) (citing *Martinez v. City of St. Louis*, 539

F.3d 857, 861 (8th Cir. 2008).

At this particular point in time, staff appointments in PCSSD occur in a vastly different

context from those in JNPSD. That will be especially true for leadership positions. So, for

example, the dispute that played out in *Humphries* involved an individual who had applied for

numerous positions over a long period of time, positions that would have been held in a fully

---

[3] The details and results of the hiring process are described in Part III, *infra*.

staffed district with over 2,300 employees.  The desegregation and integration concerns raised in such a situation cannot be discounted given the need for PCSSD to purge itself of the present effects of past invidious discrimination.

JNPSD presents an entirely different situation.  The contours and authority of the district and its superintendent have been shaped by judicial recognition of the "'serious questions with regard to *potential* negative impacts on the ability of one or more of the school districts in Pulaski County to comply with their court-imposed obligations in the Pulaski County desegregation litigation.'"  *Little Rock School District v. North Little Rock School District*, 378 F.3d 774, 779 (8th Cir. 2004) (quoting an Arkansas Attorney General opinion on a proposed detachment election) (emphasis in original)).  The initial attempt to detach via an election was enjoined by this Court, which stressed that "the vote authorizing the election violated the state's obligation under the settlement agreement 'to preserve the independence and sovereignty of [PCSSD] until such time as it had fulfilled all of its desegregation obligations and achieved unitary status.'"  *Id*. (quoting the District Court order).

These concerns reflect the pervasive reality that this litigation involved interdistrict violations that required interdistrict remedies.  The various agreements governing the creation of JNPSD are structured in the light of this and the limitations imposed on JNPSD's "sovereignty" are the direct consequences of the need to maintain, during this transition period, "PCSSD and the new district . . . as a single unit for the purposes of [this] case" in order to achieve "desegregation, and unitary status."  Post-Creation Agreement ¶ 5.  The decision to approve the detachment stressed that the "framework [structuring it] is consistent with PCSSD's desegregation obligations under this Court's Orders and will insure compliance with those Orders."  Document 5008, Order, ¶ 1.  It also made it absolutely clear that "JNPSD will assume

13

*all* of PCSSD's desegregation obligations in the establishment and operation of the new district." *Id.* (emphasis added).

The District and Board may be "brand new."  *See* Transcript of Status Conference Before the Honorable D.P Marshall, Jr. (July 20, 2015), at 60-64 (discussion of the "brand new" JNPSD).  JNPSD is concededly "engaged in the process of building a new history."  *Id*. at 63-64. But the history that led to its creation matters.  As Judge Woods observed in a prior iteration of this case, "'[t]hose who cannot remember the past are condemned to repeat it.'"  *Little Rock School District v. Pulaski County Special School District No. 1*, 724 F. Supp. 1544, 1546 (E.D. Ark. 1989) (quoting Santayana, *The Life of Reason*, vol. I, *Reason in Common Sense*).

That history includes the reality that one of the major reasons for this litigation was the fact that JNPSD's predecessor districts "never had a black in a top level administrative position" and that "[b]lacks [we]re underrepresented in the administrative offices of the Pulaski County Special School District."  *LRSD*, 584 F. Supp. at 348.  The appointments of the initial superintendent, initial assistant superintendents, and others similarly situated in the JNPSD administrative hierarchy accordingly send powerful signals about whether the new district will project "openness and inclusiveness."  *Id.*  Under such circumstances, the role created for the PCSSD Superintendent in the appointment process is both necessary and appropriate.

The initial attempt in 2004 to create a separate school district was enjoined in recognition of the belief that it was "in direct violation of . . . Section II(J) of the 1989 settlement agreement, which guarantees the sovereignty and independence of [PCSSD] until at least such time as it has fully discharged all of its desegregation obligations and obtained unitary status."  Document 3795, Transcript of Motions Hearing Before the Honorable William R. Wilson (August 18, 2003), at 53-54 (quoting Attorney General Opinion).  Eleven years later the situation has

14

changed.  PCSSD believes it is poised on the brink of achieving unitary status.  Document 4991,
Transcript of Fairness Hearing Before the Honorable D. P. Marshall, Jr., at 75 ("I believe we can
arrive at additional unitary areas perhaps rather quickly, within a year.  I think it may take the
full three years of the continued funding to finally achieve unitary in all of those areas.")
(testimony of Jerry Guess).

During that time, the strictures of Plan 2000 apply to both PCSSD and JNPSD.  *See id.* at
83 (under the "agreements that have been submitted" JNPSD "will have the same obligations
[under Plan 2000] as the remainder of the district has").  Those obligations are not confined to
the transition period governed by the Post-Creation Agreement.  Rather, they extend through
whatever point unitary status is achieved by *both* PCSSD and JNPSD.  That reality informed this
Court's determination that the recent settlement agreement was "adequate, fair, and reasonable."
*Id.* at 132.  That agreement did not end this litigation.  Rather, it "pivot[ed] everyone's attention
to [all of] Pulaski County . . . where remedying the effects of past discrimination" so that
"staffing, facilities, all of those hard issues . . . can be our focus and our concentration."  *Id.* at
140.  The affirmative action elements of Plan 2000 are, accordingly, valid remedial limits on
PCSSD and JNPSD that must be respected and enforced.

III.    **The Staff Hiring Process in PCSSD Is Designed to and Has for the Past Five Years
        Been Open, Fair, and Achieved Results Consistent with the Goals of this Litigation**

The final question is how the hiring process for staff operates in PCSSD and what the
results of that process have been in recent years.  Plan 2000 specifies that staff hiring shall be
designed "to develop a racially diverse pool of applicants."  Plan 2000, § L(1).  The goal is as
previously described:  to create a fair and open affirmative action process that provides a
narrowly tailored remedy given "historically pervasive discrimination in the District" and the

need to achieve "desegregation of the administrative staff . . . long . . . considered integral to the broader desegregation goals." *Humphries*, 580 F.3d at 698 (Melloy, J., concurring).

The actual process employed is described in considerable detail in the Affidavit of Shawn Burgess (Burgess Affidavit), attached hereto as Exhibit "1." Burgess is the Director of Human Resources for PCSSD. As she indicates, an open, advertised search is initiated for every position with the goal of developing a "pool [that] contains qualified applicants and racially diverse candidates." Burgess Affidavit, ¶ 11. A biracial committee then interviews candidates and scores each one on the basis of characteristics that reflect both the position and the goals of this litigation. *Id*. ¶ 15. A recommendation is then made to the district human resource department, "which, for at least the past five years, has been [to hire] the highest scoring candidate that remains interested in the position and has acceptable references." *Id.* ¶ 17.

The process does contemplate that the recommendation to hire the top candidate might be rejected. That reality is reflected in both the Burgess Affidavit, *id*. ¶ 18, and in the August 14, 2014 letter regarding possible unitary status in staffing for PCSSD. *See* Moore Letter, Document 5058-1 at 2. That reality does not, however, carry the weight suggested by counsel for JNPSD. *See* Document 5130-1 at 18-19, Letter from Scott P. Richardson to Johnny Key (July 2, 2015). As counsel for PCSSD explained in response, "[t]he necessity for the CEO to deny the committee's recommendation would only come into play if the committee ranked a non-black applicant higher than an equally qualified black applicant, not the other way around." *Id*. at 20-21, Letter from Allen P. Roberts to Johnny Key (July 6, 2015).

That is, this possible exception to normal procedure arises only when there are quality-related reasons or, in particular, when a proposed appointment poses a threat to the attainment of unitary status. That reality is documented by Burgess as a matter of both policy and result. As a

16

policy matter, she states that "[t]his might occur in cases where, after the fact, the pool was deemed too small, the top candidate's qualifications were deemed lacking, or the CEO or Assistant Superintendent believe hiring the recommended candidate would not further PCSSD's unitary status efforts." Burgess Affidavit, ¶ 18.

The actual results, in turn, show two things. First, "[t]here were zero occasions where a top scoring applicant with good references [who] remained interested in an available for the position . . . was not recommended by the committee." *Id.* ¶ 25(e). Second, "[f]or the eight times the top scoring applicant was not hired, the reasons were either because a transfer of another district employee bumped the applicant (1), the top scoring applicant turned down the position (3), the top scoring applicant chose to take another position with PCSSD (2), the top scoring applicant's contract was rescinded due to references (1), or the position has not yet been filled (1)." *Id.* ¶ 25(d).[4]

## Conclusion

To the extent that the questions currently before the Court involve the authority of the PCSSD Superintendent and the validity of Plan 2000 the answers are quite clear. Dr. Guess has the final say in matters bearing on unitary status. That is an issue of considerable importance for both PCSSD and JNPSD, neither of which are fully unitary, a situation both must cure. Sections L and N of Plan 2000 in turn comprise a valid affirmative action measure that is appropriately intended to and has in fact created a fair process that provides a means for redressing the present effects of past invidious discrimination.

---

[4] The dates and details for each position may be found in the position audit prepared by Burgess. *See* Exhibit 1, Affidavit of Shawn Burgess, and Exhibit "C" to her Affidavit, 2011-2015 Hiring Spreadsheet.

Respectfully submitted,

M. Samuel Jones III (76060)
MITCHELL, WILLIAMS, SELIG,
GATES & WOODYARD, P.L.L.C.
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Telephone: (501) 688-8800
Facsimile: (501) 688-8807
E-mail: sjones@mwlaw.com

Allen P. Roberts (64036)
ALLEN P. ROBERTS, P.A.
325 Jefferson St., S.W. P.O. Box 280
Camden, Arkansas 71711-0280
Telephone: (870) 836-5310
Facsimile: (870) 836-9662
Email: allen@aprobertslaw.com

and

Whitney F. Moore (2009193)
FUQUA CAMPBELL, P.A.
Riviera Tower
3700 Cantrell Road, Suite 205
Little Rock, Arkansas 72202
Telephone: (501) 374-0200
Facsimile: (501) 975-7153
Email: wmoore@fc-lawyers.com

By:   **/s/ Whitney F. Moore**
      Whitney F. Moore

      Attorneys for Pulaski County Special School
      District

## <u>CERTIFICATE OF SERVICE</u>

I, Whitney F. Moore, do hereby certify that on August 7, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to:

All counsel of record

**/s/ Whitney F. Moore**
Whitney F. Moore

19