# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# WESTERN DIVISION

LITTLE ROCK SCHOOL DISTRICT, *et al.*　　　PLAINTIFFS

No. 4:82-cv-866-DPM

PULASKI COUNTY SPECIAL SCHOOL
DISTRICT, JACKSONVILLE/NORTH
PULASKI SCOOL DISTRICT, *et al.*　　　DEFENDANTS

LORENE JOSHUA, TIFFANY ELLIS, *et al.*　　　INTERVENORS

## ORDER

**Summary**. The Jacksonville/North Pulaski School District asks the Court to declare its facilities and staffing unitary. JNPSD requests, in the alternative, an order holding that the District will be unitary if it implements its 2018 master facilities plan with some modifications. The Ellis intervenors oppose these requests. They say they're premature and, in any event, lack merit. Federal Rule of Civil Procedure 60(b)(5) governs JNPSD's motion. JNPSD descends, of course, from the Pulaski County Special School District. When Arkansas, the Districts, and the intervenors settled a large part of this case in 2013, their agreement contemplated JNPSD's creation. In due course, it came into being. The new District inherited all of PCSSD's remaining obligations under Plan 2000, the "particularization of federal law applicable to these parties." *Knight v. Pulaski County*

*Special School District*, 112 F.3d 953, 955 (8th Cir. 1997). The current question is whether JNPSD has, to the extent practicable, complied in good faith with its desegregation obligations on facilities and on staff. *Freeman v. Pitts*, 503 U.S. 467, 492 (1992). Plan 2000's provisions on these two issues are in the margin. The Court agrees with the intervenors on a threshold point: JNPSD has the burden of proof. The District is right, though, to emphasize the special circumstances presented: JNPSD inherited Plan 2000's obligations; it is likewise entitled to lean on PCSSD's compliance with those obligations insofar as they concern the new District.

The Court has benefited from the testimony and exhibits received at the five-day trial in February. Nudged—one might truthfully say, pushed—by the Court, the parties covered much ground. The Court has also drawn freely on what it has learned in presiding over the detachment-related proceedings since 2013. Whether JNPSD has complied in good faith with these two parts of Plan 2000 turns, in large measure, on the credibility of the witnesses. The Court has made those calls. All material things considered, the Court concludes that, with the exception of incentives for certain teachers, JNPSD is unitary in staffing; it is not unitary in facilities; but the District will be *if* it complies with the current master plan, as modified by this Order. To state a fiscally obvious but nonetheless important point, like districts across Arkansas, JNPSD will require

continued substantial support from the State through partnership funding (or some substantially similar program) to meet its facilities needs.

**Facilities.**\* The foundation of JNPSD's facilities obligations is "a plan so that existing school facilities are clean, safe, attractive[,] and

---

\* **H. School Facilities**

(1) The PCSSD shall prepare, with the help of consultants, as necessary, a plan so that existing school facilities are clean, safe, attractive[,] and equal. The plan shall address alternatives for funding its implementation. The Board of School Directors shall approve a plan not later than 150 days after the court's approval of this Plan. The Joshua Intervenors shall be given a 14 day period to comment on the content of the plan prior to its adoption.

(2) An elementary school, located around 145th Street, and a middle school or junior high school in the Crystal Hill/Maumelle area will be built. The Board will address the development of a plan for new school construction during the term of this Plan if funds are sufficient, including its funding, and report its conclusions not later than 150 days after the court's approval of this Plan. Moreover, the PCSSD shall not close schools which are located in predominantly African-American areas absent reasons of compelling necessity (which does not include the opposition of white patrons to attending such schools).

(3) The PCSSD shall notify the Joshua Intervenors of plans for constructing new schools and for adding capacity to existing schools. The notice shall identify the capacity of the proposed facility, the area of the system to be served, and the projected impact on the racial make-up of the students in each school expected to be affected by the new construction. The Joshua Intervenors shall have a period of 14 days in which to provide input concerning each such proposal.

equal." PLAN 2000 § H(1). JNPSD has a plan, duly adopted by the school's board, and annually updated as required by Arkansas law. The District has been engaged in facilities planning for three years. As this Court has already held, JNPSD has made a strong and ambitious start with the new high school, which is partly built. № 5187. The District's recent decision to build a new middle school, rather than renovate an existing facility, is equally ambitious and prudent. These state of the art facilities will be clean, safe, attractive, and more — they'll be excellent. They'll also serve all JNPSD students equally because they'll be the school home for every JNPSD student in those upper grades. The intervenors have no real quarrel with all this. They're concerned, though, about JNPSD's plans for the elementary schools — in particular, that the District's plan for replacing all the elementary schools will not be completed for some sixteen years.

Before the Court explores that deep issue, two other facilities-related provisions of Plan 2000 can be addressed summarily. Most of § H(2) applies to PCSSD, not JNPSD. The part that does apply — the obligation not to close schools in predominantly African-American areas absent compelling necessity — has been met. There's no evidence that JNPSD has closed such a school. The District has also satisfied its obligation under § H(3) to notify the intervenors about facility-related plans and their likely effects, plus consider any prompt response. The District is unitary in its § H(2) and § H(3) obligations.

Back to the plan for replacing the elementary schools. The combined replacement for the Tolleson and Arnold Drive schools opened in August 2018. There are four others. Dupree and Pinewood are scheduled to be replaced in August 2022. That leaves Taylor and Bayou Meto, both scheduled for replacement in 2034. There are no plans to replace the Adkins pre-K facility. It serves the entire district, so there is no equality dispute. The challenge there, of course, will be maintenance to keep Adkins clean, safe, dry, and as up to date as possible. Here again, there was no real dispute: this is being done.

The intervenors are right. Sixteen years is just too long to make the children attending Taylor, about 70% of whom are black, and Bayou Meto, more than 80% of whom are white, wait for facilities that are equal to other JNPSD elementary schools, especially the new one. The District's 2018 master plan contemplates phase II expansions in 2023-2025 in the new high school and middle school, based on projected enrollment growth. Needing more space will be a good problem to have. But fulfilling JNPSD's Plan 2000 commitment to equal facilities within its District must come first.

To its credit, JNPSD acknowledged and embraced this obligation at the trial. The District pledged to replace Taylor and Bayou Meto as quickly as possible. The District went further: it pledged to prioritize replacing those two elementary schools ahead of any expansions of the new high school or middle school. If JNPSD can't do all this at the

same time, then it will build the new elementary facilities first. That commitment puts Taylor and Bayou Meto on track for replacement in about eight years.

JNPSD's plan is extraordinary. Within approximately a dozen years of its creation, the District will have built a new high school, a new middle school, and four new elementary schools. JNPSD's good faith is demonstrated by the plan itself and the progress already made. It's not just paper. The new elementary school has opened and the new high school will open next fall. Multi-purpose buildings have been added at Taylor and Bayou Meto because they're at the back of the line for complete replacement. Those buildings will be integrated into the replacement facilities. The community hitched up with a 7.6 mill increase in real property taxes. Arkansas is in harness, too, with substantial partnership program funding. Continued partnership funding, or some equivalent state assistance, is essential for JNPSD to meet its desegregation obligations through this solid and reasonable facilities plan. Both horses are necessary to pull this wagon home.

The Court is persuaded by the testimony from Mr. Tony Wood, Dr. Charles Stein, and Dr. Bryan Duffie about the finances involved on facilities in particular and in the District as a whole. Schools are much more than buildings, and it's essential to keep JNPSD healthy, financially and otherwise. Teachers and staff must be paid fair and

competitive salaries. Equipment must be bought and maintained and replaced in due course. Facilities must be taken care of. Debt must be repaid. The Court is convinced that JNPSD's 2018 master facilities plan, as modified, keeps the District on path to do all these things, while also providing clean, safe, adequate, and — soon — equal facilities to all its students.

The Court therefore approves JNPSD's 2018 master plan with these modifications:

- The replacement elementary schools will be completed as quickly as possible;

- JNPSD will apply for state funding through the partnership program, or the then-existing equivalent program, no later than year one of the 2023–2025 project funding cycle for support of the Taylor elementary and Bayou Meto elementary replacement projects;

- Taylor and Bayou Meto will be replaced before any phase-II expansion projects at the high school or the middle school, unless the replacements can be done at the same time as one or both of the expansions without hindering completion of the new elementary schools; and

- All new elementary facilities will be equal to the new elementary school that opened in August 2018.

By July 1st each year starting in 2019, JNPSD must file a facilities report to the Court. For good cause, and in light of JNPSD's substantial partial compliance with its Plan 2000 § H facilities

obligations, the Court releases the District from those obligations except to the extent provided in this Order. FED. R. CIV. P. 60(b)(5); *see also Jenkins v. State of Missouri*, 122 F.3d 588, 599–600 (8th Cir. 1997). If JNPSD implements and completes its 2018 master facilities plan, as modified, it will be unitary in facilities in approximately 2026. The Court looks forward to that day.

**Staff.** ** Plan 2000's staffing obligations come in four parts: recruiting racially diverse applicants for administrator vacancies;

---

** L. Staff

(1) The PCSSD shall recruit applicants for each available administrative position, by internal and external means, in a manner designed to communicate, broadly, its availability and to develop a racially diverse pool of applicants. The Assistant Superintendent for Desegregation shall, with the cooperation of the Assistant Superintendent for Personnel, be informed of the make-up of each such applicant pool and they shall have the authority to direct that additional recruitment take place prior to the offering of the position to a particular applicant.

(2) The PCSSD shall engage in recruitment so that new teachers are selected from a racially diverse pool of applicants. The Assistant Superintendent for Desegregation shall monitor the recruitment process so that recruitment is extensive and sustained, and the hiring process so that no policy, practice, or custom has the purpose or the effect of imposing an upward limit on the proportion of black teachers.

recruiting racially diverse applicants for teacher vacancies; maintaining programs and providing incentives for early childhood, primary grade, and secondary core teachers, plus assigning them where they're most needed; and avoiding racially identifiable schools. JNPSD has substantially complied in good faith with all its obligations in three of these four areas and in most of the other area. The Court was impressed with the District's firm intentions, across the board, to eliminate, insofar as practicable, any vestige of segregation in its people. The law doesn't require perfection, but rather a continual striving toward a district where there are equal opportunities for teachers and staff of all races. JNPSD, the Court is convinced, is almost there in staffing.

First, some general points. JNPSD is right about the first round of hiring. PCSSD drove the process for the 2015–2016 year, when the new District stood up. *JNPSD Exhibit 9.* The intervenors acknowledged in August 2015 that PCSSD, which still included

---

(3) The PCSSD shall continue to implement programs, policies and/or procedures which result in an increase in the number of African-American early childhood teachers, primary grade teachers, and secondary core teachers, including offering incentives for African-American teachers to obtain certification in these areas, and to assign those teachers to the PCSSD schools where the greatest disparity exists.
(4) The PCSSD will allocate teachers and other professional staff in a manner which avoids the racial identification of schools.

-9-

JNPSD at that point, had a racially integrated workforce as a result of Plan 2000's implementation. № 5156 at 9. Though not determinative, of course, this acknowledgement provides important context. In 2017, PCSSD and the intervenors stipulated that the post-detachment PCSSD was unitary in staffing, and this Court so held. № 5306 & № 5310.

Intervenors push back on JNPSD's first round of hiring with a general point and instances. Their general point is results: JNPSD ended up with a smaller overall percentage of non-white teachers than PCSSD had at the same schools pre-detachment. *Intervenors Exhibits № 3–4.* Results are important, but precedent makes clear that they're usually not determinative. *Little Rock School District v. Arkansas*, 664 F.3d 738, 747–48 (8th Cir. 2011). Absent results that reveal a sham process, or a good faith push that has nonetheless completely failed, bottom-line numbers alone don't undermine a district's efforts. Here, while the detached schools didn't end up with as many non-white teachers and administrators as PCSSD had in place, significant racial diversity resulted from a hiring process much like the one PCSSD had been using for years, which the intervenors had long approved. *JNPSD Exhibits № 26–33.*

The intervenors also make several counter-points about particular hiring decisions. For example, the dispute about who would initially fill one of the JNPSD assistant superintendent slots.

The biracial interview committee recommended Dr. Janice Walker, a PCSSD principal, while then-JNPSD-superintendent Wood favored another top candidate, Bobby Lester Jr., an Arkansas Department of Education official. Walker is black; Lester is white. He is the son of a former PCSSD superintendent, Bobby Lester Sr., who served as JNPSD superintendent after Arkansas created the new District. Then-PCSSD-superintendent Dr. Jerry Guess stood firm for Dr. Walker based on a long-standing PCSSD practice: the biracial committee's recommendation was "the" hire. Wood didn't budge either. *Intervenors Exhibit № 23.* This impasse resulted in a continuing vacancy, and ultimately a change in what became JNPSD's policy about the hiring process for district-level administrators and staff: three names, ranked, come forward from these JNPSD biracial hiring committees. *JNPSD Exhibit 1 at 113 & Exhibit 87.* (More on that variation in a moment.)

What about this specific result—does it, as the intervenors urge, undermine JNPSD's good faith in hiring decisions? No. For his part, Dr. Guess was simply staying in the traces, following the practice PCSSD had developed over many years, part of the larger process that had brought PCSSD very close at that point to agreed unitary status in hiring. On the other side, Woods's testimony convinced the Court: he supported the person he believed was the best overall candidate; race played no part in his decision. This was, it's clear, a logjam between

two strong leaders, not race discrimination. Dr. Walker now serves as the founding principal of JNPSD's new Lester Elementary (named for Lester Sr.). And both current JNPSD assistant superintendents, Gregory Hodges and Dr. Tiffany Bone, are black.

Next, the intervenors emphasize that the first hiring process for department heads—transportation, maintenance, child nutrition, and the like—resulted in a mostly white group. The Court was convinced by the JNPSD testimony that experience drove these decisions. After standing up, this new District had to start sprinting toward the fall 2016 opening. The PCSSD-crafted hiring process was followed. Dr. Jeremy Owoh, JNPSD's original assistant superintendent for curriculum, instruction, and desegregation, was involved in all the details. The Court credits his testimony that none of JNPSD's hiring decisions about the first department heads was race-based.

The intervenors also criticize Dr. Duffie's hiring of Ms. Amy Arnone (a white applicant) instead of Ms. Tammy Knowlton (a black applicant) to be his executive assistant. There was, however, a racially diverse applicant pool; finalists of both races were interviewed; and JNPSD also hired Knowlton to be the human resources coordinator. Arnone had more local community connections, while Knowlton had more experience in personnel. Both positions are in the same salary range. Both, moreover, are important District jobs.

Last, the intervenors emphasize and criticize JNPSD's "three-finalists" procedure for district-level administrators and department heads, and the "preferred candidate plus an alternate" for teachers and other staff—changes from PCSSD's drill. *JNPSD Exhibit 1 at 113 & Exhibit 87*. This policy apparently grew out of the assistant superintendent conflict. And the intervenors say it's a retreat from Plan 2000's biracial interview committees and the bolded check mark by the candidate recommended by one of those committees for a vacant slot. Both parties have hold of some truth here: Plan 2000 doesn't require either the biracial committees or following one of those committee's recommendation; both practices are embedded, though, in PCSSD's culture from decades of efforts to achieve unitary status in hiring. *E.g., Humphries v. Pulaski County Special School District*, 580 F.3d 688, 696 (8th Cir. 2009). The whole truth is that JNPSD's change is marginal, not nuclear. JNPSD's adoption of the general framework built over the years by PCSSD is salutary. It shows good faith in complying with Plan 2000. Vesting greater ultimate authority in the superintendent for selecting those who run each school, and the central staff, is also reasonable in a smaller district such as JNPSD. Having an alternate finalist in school-level hires is likewise reasonable. And these changes in the PCSSD-crafted Plan 2000 custom do not break faith with what the Plan mandates.

With these general points addressed, the Court turns to Plan 2000 § L's particulars.

**Recruiting Racially Diverse Applicants for Administrator Vacancies**. JNPSD has done so. The District's hiring policy echoes § L(2). It advertises on the internet and in other media. As Dr. Owoh did, Dr. Bone and Ms. Knowlton screen applicant pools; and the assistant superintendent can and has directed further recruitment to achieve a diverse pool for a particular position. Biracial interview committees meet and evaluate leading candidates. To promote objectivity, they use standardized evaluation forms, questions, and scoring. All this is a carryover from PCSSD. In a further effort to clarify and confirm the process, Dr. Bone recently prepared a comprehensive and useful framework document. *JNPSD Exhibit 87*. It covers the hiring guidelines for district-level administrators and staff, as well as teachers. The document was late breaking, getting in the intervenors' hands only at trial. That could raise an eyebrow—but for the fact that the document puts into words the practices long followed at PCSSD (with the JNPSD three-finalists exception) and followed at JNPSD since it began. And for the reasons already explained, JNPSD's decision to give a bit more say to the superintendent on who is offered the job is not only a reasonable variation; it does not violate Plan 2000 § L(1)'s mandate.

Though the results of all this don't answer the substantial-compliance question, they're illuminating. JNPSD's superintendent is white; both assistant superintendents are black; most of the dozen or so non-academic department heads (the superintendent's cabinet) are white; and the twenty principals and assistant principals are of both races. These circumstances are a long way from the days of white-only school leaders.

In sum, JNPSD is unitary in recruiting a diverse applicant pool for vacant administrative positions.

**Recruiting Racially Diverse Applicants for Teacher Vacancies.** Here, too, JNPSD has complied in good faith with its Plan 2000 obligations. The District spreads the word about vacancies far and wide. It attends job fairs at colleges, including predominantly non-white institutions. The intervenors faulted JNPSD for not focusing on UALR. That's a small gap, which doesn't undermine the District's substantial compliance. And the Court is confident that JNPSD got the message about UALR at the February trial. The intervenors point out that there's no line item in the budget for minority recruitment. But Dr. Duffie testified that he's placed no limit on what Dr. Bone (or her predecessor, Dr. Owoh) could spend. And there was no evidence that budget concerns have limited spending on advertising, travel, or other recruiting efforts.

The JNPSD witnesses spoke as one: there is no upper limit on the number of black teachers. The Court believes this testimony. The Court sees no evidence of any policy, practice, or custom aimed at limiting the proportion of black teachers. The Court sees no JNPSD policy, practice, or custom that effectively does so, either.

Dr. Owoh, Dr. Bone, and those working with them have been vigilant about the hiring process. The applicant pools have been diverse. As JNPSD pointed out, it re-posted three academic positions (gifted and talented teacher, math coordinator, and special education director), as well as a building nurse slot, to get more diverse applicant pools. The biracial committee process has been followed. The intervenors were critical of JNPSD's documentation about recruiting and applicant pools. The Court concludes, though, that the District's records were adequate. *Little Rock School District v. Arkansas*, 664 F.3d at 747. Documents are helpful. No doubt they facilitate intervenors' monitoring. But they're a means, not an end. The Court credits the testimony of Dr. Owoh, Ms. Williams, Dr. Bone, and Ms. Knowlton about their recruiting and hiring work. It's clear, also, that JNPSD is monitoring the demographics of its teachers and staff and, where needed, promoting diversity in applicant pools. Ms. Knowlton specifically testified about nudging principals during the hiring process. This is precisely the kind of awareness, and resulting consideration of race, that § L requires. There are no quotas and there

can be none. But, as the *Humprhies* case teaches, race has been in the mix—as part of Plan 2000's purpose to remedy the effects of past discrimination. JNPSD has complied in good faith with its obligation to recruit racially diverse pools of applicants for vacant teacher positions. No more Court supervision is required in that area.

**Programs, Incentives, and Assignments.** Section L(3) requires JNPSD to do three things: continue implementing programs, policies, and procedures to increase the number of black teachers in early childhood education, primary grades, and core secondary areas; offer incentives for black teachers to get certified in those areas; and assign those teachers to the schools where they're most needed. The first obligation is, the Court concludes, primarily about recruiting and maintaining an inclusive hiring process. The Court has already explained why JNPSD has done both and has committed to continuing efforts in both areas. *E.g., JNPSD Exhibit 87 at 2.* The District is unitary on this obligation.

The same is true for assigning teachers in these areas. In the first round of hiring, as Williams testified, JNPSD sought at least one black teacher in each primary grade and secondary core area at each school. The District continues to monitor those assignments and prompt principals as needed. *JNPSD Exhibit 25.* Knowlton's testimony on this point was unequivocal. This obligation shades into avoiding schools

that are identifiable by teachers' races. JNPSD has substantially complied in good faith with its assignment obligations.

Where the District has fallen short is on incentives. The testimony from Ms. Williams, Dr. Owoh, Dr. Bone, and Ms. Knowlton established the challenges of recruiting qualified black applicants in these areas and retaining them. Adopting a front-loaded salary schedule was a good step. JNPSD's tuition-reimbursement program for current teachers, which started in 2016–2017, is another commendable commitment. No black JNSPD teacher, though, has taken advantage of it. Four non-black teachers have. Why? The Court doesn't know. But the Court is confident that the District (working through Dr. Duffie, Dr. Bone, Ms. Knowlton, and others) can answer the question and adjust the program to increase minority participation. As best the Court can tell, no other incentives to get and keep black teachers in pre-K, primary, and secondary core areas are in place. To become unitary on this last aspect of staffing, JNPSD must fill this gap. Something like PCSSD's hiring-incentives fund (adjusted down, of course, to account for JNPSD's more modest resources) is one possibility. When you read the word "incentives," money comes to mind. But, in the Court's experience, those who give their lives to teaching our children are motivated by many things other than money. The Court encourages JNPSD to investigate, experiment with creative alternatives, and document what works and what doesn't.

These kinds of efforts will demonstrate good faith in substantially complying with the incentive slice of JNPSD's § L(3) obligations. The District will remain under Court supervision solely on this part of §L(3); it is unitary on all the other parts. Based on the good faith JNPSD has shown so far in staffing, the Court anticipates unitary status on this narrow (but important) part of § L(3) within a year or two.

**Avoiding Racially Identifiable Schools.** JNPSD has substantially complied with its § L(4) obligation to avoid making its schools identifiable based on the race of administrators, teachers, and other staff. The District has eight schools: the high school, the middle school, five elementary schools, and the pre-K center. All but one are not racially identifiable: the adults who work in the classrooms, the front offices, and elsewhere in each of these facilities are black and white. *JNPSD Exhibits 26–44*. The exception is the Adkins pre-K center. The center's only administrator is white. *JNPSD Exhibit 35*. There are eleven teachers there. In the 2017–2018 school year, all nine certified teachers were white. There were two black paraprofessionals who served as lead teachers. *JNPSD Exhibit 25*. That's a short-term fix. The Court credits the testimony of assistant superintendent Hodges on this point: JNPSD recognizes that more black teachers are needed at Adkins and is actively seeking them. Dr. Duffie also acknowledged that this school's staff makes it racially identifiable and

- 19 -

pledged to change that circumstance. The Court emphasizes that JNPSD must continue to address Adkins, and implement a long-term fix, sooner rather than later. But the law requires substantial good-faith compliance with the plan, not perfect compliance. Notwithstanding Adkins, JNPSD's district-wide allocation of teachers and other professional staff satisfies § L(4).

* * *

Motion, № 5328, partly granted and partly denied. JNPSD is unitary, and is released from Court supervision on all of Plan 2000 § L's staffing obligations, except on § L(3) incentives. JNPSD will be unitary on Plan 2000 § H's facilities obligations if it implements its 2018 master facilities plan as modified by this Order. JNPSD is released from supervision on facilities except for its obligation to file a progress report by 1 July 2019, and each year thereafter, until it completes its facilities plan. The Court retains jurisdiction, of course, to ensure that the District follows through.

So Ordered.

*DPMarshall Jr.*
D.P. Marshall Jr.
United States District Judge

25 September 2018