**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**LITTLE ROCK SCHOOL DISTRICT**                                    **PLAINTIFF**

**V.**                                    **NO. 4:82-cv-866-DPM**

**PULASKI COUNTY SPECIAL SCHOOL
DISTRICT NO. 1, ET AL.**                                    **DEFENDANTS**

**EMILY McCLENDON, ET AL.**                                    **INTERVENORS**

**<u>PULASKI COUNTY SPECIAL SCHOOL DISTRICT'S
BRIEF IN SUPPORT OF ITS MOTION FOR UNITARY STATUS</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................2

I.   INTRODUCTION ..............................................................................................................4

II.  LEGAL STANDARD .........................................................................................................6

III. ARGUMENT ....................................................................................................................10

    A.   Jurisdictional and Threshold Issues .......................................................................10

    B.   The Place of Desegregation Lawsuits in Public Education...........................................11

    C.   PCSSD is Unitary in Student Achievement ...............................................................14

        1.   The Role of the Achievement Gap in the Quest for Unitary Status.......................14

            a.   Whether the achievement gap has a place in the court's analysis
                to determine whether PCSSD has achieved unitary status ......................16
            b.   Legal precedent addressing the relevancy of the achievement
                gap in this inquiry ...................................................................................16
            c.   Education literature and philosophy .........................................................19

        2.   Efforts that PCSSD has Implemented in Good Faith
            Showing Substantial Compliance with Plan 2000 .................................................20

            a.   Dr. Charles W. Donaldson Scholars Academy .........................................21
            b.   Advancement Via Individual Determination ("AVID")............................25
            c.   Collaborative instructional approaches and initiatives .............................26
            d.   Initiatives and developments supporting African American
                students and lifting all students.................................................................28
            e.   School Improvement Plans ........................................................................32

    D.   PCSSD is Unitary in Discipline ...................................................................................33

        1.   Section F(1): Data Collection ...............................................................................34
        2.   Section F(2): Criteria for Identifying Discipline Issues.......................................35
        3.   Section F(3): Goals to Eliminate Disparity...........................................................36
        4.   Section F(4): Comprehensive Study .....................................................................40
        5.   Section F(5): Initiatives to Reduce Discipline ......................................................41

            a.   Discipline Management Plan (DMP).........................................................44
            b.   Multiage classroom (elementary) .............................................................44
            c.   Mental health providers ............................................................................44
            d.   Dr. Milton FTH – PLPYP and CREATE ..................................................45

2

    e. Teacher cohort training: culturally responsive teaching ............................45

    f. Alternative Learning Classroom (ALC) .......................................45

    g. Positive Behavior Interventions and Supports (PBIS) ............................45

    h. In school suspension (ISS)....................................................46

    i. Advancement Via Individual Determination (AVID) ............................46

  6. Section F(6): Handbook Policies ...........................................................46

E. PCSSD is Unitary in Facilities ...................................................................47

F. PCSSD is Unitary in Monitoring ................................................................52

  1. Section N(1)............................................................................................54

  2. Section N(2)............................................................................................55

  3. Section N(3)............................................................................................55

IV. CONCLUSION....................................................................................................56

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

LITTLE ROCK SCHOOL DISTRICT                                    PLAINTIFF

V.                            NO. 4:82-cv-866-DPM

PULASKI COUNTY SPECIAL SCHOOL
DISTRICT NO. 1, ET AL.                                         DEFENDANTS

EMILY McCLENDON, ET AL.                                        INTERVENORS

PULASKI COUNTY SPECIAL SCHOOL DISTRICT'S
BRIEF IN SUPPORT OF ITS MOTION FOR UNITARY STATUS

Pulaski County Special School District for its Brief in Support of its Motion for Unitary

Status, submits the following.

I.      INTRODUCTION

The current litigation commenced in 1982 when the Little Rock School District ("LRSD")

sued the Pulaski County Special School District ("PCSSD" or the "District") alleging interdistrict

segregation. The true genesis of the dispute dates back further, expressly linked to the 1968 action

in which plaintiffs sued PCSSD to desegregate its schools. *See Little Rock Sch. Dist. v. Pulaski

Cty. Special Sch. Dist. No. 1*, 778 F.2d 404, 420 (8th Cir. 1985) (citing *Zinnamon v. Board of Educ.

of PCSSD*, No. LR-68-C-154 (E.D. Ark. 1973)); (Doc. 5610-2); (Doc. 5611). More accurately,

this case is placed in history "as the last in a long line of desegregation cases, dating back to 1956."

(Doc. 3675, p. 12, n. 15). The Joshua now McClendon Intervenors joined the dispute in 1984 when

they petitioned to intervene. (Docs. 452, 565). A full recounting of the litigation is beyond the

scope of this brief, but it is extensive and well-documented elsewhere. *See generally* Polly J.

Price*, The Little Rock School Desegregation Cases in Richard Arnold's Court*, 58 ARK. L. REV.

611 (2005); Honorable Robert L. Brown, *The Little Rock School District's Quest for Unitary*

*Status*, 30 U. ARK. LITTLE ROCK L. REV. 267 (2008); Thomas Mark, A., *The United States Court of Appeals for the Eighth Circuit Holds That the Little Rock School District Is Entitled to Full Unitary Status*, 32 U. ARK. LITTLE ROCK L. REV. 397 (2010).

Now 37 years since the 1982 filing of this case, 51 years since the 1968 commencement of *Zinnamon*, and 61 years since *Aaron v. Cooper*, a new day has dawned in PCSSD. Complete declaration of unitary status is warranted. Of the twelve original areas outlined in Plan 2000, PCSSD has been declared unitary in all but four: student achievement, discipline, facilities, and monitoring. All gaps in student performance have not been eliminated, nor is it likely that any school could ever completely eliminate said gaps. However, gone are the days of claiming racial blindness, or of sweeping disparate outcomes under the proverbial rug. PCSSD acknowledges that its students face challenges, some more than others. PCSSD is dedicated to the proposition that *all* students deserve an equal chance regardless of the zip code into which they are born, or the color of their skin. To those ends, over the past decade PCSSD has consistently worked towards complying with Plan 2000 in good faith. Herein, PCSSD will explain how it has not only achieved unitary status as that term is defined in a legal sense, but also will explain how its efforts are part of a greater quest to systemically address the society level inequalities that all too often fall along lines of race and class. PCSSD's work towards this broader goal will continue for years to come. However, as this case is concerned, its achievement of complete unitary status has been attained. It is time.

## II.     LEGAL STANDARD

First, it should be noted that as of late there have been no earth-shattering opinions from the Supreme Court that meaningfully change the landscape of this area of the law. Further, it is indisputable that this Court has widely studied the controlling law and is familiar therewith. This Court, as well as His Honor's esteemed colleagues that have handled this case over the past 37 years, have meticulously set out the legal standard that must be followed. *See* Judge Richard S. Arnold's 1985 opinion (778 F.2d 404, 409-10); this Court's 2018 order (Doc. 5445, p. 2); Judge Brian Miller's 2011 order (Doc. 4507, pp. 5-7); Judge Billy Roy Wilson's 2002 order (Doc. 3675, pp. 63-80); Judge Henry Woods' 1984 order (584 F. Supp. 328). As such, PCSSD will not write a treatise on the applicable law, but upon citing the aforementioned recitations, and invoking the guidance set forth in *Freeman*, *Dowell*, and their progeny, PCSSD will summarily dispense with some observations about the law controlling the case at this particular juncture. *See Freeman v. Pitts*, 503 U.S. 467 (1992); *Bd. of Educ. of Okla. City Pub. Sch., Indep. Sch. Dist. v. Dowell*, 498 U.S. 237 (1991).

The legal standard applicable to this case is whether PCSSD has "made a good-faith effort to substantially comply with [Plan 2000]." (Doc. 5565, 27:23 – 28:1). With regard to facilities, the question is whether PCSSD has made a good-faith effort "to have equal, clean, safe, attractive facilities across the district." (Doc. 5445, p. 2).[1] As one explained, "[t]he relevance of good faith underscores the notion that unitariness is less a quantifiable 'moment' in the history of a remedial plan than it is the general state of successful desegregation." *Morgan v. Nucci*, 831 F.2d 313, 321 (1st Cir. 1987). There have been many articulations of what it means to "substantially comply,"

---

[1] *See infra* note 17; (Docs. 5619, 5620).

chiefly among the section of Judge Wilson's 2002 opinion titled "Meaning Of 'Substantial Compliance.'" (Doc. 3675, pp. 78-80).

What matters is effort, not results; effort, of course, in good faith. In looking at the distinction between effort and results, Judge Arnold focused on the relevant consideration by writing:

> The thrust of the provision is that certain programs with the purpose of ensuring that there is no racial discrimination with regard to student discipline be instituted. This does not mean that the programs must be perfectly efficacious. In addition, the object is to eradicate discrimination, which is not necessarily the same thing as disparity. Racial disparity may exist without discrimination. Discrimination, of course, can cause disparity, but it is not the only possible cause.

*Little Rock Sch. Dist. v. Armstrong*, 359 F.3d 957, 965 (8th Cir. 2004). This thread is also seen throughout Judge Wilson's 2002 order. For example, there is a section explaining that "[n]othing in the Eighth Circuit's decision [Appeal of *LRSD*, 949 F.2d 253, 256 (8th Cir. 1991)] suggested that the '*effort*' to eliminate the achievement gap must be successful in order for LRSD to be declared unitary and released from court supervision." (Doc. 3675, p. 148).

Similarly, the standard to achieve unitary status is not perfection, complete compliance with Plan 2000, nor is it even complete desegregation. Commenting on a district court's wide discretion and explaining when unitary status is achieved, it has been written that "[a]lthough [*Freeman v. Pitts*] gives district courts a great deal of discretion to continue to implement desegregation decrees, it also allows them to withdraw control from school districts long before desegregation has actually occurred." Harvard Law Review Ass'n, *3. Public School Desegregation - Withdrawal of Judicial Control*, 106 HARV. L. REV. 249, 250 (1992) (citing *Freeman*, 503 U.S. 467, 112 S. Ct. 1430).

The Court should also take into account the length of time with which a school has complied with its desegregation plan. There is no magic number of years, and the standard is

compliance for "a reasonable period of time." *Dowell*, 498 U.S. at 248, 111 S. Ct. at 637; Monika L. Moore, *Unclear Standards Create an Unclear Future: Developing A Better Definition of Unitary Status*, 112 YALE L.J. 311, 317 (2002) (collecting cases and commenting on the length of compliance that must be shown to achieve unitary status).

Now decades into this litigation, much of its outcome is controlled by a mélange of stipulations, agreements, amendments, and settlements. Over the years, the Eighth Circuit has largely reviewed these deviations from the controlling desegregation plans as contracts. Where parties make an agreement controlling the outcome of the case, its metes and bounds should be contractually enforced by the terms of the agreement. *See Little Rock Sch. Dist. v. Armstrong*, 359 F.3d 957, 967 (8th Cir. 2004); *see also* Polly J. Price, *The Little Rock School Desegregation Cases in Richard Arnold's Court*, 58 ARK. L. REV. 611, 645 (2005) (harmonizing more than two decades of Eighth Circuit oversight of this case under Judge Arnold, and writing: "Arnold firmly enforced the agreement by its own terms, as a matter of contract interpretation, and not by reference to an external constitutional standard. The agreement of the parties may have broken down, but according to Arnold, the original settlement proposal determined the scope of relief to which the Intervenors were entitled.").

This reliance on contractual construction goes much deeper than a cursory quotation of any one Eighth Circuit opinion in this case, and speaks more to an underlying judicial philosophy about the proper place of the courts in overseeing desegregation litigation. Tracing this philosophy up through the Eighth Circuit, it has been observed that

> [Professor Abe Chayes] articulated a preference for decrees formulated through good-faith bargaining by the opposing parties and enforced by the court, and this point was perhaps the most influential for Arnold. Chayes noted that the decree process forces the courts to rely on the parties' negotiations to minimize the need for judicial resolution of remedial issues. Other reasons supported resolution by the parties as well: "The interest in a decree that will be voluntarily obeyed can be

promoted by enforcing a regime of good faith bargaining among the parties." Arnold echoed this sentiment when he wrote: "As a practical matter, a remedy that everyone agrees to is a lot more likely to succeed than one to which the defendants must be dragged kicking and screaming." … Arnold strongly favored settlement of the Little Rock school cases, and many of his opinions were intended to make settlement an easier process.

Polly J. Price, *The Little Rock School Desegregation Cases in Richard Arnold's Court*, 58 ARK. L. REV. 611, 645 (2005). Largely in keeping with this contractual understanding of agreements reached, there is a history in this case of adhering to the contractual terms struck between Intervenors and the districts when revising a desegregation plan. *See e.g.*, (Doc. 3675, p. 166, *aff'd sub nom. Little Rock Sch. Dist. v. Armstrong*, 359 F.3d 957 (8th Cir. 2004)) (Judge Wilson explaining that "***traditional contract principles*** bar Joshua from arguing, at this late date that LRSD violated § 2.12.2. Joshua's current interpretation of that section was never brought to the attention of LRSD during the term of the Revised Plan.") (emphasis added).

## III.    ARGUMENT

### A.    Jurisdictional Issues and Threshold Issues

Before diving into the merits of the case to show that PCSSD is unitary in all remaining areas, herein several threshold issues must be addressed.

First, as more fully explained in PCSSD's and JNPSD's Joint Motion in Limine seeking the proper allocation of the burden of proof which is incorporated herein by reference, for student achievement, discipline, and monitoring, this entire proceeding is not technically a quest for unitary status. (Docs. 5610, 5611). Upon engaging in the archeological dig endeavored therein, it appears that PCSSD has never been deemed constitutionally deficient in the areas of student achievement, discipline, or monitoring. With no constitutional finding in these areas, no presumption of unconstitutionality exists. Lacking that presumption, PCSSD does not bear the burden of proof and this is not actually a quest for unitary status. For student achievement, discipline, and monitoring, this entire proceeding is actually nothing more than a breach of contract action in which the party claiming breach, here Intervenors, bears the burden of proof. Therefore, PCCSD objects to the continuation of this proceeding as one in which it bears the burden of proof because there is no legal basis for structuring the case as such.

Second, during the course of discovery, and more precisely in the latter part of April and early part of May 2020, PCSSD learned that Intervenors' purported class representatives—Emily McClendon, Tamara Eackles, and Valeria Stallings—lack the qualifications to serve as sub-class representatives in this matter. PCSSD acknowledges that their introduction into this case (Docs. 5432, 5468, 5501) came about with the reasoned decision to avoid objection (Doc. 5467), however that decision was made subject to the representation that these purported Intervenors were aware of Plan 2000 and the benefits which it promises to African-American students, and that they

purportedly continued to rely upon Plan 2000 regarding the future of their children. Moreover, the depositions of Emily McClendon, Tamara Eackles, and Valeria Stallings revealed they were largely unaware of Plan 2000 and the benefits which it promises to African-American students, and revealed a surprising lack of continued reliance upon Plan 2000 regarding the future of their children. Upon learning of the inadequacy of these purported class representatives, PCSSD must now raise the objection that they are not adequate sub-class representatives on the remaining PCSSD-related issues. FED. R. CIV. P. 23(a)(4); *Rattray v. Woodbury Cnty., Iowa*, 614 F.3d 831, 835 (8th Cir. 2010). There was a time when the Joshua Intervenors were intimately aware of this litigation, but these new purported Intervenors lack the awareness to be representatives of the class. Without adequate representatives, the continuation of this proceeding is improper. In any event, should the Court overrule this objection and continue with the proceedings, the Intervenors must be compelled to actually show up at the hearing this summer. Absent their attendance, the case against PCSSD should not be allowed to continue without a client to represent the class.

> ### B.    The Place of Desegregation Lawsuits in Public Education.

Notwithstanding the District's objection that the remaining components of this case may be covered by contract law, courts generally have discretion to evaluate a school district's quest for unitary status. PCSSD respectfully submits this policy explanation to shed light on where desegregations cases, and this case, fit into the picture of the great experiment of American democracy.

When a desegregation plan and federal court control a school district, the power vested in the school board of education by the qualified electors of the district through the democratic process is necessarily reduced. *See Dowell*, 498 U.S. at 248, 111 S. Ct. at 637 ("Local control over the education of children allows citizens to participate in decision making, and allows innovation

so that school programs can fit local needs.") This reallocation of decision making authority is of no small consequence, a reality enhanced by decades of court supervision and punctuated by the opinion expressed by some that this "often works to the detriment of students in the system." Monika L. Moore, *Unclear Standards Create an Unclear Future: Developing A Better Definition of Unitary Status*, 112 YALE L.J. 311, 312 (2002). Educational needs and societal demands are not static. School districts, controlled through a functioning democracy, need the freedom to make decisions that address changing needs instead of being shackled to dated desegregation plans born out of educational philosophies that have been long since retired.

Although not determinative, time should factor into this Court's analysis. The Supreme Court has stated that the causal presumption of unconstitutionality diminishes "[a]s the *de jure* violation becomes more remote in time." *Freeman,* 503 U.S. at 496, 112 S.Ct. 1430; *see also id.*, 503 U.S. at 506, (Scalia, J., concurring) ("the rational basis for the extraordinary presumption of causation simply must dissipate as the *de jure* system and the school boards who produced it recede further into the past"); *Jenkins III,* 515 U.S. at 118, 115 S.Ct. 2038 (Thomas, J., concurring); *Jenkins v. Missouri*, 216 F.3d 720, 744 (8th Cir. 2000) (Loken, J., dissenting).

PCSSD has not achieved unitary status merely by the passage of time. As explained in detail herein, PCSSD's sustained efforts over the past decade show that it is deserving of unitary status on the merits of this case. However, the Court must address the case's duration. The Supreme Court has stated "[i]n *Dowell,* we emphasized that federal judicial supervision of local school systems was intended as a 'temporary measure.'" *Freeman*, 503 U.S. at 489, 112 S. Ct. at 1445 (citations omitted). The length of this case if far from a "temporary measure." In fact, of the scores of school systems that have achieved unitary status, many had cases pending for less time than this case. *See e.g.*, *Freeman v. Pitts*, 503 U.S. 467 (1992), *Mills v. Freeman*, 942 F. Supp. 1449 (N.D.

Ga. 1996) (DeKalb County School System in Georgia achieved unitary status in 1996 after 28 years); *N.A.A.C.P., Jacksonville Branch v. Duval Cty. Sch.*, 273 F.3d 960 (11th Cir. 2001) (Duval County School Board in Florida achieved unitary status in 2001 after 16 years); *Flax v. Potts*, 915 F.2d 155 (5th Cir. 1990) (Fort Worth Independent School District in Texas achieved unitary status in 1990 after approximately 30 years); *United States v. State of Ga., Troup Cty.*, 171 F.3d 1344 (11th Cir. 1999) (Troup County School District in Georgia achieved unitary status in 2003 after 34 years); *Hoots v. Pennsylvania*, 272 F. Supp. 2d 539, 553 (W.D. Pa. 2003) (Woodland Hills School District in Pennsylvania achieved unitary status in 2003 after 32 years); *Sch. Bd. of the City of Richmond, Va. v. Baliles*, 829 F.2d 1308, 1311 (4th Cir. 1987) (Richmond Public School District in Virginia achieved unitary status in 1986 after 25 years).

These cases are cited mainly to emphasize the factor of time, and to temper Intervenors' proclivity toward "scope creep"—repeatedly attempting to obtain modifications, concessions, et cetera, not included in the requirements of Plan 2000. This concern is no mere rhetorical flourish. As an illustration of this perennially active force, the Court need look no further than Intervenors' counsel's accusatory and unsubstantiated nefarious assumptions blaming PCSSD for the impact of COVID-19.[2] This has gone on long enough.

---

[2] In what is widely recognized as the most challenging and disruptive single event facing American education in modern history, PCSSD has been working to timely and prudently respond to COVID-19. In the sudden onset of these unprecedented challenges, every moment mattered as PCSSD worked to not only continue educating its students, but also work so that they had access to meals since many families are food insecure. In other words, PCSSD leaders already had their hands completely full in figuring out the district's response to the COVID-19 crisis. On March 27, 2020, counsel for Intervenors sent a letter stating:

As counsel for the Intervenors in the above-captioned case, we are concerned about the effect of the pandemic and these emergency measures on the Intervenor Class and, thus, are reaching out to assess the services being provided to students in the District and to offer support and guidance during this uncertain time. We also

C.     PCSSD is Unitary in Student Achievement.

The remaining obligation under Section M of Plan 2000 requires that PCSSD implement

plans designed to improve student achievement as recommended by the Ross Plan.

1.     The Role of the Achievement Gap in the Quest for Unitary Status

Beginning with the outward bounds of arguments previously rejected in this case, a school

need not completely eliminate the achievement gap[3] to be found unitary. (Doc. 3675, p. 148);

---

request that by April 2, 2020, you advise us of your availability for a conference
call to discuss these important issues.

**Exhibit A**. In other words, without any evidence that PCSSD was responding to the pandemic in
a discriminatory way which it absolutely was not, or in any way that was within the scope of the
remaining issues of Plan 2000, counsel for Intervenors suddenly decided that PCSSD's pandemic
response was somehow within the ambit of this desegregation litigation. They requested a response
and a meeting on short notice.

Without wading into the issue of whether the COVID-19 pandemic disproportionately
affects Americans along lines of race and class, the point here is that PCSSD was doing its best to
respond appropriately. And there was no indication that PCSSD was doing anything improper, let
alone anything less than other schools in Arkansas or nationwide. PCSSD was in fact responding
in way that went above and beyond to make sure that *all* of its students were served. Even though
this is a legitimate concern of parents and patrons of PCSSD, the relevant question here is whether
COIVD-19 is properly addressed in this desegregation case. It is not. However, because of this
ongoing litigation, Intervenors' counsel essentially attempt to insert themselves into any and every
aspect of PCSSD governance.

[3] Written in 1999, the Ross Plan, as well as judicial decisions since its inception, have
repeatedly referred to disparities in student performance as the "achievement gap." PCSSD
respectfully objects to the continued use of this phrase. The American education system certainly
experiences differences in academic performance that all too often fall along lines of race and
class. Rather than an "achievement gap" this reality is more constructively addressed as an
"opportunity gap." This shift in phraseology more precisely names the situation in our country.
"Opportunity gap" is a way of expressing that arbitrary circumstances—such as one's skin color,
zip code of birth, or economic situation—often determine the opportunities available in life.
Speaking generally and not specifically about PCSSD, emphasizing the "achievement gap" has at
times in the past been used to shift blame to students, or narrowly define the problem as lagging
test scores. By seeing the problem as an "opportunity gap," PCSSD believes that educators can
more effectively address the conditions and obstacles that students face throughout their childhood
years. While shifting the terminology will not remedy the pervasive inequities faced by students
in their lives, PCSSD believes that this more holistic understanding of the problem will be the most

(Doc. 3337, pp. 6-7).[4] At the other extreme, theoretically, based on an historical investigation of the place of the achievement gap in this litigation, PCSSD perhaps need not even address the achievement gap for purposes of showing that it has achieved unitary status. Without conceding that point, and setting aside that threshold issue for the sake of expediency, PCSSD will herein address the appropriate place of efforts to eliminate the achievement gap in this litigation. In any event, whether PCSSD must make a certain showing on the achievement gap is a pure legal and somewhat academic question, because in actuality PCSSD is quite focused on systemically closing the gaps faced by its students. PCSSD's dedication to closing gaps goes to the very core of what it means to provide a transformative education to a child.

---

effective way to work towards a school system in which *all* students have the chance to achieve their best potential in life. Noting this philosophical objection to framing the problem as an "achievement gap," briefing herein will continue to use this phrase, however antiquated, simply for purposes of judicial continuity.

[4] The April 29, 1992 PCSSD Desegregation Plan committed the district to "eliminate" the existing disparities in performance between black and white students. In replacing that 1992 commitment with Plan 2000, Judge Susan Webber Wright found that the prior plan "impose[d] rigid requirements that may never be met and sometimes frustrate, rather than assist, transition to a unitary public education system." (Doc. 3337, pp. 6-7). In reaching this conclusion, Judge Wright relied at least in part on testimony during a 1996 hearing, during which Dr. David J. Armor, PhD testified that factors such as family educational attainment, income levels, and family structures play a major role in determining academic performance and stated that, "closing the [achievement] gap .. , making it zero . . . is virtually impossible." Transcript of hearing held Tuesday May 14, 1996, page 33; (Doc. 3337, p. 6, n. 13). Relying on this same hearing, Judge Wilson synthesized hundreds of pages of expert testimony on the subject into this digestible summary:

> In May of 1996, Judge Wright conducted three days of evidentiary hearings during which Dr. Walberg, Dr. Armor, and Dr. Orfield, three nationally recognized experts in desegregation litigation, testified. According to both Dr. Walberg and Dr. Armor, the current socioeconomic differences between African–Americans and whites make it impossible to eliminate the achievement gap.

(Doc. 3675, p. 148).

  **a.**  **Whether the Achievement Gap has a Place in the Court's Analysis to Determine Whether PCSSD has Achieved Unitary Status.**

Plan 2000, Section M, and by incorporation the Ross Plan, deal with student achievement. The Ross Plan discusses the achievement gap between white students and African-American students. Wading deeper into the history on this issue, Judge Wilson examined the place of the achievement gap in this case, concluding his inquiry by summarizing:

> The original desegregation remedy in *LRSD v. PCSSD,* 778 F.2d 404, 434–36 (8th Cir. 1985), did not mention any obligations related to narrowing or eliminating the achievement gap between African–American and white students. Rather, LRSD *voluntarily agreed* to eliminate that achievement gap as one of the obligations in the 1990 Settlement Agreement and Settlement Plan.

(Doc. 3675, p. 147-48) (emphasis in original). Anything not traceable back to an original constitutional violation, to the extent that it is relevant at all, is enforceable only as a contractual dispute. (Doc. 5611). In fact, much of PCSSD's current obligations under Plan 2000 with regard to student achievement accordingly sound in contract. But before proceeding to further examine PCSSD's extensive efforts to close the achievement gap, it is worth raising PCSSD's threshold objection that the achievement gap has no place in this legal inquiry regarding the achievement of unitary status, at least not in the context of where PCSSD has a burden to prove anything. If Intervenors contend that PCSSD is not unitary in student achievement, and if they wish to make the achievement gap a part of their argument, they bear the burden of proof as the achievement gap is not traceable to a constitutional violation in this case.

  **b.**  **Legal precedent addressing the relevancy of the achievement gap in this inquiry.**

Presenting evidence that fully examines, precisely quantifies, and properly places the achievement gap in PCSSD could easily take weeks. Rather than spend significant time at trial on this issue, which is largely background, PCSSD will endeavor to address these issues herein.

Suffice it to say, these issues have largely been addressed in this case. Rather than replow the same ground again, and in the interest of judicial efficiency, PCSSD will herein rely on citation to prior findings in this case.

In what can be accurately described as this case's magnum opus on the subject, Judge Wilson wrote a particularly insightful section of his 2002 opinion titled "The Metaphysics Of Using The 'Achievement Gap' As A Factor In Deciding Unitary Status." (Doc. 3675, pp. 80-88). Summarizing his research and study of the available precedent, Judge Wilson concluded:

> [s]ociologists and educators have recognized for over a decade that there are a host of factors, completely unrelated to the effects of *de jure* segregation, that also are responsible for the minority student achievement gap. Some of these other factors include low birth weight, poverty, whether the student is raised by a single parent, parental interest and involvement, and peer influence. Complicating this issue still further is the fact that the achievement gap "exists across the country in prior segregated school districts and school districts that have not discriminated against minority students."

(Doc. 3675, pp. 81-82) (citations omitted).

Looking even broader than the history of this case, other courts have reached similar conclusions about the proper place of the achievement gap in a judicial inquiry of this nature. In *People Who Care v. Rockford Board of Education*, 246 F.3d 1073 (7th Cir. 2001), Judge Richard Posner rejected the argument that the minority student achievement gap was attributable to segregation in the school system, writing

> [y]et it is obvious that other factors besides discrimination contribute to unequal educational attainment, such as poverty, parents' education and employment, family size, parental attitudes and behavior, prenatal, neonatal, and child health care, peer-group pressures, and ethnic culture. Some of these factors may themselves be due to or exacerbated by discrimination, but not to discrimination by the Rockford school board. The board has no legal duty to remove those vestiges of societal discrimination for which it is not responsible. Insofar as the factors that we have mentioned, rather than unlawful conduct by the Rockford school board in years past, are responsible for lags in educational achievement by minority students, the board has no duty that a federal court can enforce to help those students catch up. It may have a moral duty; it has no federal constitutional duty.

> No effort has been made by the plaintiffs, despite our warnings, to partition, however crudely, the lag in achievement that is due to the school board's past illegalities and the lag that is due to other factors, factors for which the school board bears no federal legal responsibility.

*Id.*, at 1076-77; *accord Coalition to Save Our Children v. State Bd. of Educ. of Delaware*, 90 F.3d at 779 ("As humans, we acknowledge with melancholy the fact that many socioeconomic factors militate against a complete level playing field in our society. As judges, however, we are powerless to alter formidable social, economic and demographic forces and conditions over which no legal precept has control"). PCSSD respectfully requests that this Court take judicial notice of these findings by Judge Wilson as also largely supported by the well-reasoned Judge Posner among others, and in so doing, accurately set the backdrop for this Court's inquiry without belaboring these points at trial.

Judge Wilson's opinion also observed that "the gap in minority student achievement must be causally linked by expert testimony and other evidence which is sufficiently specific to allow the trial court to identify 'the incremental effect that segregation has had on minority student achievement.'" (Doc. 3675, p. 81) (citations omitted). This pronouncement of the law must be so even if PCSSD otherwise has the burden of proof. Judge Wilson concluded that "[i]n this case, no court has ever determined generally, or with the specificity required in *Jenkins III,* what portion, if any, of the minority student achievement gap in LRSD is causally linked as a vestige of *de jure* segregation." (*Id.*, p. 87). It is believed that this finding is equally true for PCSSD as it was for LRSD, and so the achievement gap cannot be imputed to PCSSD. This conclusion cannot change at the trial of this matter because Intervenors have not disclosed any expert witnesses and the deadline for doing so has passed, leaving them with no ability to causally link the achievement gap to purported segregation. As such, to the extent that the Court wishes to consider the

achievement gap at all, the Court can reasonably hold as a matter of law that the minority student achievement gap in PCSSD is not causally linked as a vestige of *de jure* segregation for want of expert proof to connect the dots.

### c.     Education Literature and Philosophy

The points that PCSSD has requested the Court take under judicial notice are further supported by the education literature. PCSSD does not intend to make these points a central part of the upcoming trial, but nonetheless believes that the content herein provides an important backdrop against which to understand PCSSD's educational philosophy.

Superintendent Dr. Charles McNulty is a social justice leader who was a principal of a high performing school before obtaining his doctorate in educational leadership from the University of Wisconsin at Madison. Under his leadership, PCSSD has remained focused on providing an education to *all* students, but also approaching education through the lens of achieving social justice. Drawing on the educational scholarship of Gewirtz (2006), PCSSD's philosophy is guided by typology that accounts for injustice's multi-dimensional nature. Gewirtz, Sharon, *Towards a Contextualized Analysis of Social Justice in Education*, 1 EDUC. PHILOSOPHY & THEORY 38 (2006).

Under this scholarship, there are three categories of just acts and outcomes: distributive, recognitional, and associational justice. Distributive justice is the absence of exploitation, marginalization, material or cultural dispossession, and how cultural or social resources are accessed or constrained by institutions or social norms. Recognitional justice refers to the absence of cultural imperialism, disrespect, or domination and nonrecognition. Associational justice implies a participative democracy both in the political form as well in the workplace. Gewirtz (2006) builds on the works of Young (1990) and Fraser (1997) to articulate a response to these

two key questions: "What criteria can we use to judge whether an educational policy or practice is socially just? How do we make comparative assessments of social justice in education?" *Id.*, at 69 (*citing* Young, Iris Marion, *Justice and the Politics of Difference.* Princeton, NJ: Princeton University Press (1990); Fraser, Nancy, *Justice Interruptus: Critical Reflections on the "Postsocialist" Condition.* New York: Routledge (1997)). At the upcoming trial Dr. McNulty is expected to testify not just about PCSSD's good faith substantial compliance with Plan 2000, but also about this research based educational philosophy that drives an outcome where all students achieve their full potential in life. Such an outcome is premised upon a proper understanding of the concept of justice.

Understanding PCSSD's educational philosophy is helpful to the inquiry at hand, but nothing herein or presented at trial is intended to be seen as a concession that Plan 2000 obligates PCSSD to right the multifaceted societal injustices and inequities facing its students. PCSSD believes that justice is an admirable goal worth pursuing, but this relates to injustices arising from outside the confines of school, and as such this goes above and beyond the requirements of Plan 2000. Setting its sights on this noble undertaking speaks volumes about PCSSD's good faith efforts.

## 2. Efforts that PCSSD has Implemented in Good Faith Showing Substantial Compliance with Plan 2000.

Turning to the merits of PCSSD's case on student achievement, the evidence clearly demonstrates that PCSSD is unitary. PCSSD has substantially complied in good faith with the requirements of Plan 2000 and the goals of the Ross Plan. Under a publicly elected School Board, PCSSD has attained this through a structured, systemic, and targeted instructional approach that positively affects achievement for all students while specifically targeting African American students to reduce the performance gap with their non-black peers. Although Section M of Plan

2000 originally had two subparts, its satisfaction of the home-school counselor component was noted by Judge Miller in 2011, leaving PCSSD to focus on the Ross Plan. (Doc. 4507, pp. 92-93).

As will be more fully developed below, in accordance with a binding stipulation, a "*substantial component*" of PCSSD's desegregation obligation on the subject of student achievement hinges on the Dr. Charles W. Donaldson Scholars Academy. Thus, this Court's inquiry is narrower and focused. Of course, the Dr. Charles W. Donaldson Scholars Academy is not the only relevant initiative, and indeed a full presentation on PCSSD's efforts to address student achievement will be henceforth commenced. However, part of the wisdom of the controlling stipulation to focus this trial on the Dr. Charles W. Donaldson Scholars Academy is so that the Court's inquiry on student achievement cannot later be subject to the criticism that it has evolved into an exercise in pedagogical sociology rather than constitutional adjudication. *See Jenkins by Agyei v. State of Mo.*, 19 F.3d 393, 404 (8th Cir. 1994) (Beam, J., Bowman, J., Wollman, J., Loken, J., and (Morris Sheppard) Arnold, J., dissenting) ("In my view, this case, as it now proceeds, involves an exercise in pedagogical sociology, not constitutional adjudication.") In any event, PCSSD should be found unitary for the following reasons.

### a.    Dr. Charles W. Donaldson Scholars Academy

In 2014, Intervenors and PCSSD filed a joint motion to modify Plan 2000. (Doc. 5018). The motion explained the change to Plan 2000 as follows:

> This proposed amendment will supplement Plan 2000 provisions regarding academic achievement. The parties agree the Donaldson Scholars Academy plan is to become a ***substantial component*** of PCSSD's desegregation obligation on the subject of student achievement.

(*Id*., pp. 2-3) (emphasis added). The parties agreed on a detailed description of the Dr. Charles W. Donaldson Scholars Academy. (Doc. 5018-1). The parties filed supplemental information explaining this program. (Doc. 5023). The Court held a hearing on this issue (Doc. 5024) and

ultimately granted the joint motion. (Doc. 5029). As such, in reviewing the instant motion for unitary status, PCSSD's commitment to good faith implementation of the Dr. Charles W. Donaldson Scholars Academy shall be a "***substantial component*** of PCSSD's desegregation obligation on the subject of student achievement." (Doc. 5018, pp. 2-3). As with other agreements reached to resolve this case, the agreement to make the Dr. Charles W. Donaldson Scholars Academy a "***substantial component***" of PCSSD's pursuit of unitary status in this area is an agreement that should be enforced by its own terms, as a matter of contract interpretation. *See* Section II, *supra*.

PCSSD implemented the Dr. Charles W. Donaldson Scholars Academy in good faith. The subject of implementation came up in hearings. (*See e.g.*, Docs. 5174, 5177). Both Intervenors and PCSSD kept the Court informed through the filing of progress reports and other documents showing consistent implementation. (Docs. 5078, 5115, 5148, 5172, 5200, 5283, 5318, and 5497).[5] These progress reports and other updates were adequate, as the Court commended: "the Court notes the comprehensive report about the Dr. Charles W. Donaldson Scholars Academy's activities between 2014 and 2019. It is appreciated." (Doc. 5501, p. 2) (referencing Doc. 5497).

Intervenors were involved in the planning, implementation, and of course the monitoring of the Dr. Charles W. Donaldson Scholars Academy. For example, Intervenors' own report states "[p]eriodic meetings have been held with Attorney Walker and Lead Monitor Ms. Joy Springer to

---

[5] PCSSD incorporates herein by reference the facts set out in these docket filings, and respectfully requests that the Court take judicial notice of its previous study of these materials. Believing that this Court will, as it did in 2018, "draw[] freely on what it has learned in presiding over the detachment-related proceedings since 2013" and the other proceedings for that matter, PCSSD will endeavor to streamline the marshaling of proof to avoid unnecessarily burdening this brief and the upcoming trial with introducing all of this material and other material similarly referenced and so incorporated. (Doc. 5445, p. 2).

keep them appraised of what is occurring with the Academy." (Doc. 5283-1, p. 4). Even given the limited time records available to PCSSD,[6] in an approximately one year period, lead monitor Rep. Joy Springer self-reported that she allegedly spent 83.02 hours[7] monitoring the Dr. Charles W. Donaldson Scholars Academy. (Doc. 5367-1, pp. 1-29). Monitors Marva Walker Smith and Charles Bolden worked for, and apparently *still* work for, the Dr. Charles W. Donaldson Scholars Academy. Depo. Rep. Joy Springer,[8] 223:17-224:1, **Exhibit B**.[9]

All of this underscores the parties' understanding the Dr. Charles W. Donaldson Scholars Academy is a "***substantial component*** of PCSSD's desegregation obligation on the subject of student achievement." (Doc. 5018, pp. 2-3). Tellingly, after all of the aforementioned monitoring, Rep. Joy Springer had no criticism of the Dr. Charles W. Donaldson Scholars Academy during her deposition.

---

[6] The only time records produced by Intervenors are a 2018 time log for Marva Walker Smith, a 2017 time log for Charles E. Bolden which also contains a lone entry from January 2018, and the time logs already available on the docket at Doc. 5367. Despite being asked to produce more, none were produced. Given Intervenors' lack of production, PCSSD has been deprived of the proof necessary to fully develop this argument.

[7] 5/31/2017 0.8 hours; 5/15/2017 2.5 hours; 4/13/2017 2.5 hours; 4/5/2017 1.1 hours; 4/4/2017 0.5 hours; 4/3/2017 0.8 hours; 4/3/2017 0.6 hours; 4/2/2017 2.3 hours; 3/30/3017 2.5 hours; 3/30/3018 2.8 hours; 2/27/2017 2 hours; 2/21/2017 3 hours; 2/17/2017 0.56 hours; 2/13/2017 5.7 hours; 2/9/2017 1.3 hours; 2/8/2017 3.2 hours; 8/9/2016 2.1 hours; 12/5/2016 2 hours; 11/28/2016 2.3 hours; 10/19/2016 0.75 hours; 10/14/2016 0.5 hours; 9/30/2016 1.8 hours; 8/22/2016 2.4 hours; 8/9/2016 2.1 hours; 7/26/2016 0.85 hours; 7/25/2016 2.35 hours; 7/25/2016 1.25 hours; 7/18/2016 3.5 hours; 7/5/2016 2.87 hours; 7/1/2016 1.3 hours; 6/30/2016 2.5 hours; 6/28/2016 0.86 hours; 6/28/2016 2.33 hours; 6/22/2016 1.5 hours; 6/21/2016 5.6 hours; 6/8/2016 4.7 hours; 6/8/2016 3.3 hours; 6/7/2016 4 hours. (Doc. 5367-1, pp. 1-29). This number is an estimation based on available information; a precise figure is impossible to calculate given the practice of block billing.

[8] PCSSD's separately filed Motion *in Limine* raising PCSSD's objections to the testimony of Rep. Joy Springer is noted, and incorporated herein by reference. (Docs. 5615, 5616).

[9] An excerpt of Rep. Joy Springer's deposition is attached to the Motion for Unitary Status as **Exhibit B**. A full copy of the transcript will be made available to the Court upon request.

Additionally, it should be noted that the Dr. Charles W. Donaldson Scholars Academy speaks directly to one of Judge Miller's chief criticisms in 2011. There, His Honor explained that "Pulaski County needs to refocus its efforts on narrowing the achievement gap. It needs to consider the specific requirements of the Ross Plan, and it needs to specifically design and implement programs to address those requirements." (Doc. 4507, p. 99). As explained above, that is exactly what the Dr. Charles W. Donaldson Scholars Academy does. It was "specifically designed" to meet the "specific requirements of the Ross Plan." Forged by collaboration of the parties and established through the annealment of considerable monitoring efforts, it comes before the Court bearing the stamp of approval of Intervenors.

During the joint motion to alter Plan 2000, PCSSD agreed that "[t]he total financial commitment of PCSSD to the plan is $10,000,000.00." (Doc. 5018, p. 1). PCSSD followed through on this commitment. Updates regarding the budget and expenses of the Dr. Charles W. Donaldson Scholars Academy were provided. (Doc. 5283-1, pp. 20-24). Final numbers show that the PCSSD has expended $10,000,000.00. **Exhibit C**. PCSSD's sustained commitment to the Dr. Charles W. Donaldson Scholars Academy over the past six years represents, as contractually agreed, a "***substantial component*** of PCSSD's desegregation obligation on the subject of student achievement."

The Dr. Charles W. Donaldson Scholars Academy is specifically designed to improve the academic achievement of all students with special attention to African American students and others who are at-risk of academic failure due to socioeconomic disadvantages and other factors. Participation in the program and successful completion are requisites for scholarship awards. This program is under the supervision of the Assistant Superintendent of Equity & Pupil Services, High School Building Administrators, High School Counselors. The program started in 2014.

24

Recruitment for the program is completed by administrators and counselors of African American students for the academy. Equity Services along with local school counselors organize transportation and secure facilities for student sessions and the summer academy.

For the reasons set out above, and more fully explained in the hundreds of pages already on the docket, the Dr. Charles W. Donaldson Scholars Academy is the most substantial component of PCSSD's unitary status on student achievement. Combined with the other initiatives detailed below, PCSSD has achieved unitary status in the area of student achievement.

### b.        Advancement Via Individual Determination ("AVID")

Another foundational support to progress toward equitable outcomes for African American students as well as impacting all students, is Advancement Via Individual Determination ("AVID") (2019-20). AVID is an "untracking" program designed to help underachieving students with high academic potential prepare for entrance to colleges and universities. AVID places previously underachieving students (who are primarily from low income and ethnic or linguistic minority backgrounds) in the same college preparation academic program as high-achieving students (who are primarily from middle or upper-middle income and "majority" backgrounds). AVID features a rigorous academic elective course with a sequential curriculum that focuses on writing, inquiry, and collaboration as methodologies to accelerate student progress.

AVID provides both school-wide and targeted instructional strategies along with professional development to approximately 260 teachers and administrators to promote a positive districtwide impact to redress the student performance gap. PCSSD was the first district in the state to implement AVID at the elementary level and was also the first district in the nation to implement AVID throughout K-12. AVID helps students develop the skills they need to be successful in college placing special emphasis on growing writing, critical thinking, teamwork, organization and

reading skills. The implementation of AVID has been spearheaded by Assistant Superintendent of Equity & Pupil Services Dr. Janice Warren and reaches grades 3 through 12. To facilitate implementation, PCSSD staff engaged in site visits to AVID demonstration schools, summer training with school teams, and on-site training for all schools. Additionally, PCSSD's commitment to AVID is shown by bi-weekly school site visits by the Deputy Superintendent as well as monthly reviews at principal and assistant principal meetings.

### c.      Collaborative Instructional Approaches and Initiatives

PCSSD has implemented a plethora of initiatives that address the requirements of the Ross Plan so as to meet the goals of Plan 2000. Since 2018, instructional initiatives have been vetted through the 90/90/90 research. 90/90/90 schools are those that were identified because they are at least 90% combined minority, at least 90% free or reduced lunch qualified students, and at least 90% successful on standardized assessments. These schools would appear to be doing something unexpected that is leading to a high level of student achievement under challenging circumstances. PCSSD has sought to implement this research to reap the benefits of lessons learned through this research. The high achieving schools were found to have five commonalities, all of which PCSSD seeks to emulate. The five areas are: (1) there is a strong emphasis and focus on achievement, (2) there are clear curricular choices, (3) there are frequent assessment and multiple chances for students to show improvement, (4) there is a strong emphasis on writing in all academic areas, and (5) there is an external scoring of student work.  The 90/90/90 research enables PCSSD to achieve education equity while serving students from low-income and high-minority backgrounds through consistent practices. Implementation has been spearheaded by Dr. McNulty and Deputy Superintendent Smith, impacting grades K through 12. To support the implementation of the

90/90/90 research, Professional Development (PD) is provided at monthly principal and assistant principal meetings, bi-weekly site visits, and School Improvement Plans.

PCSSD has used Curricular Teams (since 2012) to increase rigor across all schools. These teams rewrite and revise the math, English Language Arts (ELA), and science curriculum and pacing guides as standards are revised. They involve various administrators, instructional coaches, and teachers impacting grades K through 12. Curriculum for each content area is regularly monitored and revised to align curriculum with the state curriculum and best practices. Pacing guides are regularly monitored and revised to make sure that strategies yield intended instructional outcomes.

PCSSD has implemented Professional Learning Communities (PLCs) (since 2011) to support collaborative instructional approaches based on student performance outcomes. PLCs create a space where educators can meet regularly to share expertise, disaggregate data, and work collaboratively to improve teaching skills and the academic performance of students. PLCs involve Solution Tree,[10] administrators, instructional coaches, and teachers, impacting grades K through 12. Relevant training was held during the summer, fall, and winter of 2019. Master schedules reflect common planning time for literacy and math to facilitate PLCs, and the Deputy Superintendent attends PLCs during bi-weekly visits to the schools. PLCs have been strengthened districtwide through additional professional development (2019-2020).

The Equity Lab initiative has been implemented since 2018 to provide high quality instruction to African American and/or high poverty students. Additionally, a balanced assessment framework (2019-20) has been used to accurately identify and pedagogically respond to student

---

[10] Solution Tree is a professional development company and publisher of educational material for K–12 educators.

performance outcomes, which builds a foundation for systemic action to address student achievement. Pedagogical practices such as small group instruction, R.I.S.E.[11] basal readers to support reading comprehension, credit recovery at the secondary level, the acquisition and use of Next Generation Science textbooks, and the Donaldson Scholarship initiative have been deployed as well.

### d. Initiatives and Developments Supporting African American Students and Lifting All Students.

PCSSD has refined and executed Plan 2000 to support African American students while at the same time increasing achievement for all students. This is shown through the following programs, focuses, and initiatives.

First, PCSSD has prioritized Professional Development that supports high yield instructional initiatives. Effective professional development must utilize outside of school training, at-school support, and in the classroom coaching. Substantial effort has been made to provide learning opportunities to central office administrators, principals, assistant principals, and instructional coaches on such topics as Culturally Relevant/Responsive Teaching, AVID, Professional Learning Communities, Implicit Bias, 90/90/90 school-based instructional practices, school improvement planning, balanced assessment, and PBIS. The implementation of these high-yield instructional practices is monitored in the action plans of each school's improvement plan. Culturally Relevant/Responsive Teaching Professional Development focuses on ensuring that each student can relate course content to his or her cultural context by teaching in a cross-cultural

---

[11] R.I.S.E. (Reading Initiative for Student Excellence) Arkansas encourages a culture of reading by coordinating a statewide reading campaign with community partners, parents, and teachers to establish the importance of reading in homes, schools, and communities. R.I.S.E. is the State's balanced literacy initiative.

or multicultural setting. This has been spearheaded by Dr. McNulty and impacts grades K through 12. PD is provided at monthly principal and assistant principal meetings.

Second, PCSSD has provided Stereotype Threats Professional Development. The purpose of this programming is to confirm negative stereotypes about an individual's racial, ethnic, gender, or cultural group. This has been spearheaded by Dr. McNulty and impacts grades K through 12. PD is provided at monthly principal and assistant principal meetings.

Third, PCSSD has ramped up Literacy Instruction and AVID. Teachers are supported at the elementary level regarding literacy instruction and AVID. At the secondary level, AVID professional development and small group instruction is provided either outside the district, at district-wide professional development, or in the classroom by coaches.

Next, in addition to tracking student achievement through the ACT-Aspire summative assessment, since 2012 PCSSD also utilizes interim assessments to (1) evaluate where students are in their learning progress, and (2) determine whether they are on track to performing well on future assessments, such as standardized tests and end-of-course exams. In other words, the robust use of interim assessments provides more timely tracking of progress to avoid the development of gaps, and to assess in real time whether progress is being made to close existing gaps. This is overseen by Program Administrators/Instructional Strategists, Instructional Coaches, and teachers, affecting grades 3 through 12. To this end, Instructional Coaches were trained on the NWEA MAPP.[12] Additionally, assessments were created by a team and pushed out every three weeks.

---

[12] Northwest Evaluation Association (NWEA) Measure of Academic Growth (MAP) assessments measure what students know and inform teachers what students are ready to learn next. The programs create personalized assessments that accurately measure performance by adjusting to a student's response.

Similarly, Common Formative Assessments (CFAs) have been used beginning in 2016 to generate immediate student achievement data to monitor progress and evaluate instructional effectiveness as well as guide teachers who may need to shift instruction to meet the needs of their students. This is overseen by Program Administrators/Instructional Strategists, Instructional Coaches, and teachers, affecting grades 3 through 12. Instructional Coaches were trained on USA Test Prep[13] and Assessments were created by a team and pushed out every three weeks.

PCSSD has partially implemented Accelerated Reading (AR) to monitor reading practice and progress, and to help teachers guide students to books that are on a student's individual reading levels. PCSSD has partially implemented STAR Math[14] to monitor and manage mathematics skills practice, from preschool math through calculus. To facilitate these programs, Renaissance has provided training for teachers and administrators, and both have continually been in place since 2012. AR impacts grades K to 12, and AM is implemented in grades K through 5. For both, administrators, Instructional Coaches, and teachers received training on the platforms, and regularly assess students to determine growth and inform instruction.

PCSSD has been adherent to the Arkansas Initiative for Math and Science (AAIMS) since 2012. AAIMS is for grades 6 through 8, and it strengthens teaching of the AP® and grades 6-10 advanced pathway/accelerated mathematics, science, and English courses and to build enrollment and increase the number of students taking and earning qualifying scores on AP® exams in these

---

[13] USA Test Prep is recognized as a nationwide leader in curriculum resources and test preparation for high schools, middle schools, and elementary schools.

[14] The acronym "STAR" previously stood for "Standardized Test for the Assessment of Reading." However, this meaning is not retained because the creating company has made STAR assessments for skills in domains other than reading, for example STAR Math. As such, "STAR" originated as an acronym but is no longer used as such, and instead has taken on a meaning of its own.

subjects and better preparing students in general for higher education and career. To facilitate implementation, College Board provides training for teachers and administrators. Administrators, Instructional Coaches, and teachers are trained in strategies geared to build enrollment and increase the number of students taking and earning qualifying scores on AP® exams while preparing students for rigorous post-secondary courses.

Similarly, PCSSD supports the Arkansas Leadership Academy, which develops leadership skills that bring coherence for everyone in understanding transformational and sustainable system change by managing system components within the big picture. This is implemented on all PCSSD campuses, and is overseen by administrators, Instructional Coaches, and teachers since 2012.

PCSSD has utilized an ADE School Improvement Specialist (Comprehensive Schools) to facilitate the school improvement process from 2012 to 2016. This was supported by an employee of the district designated to facilitate the school improvement process.

PCSSD used Program Administrators for Content Areas to facilitate the planning, implementing, and evaluating of educational curriculum and programs in core discipline areas from 2012 to 2018. This impacted grades K through 12, and was spearheaded by Jennifer Beasley, Brandy Beckman, Dr. Renee Dawson, Lourdes Goodnight, Lance Levar, Dr. Kiffany Pride, Leta "Bobbette" Ray, and Nicole Townsend.

Instructional Strategists were used to oversee the improvement of classroom testing programs, monitor the weekly and daily improvement of learning goals, and modify instructional methods that might not be achieving those goals. Leta "Bobbette" Ray and Dr. Laura Strickland oversaw these efforts impacting grades K through 12, and this has been in place since 2018.

PCSSD has utilized Dyslexia Interventions/Interventionists to provide targeted or intensive reading intervention services that reflect the principles and practices of Structured Literacy to

individual and small groups of students. These efforts were for grades K through 12, and were supported by administrators, Instructional Coaches, and teachers receiving training throughout each year on the Sonday model, school based identification, Assessment level 2, and R.I.S.E.

Finally, a series of other initiatives have also been utilized by PCSSD to address achievement gaps and bolster student performance. K - 5 Math Adoption (Go Math) was implemented in the 2012-2013 school year to update the math resources available at the K - 5 level, and this continued through the 2019-2020 school year; Handwriting Adoption (Writing without Tears/Keyboarding without Tears) was implemented in the 2015-2016 school year to reintegrate handwriting and introduce keyboarding to the elementary level, and this continued through the 2018-2019 school year; and K - 5 ELA Adoption (Journeys) was implemented in the 2016-2017 school year to update the ELA resources available at the K - 5 level, and this is ongoing.

### e.    School Improvement Plans

Since 2011, PCSSD has designed and implemented an organizational structure to provide a foundational leadership platform to support equitable and high yield research-based initiatives. The development of School Improvement Plans[15] uniquely designed to support Plan 2000 began during the 2017-18 school year and was refined during the 2019-20 school year to allow for real-time systemic monitoring of instructional initiatives, targeted interventions that support African American students, and the development of leading indicators that support a results orientation for instruction and student performance. These School Improvement Plans elevate the monitoring

---

[15] The State of Arkansas used the Arkansas Comprehensive School Improvement Plan (ACSIP) as its School Improvement Plan platform until 2015. The State began the transition to INDISTAR as the School Improvement Plan platform during the 2015-2016 school year. As such, the Court may notice both the Arkansas Comprehensive School Improvement Plan (ACSIP) and School Improvement Plan (SIP) descriptions and acronyms used at various times by various witnesses.

ability of the District's Steering Committee in the analysis of PCSSD practices that support achievement of African American students. These School Improvement Plans offer targeted attention paid to math and literacy to report targeted strategies of efforts to increase student achievement in those respective areas. PCSSD contracted with School Improvement Consultant Dr. Donyall Dickey to facilitate the school improvement process at specific schools. This was for grades 3 through 12, and was for the 2015-2016 through the 2018-2019 school year.

### D. PCSSD is Unitary in Discipline.

PCSSD is unitary in the area of discipline because it has substantially complied in good faith with the requirements of Plan 2000, Section F, and has met the goals of the Ross Plan. Since 2011, the District has continued its efforts to close the discipline disparity between black and non-black students. Several initiatives and systems have been implemented to create equitable disciplinary measures for all students, specifically African-American students. The District's primary focus is to reduce discipline and eliminate the disparity. The Court appointed expert, Margie Powell, summarized the current climate as follows:

> After years of perfunctory initiatives and poorly designed behavior programs, district personnel have joined together to develop a discipline system that is researched based, student centered, and that seems to be working. The PCSSD has created a network of programs, practices, and initiatives that have already resulted in a significant drop in discipline sanctions in the past three years.
> …
>
> With its interconnected discipline programs system, the district administration has demonstrated that eliminating discipline disparities is a priority and, based on the data for the past three years, it seems to be doing just that. In the PCSSD, eliminating discipline problems and closing the disparity gap is everyone's responsibility.

(Doc. 5531, pp. 7-8).

Before setting out PCSSD's case on discipline, there are some important threshold issues for the Court to consider. Section F of Plan 2000 contains subsections F(1) through F(6). ODM

has declared that PCSSD has met its obligations under F(2), F(4), and F(5). (Doc. 5531, p. 2).

Also, in 2011 Judge Miller found that PCSSD was compliant with F(2) and F(6). In addition, the

provisions of F(6) have been institutionalized in the District since 2000.  Ms. Powell's report on

PCSSD discipline summarized where the issue of discipline stands today:

> Please note that some Plan provisions: F 2, 4, 5 are time specific dating back to
> 2000. In 2008, The Office of Desegregation Monitoring reported to the Court that
> the PCSSD had met its obligations under those provisions. As a result, those
> provisions are not included in this report. In addition, some job titles have been
> changed or have been eliminated since Plan 2000 was developed. Provision F 6 has
> been institutionalized since the year 2000 and is not included in this report.

(Doc. 5531, p. 2). As such, PCSSD requests that this Court not receive evidence, testimony, or

proof about Plan 2000 Sections F(2), F(4), F(5), and F(6) because PCSSD has been declared

compliant in these subsections.[16] Nevertheless, this Motion summarizes PCSSD's compliance

with all subsections of Section F of Plan 2000.  PCSSD should be adjudicated unitary in discipline

for the following reasons.

### 1.      Section F(1): Data Collection

Section F(1) requires that PCSSD continue to gather data to allow for a full assessment of

its success in achieving its objection of eliminating racial disparities in the imposition of school

discipline. Section F(1) also requires that PCSSD maintain records on student discipline that

identify certain metrics. PCSSD has met and continues to meet these requirements.

PCSSD creates Annual Discipline Reports from discipline data that is entered into a state

database system called eSchool. Each Annual Discipline Report quantifies discipline data by

showing the type of discipline imposed, whether the discipline occurred in an elementary or

secondary school, the breakdown between black and non-black students, and the breakdown

---

[16] PCSSD filed a separate Motion *in Limine* Regarding Unitary Areas in Discipline. (Docs.
5617, 5618). That motion and brief are incorporated herein by reference.

between males and females. The data shows the following discipline measures: out of school suspensions, bus suspensions, in-school suspensions, expulsions, and pupil services hearings. Each report contains additional data analysis, narrative summaries, and recommendations for improvements. These reports have been periodically provided to Intervenors. In addition to the Annual Discipline Reports, PCSSD also compiles mid-year reports that it distributes internally to principals of each school.  These measures meet and exceed the data gathering requirements of Section F(1).

PCSSD has also met the recordkeeping requirements in Section F(1).  Through the eSchool system, each of the disciplinary measures referenced above is logged and stored.  Each record shows the nature of the discipline imposed, the teacher and any other staff member involved, the school where the incident occurred, and the race and sex of the student.

Further, Judge Miller found that PCSSD was in compliance with Section F(1) in 2011. (Doc. 4507, pp. 62-63). Judge Miller observed that "[w]hile in-school suspensions are indeed a type of discipline and should be included in the data collected, their exclusion does not require a finding that Pulaski County failed to implement this subsection of Plan 2000." (Doc. 4507, p. 63). Learning from this observation by Judge Miller, beginning with the 2011-2012 school year, the Annual Discipline Reports now include in-school suspensions.

## 2.    Section F(2): Criteria for Identifying Discipline Issues

Section F(2) requires that, not later than 45 days after the approval of Plan 2000, PCSSD was to propose criteria for: (1) identifying teachers and other staff who are experiencing problems which require attention, (2) identifying schools that have atypically high discipline rates, and (3) identifying schools that have atypically high racial disparities in discipline.  PCSSD has identified and continues to utilize such criteria in addressing discipline.

As Ms. Powell identified in the section of her report quoted above, this obligation under Plan 2000 was imposed in the year 2000 and existed at a discrete moment in time. Judge Miller found in 2011 that "[a]lthough Pulaski County did not meet the 45 day deadline, criteria for identifying the three categories listed above were developed and provided to Joshua. Joshua acknowledges this in its proposed findings of fact and conclusions of law." (Doc. 4507, p. 63). As drafted, this section of Plan 2000 is complete, and any previous failure to meet the 45 day deadline is not relevant today, because Judge Miller already accounted for this fact in 2011.

### 3.     Section F(3): Goals to Eliminate Disparity

Section F(3) requires that PCSSD make efforts to work with schools, teachers, and personnel identified using the Section F(2) criteria to promote achievement of the goal of eliminating racial disparities in school discipline.  PCSSD's efforts to eliminate racial disparities in discipline have been and continue to be extensive.

PCSSD continues to identify discipline issues using the Section F(2) criteria. In 2011, Judge Miller observed that PCSSD provided "no guidance" for schools on how to identify individual teachers and staff members with discipline issues. (Doc. 4507, p. 66).  Since then, the District now identifies schools, teachers, and other staff with high discipline rates by reviewing data entered into the District's student database, eSchool. The District extracts data in the form of a report by the District's IT department. This report is reviewed by the Office of Equity & Pupil Services. Based on the data, individual teachers and personnel are identified for additional training and development.  Schools with the highest number of referrals and suspensions are identified as schools in need of support. A year-to-year data comparison is used to determine an increase or decrease in referral and suspension rates. Resources and services, as explained below, are provided to those schools to address any disparity.

Since 2011, PCSSD engaged two consulting services to address the issues of racial disparity in discipline: Dr. Mack Hines of Mack Hines Consulting and Dr. Walter Milton of From the Heart International Education Services, Inc.  Both Dr. Hines and Dr. Milton provided services that were tailored specifically to address issues concerning African American students. The consultants provided Professional Development training for staff identified as having high rates of discipline referrals. The training was delivered through group and individual sessions during site visits to schools and after school hours.  The consultants also spent numerous hours observing the classrooms of teachers identified as having high discipline rates. Dr. Hines worked with the District from 2012 until 2019.  Dr. Milton worked with the District from 2011 to 2017.  The District decided to institutionalize many of the practices from these consultants and phase out continued services.

In the last two years, the District itself provides services to school administrators to address any disproportionality shown by the data within the individual school. Administrators complete a discipline disproportionality worksheet and submit it to the Director of Pupil Services. Those schools which are identified as disproportionate will be asked to create an action plan for each individual school.

PCSSD currently uses numerous other initiatives specifically tailored to eliminate racial disparities in discipline. The initiatives to address goals of Section F(3) overlap with Section F(5) and are discussed more extensively below.  By way of example, student and staff supports such as multiage classrooms for elementary students, alternative learning classrooms for secondary students, teacher cohort training regarding culturally responsive teaching, Positive Behavioral Intervention Supports, AVID, and Teen Court are being, and in most cases have been, implemented to reduce racial disparity. Additionally, the ADE POINT Mentoring Program

provides for first and second year teachers to receive classroom management culturally responsive training.

PCSSD has further adopted the specific recommendations listed below tailored to reduce racial disparity in discipline.

| Recommendation & Date | Recommendation Implemented & How | Results |
|---|---|---|
| Culturally Responsive Training – Dr. Mack Hines – 8/5/2014, 8/12/14 – 8/14/14 (Assistant Principal Training) | Implemented Leading Teacher Success Towards Building Positive Behavior within African American Students – | Efforts made to decrease discipline |
| Culturally Responsive Training – Dr. Mack Hines – 2015 6/10 – 6/11, 8/6 – (Principals) 6/2 – 6/3, 8/7 – (Assist Principals) 4/20, 7/31, 8/10, 8/27 – (Teachers) | Implemented African American Student Success Discussions. Principals, Assistant Principals & Teacher Leaders | Efforts made to decrease discipline |
| Focus School Support Plan Data Collection Visits Consultant /Training Dr. Mack Hines 4/2015 – 5/2015 6/2015 – 8/2015 9/2015 – 3/2016 4/2016 – 5/2016 (Principals, Assistant Principals & Teacher Leaders) | Implemented Focus School Support Visual of Vision of Support for Black Children Dr. Mack Hines conducted a data collection visit, conducted a district wide professional development on: Developing teacher effectiveness for addressing disciplinary situations with African American Students. | Efforts made to decrease discipline |
| Consultant & School Support Dr. Mack Hines 4/15/16 – 5/31/17 | Implemented African American Student Discipline. Visits with focus schools | Efforts made to decrease discipline |
| Culturally Responsive Training- Professional Development – Focus Schools Dr. Mack  Hines 7/1/17 – 5-31/18 | Implemented III Phase Approach to Guide Each School's Approaches to Addressing Disciplinary Issues with African American Students. | Efforts made to decrease discipline |

| Culturally Responsive Training – Dr. Mack Hines 8/2018 – 12/2018 (Principals & Teachers) | Implemented Project HABSS (Harris Approach to Black Student Success) | Efforts made to decrease discipline |
|---|---|---|
| Culturally Responsive Training – Dr. Mack Hines 1/8/2019 – 4/5/2019 | Implemented The African American Student Success Initiative (Administrators, Principals, Assistant Principals, Teachers) | Efforts made to decrease discipline |
| From The Heart International Educational Services Training – Dr. Walter Milton 2014-2015 | Implemented FTH Study Conducted for PCSSD | Efforts made to decrease discipline & improve educational achievement by all students, with special attention to African American students and others who are at risk of academic failure due to socioeconomic disadvantages, or other factors |
| From The Heart International Educational Services Training – Dr. Walter Milton 2015-2016 | Implemented PLPYP – Student Academic and Leadership Initiative Training - Foundations, Professional Issues & Professional Practices (Provided intensive training and technical assistance support for a cohort of school educators) | Efforts made to decrease discipline & improve academic achievement for school aged males and females by focusing on their development. |
| From The Heart International Educational Services Training – Dr. Walter Milton 2016-2017 | Implemented Culturally Responsive Education & Teacher Empowerment. A Student Academic & Leadership Initiative (Provided intensive training and technical assistance support for a cohort of school educators) | Efforts made to decrease discipline & to explore the fundamentals of human growth and development. |

The above suggestions and intervention measures show that PCSSD has since 2011 made a good faith effort to comply substantially with Section F(3) of Plan 2000.

### 4.      Section F(4): Comprehensive Study

Section F(4) requires that PCSSD conduct a study of the discipline of black students, particularly male students at the secondary level, not later than 150 days after the approval of Plan 2000. As Ms. Powell pointed out in her report, Section F(4) necessitated the completion of a discrete report that was to be completed by a certain deadline in the year 2000. In 2011, PCSSD presented a draft Discipline Study Narrative completed by Dr. Jerry Welch. Judge Miller found that PCSSD was not compliant with this section, explaining that "[a] draft study narrative that lacks suggestions and intervention measures does not satisfy Pulaski County's obligations under this subsection." (Doc. 4507, p. 67). Starting with the text of Section F(4) and the criticism of Judge Miller in 2011, PCSSD endeavored to make a good faith effort to substantially comply with the spirit of this section, even if the discrete report and the deadline imposed in the year 2000 obviously cannot be met.

In a good faith attempt to create a Section F(4)-compliant comprehensive study, PCSSD hired two outside contractors. In the 2011-2012 school year, PCSSD contracted with the University of Memphis to develop a Formative Evaluation Process for School Improvement (FEPSI). The FEPSI was a climate survey designed to analyze data regarding African-American males. The FEPSI reports were issued annually and covered grades five, eight, eleven, and twelve.  PCSSD used the University of Memphis to issue FEPSI reports until approximately 2017.

Additionally, the District contracted From the Heart International Educational Services, Inc. to conduct a study using a focus group for African-American males in grades 9-12 at Sylvan Hills High and Jacksonville High schools during the 2012-2013 school year. These schools were selected due to their high numbers of discipline in the data reports. The study's focus was to acquire

feedback on students' perceptions, opinions, beliefs and attitudes towards their experiences at school and to provide meaningful data that supports change and to bring about improvement.

Based on the data gathered from these two studies, the District began adopting and implementing the measures and initiatives discussed in Section F(3) above and Section F(5) below. Since 2011, PCSSD has made a good faith effort to substantially comply with the study guidelines initially set forth in Plan 2000.

### 5.     Section F(5): Initiatives to Reduce Discipline

Section F(5) requires PCSSD to develop initiatives to reduce rates of discipline within 150 days of the approval of Plan 2000.  Here again, this section of Plan 2000 required specific action by a date certain that has now passed 20 years ago. In 2011, Judge Miller found that indeed the District had "implemented multiple initiatives" to address discipline, but ultimately PCSSD was not in compliance with this section because of the "long delay" of nearly six years in doing so. (Doc. 4507, p. 68).

PCSSD cannot rectify the time that elapsed between the adoption of Plan 2000 and the District's first adoption of initiatives designed under this section.  Since 2011, however, PCSSD sought immediately to implement certain additional behavior initiatives. While the initiatives have shifted somewhat over the past decade as one would expect in the education world, PCSSD's commitment to actually implementing initiatives commensurate with the spirit of Plan 2000 has remained resolute. A more thorough description of each initiative is included below, however as a preview of expected testimony, PCSSD submits the following summary:

41

| Initiatives for Section F. Discipline of Plan 2000 | School Year Implemented | Period the Initiative was carried out | Description of Success/Failures |
|---|---|---|---|
| Discipline Management Plan (DMP)/ | 1991-1992 | 1991 to present | Annual Discipline Report shows increases/decreases from year to year through discipline data. |
| Multiage Classroom (Elementary) | Prior 2006 | Prior to 2006 to present | Annual Discipline Report shows increases/decreases from year to year through discipline data. |
| Mental Health Providers | Prior to 2006 | Prior to 2006 to present | Annual Discipline Report shows increases/decreases from year to year through discipline data. |
| Dr. Milton FTH - PLPYP and CREATE (Secondary)/ (1,2,3,4) | 2011- 2012 | 2011 - 2017 | Annual Discipline Report shows increases/decreases from year to year through discipline data. |
| Teacher Cohort Training (1) Culturally Responsive (2) Teaching | 2012-2013 | 2012-2014 | Annual Discipline Report shows increases/decreases from year to year through discipline data. |
| Dr. Mack Hines Culturally Responsive Training (Elementary) | 2012-2013 | 2012-2019 | Annual Discipline Report shows increases/decreases from year to year through discipline data. |
| Alternative Learning Classroom (ALC) - Secondary | 2013-2014 | 2013 to present | Annual Discipline Report shows increases/decreases from year to year through discipline data. |
| PBIS/ RtI Behavior Tier I (Mills Feeder only) | 2016-2017 | 2016 to present | As a general rule, a score of 70% or higher for each tier is accepted as a level of implementation that will result in improved student |

| | | | |
|---|---|---|---|
| | | | outcomes (successes). Based on the TFI data from 2016-2019, Landmark Elementary was the only school that scored 70% or higher for tier I implementation.      Based on the TFI data from Fall 2019, **all** the Mills Feeder Schools are considered to be at a level of implementation for tier 1 and are ready to focus on tier II (supports for targeted groups of students, specifically African-American students). |
| PBIS/RtI Behavior Tier I District-wide | 2018-2019 | 2018  to present | Fully implemented in all PCSSD schools. |
| In School Suspension (ISS) | Prior to 2006 | 2006 to present (in secondary schools) | Annual Discipline Report shows increases/decreases from year to year through discipline data. |
| AVID | 2018-2019 | 2018 to present | Fully implemented in all PCSSD schools. |

Without considering the efficacy of any one of these initiatives, their implementation demonstrates that PCSSD is no longer deserving of the criticism that it delayed implementation, it engaged in further delay, or took no action. These initiatives also demonstrate that while changes were made over time, over the past decade PCSSD has continually been making efforts to substantially comply in good faith with the entirety of Section F of Plan 2000. A more detailed summary of each program is included below.

### a.      Discipline Management Plan (DMP)

Beginning the 1991-1992 school year, PCSSD began adopting DMPs.  DMPs are discipline plans that are narrowly tailored to each school (and, sometimes, each grade level) to keep disciplinary responses from escalating outside of the classroom setting. Each school's DMP contains a plan for addressing more minor disciplinary issues.  Generally speaking, a teacher must engage in 5 steps to address the behavioral issue within the classroom before referring the student out of classroom for discipline. All DMPs include at least one teacher contact with a student parent or guardian before a discipline referral is made. The staff at each school creates its own DMP every school year based on the current disciplinary climate. At the elementary level, separate DMPs often exist for each grade level. All DMPs are approved by the Office of Equity and Pupil Services.

### b.      Multiage Classroom (Elementary)

Beginning before 2006, elementary schools in the District implemented multiage classrooms designed to meet the needs of students who require extra support and attention, not just due to discipline issues. Students in the multiage classroom may be struggling academically, socially, or behaviorally. The goal of the multiage classroom is to provide support for a short period of time and return the student back to the mainstream classroom.

### c.      Mental Health Providers

Prior to 2006, the District implemented an initiative whereby the District connected students in need with community mental health providers.  This initiative remains in place today. The mental health providers are connected with students who need support for varying reasons, including with behavioral issues.  They are given a private space within the school to meet with students during school hours.

d.      **Dr. Milton FTH – PLPYP and CREATE (Secondary)/(1,2,3,4)**

Beginning in 2011 and continuing through 2017, Dr. Milton and From the Heart Consulting helped the District to implement two programs: Positive Living Promoting Your Purpose ("PLPYP") and Culturally, Responsive, Education, And, Teacher, Empowerment ("CREATE"). PLPYP was geared toward students while CREATE was geared toward teacher trainings.

e.      **Teacher Cohort Training: Culturally Responsive Teaching**

Beginning in 2012, PCSSD used Dr. Hines' consultancy services to conduct teacher trainings on culturally responsive teaching methods. Specifically, these trainings were designed to educate teachers on how to deal with and address issues with African American male students. Dr. Hines conducted these trainings on a group and individual basis.

f.      **Alternative Learning Classroom (ALC) (Secondary)**

Since 2011, PCSSD has dramatically overhauled its use of Alternative Learning Classrooms ("ALCs"). ALCs serve students who are in need of more thoughtful services, whether due to behavioral problems, social issues, or problems with home life. PCSSD has discontinued use of the Learning Academy, which was the standalone ALC. Since then, most middle schools and high schools maintain their own ALC serving students in their own schools. In the past two years, the District has invested significant resources to open the Center of Innovation ALC for middle school students.

g.      **Positive Behavior Interventions and Supports (PBIS) / RTI Behavior Tier I**

In 2016, PCSSD began testing the Positive Behavior Interventions and Supports ("PBIS") and Response to Intervention ("RTI") methodology in the Mills Feeder school. These programs are specifically tailored to bridge cultural and racial gaps between students and teachers. PBIS looks at behaviors and issues with teachers in dealing with students, cultural components. After

success in the Mills Feeder, both the PBIS and RTI programs were implemented district-wide in 2018.

### h.      In School Suspension (ISS)

Beginning before 2006, the District began using In-School Suspension ("ISS") as a less harsh disciplinary measures in appropriate cases where suspension was not warranted.

### i.      Advancement Via Individual Determination ("AVID")

Beginning in 2018, PCSSD introduced the AVID program, discussed in more detail above in the student achievement section.  As of today, PCSSD has trained approximately 200 teachers for AVID.  As of the 2019-2020 school year, AVID is fully implemented in all PCSSD schools. The foregoing measures show that since 2011, PCSSD has a made a good faith effort to substantially comply with Section F(5) of Plan 2000 despite an initial delay in doing so that cannot today be rectified.

### 6.      Section F(6): Handbook Policies

Section F(6) requires that PCSSD follow certain policies in the Handbook for Student Conduct and Discipline.  In 2011, Judge Miller concluded "Pulaski County has complied with this subsection." (Doc. 4507, pp. 68-69). As such, the Court need not engage in fact finding on this issue as PCSSD has clearly met its obligations under Plan 2000.

Notwithstanding the foregoing, to the extent the Court seeks reassurance that PCSSD continues to remain compliant there is ample evidence to so conclude. Dr. Whitfield continues serving as PCSSD's hearing officer, and he oversees PCSSD's efforts to make sure that the handbook is being followed. Dr. Whitfield, among others, remains laser focused on watching for disparities that arise in PCSSD's discipline data, and he takes steps to address any disparities. Further, soon after 2011, PCSSD convened a diversity committee. Plan 2000 has been addressed

at retreats with administrators, and during some of those times with administrators PCSSD looked at discipline disparities and specifically at teachers with disparate numbers. Dr. Whitfield has intervened to address particular situations where necessary. Plan 2000 was addressed at new teacher trainings held since 2011, and the Board also received training about Plan 2000 compliance.

### E.      PCSSD is Unitary in Facilities.

Section H of Plan 2000 requires that "*existing* school facilities are clean, safe, attractive, and equal." Plan 2000, § (H)(1) (emphasis added). The Court has stated that it will decide whether PCSSD has "made a good-faith effort to substantially comply with this plan obligation to have equal, clean, safe, attractive facilities across the district." (Doc. 5565, 27:23 – 28:1).[17] While this standard is a guide star, it is not overly specific. With the purpose of fleshing out what this standard looks like when implemented, the parties engaged in an arm's length negotiation and came to a roadmap by which to reach full unitary status. A joint motion to amend Plan 2000 was filed, wherein the parties represented to the Court:

> PCSSD'S quest for *full unitary status* through cooperation with Joshua demands
> an alternative commitment, a Plan B as it were, to remediate that need in the event
> of a negative vote on the aforesaid millage increase. Therefore, PCSSD commits to
> the *circa* $50,000,000.00 new Mills High School, and the *circa* $5,000,000.00

---

[17] One benefit of preparing a comprehensive brief such as the instant one is an opportunity to reexamine the case essentially since its inception. Upon this examination, the undersigned paid close attention to the applicable legal standard and controlling documents, leaving no assumption unchallenged. This led to some interesting places. For example, the standard requiring that "school facilities are clean, safe, attractive, and equal" applies, by the terms of Plan 2000 § H, to "*existing*" schools. Understanding the foregoing, PCSSD objects to this standard being applied to school construction because it goes beyond what Plan 2000 required. Also, to the extent that this standard applies to "existing" schools, contractually it can only apply to schools existing at the time of implementation of Plan 2000. In other words, it does not apply to the schools that are the subject of this judicial inquiry. In place of this contractually imposed standard that arises from Plan 2000, PCSSD submits that the controlling standard should instead be that defined by the parties' 2014 Joint Motion replacing all prior plans. *See* PCSSD's Brief in Support of its Motion *in Limine* to limit argument and evidence about facilities, incorporated herein by reference. (Docs. 5619, 5620).

conversion of existing Mills to a middle school, regardless of the success of the millage election. It is the intention of this Plan B commitment to bind PCSSD irrevocably, regardless of its future governance and administration, to the construction of a replacement facility for Mills, to begin promptly after any millage election.

(Doc. 5084, p. 3) (emphasis added). Although this joint motion contained several alternative plans, it is undisputed that this is the one that came to be controlling by virtue of a negative vote on the contemplated millage increase.

In response to this joint motion to amend Plan 2000, expert Margie Powell provided the Court valuable analysis and insight. (Doc. 5087). She wrote "[i]n my opinion, the proposed supplement to the Plan mainly serves to hold the district's feet to the fire with respect to following through on its commitment to the patrons in the southeast quadrant, no matter what happens in the future." (Doc. 5087, p. 2). The Court studied these filings, and granted the joint motion with regard to facilities, writing:

The Court applauds, and approves, the District's Plan A and Plan B for achieving unitary status in its school buildings and other structures. Ms. Powell is right: the new plans bind the District to do what it has been considering, and working toward, for some time.

(Doc. 5091).

The language in the joint motion to amend Plan 2000 makes it clear that this was intended to be a roadmap to "***full unitary status***" and also that the obligations expressed therein were intended to be binding on PCSSD. Ms. Powell offered her commentary in agreement. And most importantly, the Court reiterated that this new plan was to be "the District's Plan A and Plan B ***for achieving unitary status in its school buildings and other structures***." It is axiomatic that the new plan cannot be binding solely on PCSSD, lest the entire agreement be an illusory promise. In other words, PCSSD agreed to have its "feet [held] to the fire with respect to following through on its commitment to the patrons in the southeast quadrant"—that commitment being the expenditure of

$55,000,000.00. The consideration for this significant financial commitment was achieving full

unitary status. It is clear that counsel for Intervenors and PCSSD signed off on these plans in

agreement. (Doc. 5084, p. 5).

In evaluating whether PCSSD has substantially complied in good faith with Plan 2000 as

modified by the amendments summarized above, the Court must inquire about whether PCSSD

constructed a new Mills High School for $50,000,000.00 and whether PCSSD converted the Mills

Middle School project for $5,000,000.00.  As the Court is well aware through campus tours, the

construction has taken place and is largely completed. Furthermore, in support of its contention

that it has upheld its end of the bargain in this area, at the trial of this matter PCSSD will present

adequate proof to demonstrate to the Court that it has followed through on its total $55,000,000.00

commitment.

Specifically on the subject of good faith regarding facilities, Intervenors made stipulations

that reflect on the issue, mainly:

> The provisions of this motion are intended to demonstrate PCSSD's good faith in
> addressing and remediating the unconstitutional disparities that exist as to its
> facilities. Joshua accepts and agrees that the PCSSD general plan commitments,
> and particularly its specific irrevocable obligations pertaining to new and improved
> high school and middle school facilities in the predominantly black southeast
> quadrant of PCSSD, are, indeed, substantial evidence of PCSSD's good faith in
> removing its constitutional deficiencies regarding facilities.

(Doc. 5084, pp. 1-2). By following through on its commitments under this binding amendment to

Plan 2000 through the expenditure of $55,000,000.00 PCSSD demonstrated its good faith, as

agreed by Intervenors.

In any event, the facilities at College Station, Harris, and any location other than those

expressly addressed by the amendment to Plan 2000 are not relevant to the question of whether

PCSSD has achieved unitary status. (Docs. 5084 and 5091). At the time that Intervenors and

PCCSD negotiated over the obligations assumed by the 2014 amendment, Intervenors did not insist on new or renovated facilities at College Station, Harris, or any other school. (*Id*.). They did not insist on a promise covering the specific features of Mills High School that have now become the subject of their sundry complaints. (*Compare* Doc. 5528 *with* Docs. 5084 and 5091). This argument applies to essentially every facilities related issue that Intervenors are desperately trying to make the subject of this case. If other facilities or other obligations were arguably part of Plan 2000, the time for raising any such argument has long since passed. *See United States v. City of Fort Smith,* 760 F.2d 231, 233–34 (8th Cir. 1985) ("[w]e note that, for purposes of enforcement, consent decrees are to be construed as contracts"); *Southern Pipe Coating, Inc. v. Spear & Wood Manufacturing Co.,* 235 Ark. 1021, 363 S.W.2d 912, 914 (1963) ("one party to a contract who, with knowledge of a breach by the other party, continues to accept benefits under the contract, and suffers the other party to continue in performance thereof, waives the right to insist on the breach"); *Stephens v. West Pontiac–GMC, Inc.,* 7 Ark. App. 275, 647 S.W.2d 492, 493 (1983).

By way of illustration, an aside addressing the history of this case will prove illuminating. In 2004, there was an opinion addressing a very similar argument raised by the Joshua Intervenors, who were attempting to make issues relevant after staying silent at the time that binding decisions about those issues were made. Judge Wilson wrote:

> … traditional contract principles bar Joshua from arguing, at this late date that LRSD violated § 2.12.2. Joshua's current interpretation of that section was never brought to the attention of LRSD during the term of the Revised Plan. Joshua knew no later than March 15, 2000, that LRSD was not "investigating" the racial disparity in student discipline of Joshua's silence precludes it from now arguing that § 2.12.2 required such an investigation.

(Doc. 3675, p. 166) (*aff'd sub nom. Little Rock Sch. Dist. v. Armstrong*, 359 F.3d 957 (8th Cir. 2004)).

Similar to that historical episode, if the Intervenors' current interpretation of Plan 2000 is that PCSSD is required to address facilities at College Station and Harris, or take any particular course of action at either of the Mills schools, the time for raising this interpretation of Plan 2000 was when making bindings facilities amendments thereto in 2014. They did not do so. (Docs. 5084 and 5091). Intervenors accepted benefits under this amendment, extracting the promise of a new Mills High School and a renovated Mills Middle School, and indeed seeing PCSSD deliver on those promises. Therefore, in accordance with the legal principle that consent decrees are construed as contracts, and that continuing to accept benefits under a contract without objecting waives the right to insist on the breach, Intervenors are now limited by the contractually binding language of the 2014 amendment to Plan 2000. *See United States v. City of Fort Smith,* 760 F.2d 231, 233–34 (8th Cir. 1985); *Southern Pipe Coating, Inc. v. Spear & Wood Manufacturing Co.,* 235 Ark. 1021, 363 S.W.2d 912, 914 (1963).

The case to be made on PCSSD's facilities is a straightforward one, it being entirely controlled by the 2014 amendments to Plan 2000. This understanding of the binding amendment to Plan 2000 is stated clearly in its penultimate sentence, as both parties represented to the Court that this was a plan to "make PCSSD fully constitutional." (Doc. 5084, p. 4). As demonstrated above, in this area of the case the Court respectfully has very little discretion because PCSSD's achievement of unitary status is established as a matter of contractual interpretation. Additional argument about facilities is found in PCSSD's separately filed Motion *in Limine* to Limit Argument and Evidence about Facilities, and that separate filing is incorporated herein by reference. (Docs. 5619, 5620).

F.      **PCSSD is Unitary in Monitoring.**

Section N of Plan 2000 governs monitoring. Much of PCSSD's monitoring obligations under Plan 2000 are derivative of its substantive obligations under Student Achievement and Discipline. As such, because PCSSD has substantively shown above that it is deserving of unitary status in those underlying areas, the same outcome with regard to monitoring follows.

Although introduced above, it bears repeating here that the relevant inquiry in evaluating PCSSD's monitoring efforts is substantial compliance, not perfection. Judge Wilson explained that an inquiry under this standard requires the Court to "examine whether any of [the district's] failures to comply with the Revised Plan in the … challenged areas are 'serious enough': (1) to constitute 'substantial noncompliance'; and (2) 'to cast doubt' on [the district's] "future compliance with the constitution." (Doc. 3675, p. 80) (citing *Cody v. Hillard,* 139 F .3d I I 97, 1199-1200 (8th Cir. 1998)). In other words, assuming without conceding that Intervenors do show an instance of monitoring noncompliance, this does not spell defeat for PCSSD.

With the transformative revolution of computerization and the internet, Ms. Powell also astutely observed that "Plan 2000 is twenty years old, and information gathering and methods used to interpret data has changed considerably . . . Fortunately, the PCSSD has progressed into the new era of information gathering and data processing, and has a new monitoring tool; Educational Equity School Monitoring." (Doc. 5559, p. 5).

Consistent with its obligations to engage in appropriate monitoring, PCSSD has used a variety of tools over the years to see that monitoring happens in an effective manner, and in a way compliant with Plan 2000. While the particular methods have shifted over the years to match the evolving needs of the district's students, PCSSD's commitment to both the letter and the spirit of

its Plan 2000 Section N monitoring commitments has been unwavering. PCSSD's monitoring

efforts are reported below in chart form:

| INSTRUMENT | School Year(s) Utilized | Person/Entity Recommended | School Year was Reconstructed | Why Change | Results |
|---|---|---|---|---|---|
| School Profile | 2012-2016 | Equity & Pupil Services Department | 2016-17 | Duplication of information | For data collection |
| Elementary Equity Monitoring | 2012-2016 | Equity & Pupil Services Department | 2016-17 | Duplication of information | To create/submit an Action Plan for areas of concern |
| Secondary Equity Monitoring | 2012-2016 | Equity & Pupil Services Department | 2016-17 | Duplication of information | To create/submit an Action Plan for areas of concern |
| Elementary Equity Monitoring | 2016-2018 | Coordinator of Equity Initiatives | 2018-19 | Practical to combine the instruments | Create/submit an Action Plan for areas of concern with supporting documentation |
| Secondary Equity Monitoring | 2016-2018 | Coordinator of Equity Initiatives | 2018-19 | Practical to combine the instruments | Create/submit an Action Plan for areas of concerns with supporting documentation |
| Educational Equity Monitoring | 2018-Present | Coordinator of Equity Initiatives | Still in Use | N/A | Create/submit an Action Plan for areas of concerns with supporting documentation |

1.      **Section N(1)**

Section N(1) requires that PCSSD develop a monitoring plan and provide the Intervenors with a list of staff members responsible for carrying out the plan within 30 days of the approval of Plan 2000. In 2011, Judge Miller found that PCSSD was not unitary with regard to subsection one, writing "[t]his is the case because it failed to timely submit the required documents to Joshua; it took more than two years to adopt a monitoring plan, and the monitoring plan it finally submitted was rejected outright by the ODM as woefully inadequate." (Doc. 4507, p. 105). In other words, PCSSD did not comply with this subsection by a date certain in the year 2000. As with several of the subsections of discipline discussed above, as of Judge Miller's 2011 opinion of such noncompliance due to time must be set aside, otherwise PCSSD could never attain unitary status due to a procedural misstep twenty years ago.

Moving forward from Judge Miler's 2011 findings, PCSSD submits its annual monitoring report to the school board each August and sends a written copy of the Board report to the Intervenors. This annual monitoring report focuses on the monitoring and compliance efforts related to the remaining elements of Plan 2000, and is reported in such a way that the responsible PCSSD staff members responsible for implementation are identified. Additionally, and specifically speaking to corrective actions and interventions where problems may be found, PCSSD has made Educational Equity School Monitoring Action Plans. These actions address the requirements of Plan 2000, and seek to remedy the concerns raised by Judge Miller in 2011. As such, PCSSD has substantially complied in good faith with subsection one of Section N.

2.      **Section N(2)**

Judge Miller succinctly summarized the requirements of Section N(2) as follows:

Subsection two of this section requires Pulaski County to allow Joshua to examine and secure copies of all records relating to Pulaski County's compliance with the plan and to allow Joshua an opportunity to meet with the assistant superintendent for desegregation or staff members responsible for implementing particular sections of the plan.

(Doc. 4507, p. 105). Judge Miller heard extensive argument and evidence surrounding this subsection, and he concluded: "[PCSSD] acted in good faith and substantially complied with this subsection. This does not, however, relieve Pulaski County of its duty to continue implementing this provision in good faith until it is declared entirely unitary and excused from supervision." (*Id*.).

Expert Margie Powell examined this issue and concluded that "[t]here is no evidence that the PCSSD has not complied with this subsection of Plan 2000." (Doc. 5559, p. 4). Indeed, PCSSD has continued its efforts to maintain compliance with this Subsection of Section N. Specifically, PCSSD has continued the yearly Local Equity Monitoring Reports, and the Monitoring and Compliance Reports.  These reports are substantially similar to what was being produced prior to 2011, which is the evidence upon which Judge Miller relied when he found that PCSSD was compliance with Plan 2000. As such, PCSSD is unitary in Subsection 2 of Section N.

3.      **Section N(3)**

Section N(3) requires PCSSD to submit statistical reports in a number of categories. With respect to the long list of monitoring requirements listed in Section N(3), Judge Miller found: "[t]he evidence demonstrates that Pulaski County has acted in good faith and has substantially complied with this subsection because it made a good-faith effort to track and make available all the required data." (Doc. 4507, p. 106). Expert Margie Powell examined PCSSD with respect to

Subsection 3, and concluded that "[t]he PCSSD continues to submit the statistical reports required under Plan 2000. All of them are required by the Arkansas Department of Education (ADE)." (Doc. 5559, p. 4). PCSSD has continued its efforts to maintain compliance with Section N(3). Specifically, as already explained above, PCSSD has continued producing reports that are substantially the same as those produced prior to 2011. As such, PCSSD is unitary in Section N(3).

## IV.    CONCLUSION

PCSSD is deserving of a declaration of complete unitary status. The most straightforward determination to be made is on the issue of facilities, where this outcome is all but preordained following the joint motion to amend Plan 2000 providing the $55,000,000.00 benchmark to achieving, by its own terms, "*full unitary status*." (Doc. 5084, p. 3). The determination in student achievement is also mostly controlled by prior stipulation, Intervenors agreeing that the Donaldson Scholars Academy would become a *substantial component* of PCSSD's desegregation obligation on the subject of student achievement. (Doc. 5018, pp. 2-3). That program has now been implemented. Beyond the Donaldson Scholar's Academy, there is still more than adequate evidence in the record to find that PCSSD is unitary on student achievement. On discipline, PCSSD has maintained a longstanding commitment to Plan 2000, and although this is certainly not required for a finding of unitary status, discipline disparities in PCSSD are trending down. The issue of monitoring largely follows the outcomes just summarized, with the majority of this issue being handled by the fact that PCSSD has continued the same monitoring reports upon which Judge Miller relied in 2011 in finding that PCSSD was unitary to date. Any outstanding monitoring obligations have been met by adjustments in monitoring reports. Moreover, the standard for all of this is substantial compliance in good faith, and PCSSD has more than crossed that threshold. This brief is intended to give a general outline of the reasons supporting a declaration of unitary status,

however it is not meant to exhaustively present all argument and evidence, which will be forthcoming at the trial of this matter. A new day has dawned in PCSSD. The time for a complete unitary declaration has come.

Respectfully submitted,

*Devin R. Bates*
Devin R. Bates (2016184)
M. Samuel Jones III (76060)
Amanda G. Orcutt (2019102)
MITCHELL, WILLIAMS, SELIG,
  GATES & WOODYARD, P.L.L.C.
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Telephone:  (501) 688-8800
Facsimile:   (501) 688-8807
sjones@mwlaw.com
dbates@mwlaw.com
aorcutt@mwlaw.com

*and*

Jay Bequette (87012)
Cody Kees (2012118)
BEQUETTE BILLINGSLEY & KEES, P.A.
425 West Capitol Ave., Suite 3200
Little Rock, Arkansas 72201
Telephone:  (501) 374-1107
Facsimile:  (501) 374-5092
jbequette@bbpalaw.com
ckees@bbpalaw.com

***Attorneys for Pulaski County Special School District***