IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

LITTLE ROCK SCHOOL DISTRICT                          PLAINTIFF

v.                          Case No. 4:82-cv-00866-DPM

PULASKI COUNTY SPECIAL
SCHOOL DISTRICT, ET AL                          DEFENDANTS

EMILY MCCLENDON, ET AL.                          INTERVENORS

## INTERVENORS' PRETRIAL DISCLOSURE SHEET

1. **Identity of Parties**:

   Intervenors are the class consisting of all African American and black

students enrolled in the PCSSD and their parents and other care

givers(persons in loco parentis). Defendants are the Pulaski County Special

School District, the Pulaski County Special School District Board of School

Directors and the individual members of the Board of School Directors.

2. **Parties Legal Counsel**:

   Austin Porter
   Porter Law Firm
   323 Center Street
   Little Rock, Arkansas  72201

   Robert Pressman
   22 Locust Avenue
   Lexington, MA  02421

   Shawn G. Childs
   Lawrence A. Walker
   John W. Walker, P.A.
   1723 S. Broadway
   Little Rock, Arkansas 72206

3. **<u>Summary of Claims and Relief Sought</u>**:

PCSSD is required to implement four sections of Plan 2000, a desegregation plan approved and incorporated in a consent decree by a ruling of Judge S. W. Wright in 2000.  Intervenors seek the denial of PCSSD's Motion for a ruling of full unitary status  and termination in the entirety of court supervision. Intervenors seek as well additional affirmative relief regarding at least the area of facilities. At an appropriate time, Intervenors will also seek an award of attorney's fees and costs for their monitoring and substantive work.

4. **<u>Prospects for Settlement</u>:**

No current prospects for settlement.

5. **<u>Jurisdictional Basis</u>:**

Jurisdiction is pursuant to  28  U.S.C. Sec. 1343(a)(3).

6. **<u>Pending Motions</u>**:

a)  PCSSD's and JNPSD's Motion in Limine to Properly Allocate the Burden of Proof;

b) PCSSD's Motion in Limine to Limit Argument and Evidence about Facilities;

c) PCSSD's Motion in Limine regarding Unitary Areas in Discipline;

d) PCSSD's Motion in Limine regarding Joy Springer's Testimony;

e) PCSSD's Motion in Limine regarding Rizelle Aaron's Testimony; and

f) PCSSD's Motion for Unitary Status.

7. **Summary of Facts:**

Intervenors position based upon the holdings in the 2011 decisions of Judge Miller and the Court of Appeals is that PCSSD has the burden of proof on all Plan 2000 issues.  This position is not waived by any of the content of the following summaries, or this document overall.

## Achievement

PCSSD has been required to implement the "Ross Plan." The Plan's six "Educational Goals" are a focal point of the Plan. The Plan sets forth a detailed school improvement plan approach, with steps at the district and school levels,  to maximize attainment of the goals. In his 2011 opinion, Judge Miller discussed each goal and the related implementation activities. He described the "goals [as] dealing mainly with factors over which the district has direct control." [4507 at 93-94] Based on his findings, he ruled that PCSSD had not earned unitary status in the  Plan 2000 achievement sphere.

Three major "Education Goals" are as follows:

[*] To improve educational achievement by all students, with special attention to African-American students and others who are at risk of academic  failure due to socioeconomic disadvantages or other factors. [Goal One]

[*] To decrease the performance gap between white students and African American students through the systematic design/selection and implementation of intervention programs that provide effective remediation and/or adaptation to individual or group needs. [Goal Two]

[*] To establish an ongoing, systematic evaluation system at individual schools and the district level to:

[+] assess progress made at school and district levels in achieving the educational goals

[+] provide direction for "education Plan" and educational improvements where indicated.

Judge Miller ruled that the district could utilize the individual school, State-required ACSIP plans to address Goals One and two. "However, [PCSSD] must show that its ACSIPs specifically or effectively addressed the general goals set forth in the Ross Plan, and these goals include targeting black students specifically to decrease the performance gap.  [4507 at 95] Based upon evaluation of multiple factors [at 95-99], Judge Miller concluded that the evidence "[did] not indicate that [PCSSD] is making a good-faith effort to specifically target the achievement gap between black students and white students. In order to comply with the terms of the Ross Plan, [PCSSD] needs to focus on implementing and documenting intervention programs that are specifically targeted at narrowing the achievement gap." [4507 at 99]

Judge Miller found "the most probative piece of evidence " to be a study by "an independent group" "at the request of [PCSSD]." "The Research Group found that the ACSIPs addressed student achievement generally but did not contain the focus on black students mandated by the Ross plan." [At 95] Judge Miller questioned PCSSD's approach in claiming progress in lowering the achievement gap. That approach focused on students scoring "proficient" on the annual state-mandated testing. [4507 at 96-98] The Research Group reported that: "The education focus [at PCSSD] needs to shift from 'increasing the number of students proficient' to meeting the needs of the diverse learners in the classroom."  Judge Miller added: "[PCSSD] needs to take this recommendation seriously." [At 97-98]

Other elements of Judge Miller's analysis are pertinent. Regarding programs identified by PCSSD to show good faith compliance, he wrote: "At least two of these programs, Summer Transition and Freshman Academy, were not even implemented until after or right at the time [PCSSD] moved for unitary status. Other programs involved a very limited number of participants and, despite being  labeled as a success, were never expanded."

[4507 at 98]   Judge Miller also noted that "the scope of student achievement narrowed to simple proficiency," and identified the limiting of the gathering of "qualitative" data, in the FEPSI process, to only "schools deemed by the state as in need of school improvement." [At 99]

Implementation in good faith of actions to address goals One and Two continued to be insufficient.

Mrs. Springer attended several meetings of the PCSSD Steering Committee.  On June 8, 2018, PCSSD administrators were examining school improvement plans to assess the extent of their inclusion of the text of the six Ross Plan Educational goals.  They verbalized their conclusions that the inclusion of the goals in the plans was incomplete. As she was afforded the opportunity to examine plans during this process, she could confirm their conclusions.  Mrs. Springer attended a subsequent steering committee meeting on February 20, 2019, at which time there was again, study of school improvement plans to determine whether the Ross plan goals were included.  Of the twenty-four (24) plans reviewed, there was somewhat better inclusion of the goals, with deficiencies in 5 or 6 schools.  None of them included the goal 6 to establish an ongoing systematic evaluation system at individual schools and the district level to: a) assess the progress made at each school and district levels in achieving the educational goals and b) provide direction for "Education Plan" and educational program improvements, where indicated.  In order to secure documents to examine this question in a comprehensive manner, Intervenors served discovery on PCSSD seeking "the school ACSIP and/or school improvement plans developed and utilized by each of PCSSD's schools for the 2016-17, 2017-18, 2018-19 and 2019-20 school years."  PCSSD produced only the requested plans for 2019-20.

PCSSD provided annual ACT Aspire test score results by racial group for 2016 through 2019 to Ms. Powell for her use in preparing her achievement report. It continued the flaw of emphasizing "proficiency" alone, by using this label, and furnishing only the combined percentages of students scoring

"exceeds" or "ready"; no data was provided for students scoring "close" or "in need of support." The in need of support data is important with regard to assessing the actuality of "special attention to African-American students" including the need for revision of programs.

Data from discovery  for  the Spring 2017, 2018, and 2019 testing, show these admittedly sample results for the percentages of  the Black students tested  whose scores were in the In Need of Support (INS) category in READING:  grade 3, 4--2017 50%; 4-2018 48%; 4-2019 47%; grade 6, 4-2017 55%; 4-2018 56%; 4-2019 50%; grade 10, 4-2017 57%; 4-2018 68%; and 4-2019 55%. Intervenors will provide additional data in the hearing.

PCSSD continues to rely on new or recent initiatives with limited participants to date. These include AVID, Driven, and School of Innovation. In addition, evidence will show that participating in AVID classes and the Driven program will be appropriate  for only a segment of the student population. Participation of students with very weak Act Aspire scores of the type shown seems to be out of the question. The needs of these students require well-implemented, Goal One and Two focused programs.

PCSSD ceased utilizing the University of Memphis staff in the gathering, analyzing, and reporting of the qualitative FEPSI data at the end of the 2017-18 school year.  The district's position is that it is using an alternative instrument/process to gather this data. The use of this data has not been shown.  During monitoring on  October 18, 2017, Mrs. Springer learned that Dr. Linda Goodwin, Director of Elementary Education and Dr. John Tackett, Director of Secondary Education were unfamiliar with the Ross Plan and in addition, could not articulate the use by the district of the FEPSI data being produced by the University of Memphis.

Judge Miller discussed PCSSD's response to the Goal Six evaluation standards, together with monitoring in a general sense. He wrote:

Finally, the Ross Plan requires [PCSSD] to establish a system to monitor and assess the progress made towards the educational goals.

[PCSSD's] monitoring efforts are discussed at length in Section IV.B.12 of this order . It is once again sufficient to note that [PCSSD] failed to demonstrate good faith in adopting and implementing a comprehensive evaluation program. Further, the long delays and continued disregard for the recommendations of the ODM do not demonstrate substantial compliance with the monitoring requirements.

Monitoring, of course, is of particular importance to student achievement because it is what allows [PCSSD] to assess the effectiveness of its strategies. Simply implementing programs to address the achievement disparity is not sufficient to demonstrate a good-faith compliance with the Ross plan. Any program that is implemented must also be monitored and revised in light of its successes and failures. In the end, however, [PCSSD] failed to do both.

In discovery, Intervenors  sought in their Request for Production  No. 7 "assessments and/or evaluations of whether the ACSIP plans and school improvement plans implemented between 2016-17 school year and 2018-19 school year  have [succeeded in achieving  goals one and two]. . . . "  The OPCSSD response identified no "evaluations,"  as that term is utilized in the public education context generally and has been used in this case.

Intervenors will also address in the hearing, the other Ross Plan educational goals, three through five.

In her deposition,  Dr. Janice Warren testified to the Board of Directors' requiring her, while Interim Superintendent,  to approve the "RIFing" of four women, part of the "Learning Services" unit , "the curriculum and instruction aspect of PCSSD . . . directly related to student achievement." [Dep. At 106-107] Their role included to determine the effectiveness  of the educational piece of PCSSD as it relates to eliminating disparity that exists between black students and non-black students. "They also made sure that curriculum and strategies were implemented that addressed the needs of Plan 2000. They were on the front end of Plan 2000, when I talk about the implementation piece to the evaluation piece . . . ." [At 107-08] "There were principals who recognized their skill set and started asking for the three of them to come to their school to help their staff  with

training that they had in closing the gap." [At 108-09] Dr. Warren voiced her concern to the School Directors: "Why would we cut the heart of school instruction. . . ."[At 109] Dr. Warren's expression of concern to the School Directors included that it would have an adverse impact on the Pulaski County Special School District to try to decrease the educational achievement gap  between black and non-black students.[At 110] The evidence will show that Dr. Warren agreed to approve the RIF action only during a School Director's meeting called to address the topic.

The district claimed that it would create similar positions. Dr. Warren was not familiar with any resulting action. [At 108] Other evidence establishes the failure to activate an approach to filling this void.

## Discipline

The 2011 Court of Appeals decision summarized PCSSD's F.(1)-(3) and (5)  obligations: (1) collect detailed data on each disciplinary incident that occurs within the district, (2) develop criteria for identifying individual teachers with problematic discipline practices, individual schools with atypically high discipline rates, and individuals schools with atypically high racial disparities in discipline , (3) make specific efforts to work with the identified teachers and schools to eliminate racial disparities, . . . (5) develop initiatives to reduce disciplinary rates within the district . . . ." LRSD v. State of Arkansas, 664 F.3d at 751.

On December 19, 2019,  Intervenors served on PCSSD four Requests for Production,  10 through 13, seeking documentation showing actual implementation, if any,  of the actions required by the full texts of F. (2) and F.(3). PCSSD's response served on January 31, 2020,  set forth general and specific objections and declined to furnish the requested documentation. Annual Discipline Reports furnished relate to fulfillment of  F.(1) requirements, but not with detail any F.(2) or F.(3) obligation. Intervenors also note that PCSSD must establish that the district's reporting of discipline

referrals and instances of discipline imposed is accurate. Questions have arisen.

PCSSD maintains that it has provided substantial professional development directed to staff with racially based, problematic discipline practices. PCSSD's burden of proof will encompass showing that this professional development was ever substantial given the number of schools in the district and the magnitude of the problem. In addition, the amount of this programming has declined in recent years.

PCSSD has a standard for determining whether discipline at an individual school is excessively racially disparate. The district produces annual Compliance and Monitoring Reports. Through 2016-17, the discipline section of the report described the results, by school, of application of the standard, as well as statistics by race also allowing assessment of racial disparity. The 2016-17 report set forth the results for 2015-16 as follows: "The suspension data from 2015-2016 School Equity Reports reveal that there continues to be a disproportionate number of black students suspended; 10 (63%) of 16 elementary schools, and all secondary schools suspensions were out of compliance. . . ." The 2017-18 and 2018-19 reports included neither compliance results by school, nor discipline statistics by race.

The district has a single page form for use by schools in applying the district's excessiveness standard. In discovery, Intervenors sought, on March 28, 2020, regarding this form, with a copy attached: "Request for Production No 1:

> . . . please provide the form for each PCSSD school which was completed for the school years 2016-17, 2017-18, 2018-19, and 2019-20. If the form was completed for some schools and not all schools in a particular year, please provide the forms which were completed."

PCSSD did not respond to this request.

Section F. (1) and (3) twice refer to PCSSD in Plan 2000 voluntarily accepting the "objective of eliminating racial disparities in the imposition of

school discipline." Appendix E of the PCSSD 2018-19 Annual Discipline Report Summary, the last annual report available, sets forth the total number of in-house suspensions for 2017-18 by race, by gender, including by school. The data allows, for the 9 secondary schools, comparison of enrollment by racial group and by gender, to the total number of these suspensions [18 comparisons]. For each gender, the racial disparity disfavoring black students, for 8 of 9 schools, is more than double the district's percentage standard for identifying racial disparity.

This data adds to evidence establishing the need for PCSSD to shoulder its burden of proof  and establish the actuality of its claimed efforts. It also creates doubt as to its ability to do so.

## Facilities

Intervenors' position on facilities is that they continue to have the right to seek affirmative relief to the full extent authorized by the "equal" content of Plan 2000 Section H.(1), as construed by the Court. Intervenors contend that affirmative relief is warranted regarding, at minimum, new Mills High School, College Station and Harris Elementary Schools, and Mills Middle School. The facts on which this position is based have been identified in many ways: these are Intervenors' motion for facilities relief and supporting brief [5406-07, 5403];  content of the hearing on September 24, 2018 [5565]; Intervenors' response to  PCSSD's notice [5543]; Intervenors' comments on PCSSD 60-day reports [5528, 5583]; questions and responses in the depositions of Curtis Johnson and Dr. Janice Warren. Exhibits on the facility issues are listed in this document.

## Monitoring

PCSSD has produced an annual Monitoring and Compliance report, which has been provided each year to Intervenors, Dr. Guess and Commissioner Key, and, thereafter, to their successors by operation of State

law and Rule 25(d), Fed.R.Civ.Pro., the individual members of the Board of School Directors elected from time to time in their official capacities.

The four most recent reports are for 2015-16, 2016-17, 2017-18, and 2018-19. Intervenors note four characteristics of these reports.

There is very considerable repetition in the text from year to year, a circumstance noted by Judge Miller and criticized. [4507 at 100-01 ("Seven years of reports concerning many [PCSSD] schools read almost universally (example of text) ."] Examples are – <u>achievement</u>: 15-16 at 17;   16-17 at 16;   17-18 at 14-15;  18-19 at  13-14;  <u>"Summary"</u>: 15-16 at 17;   16-17 at 16;   17-18 at   14-15;  18-19 at  13;   <u>"Educational School Equity and Monitoring Committee Recommendations"</u>:  <u>15 paragraphs</u>: 15-16 at 17-19;   16-17 at 16-17;   17-18 at 14-16;  18-19 at 14-15;  <u>Parental Involvement/Committees:</u> 15-16 at 16;   16-17 at  15;   17-18 at  14;  18-19 at  12.

A review of these entries will also show their superficial nature.

In the 2015-16 and 2016-17 reports, the section on discipline identified for each level, elementary and secondary, the number of schools which had in the prior school year racial disparity in out-of- school suspensions, as determined by application of the district's standard. School enrollment and discipline statistics, by race, and by school were also included, facilitating specific examples of disparity. These forms of information were no longer provided in the discipline sections of the 2017-18 and 2018-19 reports. Compare 2016-17 report at 5-7 with 2017-18 report at 6.

Each report contains a school facilities section. Each quotes Plan 2000 H.(1) including the "equal" language. None of the reports contains content regarding the two Mills projects or the Robinson Middle School project.

Intervenors are aware of no evidence that members of the Board of School Directors have requested that the quality of these annual reports be approved.

The content of individual school equity reports, including the most recent reports,  does not evidence adequate monitoring.

Judge Miller ruled that PCSSD was not "relieve[d] . . . of its duty to continue implementing [the Section N.(3) reporting requirement] in good faith until it is declared entirely unitary and excused from court supervision." [At 107]. Intervenors will present an exhibit showing the failure to file all required reports.

Dr. Warren became Assistant Superintendent for Equity and Pupil Services in 2013. [Dep. at 17] In this position, she fulfills the role of "Assistant Superintendent for Desegregation" identified in Plan 2000 Section N.(1)--(2). For proper implementation of Plan 2000, the person in this role should have the job responsibility to oversee (monitor) the operations of everything in Plan 2000, including the carrying out of facility projects such as the new Mills High School and new Robinson Middle School projects. [Dep. At 155-56] Doctors Guess and McNulty assigned duties to high level administrators in a manner which did not and does not provide for such oversight (monitoring) of facility projects. [Doc. 5343 at 3 (Dr. Guess and Derek Scott); Warren Dep. at 142-43, 153-54 (not aware of PCSSD's new "3-tier" approach to facility planning; had not seen the two alternative plans for additional capacity at new Mills High, which evidence shows were received in the district in June 2019; not invited to attend Board of School Directors "retreat" to discuss content of 2020 Facility Master Plan submission to State, at time when new Mills High and College and Harris facility issues were well-known).

## Court Expert

The Court expert did not carry out in a neutral manner the assignment to complete eight reports. Nothing in the Court's description of the assignment suggested favoring the districts in the opportunity to provide input to the extent this was planned and occurred. This included providing only the districts the opportunity to provide input regarding the first five

reports completed. The district-only input approach continued, despite a communication from Intervenor's after the second of these reports, requesting the opportunity to participate in the process. When the Court expert first requested input from Intervenors, regarding  the PCSSD facility report, the only query posed related to a  pre-2010 Maumelle High School issue. Current facility issues were ignored in this input request. Details regarding this position are set forth in Intervenors' Motion in Limine Regarding the Court's Expert and  the accompanying brief.

The Court Expert's reports are marked by inadequate analyses. The report concerning achievement in the PCSSD is illustrative. The report: [a] cites the FEPSI approach two years after it was no longer in use in PCSSD; [b] cites new initiatives, AVID and Driven School of Opportunity, without discussing when implementation began and scope of implementation (number of schools, number of participating students); [c] identifies  program offerings by copying from a list of claimed offerings provided by the district; [d] involves no contact with personnel at the local school level or other step to determine actual implementation of programs identified; [e] in assessing achievement disparity utilized data provided by PCSSD which contained results by race for only two of the four ACT Aspire reporting categories [exceeds  and ready included; close and in need of support not included  (this was important because full data shows, in reading, almost half or more of Black students score in the INS category; [f] analyzed achievement disparity

with combined exceeds and ready score numbers, an approach questioned by both Judge Miller and the Court of Appeals in their 2011 opinions [g]; and in the final paragraph of the "comments" touted AVID without indication of ever witnessing its implementation and made broad assertions as to district's initiatives without indicating a knowledge base regarding their efficacy and actual implementation. In addition, has Ms. Powell's status as an expert to evaluate these academic programs been established?

8. **Proposed Stipulations**:  None.

9. **Contested Issues of Fact**:

a) the extent of implementation of each of the requirements of Plan 2000 in each of the four areas in which a determination of unitary status and release from Court supervision is sought, achievement, discipline, facilities and monitoring;

b) the duration and the scope of implementation of each implementation step PCSSD claims it has implemented to comply in each of the four areas,  achievement, discipline, facilities and monitoring;

## Achievement

c)  in addition to a) and b), facts regarding the extent of achievement disparity;

## Discipline

d)  in addition to a) and b), identification of racial disparities in the imposition of discipline techniques;

e) the racial makeup and the educational programming in the alternative learning environments;

f) facts regarding the referral of students to the juvenile justice system and the racial composition of the students referred;

g) the accuracy of district data regarding the numbers of referrals for discipline issues and discipline techniques imposed;

## Facilities

h) in addition to a) and b), facts regarding the College Station and Harris Elementary schools;

i) facts regarding the planning and construction of new Mills High School and Robinson Middle School;

j) facts regarding the comparative quality of the new Mills High School, Maumelle High School, Robinson Middle School, and Sylvan Hills High School (including with the enhancements underway);

k) the problems of carrying out the educational programs at the new Mills High School due to its inadequate capacity and other features;

l) the facts regarding the community's reaction to the disparities between new Mills High School and the Robinson Middle School and the district's response to their grievances;

m) the securing of and the plans for use of the two alternatives for additional capacity at new Mills High School;

n) the district's plan or plans for use of the ROTC building;

o)  facts regarding the comparative quality of Mills Middle School;

Robinson Middle School, Maumelle Middle School, and Sylvan Hills Middle

School;

p)  facts regarding district facility master plans;

q) facts regarding the implementation of the Joint Motion to

Supplement, paragraph 5;

## **Monitoring**

r)  the content and the quality of monitoring reports;

s) the content and quality of monitoring efforts;

t) facts regarding the extent of monitoring of construction

projects;

u) facts regarding the extent of compliance with Plan 2000 N.(3)

reporting requirements;

v) facts regarding the implementation and the monitoring of  the

staffing stipulation and special education agreements, included in the

determination of unitary status for these areas;

## **Court Expert**

w) the facts regarding the process in which the Court Expert

completed the eight reports;

x) the adequacy of the content of the Court Expert's reports;

10. **Contested Issues of Law**:

a) whether the Court should resolve the Motion for Unitary

Status in the areas of Achievement, Discipline, Facilities and Monitoring by

utilizing the approach and standards set forth in the 2011 Opinions of Judge Miller and the Court of Appeals for the 8th Circuit;

   b) in resolving the unitary status issue for each area, the duration of compliance necessary to satisfy this element of the unitary status standard;

   c) the weight to be given in assessing compliance in an area to the fact that a program is in the early stages of implementation;

   d) the resolution of the issues raised by each of the five Motions in Limine;

   e) whether the Court Expert functioned in a neutral manner in completing the eight reports.

   f) the identification of relief necessary to fulfill the "equal requirement of Plan 2000, H.1"

 11. **Exhibits**:

## Achievement

   1) Steering Committee minutes (PCCSD discovery response)

   2) ACT results (exhibit to Warren deposition)

   3) ACT results provided to Court Expert (exhibit to Warren deposition)

   4)  academic programs (3-page document provided to Court Expert)

   5 ) charts of ACT Aspire results

6) a document describing the content of the PCSSD response to Intervenors Request for Production No. 9, served by PCSSD on January 31, 2020, concerning PCSSD's "ACSIP or school improvement plans" for 2016-17, 2017-18, 2018-19, and 2019-20 (the PCSSD response is in Bates Nos.5991-6511)

7) ASCIP- CL12 Indistar document

8) AVID secondary enrollment data

9) DRIVEN enrollment data

10) DRIVEN course content

11) Monitoring communication to Warren and others re Tackett's lack of knowledge re Plan 2000

12) Monitoring communications regarding use of CL12 and DMP for monitoring

13) Monitoring communications regarding Ross Plan obligations and use of FEPSI data

14) Monitoring communications to Dr. McNulty regarding Plan 2000 obligations

15) Monitoring communications regarding  quarterly monthly meetings

16) Monitoring communications regarding  court-ordered monthly meetings

17) ACT Aspire test results 2015-2019 - Bates Nos. 3947-4157

18) Agendas for court ordered monthly meetings hosted by Intervenors (also relates to discipline, facilities, and monitoring)

19) PCSSD's responses to Intervenors Third Set of Requests for Production of Documents (Achievement), served by PCSSD 1/31/20

## **Discipline**

20) Annual Discipline Reports from 2016-17 through 2018-19

21)  Charts providing examples of discipline disparity for different years and different elements of the school system and students enrolled.

22) Individual School Disparity Form

23) Monitoring communications regarding discipline disparity

24) Monitoring communications regarding referrals of class members to the juvenile justice center

25) Monitoring communications regarding  quarterly monthly meetings

26) Monitoring communications regarding  court-ordered monthly meetings

27) Monitoring communications regarding use of CL12 and DMP for monitoring

28) PCSSD's responses to Intervenors Second Set of Requests for Production of Documents (Discipline), served by PCSSD January 31, 2020

29) Intervenors Requests for production of Documents to PCSSD regarding Discipline and Monitoring served by Intervenors March 28, 2020

## Facilities

30)  PCSSD/New Middle School schematic design/November 25, 2015 (Bates Nos. 12700-12772)

31) Excerpts from previous exhibit

32)  Baldwin and Shell schematic estimate new Mills High School (177,170 square ft.) (3/8/16) (Bates 88884)

33)  Guess and Key approval of 40 million dollars for each project dated 3/16/16

34) Transcript of status conference March 16, 2016, p. 21 (Statement by Allen Roberts)

35)  Baldwin and Shell schematic estimate; new Mills High School; 153,055 square ft. dated May 5, 2016 (Bates No. 505)

36)  Computer drawing showing new Mills High School building with   151,684 sq. ft.  (Bates 8867)

37) Chart showing 37,600,000 for "Robinson Middle" and $37,700,000 for "new Mills High" (Part of FOIA response from PCSSD, identified as "#3")

38) Intervenors' FOIA request to PCSSD and the district's responses (during October, 2017)

39) Communication from Mike Meadors of Baldwin Shell to various persons involved in the Mills High project, including Earnest Duckery (with sentence "at Derek's direction, we are working toward a $35M construction budget.") (Identified as #8)

40) Letter from Whitney Moore to John W. Walker regarding facility projects (October 26, 2016)

41) Documents re stakeholder concerns re new Mills High School and the district's response (October 2018)

42) Letter from :John W. Walker to Sam Jones regarding facility concerns (February 7, 2019)

43) Response from Sam Jones to letter from Mr. Walker dated March 7, 2019

44) Email to Curtis Johnson from architect with 2 alternative plans for additional capacity at new Mills High School (June 27, 2019)

45) Email from Curtis Johnson to Springer providing the alternative plans regarding for additional at new Mills High School (December 2, 2019)

46) Evidence regarding PCSSD's 2020 Facilities Master Plan (Tape recording of public hearing regarding facilities plan, 1/21/20)

47) Excerpts from the Master Plan: summary of public hearing,

48) Description of Driven project; description of ROTC project;

description of Harris elementary school project;

49) Documentation of cost of three Sylvan Hill projects;

50) Identification of indoor practice facility as a part
of Robinson High School

51) Document concerning air quality in new Mills and new
Robinson facilities

52) Excerpts from 60-day reports showing deficiencies in new
Mills High School facility

53) Monitoring communications re involvement of Intervenors
re facilities obligations;

54) Monitoring communications regarding  quarterly monthly
meetings

55) Monitoring communications regarding  court ordered
monthly meetings

56) Documents concerning Intervenors discovery requests
concerning additional sections of blueprints

## Monitoring

57) Annual Monitoring and Compliance Reports for 2015-16
through 2018-19;

58) Examples of school equity reports from 2017-18

59) Examples of school equity reports from 2018-19

60) Exhibit regarding analysis of content school equity reports

61) Examples of Plans of Action

62) Exhibit showing extend of compliance with submitting reports required by Plan 2000, Section N. 3.

63) Email from Joy Springer to Dr. Janice Warren concerning change from system of having school profiles to document providing lesser information

64) Exhibit showing repetitive language in annual monitoring and compliance reports.

65) Insufficient coverage of topics in monitoring reports

66) Monitoring communications regarding use of CL12 and DMP for monitoring

67) Monitoring communications regarding obligations re Staffing stipulation and Section N staffing monitoring

68) Monitoring communications regarding  quarterly monthly meetings

69) Monitoring communications regarding  court ordered monthly meetings

70) PCSSD's responses to Intervenors' Second Set of Requests for Production of Documents(Discipline), responses served on January 31, 2020

(See Responses to Requests for Production Nos. 12 and 14)

### Court Expert

71) Document No.  5343 Court Expert Report regarding comparisons of athletic complexes at new Robinson Middle School and new Mills High School, as well as the opportunities for input in projects afforded Robinson and Mills athletic directors (November 9, 2017)

72) Email of Court Expert procedures provided to the JNPSD and PCSSD on July 23, 2019;

73) Documents showing communications between Intervenors' representatives and Court Expert during period of preparation of reports and thereafter;

74) Notes of interview of Court Expert (January 2, 2020)

75) Notes of interview of Court Expert (January 20, 2020)

76) Declaration of Joy Springer dated March 30, 2020

77) Court Expert billing letter dated November 5, 2019

78) Intervenors communications providing input to the Court Expert for her work on the PCSSD facilities report and report on each district's monitoring, two communications provided to Court Expert regarding each report.

Intervenors reserve the right to utilize exhibits listed by the defendants.  In addition, Intervenors reserve the right to utilize documents

which they have produced to PCCSD as well documents PCSSD has provided to Intervenors.

12. **Charts, Graphs, Models, etc**.:  Intervenors will make charts based on the information supplied by the defendants regarding achievement data and other data.

13. **Witnesses**:

>  a)  Tracy Allen
>
>  b)  Mary Bailey
>
>  c)  Jennifer Beasley
>
>  d) Danny Bryan
>
>  e) Duane Clayton
>
>  f) Cynthia  D'Abadie
>
>  g) Earnest Duckery
>
>  h)  Curtis Johnson (part possibly be deposition)
>
>  i) Lance LaVar
>
>  j) Dr. Charles McNulty
>
>  k)  Nickey Nichols
>
>  l)  Margie Powell
>
>  m) Dr. Kiffaney Pride
>
>  n)  Linda Remele, PCSSD Board president
>
>  o)  Jeff Sean
>
>  p) Alesia Smith

q) Joy Springer

r) Laura Shirley

s) Vicki Stallings

t) Laura Strickland

u) Nicole  Townsend

v) Dr. Janice Warren (part possibility by deposition)

w) Lisa Watson

x) Sherman Whitfield

**Plaintiff also reserves the right to call any witness listed by the defendants as well as witnesses identified during discovery.**

14. **Request to Amend Pleading**: Plaintiff respectfully requests that the pleadings be amended in order to conform to the proof as presented in the trial of this matter pursuant to FRCP Rule 15.

15. **Status of Discovery**: completed except for some supplemental responses to discovery requests.

16. **Suggestions for Expediting Trial**: none.

17. **Estimated Length of Trial**:  The time designated by the Court (additional time may be needed).

Respectfully submitted,

/s/ Austin Porter, Jr.
Austin Porter, Jr. - # AB86145
PORTER LAW FIRM
323 Center Street, Suite 1300
Little Rock, Arkansas 72201
501-244-8200

26

Robert Pressman
22 Locust Avenue
Lexington, MA  02421
781-862-1955


Shawn G. Childs
Lawrence A. Walker
JOHN W. WALKER, P.A.
1723 Broadway
Little Rock, Arkansas  72206
(501) 374-3758
(501) 374-4187