**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**


| | |
|---|---|
| **LITTLE ROCK SCHOOL DISTRICT** | **PLAINTIFF** |
| **V.** NO. 4:82-cv-866-DPM | |
| **PULASKI COUNTY SPECIAL SCHOOL DISTRICT NO. 1, ET AL.** | **DEFENDANTS** |
| **EMILY McCLENDON, ET AL.** | **INTERVENORS** |


**PULASKI COUNTY SPECIAL SCHOOL DISTRICT'S REPLY IN SUPPORT OF ITS
MOTION *IN LIMINE* TO LIMIT ARGUMENT AND EVIDENCE ABOUT FACILITIES**

A concise summary of Intervenors' Response in opposition to PCSSD's Motion *in Limine* on facilities is as follows: buyer's remorse. Regardless of Intervenors' squabble over its nomenclature, the joint motion to amend Plan 2000 (the "Joint Motion" or the "Stipulation") states in its prologue that its purpose was to "consider[] all earlier studies and plans regarding facilities to be replaced with the plan and commitments of PCSSD set forth herein." (Doc. 5084). That document, as approved by the Court, is a contract. It is an undeniable fact that the parties had an agreement over a stipulation, the Court approved it, and PCSSD delivered on its end of the $55,000,000.00 stipulation. Rather than acknowledge this reality and the fact that it may actually bring an end to this 37 year old case, Intervenors have reverted to their modus operandi: "scope creep."

Above all, there is one point on which the parties manifestly agree: "[t]he Court is the best judge of the impact of that Order [approving the Joint Motion] on the scope of Intervenors' ability to secure additional facilities relief based up the 'equal' provision." (Doc. 5635, pp. 1-2). This is precisely why the Court should enter an order *in limine* as originally requested by PCSSD.

PCSSD believes that part of its task is to assist the Court in formulating an analysis of the facilities obligations that is as objective as reasonably possible and which limits the necessity for "subjective review" to the extent practicable. An analysis of whether or not PCSSD has or will spend the amount it obligated itself to spend is the most objective standard which PCSSD can conceive. It avoids the determination of an outcome based upon the subjective views of what is pleasing to an individual eye and what another observer might deem the opposite. At this stage of the proceedings, PCSSD believes the Court needs to operate upon secure ground and that analysis based upon a dollars spent or to be spent assessment is the most prudent turf for this Court to trod upon.

At this stage of this case, the PCSSD well knows that complaints about the scope of discovery would be unavailing so the PCSSD has made none.

Simply stated, the amendment to Plan 2000 Section H does not currently require a replacement or other action regarding schools such as College Station and Harris and prudence dictates that those judgments, which are, after all, at least part of a district's overall operations and obligations exclusive of Plan 2000 or any other desegregation plan, should await future developments. Parents and patrons of the school district can always seek additional action for facilities for which they have concerns and aspirations. However, PCSSD believes that the current mission of this Court is to make an objective analysis of where PCSSD is regarding Plan 2000 as amended. It respectfully submits that its position that the analysis be an entirely objective one is well grounded in jurisprudence and the proper scope of judicial review.

## A.     Concessions in Intervenors' Response to the Motion *in Limine*.

First, Intervenors response is notable chiefly for what it does not dispute, and therefore concedes. PCSSD argued that "good faith" is effectively a defined term under the 2014 Joint

Motion, and Intervenors should not now be permitted to alter the legally controlling definition. (Doc. 5620, p. 9). That is because the parties settled on a negotiated and mutually agreeable definition of what PCSSD would need to do to demonstrate "good faith." (*Id.*) (citing Doc. 5084, pp. 1-2). Intervenors' response does not address this point and therefore concede same. Likewise, Intervenors do not dispute that they made the conscious decision to include a definition of "good faith" in the 2014 Joint Motion. PCSSD asserted that "[a]ny attempt at disproving PCSSD's good faith is limited to the definition contractually agreed upon." (Doc. 5620, p. 9). Intervenors' response does not oppose these points and therefore concedes them. As such, PCSSD has conclusively shown that it is entitled to an order *in limine* instructing Intervenors that any attempt at disproving PCSSD's good faith is limited to the definition contractually agreed upon.

More globally, PCSSD asserted that consent decrees are construed as contracts, and that contract interpretation principles inform the Court's reading of the Joint Motion. (Doc. 5620, p. 6). For example, PCSSD asserted that unius est exclusion alterius applies. (*Id.*, p. 8). Intervenors' response does not contest the assertion that traditional contract principles guide the Court in its interpretation of the Joint Motion, nor does it dispute that the specific principles advanced by PCSSD, such as unius est exclusion alterius, apply. If Intervenors opposed these assertions, they would have raised their opposition in their Response. These are more concessions showing the relief to which PCSSD is now entitled.

As already established above, Intervenors and PCSSD agree that the Court is the best judge of the effect of the Joint Motion. This is precisely why the Court should enter an order *in limine* as originally requested by PCSSD. *See e.g., Imperial Trading Co. v. Travelers Prop. Cas. Co. of Am.*, No. CIV.A. 06-4262, 2009 WL 2408410, at *2 (E.D. La. July 29, 2009) (granting a defendant's motion *in limine* to prevent plaintiff from effectively seeking, through the introduction

of evidence, to redefine "Business income" where "'Business income' is a contractually defined term."). First and foremost, this is most true for the requests to which Intervenors have not objected.

**B.**      **Intervenors fail to identify an ambiguity in the Joint Motion that would permit the Court to consider extrinsic evidence in understanding its meaning.**

Intervenors now desperately try to dance around the express language contained in the four corners of the Joint Motion by introducing a litany of citations to letters, status conference transcripts, and other various comments by counsel. This all ignores an important threshold issue: whether the Court can properly consider extrinsic evidence when interpreting the relief awarded by the Joint Motion. The rule on this point is that where an instrument is unambiguous on its face, extrinsic evidence is inadmissible to contradict or vary its terms. *Hurt-Hoover Investments, LLC v. Fulmer*, 2014 Ark. 461, 12, 448 S.W.3d 696, 703 (2014). "The initial determination of the existence of ambiguity rests with the court." *Id*.

To the extent that Intervenors have pointed to an ambiguity at all, they effectively argue that there exists ambiguity in whether the Joint Motion is a pathway to full unitary status or merely partial unitary status. Thus, even though their response skates over this issue, it seems Intervenors argue that extrinsic evidence should be considered to evaluate the effect of the Joint Motion. Intervenors asserted that "[t]he [Joint Motion] thereby describes the broader plan as 'a substantial step,' important progress, thus not alone sufficient to reach the required end point." (Doc. 5635, p. 14). But the Joint Motion is not ambiguous on that point. The now indisputably operative Plan B is prefaced with the language "***full unitary status***." (Doc. 5084, p. 3) (emphasis added). The Stipulation of full unitary status was emphasized in the penultimate sentence of the Joint Motion, which stated that this was a plan to "make PCSSD fully constitutional." (Doc. 5084, p. 4). In keeping with the rule of contract interpretation that where an instrument is unambiguous on its

face, extrinsic evidence is inadmissible to contradict or vary its terms, Intervenors should not now be permitted to introduce extrinsic evidence to change the effect of the Joint Motion. The desire to do this is illustrative of Intervenors' buyer's remorse.

It is a foundation of contract law that "the written agreement itself is the best evidence of the intention of the parties." *Hurt-Hoover Investments, LLC v. Fulmer*, 2014 Ark. 461, 11, 448 S.W.3d 696, 703 (2014) (*citing Stilley v. James*, 345 Ark. 362, 48 S.W.3d 521 (2001)). Rather than rely upon letters sent between counsel, or verbal statements made, the four corners of the Joint Motion itself are the best evidence of what it sought to, and upon approval of the Court actually did, accomplish. Moreover, the Joint Motion is a contract and Intervenors should not be permitted to move the finish line in frustration of the history of interpreting agreements in this case as contracts. *See* Polly J. Price, *The Little Rock School Desegregation Cases in Richard Arnold's Court*, 58 ARK. L. REV. 611, 645 (2005) (harmonizing more than two decades of Eighth Circuit oversight of this case under Judge Arnold, and writing: "Arnold firmly enforced the agreement by its own terms, as a matter of contract interpretation, and not by reference to an external constitutional standard. The agreement of the parties may have broken down, but according to Arnold, the original settlement proposal determined the scope of relief to which the Intervenors were entitled."). This is in keeping with the Eighth Circuit's consistent review of this case, and Judge Arnold's wise judicial philosophy whereby he "strongly favored settlement of the Little Rock school cases, and many of his opinions were intended to make settlement an easier process." *Id.*; (Doc. 5622, pp. 8-9) (tracing this judicial philosophy up through the Eighth Circuit to Professor Abe Chayes).

PCSSD merely argues that the meaning of the Joint Motion is free of ambiguity, and its construction is a matter of law for the Court to determine *in limine* without resorting to extrinsic

evidence so as to properly shape the trial. *See Floyd v. Otter Creek Homeowners Ass'n*, 23 Ark. App. 31, 742 S.W.2d 120 (1988).

**C.**     **Even looking at the extrinsic evidence, it cannot contradict the words of the contract.**

Assuming, arguendo, that the Court did conclude there is an ambiguity in the Joint Motion such that considering extrinsic evidence is warranted, it cannot change or alter the express language of the contract.

As already explained above, PCSSD argued that expression unius est exclusion alterius is an applicable contract principle. Intervenors did not contest this assertion therefore conceded the point. By expressly including certain schools—Mills High School, Robinson High School, Sylvan Hills High School, Mills Middle School, Robinson Middle School—and excluding any other named school or other specific dollar amount or facilities requirement, the Joint Motion implies exclusion of all others. Allowing Intervenors to pile on obligations for College Station, Harris, a certain size gym at Mills, etc. would be tantamount to a complete rewrite of the Joint Motion. No amount of extrinsic evidence should permit this.

Even looking at the extrinsic evidence introduced in Intervenors' response to the motion *in limine*, its utility is limited. The parties agreed to submission of the Joint Motion. (Doc. 5084). Expert Margie Powell analyzed the Joint Motion. (Doc. 5087). The Court accepted the Joint Motion. (Doc. 5091). What controls is the Court's Order, which reads in relevant part:

> The Court grants the Joshua/PCSSD motion, No 5084, to supplement and modify Plan 2000 Section H on Facilities. The Court applauds, and approves, ***the District's Plan A and Plan B for achieving unitary status*** in its school buildings and other structures.

(Doc. 5091) (emphasis added). What any lawyer said in Court or put into writing, contemporaneously or sometime later, does not change the Court's order. The Joint Motion was approved, and the Court even stated that Plan B was one "for achieving unitary status." Not partial

unitary status, and not "not alone sufficient to reach the required end point" as Intervenors now interpret it. (Doc. 5635, p. 14). Intervenors' attempt to revise history, relegating Plan B to "an interim makeshift plan" is a complete non-starter where the Joint Motion itself says otherwise. (Doc. 5635, p. 8). The legal opinion of any lawyer in 2014, now, or anytime in-between, cannot change the plain language of the Joint Motion and the Court's order approving it. Extrinsic evidence is limited in that it cannot expressly contradict these legally operative documents. The words "not alone sufficient to reach the required end point" and "interim makeshift plan" are not found in the Joint Motion or the Court's Order, and in fact are inconsistent with the words that were included – "fully unitary status."[1] As far as a contest between the authority of the Joint Motion/Court Order approving same, and a letter or statement made by any one lawyer, there is no comparison. The latter does not somehow magically change the former.

Moreover, Intervenors' response is notable for what it does not say. It does not allege that there is a judicial opinion foreclosing the relief sought in PCSSD's Motion *in Limine* on facilities. At best, Intervenors identify places in various transcripts where the issue could have been contemplated by the Court, or might have been taken up for consideration. Intervenors do not identify a judicial opinion foreclosing the relief sought by PCSSD. This is in part because no party has ever filed a motion seeking interpretation of the Joint Motion until the instant Motion *in*

---

[1] It bears emphasizing that the entire reason a Plan B was created at the outset was to address a contingency "in the event of a negative vote on the aforesaid millage increase." (Doc. 5084, p. 3). Plan A had more obligations and financial commitments, which makes sense because Plan A was the contingency in the event of a positive vote on the millage. Working together, Plan A and Plan B addressed the two possible outcomes of the vote on the millage increase. Intervenors' persistent multimillion demands are quite reflective of the fact that their ideas are conceived outside of a reality in which money does not grow on trees, and oftentimes new projects can be undertaken only with a successful campaign for a millage increase.

*Limine*. It makes sense that this would happen when seeking unitary status based upon a contractual interpretation of the language within the four corners of the Joint Motion.

**D.**     **The doctrine of waiver is inapplicable as raised by Intervenors.**

Waiver is the only legal doctrine identified by Intervenors which they allege shows that PCSSD's Motion *in Limine* should be denied. (Doc. 5635, pp. 12-15). But here, Intervenors seek a nonconventional application of offensive implied waiver. Although the Cambridge English Dictionary is quoted in conjunction with this argument, conspicuously absent is any citation to legal authority to support Intervenors' proposition that PCSSD has waived the ability to seek unitary status based on the four corners of the Joint Motion. As the party asserting that waiver is applicable here, Intervenors simply have failed to support the assertion by failing to draw on the vast body of law which explains the contours of the doctrine of waiver. For this reason alone, waiver is inapplicable. But even looking at the merits of the law on waiver, Intervenors' assertion of it fails.

"Waiver is the voluntary abandonment or surrender by a capable person of a right known by him to exist, with the intent that he shall forever be deprived of its benefits, and it may occur when one, with full knowledge of the material facts, does something that is inconsistent with the right or his intention to rely upon it." *Travelers Cas. & Sur. Co. of Am. v. Cummins Mid-S., LLC*, 2015 Ark. App. 229, 6, 460 S.W.3d 308, 313–14 (2015). "The relinquishment of the right must be intentional." *Kingrey v. Massey*, No. CA 06-1314, 2007 WL 1643221, at *3 (Ark. Ct. App. June 6, 2007).

Intervenors have made no showing that PCSSD knowingly and intentionally waived anything articulated in the Joint Motion, or that it made a voluntary abandonment of a right known to it, with the intent that it would forever be deprived of the Joint Motion's benefits. At best,

Intervenors have identified points where the Joint Motion was tangentially implicated and thus counsel could have reminded the Court of the words of the Joint Motion. However, at all of those points identified, the precise issue at hand—mainly a judicial interpretation of the scope of the contractual relief awarded in the Joint Motion—was not an issue expressly before the Court. There was no duty by PCSSD's counsel to remind the Court or Intervenors of the words clearly contained in the four corners of the Joint Motion. Those words have always been there for all to see.

The fact remains that this Court has never entered an order expressly interpreting the scope of the relief awarded in the Joint Motion. Intervenors cited to no Court Order or litigation action expressly waiving and foreclosing the relief now sought. Further, Intervenors have cited no case law for their proposition that a party can waive the right to seek judicial interpretation of a judicially approved contract where there has been no order foreclosing the proffered interpretation of it. Indeed, there is some case law indicating the contrary. *See e.g., Kingrey v. Massey*, No. CA 06-1314, 2007 WL 1643221, at *4 (Ark. Ct. App. June 6, 2007) (finding no waiver where party waited nine years to seek judicial enforcement of court order); *Morsy v. Deloney*, 92 Ark. App. 383, 214 S.W.3d 285 (2005) (finding no waiver where party waited three years to seek enforcement of decree awarding her right to recover unpaid education expenses).

The waiver that Intervenors assert here is waiver by implication. Intervenors have cited no authority to support their proposition that waiver by implication is recognized in this jurisdiction. There is plenty of authority out there suggesting that waiver by implication is not favored. *See* 31 C.J.S. Estoppel and Waiver § 88 (collecting cases, and summarizing "[a] waiver by implication is not looked upon with favor, and will not be inferred from doubtful or ambiguous facts. Also, unless required by some rule of law, waiver of valuable rights should not be lightly inferred. Acts,

conduct, or circumstances relied upon to show a waiver must make out a clear case of waiver, and a waiver will not be inferred except from a clear and unequivocal act.").

Also, Intervenors assertion of waiver has the concept backwards. As one secondary source explains waiver:

> Waiver is ultimately a defense that shields one party from liability for nonperformance of duties strictly outlined in a contract … The waiver doctrine is intended to prevent the waiving party from lulling another into the false belief that strict compliance with a contractual duty will not be required and then suing for noncompliance or demanding compliance for the purpose avoiding the transaction.

17B C.J.S. Contracts § 745. Here, Intervenors are ones claiming breach. Intervenors are the ones trying to avoid the transaction that took place in executing the Joint Motion. Intervenors are not asserting waiver  as "a defense that shields one party from liability"—rather, they are attempting to offensively use waiver to advance their argument that PCSSD has not substantially complied in good faith with Plan 2000, and all amendments thereto, including the Joint Motion.

For this nonconventional application of offensive implied waiver, Intervenors have simply failed to offer the authority necessary to justify it. And upon looking at the authority outlined above, such an application of waiver asserted against PCSSD does not fit.

**E.**    **PCSSD will be severely prejudiced if Intervenors are allowed to effectively rewrite the terms of the Joint Motion.**

The terms of the Joint Motion were written five-and-a-half years ago. The Joint Motion represents the fruit of an arm's length negotiation between sophisticated parties. It involved experienced counsel who both had faithfully and stringently represented their clients over the years. As Judge Billy Roy Wilson summarized the judicial treatment to be given this reality, "[t]his may be especially true in the present context—a protracted, highly divisive, even bitter litigation, any lasting solution to which necessarily depends on the good faith and cooperation of all the parties." (Doc. 3675, p. 26) (quoting *LRSD v. PCSSD*, 921 F.2d 1371, 1383 (8th Cir. 1990)). Judge

Wilson pointed to the Eighth Circuit's conclusion that because of the thoroughness of representation in this case, "[a]bsent an extremely good reason—and we have been given none— we are reluctant to disregard [counsel's] judgment as to what is best for their own clients." (*Id.*); *see also Sandine v. Tate*, No. 3:17-CV-151-DPM, 2019 WL 921445, at *2 (E.D. Ark. Feb. 25, 2019) (weighing factors such as a party's education and experience, and concluding that "[a]ll this seems more like buyer's remorse.").

In negotiations over the Joint Motion, Intervenors lead counsel, the late Rep. John Walker, extracted a $55,000,000.00 commitment from PCSSD. In keeping with Judge Wilson and the Eighth Circuit's admonition, Rep. Walker's judgment as to what was best for his own clients should not later be disturbed. PCSSD agreed to have its "feet [held] to the fire with respect to following through on its commitment to the patrons in the southeast quadrant"—that commitment being the expenditure of $55,000,000.00. (Doc. 5087). At least in the context of this case, PCSSD agreed to the Joint Motion in part because it was getting something in return from Intervenors, consideration as it were, and counsel's judgment as to what is best for his own clients should not be disturbed.

Now five-and-a-half years later, Intervenors have seen PCSSD deliver on this commitment. PCSSD will be severely prejudiced if Interveners are now allowed to effectively rewrite the Joint Motion to achieve "full unitary status" on terms that downplay the $55,000,000.00 commitment and instead move the target to focus on other obligations. The fact that Intervenors extracted a $55,000,000.00 commitment should not be taken lightly or minimized, even if Intervenors now experience buyer's remorse. As originally argued in the Motion *in Limine*, if other facilities or other obligations were arguably part of Plan 2000, the time for raising any such argument was in 2014 prior to the filing of the Joint Motion. Therefore, in accordance with the legal principle that

consent decrees are construed as contracts, Intervenors are now limited by the contractually binding language of the Stipulation in the Joint Motion.

## F.    <u>Conclusion</u>

For the reasons outlined in PCSSD's brief in support of its motion for unitary status[2] as well as for the reasons identified in the instant Motion *in Limine* and this Reply in support thereof, determining good faith substantial compliance with Section H of Plan 2000 is a narrow question at this juncture. The Court should enter an order *in limine* limiting all argument and evidence on facilities to answering the following two questions: (1) whether PCSSD constructed a new Mills High School for $50,000,000.00, and (2) whether PCSSD converted the Mills Middle School project for $5,000,000.00. Everything else is irrelevant.

---

[2] In their Response, Intervenors acknowledge that the "equal, clean, safe, attractive" standard in Plan 2000 is a higher one than the constitutional "to the extent practicable" standard found in *Freeman v. Pitts*. (Doc. 5635, p. 10). This concession supports PCSSD's contention that the "equal, clean, safe, attractive" standard applies only to the extent contractually imposed by Plan 2000 § H, to "***existing***" schools. Also, to the extent that this standard applies to "existing" schools, contractually it can only apply to schools existing at the time of implementation of Plan 2000. This all further emphasizes that much of this dispute is now a breach of contract in which Intervenors should shoulder the burden of proof. *See also* comment and objection in footnote no. 17 of PCSSD's Brief in Support of its Motion for Unitary Status. (Doc. 5622, p. 47); PCSSD & JNPSD's Joint Motion to Allocate the Burden of Proof. (Doc. 5610, 5611). The acknowledgment that the "equal, clean, safe, attractive" standard in Plan 2000 is a higher one than the constitutional "to the extent practicable" standard found in *Freeman v. Pitts* is further illustrative of this case's prolific "scope creep"—repeatedly attempting to obtain modifications, concessions, *et cetera*, not included in the requirements of Plan 2000 or constitutional standards.

Respectfully submitted,

Devin R. Bates (2016184)
M. Samuel Jones III (76060)
Amanda G. Orcutt (2019102)

MITCHELL, WILLIAMS, SELIG,
  GATES & WOODYARD, P.L.L.C.
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Telephone:  (501) 688-8800
Facsimile:  (501) 688-8807
sjones@mwlaw.com
dbates@mwlaw.com
aorcutt@mwlaw.com

*and*

Jay Bequette (87012)
Cody Kees (2012118)
BEQUETTE BILLINGSLEY & KEES, P.A.
425 West Capitol Ave., Suite 3200
Little Rock, Arkansas 72201
Telephone:  (501) 374-1107
Facsimile:  (501) 374-5092
jbequette@bbpalaw.com
ckees@bbpalaw.com

***Attorneys for Pulaski County Special
School District***