IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

LITTLE ROCK SCHOOL DISTRICT                                    PLAINTIFF

v.                              CASE NO. 4:82CV866DPM

PULASKI COUNTY SPECIAL
SCHOOL DISTRICT, ET AL.                                      DEFENDANTS

EMILY MCCLENDON, ET AL.                                      INTERVENORS

Intervenors' Brief Responding to PCSSD's Motion for Unitary Status

[A.] The Approach to Determine Plan 2000 Compliance

[1.] Intervenors' Position

The  opinions of  Judge Miller in 2011 [PCSSD]  and this Court on September

25, 2018 [JNPSD] provide  a sound starting point for  identifying a standard for

determining Plan 2000 compliance. In each instance, the Court's focus is  the extent

of compliance with the elements of the Plan 2000 obligation at issue. Doc. 4507,

e.g., at 92-103 (student achievement); 5445 at 2 (including statement that

"provisions on these two issues are in the margins"), 14-20  (staff). It is also

significant that in approving each of Judge Miller's nine rulings, the Court of

Appeals discussed failure to comply with particular Plan requirements. LRSD v.

State of Arkansas, 664 F.3d 738, 749-50, 750-51, 751, 751-53, 753, 753-54, 754-55,

755-57, 757.

The Supreme Court discussed the extent (degree) of compliance required in

1

in  Freeman v. Pitts, 503 U.S. 467, 491 (1992) (" . . . whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; . ..". This Freeman text describes part of the standard for assessing whether a partial unitary status ruling is appropriate.

In the PCSSD ruling,  Judge Miller identified  "substantial compliance "  as applicable regarding extent of compliance. His discussion included approval of the concept that compliance can be substantial if violations are "inconsequential" in light of the party's overall performance. [4507 at 15- 16]

In the JNPSD ruling, this Court, citing Freeman at 492,  referred to compliance "to the extent practicable" with "desegregation obligations on facilities and on staff." The Court also referred to "substantial compliance." [4507 at 18 and 20] The opinion excused full compliance regarding Atkins pre-K twice. See 4507 at 5 (facility discussion) and at 19-20 (racial make-up of staff) . In each instance, the Court's text shows that His Honor's concept of "inconsequential" is restrictive.  In the facility sphere, JNPSD's overall plan rated "extraordinary."  [At 6] The staffs of seven of eight schools were not "racially identifiable." JNPSD recognized its Atkins problem, was working to address it, and "the Court [emphasized] that JNPSD must continue to address Adkins, and implement a long-term fix, sooner rather than later." [At 19-20]

The Supreme Court discussed the duration of compliance necessary to support

2

a unitary status ruling in <u>Board of Educ. of Oklahoma City v. Dowell</u>, 498 U.S. 237, 248(1991) ("Dissolving a desegregation decree after local authorities have operated in compliance with it for a reasonable period of time . . . .") The Court's discussion in <u>Freeman</u> of the standards governing a partial unitary status determination bears upon the duration question. The Court identified as relevant "whether the school district has demonstrated to the public and to the parents of the once disfavored race , its good faith commitment to the whole of the court's decree and to the provisions of the law and the constitution that were the predicate for judicial intervention in the first instance." The Court referred to "the school system's record of compliance" and the instance "when its policies form a consistent pattern of lawful conduct directed to eliminating earlier violations." <u>Freeman v. Pitts</u>, 503 U.S. At 491. These Supreme Court decisions evidence that in making unitary status decisions emphasis is placed on programs actually implemented for a substantial period.

This discussion envisions application of procedural category reasoning in a "vestiges" context to this setting. At this point, this context is one where by joint action of the parties, and Court approval, a consent decree requires implementation of a remedy, Plan 2000, "the 'particularization of federal law applicable to these parties.' <u>Knight v. Pulaski County Special School District</u>, 112 F.3d 953, 955 (8thCir. 1997)." [Case Doc. 5445 at 1-2]

Judge Miller dealt with duration directly in his 2011 decision, upon finding

"deficiencies [in] the one-race class reports."   He directed PCSSD to prepare fully compliant reports and to present them to ODM. He wrote: "If such reports are maintained for forty-eight months, this finding will be reconsidered."  [4507 at 49] This text identifies reconsideration by the Court.

Intervenors have demonstrated that PCSSD has the burden of proof regarding the Plan 2000 obligations at issue. See Docs. 5642, 5643.

[2.] The PCSSD Position

PCSSD discusses the "substantial" component based upon  part of a statement of this Court during the September 24, 2018 bench ruling on facilities issues. PCSSD writes: "The legal standard applicable to this case is whether PCSSD has 'made a good-faith effort to substantially comply with [Plan 2000]." "Doc. 5565, 27:23—28.1)." [5622 at 6] In this sentence, "[Plan 2000]" replaces the words "this plan obligation to have equal, clean, safe, attractive facilities across the district?"

Respectfully, the proposed standard  is not correct. Moreover, it is not the standard this Court utilizes, as shown by the ruling  released the next day on JNPSD facility issues, with the "equal" standard a focal point. [Case Doc. 5445] The wording suggests that a district may properly begin its implementation  steps with a goal of reaching only substantial compliance.  The proper starting point is to be seeking "full and satisfactory compliance." Freeman at 491. This is, in  substance, the standard the Court employed in evaluating JNPSD's facility proposals, with the

addition of the Freeman "to the extent practicable" wording. Freeman, at 492. See 5445 at 2, 5-6, 7. Intervenors have demonstrated that this Court's interpretation of "substantial compliance" does not create a wide open escape hatch. It addresses the edges after very strong compliance is shown. Finally, it is important to note that referring to "a substantial" implementation activity is not the equivalent of finding conduct which supports a unitary status ruling. The word "substantial" is like a coat of many colors.

Review of the 2011 opinions of Judge Miller and the Court of Appeals is also instructive. At the conclusion of this aspect of his summary of applicable law, Judge Miller wrote: "Proving good faith and substantial compliance is the burden of the school districts." [4507 at 16] Judge Miller discussed actual compliance throughout his opinion. The Court of Appeals standard also, beyond a shadow of a doubt, requires proof of both compliance with Plan 2000 requirements and good faith. LRSD v. State of Arkansas, 664 F.3d 738, 744-45 and passim (repeated emphasis on failure to implement particular Plan 2000 requirements) (8thCir. 2011).

[B.]   Objection to Class Members

The defendant takes a passing swipe at the class representatives by contending that they are inadequate to serve as class representatives. The basis of the defendant's argument is that the class representatives know very little about Plan 2000; this is not the case.

As the Eighth Circuit pointed out, class representatives must meet four requirements:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Wright v. Stone Container Corp., 524 F.2d 1058, 1061 (8th Cir. 1975).

"We are committed to the proposition that Rule 23 should be liberally construed to effectuate the remedial policy of Title VII since therein proscribed is discrimination against a class characteristic." 524 F.2d at 1062, *citing* Reed v. Arlington Hotel Co., 476 F.2d 721, 723 (8th Cir.), *cert. denied*, 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (1973); Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 425 (8th Cir. 1970). This reasoning is applicable to this case involving discrimination in education.

It is apparent that Pulaski County Special School District (PCSSD) is challenging whether the class representatives meet the fourth requirement of Rule 23, can they "fairly and adequately protect the interests of the class." In Wright, *supra*., the district court denied class certification because the plaintiff could not identify one person who had been subjected to the same or similarly discriminatory treatment. In other words, the plaintiff was unable to demonstrate that his claims were typical of the potential class members. "The typicality requirement of Rule

6

23(a)(3) obligates the class representative to at least demonstrate that there are other members of the class who have similar grievances." Wright v. Stone Container Corp., 524 F.2d 1058, 1062 (8th Cir. 1975), *citing*, Green v. Missouri Pac. R.R., 62 F.R.D. 434, 436 (E.D. Mo. 1973), *rev'd on other grounds*, 523 F.2d 1290 (8th Cir. 1975); *accord*, Williams v. Matthews Co., 499 F.2d 819, 829 (8th Cir.), *cert. denied*, 419 U.S. 1027, 95 S.Ct. 507, 42 L.Ed.2d 302 (1974).

Pulaski County Special School District is not challenging the typicality requirement, but only the representatives' ability to fairly and adequately represent the interests of the class members as FRCP Rule 23(a)(4) requires. The defendant relies on the case of Rattray, et al. v. Woodbury County, IA, et al., 614 F.3d 831 (8th Cir. 2010). However, the defendant's reliance on *Rattray* is misplaced. The issue in Rattray concerned the timing of filing a motion for class certification. The case at bar was certified as a class action almost thirty (30) years ago. Rattray filed a motion for class certification fourteen (14) months after filing her initial complaint and almost six (6) months after filing her amended complaint. "Rule 23(a)(4) permits certification of a class action only if the representative 'will fairly and adequately protect the interests of the class.' Fed. R. Civ. P. 23(a)(4). The party moving for certification bears the burden to prove that she will adequately represent the class." Rattray, 614 F.3d at 835, *citing*, Bishop v. Comm. on Prof'l Ethics & Conduct, 686 F.2d 1278, 1288 (8th Cir. 1982). "A failure of the putative class representative to

assure the court that it will vigorously pursue the interests of class members is a sufficient basis to deny certification." Rattray, et al. v. Woodbury County, IA, et al., 614 F.3d 831 (8th Cir. 2010), *citing*, Monroe v. City of Charlottesville, 579 F.3d 380, 385 (4th Cir. 2009), *cert. denied*, ___ U.S. ___, 130 S.Ct. 1740, 176 L.Ed.2d 214 (2010).   The Rattray effort failed due to the delay in filing, which raised for the court a concern about adequacy of representation.

The class representatives in this case have demonstrated a knowledge of the issues that are involved in this case, and have demonstrated a zeal to protect the interests of the class members.   Tamara Eackles demonstrated a great deal of knowledge about the issues in this case, and her knowledge of Plan 2000. Undersigned counsel will concede that the class representatives do not possess as extensive knowledge of the issues and Plan 2000 as lawyers and judges would have, but they do have considerable knowledge about the issues in this case.

Ms. Eackles is employed by the Department of Human Services in the Office of Appeals and Hearings. (**See Deposition of Tamara Eackles attached herein as Intervenors' Exhibit "A", pp. 13-14**).   Ms. Eackles stated that she understood her role in this case was being a representative of African-American students.   Ms. Eackles stated that she has attended some community meetings put on by the Progressive League of College Station, Inc..[1]   Ms. Eackles stated that she has been

---

[1] College Station, Arkansas is an unincorporated town that lies east of the City of Little Rock, Arkansas.   The

involved in community meetings since she was eighteen (18) years old.  (**Eackles'**
**depo., p. 16-17**).    Ms. Eackles stated that she became more aware of the
desegregation case in 2017.  Ms. Eackles stated that she had some concerns about
her son being labeled as a behavior problem as a student at College Station
Elementary.  Ms. Eackles stated that she was concerned about her son's educational
and behavioral issues. (**Eackles' depo., pp. 18-19**).

Ms. Eackles stated that she understands that she is an intervenor on behalf of
black students.  Ms. Eackles stated that the desegregation issues were discussed at
Progressive League meetings, and she became concerned about the issues facing
black students. (**Eackles' depo., p. 25-26**).   Ms. Eackles stated that she received a
copy of Plan 2000 from Joy Springer and John Walker.  (**Eackles' depo., p. 27**).
Ms. Eackles stated that she has visited Robinson Middle School and Robinson High
School, College Station, and Bates Elementary. (**Eackles' depo., p. 32**).  Ms. Eackles
stated that she went to Robinson Middle to support a friend who had a child
participating in an honor roll assembly. (**Eackles' depo., p 33**).

Ms. Eackles also spoke on the issues about the facilities not being equal within
the PCSSD.  Ms. Eackles stated that she noticed the inequities of the facilities in the

---

Progressive League of College Station, Inc., is a 501(c)(3) non-profit organization that was organized in 1968.  The
Progressive League serves as the governing body for the College Station community.  The Progressive League has a
mission of improving the living conditions of the people of College Station, and has a long history of being involved
in the education of children, providing recreational opportunities for youth, providing tutoring services for the youth,
installing a sanitation sewer collection system for the community, built with the assistance of Pulaski County, a medical
facility in the community.  Undersigned counsel has served as the President of the Progressive League for the past
twenty (20) years, and has been an active board member since 1980.

black community versus those in the white communities. (**Eackles' depo., p. 36, 38-39**).  Ms. Eackles also spoke on the issue of discipline disparity for black children, stating that children are placed in PBIS.  (**Eackles' depo., pp. 40-41**).  Ms. Eackles also stated that she was concerned about these children being labeled as "bad children," and not being given the opportunity to excel like other students. (**Eackles' depo., p. 42**).    Ms. Eackles stated that she has had parents to call her with their concerns about educational issues within the PCSSD and she tried to assist them with their concerns. (**Eackles' depo., pp. 48-49**).  "The Court must ask 'whether the representative part[y] will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4)."  <u>Mounce, et al. v. CHSPSC, LLC, et al.</u>, United States District Court No. 5:15-CV-05197 (W.D. Ark. 2017).  Ms. Eackles and the other class members have demonstrated that they will vigorously protect the class members in this case.

Valarie Stallings gave a deposition in this case as well.  Ms. Stallings has a child who attends College Station Elementary and another who attends Mills Middle School.  (**See Deposition of Valarie Stallings attached herein as Intervenors' Exhibit "B", p. 8**).  Ms. Stallings stated that she is the type of parent who is attentive to her children's educational needs. (**Stallings' depo., p. 19**).   Ms. Stallings stated that when she noticed that her child's class did not have a Smart Board, she contacted the school district, and stayed on the matter until Smart Boards were placed in the

school at College Station. (**Stallings' depo., pp. 20-21**).   Ms. Stallings also stated

that she was concerned about the classrooms at College Station being cold, and she

has tried to address this issue with the school district.  Ms. Stallings also stated that

she was concerned about the playground at College Station, because she noticed a

child with a disability having difficulty using the equipment. (**Stallings' depo., pp.

22-23**).  Ms. Stallings also stated that she read the College Station Parent and Family

Engagement Plan. (**Stallings' depo., p. 25**).   Ms. Stallings stated that she learned

about the desegregation case about two (2) years ago.  (**Stallings' depo., p. 30**).

Again, Ms. Stallings stated that she voiced her concerns about the lack of heat in the

classrooms and lack of air conditioning in the classrooms, which deals with facilities.

(**Stallings' depo., p. 31**).  Ms. Stallings stated that she read Plan 2000, and visited

some facilities within the PCSSD.  (**Stallings' depo., pp. 33-35**).   Ms. Stallings

stated that she has noticed that the schools in the white areas are a "little bit [better]

on the eyes," than the schools in the black areas. (**Stallings' depo., p. 37**).   Ms.

Stallings stated that she has concerns about the educational achievement of black

children. (**Stallings' depo., p. 38**).

Again, the class members have demonstrated that they are capable of

protecting the interests of black children and black parents in the desegregation case.

"The 'adequacy of representation' requirement, set forth in Fed. R. Civ. P. 23(a)(4),

typically involves two questions: '(1) whether the class representatives have

common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel.'" <u>Hoekman, et al. v. Education Minnesota, et al</u>., United States District Court Nos. 18:CV-01686, 18:CV-02384 (D.C. Minn. 2020), *citing*, <u>Medtronic, Inc</u>., 325 F.R.D. at 286,87, and <u>Paxton</u>, 688 F.2d at 562-63).   Even if class members have different concerns, that is not a bar to class certification.   "Accordingly, '[f]actual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory.'" <u>Hoekman</u>, *supra*., *citing*, <u>Alpern v. UtiliCorp United, Inc</u>. 84 F.2d 1525, 1540 (8th Cir. 1996).   The district's position lacks merit.

[C.] <u>Facts: the Four Plan 2000 Sections at Issue and the Court Expert</u>

Intervenors have set forth, in their Pretrial Disclosure Sheet, detailed factual summaries regarding the  status of the achievement, discipline and monitoring areas; facts regarding the Court Expert are also, of necessity, included. Pretrial Disclosure Sheet. [Doc. 5628 at 3-12]. This material is incorporated by reference and discussed in Part [C.] of this brief.  A detailed summary regarding facility facts follows.

<u>Facilities</u>

[1.]  <u>New Robinson Middle (Priority One); New Mills High (Priority Two)</u>

PCSSD gave greater priority to the development of the  new Robinson Middle

School project  than it did to the new Mills High project. A high quality, 73 page "[PCSSD] /New Middle School/Schematic Design" document is  <u>dated November 25, 2015</u>. [Bates 12700-12772] A detailed "schematic design drawing" shows  all facilities planned for the site; this includes identification, clearly, of  potential expansion areas for the new Robinson Middle School and Robinson High School. [12748]  The "Conceptual Budget" lists costs for  all  components eventually constructed. "The Bricks and Mortar Costs Excluding Fees, Fixtures, Etc." figure is "$34,565,000." [12772]  Multiple color computer mock-ups of the outside of the facility [12753-66] hint at the creation of "a phenomenal facility." [Doc. 5565 at 32 (characterization by the Court of the final product)]  The design package was not shared with Intervenors.  The cost of the Robinson Middle School project has been reported as $43.5 to $45 million. [Deposition of Curtis Johnson, PCSSD Executive Director of Operations, at 76 (Feb. 19, 2020)]

A draft "Schematic Estimate" document for  the new Mills project, <u>dated March 8, 2016</u>, identifies the square footage of the "New  High School" as 177,170 and the "New Field House" as 44,857. [Bates No. 8884]

On or about <u>March 8, 2016</u>, Derek Scott directed the architects for the new Mills High project to make a drastic reduction in the cost of the planned school building. This required major design changes.  The changes included:  reduction of square footage by 21,262 square feet;  capacity reduced from 750 to 700 students;

number of classrooms reduced;  reduction in the size of some classrooms;  reduced cafeteria area; some reductions in the auditorium; masonry walls changed to sheet rock walls;  narrowed hallways;  changed lighting and glass in the building.  [Per Architect Earnest Duckery]   Contrary to paragraph 5 of the joint motion to supplement [5084 at 4], this step, too, was not the subject of discussion with Intervenors' counsel.

A PCSSD District Operations form, prepared by Derek Scott and  dated March 15, 2016, shows a project to "Construct Mills High Replacement and Robinson Middle School Replacement projects." It includes conversion of a part of old Robinson Middle to a "9th grade academy." The total cost is "$80 Million." Recommended by Jerry Guess and Approved by Johnny Key (the official liability predecessors of the current members of the  PCSSD Board of School Directors).

A Baldwin and Shell Schematic Estimate document for the new Mills High project, dated May 5, 2016, identifies the square footage of the "New High School" as 153,055. [Bates 505] This was during the course of the architects making the  New Mills High design changes.

A computer drawing of the new Mills High School building shows 151,684 square feet. [Bates No. 8867]

On October 21, 2016, PCSSD provided to Mr. Walker a notice letter regarding three projects:  new Mills High School, old Mills High conversion to a middle

14

school, and  new Robinson Middle School. The letter revealed that work on each project was already underway. The description of new Mills High School provided: "the new High School  will have classroom space for up to 750 students; the interior common areas are designed for 1000 students. The school's design allows for potential future expansion and a pad for future additions is in place to the southwest of the school." [At 4]

In his deposition , Curtis Johnson, testified that capacity is  700; the new Mills High is built and  designed for 700 students; and "there's no separate pad, no." [Deposition at 72-74]  The chart provided with some of the PCSSD 60-day reports shows, uniformly, the "current" and "future" capacity of new Mills as 700; the figures shown for new Robinson are 799 and 999.  [Doc. 5493, Exhibit 5]  The total square footage for new Mills shown on the chart includes  the "New Fieldhouse." [Bates No. 8884] PCSSD did not provide notice of these changes to Intervenors' counsel.

PCSSD did not provide the new Mills High School identified in the notice letter.

In July 2017, Dr. Janice Warren, then PCSSD Interim Superintendent, directed follow-up of a parental complaint regarding comparison of the new Robinson and new Mills athletic complexes.  [Deposition of Dr. Janice Warren, now Assistant Superintendent for Equity and Pupil Services, at 120-121] A resulting video revealed

"there were huge physical discrepancies that you could see in the two facilities" – with the features at new Robinson superior to those of new Mills. [121- 122] "[Dr. Warren] knew it would be a violation of Plan 2000. But more importantly, [she] knew it was wrong for kids." [122] Dr. Warren made the video available to all of the School Directors; everyone "made the statement that we have a problem." [Dep. At 122-24; see also at 128-29 (positive reaction of Mills football coach to his new facility altered after observing facility at new Robinson).]

Dr. Warren brought the matter to PCSSD's Sam Jones, then lead counsel, who followed-up by submitting a Supplemental Status Report, for a status conference scheduled for September 8, 2017. [5322 (Sept. 5, 2017] The submission identified matters being investigated by the district regarding comparison of the athletic complexes; expenditures to date for the new Mills and new Robinson projects; budget changes and persons involved; change in the original Mills design; steps to equalize the projects if determined to be necessary; and insuring compliance with the Court's Order of  January 12, 2015. The matter of inequality in the athletic complexes was stated less forcefully than Dr. Warren did in her deposition. [5322 at 1-4]  The Report also: stated that "it  appears that on March 14, 2016 , the architects for Mills were directed to work toward a $35,000,000 construction budget for new Mills High School" and mentioned the March 15, 2016  approval of an $80,000,000 total for the two projects by Commissioner Key at the request of Dr. Guess.  [5322

at 4]

The Court responded by requiring facility reports, in turn, by PCSSD, Intervenors, and the Court expert. [5327 (Sept 8, 2017)].

PCSSD's report on October 9, 2017:  pledged to complete the projects so that when "the Mills projects  and the Robinson Middle School projects are completed, the Mills projects should be equal to the facilities constructed at Maumelle High School, and the Mills and Robinson projects overall should be substantially equal one to the other" [5337 at 2]; recognized that "by September of 2017, it had become apparent that" the $40 million sum was "inadequate to appropriately fund the Mills projects" [at 7]; pledged to rectify this problem [at 7]; and noted  that as of September 12, 2017, $20, 246,000 had been spent at Mills with $24,539,000 spent at Robinson. [At 5]

The Court Expert found the features of the new Robinson athletic complex to be superior to those at new Mills. The extent of the superiority found is evidenced by the blistering nature of the criticism delivered. The Court expert also found discrimination in the earlier planning process.  The Robinson athletic director was given the opportunity to provide input on features to be included; the Mills athletic director was not. [5343 (Nov. 9, 2017)].   The Court Expert also noted that the Robinson Middle School project had construction priority over the Mills High School project.  The Court Expert made the following observation during her visit

to Mills High School construction site on October 25, 2017:

> The first thing of note on my initial to the Robinson complex is that it was up and running; fully functional, and the landscaping was almost complete. Mills' was not operational and the land preparation was no where near completion. According to the AD, no work had been done on the site in three weeks. On my follow up visit to Mills on October 24th the field house was in operation, but the landscape looked much the same.

[**Doc. # 5343, p. 3**].

In the period after the Court expert reported, Dr. Warren spoke to a group of PCSSD personnel. She stated that during the course of work on the two new schools, funds had been diverted from the new Mills to the new Robinson project. She also informed the gathering of the Court expert's conclusions. [Intervenors' monitoring] Curtis Johnson developed the same view on diversion of funds after entering his position, following the departure of Derek Scott. He testified: "It is my understanding that most of the changes to Mills High school were – and the deviations that took place at Mills High school were because of cost. We started the Robinson Middle School first, and the overspending there caused us to be to a point to not be able to complete everything at Mills." He based this conclusion on conversations with architects Brad Chilcote and Earnest Duckery, as well as Michael Hansberry, Baldwin and Shell project manager. [Deposition at 89-90]

On September 24, 2018, the Court made bench rulings concerning Intervenors' motion for facilities relief. [5565] The Court and party representatives

had toured Maumelle High School, new Mills High, and new Robinson Middle School on an earlier date. No doubt alluding to the events noted in the preceding paragraphs, the Court stated that " the county district has been candid as early as last winter of saying things had gotten off track at Mills and that changes needed to be made, and the district pledged to investigate and get it right." [At 14]

The Court's bench ruling included comparison of facilities. The Court stated: ". . .[A]s good as they are, neither Mills nor Robinson is the equivalent of Maumelle. Yet Robinson is, I think, closer to that standard than Mills is." [At 15] In this analysis the Court posited that if a group of 12 parents were to tour the two schools, "that most, if not all, of the parents would say that the Robinson facility overall is superior to the Mills facility." [At 16] Later in the hearing, the Court stated: "Mills is - - has this advantage of the auditorium, but the Robinson Middle School is just a phenomenal facility." [At 32]

Exposed to the Court's 12 parents hypothetical in their depositions, PCSSD Assistant Superintendent Dr. Janice Warren and Executive Director of Operations Curtis Johnson each expressed the same conclusion as the Court. [Warren Dep. at 140-41; Deposition of Curtis Johnson , PCSSD Executive Director for Operations, at 137 (Feb. 19, 20220)]

In late October 2018, new Mills High stakeholders made multiple complaints as to the functionality of the facility with students and staff engaged in a four-grade

high school program.   The district replied to their grievances as to inadequate classroom space as follows: "teachers are, in fact, sharing classrooms in new Mills High school. There are five teachers who are on rotation with other teachers for classroom space. This plan will remain  in place for the time-being."  [5528, Exh. 2] The parents' concern: "So the money wasn't the big issue  that they were discussing . How do we make Robinson Middle School better than Mills, which is the high school. That was the  – that was the bulk of the conversation." [Johson Dep. At 60] During the period of the stakeholders' complaining,  Mr. Johnson stated publicly: "What I will say is there are some things by comparisons that we as a district have to address." [Johnson Dep. at 59 (confirms that statement made)]

Mr. Johnson concluded that there is not enough  classroom space at new Mills High. [Dep. at 64] ("Do we have enough space for classrooms? No we do not" "at Mills High School." [Dep. at 64]  Asked if "teachers  . . . sharing classroom spaces at new Mills High School" was "still an ongoing problem," Mr. Johnson replied: "So we we haven't as an administration addressed the issue to that detail." [Dep. at 63] Brad Chilcote, one of the  architects, informed  Mr. Johnson that a modification to the original new Mills High design eliminated 12 classrooms. [Dep. at 74]

Cost-cutting resulted in some below standard construction at new Mills. The sheet rock wall issue is shown in district 60-day reports and Mr. Johnson's deposition testimony.  [5498 at 1 (May 31, 2019); 5509 at 2 (July 31, 2019); Johnson Dep. at

58 (sheet rock walls frequently suffered damage)] Maumelle High School and new Robinson Middle School have masonry walls.  The glass originally used in the new Mills media center was replaced [5495 at 2 (March 27, 2019)]; it was not safety glass

With Mr. Johnson in the lead, PCSSD "reached out to the architects to basically try to design more space based on two concepts that we've  provided to you guys." [Dep. at 64] This was for the new "Driven Program" and "in essence would be approximately six or seven classrooms depending upon how we can design the space, and then, too, what the cost would be to basically build either of those two structures." [Dep. at 64-65] On June 27, 2019, the architects provided Mr. Johnson, in high quality materials, alternative concepts, one structure "attached to the [new Mills] building"  (13,425 square feet) and the other "a detached building" (7,687 square feet).  [Dep. At 75-76] These plans were provided to intervenors on December 2, 201.

The construction of either alternative would have a secondary effect, namely, freeing up classroom space in the main, new Mills High building. See Johnson Dep. at 78-79 (space needs raised by Mills High principal; and "when we gave a direction to look at the Driven Program" "one of the main parts outside of the Driven Program to look at more space on the campus.")

PCSSD in its sixth 60-day report informed the Court: "The architects have completed some preliminary design recommendations for additional classroom

programming at Mills High School."[5522 at 1 (Sept 30, 2019)] The next two reports had "still considering recommendations . . ." content. [5548 at 1; 5562 at 1] The topic was then absent from the March 27, 2020 report. [5576 at 1] PCSSD never provided the Court copies of the alternatives, or explained to the Court their parameters.

PCSSD completed its 2020 Six-Year Facility Master Plan belatedly, and following its approval by the Superintendent and School Directors, provided it to the relevant State division in April 2020. [Bates 1269] It contains no proposal to move forward in the six year period on either of the alternative, a step needed to relieve the space problem at new Mills.

The tenth sixty-day report continues to state: "Designs for the ROTC Building to house the Driven Program continue to be evaluated." [5612 at 1 (June 1, 2020)] This structure is only 1, 600 square feet in size and not immediately adjacent to new Mills High. In his February 2019 deposition, Mr. Johnson described this concept as unsound, when evaluated both fiscally and in terms of meeting the space need. [Deposition at 131]. Robinson High School students have utilized in the two-story Indoor Practice Facility, constructed as part of the Robinson Middle School project, the weight room, and for their Driven Program, the second floor. PCSSD has arranged for the steps needed to "finish out" the latter space. [C. Johnson dep. At 79-80; Doc. 5576 at 2 (March 27, 2020]

The first phase of  the three--phase Sylvan Hills High School project was in use as of the November 26, 2019 PCSSD 60-day report. [5548 at 2] The projects will add approximately 283,000 square feet to the campus.  [Bates 9201] The Court  has recently approved a third school tour, including at the Sylvan Hills site. [ 5641 (June 19, 1920)] This evidences to intervenors that comparison with new Mills will again be appropriate. See Dep. of Dr. Warren  at 138-39 (new Sylvan Hills  High superior to new Mills High).

[2.] College Station and Harris Elementary Schools

College Station and Harris were schools for African American students in the dual system days. The 2015 PCSSD state-mandated Facility Master Plan  included this content as to each school: ". . . absent a complete replacement facility parity is not attainable."  The 2016 Facilities Plan, about faced. It stated: College Station (Repairs over the past three years and planned upgrades will improve this campus") and Harris ("Significant repairs over the past three years and planned repairs will improve this campus").  The 2017 Facility Master Plan touted projects completed at College Station and Harris. The College Station text   also included this content:"Classroom doors open to the outside elements which cannot be easily rectified."   The reality for the great majority of College Station students has been that  when exiting their classroom to use a restroom, or to enter the building interior, they have been subject to the elements, sometimes rain and sometimes winter

temperatures and conditions.  [As  was Mr. Porter in his day there.]

In the shadow of the hearing, the 2020 Master Plan text for College Station includes this wording: "Classroom doors open to the outside elements which can  not easily be rectified from a security perspective." However, there is also a positive step, with this text: "In the coming future, we will be developing plans to update and/or replacement." [Bates 9216] This statement reflects Mr. Johnson's position.

One requirement of the Master Plan preparation process is to hold a public hearing to explain a district's proposed plan content. A summary of the hearing is a required element of the filed plan. Asked  by Mr. Porter during the required  hearing about the district's  plans for College Station and Harris,  Mr.  Johnson replied: I would like to push them over. This meant demolish them. This content does not appear in  the summary of the public hearing content,  which PCSSD filed as in accord with the standards for plan content. [Bates 9439]

In his deposition, Mr. Johnson testified that both College Station and Harris should be replaced.  [Dep. At 111- 15] Asked if what's been happening as it relates to College Station and Harris has been "putting lipstick on a pig," Mr. Johnson replied: "I would say that's probably been the practice of the district." [Dep. at 113] He added that "the cost to go in and to rehab those schools would be astronomical." [ Dep. at 115]

[3.] The PCSSD Middle Schools

Intervenors are concerned by the fact that Robinson Middle School, Sylvan Hills Middle School, and Maumelle Middle School, are superior to Mills Middle School, a rehab project. This matter requires a PCCSD response.

[4.]   Conclusions Regarding Facilities.

Intervenors note the following major points. First.  The decisions early on regarding the nature of the facilities to be constructed at New Mills High School and the funding for that project are the cause of the shortcomings in its operations, which require substantial remedies for correction.   Second. The foregoing facts, overall, demonstrate a renewal of the school construction practices, which Judge Miller found.   Once again, intentional discrimination favoring white residential areas. Third.  The funding for New Mills High School referred to *circa* $50,000,000.  That encompasses the possibility of an amount above $50,000,000.  The foregoing facts demonstrate that the "*circa* amount" for New Mills High School was diverted to the Robinson Middle School project.

[E.]  Additional Responses to PCSSD's "Brief"

[1.] The Number of Plan 2000 Sections Remaining Active

PCSSD mentions that only four Plan 2000 Sections remain applicable.  The achievement, discipline, and facilities requirements are among the most important of the full set of obligations originally included in the plan.

[2.] The <u>Duration of the Case</u>

PCSSD complains about the overall duration of the case. [5622 at 12-13] The District delayed commencing the constitutionally required transition to a system freed of racial discrimination. It complied poorly when it did. The District played a major role in the inter-district violation. PCSSD chose the Plan 2000 route instead of pressing ahead in that time-frame with its unitary status motion. [Docs, 3309, 3310, 3337, 3347 at 2]  In his 2011 opinion, Judge Miller found that "[PCSSD] has given very little thought, and even less effort, to complying with its desegregation plan. Complying with its plan obligations seems to have been an afterthought." Judge Miller also found that the PCSSD  facility construction program evidenced intentional racial discrimination.  [4507 at 44, 75-78]  The Court of Appeals upheld each of these rulings. <u>LRSD</u>, 664 F.3d at 748, 753.

[3.] <u>The COVID 19 Letter Furor</u>

PCSSD perceives a benefit in featuring a letter from the current attorneys of John W. Walker PA, seeking to explore the district's response to the pandemic crisis. [5621 at 2, para. 10; 5622 at 13-14] The letter was written, in the main,  by an attorney employed by the Legal Defense Fund; this was as part of that organization's major effort to enhance the quality of school districts' responses to the  issue.  Mr. Walker was a <u>very</u> long-time member of  the LDF  Board of Directors and its attorneys have participated in representing the class in this case at various points,

including at the times of the 1990 and 2011 appeals and Court of Appeals decisions.
Walker P.A. and LDF counsel were motivated not only by the reality that educational
opportunity is vitally important to class members, but also by the recognition that
district nutritional programs and their *de facto* form of childcare are, as well.

This attack is, all things considered, bewildering. During two and in the main
a third monthly meeting of the parties, PCSSD's approach was to open with
discussion of the system's response to the pandemic, with no other issue on its
agenda (but for limited discussion of the attorneys' responsiveness to the matter in
the courtroom).

[4.] PCSSD's Claim of Unitary Status Regarding Achievement

The Court of Appeals began its discussion of student achievement as follows
[664 F.3d at 755-56, footnote omitted, emphasis added]:

> Section M of Plan 2000 requires PCSSD to implement a plan designed
> by Dr. Stephen Ross ('the Ross Plan') to improve student achievement.
> The Ross Plan requires PCSSD to 'improve educational achievement
> by all students, with special attention to African-American students and
> others who are at-risk of academic failure due to socio-economic
> disadvantages or other factors' and to 'decrease the performance gap
> between white students and African American students through the
> systematic design/selection and implementation of intervention
> programs that provide effective remediation and/or adaption to
> individual or group needs.' The district court found that PCSSD failed
> to provide 'special attention' to black students in its performance-
> enhancement strategies and failed to systematically design, select, and
> implement effective intervention programs.

Intervenors have provided a detailed discussion of the student achievement

facts in the Pretrial Disclosure Sheet.  [5628 at 3-7] It includes a description of Judge Miller's careful analysis of PCSSD's performance with respect to Ross Plan requirements. Intervenors' summary and the following text demonstrates that a like analysis will again conclude that PCSSD is unable to satisfy its burden of proof on this topic. The following four  topics warrant discussion.

    [a.] <u>Special Attention to African American Students and Decreasing the Performance (Achievement) Gap</u>

      PCSSD takes five pages for an in and out discussion of the "achievement gap." [5622 at 14-19] The district never mentions the two points where it must begin. The district sought adoption of Plan 2000 and its Ross Plan, thereby voluntarily agreeing to be subject to Goals One and Two, which are quoted in the Court of Appeals text set forth above. Second, in the portion of its 2011 opinion devoted to reviewing Judge Miller's  student achievement findings and holding, the Court of Appeals rejected the approach now advanced. <u>LRSD</u>, 664 F.3d at 756-57  ("Regardless of whether the specific intervention programs required by Plan 2000 eventually bear fruit, however, PCSSD cannot disavow its agreed-upon obligation to make a good-faith effort"  ["to decrease the the performance gap between white students and African -American  students  . . . ."].

      The district presents no data in its lengthy brief.  The district has the burden of proof on this point. The district's listing of exhibits and witness list, including the court expert,  suggest that the district will present some evidence on the point. This

includes the Court expert's PCSSD achievement report [5550].  The first listed exhibit  is identified as "ACT Aspire Exhibit: showing combined ACT Aspire results." This is the exhibit which the Court expert used in  that report to discuss achievement disparity.

 Intervenors' achievement factual summary [5628 at 3] and facts regarding the Court expert  [5628 at 12[e] – [f]] show the flaws in that analysis. A major flaw is not including the data by race, grade, and area tested for the lowest group of the four score categories, students "In Need of Support." The percentage of African-American students tested,  scoring in that category for all grades in reading and science, raise questions as to delivery of the overall academic program claimed, whether there is actual "special attention to African--American students" educational needs,  and the status of PCSSD compliance with Ross Plan Goal Six, addressing program evaluation at the district and school level. PCSSD's massive brief is silent on this topic.

The district lengthy list of exhibits includes several other documents which seem to have information on achievement.

[b.] The Donaldson Program

Consideration of the Donaldson Program relief is appropriate. PCSSD's argument, however,  suffers from great over-breathe and over-emphasis. [5622 at 21-25]

First. Proper analysis requires  scrutiny of implementation regarding each Ross Plan element, in particular, those regarding goals one, two, and six.  See Part [A.] above. Second. The Donaldson Program does not involve kindergarten through grade eight students. Third. PCSSD provides no data allowing, by school year, comparison by high school, by race,  of student enrollment and participation in the several components of Donaldson. Fourth. There is no discussion of what, if any, lesson Donaldson provides on  the ability to overcome the impact of K-8 education of participants, to such an extent that they can complete a college education.

In her monitoring capacity, Ms. Springer secured information from Dr. Donaldson regarding the fourth point, for the period 2014-15 through 2019-20. For UALR: 324 students enrolled; 21 have graduated; 50 earned 80 or more hours; for Philander Smith University: 59 students enrolled; 3 graduated; 5 students earned 50 or more hours. This data evidences a limited ability to overcome the results of earlier K-8 education.

[c.] The AVID Program [5622 at 25-26]

The following points will be important. [a] An accurate description of the extent and duration of AVID implementation in the district to date. [b] The proportion of the students in the district at the secondary level for whom participation in AVID  classes will be a realistic option, given their academic levels. [c] The purpose of AVID class participation at the secondary level. [d] The actuality

of AVID implementation at the elementary level. PCSSD's "expected" AVID expert witness is a 10-year employee of AVID.

[d.] The Many Initiatives Touted:[ 5622 at 26-33]

PCSSD claims implementation of many positive initiatives. As shown by Intervenors' factual summary on this topic,  the coverage of  two initiatives shows that careful scrutiny should precede fully crediting the  entirety of the  contentions.

PCSSD touts its use of Program Administrators. [5622 at 31] Intervenors' factual statement shows that Ms. Beasley, Dr. Pride, and Ms. Townsend were the subject of a RIF, with Dr.  Warren, then Interim Superintendent, refusing to sign dismissal letters, until the Board of School Directors "forced her hand" at a special meeting. Intervenors' summary shows Dr. Warren's high praise for these women and her explanation of their importance  in seeking to address Ross Plan goals. It also shows a need to scrutinize the claim that alternative steps were implemented following the RIF. *See* 5628 at 6-7 and *see* Exhibit "C" (excerpt from Dr. Warren's deposition regarding the termination of these employees).

PCSSD also cites School Improvement Plans.  [5622 at 32-33] Intervenors' factual statement shows that the extent of actual implementation of the requirement and the content of the documents, in particular inclusion of Ross Plan goals, warrants scrutiny. See 5628 at 4-5.

[5.] Facilities

PCSSD's argument is limited to its new Mills High School and  Mills  Middle School monetary position.  [5622 at 47-51]  A full response is made in the motion *in limine* arena. See Docs. 5634, 5635, 5636. The facility fact summary in  Section [B.] of this brief describes the multiple important issues in this sphere.

[6. ] Discipline

PCSSD argues at length that it is unitary in discipline. [5622 at 33-47] Intervenors discipline fact statement places in question whether PCSSD has actually implemented key elements of Plan 2000 Section F. requirements. See 5628 at 7-9 [Intervenors' Pretrial Disclosure Sheet]. Intervenors also identify the need to assess carefully the timing and the scope of the efforts of consultants to work with staff members found to have problems regarding racially disparate discipline and excessive use of discipline. The timing issue relates to the time period in which this work was concentrated and the scope issue to  the  adequacy of the number of schools and staff members involved, in light of the overall magnitude of the problem.

The lengthy presentation is marked by a glaring omission. Plan 2000 Section F.(1) and (3) each contain a reference to PCSSD in Plan 2000 voluntarily accepting the "objective of eliminating disparities in the imposition of school discipline." The brief makes references to this voluntary undertaking [5622 at 33, 34, 36, 37, 38]. It is noteworthy, however, that there is no instance, not one, of presentation of data

regarding disparity.

PCSSD does quote an excerpt from the Court expert's PCSSD discipline report, stating that "based on the data for the past three years, [PCSSD] seems to be" eliminating discipline disparities. [5622 at 33, quoting 5531 at 7-8] No specific example is provided. The full content of the Court expert's report does not fill this gap. It does provide discipline data "for the past three years" – 2016-17, 2017-18, and 2018-19. However, it is just numbers of discipline instances of different sorts by racial group. It does not use this information, together with group enrollment totals, to calculate racial disparity in any segment of the system such as a school, or the secondary level.

Intervenors' discipline facts show an in-school suspension example for  all secondary schools by race and gender, showing racial disparity well above the level identified  as problematical  by application of PCSSD's standard. Intervenors presented other examples of discipline disparity in responding to PCSSD's Motion *in Limine* Regarding Unitary Areas in Discipline. [5617, 5618] See Doc. 5617. Many other examples could be identified. Such facts evidence the need for scrutiny of actual implementation of the claimed initiatives.

Intervenors' facts regarding PCSSD monitoring also contain information germane here.  The Annual Compliance and Monitoring Report through the school year 2016-17,  in the discipline section, identified the number of schools

at each level, elementary and secondary, where out-of-school suspensions by race, were excessively racial disparate, by application of the district's standard. This information did not appear in the two most recent reports, for 2017-18 and 2018-19. [5628 at 10]

PCSSD contends that in the last two years "administrators complete a discipline disproportionality worksheet and submit it to the Director of Pupil Services. Those schools which are identified as disproportionate will be asked to create an action plan for each individual school." [5622 at 37] Intervenors' factual statement  reveals that a discovery request seeking such completed forms did not receive a response. [5628 at 8]

The brief states: "In addition to the Annual Discipline Reports, PCSSD also compiles mid-year reports that it distributes internally to principals of each school. [5622 at 35] Plan 2000 Section N.(3) requires the submission of this report to Intervenors "not later than 30 days after the end of each semester" [emphasis added]; this has not been done. In addition, PCSSD did not provide this report for 2019-20 semester one despite Ms. Springer's specific request. This prevents scrutiny of discipline disparity in the most recent period of schooling.

[7.] Monitoring

PCSSD claims to be unitary in monitoring on alternative bases, derivative and substantial compliance in monitoring as such.  [5622 at 52] Other sections address

34

the derivative approach. Intervenors' factual statement regarding monitoring establishes that PCSSD's efforts do not approach the "substantial compliance" claimed. See 5628 at 9-11 (Intervenors' Pretrial Disclosure Sheet).

In conclusion, it is readily apparent that PCSSD has not demonstrated the ability to establish the basis for a court ruling for unitary status in any of the four areas at issue, wholly or in part.  Furthermore, PCSSD's assertion that the class representatives are not qualified to represent the interest of the class members is without merit.  Therefore, the Court should deny their request for unitary status and retain jurisdiction over this case until a time when the PCSSD has demonstrated that it has in good faith substantially complied with Plan 2000.

Respectfully submitted,

Austin Porter Jr., No. 86145
PORTER LAW FIRM
323 Center Street, Suite 1035
Little Rock, Arkansas 72201
Telephone: 501-244-8200
Facsimile: 501-372-5567
Email: aporte5640@aol.com

Robert Pressman
22 Locust Avenue
Lexington, MA  02421
Telephone: 781-862-1955

Shawn G. Childs
Lawrence A. Walker
JOHN W. WALKER, P.A.
1723 S. Broadway
Little Rock, Arkansas 72206

Telephone: 501-374-3758

johnwalkeratty@aol.com
schilds@jwwlawfirm.com
lwalker@jwwlawfirm.com

ATTORNEYS FOR INTERVENORS

**CERTIFICATE OF SERVICE**

I, Austin Porter Jr., do hereby certify that a copy of the foregoing pleading was electronically filed with the Clerk of the United States District Court for the Eastern District of Arkansas, on this 29th day of June 2020, by using the CM/ECF system, which is designed to send notification of such filing to the following person:

M. Samuel Jones III.
Devin R. Bates
MITCHELL, WILLIAMS, SELIG,
GATES & WOODYARD, P.L.L.C.
425 West Capitol Avenue, Ste. 1800

sjones@mwlaw.com
dbates@mwlaw.com

Jay Bequette
W. Cody Kees
BEQUETTE, BILLINGS & KEES, P.A.
425 W. Capitol Avenue, Suite 3200
Little Rock, Arkansas 72201

jbequette@bbpalaw.com
ckees@bbalaw.com

Scott P. Richardson
McDaniel, Richardson, & Calhoun PLLC
1020 West 4th Street, Suite 410
Little Rock, Arkansas 72201

scott@mrcfirm.com

Austin Porter Jr.