# Transcript of the Testimony of

# Eackles, Tamara

**Date:** May 14, 2020

**Case:** Little Rock School District v. Pulaski County Special School District, et al

**Bushman Court Reporting**
Janess Ferguson Smith
Phone: (501) 372-5115
Fax: (501) 378-0077
&lt;www.bushmanreporting.com&gt;



EXHIBIT A

1  Q.    Heartbeat To Heartbeat. So you have your CNA
2  certificate?
3  A.    I do, yes, sir.
4  Q.    Give me the year again, August of when?
5  A.    2008.
6  Q.    All right. Just briefly your work history.
7  Where do you work now?
8  A.    Department of Human Services.
9  Q.    Which division in DHS?
10 A.    OCC, Appeals and Hearings.
11 Q.    Okay. And what's your title?
12 A.    Administrative Specialist Three.
13 Q.    And you do some of the processing and paperwork
14 for the hearings?
15 A.    Yes, sir, answer the phone.
16 Q.    Okay, yeah, I cut you off. So administrative
17 work for the Office of Appeals and Hearings?
18 A.    Yes, sir.
19 Q.    Do you -- I know that there are several
20 different areas, like the SNAP program, Child
21 Maltreatment. Which area do you work in?
22 A.    Well, I'm actually a receptionist and do input
23 of some appeals, so actually a little hands on in all
24 area, TEA, SNAP, Medicaid, and Child Maltreatment.
25 Q.    Okay. And how long have you been at DHS?

1  A.   I have been with DHS probably about five years,
2  but particularly in the OCC Appeals and Hearing
3  Department, probably about three.  Maybe -- yeah,
4  about three.
5  Q.   And so you're not assigned to a specific judge?
6  A.   No, sir.
7  Q.   Okay.  So five years at DHS, and then prior to
8  DHS where did you work?
9  A.   Magnolia Retirement Center.
10 Q.   Is that an assisted living facility?
11 A.   It is.
12 Q.   How many years there?
13 A.   Probably about three.
14 Q.   And you were a CNA?
15 A.   Yes, sir.
16 Q.   Okay.  So that gets us about eight years back.
17 What was before Magnolia Retirement Center?
18 A.   I did home health.  I can't remember the
19 exact -- oh, Bright Star Home Health before Magnolia.
20 I'm sorry.
21 Q.   How many years, roughly?
22 A.   Maybe a year and a half, somewhere between
23 there.
24 Q.   Roughly that gets us work history back to about
25 2010?

1  A.    I understand that I am a representative for
2  black students, interviewer.
3  Q.    A representative for black students?
4  A.    Yes, sir.
5  Q.    And how did you gain that understanding? Like,
6  how did you come about that that was what you were
7  doing?
8  A.    I attended some meetings, as far as, like,
9  Progressive League in my community. I read about it,
10 and that's how I came involved.
11 Q.    Okay. Are you referring to the College Station
12 Progressive League?
13 A.    I have attended some meetings, as far as, like,
14 the production in the community and things like that.
15 I have attended meetings and things of that nature,
16 and gave my input.
17 Q.    And -- okay. So is that the League, or the --
18 that's what Mr. Porter is a member of, and
19 Ms. Dozier's the -- do you know that name, Ms. Dozer?
20 A.    Yes, sir.
21 Q.    Okay. When did you begin participating in that
22 association, or that League?
23 A.    As far as for the Progressive League?
24 Q.    The Progressive League, yeah.
25 A.    Probably I've been involved, maybe, since I was

1   18. You know, once I graduated high school, I
2   attended meetings and heard about the production of
3   Progressive League, basically when I probably was,
4   like, 18, getting involved as far as, like, the
5   parade, and, you know, things like that with the
6   community.
7   Q.   Okay.  So since 18 it's fair to say you have
8   been involved in various activities sponsored or
9   hosted by the League?
10  A.   Yes, sir.
11  Q.   And I don't want to misstate what it's called.
12  Is the League the term?
13  A.   Progressive League, yes, sir.
14       MR. PORTER:  Progressive League of
15           College Station.
16  Q.   Progressive League, okay.
17       MR. KEES:  Yeah, I know the full name,
18           Austin.  I just -- is there a shorter name
19           that you would go by?
20       MR. PORTER:  We just call it the
21           League.
22       MR. KEES:  Okay.
23  BY MR. KEES:
24  Q.   So I understand 18 years of being in the
25  League.  Do you recall when you first started

1  learning about this present lawsuit?
2  A.     I want to say the end of 2017.
3  Q.     2017?
4  A.     Uh-huh.
5             MR. PORTER:  Is that a "yes"?
6  A.     Oh, yes.  I'm sorry.
7  Q.     Okay.  So prior to 2017, you weren't aware of
8  the desegregation lawsuit?
9  A.     I think I was aware.  As far as getting
10 in-depth with it, it didn't start until 2017.
11 Q.     Okay.  So prior to 2017, and correct me if I'm
12 wrong, would your knowledge have been just because
13 it's, it's in the paper and on the news, and it's
14 that kind of awareness?
15 A.     Yes.  But as far as awareness, as far as the
16 children in the community and things of that nature.
17 Q.     That happened -- you started becoming more
18 aware in 2017?
19 A.     Yes.
20 Q.     Okay.  What happened in 2017 that brought, that
21 caused you to be more engaged?
22 A.     What happened in 2017 that caused me to be more
23 engaged, I had some issues, as far as my son getting
24 the proper educational needs that he is needing, and
25 that's why I became more involved.  I had some

1   concerns.
2   Q.   And who did you go to with those concerns about
3   James?
4   A.   His teachers, at that time.
5   Q.   Okay. And then -- and I'll go back and ask
6   about James in a little bit more detail, but how did
7   it progress from talking to his teachers about James
8   to getting more involved in the deseg lawsuit?
9   A.   I noticed issues within that that I noticed
10  that, that's proceeding with these that I had with
11  James, some, you know, educational and behavioral
12  issues.
13  Q.   Okay. So you first addressed it with his
14  teacher around 2017?
15  A.   I did.
16  Q.   And then did you address it with someone else
17  outside the school system?
18  A.   I didn't.
19  Q.   Okay. So was the issue in 2017 with James at
20  College Station, was that ultimately resolved?
21  A.   No.
22  Q.   Okay. What did you do when there was no
23  resolution at the teacher level?
24  A.   I pushed it. I got more in-depth with the
25  teacher, and I kind of pushed the issue, as to the

1  Q.    Okay.
2  A.    So it wasn't like a person saying, Hey, you are
3  going to be in this.  I was, actually, already
4  involved with the concerns and things of that nature
5  that the children were having.
6  Q.    Okay.  And is this -- when you are talking
7  about wanting to get more involved, are these at,
8  like, League meetings?
9  A.    I'm sorry.  What did you say?  What now?
10 Q.    When you decided to get more involved on behalf
11 of other parents, were those conversations that you
12 were having at League meetings?
13 A.    Yes, it was mentioned.
14 Q.    Okay.  And I asked you earlier what your role
15 was, and you said a representative for black
16 students; correct?
17 A.    Uh-huh.
18             MR. PORTER:  Yes?
19 A.    Yes.
20 Q.    Do you understand --
21 A.    I'm sorry.
22 Q.    What?
23 A.    Yes.  I keep saying "uh-huh."  I keep saying --
24 yes.  I'm sorry.
25 Q.    Yeah, that's a bad -- we all have that bad

1   habit, because we want to talk naturally.
2           Do you understand what your specific title
3   is in this lawsuit?
4   A.   I do, yes.
5   Q.   What is that?
6   A.   I'm an interviewer for black students.
7           MR. PORTER:  Intervenor.
8   A.   Intervenor.  I'm sorry.  Intervenor.
9   Q.   Intervenor?
10  A.   Uh-huh.
11  Q.   Okay.  And do you recall when you took on that
12  official role?
13  A.   I want to say maybe 2018, maybe.  And it may
14  have leading, been the end of -- I'm going to say
15  2018.
16  Q.   Okay.  I see you reading some documents.  What
17  did you bring today with you?
18  A.   I brought the Plan 2000.
19  Q.   Okay.  Plan 2000?
20  A.   Uh-huh.  I also have the, the docket that was
21  filed, I want to say, yesterday.
22  Q.   What does that say at the --
23          MR. KEES:  What is the title of that,
24      Austin?
25          MR. PORTER:  That's the, that's the

Case 4:82-cv-00866-DPM   Document 5649-1   Filed 06/29/20   Page 10 of 20
Eackles, Tamara 5/14/2020                                    Little Rock School District v. Pulaski County Special School District, et al
Page 27

```
 1              Motion to Intervene that was filed, I
 2         guess, by Dr. Janice Warren.
 3              MR. KEES:  Okay.
 4              THE WITNESS:  And I just have the
 5         multipurpose field house information.
 6   BY MR. KEES:
 7   Q.    Okay.  All right.  So where did you receive a
 8   copy of Plan 2000?
 9   A.    I received a copy of Plan 2000 from
10   Ms. Springer, and at that time John Walker.
11   Q.    So that's been last year?
12   A.    Yeah.  Yes, sir.
13   Q.    Okay.  How did you get a copy of the filing
14   from yesterday?
15   A.    Mr. Porter.
16   Q.    He gave that to you today?
17   A.    Yes.
18   Q.    Okay.  Do you, do you ever get online and check
19   the docket of filings on this case?
20   A.    I haven't.
21   Q.    Okay.  So documents that -- okay.  You have got
22   Plan 2000.  You have got the filing from yesterday,
23   and then you said you had a field house document?
24   A.    Uh-huh.
25              MR. PORTER:  Is that a "yes"?
```

Page 32

1　Q.　Okay. What other schools in the district, and
2　I know you have been, you went to the district as a
3　student, so let me just say within the past five
4　years, have you been in any other schools in the
5　district?
6　A.　I have.
7　Q.　Which ones?
8　A.　Robinson, of course Mills, of course College
9　Station, Bates, and there was one other one. I can't
10　think of it at this time.
11　Q.　Okay.
12　A.　Joe T. Robinson. I'm sorry.
13　Q.　Okay. So you went to the -- well there's two.
14　There's a high school and a middle.
15　A.　Uh-huh.
16　Q.　Which one did you --
17　A.　I saw both, the high school and the middle. I
18　got it -- I should have said that.
19　Q.　What caused you to go to Robinson? Did you go
20　in the schools at Robinson?
21　A.　Uh-huh.
22　　　　　　MR. PORTER: Yes?
23　Q.　Yes?
24　A.　Yes. I'm sorry.
25　Q.　Did you go in the middle school and the high

1  school?
2  A.    Yes.
3  Q.    And when was that last time you went?
4  A.    What is this, 2020?  I want to say the end of
5  '19, proceeding into '20.  I went with a friend to
6  support her children.
7  Q.    What do you mean by that, Ms. Eackles?
8  A.    You mean what do I mean by support?
9  Q.    Yeah, I mean, what caused you to go there with
10 your friend?
11 A.    They had an honor roll assembly, and just
12 various things, like cake drives and things of that
13 nature, fundraisers and stuff like that, just go to
14 support the kids.
15 Q.    Oh, okay.  So you went -- were there kids --
16 were your friends' kids in the middle and high
17 school?
18 A.    Yes.
19 Q.    And you went to an event there because your
20 friend's kid was there?
21 A.    Yes.
22 Q.    Okay.  Have you ever been there -- well, strike
23 that.  Are those the only -- is that the only one
24 occasion that you have been to Robinson Middle and
25 High School?

Eackles, Tamara 5/14/2020                Little Rock School District v. Pulaski County Special School District, et al

Page 36

1  Q.    What is your understanding of the facility
2  issues?
3  A.    To my understanding, that the facilities are
4  not presentable, meaning they're not equal, as far as
5  presentation, and the, to accommodate the children in
6  the area.
7  Q.    Which -- okay.  And which facilities are you
8  talking about are not equal in presentation?
9  A.    I'm speaking in reference to Mills auditorium,
10 College Station, of course.  I want to say Bates, as
11 far as looking at Joe T. Robinson and the other
12 schools that's not predominantly in the minority
13 area.
14 Q.    But when you went to Joe T. Robinson Middle
15 School and High, like I was asking you, you weren't
16 there to inspect or compare?
17 A.    Correct.
18 Q.    Okay.  And your understanding of the facility
19 issues that you just talked about, how did you come
20 to that understanding?
21 A.    Well, observation.  And when I say
22 "observation," I mean by looking at the comparison,
23 let's just say from College Station to another
24 school, or from Mills Middle and High, compared to
25 Joe T. Robinson High, and so forth.

1  you told me about?
2  A.   Yes.
3  Q.   Bates, College Station?
4  A.   Yes.
5  Q.   Do you know, aside from the facilities that we
6  have talked about, are you aware of any of the other
7  issues that are being litigated or are a part of this
8  lawsuit?
9  A.   I am aware.
10 Q.   Okay.  And what are you aware of?
11 A.   I am aware that some of the facilities that
12 were supposed to be renovated or, to make it look
13 better, versus some of the other schools have said
14 they have been met, but they have not been met, as
15 far as accommodation for the kids, the children.
16 Q.   Which facilities are you -- I think you told me
17 about that.  Are you, again, referring to Mills?
18 A.   Yes.  Mills and College Station.
19 Q.   Mills High and College Station?
20 A.   Yes.  Yes, sir, Mills High and College Station.
21 Q.   Okay.  Aside from what I will call the building
22 programs, or facilities, or school structures, are
23 you familiar with any other issues that are in this
24 lawsuit?
25 A.   I am sorry.  Can you repeat yourself?

1  Q.   Yeah.  So we talked about what I'm calling
2  facilities --
3  A.   Okay.
4  Q.   -- the buildings.
5  A.   Okay.
6  Q.   Are you familiar with any other issue disputes
7  that are still, that are a part of this lawsuit?
8  A.   I am familiar.
9  Q.   Okay.  And what are those that you are familiar
10 with?
11 A.   As far as the school facilities, as far as,
12 like, the funding issues, being able to accommodate
13 students' special needs, the attractiveness, as far
14 as how it looks, is it accessible, you know, for the
15 children, and so forth.
16 Q.   Okay.  What do you mean by funding for special
17 needs?  Are you talking again about funding for the
18 schools?
19 A.   Yes, sir.
20 Q.   Like funding for the schools to be able to make
21 it more accessible for students?
22 A.   Yes, sir.
23 Q.   Is that what you are saying?
24 A.   Yes.
25 Q.   Okay.

Eackles, Tamara 5/14/2020                                Little Rock School District v. Pulaski County Special School District, et al

Page 40

1  A.   As well as discipline as well.
2  Q.   Okay.  What is your understanding of the
3  discipline issues?
4  A.   And, again, I'm just speaking on personal.  A
5  lot of times you know, it may, the children who tend
6  to act out more, there, there seems -- not seems,
7  there seems to be that they get labeled.
8       And what I mean by "labeled," Oh, this
9  student is bad, or whatever, has been acting out two
10 or three days out of the week.
11      And they will put them in a PBIS, which is
12 a behavioral issue class that the students go to if
13 they can't participate in Fun Fridays, or whatever
14 school involvement, or participation, you know, for
15 students who don't act out.
16 Q.   And where have you seen this, what school?
17 A.   College Station.
18 Q.   College Station?
19 A.   Yes, sir.
20 Q.   And is that the only school you have seen that
21 issue?
22 A.   Yes.
23 Q.   So you told me about what you have observed,
24 but what do you take issue with about how College
25 Station is handling the behavior of the students?

1　A.　I'm sorry. The air had came on, so I didn't --
2　I caught the last end of your question.
3　Q.　I said -- I know you have told me about your
4　observation --
5　A.　Uh-huh.
6　Q.　-- at College Station. Some of the students
7　are put in a PBIS setting for behavioral issues, and
8　I want to know particularly what is your complaint,
9　or did if you even have one about that process?
10　A.　My issue and complaint is, is that they're
11　targeting black boys, little black boys who, who
12　probably do have some behavioral issues that they're,
13　College Station, or -- well, College Station isn't
14　able to really accommodate them the way they should.
15　　　　My problem is if the same students are
16　acting out, why are you putting them in a class, a
17　PBIS class, with the students who are acting out?
18　You know, it's the same students. So the issue is
19　not getting resolved.
20　Q.　What -- you used the term "targeting black
21　boys." What makes you think that College Station is
22　targeting these students?
23　A.　If you look into it and do a little bit more
24　research, you will see that it's more than 50 percent
25　of the kids, of black boys who initiated the PBIS

Eackles, Tamara 5/14/2020　　　　　　　　　　　　Little Rock School District v. Pulaski County Special School District, et al

Page 42

1  behavior, meaning they pull them out if they're not
2  doing good and place them in a classroom until the
3  activities are over.
4        And how do you expect those kids to excel
5  beyond that if you keep putting them in a classroom
6  because their behavior is bad, versus targeting, no,
7  not targeting, trying to get more in-depth as to see
8  why are they acting out, and such.  Placing them in
9  the classroom, the same students, is not getting to
10 the problem.
11 Q.    Have you addressed this concern with anyone at
12 College Station?
13 A.    I have.
14 Q.    Who did you address that with?
15 A.    I had a talk with Mary Carpenter, which is the
16 principal.  I had a talk with Karen Green, which is
17 James' teacher.
18        I had a talk with, with Ms. Evans, and I
19 want to say at that time she was one of the people
20 who actually sat in the classroom with the kids while
21 the other kids participated in the good activity, or
22 the activities.
23 Q.    So this issue, talking about the PBIS, that,
24 that arose from James's time at College Station;
25 right?

Page 48

1  if I had, you know, correspondences, Mr. Walker and
2  Springer did, but for right now Mr. Porter.
3  Q.    Okay.  Do you, do you receive emails, or do you
4  use email?
5  A.    Yes.
6  Q.    Okay.  Have you ever been asked to review any
7  type of document before it's filed with the court?
8  A.    Pertaining to this case?
9  Q.    Yes.
10 A.    I can't really vaguely remember it, but no.
11 Q.    Okay.  Do members of the community, do they --
12 are you a point person for members of the community
13 to call and, and air any grievances or issues, or let
14 you know about something that's taken place in the
15 school system?
16 A.    I haven't been sworn in or, you know, been
17 actually appointed to it, but if some parents have
18 some concerns with issues, I do -- if I can help,
19 then, I do, you know, address it with them, help
20 them.
21 Q.    And how often would you say -- Okay.  Thank you
22 for that.  I didn't mean -- yeah, I didn't mean for
23 you swearing in.  I just meant casually.
24 A.    Oh, okay.
25 Q.    How many occasions do you think a parent in the

Eackles, Tamara 5/14/2020    Little Rock School District v. Pulaski County Special School District, et al

Page 49

1  school district has called with a, you know, an issue
2  related to the school, and talked to you about that?
3  A.    It just depends on the certainty of the issue,
4  as far as, like, behavior or anything like that, it
5  may be one or two here and there within, like, a two-
6  or three-month timeframe, but as far as having some
7  concerns, or trying to get them to the resources they
8  need for their children -- and I'm just speaking on
9  behavior, education, you know, outside sources, as
10 far as, like, after school program, educational
11 needs, and stuff like that -- it may be two or three
12 times a month. Maybe one or two parents say, Hey,
13 maybe about the Audubon program, or Life Strategies,
14 or something like that.
15 Q.    Are these parents in the College Station
16 community?
17 A.    Some are, and some, they are not.
18 Q.    So the ones that are not in College Station, in
19 that feeder pattern of Fuller and Mills, where, where
20 are they generally located?
21 A.    They, they are within the Little Rock School
22 District. There's only two main districts, Pulaski
23 County and Little Rock, so.
24 Q.    Okay. So in terms of parents that have kids in
25 PCSSD, and to the extent they call you to get advice,