Transcript of the Testimony of

# StallingsKehinde, Valerie

**Date:** May 1, 2020

**Case:** Little Rock School District v. Pulaski County Special
School District, et al

**Bushman Court Reporting**
Janess Ferguson Smith
Phone:  (501) 372-5115
Fax: (501) 378-0077
<www.bushmanreporting.com>


EXHIBIT
B

StallingsKehinde, Valerie 5/1/2020                    Little Rock School District v. Pulaski County Special School District, et al

Page 8

1          MR. PORTER:  That's in College

2      Station, Cody.

3          MR. KEES:  Yeah.

4          MR. PORTER:  Okay.  She lives in

5      Higgins Switch.

6          THE WITNESS:  Higgins Switch.

7          MR. KEES:  Okay.

8          THE WITNESS:  So it's a little bit

9      down Dixon Road.  There's two or three

10     areas you can go.

11         MR. PORTER:  Kind of more closer to

12     Mills High School.

13         THE WITNESS:  Correct.

14 BY MR. KEES:

15 Q.    But you're in the College Station feeder?

16 A.    My kids attend College Station, one of my

17 children does.

18 Q.    Okay.  And your other child attends Mills

19 Middle?

20 A.    That is correct.

21 Q.    Did you tell me how long you had lived at 8500

22 Higgins Switch?

23 A.    8500, me and my spouse just built that house

24 recently, so within the last, I would say a couple of

25 months we have resided there.

1  Q.    Okay.  How was her experience at College

2  Station second through fifth grade?

3  A.    Well, experience was fine, because I'm, I'm

4  going to be the attentative {sic} parent and be

5  there, and drop my children off.

6        I try to speak with the teacher, not on a

7  daily basis, within a, every other day, as far as to

8  check on my child's progress.

9  Q.    So currently do you take Leah to school at

10 College Station?

11 A.    Some days I do.

12 Q.    And other days she rides the bus?

13 A.    That is correct.

14 Q.    And then Mia, how does she get to Mills?

15 A.    Some days I take her to school, and some days

16 are the bus.

17 Q.    When you say you're the attentative parent,

18 you're the primary contact?

19 A.    Yes.

20 Q.    So in -- let's talk about Mia first.  She was

21 there for three years; correct?

22 A.    Uh-huh.

23 Q.    Second -- well, actually more, second, third,

24 four, and fifth.

25 A.    Correct.

StallingsKehinde, Valerie 5/1/2020

Little Rock School District v. Pulaski County Special School District, et al

Page 20

1   Q.      Four years.  How would you describe her

2   overall, her overall experience at College Station?

3   A.      Well, the experiences was good, as far as her

4   educational, as far as that.  My main concern was

5   there was not even Smart Boards in her classes for

6   the teacher to teach off of and to be interactive

7   with the students as well.

8   Q.      And is College Station set up with one teacher

9   per grade?

10  A.      It is one teacher per grade, yes, sir.

11  Q.      So they would have one teacher all day, aside

12  from the electives and co-curriculars, such as P.E.,

13  music, art, that kind of thing?

14  A.      Yes.

15  Q.      Okay.  So a Smart Board, what did they operate

16  off of, if they didn't have a Smart Board?

17  A.      They were using, I guess, computers, as far as

18  that, and books, textbooks.

19  Q.      And a Smart Board, that's the projector;

20  correct?

21  A.      Correct.

22  Q.      Did you address the issue of Smart Boards?

23  A.      I did.

24  Q.      Who did you address?

25  A.      I addressed it with the teacher, and then I

StallingsKehinde, Valerie 5/1/2020                    Little Rock School District v. Pulaski County Special School District, et al

Page 21

1    also called the Pulaski County School District.

2    Q.    Who did you speak with; do you know?

3    A.    I got the runaround, and I made sure I got a --

4    I made a statement to one of the secretaries there,

5    but I can tell you within the, within the upcoming

6    month they did have a Smart Board in her classroom.

7    Q.    Okay.  So you called the secretary at central

8    office?

9    A.    Central Office, Pulaski County School District.

10   Q.    Okay.  I know Ms. Carpenter is the principal

11   now.  Was she there at that time?

12   A.    No.  No, she wasn't.

13   Q.    Did you talk to the principal about the issue?

14   A.    I tried to.  At that time the principal was not

15   there in a timely manner when I was there, for

16   starting school.

17   Q.    When you dropped off?

18   A.    Correct.

19   Q.    What did time did you drop off Mia?

20   A.    Mia at that time was roughly around about 7:45.

21   Q.    Okay.

22   A.    And that's when school starts.

23   Q.    So the Smart Board issue, that was resolved;

24   correct?

25   A.    Yes.

Page 22

1   Q.      Any other issues, you know, good or bad that

2   stand out with Mia in her four years at College

3   Station?

4   A.      No.  Other than that, she was cold all of the

5   time, and I had to make sure she had either her coat

6   or some other pants or something she could put on.

7   Q.      Does she have a medical issue or something?

8   A.      No medical issues, just it's an outside school.

9   Q.      Was she cold when she was outside or in the

10  classroom?

11  A.      The classroom.

12  Q.      And that was all year round, or during the cold

13  season?

14  A.      Basically, they didn't turn their heat on at a

15  good time, as far as that.  They turn it on after

16  months.

17  Q.      Okay.  Any other issues that stand out?

18  A.      Other than the playground area, they had one

19  student that had a disability, and they were unable

20  to get down on the playground due to it not being

21  leveled for them to get down and, to join to have the

22  playground access.

23  Q.      Was that remedied?

24  A.      I haven't checked.  As far as that, I haven't

25  known, but I did voice an opinion as far as that too

Page 23

1    as well.

2    Q.    How did you learn of the student?

3    A.    I saw the student.

4    Q.    Was the student -- did the student have some

5    type of service device?

6    A.    Not a service device.  It's just that he had a

7    shoe that was higher than the other one --

8    Q.    Right.

9    A.    -- for levelizing for him.

10   Q.    Okay.

11   A.    Uh-huh.

12   Q.    Who did you report that to?

13   A.    I actually voiced my concern when I called the

14   school district then, along with the Smart Board.

15   Q.    Okay.  So you made those two issues?

16   A.    At the same time, yes.

17   Q.    Do you think you talked to somebody in, like,

18   Equity Services, or do you -- you just don't know?

19   A.    I don't know who I spoke with.  I spoke with

20   her secretary, whoever is her secretary who is over

21   the Pulaski County School District, is whoever I

22   voiced my concerns to.

23   Q.    Okay.  Does Mia, is she on an IEP or anything?

24   A.    She is an IEP.  Yes, she is.

25   Q.    When was she placed on an IEP?

StallingsKehinde, Valerie 5/1/2020                    Little Rock School District v. Pulaski County Special School District, et al

Page 24

1   A.    Mia has been on an IEP for, since she has been

2   in elementary school.

3   Q.    Okay.  And how has your experience been with

4   the Special Education services?

5   A.    Special Education has been good, because I have

6   been dealing with the same teacher, as far as that,

7   not dealing with multiple teachers as far as that,

8   the parent conferences.  It's been good, a good

9   experience.

10  Q.    Is Mia, and I don't want to get into this very

11  deep.  I'm just generally asking you.  Is she with

12  the regular ed curriculum, like the general ed, and

13  she gets supports, or is she in a self-contained?

14  A.    She is in a self-contained classroom.

15  Q.    Okay.

16  A.    Uh-huh.

17  Q.    Was she in a self-contained classroom at

18  College Station?

19  A.    No.

20  Q.    She was in the general education setting.

21  A.    Yes, and pulled out.

22  Q.    Okay.  And now at Fuller, she is in a

23  self-contained setting?

24  A.    Mills.

25  Q.    I'm sorry.  Mills, yeah.  It's the old Fuller.

Page 25

1    It's a hard habit.

2    A.    Uh-huh.

3    Q.    Okay.  Are you in any type of, like the Parent

4    Teachers Association at College Station?

5    A.    No.  There is not enough active parents there.

6    Q.    How do you know that, or what leads you to

7    believe that?

8    A.    Because I went to some of the, not necessarily

9    screenings, but things that they have held their

10   publicly, as far as open to parents, reading nights

11   and things of that nature.

12   Q.    So you attended those type activities?

13   A.    Yes.

14   Q.    Have you read the College Station Parent and

15   Family Engagement Plan?

16   A.    Yes.

17   Q.    You have read that document?

18   A.    Uh-huh.

19   Q.    Did you participate in crafting that document?

20   A.    Not necessarily crafting the document, no, sir,

21   I did not.

22   Q.    Okay.  So you would -- a copy was made

23   available, and you have read it?

24   A.    Yes.

25   Q.    Now let's look at Leah.  She started attending

Page 31

1   Q.    Okay.  Can you break that down for me?  So what
2   led you to even go searching?
3   A.    Voicing my opinion as far as the school, as far
4   as the Smart Board, that was my concern.  And then
5   the heating in the classrooms and the air
6   conditioning in the classrooms.
7   Q.    Okay.  So you had --
8   A.    So that prompted it.
9   Q.    I gotcha.  Great.  So you had these concerns at
10  College Station that we have addressed, and that led
11  you to, you said go talk to somebody?
12  A.    Correct.  Because it wasn't handled over night,
13  as far as that.  Once you broach your concern, I got
14  the runaround calling the Pulaski County School
15  District at first.
16  Q.    Okay.
17  A.    And so I just left the secretary -- I told her,
18  I don't know who you are going to give it to, but it
19  needs to be heard, and I left a detailed message, as
20  far as that.
21  Q.    And then you subsequently spoke with somebody
22  else that was not an employee of the school?
23  A.    Not an employee of the school.  This was
24  somebody that I don't even know where I met them at,
25  possibly at a school or somewhere, and we were just

Page 32

1    talking about education, as far as the school

2    districts and everything as far as that.

3    Q.    And she mentioned this --

4    A.    Yes.

5    Q.    Well, let me finish.  She just mentioned there

6    was a lawsuit of some sort?

7    A.    Yes, sir.

8    Q.    And then what did you do after that?

9    A.    As of that, she did give me a name of an

10   attorney, as far as that, and I did go ahead and

11   speak with them, as far as the issue.

12   Q.    Okay.  And I don't want to know what you told

13   your attorney, but I think I can know what you did.

14   A.    Okay.

15   Q.    And Austin will stop me if I become improper,

16   but did you contact Mr. Walker's office?

17   A.    I did.

18   Q.    Okay.  And did they provide you with documents

19   to read, to learn, or did you have to go find

20   documents?

21   A.    No, they provided me with documents.

22   Q.    Okay.  What are you brining in here today; is

23   this Plan 2000?

24   A.    That is correct.

25              MR. KEES:  Austin, can I look at this?

Page 33

1              MR. PORTER:  Yes.

2    BY MR. KEES:

3    Q.     What did you -- prior to coming in here today,

4    what have you recently reviewed in preparation for

5    this deposition?

6    A.     Well, I have read that, and I have also

7    visited, drove by some of the facilities that are in

8    the Plan 2000 as well.

9    Q.     Okay.  So you have got your -- I'm not going to

10   put this in the record, because we have abundant

11   copies, but this is a copy of Plan 2000; correct?

12   A.     Yes, sir.

13   Q.     Do you remember when you -- did you -- you

14   first obtained this in or around March of 2018?

15   A.     Yes, sir.

16   Q.     Okay.  Did you review any other documents in

17   preparation for today besides the Plan 2000?

18   A.     No, sir.

19   Q.     Have you, have you looked at any documents

20   related to this case besides Plan 2000 since you

21   became aware of it in 2018?

22   A.     No, sir.

23   Q.     And so -- and the "no" is fine.  I just want to

24   go over it.  Have you read any amendments to Plan

25   2000?

Page 34

1   A.     No, sir.

2   Q.     Okay.   Have you read any orders from the

3   various judges that have been a part of this case?

4   A.     No.

5   Q.     Okay.   Have you read any reports authored by

6   any court-appointed experts?

7   A.     No.

8   Q.     So your testimony is in terms of what you

9   reviewed, documentation, it's Plan 2000 I'm holding?

10  A.     Yes.

11  Q.     Have you read any newspaper articles?

12  A.     No.

13  Q.     Okay.   Do you subscribe to the Arkansas

14  Democrat-Gazette?

15  A.     No.

16  Q.     How do you get your news, if you do?

17  A.     As far as the news, local news, as far as that.

18  Q.     Okay.   You watch it on TV?

19  A.     Yes.

20  Q.     You're not a Twitter warrior --

21  A.     No.

22  Q.     -- that gets on there and banters?

23  A.     No.

24  Q.     You mentioned that you have done some site

25  inspections, for lack of a better word.   You have

Page 35

1    looked at schools?

2    A.    Yes.

3    Q.    Well, besides College Station and Mills Middle,

4    what schools have you looked at?

5    A.    Joe T. Robinson Middle School, also the new

6    McClellan High School.

7    Q.    While you were at Joe T. did you also look at

8    the high school?

9    A.    I drove by it.  I couldn't actually go in the

10   school, as far as that, sir.

11   Q.    Sure.  Have you -- because that's pretty far

12   from where you live; isn't it?

13   A.    Yes.

14   Q.    When did you drive by and look at the Robinson

15   campus?

16   A.    One day I was out Highway 10, and I was going

17   to Walmart.

18   Q.    Okay.  Well, you passed by four Walmarts to get

19   there.

20   A.    Yeah, but you know you have to go out.

21   Q.    Yeah, I understand.  So one time you recall --

22   A.    Yes.

23   Q.    -- looking at Joe T. Robinson?

24   A.    Yes.

25   Q.    And then -- do you remember, was it after the

Page 36

1    new construction?

2    A.    After the new construction.

3    Q.    Okay.  And what other schools have you

4    inspected?

5    A.    I have looked at the Mills, not Mills,

6    McClellan.  The new school for McClellan, it's up and

7    coming.

8    Q.    Okay.  Anything north of the river?

9    A.    Maumelle.  It's a beautiful school as well.

10   Q.    You went and looked at that school?

11   A.    Yes.

12   Q.    Okay.  And, obviously, you see Mills High

13   School.  Every day you go to Mills?

14   A.    Yes.

15   Q.    Have you been in the Mills High School

16   facility?

17   A.    I have not gone into the facility, but I have

18   drove around, as far as looking at it, yes.

19   Q.    Are the two facilities you have been in limited

20   to College Station at Mills Middle?

21   A.    Yes.

22   Q.    Okay.  You've stated that you didn't, you

23   haven't read any orders, or documents, or anything

24   besides this plan.

25         My question is have you provided

Page 37

1  information to Mr. Walker, or his office, or

2  Mr. Porter, or his office about your inspections or

3  any, or your observations?

4  A.   I have said, yes, that their schools are a

5  little bit bitter on the eyes than the other schools

6  are, yes.

7  Q.   So you reported to the attorneys for the

8  Intervenors your observations about the facilities?

9  A.   Yes.

10  Q.   Is that on one occasion?

11  A.   Yeah, one occasion.

12  Q.   Okay.  Have they -- I think the answer is no,

13  based on what you told me, but let me be sure.  Has

14  somebody in the Intervenors' office, counsel's

15  office, ever sent you a document to review for

16  editing or revising?

17  A.   No, sir.

18  Q.   Okay.  Do you use email?

19  A.   I do.

20  Q.   Well, yeah, obviously you have to with Geico;

21  right?

22  A.   Yes.

23  Q.   Okay.  In addition to sharing your views on the

24  facilities with counsel for the Intervenors have you

25  ever shared any issues about academics with counsel?

StallingsKehinde, Valerie 5/1/2020                    Little Rock School District v. Pulaski County Special School District, et al

Page 38

1    A.    Yes.   I think there should be some -- the

2    academics, as far as that, they need to have goals

3    set aside for each grade level.

4    Q.    Are you speaking to the grades that your kids

5    are in?

6    A.    Yes.

7    Q.    Is it fair to say that your knowledge is, is

8    limited to the grade levels that your two daughters

9    have been in?

10    A.    Yes.

11    Q.    Anything else with academics that you have

12    addressed in terms of concerns?

13    A.    No.  As far as the facilities -- academic-wise,

14    as far as you're talking about the -- what am I

15    trying to say?

16          Are you talking about, like, the

17    activities, as far as outside, like football,

18    basketball --

19    Q.    No, no.

20    A.    -- or anything of that nature?

21    Q.    I'm sorry.   I'm talking mainly academics.

22    A.    Okay.

23    Q.    Classroom learning.

24    A.    Classroom learning, okay.  No.  Everything is

25    on my children's level, as far as that.