**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

LITTLE ROCK SCHOOL DISTRICT                                             PLAINTIFF

V.                                          NO. 4:82-cv-866-DPM

PULASKI COUNTY SPECIAL SCHOOL
DISTRICT NO. 1, ET AL.                                                  DEFENDANTS

EMILY McCLENDON, ET AL.                                                 INTERVENORS


**PULASKI COUNTY SPECIAL SCHOOL DISTRICT'S
REPLY IN SUPPORT OF MOTION FOR UNITARY STATUS**

Pulaski County Special School District (PCSSD) for its Reply in Support of its Motion for

Unitary Status (Doc. 5621), submits the following:

**I.    Overarching Issues**

    **a.    Misplaced and Impermissible Hearsay**

As an initial point salient to Intervenors' entire responsive submission, close attention must

be paid to distinguish between fact supported through citation, and unsubstantiated hearsay.  For

example, PCSSD previously cautioned "[d]iscovery has suggested that Intervenors seek to

transmogrify the narrow 2014 Joint Motion [regarding facilities] into a full blown case about an

alleged conspiracy theory." (Doc. 5620, p. 10). Intervenors response to the Motion for Unitary

bears this out as it is mired with gratuitous paraphrasing and unsupportable hearsay. Intervenors

submitted:

> Curtis Johnson developed the same view on diversion of funds after entering his
> position, following the departure of Derek Scott. He testified: "It is my
> understanding that most of the changes to Mills High school were – and the
> deviations that took place at Mills High school were because of cost. We started
> the Robinson Middle School first, and the overspending there caused us to be to a

> point to not be able to complete everything at Mills." He based this conclusion on conversations with architects Brad Chilcote and Earnest Duckery, as well as Michael Hansberry, Baldwin and Shell project manager. [Deposition at 89-90]

(Doc. 5649, p. 18). Derek Scott, Brad Chilcote, and Michael Hansberry are not listed as witnesses for Intervenors. (Doc. 5628, p. 25). Therefore, they will not be at the trial and hearsay attributable to them is inadmissible. *See* FED. R. EVID. 801. Further, as Curtis Johnson's deposition as a whole also made clear, the testimony quoted above references a time when Mr. Johnson was not employed by the district. He has no first hand knowledge. These decisions were made under the direction of Mr. Johnson's predecessor—Derek Scott. If a conspiracy centering around Mr. Scott existed, one would think Intervenors would have deposed Mr. Scott and called him as a trial witness. Instead, Intervenors apparently intend to attack Mr. Scott through conjecture and hearsay. At trial, PCSSD plans to object when Intervenors veer off into this hearsay, and it is improper to use any such statements. This is just one example of Intervenors' copious reliance on hearsay in their response to the Motion for Unitary Status.

> b.   <u>Class Representatives</u>

Intervenors previously represented to the Court and to PCSSD that the purported Intervenor representatives were aware of Plan 2000 and the benefits which it promises to African-American students, and that they purportedly continued to rely upon Plan 2000 regarding the future of their children. Respectfully, this is highly suspect in light of the deposition transcripts of the Intervenors' purported representatives. Ultimately the Court will need to make this determination following a rigorous cross examination. However, in its Motion for Unitary Status PCSSD stated that "the Intervenors must be compelled to actually show up at the hearing this summer. Absent their attendance, the case against PCSSD should not be allowed to continue without a client to represent the class." (Doc. 5622, p. 11). Intervenors did not contest these assertions. So ultimately

on this point, the Court will need to make a determination when these purported representatives show up for the trial and undergo cross examination.

### c.      The NAACP Legal Defense Fund

PCSSD introduced Intervenors' letter regarding COVID-19 as an illustration of their proclivity towards scope creep. In response, Intervenors state that apparently none of Intervenors' four attorneys wrote the letter but actually it "was written, in the main, by an attorney employed by the [NAACP] Legal Defense Fund." (Doc. 5649, p. 26). This is effectively a concession that the letter had nothing to do with Plan 2000 and education in Pulaski County, Arkansas, and rather Intervenors shoehorned a set of general talking points from a national organization into this litigation. Since Intervenors have raised the issue, it is worth pointing out that the NAACP Legal Defense Fund has not been active in this case in decades. In any event, this case is not the NAACP versus PCSSD, and PCSSD objects to the use of NAACP talking points to broaden the scope of PCSSD's obligations under Plan 2000.

## II.      Student Achievement

Intervenors response is substantively thin. So thin, in fact, as to indicate that Intervenors do not meaningfully contest that PCSSD is unitary in student achievement. They take an untimely swipe at the Charles W. Donaldson Scholars Academy, criticize PCSSD's data, briefly mention AVID, and take issue with PCSSD's Program Administrators. Other that those cursory attacks, they do not even mention the dozens of initiatives and programs outlined in PCSSD's brief in support of its Motion for Unitary Status.  (Doc. 5622, pp. 26-33). Even if Intervenors' passing criticisms had merit, which they do not, the remaining uncontested initiatives are more than enough of a basis for this Court to conclude that PCSSD has substantially complied in good faith with Plan 2000 and is thus unitary in student achievement.

a.     **The Achievement Gap**

In its Motion for Unitary Status, PCSSD asserted:

> Judge Wilson concluded that "[i]n this case, no court has ever determined generally,
> or with the specificity required in *Jenkins III*, what portion, if any, of the minority
> student achievement gap in LRSD is causally linked as a vestige of *de jure*
> segregation." (*Id.*, p. 87). It is believed that this finding is equally true for PCSSD
> as it was for LRSD, and so the achievement gap cannot be imputed to PCSSD.

(Doc. 5622, p. 18). It remains that "the gap in minority student achievement must be causally

linked by expert testimony and other evidence which is sufficiently specific to allow the trial court

to identify 'the incremental effect that segregation has had on minority student achievement.'"

(Doc. 3675, p. 81). In their response, Intervenors identified no such expert witness or judicial

finding making this link. As such, PCSSD cannot be required to close the achievement gap to

achieve unitary status. Plan 2000 does not say this, and precedent does not support it.

To the extent that PCSSD has undertaken efforts with regard to the student achievement

gap, it did so through Plan 2000, a contract not tied to a finding of a constitutional violation for

student achievement. For claiming breach of a contract not originally stemming from a

constitutional violation, Intervenors bear the burden of proof as the party claiming breach. (Doc.

5610). In any event, Intervenors seem to be suggesting that PCSSD must entirely close the

achievement gap in order to achieve unitary status. Such an unworkable standard was resoundingly

rejected by Judge Wright and Judge Wilson, among others. (Doc. 5622, pp. 14-15) (Doc. 3337,

pp. 6-7) (Doc. 3675, p. 148). It stands to reason that if PCSSD cannot be held to the standard of

*completely* eliminating the achievement gap, which it obviously cannot be, then how much must

it close the gap by to be considered unitary? This circles back to the practical problem that this

question cannot be answered without the benefit of expert testimony. (Doc. 3675, p. 87) (applying

*Missouri v. Jenkins,* 515 U.S. 70, 88 (1995)). This also ignores the distinction between making a

good faith effort to implement programs designed to eliminate the achievement gap, versus actually eliminating it. (*See* Doc. 5622, p. 7) (summarizing Judge Arnold's and Judge Wilson's distinction on this point). By advocating the position that PCSSD must close the achievement gap in order to achieve unitary status, regardless of whether by constitutional mandate or through contractual agreement, Intervenors have committed themselves to an interpretation of Plan 2000 that is unworkable, foreclosed by precedent, and not supportable.

Of course, Intervenors would love to have this Court hold that PCSSD must close the achievement gap in order to be considered unitary. That is because, according to Judge Wilson's summation of expert testimony, "current socioeconomic differences between African–Americans and whites make it impossible to eliminate the achievement gap." (Doc. 3675, p. 148). In other words, such a holding would be tantamount to handing Intervenors a blank check for another 37 years of litigation.

      **b.**        **<u>Data sufficient to justify the assertion that PCSSD is unitary</u>**

Next, Intervenors allege that Margie Powell's analysis on student achievement is flawed, staking out the bold position that Ms. Powell does not know how to properly analyze data despite the fact that she has been monitoring student achievement data in this case for decades. (Doc. 5649, p. 29). Intervenors alleged that "[a] major flaw is not including the data by race, grade, and area tested for the lowest group of the four score categories, students 'In Need of Support.'" (*Id.*). However, this data was produced to Intervenors in discovery, and will be presented to the Court at trial.

      **c.**        **<u>Charles W. Donaldson Scholars Academy</u>**

Shamelessly backing away from contractually agreed upon language in a stipulation, Intervenors allege that PCSSD's reliance on the Charles W. Donaldson Scholars Academy "suffers

from great over-breathe and over-emphasis." (Doc. 5649, p. 29). The only suffering going on here is Intervenors regret at agreeing to the contractually binding stipulation that this shall be a "***substantial component*** of PCSSD's desegregation obligation on the subject of student achievement." (Doc. 5018, pp. 2-3) (emphasis added). Largely, the only thing left for this Court to decide with regard to the Charles W. Donaldson Scholars Academy is how much weight should be given this "***substantial component***."

In their response to the Motion for Unitary Status, *for the first time ever* Intervenors allege that the Charles W. Donaldson Scholars Academy (1) fails to account for elements of the Ross Plan, (2) does not involve kindergarten through grade eight students, (3) lacks data, and (4) lacks an ability to overcome the impact of K-8 education. (Doc. 5649, p. 30). These new criticisms are foundational and get to the very philosophy and structure of the program, raising complaints about its target audience and pedagogical methodology.

As an initial matter, these late criticisms raise serious questions about the benefits of monitoring. Even given the limited time records available to PCSSD (Doc. 5622, p. 23, n. 6) in an approximately one year period, lead monitor Rep. Joy Springer self-reported that she allegedly spent 83.02 hours monitoring the Dr. Charles W. Donaldson Scholars Academy from June 1, 2016 to May 31, 2017. (Doc. 5367-1, pp. 1-29) (Doc. 5622, p. 23). To emphasize, that was just one year of monitoring in the six years since implementation. After all of this monitoring, she never raised the alarm on all of these alleged issues. These questions get to the core of what monitoring is attempting to accomplish, and whether PCSSD should have to pay for these efforts at all, especially when they prove to be completely ineffective at spotting issues, according to what Intervenors now allege.

These arguments are untimely and cannot be introduced into this litigation at this late stage. When Intervenors designed the Charles W. Donaldson Scholars Academy they apparently did not have these issues. When Intervenors presented the Charles W. Donaldson Scholars Academy to the Court none of these criticisms were raised. (Docs. 5024, 5032). When Intervenors updated the Court about the Charles W. Donaldson Scholars Academy at hearings none of these criticisms were raised. (*See e.g.*, Docs. 5174, 5177). When Intervenors filed progress reports and other documents showing consistent implementation none of these criticisms were raised. (Docs. 5078, 5115, 5148, 5172, 5200, 5283, 5318, and 5497). At the initial phase of discovery, PCSSD sent an interrogatory reading "Do you contend that the PCSSD has not achieved unitary status in the area of achievement? If your answer is other than 'No' please set forth each and every reason which supports your opinion that the PCSSD has not attained unitary status in the area of achievement." Interrogatory No. 9. Intervenors' response goes on for pages, but the Charles W. Donaldson Scholars Academy is not even mentioned. Now, on the eve of trial, for the first time, Intervenors have apparently developed philosophical complaints getting to the very design of the Charles W. Donaldson Scholars Academy. PCSSD objects to these untimely complaints, which it could not possibly have refuted in discovery and trial preparation since they were aired for the first time on June 29, 2020.

The belated complaints that Intervenors just raised for the first time were in the contemplation of the parties at the time of implementation. As far as accounting for the Ross Plan, when Rep. Walker introduced the Charles W. Donaldson Scholars Academy to the Court, the Court stated "I would like to understand better the genesis of this plan." (Doc. 5032, p. 6:10-11). Rep. Walker gave a long explanation, stating in part that "[t]his is a take-off from the Ross Plan." (*Id.*, p. 8:15). In other words, from its genesis, Rep. Walker made clear that the program is rooted in

the Ross Plan. To now claim that the Academy fails to account for elements of the Ross Plan is simply not supportable in light of this history. As far as the involvement of kindergarten through grade eight students and overcoming the impact of K-8 education, these were issues also contemplated at the time of creation. They are certainly not a surprise to Intervenors now. For example, Rep. Walker stated:

> Well, it is my position, your Honor, that the students who are in the school system now in all grades beyond grade one are victims of failure of the district to equally treat students, and the effects of those -- of that will linger for some time. So if a student is in, say, the ninth grade now, or, say, the seventh grade, he will be eligible or she will be eligible to participate at some point, if not seven, grade nine, and at that point, we would be, in effect, saying to them that you're here in part because of the residual effects of past discrimination.

(Doc. 5032, pp. 22:21-23:5). In other words, the K-8 issues that Intervenors raise now were contemplated at the time of creation of the Academy, and according to Rep. Walker the Academy was specifically designed to overcome, as he called it "residual effects of past discrimination."

But further, these criticisms attempt to shift blame to where it is not due. Former lead counsel Rep. Walker hand-selected the designers and implementers of the Charles W. Donaldson Scholars Academy. He championed the academy, arguably serving as its most vocal advocate. (Doc. 5032, p. 65:19-20) ("We proudly present this to the Court"). This entire program, underwritten by PCSSD's $10,000,000.00 commitment, was Intervenors' pet project. (Doc. 5032, p. 4:13-15 (the Court sought direction on how to begin the hearing, and Mr. Roberts deferred to Rep. Walker, stating "it's a joint motion, but with all deference, it was John [Walker] and Dr. Donaldson's idea, so I think it would be appropriate for them to go first." Thereafter Rep. Walker took the lead.) It was indeed supported by PCSSD, but from the beginning was designed to be implemented by separately hired people, mostly those affiliated with UALR and Philander Smith. (Doc. 5032, p. 16:5-17:3) ("So there won't be staff members per se from PCSSD who are directly

involved in anything regarding the program…the staff that will conduct the Summer Bridge Program will be exclusively UALR and Philander Smith staff….They would be housed at UALR and Philander Smith.").

To raise such foundational objections at the eleventh hour, six years after design and implementation, is quite revealing of Intervenors' litigation strategy to move the goal post and keep this case alive at all costs—even when the cost involves tastelessly calling a creation of Rep. Walker's legacy into question. Intervenors recent criticism that the implementers failed to collect data, if true, does nothing more than point the finger at Rep. Walker's hand selected implementers. In any event, the ship has long since sailed on raising criticisms of the Charles W. Donaldson Scholars Academy.

     **d.**     **AVID**

Intervenors' comments on AVID cannot even be called criticisms. Rather they pose a series of questions, all of which either were answered in written discovery, or will be answered at trial by PCSSD personnel and the AVID expert witness.

## III.  **Discipline**

As with student achievement, Intervenors response is so substantively weak as to question whether they meaningfully contest that PCSSD is unitary in discipline. Intervenors' entire theory of its discipline case is premised on the fallacy that PCSSD must completely eliminate racial disparities in discipline in order to be found unitary. Plan 2000 does not require this. Intervenors have pointed to no precedent or document that interprets Plan 2000 this way. What Plan 2000 actually acknowledges is the "objective of eliminating racial disparities in the imposition of school discipline." This standard comes into play in two areas of Plan 2000, Section F. First, under subsection F(1), PCSSD is required to gather data that allows for the *assessment* of success

achieving the objective of eliminating racial disparities in the imposition of school discipline. Second, subsection F(3) requires that PCSSD engage in "specific efforts" to "promote achievement" of this goal. PCSSD will present evidence at trial that shows substantial compliance in good faith with these Plan 2000 requirements.

Complete elimination of racial disparities in discipline is a noble goal, and one that PCSSD strives to achieve through its various efforts. However, PCSSD is not required to eliminate completely racial disparities in discipline to be found unitary. As Judge Arnold said: "certain programs with the purpose of ensuring that there is no racial discrimination with regard to student discipline be instituted. This does not mean that the programs must be perfectly efficacious." *Little Rock Sch. Dist. v. Armstrong*, 359 F.3d 957, 965 (8th Cir. 2004). Here again, this is a shameless attempt to expand the scope of this case to receive a blank check for another 37 years of litigation.

The remainder of Intervenors' response on discipline is unavailing. The data that Intervenors complain about was produced in discovery, and will be presented at trial. As were the completed disproportionality worksheets, which Intervenors requested for the first time on March 28, 2020 and produced recently. Intervenors contention that "PCSSD did not provide [a semester discipline] report for 2019-20 semester one despite Ms. Springer's specific request" is one of the most telling examples in Intervenors entire submission. PCSSD has been faithfully reporting discipline statistics to Intervenors using the same or similar methodology for the past decade without objection. Mid-year discipline reports are created and circulated internally to PCSSD principals. All of a sudden, on April 30, 2020, a few months before trial, Rep. Springer requested these reports for the very first time. Intervenors present this as a reason that PCSSD is not unitary in discipline. In other words, Intervenors are merely trying to play "gotcha" while remaining silent on a topic for at least 10 years. These types of requests again call into question the thoroughness

and credibility of Rep. Springer's monitoring efforts.  If Intervenors are permitted to litigate in this manner, this case will have no end.

## IV.    Facilities

The parties' arguments on the issue of facilities are largely fleshed out in the Motion *in Limine* on facilities (Doc. 5619), PCSSD's Brief in Support (Doc. 5620), Intervenors' Response (Doc. 5634), Intervenors' Brief in Support (Doc. 5635), and PCSSD's Reply (Doc. 5645). Essentially, determining good faith substantial compliance with Section H of Plan 2000 is a narrow question at this juncture, reduced to currency by the parties' joint motion to replace all prior commitments and amend the controlling obligations. (Doc. 5084, p. 3). Further, as Intervenors have conceded, the "equal, clean, safe, attractive" standard in Plan 2000 is a higher one than the constitutional "to the extent practicable" standard found in *Freeman v. Pitts*. (Doc. 5645, p. 12, n. 2) (*citing* Doc. 5635, p. 10) (*see also* Doc. 5622, p. 47, n. 17). As explained in those other filings, PCSSD has objected to the applicability of the "equal, clean, safe, attractive" standard.

Respectfully, there is not a great deal of fact finding remaining for the Court. Neither party has hired their own expert on facilities. The Court denied Intervenors' request for an independent facilities expert. (Doc. 5565, p. 23) ("For better or for worse, y'all are stuck with me"). The Court has been kept appraised of facilities developments with the filing of bimonthly facilities reports. Most notably, the Court either has seen, or will soon see, all of these facilities for itself through tours. Given that this is a bench trial and the Court is effectively taking collective judicial notice, PCSSD is litigating based on the understanding that this Court will, as it did in 2018, "draw[] freely on what it has learned in presiding over [this case]" which includes facilities tours. (Doc. 5445, p. 2). The facilities largely are what they are at this point, and the Court, through first hand observation, is the judge of things.

All of Intervenors' arguments on facilities are their attempt at proving a conspiracy theory, which PCSSD has argued at length is irrelevant. (Doc. 5620, p. 10). In fact, their responsive brief dedicates twelve (12) pages essentially presenting arguments about *why* PCSSD did what it did with regard to facilities. (Doc. 5649, pp. 12-25). This all while failing to call Derek Scott as a witness—the person in the driver seat of many of those decisions. This all emphasizes that the Court's analysis of the facilities obligations should be as objective as reasonably possible, seeking to limit the necessity for "subjective review." Especially when that "subjective review" hinges on an absent witness. An analysis of whether or not PCSSD has or will spend the amount it obligated itself to spend is the most objective standard which PCSSD can conceive. It avoids the determination of an outcome based upon the subjective views of what is pleasing to an individual eye and what another observer might deem the opposite.

Lastly, a direct response to a direct question, itself a quintessential example of what Intervenors are actually attempting to accomplish. Intervenors posited: "Intervenors are concerned by the fact that Robinson Middle School, Sylvan Hills Middle School, and Maumelle Middle School, are superior to Mills Middle School, a rehab project. This matter requires a PCCSD response." (Doc. 5649, p. 25). However, the fact that Mills Middle School would be a rehab project as opposed to a new construction was part-and-parcel of the facilities deal that Intervenors cut in 2014. The time for raising this concern was when making binding facilities amendments to Plan 2000 in 2014. They did not do so. (Docs. 5084 and 5091). If constructing a brand new Mills Middle School was arguably part of Plan 2000, then why does the actual agreed language of the stipulation promise "the *circa* $5,000,000.00 **conversion** of existing Mills to a middle school?" (Doc. 5084) (emphasis added). The fact that Intervenors would now posit that PCSSD must build a new Mills Middle School to achieve full unitary status is a glaring illustration of their "scope creep"—moving

the goal post once PCSSD has finally entered the end zone after 37 years. The same can be said for the suggestion that PCSSD must actually spend a minimum amount that is something higher than $5,000,000.00 on Mills Middle School. The Joint Motion to Amend Plan 2000 speaks directly to these points. (Doc. 5084). These arguments are an affront to contract law and the precept of justice that one is bound by a contract to which they agree.

**V.**      **Conclusion**

WHEREFORE, Pulaski County Special School District respectfully requests that its Motion for Unitary Status be granted and that Pulaski County Special School District be declared unitary in all remaining areas of Plan 2000.

Respectfully submitted,


M. Samuel Jones III (76060)
Amanda G. Orcutt (2019102)
Devin R. Bates (2016184)
MITCHELL, WILLIAMS, SELIG,
  GATES & WOODYARD, P.L.L.C.
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Telephone:  (501) 688-8800
Facsimile:  (501) 688-8807
sjones@mwlaw.com
dbates@mwlaw.com
aorcutt@mwlaw.com

*and*

Jay Bequette (87012)
Cody Kees (2012118)
BEQUETTE BILLINGSLEY & KEES, P.A.
425 West Capitol Ave., Suite 3200
Little Rock, Arkansas 72201
Telephone:  (501) 374-1107
Facsimile:  (501) 374-5092
jbequette@bbpalaw.com
ckees@bbpalaw.com

***Attorneys for Pulaski County Special
School District***