IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

LITTLE ROCK SCHOOL DISTRICT                                    PLAINTIFF

v.                              CASE NO. 4:82CV866DPM

PULASKI COUNTY SPECIAL
SCHOOL DISTRICT, ET AL.                              DEFENDANTS

EMILY MCCLENDON, ET AL.                              INTERVENORS

Brief in Support of Intervenors' Opposition to JNPSD's
Motion for Unitary Status

This brief discusses: the  facts regarding the four active Plan 2000 mandates,

with a suggested approach to structuring the Section L.(3) staffing incentives proof;

the applicability of unitary status principles, their content, and application; JNPSD's

Horne argument; the flawed nature of the district's argument regarding Intervenors'

racial  disparity approach in the PCSSD hearing; the history of PCSSD's default-

mode response to Brown v. Board of Education I (1954), Brown II (1955), and their

progeny, through the late 1980's; the parties' joint efforts in developing and securing

approval  and inclusion in consent decrees of the student achievement and discipline

relief, through approval of Plan 2000, on motion of PCSSD in early 2000; the roots

of this relief in federal remedial principles;  JNPSD having the burden of proof; the

barring by application of laches and waiver principles of JNPSD's effort to treat the

achievement and discipline relief as having been merely encompassed in private

1

contracts --- and, by JNPSD now, even subject to being set aside entirely.

Intervenors demonstrate that JNPSD will be unable to fulfill its burden of establishing the sustained period of requisite compliance, regarding the achievement, discipline and monitoring obligations, necessary to warrant a unitary status ruling. Intervenors describe, as well, a path for careful determination of the L.(3) staffing incentives facts. The latter approach does not signal agreement to compliance in that sphere.

[A.] Introduction to JNPSD's Ross Plan Student Achievement Obligations

In the 2018 JNPSD ruling, this Court wrote: "[JNPSD] inherited all of PCSSD's remaining obligations under Plan 2000, the 'particularization of federal law applicable to these parties.' Knight v. PCSSD, 112 F.3d 953, 955 (8thCir. 1997)." [Case Doc. 5445 at 1-2 This text bears emphasis regarding a major factor in this hearing. That is – an agreed upon remedial plan, at times, fulfills a role in other instances fulfilled by a court's remedial order, entered based on findings following adversarial proceedings. See also LRSD v. PCSSD, 921 F.2d 1371, 1383, 1394 (8thCir. 1990) (in earlier opinion in this case, Court states: "The law strongly favors settlements" and directs approval and enforcement of five settlement documents, two concerning PCSSD, the predecessors of Plan 2000, also agreed upon, and then approved on Motion by PCSSD).

The Eighth Circuit's 2011 opinion noted that "Section M of Plan 2000 requires

[JNPSD] to implement a plan designed by Dr. Stephen Ross ('the Ross Plan') to improve student achievement." That Court also set forth the Plan's Goals 1 and 2 (with which this Court is familiar).  LRSD v. State of Arkansas, 664 F.3d 738, 755-56. The Court further alluded to the Plan's significant Goal 6, regarding program evaluation at the district and school levels, by noting Judge Miller's finding of PCSSD's "fail[ure] to systematically design, select, and implement effective intervention programs." [At 755-56]

Judge Miller wrote: "The Ross Plan required each school in [PCSSD] to prepare a school-wide plan for increasing student achievement and closing the achievement gap."  [4507 at 94] He noted the "[functional resemblance]" of this plan,  to "[Arkansas] Comprehensive School Improvement Plan[s]" (ACSIP plans,) as described at  that  time in Arkansas's ACTAAP legislation, AR Code Sec. 6-15-404(f)(4)(A)-(B). He added: "In light of this functional similarity, [PCSSD] determined that each school should develop  a single school improvement plan that infused elements of the [Ross-required plan] into the ACSIP. Although [PCSSD's] ACSIP plans were not specifically created to implement the Ross Plan, their focus on data, monitoring, and school improvement makes them a viable apparatus for [PCSSD] to meet its obligations under the desegregation plan." [At 95]  Judge Miller ultimately found PCSSD's implementation, not this choice, to be deficient. [At 95-99] See also LRSD, 664 F.3d at 756-57 (summarizing this analysis).

The Arkansas Educational Support and Accountability Act" currently requires each public school "by May 1 annually" to  submit to its public school district a school-level improvement plan for approval by the public school district and public school district board of directors for implementation in the following school year." Ark Code Ann. § 6-15-2914 (b)(1) [emphasis added].  Districts must monitor  the plans throughout the school year and evaluate them "annually . . . for goal progress and accomplishment." Ark Code Ann. § 6-15-2914(b)-(c). In addition, "annually by September 1, a public school district receiving . . . Level 4 – Directed,  or Level 5 – Intensive support shall submit to the Department of Education a public school system support plan in accord with the rules of the State Board of Education." [Sec. 6-15-2914(d) (emphasis added)]

JNPSD has been silent on its "Level" status. The Court should be knowledgeable sooner rather than later.

JNPSD District Leadership Team Meeting Minutes  for August 26, 2019 include the following statement by Assistant Superintendent Dr. Bone:

> Dr. Bone . . . transitioned the Discussion to the District's Plan of Support. She briefly pointed out that more than 40% of the students in the district are lacking in reading achievement, which more specifically is 1193 students out of 2251 or 53%. The percentage has put the district at a Level 4 support, and if we do not show significant improvement on the ACT Aspire next April, we could easily shift to a Level 5, which creates the possibility for state takeover. . . .

[**Exhibit 1; Bates No. 5458**]

4

Section 8.00 of the "Arkansas Division of Elementary and Secondary Education Rules Governing the Arkansas Educational Support and Accountability Act" are relevant in light of Dr. Bone's comments.   Regarding Dr. Bone's 53% figure, Intervenors note that the statistic was  not provided by race and students "lacking reading achievement" referred only to those "in need of support"; the "close" category was not included. Rules at Section 8.04.

Arkansas law continues to require an annual school improvement plan for each school. The PCSSD hearing included no claim of  an inability to include Ross Plan goals and strategies in school  improvement plans.  JNPSD's rhetorical flourish --- "[t]he Ross Plan is outdated and no longer a good fit for improving educational outcomes in JNPSD" --- lacks merit. See 5535  at 16 (Oct. 24, 2019 ).  Indeed, JNPSD's Motions  have twice asserted substantial compliance with Plan 2000. [5534 (Oct. 24, 2019) and 5686  each at 1 (August 8, 2020)]]

[B.] Facts Regarding JNPSD's School Improvement  and Other Plans

JNPSD places "its creation in the 2014 school year" based upon action by the State Board of Education.   [5535 at 7] Its educating of students, however, commenced  with the school year 2016-17. Intervenors' monitoring, including discussion and requests to JNPSD at  the required monthly meetings,  and discovery revealed that JNPSD worked to develop ACSIP plans in  2016-17 and 2017-18. These documents were incomplete and did not include the text of the Ross Plan

goals. This fact was determined by reading the plans.

Minutes of a District Leadership Team meeting on October 24, 2017, include a long list of "key points" "made by Dr. Duffie, Dr. Bone, and Mr. Hodges. They include: "1) No real sense of urgency regarding test scores in the district; staff seems unconcerned"; 3)" I need you to worry less about the 'happiness' of your staff and much more about the effectiveness of your staff in guaranteeing that our scholars are LEARNING and SAFE"; 5) "We seem to have a large number of staff members who truly do want to improve the system but they don't really know how"; 6) "I expect administrators to deal with those staff members who don't want to get on board with what we expect them to do"; . . ." [**Exhibit 2; Bates Nos. 5417-19**]

Intervenors reviewed JNPSD's 2018-19 and 2019-20 school improvement plans to identify the facts regarding the presence or absence of the text of the Ross Plan goals in each plan. The title page identified each plan as a "strategic plan."

2018-19 (results determined by reading the school improvement plan for the district and each JNPSD school ; for this analysis, Intervenors numbered the 6 Ross Plan goals 1 to 6 and listed the number of each goal not included in the plan): District plan [3 and evaluation goal, number 6, not included]; Bayou Meto Elem. [3 and evaluation goal 6B not included]; Bobby Lester Elem. [1 through 6B not included]; Murrrell Taylor Elem. [1 through 6B not included]; Pinewood Elem. [1 through 6B not included]; Warren Dupree Elem. [1 through 6B not included]; Middle

School [1 through 6B not included]; <u>Jacksonville High School</u> [3 and 6A not included].

<u>2019-20</u> (determined by reading the school improvement plan for the district and each JNPSD school ;  for this analysis,  Intervenors numbered the  6 Ross Plan goals  1 to 6  and  listed the number of each goal <u>not included</u> in the  plan:  District [3 and evaluation goal, 6, not included; <u>Bayou Meto Elem</u>. [2, 5,  and  evaluation goal 6B not included];  <u>Bobby Lester Elem.</u> [2, 3,  and 6B not included]; <u>Murrrell Taylor Elem.</u> [2 and  3 not included]; <u>Pinewood Elem.</u>: [evaluation goal 6B not included]; <u>Warren Dupree</u> [2, 5 and 6B not included]; <u>Middle School</u> [no goal explicitly included; some improvement in African American student achievement on ACT Aspire identified; some decrease in out-of-school suspensions of African American students identified]; <u>Jacksonville High School</u> [2, 3, 5 and 6B not included].

The district required each  of the 7 JNPSD schools to prepare a plan for consideration at a "School Board Work Session" on October 28, 2019. The topic of the discussion was "State Achievement Ratings and Plans for Improvement." The plans were provided as JNPSD Bates numbers 8182 through 8304. The seven plans were presented to the Board.  **See Exhibit  3** (meeting minutes showing duration of meeting and extent of presence of Board members).

Review of the wording of the plans revealed the following facts: four plans

included the wording of no Ross Plan goal [Bayou Meto, Pinewood, Middle School, and High School].   No school included goal 2 regarding the performance gap. Three schools included Ross Plan goals: Bobby Lester [1, 4, and 5];  Murrell Taylor [1, 4, 5 and  6]; Warren Dupree  [1, 3, 4,  and  6].   In all eight instances, schools included data on students' performance on one or more tests, most commonly the annual ACT Aspire test. <u>There was no instance in which the facts included test results by race.</u> Assistant Superintendent Tiffany Bone  gave instructions to principals regarding the content of their plans and reviewed them  before their submission to the Board members.  [**Exhibit 4; Bates No. 5450**] Her first point was -- "Start with the data explaining your current reality (Focus is Reading) Present the data, and then explain what you will do to impact students to improve the data"  Noteworthy: the major emphasis in Goals 1 and 2 on African American  students'  achievement is absent from her instruction.

The more recent JNPSD plans identify a plethora of initiatives. But are they implemented, school by school, grade by grade, class by class? The minutes of the "JNPSD District Strategic Planning Meeting" of November 8, 2018 include this content: "High School: Ms. Biggs reported that the training they have offered needs to be implemented in the classroom. In her camera surfs, she has observed a lack of implementation in addition to her formal observations."  [**Exhibit 5; Bates No. 5451, 5455; text as in original**]  Intervenors' achievement area  Request for

8

Production No. 7 reads: "For the Dupree and Taylor elementary schools, separately, please produce documents, created by school based and central office administrators addressing monitoring of the extent of actual implementation of the multiplicity of programs identified in the schools 2018-19 and 2019-20 school improvement plans." JNPSD responded: "See Bates Nos. JNPSD 00006486-6487; 6492-6495;" These documents are non-responsive. [**Exhibit 6**]

In preparing her JNPSD student achievement report, Ms. Powell did not investigate the extent of implementation of initiatives at the school level. Her report implies full implementation of the AVID program in 2018. [5540 at 2] Discovery revealed that this was not the case even in 2019-20 (while schools were open). Moreover, at a District Strategic Planning Meeting on March 14, 2019, Ms. Parker, Middle School Principal, reported: "Unfortunately, the implementation of AVID is struggling, 'School wide.'" [**Exhibit 7; Bates No. 5443**]

[C.] <u>April 2019 ACT Aspire Reading and Science Scores for JNPSD Students</u>

In the PCSSD hearing, Intervenors emphasized not only the performance gap but also the percentages of African American students in the grades tested on the annual ACT Aspire test, 3 through 8, scoring in the lowest two categories, "Close" and "In Need of Support." The evidence revealed that for the reading portion of the test, students scoring at each of these levels have below grade level reading ability. [Testimony of Dr. McNulty and Ms. Townsend] The role of reading ability to overall

achievement growth was emphasized repetitively by PCSSD's Deputy Superintendent Ms. Smith. The below grade level reading results for African American students in PCSSD were woeful, with the results for white students better, but by no means anything "to write home about." (Intervenors plan to develop in the JNPSD hearing foundational evidence akin to that provided in the PCSSD hearing and cited in this paragraph.)

The JNPSD Spring 2019 <u>reading results</u> were even worse, as Intervenors next show. JNPSD may note a lesser performance gap than in PCSSD. This is due, however, to the scores for white students being only somewhat less troubling. The data in this chart is drawn from a document which the district provided Ms. Powell for her work on her JNPSD achievement report. Ms. Powell made this document available to Intervenors, when requested to provide the achievement-related materials given her by JNPSD. This material, limited to testing in the Spring of 2019, is similar in format to the often-referenced PCSSD Exhibit 9.

<u>African American Students</u>

| Grade | % Close | % INS[1] | Total |
|-------|---------|----------|-------|
| 3 | 18% | 61% | 79% |
| 4 | 27% | 55% | 82% |
| 5 | 23% | 57% | 80% |

---

[1] In Need of Support

| | | | |
|---|---|---|---|
| 6 | 20% | 65% | 85% |
| 7 | 25% | 66% | 91% |
| 8 | 23% | 49% | 72% |
| 9 | 21% | 67% | 88% |
| 10 | 21% | 69% | 90% |
| | | | |

Caucasian Students

| Grade | % Close | % INS | Total |
|---|---|---|---|
| 3 | 25% | 39% | 64% |
| 4 | 24% | 32% | 56% |
| 5 | 24% | 40% | 64% |
| 6 | 25% | 47% | 72% |
| 7 | 31% | 43% | 74% |
| 8 | 26% | 29% | 55% |
| 9 | 19% | 46% | 65% |
| 10 | 26% | 46% | 72% |

In sum, the percentage of African American students, by grade, demonstrating below grade level reading ability, ranged from 72% to 90 %. The comparable range for white students was 55% to 74%. These percentages relate to students, as follows: 1112 of the 1344 African American students tested scored below grade level in reading (83 percent of this group) ; and 587 of 916 white students tested scored below grade level in reading (64 percent of this group). (The document mentioned

11

includes for each grade the number of African American students and the number of white students tested, allowing the by student calculations.)

The science results in the Spring of 2019 also bear emphasis. For this test, students scoring "close" and "in need of support" are classified as not at the science "readiness"  level. [**Exhibit 8 at 1, 27-28**]

African American Students

| Grade | % Close | % INS[2] | Total |
|---|---|---|---|
| 3 | 19% | 66% | 85% |
| 4 | 22% | 65% | 87% |
| 5 | 19% | 65% | 84% |
| 6 | 17% | 71% | 87% |
| 7 | 17% | 75% | 92% |
| 8 | 12% | 77% | 89% |
| 9 | 13% | 80% | 93% |
| 10 | 19% | 72% | 91% |

Caucasian Students

| Grade | % Close | % INS | Total |
|---|---|---|---|
| 3 | 20% | 43% | 63% |
| 4 | 24% | 35% | 59% |
| 5 | 24% | 42% | 66% |

---

[2] In Need of Support

| 6 | 12% | 46% | 58% |
| 7 | 28% | 46% | 74% |
| 8 | 19% | 49% | 68% |
| 9 | 23% | 57% | 80% |
| 10 | 24% | 49% | 73% |

In sum, the percentage of African American students not scoring at the science readiness level for their grade level, by grade, ranged from 84% to 93%. The comparable range for white students was 58% to 80%. These percentages relate to students as follows: 1172 of the 1326 African American students tested did not score at the science readiness level (88.4% of this group) ; and 608 of 918 white students tested did not score at the science readiness level (66.2% percent of this group).

These analyses address only Spring 2019 ACT Aspire results, based on the tables provided Ms. Powell. Intervenors achievement area RFP 6 explicitly sought like data for 2016, 2017, and 2018. The district provided only non-responsive documents.

Intervenors have, using the Spring 2019 ACT Aspire results for Reading and Science, calculated racial disparity by comparing, in each area, the total percentages of students scoring exceeds and ready for white and African American students. In the following text, the percentage stated is the percent by which the combined total for white students was greater, always the case. This was the only approach available

13

at this time.

**Reading** Scores of White Students versus Black Students disparity:

| Grade | Percentage Disparity |
|:---:|:---:|
| 3 | 15% |
| 4 | 27% |
| 5 | 16% |
| 6 | 13% |
| 7 | 16% |
| 8 | 18% |
| 9 | 22% |
| 10 | 18% |

**Science** Scores of White Students versus Black Students disparity:

| Grade | Percentage Disparity |
|:---:|:---:|
| 3 | 24% |
| 4 | 27% |
| 5 | 18% |
| 6 | 29% |
| 7 | 18% |
| 8 | 21% |
| 9 | 13% |
| 10 | 18% |

In her JNPSD achievement report "Comments," Ms. Powell wrote: "As of yet,

test results for JNPSD students are all over the map. Unfortunately, the results so far do not reflect a narrowing of the achievement gap between black students and white students. In addition, the data show no indication that student achievement is improving in the district as a whole." [[5540 at 5] This negative critique was made even without Ms. Powell exhibiting knowledge of the reading and science scores noted above.

In the PCSSD hearing, Superintendent McNulty testified to initiating discussion of the book Whistling Vivaldi, regarding "implicit bias." Minutes of three JNPSD leadership committee meetings in January and February of 2020 show that Dr. Bone led discussions using the book on three occasions. The full title is *Whistling Vivaldi: How Stereotypes Affect Us and What We Can Do About It*. During the February 10, 2020 meeting, "Dr. Bone asked the group to share their own experiences they may have resulted from stereotype, and then asked what they were actually doing in the buildings to address possible bias in the classroom." [**Exhibit 9; Bates Nos. 5420-21 (text as in doc.); *see also* Bates Nos. 5431, 5426-27**]

[D.] JNPSD's 2019-20 "Support Plan": Goals 1 and 2 Progress Practicable

During the 2019-20 school year, JNPSD prepared a "Plan of Support."   The Arkansas Educational Support and Accountability Act and ADE's associated  Rules required this Plan, by reason of the district's "Level" status.

The Plan  identifies the poor reading levels of African American students, as

well as the performance gap in this sphere.  <u>It identifies as one priority "decreas[ing]</u> <u>the performance gap between black and non-black scholars in English Language</u> <u>Arts (Reading, Writing, English)</u>."  It identifies steps thought adequate to produce the following results: " . . . the number of students reading on grade level will increase"; ". . . teachers will adjust their teaching to ensure that all students achieve mastery"; <u>and ". . . the gap between black and non-black students will be reduced.</u>" [emphasis added]  Noteworthy: the "Goals" for reading include moving students to at least the "close" scoring level, a reading score below grade level. This is consistent with the ADE Rules cited above.

   This district action, premised on the ability to make progress regarding the performance gap, buttresses Intervenors' position. The district does not accept the status quo as inevitable, all that can be accomplished.  This is akin to testimony on which Intervenors rely in the PCSSD context. There, Superintendent McNulty and Deputy Superintendent Smith each testified to a personal premise that the district has the capacity to narrow the performance gap.

[E.] <u>Ross Plan Goal 6 Concerning Evaluation; a JNPSD Default</u>

Ross Plan Goal 6 required JNPSD "to establish an ongoing systematic evaluation system at the individual school and district levels to: ^ assess the progress made at school and district levels in achieving the educational goals [and] ^ provide directions for 'Education Plan' and educational program improvements where

indicated." <u>The cited reading and science results, alone, show the critical importance of these required steps in JNPSD.</u>

Intervenors served achievement area discovery on JPSD. The text of RFP 8 and the response are as follows: "Please provide all evaluations of the effectiveness of ACSIP plans and school improvement plans between 2016 and the present with regard to achieving Educational goals 1 and 2 of the Ross Plan of Plan 2000." (See Ross Plan Goal 6 regarding evaluations). RESPONSE: See Bates Nos. JNPSD 00006205-6209; 6486-6487; this content was non-responsive. Intervenors' RFP 19 also sought Goal 6 evaluations. The response did not identify documents by Bates number; the supplementation mentioned did not occur. **See Exhibit 10** (documents supporting the foregoing text).

Judge Miller found that "[PCSSD] failed to demonstrate good faith in adopting and implementing a comprehensive evaluation program." [4507 at 103] He added: "Monitoring, of course, is of particular importance to student achievement because it is what allows [[PCSSD] to assess the effectiveness [of] its strategies. Simply implementing programs to address the achievement disparity is not sufficient to demonstrate a good-faith compliance with the Ross Plan. Any program that is implemented must also be monitored and revised in light of its successes and failures. In the end, however, [PCSSD] failed to do both." [4507 at 103] JNPSD is non-compliant in a like manner.

17

[F.]   <u>Facts Regarding JNPSD's Discipline Obligations</u>

JNPSD administrator Jacob Smith oversees JNPSD's steps regarding Plan 2000 Section F. (Discipline). On February 11, 2019, during the 2018-19 school year, he provided an "Enrollment Demographic and Disciplinary Action Compilation [Report]" to JNPSD's assistant superintendents, principals, and other school administrators. It includes the following text:

> <u>Discipline Disparity</u>: As a district, we are disciplining African American students at a higher rate than other students. . . . [At 1]
>
> <u>Consistent Interpretation of the Evidence</u>: Across the nation and in our district, ambiguous rules have high racial disparities. This includes offenses such as failure to follow directives, insubordination, disruptive behavior, and disorderly conduct. It is important to examine ourselves to ensure that we interpret evidence and determine findings consistently. During training, someone suggested having another administrator review the evidence for these types of offenses before making a final determination. That's a great idea. . . . [At 2]
>
> The Right Way: <u>We will follow the handbook for all students</u> and documents discipline with integrity. <u>We can close the gap with, positive, proactive measures</u>. [At 2; emphasis added]

In 2017-18, the district identified a significant problem regarding violations of the Student Handbook. Mr. Smith determined that principals were not adhering to its content regarding first-time Level One rule violations,. While the Handbook provided for a parent conference, in 99 of 142 instances in which black males received referrals (70%), principals imposed an in-school suspension. This Handbook departure continued to occur in 20% of such referrals in 2018-19. Mr.

Smith provided this information to Mr. Porter and Ms. Springer during a meeting in Mr. Richardson's office  on June 7, 2020. It had not been reported before that time.

After the 2018-19 school year, the district provided the   JNPSD 2018-19 Discipline Report Summary. The data at pages 4-8 allows calculation of   the following examples of racial disparity in discipline, during the  2018-19 school year, the last full year of  in-school, operation. [**Exhibit 11**]

- Black students were the subjects of 1034 of the  system's 1364 TOTAL OUT OF-SCHOOL SUSPENSIONS, 75.8%; they were 2147 of 3845 enrollees, 56.4%.

- At the elementary level, Black students were the subjects of 239 of the 292 out-of-school suspensions, 81.8%;  they were 1080 of the 2065 students enrolled,  52.3%.

- In the middle school,  Black students were the subjects  of 422 of the 602 out-of-school suspensions, 70.1%; they were 475 of the 809 students enrolled, 50.8%.

- In the high school,  Black students were the subjects of 422 of the 602 out-of-school suspensions, 70.1%; they were 592 of the 971 students enrolled, 61%.

- In the system in 2018-19, 28% of Black male students  and 13% of non-Black male students received one or more out-of-school suspensions, a

rate of approximately 2 to 1.

- In the system in 2018-19, 17% of Black female students  and 6% of non-Black female students received one or more out-of-school suspensions, a rate of almost 3 to 1.

- In 2018-19, Black students were the subjects of 1013 of the  system's 1364  TOTAL IN-SCHOOL SUSPENSIONS, 78.4%; they were 2147 of 3845 enrollees, 56.4%.

- In the system in 2018-19, 35% of Black male students  and 15% of non-Black  male  students  received  ONE  OR  MORE  IN-SCHOOL SUSPENSIONS, a rate of 2.3 to 1.

- In the system in 2018-19, 24% of Black female students  and 7% of non-Black female students received one or more in-school-suspensions, a rate of 3.4 to 1 (this is approximately 1 in 3 students compared to 1 in 14 students).

On February 7, 2020,   as noted,  Mr. Porter and Ms. Springer met with Mr. Smith at Mr. Richardson's office. In response to an earlier request by Mr. Porter, Mr. Smith provided them  a table showing year to date statistics, by race and gender, for the four subjective offenses cited above. `This data is as follows.

| Rule | Black Females | Black Males | Total |
|---|---|---|---|
| Failure to Follow Directives | 29 | 58 | 87 |
| Disruptive Behavior | 67 | 173 | 240 |
| Insubordination | 49 | 108 | 157 |
| Disorderly Conduct | 46 | 74 | 120 |
| | | | |
| **Grand Total** | 191 | 413 | 604 |

| Rule | Non-Black Females | Non-Black Males | Total |
|---|---|---|---|
| Failure to Follow Directives | 4 | 14 | 18 |
| Disruptive Behavior | 22 | 58 | 80 |
| Insubordination | 26 | 30 | 56 |
| Disorderly Conduct | 21 | 24 | 45 |
| | | | |
| **Grand Total** | 73 | 126 | 199 |

| Rule | Total Black | Total Non-Black | Grand Total |
|---|---|---|---|
| Failure to Follow Directives | 87 or 82.8% | 18 or 17.1% | 105 |
| Disruptive Behavior | 240 or 75% | 80 or 25% | 320 |
| Insubordination | 157 or 73.7% | 56 or 26.3% | 213 |
| Disorderly Conduct | 120 or 72.7% | 45 or 27.3% | 165 |
| | | | |
| **Grand Total** | 604 | 199 | 803 |

African American students make up 75.2% of the above-named conduct violations, while Caucasian students make up 24.8%.

On February 1, 2020, Black enrollment in PCSSD was 53.03 percent. [Bates No. JNPSD 00000040] Black pupils were, as noted, the subjects of 75.2 percent of the discipline for these four violations. The picture for each violation was as follows: <u>failure to follow directives:</u> black pupils subjects of 82.5% of these violations; <u>disruptive behavior</u>: black pupils subjects of 75% of these violations; <u>insubordination</u>: black students 73.7% of these incidents; <u>disorderly conduct</u>: black students 72.7% of these incidents. Mr. Smith explained that securing these statistics from the system's data base had not been difficult.

During the February 7, 2020 meeting, Mr. Smith also commented regarding the overall status of the district's "success in achieving its objective of eliminating racial disparities in the imposition of school discipline." [Plan 2000, Sec. F.(1)] He said he was "not happy with the progress of dealing with discipline disparity."

In discovery, Intervenors sought other documents regarding the subjective offenses issue. This query encompassed documents reflecting work by Mr. Smith, then Director of Pupil Services. Intervenors' discipline area RFP 24 and JNPSD's response served on March 13, 2020 are Exhibit 12. The response reads: "Will be produced." No production occurred.

In discovery, Intervenors also sought to secure a complete picture regarding all out-of-school suspensions in 2018-19. Intervenors provided a form to secure for each school: [i] on the left side of the table, a listing of each discipline category for

which a violation was the basis for one or more suspensions in the school, [ii] along with data showing across the table  by  each such category, the number of Black males, non-Black males, Black females and non-Black females  affected by a violation of the rule. This data would  help to understand the source[s] of disparity and to identify effective remedial steps. This request was made in Interrogatory 4 of Intervenors' discipline discovery. Intervenors provided a revised form to JNPSD on May 6, 2020. JNPSD has not responded. **See Exhibit 13**.

The district's "Plan of Support, " referenced above, also contains data regarding discipline. It reads: "2018 there were a total of 4563 referrals (3465 AA, 1098 Non AA) district wide; In 2019 there were a total of 4,164 referrals (3,181 AA, 983 Non AA) district wide." African American students were thus 76.4% of 2019 "referrals"; they were  55.8% of enrollees in 2018-19. [JNPSD 2018-19 Discipline Report Summary at 4]

Lastly, Dr. Bone's query as to following up on bias in the classroom setting is also pertinent regarding discipline. *See text re* <u>Whistling Vivaldi</u> discussions  in Part [C.] above.

[G.] <u>An Inaccurate View on Intervenors' PCSSD Hearing Disparity Approaches</u>

The section of JNPSD's brief titled "Other Potential Causes of the Achievement Gap and Differences in Discipline Rates"  lacks merit. See 5687 at 6-8.  The district ignores the content of Plan 2000 regarding achievement and

discipline and its application in the 2011 opinions. JNPSD writes, erroneously, as if Intervenors' PCSSD hearing approach in each area relied upon disparity alone.

The Court is well-aware that the text of the Ross Plan targets in Goal 2 "decreasing the performance gap" and within that Goal and elsewhere identifies required approaches for striving to do so. The Plan 2000 discipline requirements include data gathering "which allows a full assessment  of [PCSSD's] success of achieving its objective of eliminating racial disparities in the imposition of school discipline." [F.(1)] The district must work with staff and personnel of particular schools, identified by criteria required by F.(2),  "to promote achievement of the goal of eliminating racial disparities in school discipline."   [F.(3)]

In his 2011opinion, Judge Miller found significant deficiencies in the implementation of the Plan 2000 achievement requirements, including the Goal 6 evaluation requirements.  [4507 at 95-99, 103] The Court of Appeals affirmed his student achievement ruling. LRSD, 664 F.3d at 755-57. Regarding discipline, Judge Miller's findings of non-compliance included a failure by PCSSD  to implement adequately the requirements of Section F.(3), regarding both particular schools and particular staff members and teachers, identified by use of the criteria, which had been developed as required by Section F.(2). [4507 at 66]  The Court of Appeals also affirmed Judge Miller's discipline rulings. [664 F.3d at 751]

In the  recent PCSSD hearing,  as in the 2011 hearing, Intervenors relied upon

facts in addition to racial disparity in each sphere.

Achievement. Intervenors addressed in addition to the performance gap: the evolution and status of school improvement plans; the identification and status of implementation of the PCSSD "Rocks";  the limited duration of AVID implementation and the program's focus for its high school AVID class participants (college-going rates,  persistence rates in continuing college education, etc.);  the facts regarding the proportion of African American students  reading below grade level, in the light of PCSSD evidence  emphasizing the importance of reading ability to achievement growth  generally; the personal views of PCSSD's highest level administrators  that reducing achievement disparity is doable; and the district's eliminating the positions of staff members having a vitally important role in efforts to address the performance gap.

Discipline. In addition to racial disparity, Intervenors emphasized departures from Plan 2000 Sections F.(2)--F(4). PCSSD presented evidence regarding four "cohorts" of teachers and other staff members. See PCSSD 100 at 9774, 9784-85, 9787-88, 9803, 9818, and 9849. These persons were identified pursuant to F.(2) criteria and provided  training and support. The most recent date of a document concerning a cohort is February 28, 2014. [PCSSD 100 at Bates 9784] These documents and testimony established that the district had ceased utilizing the F.(2) criteria to identify teachers and other staff members in need of training and support.

25

Regarding testimony, Intervenors refer to Dr. Warren's inability to identify a subsequent "cohort" (and absence of other testimony). The district asserted implementation of a substitute procedure to identify such individuals. It did not, however, provide documentation of this procedure, or facts regarding the numbers of persons identified after February 201.

Mr. Porter's questioning established that the Section F.(4) "comprehensive study of the disciplining of African-American students, particularly male students" was never completed.

[H.]  The  Section L.(3) Staffing Incentives Issue

On September 25, 2018, the Court ruled that JNPSD had not established compliance with the "offering incentives" feature of Plan 2000 Section L.(3). [Doc. 5445 at 17]  Section L.(3),  as a whole,  has three branches.

The  governing text  of the remaining obligation requires actions to "offer incentives for black teachers to get certified in [the] areas" of "early childhood education, primary grades, and core secondary areas."  The Court distinguished this requirement from the two other elements of Section L.(3), the first "primarily about recruiting and maintaining an inclusive hiring process" and the second about assigning  to schools teachers qualified to teach in one of the priority areas.

The meaning of the standard is important. It seems to refer to a monetary offer or other action which will motivate a person to act in a certain manner; the category

of person mentioned is a "Black teacher"; and the desired action is "to get certified" in a priority area. This might be, for example: [i]  a black certified PE teacher in JNPSD motivated by an incentive to earn certification in "early childhood education"; [ii]  a black PE teacher in another district, willing to join JNPSD in that capacity, with the understanding that a monetary grant would be forthcoming, supporting gaining certification  in a priority area;  or [iii] a black person working in a classified position, yet possessing  teaching certification, either in a priority area or another area. Whether the standard includes incentivizing a person not a "black teacher"  or a black teacher to secure a second certification in a priority area are open questions.

The Court indicated interest in not only an appropriate program, but also qualified  black persons' participation in fact. [5445 at 18]

On October 24, 2019, in its premature unitary status brief [Doc. 5535], JNPSD  emphasized Ms. Powell's Section L.(3) report and provided little other content. [At 19-20] Ms. Powell's report is packed with details, including much statistical data.  [5521 (Sept. 30, 2019)] When Ms. Springer requested first JNPSD counsel and then Ms. Powell for access to the materials provided her for use in preparing the report, each replied that no materials had been provided. **See Exhibit 14**.

Intervenors then directed  detailed discovery to JNPSD, geared to the details

in the report.   One purpose was to determine how such detailed text could be prepared, independently,  without a series of documents.  Another was to turn the details into an understanding of : incentivizing initiatives; existence of "black teacher" participants; such participants' succeeding  in earning certification in a priority area,  or on a path to do so; and persons teaching  in the district in a priority area.

In its responses, JNPSD fought off the efforts to learn how the report was prepared. **See Exhibit 15** (responses to Interrogatory 1 and RFPs 3-5). Intervenors note that JNPSD Bates numbers 1851-1861 are an e-mail strand, from August 27 to September 26, 2019,  regarding the scheduling of Ms. Powell's visit to the district and, later,  her submission of her draft report to its administrators. [**Exhibit 16**] Interestingly, it ends at the point where JNPSD was about to respond  to the draft. There is no copy of the response or message. The existence of these e-mails raises concerns as to the "not keep[ing] logs" answer--avoidance element of the response to Interrogatory No. 1[d].  Ms. Powell's L.(3) report was filed on  September 29, 2019.

Intervenors note also JNPSD's response to RFP 4, seeking "the District's definitions of 'early childhood teachers,'  'primary grade teachers,' and 'secondary core teachers' in L.(3)." RESPONSE: Not applicable."  [**Exhibit 17**] The parties' evaluation of the responsiveness of other answers would no doubt differ.

Bottom line: In view of the overall answers and the content of the report, a well-organized hearing presentation is necessary to assess L.(3) compliance status. A suggestion: in the PCSSD hearing, the Court at times reached out to enhance the clarity of the presentation. Here, the Court might request that JNPSD's proof address each incentive action separately, showing: the details of the incentive action; the facts regarding "black teacher" or other participants thought to be relevant; and the outcome for each participant, with reference to the goal of the incentive requirement. A series of mini, mini-trials.

[I.]   The Monitoring Issue; Plan 2000, Section N.

Judge Miller denied unitary status in the area of monitoring. [4507 at 43-44; 108-09]. The Court of Appeals affirmed this ruling. The Court stated in part: ". . . PCSSD cannot pick and choose among the requirements of Section N and expect to achieve unitary status in the area of monitoring." LRSD v. State of Arkansas, 664 F.3d 738, 757 (8thCir. 2011).

Section N.(1) provides that "the Assistant Superintendent for Desegregation shall (i) develop a plan so that he (or she) and his (or her) staff focus their monitoring and compliance efforts on the specific elements of the Plan . . . ." Judge Miller found deficiencies in PCSSD's performance regarding the timing of "develop[ment] [of] a monitoring plan"; "produc[ing] a satisfactory monitoring instrument"; and producing monitoring reports. [4507 at 104]   The text explicitly calls for a

29

monitoring plan.   Judge Miller's also identifying requirements to  develop a monitoring instrument and to prepare and distribute monitoring reports cannot be faulted; his interpretation is warranted by "reasonable implication" from the Plan's text. Knight v. PCSSD, 112 F.3d  953, 954 (8thCir. 1997).

The context also supports this interpretation. The Court and the Court expert need  information to fulfill their roles.  Intervenors' representatives need information to fulfill their monitoring and enforcement responsibilities. Finally, Intervenors note that PCSSD has through the years interpreted the Plan language to require developing  and revising a monitoring instrument and preparing and disseminating annual  monitoring reports.

JNPSD has never identified the  monitoring plan  to which Section N.(1) refers. JNPSD has shared with Intervenors neither any sample monitoring instrument, nor any completed monitoring forms. In total, JNPSD provided one, undated, "JNPSD Quarterly Desegregation Monitoring (Report): Student Achievement" and one, undated, "JNPSD Quarterly Desegregation Monitoring (Report): Student Discipline." JNPSD has not complied with Section N.(1).

Plan 2000 Section N.(3)(a)-(f)  required the submitting of six statistical reports. JNPSD complied with only sub-part (d) regarding discipline. This pattern ensued despite Intervenors' repeated oral and written requests for additional reports. Judge Miller ruled generally regarding monitoring requirements; he made no ruling

of partial unitary status and partial release of supervision, a concept identified well before 2011 in <u>Freeman v. Pitts</u>, 503 U.S. 467, 485, 489 (1992)(1992). JNPSD has not complied with Section N.(3).

JNPSD's performance in the monthly meetings  required by the Court is also relevant in this realm. Until well into the hearing period, JNPSD's approach was minimal compliance. Little information was volunteered. Queries by Mr. Walker and Ms. Springer yielded little or no response. At a meeting hosted by JNPSD in late 2019 at Jacksonville High School,  the approach was to offer a 12 to 15 minute discussion of the Taylor and Bayou Meto facility funding issues and then state that it was rime to eat in  High School's facility.

JNPSD's performance did change somewhat, but only as the time for the scheduled hearings approached.  The district twice made administrator Jacob Smith available for questioning as to discipline issues.  At this time, Intervenors learned facts which they would and should have learned much earlier, had JNPSD administrators been allowed to respond to queries made by Mr. Walker and Ms. Springer at monthly meetings. JNPSD never informed Intervenors representatives of the District "level" rating and its implications. It never offered voluntarily Leadership committee meeting minutes.

[J.] <u>Principles for Assessing Unitary Status and their Application</u>

[1.] <u>Unitary Status Principles Govern Resolution of the Motion</u>

This Court addressed JNPSD's request to be released from Plan 2000's facilities and staffing requirements in the September 25, 2018 Order. [5445] The Court repeatedly referred to the request as presenting unitary status issues. [5445 at 1, 2, 7-8, 19-20] Here, the Court's Orders have identified the JNPSD issues in the same manner; namely, whether JNPSD is unitary on discipline, student achievement, monitoring and Sec. L.(3) staffing incentives. [5444 (Sept. 25, 2018) (expressing intention to schedule "a series of unitary status hearings"); and 5503 at 1 (July 18, 2019; and 5599 at 1 (May 11, 2020) (initial and amended scheduling orders with multiple references to unitary status).

This Court's September 2018 JNPSD ruling cited <u>Freeman v. Pitts</u>, 503 U.S. at 492, as a source of unitary status decisional principles. [5445 at 2] In their 2011 decisions, Judge Miller and the Court of Appeals had done the same. See 4507 at 14-15 and 664 F.3d at 744-45 and *passim*.

This Court also wrote in the 2018 JNPSD ruling: "Federal Rule of Civil Procedure 60(b)(5) governs JNPSD's motion." [5445 at 1] JNPSD here cites this standard. [5686 at 1 (August 7, 2020)]

A role for Rule 60(b) does not warrant a departure from unitary status principles. The major "Advisory Committee [Note]" regarding Rule 60, in 1946, provides in its final paragraph: "It should be noted that Rule 60(b) does not assume to define the substantive law as to the grounds for vacating judgments, but merely

prescribes the practice in proceedings to obtain relief." In sum, in this school desegregation case sphere, unitary status principles provide the substantive law for defining when "the judgment has been satisfied"  and when "applying it prospectively is no longer equitable; . . ."  [Rule 60(b)(5)]  See also Board of Education of Oklahoma City Pub. Schools v. Dowell,  498 U.S. 237, 248, 249-50 (1991) (proper standard for "dissolution  of a decree entered by the District Court imposing a school desegregation plan"; repeated references to compliance with the remedial decree, in that case imposed by court based on multiple liability findings, not a settlement).

[2.]  The Elements of A  Unitary Status Decisional Framework

The rulings of Judge Miller in 2011 (PCSSD) and this Court in 2018 (JNPSD) provide a sound starting point for identifying a decisional framework. In each case, the focus is compliance with the elements of the Plan 2000 obligation at issue. Judge Miller: Doc. 4507, e.g., at 92-103 (student achievement); His Honor: 5445 at 2 (plan content at issue quoted in margin); at 14-20 (staff issue analysis).  Also, significant: in approving Judge Miller's nine challenged rulings, the Court of Appeals cited failure to comply with particular Plan requirements in each instance. LRSD, 664 F.3d at 749-50, 750-51, 751, 751-53, 753, 753-54, 754-55, 755-57, 757.

The Supreme Court discussed the degree of compliance required  in Freeman, 503 U.S. at 491 (" . . . whether there has been full and satisfactory compliance with

the decree in those aspects of the system where supervision is to be withdrawn; . . .”). The earlier <u>Dowell</u> decision also contains relevant text [498 U.S. at 248 (“Dissolving a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time . . .”); at 249 (“But in deciding whether to modify or dissolve a desegregation decree, a school board’s compliance with previous court orders is obviously relevant.”).   The term “substantial compliance” does not appear in this text.

In the PCSSD ruling, Judge Miller identified “substantial compliance” as acceptable. This approach encompassed tolerating violations “inconsequential” in the light of a district’s overall performance. [4507 at 15-16]

In the JNPSD ruling, this Court, citing *Freeman*, 503 U.S. at 492, referred to compliance “to the extent practicable” with “desegregation obligations on facilities and on staff.” This Court also referred to “substantial compliance.”  [4507 at 18 and 20] The opinion excused full compliance regarding Atkins pre-K twice.  See 4507 at 5 (facility discussion) and at 19-20 (racial make-up of staff). In each instance, the text shows his Honor’s concept of “inconsequential “ is restrictive. In the facility sphere, JNPSD’s overall plan rated “extraordinary.”  [At 6] The staffs of eight schools were not “racially identifiable.” JNPSD recognized its Atkins issue, was working to address it, and “the Court [emphasized] that JNPSD must continue to address Atkins, and implement a long-term fix, sooner rather than later.” [19-20]

The Supreme Court discussed the duration of compliance necessary to support a unitary status ruling in Dowell, 498 U.S. at 248 ("Dissolving a desegregation decree after local authorities have operated in compliance with it for a reasonable period of time . . . ." [emphasis added]) Some Freeman text bears upon the duration question. The Court identifies as relevant "whether the school district has demonstrated to the public and to the parents of the once disfavored race, its good faith commitment to the whole of the court's decree and to the provisions of the law and the constitution that were the predicate for judicial intervention in the first instance." The Court refers to the "system's record of compliance" and the instance "when its policies form a consistent pattern of lawful conduct directed to eliminating earlier violations." Freeman v. Pitts, 503 U,S. at 491 (emphasis added). Freeman also cites the Dowell reference to compliance with the "desegregation decree" "for a reasonable period of time." [503 U.S. at 498]

Dowell and Freeman evidence that in making unitary status decisions emphasis is placed on a consistent record of actual compliance with the terms of the decree. A promise or a prediction of future compliance is not identified as sufficing.

Judge Miller dealt with duration directly in his 2011 decision, upon finding "deficiencies [in] the one-race class reports." He directed PCSSD to prepare fully compliant reports and to present them to ODM. He wrote: "If such reports are maintained for forty-eight months, this finding will be reconsidered." [4507 at 49]

This text identifies reconsideration by the Court.

JNPSD's "Motion   for Unitary Status" cites not only   Rule 60(b)( and Freeman, but also the Rufo and Horne decisions. [5686  at 1 (August 7, 2020)].  No particular Rufo argument has been offered in JNPSD's opening papers (where it should appear, if  relied upon).

JNPSD's  Horne argument includes this sentence:" The Horne opinion by the United States Supreme Court is of particular importance because in it, the Court made clear that plan compliance is not the touchstone of consent decree release decisions. Horne, 129 S.Ct. 2579." [Quoted from Brief, 5535 at 5 (Oct. 24, 2019); emphasis as in Brief; 2579 is the first page of the decision in the Supreme Court Reporter, not a citation to decision text.]  This argument falls short.

Freeman and Dowell, school desegregation cases, establish that compliance with the plan set forth in the decree for a reasonable period is a requirement for termination of Court supervision in this sphere. As noted,  the 2011 rulings and your Honor in 2018 implemented this standard. If Rule 60(b) plays a role  -- it is not cited in  Freeman or the 2011 rulings -- the decisions relied upon by Intervenors  provide the appropriate substantive link in its application.

Intervenors note also that school desegregation cases like this one spring from the long history of state-imposed  segregation with its discrimination, negative racial messaging,  and effects described in Brown I , 347 U.S. At 494  and by Justice Black

for a unanimous Court in  United States v. Montgomery County Board of Education,

395 U.S. 225, 227 (1969). Consideration of the quoted text from Freeman v. Pitts

regarding  the need for decree compliance for a period sufficient to communicate a

positive  message  "to  the  once  disfavored  race"   helps  to  explain  why  such

compliance is required in this realm, with this history.  Freeman, 503 U.S. at 491.

[K.] Intervenors' Position Regarding the Remaining Plan 2000 Obligations

The  JNPSD  will  be  unable  to  establish  the  requisite  period  of  sustained

compliance  with  Plan  2000  student  achievement,  discipline,  and  monitoring

requirements.   The  Court  has  the  right  to  expect  Intervenors  to  be  specific  on

duration regarding the four areas as of closing argument, when the matter can be

addressed in the light of the JNPSD and Intervenor evidence. Duration regarding

facilities  is  addressed  in  the  Court's  2018  ruling.  At  some  point,  the  Taylor

Elementary School funding issue will require attention.

Given the facts available at this time, Intervenors reiterate the request for the

Court's assistance in insuring an evidentiary presentation providing a clear picture

of the district's actions and results regarding  L.(3) staff incentives requirements.

Intervenors reiterate  that the Court's 2018 ruling distinguished from the incentives

requirement "recruiting and maintaining an inclusive hiring process" and "assigning

teachers" in the priority areas. [5445 at 17]

Intervenors student achievement position is based  on the discussion  in Parts

[A.]-[E.] of facts regarding: deficient Ross Plan Goal content in school improvement and other plans; lack of evidence of actual implementation of initiatives described in plans; disastrous 2019 ACT Aspire results in reading and science for African American students, with reading ability pivotal for mastering knowledge and skill standards generally; regarding Ross Plan Goal 2, the extant racial performance gap, as well as the acknowledgement in the Support Plan that progress is possible; the failure to fulfill the Ross Plan Goal 6 evaluation requirement, a major shortcoming given student achievement outcomes.

Ross Plan Goal 1 refers to achievement growth for "all students" and "special attention to African-American students and others who are at-risk of academic failure due to socioeconomic disadvantages, or other factors." The magnitude of the district's failure regarding each group, shown by achievement outcomes, is almost unimaginable. The same is true regarding the possibility that there has been sustained, systematic Ross Plan required program implementation, warranting a student achievement unitary status ruling. On this point, as noted, Ms. Powell's JNPSD achievement report is supportive of Intervenors' position. Dr. Bone's emphasis on consideration of stereotyping and implicit bias is also significant (here as in the discipline sphere).

Intervenors' discipline discussion in Part [F.] cites acknowledgement of racial disparity in subjective rule violation categories and data showing that result. The text

38

also identifies racial disparities in various segments of the data, for out-of-school and in-school suspensions for 2018-19, the last full year of district operation. The district identified, belatedly, handbook violations resulting in unwarranted in-school suspensions. The district's administrative leader for discipline matters expressed dissatisfaction with progress in reducing discipline disparity. The district's response to discipline discovery requests was unsatisfactory. Adequate compliance with multiple Plan 2000 Section F. requirements has yet to be shown.   Intervenors emphasize the mandates of Section F.(2), (3), and (6).

The facts set forth in Part [I.] above evidence that JNPSD has not fulfilled the <u>monitoring</u> requirements of Sections N.(1) and N.(3). The district's reticence at the monthly meetings has also been noted. A stark example of this fact: JNPSD never informed Intervenors (or the Court) of the Level 4 State status and possible future implications. Respectfully, Ms. Powell's approval of JNPSD 's monitoring compliance was based on taking district assertions as a given, ignoring Intervenors' input in the entirety,  and developing a new, never-before-heard-from approach to N.(3) reporting.

[L.] <u>The Instant Remedy: Lawful Settlements and Consent Decrees Since 1992</u>

[1]  <u>Introduction: the Parties' Different Approaches</u>

Remedies arise in a case like this one in multiple ways, two  are as follows: [1] a court finds facts, identifies violations, and enters relief by an order or orders;

[2] the parties agree to a settlement and successfully urge its incorporation in a consent decree.  This may occur, as here, after a period of court-ordered relief. Regarding the achievement and discipline remedies, JNPSD's approach now centers on example [1] and Intervenors example [2].

In its Brief of October 24, 2019, JNPSD's subject specific violation finding/relief by order model is explained by discussion of the Supreme Court's Dowell decision [5535 at 2-3]; in its more recent Brief, the Jenkins III decision is the focal point. [5687 at 5 (Aug.7, 2020)] The first paragraph of the Jenkins III opinion and its text evidence its violation finding/relief by order nature.  See 515 U.S. 70, 73, 76, 78, 80 (1995). In each brief, as in arguments, JNPSD's Zinnamon contentions relate to the subject specific violation finding/relief by order model. See 5687 at 4-5; 5535 at 5-7.

Intervenors respond that JNPSD has the wrong focus. The case remedies since May 1992 have been set forth in three agreed upon plans, incorporated in consent decrees by joint action of Intervenors and PCSSD.  These are a PCSSD intra-district plan and the Interdistrict Plan (1992-2000) and Plan 2000 (2000 to date). Intervenors argue that the achievement and discipline content of the plans was and is lawful, on the facts and law, regarding  desegregation remedies generally and permissible settlements.  Intervenors also: note that PCSSD very long ago joined in seeking approval of achievement and discipline relief in the plans and decrees,  and contend

that JNPSD's current mode of challenge to that relief is barred by laches and waiver standards. PCSSD's role in approval of Plan 2000 has been emphasized. See Part [M.] below.

[2.] The Period Through 1969

Judge Wood's April 1984 decision, PCSSD No. 1 v. NLRSD, 584 F.Supp. 328 (E,D.Ark.), provides an apt starting point for learning PCSSD's longstanding constitutional violator mode of operation. The Court describes the stark Plessy v. Ferguson constitutional violations in PCSSD, regarding high schools in 1930, and as late as 1950. Then, only four years before Brown I, "Dunbar High school in the LRSD was the only black high school in Pulaski County with North Central accreditation . . . . The Pulaski County District in 1950 had two black high schools – Pulaski County Training School at McAlmont and J.C. Cook at Wrightsville. The former had a C rating and the latter an(X) or unaccredited rating." [At 329]

In 1954, in Brown I, 347 U.S. 483, the Court held that segregation of children in public schools solely on the basis of race deprives the children of the minority group of equal educational opportunities, even though the physical facilities and other tangible factors may be equal . [At 493] The Court reasoned that this enforced segregation "generates a feeling of inferiority as to their status in the community . . . ." [At 494; emphasis added] The Court agreed with the Court in the Kansas case regarding segregation of white and black children in public schools with

the sanction the law. This "policy of separating the races is usually interpreted as denoting the inferiority of the negro group." [At 494; emphasis added]

Brown II, 349 U.S. 294 followed in 1955, after "further argument on the question of relief" "because these cases arose under different local conditions and their disposition will involve a variety of local problems." [At 299; emphasis added] "These presentations were informative and helpful to the Court in its consideration of the complexities arising from the transition to a system of public education freed of racial discrimination." [At 299; emphasis added] Four other elements of the opinion are significant.

FIRST. The Court returned  to the theme of "solution of varied local school problems" in identifying how local "school authorities" should respond. They "have the primary responsibility for elucidating, assessing,  and solving these problems ; . . ." [At 299; emphasis added] SECOND. "Courts  will have to consider whether the action of school authorities constitute good faith implementation of the governing constitutional principles ." Due in part to "their proximity to local conditions," the cases should be remanded to the courts which originally heard the cases. [At 299; emphasis added ] THIRD. "[The] cases call for [the] traditional attributes of equity power." "To effectuate [the personal interests of the plaintiffs] may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional set forth in our May 17, 1954 decision.

Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner." [At 300; emphasis added] FOURTH. With regard to timing, the Court referred to both "a prompt and reasonable start toward full compliance" and "with all deliberate speed." [At 300, 301; emphasis added]

Supreme Court decisions of  note occurred in 1968 and 1969,  before any positive desegregative step by PCSSD. These are --- Green v. County School Board, 391 U.S. 430 (1968) and United States v. Montgomery County Board of Education, 395 U.S. 225 (1969).

Two noteworthy aspects of Green: [i] "School Boards such as the respondent then operating state-compelled dual systems were nevertheless  clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." [At 437-38]  [ii] The ultimate goal is conversion "to a system without  a 'white' school and a 'Negro' school , but just schools." [At 442] (Below, Intervenors relate these principles  and others to the  parties' achievement/ discipline dispute.)

The Montgomery County Board of Education decision is significant for two reasons.  *First*, the Court notes that faculty desegregation  is  required and will also be a stark change. [ 395 U.S. at 229].   *Second*, Justice Black's decision for a unanimous Court, well-describes  important aspects of the roots and branches of the

required, longstanding segregated  and discriminatory educational system.

> [M]any others States had for many years maintained a completely
> separate system of schools for whites and nonwhites, and the laws of
> these states, both civil and criminal, had been written to keep this
> segregated system of schools inviolate. The practices, habits, and
> customs had for generations made this segregated school system a fixed
> part of the daily life and expectations of the people. Recognizing these
> indisputable facts, we neither expected nor ordered that a complete
> abandonment of the old and adoption of a new system be accomplished
> overnight. The changes were to be made 'at the earliest practicable date'
> and with 'all deliberate speed.': *Id.*, at 300, 301, 75 S.Ct. at 756. We
> were not content however to leave this task in the unsupervised hands
> of local school authorities, trained as most would be under the old laws
> and practices, with loyalties to the system of separate white and Negro
> schools.

United States v. Montgomery County Board of Education,  395 U.S. at 227

[3.] The Filing of Zinnamon through 1988-89

PCSSD's "response" to the Brown decisions was in its "constitutional

violator" mode. Its officials retained their "loyalties to the system of white and negro

schools"  until the start of the 1970-71 school year.  Two  more school years had

then elapsed from the filing of the Zinnamon suit on August 7, 1968. [5664-1]  An

aspect of  Judge Henley's decision of August 17, 1970 exemplifies the Montgomery

County observation as to the impact of the longstanding requirement  of "completely

separate schools for whites and non-whites" on the "expectations of the people." The

Court notes: "The District's plan was displeasing to certain white patrons of the

District. These patrons commenced cases LR-70-C-148, LR-C-154, and LR-C-159."

The Court dismissed these actions. [5687-3 at 3-5]

JNPSD cites a positive comment by Judge Henley regarding  PCSSD school desegregation efforts. [5687-3 at 4] This was praise, however, for  the district being "almost successful"  in "com[ing] up  with an integration plan satisfactory to the Department of Health, Education and Welfare."  [5687-3 at 2, 5-6]  Of course, the district had  wholly shirked its obligations  for about 15 years after Brown II.

In 1973, the Zinnamon parties entered into a "consent decree." In his 1984 opinion, Judge Woods summarized six of its provisions. He reported very poor overall compliance with its terms, including that "[i]n a number of respects there has not even been  minimal compliance with the mandates." LRSD,  584 F.Supp. at 336. The district, for example, "never made an attempt to establish a bi-racial committee"; it did not comply "with the mandate requiring two black citizens selected by the black community to serve in an ex-officio capacity on the Board of Education." [At 337] The objective message of these defaults was that black citizens were not "equipped" for participatory and leadership roles.

 PCSSD had again for a decade functioned in its "constitutional violator" mode, and done so in ways again communicating a favored and a disfavored  race. This, again, was NOT an approach to give life to  different "practices, habits and customs" so that a school system functioning in accord with  the letter and the spirit of the Brown decisions  and their progeny would become "a fixed part of the daily life and expectations of the people."

[4.] <u>1990 Court of Appeals Decision through May 1992 Plan Approvals</u>

The 1990 opinion in <u>LRSD v. PCSSD</u>, 921 F.2d 1371 (8thCir. 1990) identifies

critically important changed circumstance several years later.

> Then, in 1988 and 1989, in a sharp departure from the adversary
> bitterness that had marked the controversy for over thirty years, the
> parties including the Joshua Intervenors representing the injured class
> of black schoolchildren and citizens, LRSD, the North Little Rock
> School District (NLRSD), the Pulaski County Special School District
> (PCSSD), and the State of Arkansas, agreed to settle the case. They
> submitted to the District Court comprehensive agreements covering
> both inter-district and intra-district measures—agreements referred to
> buy the parties as the 'settlement plans.' They also submitted a separate,
> but related document called the 'settlement agreement,' settling the
> financial liability of the State of Arkansas for something over one
> hundred million dollars.

<u>LRSD v. PCSSD</u>, 921 F.2d at 1376.

The five agreements included a desegregation plan for the PCSSD, as well as an

"Interdistrict Desegregation Plan" applicable to the three districts. [At 1377-80]

Judge Woods had declined to approve the five agreements, as submitted. He

also "purported to modify them and order the unwilling parties to put them into effect

as modified." [At 1376] In this 1990 opinion, the Court held that this was error. "We

now reverse the judgment of the district Court. In general, we direct that Court , on

remand, to approve the settlement plans and settlement agreement as submitted by

the parties." [At 1376; see also at 1394, paras. 3, 6]. The three school districts and

Joshua were united in challenging Judge Woods rejections of the five agreements.

[921 F.2d at 1381, 1394]

The evaluation of the four settlement plan by this three judge panel is significant:

> In sum, our examination of the four settlement plans – the LRSD, PCSSD, NLRSD, and interdistrict plans – convinces us that they are not facially unconstitutional. They are reasonable, good-faith efforts to solve seemingly intractable problems, efforts involving give and take on the part of all concerned, but embodying also significant relief for the plaintiff class. We think it was an abuse of discretion for the District Court not to approve these plans as submitted.

LRSD v. PCSSD, 921 F.2d at 1388.

Following remand, some refinement of the content of the "settlement plans" occurred. The process included another trip to the Court of Appeals, again with a joint district and Joshua front. See Appeal of Little Rock School District, 949 F.2d 253 (8thCir. 1991). This decision discusses the standards for modifications of the settlement plans. One aspect of the opinion  includes "the agreed effort to eliminate achievement disparity between the races" within "those elements of the 1989 plan that we consider crucial , and with respect to which no retreat should be approved." [At 256] This content is relevant to the current dispute.

The process culminated in an Order of Judge Wright on May 1, 1992. See Doc. 1587 ("ORDER by Judge Susan W. Wright  approving the revised plans attached to this order; . . ." [emphasis added]. The approved plans included the PCSSD Desegregation Plan  and the "Interdistrict Desegregation Plan of the LRSD, PCSSD, [and] NLRSD."  Judge Wright did not in her discussion of  the two plans

refer to contracts.  [1587 at 4-14]  In keeping with the <u>Brown II</u> model,  approval followed hearings on nine days.  [1587 at 1] This Order created consent decrees. <u>Knight v. PCSSD</u>, 112 F.3d 953, 954 (8thCir. 1997) April 29, 1992 is the date on the cover page of the Interdistrict Plan.

The  PCSSD Plan approved by Judge Wright  addressed remedying racial disparity in achievement  (at 7, 38, 95-96) and discipline (at 12, 74-75).  The Interdistrict Plan  included the six "<u>Green</u> [factors]," without mentioning that case, or  stating  that  they  were  of  heightened  importance.  Remedies  regarding achievement  disparities by race  (at 1, 6), racial disparity in discipline (at 1,6), and monitoring (at 6) are included. The achievement disparity provision was substantive in content, not cursory. Other remedial provisions were included, as well.

The remedies in the PCSSD Plan and the Interdistrict Plan were developed in the period from 1988 to 1992. Regarding PCSSD remedies, those participating  on each side had knowledge of the long history cited and experience in the district's desegregation process from 1971-72  to date. That experience informed participants of  the issues, "local school problems," "obstacles,"  and "complexities" arising in this setting, with this history, when substantial integration of students and staff  first occurred <u>within the same schools.</u>  The parties' representatives, not in the immediate aftermath of the <u>Brown</u> decisions,  but with years of relevant experience, engaged in an enhanced <u>Brown II</u> approach to developing  a more "effective" remedy. *See* 349

48

U.S. at 300.  This included district representatives, working jointly in "elucidating, assessing, and solving . . .problems." <u>Brown II</u> at 299.

[5.]  <u>Provisions Rooted in Federal Remedial Standards; Not Mere Contracts</u>

That remedy included the achievement and discipline precursors to the Plan 2000 remedies now challenged.  These remedies were rooted in governing standards. They can reasonably  be viewed as aimed at eliminating a condition that violates the Constitution, or  a condition "flow[ing] from" such a violation.  <u>Milliken v. Bradley</u>, 433 U.S. 267, 282 (1977).  JNPSD cites this standard in each of its briefs. See 5534 at 4; 5687 at 5.   This is not a situation of obligations created by contract, outside the parameters of the constitutional claims and standards.

A thorough application of the <u>Milliken II</u> standard begins with <u>Brown I</u>, holding that State-mandated racial segregation denied African American children "equal educational opportunities." The Court reasoned that such segregation "generates a feeling of inferiority as to  . . . status in the community . . ." and  "is usually interpreted  as denoting the inferiority of the negro group." [347 U.S. At 493-94] <u>Brown II</u> referred to  "a transition to a racially nondiscriminatory school system" and pupil assignment and personnel, briefly. [349 U.S. At 300-01] In 1968, <u>Green</u> made clear that freedom of choice plans producing token pupil desegregation did not suffice  and that the dual system must be eliminated "root and branch" [391 U.S. 437-38]. The 1971 decision in <u>Swann v. Charlotte-Mecklenburg Bd. of Educ</u>, 402

U.S. 1 (1971) confirmed a requirement of extensive faculty desegregation (at 19-20) and approved use of multiple, far-reaching  student assignment techniques and related pupil transportation (at 22-31).

These changes of tremendous magnitude would occur in a populace shaped in the manner described by the unanimous Court in 1969 in <u>Montgomery County Board of Education</u>, with magnification in PCSSD in the period from 1955 until the latter 1980's by the district's extensive delay and deficient compliance. <u>Judge Wood's decision</u>. See also <u>Milliken II</u>, 433 U.S. at  287-88 (impact of discriminatory system on "habits of speech, conduct and attitudes"). The mandates  of the student assignment and staff desegregation standards yielded a new phenomenon: African American and white students and mixed race staffs  together in many schools. Also within many schools thereafter: African American students experiencing extensive racial disparities in achievement and discipline, realities that would be known to all. In the light of the <u>Montgomery County</u> text, a relationship to the role of white staff is logical  (attitudes, biases,  and absence of culturally relevant teaching skills, points at least implicit in PCSSD hearing and Exhibit --- hereto).

The circumstances would give rise to repetition of the <u>Brown I</u> harms within the desegregated  schools : stigmatic harm  from "feelings of inferiority" and views of "the inferiority of the [African American] group." This would not be "just a school." [<u>Green</u>, 391 U.S. at 442; *see also* <u>Freeman</u>, 503 U.S. at 485 ("the principal

wrong of the *de jure* system, the injuries and stigma inflicted upon the race disfavored by the violation . . . "); at 492 (district court addressing "whether minority students were being disadvantaged in ways that required the formulation of new and further remedies to insure full compliance with the court's decree . . ."); Wright v. Council of City of Emporia, 407 U.S. 451, 465-66 (1972) (extensive discussion of stigmatic harm).

The  PCSSD parties and Joshua reacted in a positive manner identifying and securing approval of affirmative responses. These provisions are reasonably viewed as  addressing "the principal wrong of the de jure system" as identified in Freeman. They may also be seen as remedying harm flowing from  elements  of the constitutional violation,  response to which required remedies bringing mixed race students and staffs together in the same facilities, where the two disparate patterns emerged, with the effects identified.  Compare Milliken II, 433 U.S.  at  287 ("In so doing, the District Court was adopting specific programs prepared by local school authorities, who must be presumed to be familiar with the problems and needs of a system undergoing desegregation." [footnote omitted])

The  inclusion  of  the  questioned  remedies  in  the  consent  decree,  as  full partners, is also established by reference to case law addressing lawful consent decree content. Rufo v. Inmates of Suffolk County Jail, 502 U.S. at 389;  Frew Ex. Rel. Frew v. Hawkins,  124 S.Ct. 899, 903 (2004) ("The decree is a federal-court

order that springs from a federal dispute and furthers the objectives of federal law." [at 904]); Fire-fighters v. Cleveland, 478 U.S. 501, 519 (1986); *see also* LRSD v. PCSSD, 921 F.2d at 1383-84.

### [6.] The Approval of Plan 2000 on Motion of PCSSD

Judge Wright's Orders of February 22, 2000 and March 20, 2000 modified the consent decree to establish Plan 2000 as the desegregation remedy for PCSSD and more recently JNPSD. Her Honor found that the content reflected the joint effort of Joshua and PCSSD and that it would be a more efficient plan, which the Court would enforce if necessary [Docs. 3337 at 4, 7; 3347] Judge Wright's ruling followed the filing of "PCSSD's Motion for Approval of Plan 2000" [3309 (Nov. 17, 1999] and "PCSSD's brief in Support of Plan 2000" [3310 (Nov. 17, 1999]. These papers establish with absolute clarity that PCSSD requested Judge Wright to modify the existing "consent decree" to establish Plan 2000 as the desegregation remedy. The PCSSD papers do not discuss the contract approach later advanced by the districts.

The district's current stance provides another instance of failing to recognize the importance of voluntary undertakings. Here, it is JNPSD's omission. Compare LRSD v. PCSSD, 921 F.2d at 1383 (Part II, paragraph 2).

Intervenors also note that JNPSD is seeking modification of a consent dcree, by its termination. A party seeking modification of a consent decree has the burden of proof. Rufo, 502 U.S. At 383-84, 390.

[M.] <u>Laches and Waiver Bar the Current Challenge to the Nature of the Plan</u>

Through the years, until the recent hearing period, PCSSD never challenged the content of the consent decrees as untethered to the constitutional violations. How could the district have done so? Its representatives, in each instance, participated voluntarily with Joshua in the formulation of the remedial standards. Its representatives in each instance participated voluntarily in seeking Court approval of the agreed upon standards (with a lead role regarding Plan 2000). These efforts were successful in each instance, with court approval and a consent decree eventuating. There was no mention of a contract in the Plan 2000 approval process, by either PCSSD or the Court. In any event, JNPSD's raising of the decree lawfulness and contract points, at this late date, is barred by application of waiver and laches principles. The following argument supports this position.

The Eight Circuit Court of Appeals addressed the issue of laches and waiver in the case of <u>Liddell, et al. v. The Board of Education, et al.</u>, 142 F.3d 1103 (8th Cir. 1998) The State of Missouri and the Special School District (SSD) entered into an agreement back in September 1983. The parties entered into an agreement for the purpose of submitting a proposed plan to settle claims to special education services arising from a pending desegregation case. In 1985, the district court approved the parties' plan. Under the plan, the SSD was to provide necessary special education services to Phase I students. The plan required the state to reimburse the SSD for

the per pupil cost of providing these special education services.

In March 1995, the SSD requested the state to reimburse the SSD for special education services provided to Phase 1 in the amount of $7,425,000.00.  The state objected.  The trial court required the state to pay for these costs, and the state appealed. In September 1996 the SSD requested the State to reimburse the SSD for the following years: 1985—1986, 1996-1997.

On appeal, the "state reiterates that its arguments that it is not obligated to continue because there is no interdistrict violation under Missouri v. Jenkins, 515 U.S. 70, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995), unitary status has been achieved, and there are no longer victims of *de jure* violation.  We reject the State's renewed objections to its general funding obligations for the reasons stated in Liddell v. Board of Education, 126 F.3d 1049, 1055-59 (8th Cir. 1997), *cert. denied,* ___ U.S. ___, 118 S.Ct. 1164, 140 L.Ed.2d 175 (1998).  We decline to reconsider that decision." Liddell, et al. v. The Board of Education, et al., 142 F.3d 1103, 1106 (8th Cir. 1998).

> We agree with the State and the City Board that the SSD's ten-year delay in seeking reimbursement and its 1994 declaration that it had previously chosen to forego reimbursement for Phase I costs before the 1994-1995 school year constitutes an express waiver of its right to receive these costs before 1994.  *See* Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (waiver is intentional relinquishment or abandonment of a known right).  In addition, we conclude that the doctrine of laches also applies here to avoid unfairness resulting from the prosecution of stale claims.  *See* Goodman v. McDonnell Douglas Corp., 606 F.2d 800, 805 (8th Cir. 1979), *cert. denied*, 446 U.S. 913, 100 S.Ct. 1844, 64 L.Ed.2d 267 (1980).  To prove laches, courts look to whether the delay in exercising a right is

unreasonable and unexcused and whether the delay results in prejudice for the defendant.  *See id* at 804.  We conclude that SSD has not adequately explained the ten-year delay in seeking reimbursement, and that the paucity of records hinders the State's ability to retroactively apply the complex reimbursement formula.

Liddell, et al. v. The Board of Education, et al., 142 F.3d 1103, 1106 (8th Cir. 1998).

"The doctrine of laches does not apply unless there is an unreasonable delay coupled with some change of position which makes it inequitable to enforce the claim."

Mobil Exploration & Producing North America, Inc., v.  Graham Royalty LTD., 910 F.2d 504, 507 (8th Cir. 1990).

In the case at bar, Jacksonville North Pulaski School District is arguing that Plan 2000 should not be enforceable.  Certainly, the doctrine of laches and/or waiver applies here.  The Pulaski County Special School filed a motion in November 1999 requesting the Court to adopt Plan 2000.  It has generally been understood between the parties that Plan 2000 was the playbook by which the parties would go by in order to achieve unitary status.  The intervenors have relied on this agreement.  Therefore the districts have waived their right to object to the applicability of Plan 2000.

## Conclusion

JNPSD will be unable to fulfill its burden of proof; the Motion should be denied.

Respectfully submitted,

Austin Porter Jr., No. 86145
PORTER LAW FIRM
323 Center Street, Suite 1035
Little Rock, Arkansas 72201
Telephone: 501-244-8200
Facsimile: 501-372-5567
Email: aporte5640@aol.com

Robert Pressman
22 Locust Avenue
Lexington, MA  02421
Telephone: 781-862-1955

Shawn G. Childs
Lawrence A. Walker
JOHN W. WALKER, P.A.
1723 S. Broadway
Little Rock, Arkansas 72206
Telephone: 501-374-3758

johnwalkeratty@aol.com
schilds@jwwlawfirm.com
lwalker@jwwlawfirm.com

ATTORNEYS FOR INTERVENORS

## **CERTIFICATE OF SERVICE**

     I, Austin Porter Jr., do hereby certify that a copy of the foregoing pleading was electronically filed with the Clerk of the United States District Court for the Eastern District of Arkansas, on this 8th  day of September 2020, by using the CM/ECF system, which is designed to send notification of such filing to the following person:

M. Samuel Jones III.               Scott P. Richardson
Devin R. Bates                   McDaniel, Richardson & Calhoun PLLC
Amanda Orcutt                1020 West 4th Street, Suite 410
MITCHELL, WILLIAMS, SELIG,   Little Rock, Arkansas 72201
GATES & WOODYARD, PLLC
425 West Capitol Avenue, Suite 1800

sjones@mwlaw.com             scott@mrcfirm.com
dbates@mwlaw.com
aorcutt@mwlaw.com

                         Austin Porter Jr.