IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

LITTLE ROCK SCHOOL DISTRICT, *et al.*                    PLAINTIFFS

No. 4:82-cv-866-DPM

PULASKI COUNTY SPECIAL SCHOOL
DISTRICT, JACKSONVILLE/NORTH
PULASKI SCHOOL DISTRICT, *et al.*                        DEFENDANTS

EMILY McCLENDON, TAMARA EACKLES,
VALERIE STALLINGS, TIFFANY ELLIS,
and LINDA MORGAN                                         INTERVENORS

MEMORANDUM OPINION and ORDER

Is it time?  Yes.  With the exception of some facilities issues, the
Pulaski County Special School District has substantially complied in
good faith with Plan 2000.  Subject to the ongoing implementation of
its 2018 master facilities plan as previously modified by the Court, the
Jacksonville/North Pulaski School District has also substantially
complied in good faith with Plan 2000.  It is therefore time for both
Districts to continue their important and challenging work of
educating all students without oversight from this Court, except as
specified on facilities.

**Background**.  It has been a decade since this Court held a
compliance trial in this case.  *Doc. 4507*, 2011 WL 1935332, *affirmed in
part and reversed in part, LRSD v. Arkansas*, 664 F.3d 738 (8th Cir. 2011).

The Court therefore convened a three-week bench trial in July 2020 on the four areas in which PCSSD remains under supervision. Fifteen witnesses testified, some several times on various areas, and two-hundred fifty-five exhibits were received. In October 2020, the Court held a two-week trial on JNPSD issues. There were twelve witnesses and two-hundred thirty-five exhibits. Tours of many school facilities in both districts were also informative. The Court has measured the witnesses' credibility in reaching its factual conclusions. (The Court hasn't considered PCSSD's post-trial special status report, *Doc. 5723*, in deciding the unitary status issues. Intervenors' motion to strike it will therefore be denied as moot.)

Much has happened in the decade since my Brother Miller presided over the last trial. There was a settlement about state desegregation funding. With the Court's approval, PCSSD, Arkansas, the Little Rock School District, and the North Little Rock School District resolved that branch of the case. *Doc. 4980 & 5063*. Across several years, state funding was phased out. This was a substantial change because each of the central Arkansas districts was receiving millions of dollars each year pursuant to the 1990 settlement agreement. The deal also opened the possibility of creating a new district for Jacksonville and north Pulaski County. The affected voters agreed. In due course, JNPSD was detached from PCSSD. This was a big lift by many hands. There was some contention, too.

Soon after the settlement on state funding, and before the JNPSD detachment, Arkansas took over PCSSD because of that District's long-running fiscal problems.  The State appointed Dr. Jerry Guess as superintendent.   And the Director of the Arkansas Department of Education acted as PCSSD's school board.   ARK. CODE ANN. § 6-20-1909(a).   The Joshua Intervenors, representing the class of black children and their parents, and PCSSD also embarked on what one of the lawyers has aptly called a slow-motion settlement.   Between January 2014 and June 2017, the Court approved stipulations that PCSSD was unitary in various areas governed by Plan 2000:

- student assignment, *Doc. 4986*;

- talented and gifted, advanced placement, and honors programs, *Doc. 4986*;

- scholarships, *Doc. 5009*;

- special education, *Doc. 5088*; and

- staffing, *Doc. 5310*.

In 2014, the Court approved a modification to Plan 2000 Section M about student achievement.   This modification launched the Dr. Charles W. Donaldson Scholarship Academy.   *Doc. 5018*.   The Donaldson Academy figures in the current academic achievement issues.   In 2015, the Court also approved a supplement to Plan 2000 about PCSSD facilities.   *Doc. 5084 & 5091*.   That supplement is a root of a current facilities dispute.

At the end of 2016, Arkansas returned PCSSD to a newly elected school board.   The following year Dr. Guess stepped down as superintendent.  The Court doesn't know the particulars, but there's a reasonable inference some tension existed between him and the new PCSSD board.

By late 2017, it became clear that the slow-motion settlement had stopped.   Trials were needed to evaluate the Districts' Plan compliance in the areas remaining under Court supervision.  By that point, too, JNPSD had stood up.   The new district had inherited PCSSD's Plan 2000 obligations.  *Doc. 5088.*  JNPSD was included in all the parties' stipulations about partial unitary status except for the one about staffing.  The Court therefore started with a February 2018 trial about JNPSD's compliance in staffing and facilities.   Thereafter, the Court declared the new district unitary on staffing, except for a slice about incentives in minority recruiting, and unitary in facilities contingent on JNPSD's completion of its 2018 master plan as modified.  *Doc. 5445.*  No appeal was taken.  JNPSD has provided the Court annual reports about its building program.   There are some lingering questions about the amount of available State partnership funding.  To its credit, JNPSD has accelerated its already ambitious building schedule to maximize Arkansas's contributions.  The Court has toured many of these facilities.  JNPSD's efforts here continue to be nothing short of extraordinary.

The Intervenors have been on the scene through all this. Because there were now two Districts, and Lorene Joshua had passed away, the Court requested nominations for new class representatives. Without objection, Emily McClendon, Tamara Eackles, and Valerie Stallings were appointed to represent the PCSSD class. In its trial brief, PCSSD now makes a passing challenge to these representatives. After some wrangling, Tiffany Ellis and Linda Morgan were appointed to represent the JNPSD class. John W. Walker, who had valiantly led the team of lawyers for the intervenors for more than three decades, passed away in October of 2019. M. Samuel Jones III, who had matched Walker step for step as PCSSD's lawyer since the case began in 1982, shifted to an advisory role. All the members of the current legal teams, some veterans and some new, have done exemplary work.

PCSSD remains under this Court's supervision in four areas: discipline, facilities, student achievement, and monitoring. JNPSD remains under supervision in those areas, too, with the caveat on facilities—the Court's role is limited to ensuring implementation of the District's master plan. The Court looks forward to future annual reports of continued progress. *Doc. 5445 at 7.* Though mostly unitary on staffing, JNPSD is also under supervision on minority-hiring incentives, Plan 2000 Section L(3). All this ground was covered during the July 2020 and October 2020 trials.

**Preliminary Issues.**  There are five important general points.

*First*, the deep question is whether the Districts have complied in good faith with Plan 2000, eliminating the traces of past discrimination insofar as practicable. *Freeman v. Pitts*, 503 U.S. 467, 492 (1992);  *LRSD v. Arkansas*, 664 F.3d at 744.  The shorthand is substantial compliance.  A careful assessment of the facts is required. *Freeman*, 503 U.S. at 474.  PCSSD proposed Plan 2000;  Intervenors did not oppose its substance; and this Court adopted it as a consent decree.  *Doc. 3309, 3337 & 3347.*  As Judge Richard S. Arnold put it, Plan 2000 is the "particularization of federal law applicable to these parties." *Knight v. PCSSD*, 112 F.3d 953, 955 (8th Cir. 1997).  It is a contract that, with this Court's imprimatur, became an Order.  In procedural terms, the Districts seek relief from this Court's Order based on changed circumstances pursuant to Federal Rule of Civil Procedure 60(b)(5).  This Court sits to ensure that the United States Constitution and other federal law is enforced in full measure for every person.  In institutional-reform cases, such as this one, the Court must also be mindful that our Constitution creates a compound republic, vesting substantial authority in states and their arms, including local school districts. *Freeman*, 503 U.S. at 490;  *Horne v. Flores*, 557 U.S. 433, 447–50 (2009).  Though it is a relative term, as this case's almost four-decade history shows, a consent decree like Plan

- 6 -

2000 is "a temporary measure[.]"  *LRSD v. Arkansas*, 664 F.3d at 745 (quotation omitted).

*Second*, who must prove substantial compliance?  The parties agree that the Districts have the burden on facilities and staffing. Speaking through Judge J. Smith Henley, this Court held long ago in the *Zinnamon* case, a predecessor to this one, that PCSSD had violated the Constitution in those areas.  *Zinnamon v. Board of Education of the Pulaski County Special School District*, E.D. Ark. No. LR-68-C-154, Memorandum Opinions (17 August 1970 & 22 July 1971) & Decree (4 June 1973); *see also Doc. 5664*.  Not so, the Districts say, on the other remaining areas—discipline, student achievement, and monitoring. According to PCSSD and JNPSD, parts of Plan 2000 were simply matters of contract, on which the Intervenors have the burden of showing a breach, as in any contract case.  The Districts draw their argument from many cases, in particular *Horne*, *Jenkins v. Missouri*, 216 F.3d 720 (8th Cir. 2000) (*en banc*), and *Jackson v. Los Lunas Community Program*, 880 F.3d 1176 (10th Cir. 2018).

The Intervenors disagree, contending that the Districts have the evidentiary burden in all Plan 2000 areas.  They point out that the Districts' burden has been an accepted premise of prior litigation. *E.g.*, *Doc. 4160 at 5–9*;  *LRSD v. Arkansas*, 664 F.3d at 744–45.  In the run-up to Plan 2000, PCSSD argued for a split in the burden of proof. *Doc. 3253 at 29–30*.  My Sister Wright rejected this position, noting that

the District had bound itself to the full desegregation plan. *Doc. 3304 at 6 & 29.* Intervenors compare LRSD's plan, which specifically allocated the burden to the party challenging that District's substantial compliance. *LRSD v. PCSSD*, 237 F. Supp. 2d 988, 1033–34 (E.D. Ark. 2002). Plan 2000 does not make this allocation. Intervenors contend, finally, that the discriminatory effects in discipline and student achievement, and the indifference shown by lack of monitoring, flow naturally and directly from the Districts' past segregation. The whole Plan was therefore needed to remedy the constitutional violations.

While the Districts' new argument has some force, the Court is not persuaded. *Horne* did not overrule *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992), *Frew v. Hawkins*, 540 U.S. 431 (2004), and like cases. The starting point is that Plan 2000 is a consent decree, not a court-imposed remedy. Applying Rule 60(b)(5), the Supreme Court held in *Rufo* that "a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." 502 U.S. at 383. *Horne* recognized and applied this legal principle. 557 U.S. at 447. The *Horne* Court rightly added cautions: the institutional-reform context requires attention to the incentives that may have prompted the consent decree, as well as to changes over time in local public officials. 557 U.S. at 448–50. A flexible approach to the Rule 60 inquiry, prompted by a good dose of horse sense, is necessary. But, the

burden of proof remains with the party seeking to change the Court's consent decree. The significant change advanced in this case is substantial compliance. "Because this case has been settled, the settlement agreement becomes, in a sense, a particularization of federal law applicable to these parties." *Knight*, 112 F.3d at 955. This Court did not hold the Districts "over their objection, to undertake a course of conduct not tailored to curing a constitutional violation that has been adjudicated." *Rufo*, 502 U.S. at 389. The Court is holding the Districts to their word. To speak in terms of the Districts' contract-law analogy, if they were seeking a declaratory judgment that they had fulfilled their contractual obligations, the Districts would have the burden of proof. The Intervenors did not seek relief, alleging some breach. They are defending (with non-performance arguments) against the Districts' efforts to change the status quo. The Court has found no solid precedent for the split evidentiary burden the Districts now propose. And the Court does not see any lurking jurisdictional issue. The Districts' contrary argument seems to be a way to inoculate against a possible forfeiture finding. But under Plan 2000 § O, the Court retained jurisdiction to enforce the Plan. *Doc. 3337 & 3347*; *Kokkonen v. Guardian Life Insurance Co. of America*, 511 U.S. 375, 380–82 (1994).

The Districts also say that the Eighth Circuit's 1985 interdistrict remedy created a clean slate for PCSSD. *LRSD v. PCSSD No. 1*,

778 F.2d 404, 434–36 (8th Cir. 1985) (*en banc*);  *see also LRSD v. PCSSD No. 1*, 805 F.2d 815, 816 (8th Cir. 1986) (*per curiam*).  They argue that the Intervenors must therefore identify constitutional violations since then to justify continued court supervision.  *Doc. 5611 at 4–6 & 11*.  This argument ignores the line from the 1985 interdistrict remedy, through the Districts' desegregation plans, and to Plan 2000.  *LRSD v. PCSSD*, 237 F. Supp. 2d at 1002;  *Doc. 4507 at 11–13*, 2011 WL 1935332 at *6–*7.  When the Court of Appeals affirmed the finding of interdistrict constitutional violations and remanded the case to implement the remedy, the parties chose to settle "by undertaking to do more than the Constitution itself require[d] . . . but also more than what a court would have ordered absent the settlement."  *Rufo*, 502 U.S. at 389.  The parties thus tied their chosen remedy—now embodied in Plan 2000—to the underlying constitutional violations.

*Third*, during the testimony about various District statistical reports, Intervenors developed proof about the fact that the "non-black" or white category included students other than white students.  PCSSD has a growing Hispanic population.  According to PCSSD, a year or two before his death Mr. Walker raised this issue with the District.  The (disputed) point is that the non-black numbers may mask greater black/white disparities.  In argument, Intervenors pressed that the correct comparison on discipline and student achievement issues was between black students and white students.

PCSSD and JNPSD counter that taking this view of the record is both novel and unfair because of the parties' long-settled way of reporting and evaluating data in this case.

The Districts have the better of this dispute.  To date, the Court's evaluation of the data has been in terms of black/non-black.  *E.g.*, *LRSD v. PCSSD No. 1*, 659 F. Supp. 363, 371 (E.D. Ark. 1987).  The documents embody this settled understanding.  *E.g., PCSSD Exh. 193* (2008–2009 monitoring and compliance report).  Every witness who testified about this issue said that black/non-black has always been the rubric.  Those witnesses included Dr. Janice Warren and Dr. Yolaundra Williams, who have been involved with PCSSD's desegregation efforts for many years, and Margie Powell (the Court's expert) who worked in the Office of Desegregation Monitoring and was the monitor when that office closed in 2014.  When the category "white" has been used, it has always included all non-black students. The Court need not address the parties' contending arguments about the rubric's merits.  Given the case history, and the reliance of the parties and the Court on the black/non-black rubric, Intervenors are estopped from arguing at this late point that a different comparison is better.

*Fourth*, good faith.  This is an essential condition of relief from the consent decree.  The issue is whether PCSSD and JNPSD have "demonstrated, to the public and to the parents and students of the

once disfavored race, [their] good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance." *LRSD v. Arkansas*, 664 F.3d at 745, quoting *Freeman*, 503 U.S. at 491. PCSSD's lack of good faith was one of the main themes of Judge Miller's 2011 Order and the Court of Appeals' affirming decision—implementation of Plan 2000 was an afterthought. This has changed.

The change began with Dr. Guess. It was manifested in the various stipulations, which recognized PCSSD's progress in several Plan 2000 areas. The stipulations about student assignment and staffing were particularly important because these were among the deep roots of segregation. The JNPSD detachment likewise showed PCSSD's, and the State's, good intentions. PCSSD's facilities needs were so many that Plan 2000's facilities obligations were out of reach. The detachment opened the way for substantial state partnership funding for JNPSD buildings. The parties' 1990 settlement agreement, which covered all three central Arkansas Districts, forbade alteration of District boundaries. PCSSD's willing participation in the 2013 deal, and the resulting detachment of JNPSD, demonstrated good faith.

Turning to the last few years, the Court has observed the attitudes and actions of the PCSSD and JNPSD leaders during three trials, many status conferences, and several all-day school tours.

These administrators answer to their respective school boards. They reflect those boards' views and commitments. The administrators are diverse in background, training, gender, and race. These are the key leaders that were in place during the 2020 trials: At PCSSD, the team was Dr. Charles McNulty (superintendent), Dr. Janice Warren (assistant superintendent of pupil services), Alesia Smith (deputy superintendent for learning services), Dr. Yolaundra Williams (director of special programs), Dr. Sherman Whitfield (director of pupil services), Dr. John McCraney (coordinator of equity initiatives), and Curtis Johnson (executive director of operations). At JNPSD, the team was Dr. Bryan Duffie (superintendent), Dr. Tiffany Bone (assistant superintendent for secondary curriculum, student services, and desegregation), Gregory Hodges (assistant superintendent for elementary instruction and education), Tammy Knowlton (director of human resources), and Jacob Smith (director of federal programs). Having spent time listening to and observing all these educators, the Court has no doubt whatsoever about their good-faith commitment to the whole of Plan 2000, including the Ross plan goals. And this is not just a central-office ethos. As exemplified by the testimony about what is happening at the building level in PCSSD and by two JNPSD principals who testified—Janice Walker (Lester Elementary) and Shana Loring (Taylor Elementary)—the Districts' commitment to educating all students fairly and faithfully is deep. With one

exception discussed below, PCSSD and JNPSD have demonstrated to the public, the black students and their parents, and this Court their commitment to our Constitution's promise of equal treatment and to Plan 2000's remedies for unequal treatment in the past. *Freeman*, 503 U.S. at 491.

*Fifth*, to secure release from Court supervision, the Districts must also have eliminated the vestiges of segregation to the extent practicable. *LRSD v. Arkansas*, 664 F.3d at 749. The qualifying phrase is important. "[B]ecause racism still remains a most regrettable part of the nation's social fabric, no amount of federal supervision can *eliminate* racial discrimination." *LRSD v. PCSSD*, 237 F. Supp. 2d at 1029 (emphasis original). Therefore, in a school case like this one, the law's inquiry has a narrower focus. "The vestiges of segregation that are the concern of the law in a school case may be subtle and intangible but nonetheless they must be so real that they have a causal link to the *de jure* violation being remedied." *Freeman*, 503 U.S. at 496. Here, half a century separates Judge Henley's rulings in the *Zinnamon* case and the Districts' current operations. Much has changed, especially in the last decade. The turning of the years makes it less likely that disparities are "a vestige of the prior *de jure* system." *Ibid*. No expert testimony was offered by the Districts or the Intervenors on what causal link exists between the constitutional violations being remedied and the undisputed disparities that remain in student

performance and discipline. *Compare Jenkins*, 122 F.3d 588, 598–99 (8th Cir. 1997). The Court must therefore look primarily to the Districts' good faith, which informs the vestiges issue indirectly: "The causal link between current conditions and the prior violation is even more attenuated if the school district has demonstrated its good faith." *Freeman*, 503 U.S. at 496. As explained above, and as will be described in detail below, PCSSD and JNPSD have demonstrated their good faith. Last, the Court must consider whether judicial oversight is needed to ensure continued progress. *Freeman*, 503 U.S. at 491–92. The superintendents from both PCSSD and JNPSD said that the many efforts to educate all students are entrenched. This firm testimony was powerful and persuasive. Court supervision is not necessary to make sure that these Districts press on. And continued oversight is unlikely to yield better results than what the Districts will achieve on their own. For all these reasons, the Court concludes that, with the carve outs on facilities issues, PCSSD and JNPSD have—to the extent practicable—eliminated the vestiges of PCSSD's segregated past.

Having addressed these five general issues, the Court turns to each district and Plan 2000's specifics.

PCSSD.   As noted, the District remains under supervision in four areas:  discipline, facilities, student achievement, and monitoring.

*Discipline.*[*]   Plan 2000's provision is in the margin.  Judge Miller captured the situation at PCSSD in this area as of 2011:  "If one word could describe the hearing evidence, it would be sad."  *Doc. 4507 at 59,*

---

[*] **F.   Discipline**

(1)   The PCSSD will continue to gather data which allows a full assessment of its success in achieving its objective of eliminating racial disparities in the imposition of school discipline.  As a foundation for this effort, disciplinary records shall be kept on each student concerning the nature of any discipline imposed (suspension, Saturday school, expulsion, etc.);  the teacher and staff member involved;  and the school, race, and sex of the student.

(2)   Not later than 45 days after the court's approval of this Plan, the Assistant Superintendent for Desegregation shall submit to the Joshua Intervenors, for comment, proposed criteria for identifying, from the data collected:  (i) teachers and other staff members who are experiencing problems which require attention;  (ii) schools which have atypically high discipline rates;  and (iii) schools which have atypically high racial disparities in discipline.  The Joshua Intervenors shall have 21 days to provide comment on these proposed criteria.  The PCSSD shall then complete the criteria promptly.

(3)   The Assistant Superintendent for Desegregation and the Assistant Superintendent for Pupil Personnel shall thereafter provide for and participate in specific efforts to work with teachers and other staff members and the personnel of schools, identified pursuant to the criteria set forth in paragraph 2, to promote achievement of the goal of eliminating racial disparities in school discipline.  The Assistant Superintendent for Desegregation shall maintain records showing the specific steps undertaken.

(4)   PCSSD shall conduct a comprehensive study of the disciplining of African-American students, particularly male students, at the secondary level.  The participants (a minimum of twelve (12)), one-half designated by the Joshua Intervenors and one-half by PCSSD and the PACT and PASS, shall consider the causes for the high rates of discipline for African-American students and possible remedies. The panel shall, among other things:  review discipline records to secure an understanding of the circumstances in which African-American students are disciplined;  interview and/or survey African-American students regarding their experiences in the system generally and in the discipline process;  and consider the possibility of a relationship between unmet academic needs and discipline rates. The written study shall be completed not later than 150 days after court approval of this Plan and shall provide suggestions for prevention and intervention measures.

(5)   The PCSSD shall develop a specific initiative to reduce the rates of discipline in the PCSSD shown in ODM's report dated March 18, 1998.  This initiative shall be implemented not later than 150 days after the court's approval of this Plan.

(6)   PCSSD shall adhere to the policies set forth in the Handbook for Student Conduct and Discipline, as revised after consultation with the Joshua Intervenors, PACT and PASS, to provide that students are disciplined in a fair and equitable manner.   The Assistant Superintendent for Pupil Personnel shall be responsible for determining the fairness of student disciplinary decisions.  He will delegate the student hearing function to a single hearing officer who will consider the appeal brought by parents and the position of the administrator making the recommendation and then make a decision based upon equitable factors.  An aggrieved student may appeal to the Superintendent of Schools.  The Superintendent may review the matter or refer it to the school board for action.  The committee approach which utilizes school principals in the student appeal process has been discontinued and will not be reinstituted.

2011 WL 1935332, at *29.  Today, the Court needs more words than one.  On discipline issues, PCSSD is committed, improved, and imperfect.  The circumstances add up to substantial compliance. *Freeman*, 503 U.S. at 491–92.

PCSSD was implementing three subparts of its discipline obligations in 2011.  It was collecting comprehensive data, identifying discipline issues, and following handbook provisions about discipline. Plan 2000 § F(1), (2) & (6).  All these efforts have continued.  The record overflows with reports about discipline numbers.  *PCSSD Exh. 90–98.*  As Dr. Whitfield and Dr. McCraney testified, the District identifies teachers with large numbers of discipline referrals and schools with high numbers in general.  And PCSSD follows its current handbook provisions that prescribe how students are disciplined, including appeals.  These matters are within Dr. Whitfield's portfolio, and the Court credits his testimony.  The Intervenors concentrated their fire elsewhere.

Section F(3) requires PCSSD to make specific efforts to work with high-discipline teachers and schools to eliminate racial disparities in discipline.  In 2011, PCSSD had discipline plans at both the school and district levels.  But those plans weren't tailored toward reducing disparities in discipline;  and they didn't focus on teachers and staff members with high discipline rates.  Further, none of the District's initiatives had been in place long enough to support a

finding of good faith.  Judge Miller found the District's efforts on this front inadequate;  and the Court of Appeals affirmed.  *Doc. 4507 at 64–66*, 2011 WL 1935332, at \*32–33;  *LRSD v. Arkansas*, 664 F.3d at 751.

The recent facts are different.  Each school's improvement plan has a discipline section.  *PCSSD Exh. 12.*  Those plans now focus on reducing racial disparities.  *E.g., PCSSD Exh. 12 at 6349–76.*  Each school has a discipline management plan with objectives based on that school's discipline data.  *PCSSD Exh. 131.*  Most importantly, schools with a problem are addressed.  For example, as Dr. Whitfield testified, Mills High School was "off the charts" on discipline issues five years ago;  a discipline intervention team was deployed;  and the situation improved.  The District also identifies and works with teachers who make lots of discipline referrals.  Between 2012 and 2018, the District contracted with Dr. Mack Hines to work with those teachers.  *PCSSD Exh. 100–112.*  Dr. Robert Clowers was also involved in training cohorts of teachers with the same challenge.  *PCSSD Exh. 100.*  For these reasons, and those explained below, the Court credits Dr. McCraney's testimony that PCSSD's response to the discipline disparity has been woven into the District's fabric.  PCSSD is meeting its § F(3) obligations.

Section F(4) requires PCSSD to undertake a comprehensive and immediate study of how black students, particularly young men, are disciplined.  Plan 2000 speaks here with specificity about the twelve-

member panel that would complete the study, the ground to be covered, and the goal:  identifying the causes of high discipline rates for black students and possible remedies.  PCSSD didn't do this study. In the mid-2000s, a former district administrator did a draft of a study in this area.  But it was devoid of suggested remedies, and Judge Miller found it insufficient.  *Doc. 4507 at 66–67*, 2011 WL 1935332, at \*33.  The Court of Appeals affirmed.  *LRSD v. Arkansas*, 664 F.3d at 751.

In the decade since, PCSSD has not conducted the kind of comprehensive study envisioned by § F(4).  Of course the original deadline had long passed, but the calendar is not determinative, and no solid explanation was offered for why this study was never done. There were studies that touched on discipline.  In 2013, From the Heart International Educational Services did focus groups at Sylvan Hills High School and Jacksonville High School.  Dr. Whitfield testified that these schools had the highest rates of discipline in the District at that time.  These focus groups involved black males. *PCSSD Exh. 119 & 121.*  From the Heart also did at least one district-wide study in 2014–2015.  *PCSSD Exh. 123.*  The University of Memphis took a District-wide look every school year between 2011 and 2018 in a Formative Evaluation Process for School Improvement. *E.g., PCSSD Exh. 120, 126 & 127.*  PCSSD argues that all these studies complied with the spirit if not the letter of § F(4).  These studies,

- 20 -

though, were about what was referred to at trial as the "climate" of the schools. They were primarily about academic achievement and impediments to it. The Court was certainly persuaded by the testimony that discipline rates and academic achievement are inversely related—students getting into trouble of one sort or another aren't learning as much as others. But, PCSSD's important work with From the Heart and the University of Memphis does not turn § F(4)'s square corner. This fact weighs against the District.

Plan 2000 § F(5) required PCSSD to develop, within a few months, a specific initiative to reduce the discipline rates documented in 1998 by the Office of Desegregation Monitoring, *Doc. 3134*. ODM had found that in most sanction categories, over-representation of minority students hadn't improved: "Each year for the past six years, more and more black students (especially males) have been suspended or expelled from school, thus receiving less classroom instruction." *Doc. 3134 at 100*. Black students continued to be disciplined at rates that were disproportionate to their numbers in the student population. The only area in which discipline had improved was bus suspension. *Ibid.* Judge Miller noted that the District had implemented various responding programs, but did so several years late. This foot-dragging prevented a finding of compliance in 2011. *Doc. 4507 at 67–68*, 2011 WL 1935332, at *34. The Court of Appeals

affirmed on this issue, rejecting PCSSD's argument that it was doing well if graded on a national curve. *LRSD v. Arkansas*, 664 F.3d at 751.

In the years since the last trial, PCSSD has continued and refined its initiatives to reduce the racial disparity in discipline. The Court's expert (Margie Powell) summarized where things now stand in her pretrial report. "After years of perfunctory initiatives and poorly designed behavior programs, district personnel have joined together to develop a discipline system that is research[] based, student centered, and that seems to be working." *Doc. 5531 at 7*. The proof at trial confirmed Ms. Powell's conclusion.

The Court highlights these aspects of the District's efforts.

- **PBIS.** Positive Behavioral Interventions and Supports is about preventing discipline problems rather than punishing them. *PCSSD Exh. 145–53*. PBIS went district wide in 2019–2020. It began in the Mills High School feeder schools (elementary and middle) in the 2014–2015 school year, succeeded, and was expanded. Every building has a PBIS coach.

- **RTI.** Response to Intervention is a tiered approach to academic and discipline issues. *PCSSD Exh. 153*. It has long been in place at PCSSD. The Court was persuaded by Nickey Nichols's strong testimony about the District's increased fidelity to this program in recent years. She helped create a manual, which includes guidelines

for teachers and is available to all staff.  *PCSSD Exh. 144*.  Nichols monitors compliance, and this program is getting good results.

- **AVID.** The Advancement Via Individual Determination program is a new initiative.  It is directly about achievement and indirectly about discipline.  *PCSSD Exh. 13*.  The Court will discuss it below in terms of the achievement-gap issues but mentions it here because of the undoubted link between good behavior and academic progress.

The Court also notes PCSSD's ongoing development of a Teen Court program, where peers mete out restorative justice.  This program has not yet been launched, but it indicates that the District is continuing to seek ways to close the discipline gap.

What are the results of PCSSD's efforts?  Dr. Warren testified that, based on her long experience in school administration, she looks at five-year trends.  Her chart on suspensions is telling.  *PCSSD Exh. 209*.  From the 2014–2015 school year to the 2018–2019 school year, the disparity between black and non-black students decreased from 42% to 26%.  The District's various charts about discipline show similar downward trends. *PCSSD Exh. 203–08*.  Results are important, but they aren't the full measure of substantial compliance.  *LRSD v. Arkansas*, 664 F.3d at 747–48;  *LRSD v. Armstrong*, 359 F.3d 957, 965 (8th Cir. 2004).   It is a weighty fact that PCSSD is succeeding in reducing the racial disparity in discipline.   Every district witness

recognized, however, that a gap still exists.   And every witness recognized that this is unacceptable.  The effort must continue.  The District has substantially complied with § F because PCSSD has, in the main, done what Plan 2000 requires, its efforts have produced good fruit, the District recognizes its obligation to continue those efforts, and the network of programs (old, recent, and planned) are a durable way of continuing to address the remaining racial disparity in discipline.

*Facilities*.** "We find no clear error in the district court's factual findings that PCSSD has devoted a disproportionate share of its

---

** **H.  School Facilities**

(1)    The PCSSD shall prepare, with the help of consultants, as necessary, a plan so that existing school facilities are clean, safe, attractive[,] and equal.  The plan shall address alternatives for funding its implementation.  The Board of School Directors shall approve a plan not later than 150 days after the court's approval of this Plan. The Joshua Intervenors shall be given a 14 day period to comment on the content of the plan prior to its adoption.

(2)    An elementary school, located around 145th Street, and a middle school or junior high school in the Crystal Hill/Maumelle area will be built.  The Board will address the development of a plan for new school construction during the term of this Plan if funds are sufficient, including its funding, and report its conclusions not later than 150 days after the court's approval of this Plan.  Moreover, the PCSSD shall not close schools which are located in predominantly African-American areas absent reasons of compelling necessity (which does not include the opposition of white patrons to attending such schools).

facilities spending to predominantly white areas." *LRSD v. Arkansas*, 664 F.3d at 753. That was the situation in 2011. There had been no good faith effort to substantially comply with Plan 2000's facilities requirements. *Ibid*. As indicated by the State takeover, PCSSD's fiscal problems were acute. Various studies, plans, and proposed millage increases went nowhere. The JNPSD detachment was part of the recipe for achieving Plan 2000's promise that "existing school facilities are clean, safe, attractive[,] and equal." Plan 2000 § H(1). In 2014, during the slow-motion-settlement period, PCSSD and Joshua approached the Court with a proposed supplement to § H. *Doc. 5084*. A purpose of this supplement was to address PCSSD's facilities needs after the JNPSD detachment. Plan 2000 § H(2) & (3) were uncontroversial and satisfied. PCSSD had built a new Daisy Bates Elementary and Maumelle Middle School; no school in a predominantly black area had been closed; and the District had notified Intervenors about plans for new schools or adding to existing ones. *Doc. 5554 at 3*. The pressing issue was equalizing facilities as

---

(3)The PCSSD shall notify the Joshua Intervenors of plans for constructing new schools and for adding capacity to existing schools. The notice shall identify the capacity of the proposed facility, the area of the system to be served, and the projected impact on the racial make-up of the students in each school expected to be affected by the new construction. The Joshua Intervenors shall have a period of 14 days in which to provide input concerning each such proposal.

contemplated by Plan 2000 § H(1) and as informed by the Kahn Study. *Doc. 4507 at 73–78*, 2011 WL 1935332, at * 37–39.

The parties' 2014 supplement supplanted that study and all similar efforts.  PCSSD pledged to seek a millage increase.  If it passed, Plan A would be implemented:  new high schools at Mills and Robinson (circa $50 million each), conversions of the existing high schools at Mills and Robinson to first-class middle schools (circa $5 million each), and a modernization/expansion of Sylvan Hills High School (circa $50 million).  The Mills projects were to have priority if the Robinson work couldn't be done simultaneously.  If the millage failed, then Plan B would be implemented:  a new Mills High School (circa $50 million) and conversion of the existing Mills High School into a middle school (circa $5 million).  The Mills schools serve a majority-black area.  The Robinson schools serve a majority non-black area.  Plan B was silent about other facilities projects.

PCSSD bound itself irrevocably to Plan B.  The supplement was "intended to demonstrate PCSSD's good faith in addressing and remediating the unconstitutional disparities that exist as to its facilities." *Doc. 5084 at 1*.  The Intervenors "accept[ed] and agree[d] that the PCSSD general plan commitments, and particularly its specific irrevocable obligations pertaining to new and improved high school and middle school facilities in the predominantly black southeast quadrant of PCSSD, are, indeed, substantial evidence of

PCSSD's good faith in removing its constitutional deficiencies regarding facilities." *Doc. 5084 at 1–2.* This Court applauded and approved the parties' supplement to § H. *Doc. 5091.*

The proposed millage failed. True to its word, PCSSD moved forward on Plan B. Implementation did not go well. In the beginning, there were undercut problems at the agreed site. The Mills facilities are in an area accurately called Granite Mountain. Construction slowed and costs increased. Meanwhile, PCSSD had decided to meet needs at Robinson by razing most of the old middle school and building a new one there. The needs were real. The decision was sound in principle. But, through then-serving director of operations Derek Scott, PCSSD favored the Robinson project and squeezed the Mills projects. There were only so many dollars to go around at any given time. The plans for Mills High that Scott presented to the PCSSD cabinet of District leaders were not followed. For example, classroom size was reduced to the state minimum. Hallways shrunk in width and three feet in height. Overall capacity was reduced from seven hundred fifty students to seven hundred.

In August of 2017, Dr. Janice Warren discovered what had happened. Dr. Guess having left for unrelated reasons, she was then serving as interim superintendent. The new Mills High School and the new Robinson Middle School were, by this point, substantially complete. Scott resigned. Dr. Warren's understated testimony was

powerful:  "I gave him a little assistance."   In another show of good faith, PCSSD immediately alerted the Court and the Intervenors. There were motions, hearings, and facility tours.   The Court made preliminary findings from the bench in September 2018 about Robinson Middle's superiority and various insufficiencies at Mills High.  *Doc. 5565 at 13–25.*  The Court denied the Intervenors' request for an independent facilities expert and instead directed PCSSD to get busy with upgrades at Mills High School and report to the Court bi-monthly.   PCSSD has faithfully done so.   Curtis Johnson, who replaced Scott as director of operations, gave helpful and credible testimony at trial about these efforts.   The Court also toured Mills High again during the 2020 trial.

Where do things stand?   PCSSD points to the dollars.   The District has spent just north of $50 million on Mills High School and more than $5.4 million on Mills Middle School.   These figures include various upgrades responding to the Court's preliminary ruling.   The District has spent slightly more than $43 million on Robinson Middle School. *PCSSD Exh. 156.*  PCSSD argues hard that it has kept its word, crossed both dollar thresholds at Mills, and thus satisfied its modified § H obligations.   Intervenors disagree.   While they have from time to time highlighted needs at our PCSSD schools, such as College Station, Intervenors did not fight the premise of PCSSD's argument:   the parties designed the supplement to § H as the path toward substantial

compliance on facilities.   Intervenors argue instead that PCSSD stepped off that path and, though it has gotten back on it, the District still has some distance to go.

The Court agrees with the Intervenors.  Plan B was in good faith. Plan B's implementation was not.  The fits and starts at Mills High School, and the favoritism toward the Robinson Middle project, did not demonstrate to the public, students, and parents that PCSSD was committed to Plan 2000 § H(1), as supplemented, and righting the District's prior wrongs on facilities.  *Freeman*, 503 U.S. at 491.  Instead, it was more of the same:  unequal facilities based on race.  *LRSD v. Arkansas*, 664 F.3d at 753.  The many fixes in the last two years are commendable.   They are not, however, a complete cure for the resulting inequity.

Mills High School and Robinson Middle School are both excellent facilities.  But, if Mills High gets an A, Robinson Middle gets an A++.  Mills is superior in only two ways:  its new stainless steel kitchen;  and its magnificent auditorium, which is a smaller version of the singularly impressive Maumelle High School auditorium. Robinson Middle has no auditorium;  it has a cafetorium.  In almost every other way Robinson Middle School is "superior," in Curtis Johnson's apt word, to Mills High School.   Robinson's walls are concrete block rather than gypsum board;  the classrooms are larger; every teacher has a classroom, while at Mills High five teachers are in

rotation with other teachers for classroom space;  the entrance atrium is grander;  the halls are wider with higher ceilings;  its sports practice building is better;  and Robinson has an arena that seats more than 2,000 people, while Mills has a gym with a capacity of about 1,100. Mills's maple floor is certainly better than Robinson's parquet.  That superiority must be cold comfort, though, to student athletes who are consistently among our State's best, but whose school cannot host tournament games because their gym is too small.

PCSSD spent more and got less at Mills High School than at Robinson Middle School.  Scott's favoritism is part of the explanation. Notwithstanding its inability to follow Plan A because the proposed millage had failed, through him the District decided that the new Robinson Middle School would be the functional equivalent of a high school.  It is.  Another important part of the explanation, the Court concludes, is attention.  Robinson's polished concrete floors are part of that facility's wow factor.  So are the ultra-modern light fixtures in the cafetorium.   It turns out that both were less expensive than the flooring and lighting used at Mills.   Careful attention to details improves school buildings and saves money.  The various Mills fixes made under Curtis Johnson's leadership show what good stewardship can accomplish.

What must PCSSD do to comply with § H(1) (as supplemented) and square up the Mills High School/Robinson Middle School

inequity?   The Court declines to dictate particulars at this point. Instead, it requests a proposal from the District.   Various possibilities were mentioned at trial—new and dedicated space for the Driven program, new space for the ROTC program, more classrooms, or an arena.   The Court recognizes the constraints:   dollars are finite and needs are many.   For example, PCSSD has other pressing facilities needs, which Johnson described.   *See also Intervenors' Exh. 49e*. Finishing the job at Mills High School must not hobble those efforts. And schools, of course, are much more than buildings.   The District must also be a faithful steward of teachers, curriculum, and everything else necessary to educate students.   PCSSD has shown—in the Plan A/Plan B proposal and in the Mills High School upgrades so far—the capacity and the will to act in good faith.   The District must, after balancing all the other District needs, and after consulting with the Intervenors, propose a plan for finishing this task.   That is how PCSSD can substantially comply with Plan 2000 on facilities.

*Student Achievement.*\*\*\*   Though one of the briefest parts of Plan 2000, § M addresses perhaps the most challenging issue—academics.   PCSSD has long been unitary on the home-school counselor program required by § M(2).  *LRSD v. Arkansas*, 664 F.3d at 756 n.9.   The core dispute here is whether the District has implemented the plan designed by Dr. Ross to improve student achievement.  Plan 2000 § M(1).  As Margie Powell testified, the Ross plan was a draft done more than two decades ago.  *PCSSD Exh. 2.* Recognizing that the particulars are somewhat timebound, the parties have focused on the Ross plan's animating goals.   They're comprehensive, covering everything from achievement to discipline. Three of the goals are about academics.

- To improve educational achievement by all students, with special attention to African-American students and others who are at-risk of academic failure due to socioeconomic disadvantages, or other factors.

- To decrease the performance gap between white students and African-American students through the systematic design/selection and implementation of

___

\*\*\* **M. Student Achievement**

(1)   The PCSSD shall implement the plans designed to improve student achievement, recommended by Dr. Stephen Ross, and shall work with Dr. Ross in their implementation.  See Attachment (plans).

(2)   The PCSSD shall continue to implement its home-school counselor program.

intervention programs that provide effective remediation and/or adaptation to individual or group needs.

- To increase the number and proportion of African American and disadvantaged students participating in extracurricular activities, gifted programs and honors, enriched, and advanced placement courses.

*PCSSD Exh. 2 at 3.* A fourth goal shades into monitoring, a stand-alone Plan 2000 obligation that the Court will address a bit here and in detail later.

- To establish an ongoing, systematic evaluation system at individual schools and the district level to:

  o assess the progress made at school and district levels in achieving the educational goals

  o provide direction for "Education Plan" and educational program improvements, where indicated.

*Ibid.* As the evaluation goal indicates, the bones of the Ross plan require effort across the District and at each school. *PCSSD Exh. 2 at 4–6.* This two-fold obligation was undisputed. The parties presented the case as one about fidelity: how faithful has PCSSD been in pursuing the Ross plan's goals related to academics? The Court endorses this approach.

The parties stipulated in 2013 that PCSSD was unitary on its Plan 2000 obligations about standards for participating in advanced

placement, gifted and talented, and honors programs, "including standards to promote racial diversity in these programs." Plan 2000 § D; *Doc. 4960*. The Court approved this stipulation and declared the District unitary in that area. *Doc. 4986*. PCSSD's efforts to pursue the corresponding Ross plan goal were thus undisputed. *PCSSD Exh. 2 at 3*. Ensuring access—especially for black students—to these programs, which enrich students' academic experiences, is a threshold indicator of PCSSD's good faith on academic achievement.

Next, test results. The record contains many years of data. *PCSSD Exh. 8–9; Intervenors' Exh. 5a–5c*. According to the numbers, PCSSD has not achieved the Ross plan's goal of improving the educational achievement of all students. The most recent ACT Aspire test results, for example, show that most students are performing below grade level in reading, science, and math. *PCSSD Exh. 9 at 4137–38*. This has been true for many years. *PCSSD Exh. 9 at 3994, 4029–30 & 4086–87*. And black students' scores consistently lag both non-black scores and the District-wide average for every grade and subject tested. *PCSSD Exh. 8 & 9*. Unlike with discipline, there is no clear narrowing of the gap between black and non-black students. *PCSSD Exh. 8*. Ms. Powell helpfully summarized the ACT Aspire results by grade and subject between 2016 and 2019 in her report. *Doc. 5550 at 3–5*. There are ups and downs. PCSSD's charts show this, as well as increases in the gap in some areas in recent years. *PCCSD*

*Exh. 212.* The gap between black and non-black students' scores on the ACT itself has also increased over the last few years. *PCSSD Exh. 8 at 868; Intervenors' Exh. 2 at 1*. Intervenors emphasize all these test results. Dr. Warren agreed that numbers don't lie.

The Court rejected PCSSD's proffer of evidence about the performance gap in other central Arkansas districts and state-wide. How PCSSD is doing comparatively is not the issue. The Court of Appeals has been clear about this. *LRSD v. Arkansas*, 664 F.3d at 751 (discipline) & 754 (staff).

The numbers don't lie, but they don't tell the whole truth, either. Education is a people business—people who can't be reduced to numbers. That observation holds especially true for the constantly changing group of children moving through a big, urban school district. "[O]utcomes are not determinative of good-faith compliance." *LRSD v. Arkansas*, 664 F.3d at 756. Instead, the Court must measure PCSSD's efforts against its Plan 2000 obligations. *Ibid*. The determinative issue is whether the District has implemented measures designed to improve achievement by all students, especially those who are black or disadvantaged, and to decrease the performance gap between black students and others.

The Charles W. Donaldson Academy is an example of PCSSD's recent Plan-compliant efforts. It came into the case by way of a 2014 joint motion. *Doc. 5018*. Dr. Guess was leading the District then. Dr.

Warren and John Walker were also prime movers on the Academy.  In the parties' initial presentation to the Court, they firmly linked PCSSD's $10 million commitment to the Ross plan's goal of giving special attention to black students' academic performance.  *Doc. 5018 at 2*.  Mr. Walker confirmed this linkage in a hearing on the proposal.  *Doc. 5032 at 8–9*.  The Court approved.  *Doc. 5029*.  The Donaldson Academy prepares ninth through twelfth graders for college and supports them there with scholarships.   The 2014–2019 summary report, *PCSSD Exh. 5*, provides details, as do the periodic reports submitted to the Court, *PCSSD Exh. 6*.  There were summer bridge programs (some weekends and some multi-week), tutors, ACT bootcamps, Saturday sessions, and field trips.  More than 2,400 PCSD students have participated in some aspect of the Academy.   One hundred seventy-five students received scholarships to Philander Smith College and the University of Arkansas at Little Rock.  *PCSSD Exh. 5 at 39*.  Other participants attended the University of Central Arkansas and other colleges.  Though they got no scholarships, the program helped them get there.   As Dr. Warren testified, the Donaldson Academy reflects the District's effort to improve academic achievement, address achievement disparities, and nurture black students.  These are all Ross plan goals.

Intervenors noted that this program didn't help younger students.  True;  it wasn't designed to do so.  Intervenors also made a

passing suggestion at trial that the District's support was less than enthusiastic, at least in the early years.  The Court disagrees.  You don't get thousands of students to participate in a program without support from the central office and from counselors in the schools. PCSSD promised $10 million and spent $10 million (with a pro rata contribution from JNPSD in the third year of funding).  *PCSSD Exh. 7 & Doc. 5696 at 4.*  Ms. Powell was correct that, measured by the dollars invested against the number of college attendees, this was an expensive effort.   If we were weighing results, Dr. Warren's persuasive testimony about the many benefits the Donaldson Academy provided to all the other participating students should go on the scale, too.  But results aren't the measure.  The Court agrees with the PCSSD/Intervenors 2014 joint motion:   the Donaldson Academy is "a substantial component of PCSSD's desegregation obligation on the subject of student achievement." *Doc. 5018 at 3.*

The Donaldson Academy is a main strand in what Ms. Powell described as a net of PCSSD programs and initiatives on academic achievement.  Some are older, some newer.  Some are State-required, some PCSSD specific.  District exhibit 199 lists them in creation-date order.  There have always been various initiatives and programs.  As Ms. Powell testified, what is different now is connectedness, both between programs and in a District-wide commitment.   Many initiatives are focused on black students and socioeconomically

challenged students.  As Alesia Smith, Dr. Warren, and Dr. Williams testified, the programs' substance aligns with the Ross Plan goals. Especially since Dr. McNulty's advent in 2018, PCSSD leaders have been united in an unflagging effort to reach all students.

The Intervenors doubt the District's commitment.  They point out that many of the initiatives are at a fledging stage;  they see no durable remedy in place;  and, while acknowledging that results aren't determinative, they say students' poor performance indicates lack of a real District commitment.

PCSSD is far from perfect in academic achievement, but the Court disagrees with Intervenors' assessment of the District's efforts. As Dr. McNulty put it, the overall academic health of the District has improved.  Some of the positive initiatives, such as Data Walls, are more than a decade old.  Others, such as Response to Intervention and Professional Learning Communities, started small in 2012, produced results, and went district wide.  That's what PCSSD did with RTI in 2016 and PLCs in 2018.  *PCSSD Exh. 199*.  The Court has faulted the District in the past for not expanding successful programs.  *E.g., LRSD v. Arkansas*, 664 F.3d at 756.  PCSSD got this message.  It is certainly true that the number of initiatives picked up after Dr. McNulty arrived in 2018.  Given his background in challenged school districts, it would be passing strange if he hadn't quickened PCSSD's pace.

While the Court can't discuss every initiative without unduly lengthening this already lengthy opinion, some examples show PCSSD's efforts on student performance and closing the gap.

- **Data Walls.**  When every student's performance is on the wall, it is clear who's succeeding and who's not.  Ms. Smith gave compelling testimony about how she monitors each school's wall and how teachers respond, student-by-student.

- **Professional Learning Communities.**  This is dedicated time each week for teachers at each school to gather, compare notes on what is working in the classroom and what is not.  This is not water-cooler time.  Smith monitors agendas.  The information can be uploaded into each school's improvement plan.  *PCSSD Exh. 22–29.*

- **Response to Intervention.**  This tiered approach to discipline not only addresses the gap in that area, but it helps create an environment where all students—particularly black students and students with home challenges—can learn without discipline-related disruptions.  *PCSSD Exh. 144.*

- **Common Formative Assessments.**  PCSSD has been using this strategy since 2016.  The point is to teach, assess promptly, and then re-teach if necessary.  The "common" part of the name indicates that the assessments are grade-wide.  Individual students are the focus.  Ms. Smith gave strong testimony about how this program

works and how it benefits black students in particular.  *PCSSD Exh. 65–67.*

- **Advancement Via Individual Determination.**  This new program, championed by Dr. McNulty and by Dr. Warren, was launched District wide in 2019.  AVID teaches students how to be good students using writing, inquiry, collaboration, organization, and culturally relevant reading.  AVID is in all twenty-five PCSSD schools, with special emphasis in the upper grades.  There is a college-preparatory course, plus a critical-thinking emphasis, which is employed in all courses.  More than 380 PCSSD personnel have been trained.  AVID is not for the short-winded.   It will be at least three years, probably longer because of COVID-19, to fairly judge the program's effectiveness.  It can take as long as seven years to make permanent changes in a district's culture.  That's according to the AVID Foundation's Dr. Wendell Brown, who is working with PCSSD. He said PCSSD has made a "supercharged" launch compared to other districts.  The number of trained personnel show that his assessment was not hyperbolic.  And one of AVID's main targets is narrowing the performance gap—with rigorous standards, support for students, teacher training, and positive reinforcement. *PCSSD Exh. 13.*

- **Curriculum Maps and Teams.**  Groups of educators examine the standardized assessments and available resources and then develop in-depth plans called "curriculum maps" for teaching

standards to all students before annual testing. The map for a unit includes the key standards, how to pre-assess students at the outset, tasks keyed to the standards, essential questions for students, multicultural resources, and a pacing guide for teaching the unit. *PCSSD Exh. 19–21.* These maps and teams began in 2012.

The Court was, in summary, impressed with PCSSD's district-wide initiatives.

The Ross plan requires school-by-school efforts, too. *PCSSD Exh. 2 at 5.* Ninety percent of PCSSD schools now have a "living" School Improvement Plan, one that is electronic and constantly being updated. Examples were received in evidence. *PCSSD Exh. 12.* The Court has noted that PCSSD's past use of State-required school plans did not keep faith with the Ross plan. *LRSD v. Arkansas*, 664 F.3d at 756. When he arrived in 2018, Dr. McNulty recognized the shortcomings of the existing school plans. Improving them was a priority for him. As part of their monitoring efforts through Ms. Joy Springer and others, Intervenors noted that the schools' plans needed to speak in terms of the Ross plan's goals. This has happened. Intervenors say it took too long. But much of the substance — improving achievement of all students and closing the gaps — was there before. And under Dr. McNulty's leadership, the Ross plan's goals are now explicit and emphasized. *PCSSD Exh. 12.* The Court was also persuaded by Ms. Smith's testimony about her ongoing

school-by-school evaluation of the net of academic programs.  The Court didn't see the binder she keeps for each school but has no doubt that they exist and are overflowing.  Her oversight is precisely the kind of vigilance required by Plan 2000 § M and the last Ross plan goal — "an ongoing, systematic evaluation" to assess progress at each school.

Much remains to be done at PCSSD on academic achievement and the performance gap.  Everyone recognizes this.  Intervenors are certainly right that some important District initiatives, such as AVID, are in early days.  This circumstance, though, is unremarkable in a large institution that should always be seeking to do better.  The core issue is whether PCSSD has done enough in good faith so far to comply with § M, implementing programs in pursuit of the Ross plan goals and demonstrating an entrenched commitment to our Constitution's ideal of equal protection under law.  It has.

*Monitoring*.\*\*\*\*   PCSSD was unitary in two of its three Plan 2000 monitoring obligations in 2011.   *LRSD v. Arkansas*, 664 F.3d at 757.

_____

\*\*\*\* **N. Monitoring**

   (1)   The Assistant Superintendent for Desegregation shall: (i) develop a plan so that he (or she) and his (or her) staff focus their monitoring and compliance efforts on the specific elements of this Plan;  and (ii) provide the Joshua Intervenors within 30 days of the court's approval of this Plan a list, geared to the sections of this Plan, identifying the staff member or members with particular responsibilities for its implementation and the position held by each.

   (2)   Upon reasonable notice, the Joshua Intervenors shall have the opportunity:  (i) to examine and secure copies of records relating to the PCSSD's compliance with this Plan, including records identified in this Plan, and (ii) to meet with the Assistant Superintendent for Desegregation or a staff member responsible for a particular part of the implementation of the Plan.

   (3)   The PCSSD shall submit statistical reports showing the following:

   (a)   The enrollment in each school by race;

   (b)   The enrollment in gifted and talented programs, honors programs, and advanced placement classes, by school and by race;

   (c)   The make-up of special education programs:  (i) by disability category, including Section 504, by race, and by sex;  and (ii) by school by race, and by sex;  provided that the system my comply with this reporting requirement by providing copies of materials submitted to ADE, as long as they include all information designated in this paragraph;

   (d)   For each school and the system, the number of instances of each form of discipline, by race and by sex;  for each school and the system, the number of

The District's door has remained open to Intervenors for meetings with staff and for gathering documents, § N(2).  And the District has continued to submit various statistical reports required by § N(3).  *E.g., PCSSD Exh. 192* (2018–2019 monitoring and compliance report) and *PCSSD Exh. 90–97* (annual discipline report summaries).  Plan 2000 § N(1) required PCSSD to identify which staff members were responsible for monitoring and complying with each part of the Plan and to inform the Intervenors.  There was no real dispute about this.   Dr. Warren testified that she provides the Intervenors the required list of responsible staff each year.  § N(1)(ii).

PCSSD now goes to great lengths to evaluate compliance with various Plan 2000 obligations, including in areas where the District has achieved unitary status.  Here, too, the proof confirmed Ms. Powell's pre-trial conclusion, *Doc. 5559 at 4–5*.  Intervenors argue that

---

<div style="margin-left:2em">

students receiving each form of discipline, by race and by sex;

(e)  The racial make-up, in each school, of (i) the administrators, (ii) the faculty, (iii) other professional staff, and (iv) support staff;

(f)  The racial make-up, by category, of the various categories of administrators, faculty, support staff, and other workers employed in the PCSSD.

</div>

The information in all sub-paragraphs other than sub-paragraph (d) shall be submitted not later than November 1 of each year, and the information in sub-paragraph (d) twice a year, not later than 30 days after the end of each semester.

the District's annual summary reports are a bit formulaic.  There is, in fact, some carry over across the years.  *Compare PCSSD Exh. 192 & 193.* But look behind these summaries.  The action is at each school where a committee evaluates various equity issues and measures progress year to year.  These equity monitoring reports, *e.g., PCSSD Exh. 194–96*, are comprehensive.  And their conclusions flow into an action plan for each school.  *PCSSD Exh. 113–15.*   Intervenors questioned Dr. Warren at some length about why, as of 2018–2019, problems such as non-diverse seating arrangements and insufficient multicultural materials on bulletin boards still cropped up from time to time.  Dr. Warren's response was convincing:   a perfect report would be concerning;   some imperfection indicates real evaluation of fallible people and an ongoing effort to improve. That monitoring effort is what Plan 2000 § N(1) requires and what PCSSD has done.  *Freeman,* 503 U.S. at 491–92.

With the noted exception on the Mills High School facilities issue, PCSSD is unitary in all four areas remaining under Court supervision.

**JNPSD.**  The new District remains under supervision on staffing incentives, discipline, academic achievement, and monitoring.

*Staffing Incentives.*[*****]  In 2018, the Court held that JNPSD was unitary on most staffing issues.  *Doc. 5445 at 8–20*.  The exception was one part of § L(3) — offering incentives for black teachers to obtain certification in early childhood, primary, and secondary core areas.  *Doc. 5445 at 18–19*.  JNPSD says it has now met its incentives obligations.  The District points to its tuition reimbursement program, its Grow Your Own program, and its teacher cadet pathway for current high school students.  The unrebutted testimony from Dr. Bone was that 60% of teachers work within twenty miles of where they graduated high school.  So the teacher cadet pathway is an excellent long-term effort to cultivate potential teachers for the district.  And because more than half of the participating students are black, the program demonstrates JNPSD's continuing good faith on § L(3) recruitment obligations, on which the District is already

---

[*****] **L.  Staff**

. . .

(3)    The PCSSD shall continue to implement programs, policies and/or procedures which result in an increase in the number of African-American early childhood teachers, primary grade teachers, and secondary core teachers, including offering incentives for African-American teachers to obtain certification in these areas, and to assign those teachers to the PCSSD schools where the greatest disparity exists.

unitary. *JNPSD Exh. 9.* The core on incentives is tuition reimbursement for any certified teacher and Grow Your Own, which supports current JNPSD employees who are not teachers in becoming certified to teach.

The District has redoubled its efforts to use tuition reimbursements to encourage certification of black teachers in needed areas. Forty thousand dollars is available each year. *JNPSD Exh. 2.* JNPSD uses the program to recruit black teachers. The dollars are also available to current teachers in the district. Black teachers have priority in getting the benefits. *Ibid.* In 2019–2020, for example, eighteen folks were approved for reimbursement, seven of whom were black. Intervenors fault the District for allowing teachers of any race to benefit, but the priority status for black applicants satisfies Plan 2000's incentive requirement.

Dr. Bone described Grow Your Own as her baby. The target group is current JNPSD employees who have a bachelor's degree but no teaching certificate—paraprofessionals, secretaries, and others. The program helps them get certified with tuition reimbursement, tutoring, and exam costs. *JNPSD Exh. 1.* Fifteen thousand dollars is available each year. So far, almost all participants have been black. *JNPSD Exh. 8.* As Dr. Bone testified, the link to Plan 2000 is that the District is encouraging certification in elementary and core areas. *JNPSD Exh. 1 at 3.* Intervenors rightly note that while many have

begun this program, few have completed it.  *JNPSD Exh. 8*.  And there's no reimbursement for tuition or testing without certification.  *JNPSD Exh. 1 at 1*.  But the law doesn't require success;  it requires effort in good faith.

JNPSD has offered incentives for black teachers to obtain certification in the critical areas.  The District has therefore complied with the only outstanding slice of § L(3) and is unitary in staffing.

*Discipline*.  The letter of Plan 2000 § F on discipline is in the margin at pages 16–17.  In summary, these are JNPSD's inherited obligations:  data gathering, § F(1);  identifying teachers and schools with high rates of discipline and racial disparities, § F(2);  specific efforts to eliminate racial disparities, § F(3);  studying causes and possible remedies for high discipline rates, § F(4);  initiatives to reduce disparities, § F(5);  and handbook fidelity, § F(6).  A decade ago, PCSSD was complying with Plan 2000 in several of these areas, and that compliance carried over into JNPSD and has continued, with important changes for the better.

JNPSD excels at gathering and disseminating discipline-related data.  There's a weekly report, an Excel spreadsheet of many tabs, which is sent to all campus administrators.  Dr. Tiffany Bone, the assistant superintendent for secondary curriculum, student services, and desegregation, and Gregory Hodges, the assistant superintendent for elementary instruction and education, get copies.  This report

identifies by school the teachers, administrators, and staff making referrals, the kind of discipline imposed, as well as the race of the students disciplined. *E.g., JNPSD Exh. 19.* The report is color coded, like a traffic light, so that building administrators and District leaders can easily identify teachers and schools with high numbers. Red means many discipline referrals, yellow some, and green a few. There's a weekly "discipline error" report, which allows administrators to spot coding mistakes and check conformity with the student handbook. *E.g., JNPSD Exh. 26.* Every four to six weeks, there's an "equitable campus discipline" report, which breaks things down by race and gender for each school. *E.g., JNPSD Exh. 33.* There's also a quarterly report, which builds through the year, and which shows the consistency of discipline imposed by race and gender. *E.g., JNPSD Exh. 27 & 28.* An "at risk" report identifies specific students who are tardy, absent, being disciplined, or struggling academically. *JNPSD Exh. 39.* Administrators get this report. And there are District-wide semester and annual reports that summarize all the discipline information. *JNPSD Exh. 82–87.* The integrity and thoroughness of all these reports was unchallenged. Through them, JNPSD has substantially complied in good faith with the data-gathering aspects of § F(1) & (2).

As the Intervenors emphasized in their questioning of District witnesses, gathering data is one thing, while acting in response to it is

another.   Plan 2000 § F(3) requires JNPSD to undertake "specific efforts" to work with teachers and staff who have high discipline rates "to promote achievement of the goal of eliminating racial disparities in school discipline."   The District has made specific efforts.   First, names and numbers are provided regularly, and in some instances almost immediately, to building-level administrators.   This allows prompt responding action.   Second, Dr. Bone and Mr. Hodges keep a weather eye on the reports and campus administrators' efforts. Hodges described this as identifying teachers that are in the wrong seat on the bus.   The District tries to get them in the right seat with TESS (the state's teacher evaluation tool), mentoring, sending them to equitable discipline training (an annual state program), and developing individual plans for improvement.   Two principals—Dr. Janice Walker (Lester Elementary) and LaGail Biggs (Jacksonville High School)—gave persuasive testimony about these kinds of efforts at their schools.   For example, Ms. Biggs testified that during the first year implementing the mentoring program, some teachers were concerned that the mentors might be "the eyes and ears" for the administration.   The District has since made it clear to teachers that a mentor will contact an administrator only if the teacher is stonewalling the mentor.   Otherwise, the relationship is confidential. Continuing his metaphor, Hodges said that, if a teacher did not respond, then their contract would not be renewed because they're on

the wrong bus, given this District's student body and goals. Dr. Bone confirmed that a couple of teachers who were uncooperative during the first year of the mentoring program left the District rather than accepting support. JNPSD has substantially complied in good faith with its § F(3) obligations.

Like PCSSD, JNPSD has not done the comprehensive discipline study required by § F(4). Ms. Powell's expert report did not touch on this other than to say the obligation was timebound. *Doc. 5538 at 2.* This is certainly true; Plan 2000 contemplated the study being done within a few months of this Court's approval of the Plan decades ago. *Intervenors' Exh. 63a at 3–4.* But, as Intervenors note and as the Court has held as to PCSSD, the calendar is not a complete answer. The study could have been done belatedly. That it was not weighs against JNPSD. But the District has not closed its eyes to the causes of disparities in discipline or to promising cures. JNPSD's many reports show self-study and scrutiny. The training provided to teachers with lots of referrals and to administrators with high discipline rates shows the District's continuing intention to address race-based disparities. And, as will be explained below, JNPSD's many programs that address both performance and discipline recognize the deep linkage identified by § F(4)'s reference to "unmet academic needs and discipline rates." Considered on balance with all the material

circumstances about discipline, JNPSD's lack of a § F(4) study is not determinative.

Of course JNPSD did not exist in 1998 when ODM reported troubling discipline rates.  As to the new District, § F(5) is best understood to require good faith efforts in pursuing the Ross plan's goals about discipline.  One goal is, without regard to race or background, "[t]o reduce the number of discipline problems and classroom disruptions caused by all students," and "[t]o increase student attendance and reduce suspensions and grade retentions for all students[.]"  *Intervenors' Exh. 63b at 3.*  Another is to "promote achievement of the goal of eliminating racial disparities in school discipline[,]" as recognized by § F(3).

JNPSD has made substantial efforts in pursuing these goals. Like PCSSD, the District has healthy Response to Intervention and Positive Behavioral Interventions and Supports programs.  It employs behavior specialists who work with teachers and students to develop individualized plans for students.   Under Dr. Bone's leadership, JNPSD reorganized the school day, which now has fewer periods of longer duration.   This change is important on academics;  it is important on discipline, too, because of the time created to address behavior issues—Titan Time at the high school and similarly named sessions in lower grades.  The District uses "second step" curriculum, which builds social and emotional skills.   The ENVoY program

provides outside consultants who coach high school teachers on classroom management. And JNPSD has various alternative learning environments for students with significant behavioral issues. These range from one at the elementary level, which the Court saw at Lester Elementary during the school tours, to the Titan Academy, a separate facility for high school students. One component of the Titan Academy is The Hub, which works with pregnant students and others in need of a flexible schedule to reduce drop outs and grade repeats.

What are the results? It was common ground that overall discipline rates are down throughout the District. The annual reports show this. *E.g., JNPSD Exh. 85 & 87.* Disparities by race, however, continue. This unacceptable condition was Intervenors' main critique. A comparison from 2016 to 2020 shows trends in the right direction: the gap between black and non-black students decreased across those years in suspensions (19% to 10%), in-school suspensions (20% to 10%), and expulsions (0.8 % to 0.3%). *JNPSD Exh. 89 & 90; see also JNPSD Exh. 36 at 3–5.* (These percentages are approximate. The percentages in the annual snapshot tables differ slightly from those in the summary reports because of variations in the enrollment numbers used for each. *Compare, e.g., Exh. 90 at 2 with JNPSD Exh. 85 at 4, 6, 8 & 12.*) Of course the trend lines are not straight, and there is variation among schools. *JNPSD Exh. 46–49* (2019 data). The results are good

fruit, but more important are JNPSD's many efforts, which are bearing this fruit.

Those efforts remain imperfect. Intervenors offered some granular proof, for example, that revealed an area still needing attention. Intervenors' Exhibit 30 is a chart based on a snapshot of 2019–2020 data about disparities in discipline for failure to follow directives, disruptive behavior, insubordination, and disorderly conduct. There are disparities ranging from approximately twenty to thirty percent between black students' share of the student body and the rates at which they're disciplined. (This is a different calculation than the one the District uses, which compares the rates at which black and non-black students are disciplined, to capture the disparity. *Compare Intervenors' Exh. 30 at 2 with JNPSD Exh. 88 & 90.*) As Intervenors emphasized, there's a great deal of subjectivity involved in what crosses the line for these kinds of offenses. These disparities make an important point: JNPSD must continue striving to ensure both that schools are places of order, where all are shown respect, and that needed discipline is imposed fairly without regard to race. The Court is confident that the District is in fact striving to do both things. All the District leaders who testified about discipline recognized JNPSD's need and obligation to keep striving. And, again, substantial compliance in good faith is primarily a function of effort, not results.

*LRSD v. Arkansas*, 664 F.3d at 747.   The District has substantially complied in good faith with its § F(5) obligations.

Last, handbook fidelity.   There was no dispute that the District had a single hearing officer for discipline appeals (Mr. Smith) and that JNPSD's handbooks embody a Plan-conforming process for discipline appeals.   *E.g., JNPSD Exh. 17 at 9342.*   As mentioned, one of the District's many reports prompts administrators to take a weekly look at discipline coding to fix errors.   Another—the "equitable campus discipline" report—reveals by race and gender whether each campus is imposing discipline on an equitable basis.   These reports show imperfection, which Intervenors highlighted.   *E.g., JNPSD Exh. 33 & 34.*   In Smith's frequent emails distributing the reports and comparing one school to another, however, the Court sees the ongoing pursuit of improvement.   *JNPSD Exh. 33–38.* Schools that are following the handbook and disciplining students equitably are commended, while those that are falling short are exhorted to do better.   In particular, JNPSD is making a good faith effort to treat all students fairly by scrutinizing who is being disciplined, what students are being disciplined for, and what consequences are being imposed. All this is to the good.

Based on all the evidence of record, JNPSD is unitary on all its discipline obligations.

*Student Achievement.*  JNPSD contends that it has complied with its § M obligations.  Before detachment, the Court granted unitary status on § M(2)'s provision about home school counselors.  JNPSD inherited this status.  Intervenors do not argue otherwise.  They vigorously dispute, however, whether JNPSD has implemented plans designed to improve student achievement by all students, especially those who are black or disadvantaged, and to decrease the achievement gap between black students and other students, all in pursuit of the Ross plan's goals for academic achievement.  Those are the obligations imposed by Plan 2000 § M(1).  Mindful that "outcomes are not determinative of good-faith compliance[,]" the Court must measure JNPSD's efforts in its relatively short life as a separate district.  *LRSD v. Arkansas*, 664 F.3d at 756.

The place to start is with some hard truths.  According to the ACT Aspire test results, most of JNPSD's students are performing substantially below grade level.  *JNPSD Exh. 134, 135 & 136*.  And, in general, the performance gap between black and non-black students is either holding steady or getting worse.  *JNPSD Exh. 190 & 191; Intervenors' Exh. 21*.  Ms. Powell documented these facts before trial.  *Doc. 5540 at 4–6*.  The evidence received in testimony and exhibits confirmed it.  Intervenors characterized these circumstances as horrendous.  One need not endorse that adjective to reach the inescapable conclusion:  JNPSD's students have profound academic

needs.   The parties have a simmering dispute about the exact relationship between poverty and academic performance.   As this Court put it many years ago, speaking through Brother Wilson, the "Metaphysics of Using the 'Achievement Gap' as a Factor in Deciding Unitary Status" is a vexed issue.   *LRSD v. PCSSD*, 237 F. Supp. 2d at 1036–40.   This record presents no occasion to resolve that issue.   It suffices to say that a child who comes to school hungry, or in dirty clothes, or having left a home in tumult will not be as ready to learn as a peer without these challenges.   Every witness on point agreed with this proposition, which is really just common sense.   Elementary schools should not have to have clothes closets, food pantries, or washing machines and dryers.   But these needs are there, and so JNPSD's elementary schools meet them as best they can.   The material fact is that JNPSD serves many children who face these challenges regularly.   This fact is not an excuse for the District's academic performance;  it is a truth that JNPSD must face squarely and address unflinchingly.

Dr. Duffie did so when he arrived as superintendent several years ago in 2017.   He blew the bark off the tree in a meeting with all the district administrators.   *Intervenors' Exh. 2.*   According to the minutes, Dr. Duffie (seconded by Dr. Bone and Mr. Hodges) made many key points.   Here are the first six.

1) No real sense of urgency regarding test scores in the district; staff seems unconcerned.

2) It is very important to operate as ONE system; we still have 9 separate kingdoms and I don't want that; we should not be competing against each other; we are fighting our own people.

3) I need you to worry less about the "happiness" of your staff and much more about the effectiveness of your staff in guaranteeing that our scholars are LEARNING and SAFE.

4) This is a TOUGH job in a TOUGH demographic. This isn't the place for everyone. We must have employees who are willing to go the extra mile, do more than the bare minimum, and take ownership of the learning FOR their students who don't know how to own their education. This is where the REAL work can be done for those willing to work this hard. Everyone isn't. Identify them. Help them find their place or their passion and do it quickly.

5) We seem to have a large number of staff members who truly do want to improve the system but they don't really know how.

6) I expect administrators to deal with those staff members who don't want to get on board with what we expect them to do.

*Ibid.* The minutes of other leadership meetings and strategy sessions in later years, and related testimony about those meetings, show the central staff's commitment to pressing forward. *Intervenors' Exh. 6, 7,*

8, 10, 14 & 16; *JNPSD Exh. 118*.  JNPSD's academic challenges are not being ignored or shirked;  they're recognized and embraced.  *E.g.*, *JNPSD Exh. 130*.    Dr. Bone testified with emotion about the joy she has found in working at school districts with these challenges, including JNPSD.   Mr. Hodges and Mr. Smith spoke about their considered choices in moving from high achieving districts to JNPSD—to help these challenged students.   Hodges explained his calling to work with black students, especially elementary-age black males.   Smith—the man of many reports—obviously delighted in addressing students' challenges with a systemic and constant flow of data.   See his emails, which combined cheerleading and prodding. *E.g.*, *JNPSD Exh. 33*.   Dr. Walker and Ms. Loring, building principals, showed the same commitment.   The Court saw no complacency in JNPSD's administrators.   It saw devotion.

Grant the commitment, but—Intervenors reasonably say— scrutinize the actions.  The Court has done so.

There is much planning.  The District's strategic plan identifies academics as a focus area: "Expect high-quality teaching and learning at JNPSD[:]  Improve instruction and student achievement."  *JNPSD Exh. 105 at 5467*.  The plan then quotes the Ross plan's goal about improving student achievement and provides related actions.   Each school has a campus-specific strategic plan.   *E.g.*, *JNPSD Exh. 99* (Taylor Elementary).   These plans are built around current students.

According to Dr. Bone, they are "living, breathing documents." Ms. Loring confirmed her experience as a new principal in refining Taylor's plan. These plans have interim "SMART" goals that are Specific, Measurable, Attainable, Relevant, and Time-based. The Ross plan's goals are included. *E.g., JNPSD Exh. 99 at 8854–55, 8858.* Intervenors deserve credit for nudging JNPSD to quote the Ross plan's goals in each school's strategic plan. But, as assistant superintendent Hodges testified, the substance was there before these references. *E.g., JNPSD Exh. 95 at 4515.* JNPSD's planning is action on achievement issues.

The plans also reflect the District's many programs and initiatives on this front. The Court heard much testimony about Response to Intervention, Professional Learning Communities, and Advancement Via Individual Determination. PCSSD has these programs, too, so the Court will not repeat a description of them. *See supra at 39–40.* There are differences. JNPSD is much smaller, about one third the size of the County District. The programs' implementation at JNPSD reflects this with a greater focus on individual students. Some highpoints. Dr. Bone emphasizes the Professional Learning Communities as one way of addressing the District's many inexperienced teachers. The District supports the program with consultants from Solution Tree. Mr. Hodges testified, too, about the importance of the time devoted each week to these

collaborations district wide.  These are gatherings by subject area (for example, all the math teachers).  Among more general topics, the teachers discuss particular students' academic challenges.

A few years ago, JNPSD started AVID in the sixth and ninth grades, and it is being "rolled up" with those two classes.  Before she became Taylor Elementary's principal, Ms. Loring was JNPSD's curriculum coordinator and helped bring AVID to this District.  She explained convincingly about how AVID targets middling students with potential, and thus links with the Ross plan's goals of improving achievement of black students and students facing socioeconomic challenges, as well as reducing the achievement gap.  AVID aims at improving all students' school skills, with an emphasis on college preparation.  *JNPSD Exh. 141–42.*  Ms. Biggs said the freshman seminar is helping her new students in the transition to high school.  The Court saw college banners at Taylor Elementary and heard from Ms. Loring about college-tee-shirt days and planting that seed early.

Response to Intervention is a pillar program.  RTI's tiers, the students in them, and the District's responding actions are emphasized.  *E.g., JNPSD Exh. 133 & 148–50.*  Each school's RTI team (administrator, counselor, teachers) meets either weekly or biweekly.  "RTI (done the way the district has prescribed it) is a non-negotiable[.]"  *Intervenors' Exh. 2 at 2.*

JNPSD has participated in the Charles W. Donaldson Academy, too.  Ms. Biggs (the high school principal) and Dr. Bone testified about how it has benefitted students.  Dr. Bone said that she had not heard from those running the program, which is based at UALR, in the last two years.  There seems to have been some recent slippage here, at least in communication, which is concerning.  But Dr. Bone and Ms. Biggs were clear about past benefits to students at JNPSD high school.

JNPSD also has novel academic initiatives and efforts.  For example, it takes advantage of teacher training and support through the Wilbur D. Mills Educational Co-op.  Dr. Bone and Dr. Walker both testified about the co-op resources.  JNPSD often meets teacher needs revealed in the Professional Learning Community meetings through co-op programs.

JNPSD deploys MAP testing three times a year:  September, November/December, and March.  *JNPSD Exh. 165–68 & 170–81*.  As Ms. Garrison (the former District Testing coordinator) explained, the District wants to know where each student is at the start of each year, how they've progressed after a few months, and how they've progressed near year end.  The results are shared with teachers and administrators and analyzed.  All this is in service of improving academic achievement.  Garrison's prediction, based on MAP scores, was that JNPSD students were on track to do better on the spring 2020 ACT Aspire tests than in years' past.  There is no way to confirm that

prediction, however, because the pandemic meant there were no such tests given.

Titan Time (under various names depending on grade level) is another JNPSD innovation. *JNPSD Exh. 148*. Mr. Hodges brought it to the District. It is a daily set-aside period of interventions in various subject areas, such as math or reading, as well as behavioral issues. JNPSD also has a robust mentoring program to help its young crop of teachers. Ms. Loring identified this as a particular need. The mentors (other teachers) and the mentees are paid for after-hours collaboration. This program touches both discipline and achievement because it helps new teachers learn classroom management skills so they can reduce discipline referrals and spend more time teaching.

While learning is a good thing in and of itself, one practical purpose of the Ross plan's goals is to better prepare students for their next step, whether it be higher education or a job. Dr. Bone testified that one of her aims is for a JNPSD diploma to mean something — that a JNPSD graduate could get a job and support a family. The new Ford NGL initiative advances this aim. *JNPSD Exh. 160–64*. The District had a pathways program that emphasized career-directed courses. Ford NGL builds on this idea in partnership with local industry. The Court saw the program in action when it toured the new JNPSD high school. Ms. Biggs, the high school principal, testified about it. There's a freshman academy where students are exposed to various career

areas.  In tenth through twelfth grades, students can elect courses in one of three broad domains:  marketing (business and culinary arts); business and computer-aided drafting (IT emphasis);  and health and safety (CNA and phlebotomy).  The point is to engage students in their studies by organizing instruction around a future of meaningful work.  Though it's too soon to tell whether the Ford NGL program will work at JNPSD, it has succeeded elsewhere, employers in central Arkansas support it, and other local school districts are participating. The program is a promising way to reach and help JNPSD's high school students.

It has been well said that the important question is not "Are you busy?" but "What are you busy about?"  JNPSD is busy about trying to improve the academic achievement of all its students, especially those who are black or poor or stuck in a troubled home.  Those groups include many, many of the District's students. Notwithstanding the bad test results and the continuing academic challenges they reveal, JNPSD has complied in good faith with Plan 2000 § M(1).  It has made, and is making, sustained efforts to improve student achievement and close the achievement gap between black students and non-black students.  That effort, not success, is how the law measures JNPSD's good faith compliance, which in turn illuminates whether the District has eliminated the vestiges of

segregation to the extent practicable. *Freeman*, 503 U.S. at 491–92 & 496; *LRSD v. Arkansas*, 664 F.3d at 747.

*Monitoring.* As in other areas, PCSSD was unitary on several aspects of its § N obligations on monitoring a decade ago, and JNPSD is entitled to the benefit of this history. But, the monitoring duties seep through the whole of the case. The Court will therefore touch on all of them.

There's no uncertainty about the individuals primarily responsible for the new District's desegregation efforts. Those efforts are one of Dr. Duffie's priorities. They are Dr. Bone's main task, assisted by Mr. Smith and Mr. Hodges. As § N requires, JNPSD has plans to guide its ongoing evaluation of compliance: the District's strategic plan and one for each school. *JNPSD Exh. 105 & 92–104.* Dr. Duffie testified about his "back doors" — regular unannounced visits to all the schools. He not only observes, he also asks teachers and administrators how various programs are working. Dr. Bone spends much of her time monitoring each school's performance and conformity with Plan 2000-related programs. Mr. Hodges does, too, albeit focused on the various elementary schools. Mr. Smith provides a flow of information in his various reports, some of which JNPSD created from scratch. They're all important, as Dr. Duffie testified, because the District needs to see the trends — "good or bad" — so it can either expand successful efforts or stop and replace unsuccessful ones.

The District issues discipline reports quarterly, twice as often as Plan 2000 requires. *Compare § N(3) with JNPSD Exh. 27 & 28.* Intervenors fault JNPSD for not having one comprehensive report, like PCSSD's. This is a matter of taste rather than substance. Smith's regular reports, as well as JNPSD's more general reports, satisfy the District's § N(3) reporting obligations. And JNPSD's compliance efforts go to its § N(1) obligations.

The parties' dispute here, to the extent there is one, is about § N(2)'s open-door requirement. JNPSD says its records, including all the reports, are readily available, many on the internet. Intervenors respond that there's been foot-dragging and needless involvement by counsel. They also say that, from time to time, the internet links have not worked. The Court acknowledges all this static. The JNPSD/Intervenors relationship has been more adversarial than the PCSSD/Intervenors relationship. The static and periodic disputes, however, are not material. At the Court's direction, the parties have participated in regular meetings—monthly and now bimonthly. When the Intervenors sought to meet with a specific administrator, or visit a particular school, JNPSD arranged it. Information requested has been supplied or directions about its public location have been provided, albeit with occasional and unremarkable internet problems. The District has, in summary, complied with its § N(2) records/meetings obligations.

Ms. Powell brings a long perspective to the case.  She began her work at the Office of Desegregation Monitoring three decades ago with responsibility for overseeing the North Little Rock School District's efforts.   She testified that NLRSD's monitoring was kindergarten compared to JNPSD's high school.  Discounting for both time and differing circumstances between these Districts, her comparison is a powerful one.   The new District's efforts are comprehensive.  The timing aspect is what struck the Court.  Data flows continuously.  Central office staff (Dr. Bone and Mr. Hodges) work regularly with building-level administrators (*e.g.*, Dr. Walker, Ms. Loring, and Ms. Biggs), who work in turn with teachers.  This is monitoring in action, as § N(1) contemplates.  JNPSD has substantially complied in good faith with all its § N monitoring obligations.

*     *     *

Motion to allocate the burden of proof, *Doc. 5610*, denied. Motion to strike, *Doc. 5724*, denied as moot.   JNPSD's motion for unitary status, *Doc. 5686*, granted.  With the exception of completing its 2018 master facilities plan as modified, JNPSD is unitary.   It remains obligated to file its annual reports every July.   PCSSD's motion for unitary status, *Doc. 5621*, partly granted and partly denied. With the exception of truing-up the Mills High School/Robinson Middle School problem, PCSSD is unitary.   Proposal on the Mills/Robinson issue due by 1 August 2021.  PCSSD does not have to

file any more bimonthly facilities reports.  There is no further need for the parties' regular lunch meetings.  The Court encourages counsel to meet (either in person or remotely) and confer about a reasonable attorney's fee for monitoring both Districts since the last fee award, as well as for the litigation about PCSSD facilities issues, on which Intervenors have prevailed.  Intervenors must provide their supporting records to the other parties by 18 June 2021.  Motion for fees (either unopposed or opposed) due by 30 July 2021.  With the exception of the noted facilities issues, and the fee issues, which are collateral, this Court's jurisdiction over the Pulaski County Special School District and the Jacksonville/North Pulaski School District is at an end.

So Ordered.

*WPMarshall Jr.*

D.P. Marshall Jr.
United States District Judge

*6 May 2021*

- 68 -