IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**LITTLE ROCK SCHOOL DISTRICT**                                                               **PLAINTIFF**

v.                                      NO. 4:82-cv-866-DPM

**PULASKI COUNTY SPECIAL SCHOOL**
**DISTRICT NO. 1, ET AL.**                                                                  **DEFENDANTS**

**EMILY McCLENDON, ET AL.**                                                          **INTERVENORS**

**PULASKI COUNTY SPECIAL SCHOOL DISTRICT'S**
**FACILITIES PROPOSAL**

Pulaski County Special School District, for its facilities proposal to the Court, submits the following. This is submitted in the format of a proposal as directed by the Court. *Doc. 5730, p. 30*. It has been endorsed by the PCSSD board and administration to make the District completely unitary in facilities.

**I.      Introduction**

On May 6, 2021, the Court ordered PCSSD to develop a proposal for facilities work to be done at Mills University Studies High School to "comply … and square up" the inequity between Mills University Studies High School and Robinson Middle School (the "Mills-Robinson Inequity"). *Doc. 5730, p. 30*. PCSSD began complying with the Court's order immediately. PCSSD sought to involve Intervenors along the way. PCSSD also sought the input of the community beyond the Intervenors. PCSSD remains dedicated to the proposition that *all* students deserve an equal chance regardless of the zip code into which they are born, or the color of their skin. As the Court correctly observed, facilities are an important part of this mission. To those ends, over the past several months PCSSD has worked diligently to develop a multi-part initiative, the details of which will be presented below (the "Proposal").

1

## II. Action Ordered by the Court

In its Order directing PCSSD to take action on its facilities, the Court did not provide a "to do" list. To the contrary, the Court stated:

> The Court declines to dictate particulars at this point. Instead, it requests a proposal from the District. Various possibilities were mentioned at trial – new and dedicated space for the Driven program, new space for the ROTC program, more classrooms, or an arena.

*Doc. 5730, p. 30*. As to procedure, the Court ordered:

> The District must, after balancing all the other District needs, and after consulting with the Intervenors, propose a plan for [achieving unitary status on facilities].

*Id., p. 31*. While other campuses and other projects have historically been a part of this litigation, the Court's most recent order narrows down the focus to a comparison between Mills University Studies High School ("Mills") and Robinson Middle School ("Robinson").

The Court's general introductory section also wisely directed PCSSD to eliminate past segregation "to the extent practicable" noting that "[t]he qualifying phrase is important." *Id., p. 14*.

## III. The Procedure Followed to Develop the Proposal

1.  On May 11, 2021, the PCSSD School Board discussed the Court's May 6th Order, and discussed what it must do to comply. The Board tasked the Administration with developing the Proposal.

2.  On May 18, 2021, PCSSD provided formal notice to Intervenors under Section H(3) of Plan 2000, announcing its intention to move forward with developing the Proposal. PCSSD invited Intervenors to provide their input on the Proposal in the time and manner contemplated by Plan 2000, Section H(3). *See* May 18, 2021 Notice, attached hereto as **Exhibit 1**; *see also* PCSSD Trial Exhibit 1, Plan 2000, § H(3).

3. On June 2, 2021, Intervenors sent a responsive letter. There was only one substantive request submitted, which was to renew an earlier request that the Driven project be constructed as an attachment to the main Mills facility. There was a procedural request for a meeting. *See* June 2, 2021 Intervenor Letter, attached hereto as **Exhibit 2.**

4. On June 10, 2021, in response to Intervenors' request for a meeting, PCSSD hosted a virtual meeting. Dr. Charles McNulty, Curtis Johnson, Austin Porter, Bob Pressman, Rep. Joy Springer, and Devin Bates were in attendance. At the meeting, Intervenors identified several new substantive requests. Additionally, Intervenors made two additional procedural requests: that counsel for PCSSD e-mail them a copy of notes from the meeting, and that Intervenors receive an update on the status of the Proposal by June 30, 2021. *See* June 10, 2021 meeting minutes, attached hereto as **Exhibit 3.**

5. On June 10, 2021, counsel for PCSSD sent Intervenors a copy of the meeting minutes as requested. *See* June 10, 2021 e-mail to Intervenors, attached hereto as **Exhibit 4.**

6. On June 10, 2021, after the meeting, Intervenors sent PCSSD a long list of substantive input on facilities that had not been discussed but which was nonetheless received over e-mail. *See* June 10, 2021 e-mail to PCSSD Counsel, attached hereto as **Exhibit 5.**

7. On June 21, 2021, PCSSD held a focus group meeting with community leaders and shareholders seeking to gather additional opinions on what would be needed for PCSSD to "comply … and square up" the Mills-Robinson Inequity.

8. On June 30, 2021, PCSSD sent Intervenors an update on the status of the Proposal. *See* June 30, 2021 letter to Intervenors, attached hereto as **Exhibit 6.**

9. On July 8, 2021, Intervenors responded with a letter. *See* July 8, 2021 letter to PCSSD counsel, attached hereto as **Exhibit 7.**

10. On July 12, 2021, PCSSD held a public forum meeting in the community seeking to present the current draft of the Proposal and gather the input of the community at large on what would be needed for the District to "comply … and square up" the Mills-Robinson Inequity. Dr. McNulty, Dr. Alesia Smith,[1] Mr. Johnson, Mills Principal Duane Clayton, Rep. Springer, Mr. Bates, and a variety of community members and stakeholders were in attendance, including various Mills alumni stretching across several decades. This was an open forum with an opportunity to hear about the Proposal, and provide feedback. There was open discussion where concerns were ventilated, ideas were proposed, and where everyone who wanted to was given an opportunity to speak. Rep. Springer, appearing on behalf of the Intervenors, was a part of this dialogue. Rep. Springer fully ventilated all of the concerns that Intervenors wrote into their July 8, 2021 letter. PCSSD responded to those concerns at the meeting.

11. On July 13, 2021, the PCSSD Administration presented the Proposal to the PCSSD School Board. The Board approved the proposal by unanimous vote. Also at this meeting, the Board explored funding options and voted to approve a $15 million second lien bond. Other funding sources were discussed. Once again, Rep. Springer was in attendance.

12. On July 28, 2021, Intervenors sent a letter to PCSSD. *See* July 28, 2021 letter to PCSSD counsel, attached hereto as **Exhibit 8.**

13. On July 29, 2021, PCSSD sent Intervenors a response to their July 28th letter. *See* July 29, 2021 letter to Intervenors, attached hereto as **Exhibit 9.**

---

[1] In July 2020, the Court heard testimony from Deputy Superintendent Alesia Smith, who at the trial was identified as "Ms. Smith." *Doc. 5730, p. 13*. PCSSD is pleased to report that she has since obtained her doctorate degree.

14. Throughout the events listed above, Dr. McNulty and Mr. Johnson worked diligently to consider options, approximate costs, and balance the needs of the District, including the other pressing facility needs.

## IV. The Substance of the Proposal

PCSSD filed its Motion for Unitary Status, *Doc. 5621*, which the Court considered under Rule 60 as a motion to change the Court's consent decree due to PCSSD's substantial compliance with Plan 2000. *Doc. 5730, pp. 7-8*. The Proposal can likewise be considered under Rule 60 as a renewal of PCSSD's Motion for Unitary Status, at least as to the remaining facilities portion not granted. This is in keeping with the Court's stated "flexible approach to the Rule 60 inquiry, prompted by a good dose of horse sense." *Doc. 5730, p. 8*. PCSSD believes that the facts presented in this Proposal show its good faith, and also show changed circumstances such that modification of Plan 2000 is appropriate.

### A. The Aim of the Proposal.

The Proposal addresses what the Court identified as "inequity." *Doc. 5730, p. 31*. It bears emphasizing at this stage that the new Mills project will ***not*** be identical to Robinson. First, in a legal sense, PCSSD is tasked with remedying past wrongs "to the extent practicable." Given some of the differences between Mills and Robinson, for example the width of hallways and height of ceilings, there is necessarily an element of practicability to the Proposal. Second, a meaningful distinction must be drawn between equality and equity. In one sense, once again considering the width of hallways, strict equality is impossible at this point short of demolishing Mills and starting over. Further, pursuing strict equality as between existing Robinson and the new Mills has the potential to lead to inefficient and unhelpful outcomes. Indeed, in some sense, pursuing strict equality would be shortsighted at this point.

5

Take for example the classrooms proposed below. The reality is that Robinson was built prior to the pandemic, and the new Mills classrooms will be constructed in a post-COVID world. Instructional practices have adapted, new pedagogical models have developed, and needs have shifted. There is pandemic learning loss to be confronted. On the topic of technology, change is of course omnipresent. Additionally, true to its namesake, Mills is a University Studies school that strives to be a beacon for the community and prepare its students for higher education. Robinson is a middle school. All of these factors and others inform PCSSD's goal of achieving equity as between existing Robinson classrooms and new Mills classrooms. They also illustrate why pursuing strict equality might actually result in inefficient use of school resources, lest PCSSD be expected to build pre-pandemic middle school level classrooms to meet post-pandemic high school needs.[2] Elsewhere in this case, Judge Susan Webber Wright posited about the potential absurdity of a strict equality standard. *Doc. 1484*.[3] To the extent that the Court is inclined to impose a strict equality standard on the District at this juncture, and to the extent that the controlling case law does not implicitly already accomplish this, PCSSD respectfully requests that under Rule 60 the Court modify the word "equal" in Plan 2000 to become "equal to the extent practicable."

However admirable, both the concepts of equity and equality can be challenging concepts to quantify. Likewise difficult to quantify is the concept of "good faith." While PCSSD will

---

[2] While PCSSD will not rehash the July 2020 trial, it is worth incorporating its prior arguments and renewing PCSSD's objection to use of the "clean, safe, attractive, and equal" standard found in Plan 2000. *Doc. 5622, p. 47*; *see also* PCSSD's counsel's July 31, 2020 closing argument on the history of this standard.

[3] Commenting on the "clean, safe, attractive, and equal" standard, and specifically inclusion of the word "equal," Judge Wright warned "[e]qual in what way? Size? Square footage of the library of computer labs or the teachers' lounge? The amount of playground equipment? The number of volumes in the library?" *Doc. 1484, p. 23*.

continue to approach this project with the same good faith that the Court has already observed, a standard of "good faith" can be somewhat problematic from a practical perspective. "Good faith" is something apparent that is eventually observable by a fact finder. But a precise legal definition is often elusive. This conundrum is perhaps aided by analogy to Justice Stewart's famous "I know it when I see it" test for obscenity. *Jacobellis v. State of Ohio*, 378 U.S. 184, 197, 84 S. Ct. 1676, 1683, 12 L. Ed. 2d 793 (1964). In the event of a later challenge to "good faith", the process of getting to where the Court can make such findings about "good faith" could potentially be costly, both in terms of time and attorney fees.

PCSSD is ever mindful of the Court's introductory adage that *yes, it is time*. PCSSD agrees. A plan is needed to wrap up the case. One simple solution to this would be to "reduce good faith to currency" as was argued and considered by the Court at the July 2020 trial. Indeed, PCSSD's last attempt at a pathway to full unitary status was purely a function of money. *Doc. 5084, p. 3; Doc. 5619; Doc. 5620; Doc. 5622, pp. 47-48*. However, that approach did not work. Mindful of the fact that an alternative is necessary, and operating from a place of good faith, PCSSD herein presents a path to full unitary status that is instead a function of outcomes. This is evidence of PCSSD's good faith. In the spirit of pursuing finality while maintaining the upmost integrity, PCSSD will endeavor below to set out a series of objective and observable criteria for each part of the Proposal. The Proposal and its criteria are based on squaring up the Mills-Robinson Inequity, using Robinson as a guide star. By meeting the criteria set out below, PCSSD believes that it will: (1) eliminate the Mills-Robinson Inequity to the extent practicable such that it has achieved unitary status, and (2) demonstrate its good faith in a manner that creates a legal presumption of good faith.

B.     **Addition of 10 Classrooms.**

The Court observed that the Mills "classroom size was reduced to the state minimum" and further that "[o]verall capacity was reduced from seven hundred fifty students to seven hundred." *Doc. 5730, p. 27.*

The Proposal includes the addition of 10 classrooms to Mills, which would increase its capacity from 700 to at least 800 students. This classroom space will support the Driven program, but not exclusively. The classroom space will also be used to fill other academic needs at the discretion of the administration. Originally, PCSSD had proposed to construct these classrooms as a standalone facility located behind Mills. However, the Intervenors expressed strong opinions that the classroom space should be attached to the main Mills building, as opposed to being a standalone building. In large part due to this feedback from the Intervenors, the Proposal changed along the way and now it is envisioned that the 10 classrooms will be attached to Mills. The thinking on the attached vs. detached question could possibly change when architects become involved.

The classrooms will be built according to the following specifications:

- Substantially similar in size and quality to the "Robinson standard"—which means substantially similar to Robinson Middle School classroom number 207 (a typical Robinson classroom in the new part of the school) (a minimum of 870 square feet);
- Technology enabled, meaning power outlets in convenient locations to support technology;
- Wi-Fi enabled;
- One or more screens for presentations;
- At least one wall will be of the material that it can be written on with dry erase markers.

The proposed classroom space described above will conclusively cure the academic component of the existing Mills-Robinson Inequity when it meets the criteria defined above.

### C. Improvements to the Existing ROTC Building.

Mills has the only ROTC program in PCSSD. Nonetheless, PCSSD believes that improvements are needed at Mills' existing ROTC facility. However, this presents a practical problem. Even though there is no space at Robinson dedicated to ROTC against which a comparison can be made, PCSSD still faithfully seeks to adhere to the Court's directive to "square up" the Mills-Robinson Inequity. Some comparator criteria must be developed.

The facility space dedicated to Mills ROTC[4] is part of the old Fuller Elementary School that was closed in 2000 when Daisy Bates Elementary School was opened, and that space has now been repurposed for ROTC. *Doc. 3266*, *Doc. 3281*. Photographs of the Mills ROTC facility exist in the record. *Doc. 5690, pp. 5-11*. There exists at Robinson an older school building that has been repurposed. *See* Photograph of Old Robinson Classroom # 1, attached hereto as **Exhibit 10**. True to the older style, this classroom space at Robinson opens directly to the outside, and there is no interior hallway. *See* Photograph, attached hereto as **Exhibit 11**. Of course, the Mills ROTC space also opens to the outside because it is a standalone facility. The spaces look and feel similar. *Compare* **Exhibit 10** *with Doc. 5690, pp. 5-11*.

In absence of a perfect comparator, PCSSD proposes using Classroom # 1 at the Old Robinson to compare to the ROTC classrooms at Mills. To be clear, PCSSD is not proposing a side-by-side comparison of the Mills ROTC building to the entirety of the old Robinson building. The old Robinson building is much larger, and it is currently used for many different purposes. The suggested comparison extends only to a side-by-side comparison of Old Robinson Classroom # 1 to the ROTC classroom space.

---

[4] The existing ROTC facility at Mills is a standalone building on the north side of the parking lot behind the main Mills building. The Court toured this facility on August 4, 2020. *Doc. 5676, ¶¶ 2, 4*.

The ROTC component of the Proposal is based on Section 3-5(g) of the Cadet Command Regulation 145-2, a copy of which is attached hereto as **Exhibit 12**. The Proposal includes improvements to the Mills ROTC facility such that at the end of the project, the ROTC facility will include the following:

- 2 classrooms. These 2 classrooms represent necessary and adequate classrooms. As far as size and quality, they will be approximately comparable to Classroom # 1 at old Robinson. There are already two classrooms in place, but changes are proposed as follows:
  - The classroom in the southeast corner of the building is necessary and adequate and comparable to Classroom #1 at old Robinson. No changes are needed;
  - The classroom in the northeast corner of the building is smaller than the southeast classroom because of the fact that there are sheetrock walls dividing the space. This Proposal involves removing one or possibly two of those walls to open up the classroom space to make it necessary and adequate;
- 2 administrative offices. These 2 offices represent necessary and adequate offices. Currently, there are no offices that are closed door administrative offices and so 2 more are needed. The existing space inside the ROTC building can likely be remodeled to create these offices;
- Desks, chairs, and computer equipment in the offices, which serve as office equipment. These are already in place;
- Drill space. The regulations allow that this can exist in the immediate vicinity of the institution as required. It is clear from the location of the gun storage, that it was envisioned that ROTC would use the Mills indoor practice facility for drills and shooting. Thus, a drill facility is already present because the ROTC can drill in the Mills indoor practice facility;
- A room that can be locked for the storage of arms. This is already present at the Mills indoor practice facility;
- Storage space for ROTC materials. There is storage space at the existing ROTC building, but in light of changes mentioned above, and in light of the large amount of gear that ROTC uses, more storage space is needed. This will possibly involve adding new storage space behind the existing ROTC building;
- A private telecommunications line suitable for voice transfer. This is already in place;
- Internet connectivity which enables data transfer. This is already in place.

The existing ROTC facility already meets many of the above criteria. The above "final checklist" for ROTC is set out above, as included in the aforementioned regulation, to provide an objective metric against which PCSSD will measure the outcomes for a complete ROTC facility.

The proposed Mills ROTC facility described above will conclusively cure the miscellaneous part of the existing Mills-Robinson Inequity when it meets the criteria as defined above.

**D. Softball Field.**

Mills does not have a softball field. Robinson does. *See* Photograph of Robinson softball field, attached hereto as **Exhibit 13**. The Proposal includes the construction of a softball field at Mills. The proposed softball field at Mills will conclusively cure the softball component of the existing Mills-Robinson Inequity when it contains the following:

- A regulation size field;
- Infield made of artificial turf, grass outfield, s*ee* **Exhibit 14**;
- Two dugouts;
- Lights to enable night play;
- Bleacher capacity that is substantially similar to Robinson, s*ee* **Exhibit 15**;
- A scoreboard that is substantially similar to Robinson, s*ee* **Exhibit 16**.

**E. A Multi-Purpose Arena.**

The Court found that "Robinson has an arena that seats more than 2,000 people,[5] while Mills has a gym with a capacity of about 1,100." *Doc. 5730, p. 30*. The Court went on to observe

---

[5] The record is mixed on the issue of the Robinson arena size. PCSSD is mindful of the fact that at one point a capacity of 2,323 was stated verbally by a district witness. *Doc. 5429, p. 129*. However, PCSSD notes that Robinson's arena does not seat more than 2,000 people, and the actual capacity is around 1,133. PCSSD believes that an inaccurate number was stated during the tour. The fact that Robinson's capacity is around 1,133 has been reported on multiple occasions. *See e.g. Doc. 5474-1; Doc. 5493-1*. Additionally, a newly obtained blueprint from the architect firm shows a capacity of 1,136. *See* Blueprint, attached hereto as **Exhibit 17**. Another look at Robinson certainly reveals a room that is closer to 1,000 than it is to 2,000. *See* Robinson Arena photograph, attached hereto as **Exhibit 18**. Nonetheless, the fact remains that Robinson

of the Mills basketball athletes that they are "consistently among our State's best" but that they attend a "school [that] cannot host tournament games because their gym is too small." *Id*.

The Proposal includes a multi-purpose arena capable of hosting state tournaments, as defined by the Arkansas Activities Association ("AAA"), which means that Mills would, at the end of the project, meet the following:

- Seating capacity of 2,200 (seating capacity is based on a minimum width of 18 inches. Using the formula of number of feet times 12 divided by 18).
- Four dressing rooms, each with showers, hot water, toilets, and washbasins.
- Two rest rooms for public use.
- Floor dimensions equal to or in excess of 48 x 84 feet.
- There shall be at least three feet of unobstructed space outside the court adjacent to the sidelines and at least five feet of unobstructed space outside the end lines.
- There shall be a time clock visible from both directions of the playing court.

*See* AAA Handbook, attached hereto **Exhibit 19**, pp. 63-64.[6] Mills is currently a 4A school, meaning that the minimum standard for hosting tournaments is a capacity of 1,400 for regional tournaments, and a capacity of 1,800 for state tournaments. The proposed 2,200 seat arena would allow for hosting tournaments based upon Mills' current 4A classification, as well as hosting tournaments in the future upon being upgraded to a 5A school. The fact that PCSSD is herein proposing to build an arena that exceeds the AAA minimum standards with an eye toward future growth is worth examining for a moment. In the past, PCSSD has taken what some could

---

has an "arena" style space while Mills has a gym. PCSSD is not arguing at this stage that Mills is on par with Robinson merely due to the nearly equal seating capacity, but for purposes of drawing comparisons, and ever mindful of the Court's guidance at the July 2020 trial that in all of this His Honor seeks the truth, PCSSD respectfully requests that the record reflect Robinson's capacity of 1,133. PCSSD makes this observation with no intent to criticize the Court's May 6th opinion, especially in light of the inconsistent record.

[6] To the extent that any tournament qualifying criteria in these AAA regulations conflict with what is written in this Proposal, the AAA regulations control. This must be true so that Mills can host tournaments.

characterize as a pessimistic view of Mills. *Doc. 5404-11, p. 3*.[7] The intent behind building the Mills arena up to 5A specifications when only 4A is required reveals a more optimistic view of Mills. PCSSD submits this observation to the Court and suggests that it is compelling evidence of the District's deep and abiding good faith.

To the extent that some of the above is already in place at Mills (i.e.: two public restrooms), brand new construction is not necessarily required. The above criteria, based on AAA standards, are set out to show what Mills will, at the end of the project, be able to accommodate for tournament hosting purposes.

The proposed arena at Mills will conclusively cure the gym/arena components of the existing Mills-Robinson Inequity when it is able to host tournaments as defined above.

## V. Funding

Although there are no final budgets, drawings, or other architect documents to attach at this early stage, PCSSD estimates that the total cost of the Proposal would be approximately $19 million. PCSSD believes that spending $19 million to "[f]inish[] the job at Mills" will not "hobble" PCSSD's many needs including the "other pressing facility needs." *Doc. 5730, p. 31*.

At the July Board meeting, the Board approved a second lien loan for $15 million. To move forward, it is now subject to approval of the State Board of Education. But notably, the funds can become available to PCSSD without the need for voter approval. For the remainder of the funding, for the academic portion of the Proposal, the PCSSD Administration plans on sending a construction proposal to the Arkansas Department of Education to seek ARP funds[8]

---

[7] Letter from PCSSD's counsel to Intervenors stating that "[s]tudent enrollment in Mills and its feeder schools, however, is stagnant, and Mills is not at full capacity."

[8] American Rescue Plan (ARP). This refers to federal funds recently made available to Arkansas schools. In July 2021, the U.S. Department of Education approved Arkansas' plan for

for approximately $4 million. These two funding sources will result in making available the approximately $19 million that PCSSD anticipates the Proposal will require.

While the above represents the clearest and most viable path forward for financing the Proposal, alternative sources of funding it may be available. PCSSD does not foreclose the possible existence of those alternatives. If an alternative funding source did become available, PCSSD does not intend to be irrevocably bound to utilizing a second lien loan. For example, at the July Board meeting, it was also discussed that PCSSD may soon be considering a campaign to restructure or extend existing bonds. This is not a change in the millage rate, and would not be a tax hike. However, such a funding proposal would need to get presented to the voters of PCSSD.[9] Of course, that involves uncertainty. If this were to be presented to the voters, and if it were to pass, this might result in PCSSD reversing its reliance on second lien loans, as the terms for a second lien loan are less favorable to PCSSD as a borrower. If this alternative were to become viable, it would make more than $15 million available to the District generally. However, given the multiple steps and the uncertainty involved in such a restructuring or extension, this funding source is far from guaranteed. Given the history of presenting a tiered "Plan A" or "Plan B" approach to the Court, PCSSD has not structured the Proposal as such.

---

using ARP Elementary and Secondary School Emergency Relief (ESSER) funds to safely reopen and sustain the safe operation of schools and equitably expand opportunity for students who need it most, particularly those most impacted by the COVID-19 pandemic. Subject to compliance with the rules and approval by the ADE, PCSSD believes that some of these ARP funds can be used toward the aforementioned academic construction proposed at Mills, especially in light of the purpose of that classroom space as explained above. This is largely a regulatory matter for state and/or federal government beyond the scope of the Proposal, but this funding source is being identified herein. *See* U.S. Dept. of Educ. Press Release, July 7, 2021, attached hereto as **Exhibit 20**.

[9] There is a precedent in this case for using a millage extension to fund court ordered facilities projects. JNPSD had a May 21, 2019 millage extension election, and used its passage in part to fund the projects required by the Court.

These contingencies are mentioned herein so that if PCSSD later cancels all or some of its reliance on second lien loans and instead secures alternate funding, there will be no argument that PCSSD breached the terms of this Proposal, or that it should have relied on the alternative source *in addition to*, rather than in place of, the second lien loan to accomplish the Proposal or some addition to it. It should go without saying, but will be stated herein for clarity, if PCSSD finds a more fiscally responsible way to fund the Proposal it will go that route instead.

**VI.    Context of the Proposal in the District**

The Court also directed PCSSD to engage in a complex balancing act as follows:

> The Court recognizes the constraints: dollars are finite and needs are many. For example, PCSSD has other pressing facility needs, which [Curtis] Johnson described. Finishing the job at Mills High School must not hobble those efforts … The District must also be a faithful steward of teachers, curriculum, and everything else necessary to educate students … The District must, after balancing all the other District needs, and after consulting with the Intervenors, propose a plan for [achieving unitary status on facilities].

*Doc. 5730, p. 31*.

As the Court has expressed an interest in these numbers in the past, the Court can consider the $19 million proposed Mills spending alongside expenditures in other parts of the district. *See* comparison of facility construction projects since the implementation of Plan 2000, attached hereto as **Exhibit 21**. This exhibit is structurally similar to past such exhibits used, however this new chart accounts for what these numbers would look like if the Court were to approve the Proposal. Anticipating the Court's reaction to this information, PCSSD acknowledges the Court's findings of past inefficiency in the construction at Mills. *Doc. 5730, p. 30*. Thus, **Exhibit 21** is simply a comparison point, albeit an imperfect one.

Assuming that PCSSD relies on $15 million of second lien loans and not on the alternative bond options mentioned above, funding the Proposal represents a significant and recurring financial obligation to PCSSD that will last 25 years into the future. For every year

from 2023 to 2048, PCSSD will spend approximately $860,000 annually to service the second lien loan.[10] Beyond strict dollars, for purposes of context, the opportunity cost of $860,000 is approximately 16 full-time teachers.[11] At this time it is not possible to quantify what the cost would be to the District in the event of bond restructuring.

## VII. Timing

From start to finish, PCSSD estimates that the Proposal will take approximately 36 months to complete. Supply chain issues, the status of the COVID-19 pandemic over those 36 months, and other unforeseen obstacles may change the timeline and as of today these variables remain unpredictable. Much of that will be out of PCSSD's control.

Although the various parts of the Proposal are being presented herein simultaneously, this does not mean that they will be on an identical schedule to be considered, approved, designed, bid, financed, constructed, and opened. At this point, no one can guarantee exactly when the Proposal will be entirely complete assuming the Court approves it.

At this stage, architects have not completed final designs, plans, or drawings. Upon completion of same, it is possible that some above detail may need to be adjusted. PCSSD hopes this will not happen, but the possibility must at least be acknowledged here.

## VIII. Conclusion

By meeting the criteria set out above, the Proposal will conclusively cure the facilities component of the existing Mills-Robinson Inequity. By committing itself to the projects set out

---

[10] $860,000 per year is an estimate, and it is a moving target based on external factors, chiefly among them fluctuations in interest rates.

[11] This assumes $41,000 per year teacher salary plus 30% per year cost of teacher benefits. This is an estimate only, and is intended to be received as a rough illustration. This does not account for inflation.

in the Proposal, according to the specifications set out above, PCSSD should be considered completely unitary.

Since the installation of a new school board, and under the tutelage of Dr. Warren and then Dr. McNulty, the Court found that PCSSD had been operating in good faith. If approved by the Court, PCSSD commits to move forward with the Proposal in continued good faith. In light of the Court's finding about good faith, and in light of the good faith shown above, PCSSD respectfully submits to the Court that ongoing federal court supervision is not needed in order to complete the Proposal. It is respectfully suggested that the Court could consider this submission as PCSSD renewing the denied portion of its Motion for Unitary Status, *Doc. 5621*, which the Court considered under Rule 60 as a motion to change the Court's consent decree. *Doc. 5730, pp. 7-8*. In any event, the Court has declared PCSSD unitary in all remaining areas, except for facilities. By submitting the Proposal, however characterized and regardless of which Rule under which it is considered, PCSSD believes that full unitary status would be justified. Therefore, PCSSD respectfully believes it appropriate to enter a complete and final declaration of unitary status, which would include the finding that PCSSD is unitary in facilities.

          Devin R. Bates (2016184)
          M. Samuel Jones III (76060)
          Amanda G. Orcutt (2019102)
          MITCHELL, WILLIAMS, SELIG,
            GATES & WOODYARD, P.L.L.C.
          425 West Capitol Avenue, Suite 1800
          Little Rock, Arkansas 72201
          Telephone: (501) 688-8800
          Facsimile: (501) 688-8807
          dbates@mwlaw.com
          sjones@mwlaw.com
          aorcutt@mwlaw.com

and

Jay Bequette
Cody Kees
Bequette Billingsley & Kees, P.A.
425 West Capitol Ave., Suite 3200
Little Rock, Arkansas 72201
Telephone: (501) 374-1107
Facsimile: (501) 374-5092
Mobile: (501 590-4500
jbequette@bbpalaw.com
ckees@bbpalaw.com

***Attorneys for Pulaski County Special School District***