IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

LITTLE ROCK SCHOOL DISTRICT, *et al.*　　　　　　　　　PLAINTIFFS

VS.　　　　　　CASE NO. 4:82-CV-00866 DPM

PULASKI COUNTY SPECIAL SCHOOL
DISTRICT, JACKSONVILLE/NORTH
PULASKI SCHOOL DISTRICT, *et al.*　　　　　　　　　DEFENDANTS

EMILY MCCLENDON, TAMARA EACKLES,
VALERIE STALLINGS, TIFFANY ELLIS,
and LINDA MORGAN　　　　　　　　　　　　　　INTERVENORS

Declaration of Robert Pressman

Robert Pressman states as follows:

[1.] This declaration and its attachments are in support of the agreement of Intervenors and JNPSD to settle Intervenors' entitlement to an award of attorneys' fees and costs for the period subsequent to the last relevant JNPSD award.

[2.] Attachment One sets forth my JNPSD time for the period from January 13, 2019 through October 16, 2020. I prepared this document by use of contemporaneous notes of the tasks I performed and reference to case materials.

[3.] The Court has ruled on fee award issues on multiple occasions since transfer of the case to His Honor's docket. One such decision, Doc. 5095 (4-2-25), concerned a successful Joshua motion seeking an award against the State. I

1


EXHIBIT B

prepared a detailed Declaration in support of this motion. See Attachment Two. Sections A. and B. describe my work in this case from 1995 through the declaration's date, January 20, 2014. Section C. describes my prior work on school desegregation and other civil rights issues in the period from August 1965 through September 1995. I am utilizing this earlier, detailed filing in order to minimize additional work at this time.

[4.] I believe that the Court has the ability, to the extent deemed necessary, to assess my performance in the case in the period between the beginning of 2014 and the beginning of 2019.

[5.] The opinion in <u>Little Rock School District v. Arkansas</u>, 674 F.3d 990 (8thCir. 2012) addresses the awarding of fees and costs to our side, for success on the appeal decided in 2011. About 10 years ago, that Court utilized a rate of $325 per hour for the 90.3 hours in which I assisted the Legal Defense Fund counsel. [final paragraph of opinion] The Court wrote: "Mr. Pressman began his civil rights work in 1965 for the Civil Rights Division of the United States Department of Justice, working on desegregation cases in Mississippi, Illinois, and Alabama, before spending twenty-five years with the Center for Law and Education, where he continued to serve as counsel in desegregation cases in Boston, and Omaha, among other locations. He has been working with Mr. Walker on the instant case since at least 1997. The billing rates charged by Mr. Walker and Mr. Pressman thus

represent those charged by the most senior and skillful attorneys in the local community." [fourth paragraph from end of opinion]

[6.] Attachment One at 7 includes the entire time that I listened to the October 2020 JNPSD hearing. This is appropriate. As there indicated, I made 184 pages of handwritten notes as I listened. In addition, I believe that the closing argument which I made evidenced a best effort, using those notes and my overall knowledge of the case, to present Intervenors' position in a clear and comprehensive manner.

Pursuant to 28 U.S.C. Sec. 1946, I declare under pains and penalties of perjury that the foregoing is true and correct to the best of my knowledge and belief.

/s/ Robert Pressman

August 5, 2021

<u>Robert Pressman JNPSD Time</u>

[time claimed is listed in the most right column on the page; the time there identified is in some instances supported by day-by-day time entries]

| | | |
|---|---|---|
| 1-13-19 | review JNPSD enrollment and discipline data | 2.00 |
| 7-2-19 | read Doc. 5500, JNPSD annual facility report, required by Court | .20 |
| 10-1-19 | study M. Powell JNPSD staffing incentives monitoring report, Doc. 5521 | .25 |
| 11-5-19 | study M. Powell JNPSD discipline monitoring report, Doc. 5538 | .33 |
| 11-17-19 | study M. Powell JNPSD achievement monitoring report, Doc. 5540 | .33 |
| 11-22-19 | on 10-24-19, JNPSD filed Docs. 5333-34, converted by the Court to a required "notice"; on this date (11-22), Intervenors filed their response [Doc. 5542] to the JNPSD notice ; work on response was 11-16: 2.75; 11-17: 2.50; 11-18: 1.00; 11-20: .20 and email to JS and AP; 11-21: work with JS on notice response: 1.00; <u>time claimed</u>: | 7.45 |
| 11-29-19 | research Ark. Statutes regarding facilities, in context of Taylor Elementary partnership funding issue | 1.50 |
| 11-30-19 | study partnership funding standards [.50] and email SR [---] | .50 |
| 12-7-19 | emails with SR regarding Taylor and related research | .33 |
| 1-16-20 | discuss with AP and JS agenda for monthly meeting | .25 |
| 1-17-20 | discuss JNPSD Plan 2000 continuing obligations | .58 |
| 1-18-20 | read ADE opinion regarding Taylor and Bayou Meto funding [.50]; discuss 1-17 meeting with AP [.08] | .58 |
| 1-21-20 | Intervenors served discovery regarding L.(3) staffing obligations on JNPSD; work on this discovery was 1-14-20: 1.00; 1-19: .75; 1-20: .75; 1-21: 1.33; .33 (revise with JS); <u>time claimed</u>: | 4.16 |
| 1-23-20 | work with JS on response to M. Powell JNPSD monitoring report | |

EXHIBIT 1

|          |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                      |       |
|----------|---|---|
|          | [1.00];  work on response to monitoring report [.25]                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                 | 1.25  |
| 1-24-20  | work on response to MP monitoring report, including emails to JS                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                     | 1.50  |
| 1-27-20  | work on response to MP monitoring report [.66]; work with JS to complete response to report  [1.50]                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                  | 2.16  |
| 1-27-20  | Intervenors served discovery regarding compliance with Plan 2000 discipline requirements on JNPSD   (10 pages); written by JS and RP; <u>estimate of RP time</u>: JNPSD responded on  3-13-20 (included 16 objections and citations to documents produced; the content of the response included reference to  identification of documents in discovery  through  page number 1666)                                                                                                                                                                                                                                                                                                   | 5.00  |
| 2-13-20  | Intervenors responded to JNPSD's interrogatories and requests for production served on 12-30-19; my time in a joint effort with JS was 1-2:  .33 (discuss with JS); 1-3: 2.05 (work with JS); 2.83  (examining docs., drafting ); 1-22: 1.33;  1-23: 1.33; 1-29: .50; 1-30: .50; 1-31: 3.00; 1.00 (with JS); 2-3: 2.00; 2-4: 4.00;  2-5: 5.50; .50 (consult with JS); 2-6: 2.84;  .66 (consult with JS); 2-7: 1.33; 2-8: 3.00 (particular docs.); 2-9:  3.00 (email to JS list of many exhs. to include with response; consult with JS and read docs. from her); 2-10: .50 (work with JS on response); JS provided for response on 2-13 with many exhibits; <u>claim for RP time:</u> | 36.20 |
| 3-5-20   | Intervenors served discovery regarding compliance with Plan 2000 achievement obligations on JNPSD (--- pages); written by JS and RP ; <u>estimate of RP time</u>: JNPSD responded on  4-13-20 (the content of the response included reference to identification of documents in discovery                                                                                                                                                                                                                                                                                                                                                                                            | 5.00  |

responses through page number 7391)

| | | |
|---|---|---:|
| 3-19-20 | study JNPSD responses to L.(3) discovery | 1.75 |

[****]

Intervenors filed on <u>4-2-20</u> Doc. 5583 titled "Intervenors Facilities Status Report Concerning JNPSD and PCSSD." Our 5583 addressed JNPSD Doc. 5575, titled "Status Report," as well as PCSSD facility issues. All RP time entries regarding response to JNPSD 5575 and to produce the content in Ints.' 5583 concerning the two districts are shown in the next 9 entries. They total 16.86. The work included attention to precedent on raising additional funds to implement remedial obligations. In Intervenors' submission to PCSSD, we claimed 7.00 of this time. Here we claim 5.00 as to JNPSD.

| | | |
|---|---|---:|
| 3-21-20 | first review of JNPSD Doc. 5575 and related exhibits [.50]; email to SR regarding an aspect of position stated [---] | .50 |
| 3-22-20 | research regarding facility funding issue | .50 |
| 3-23-20 | SR email responding to RP query of 3-21 | ---- |
| 3-24-20 | work on JNPSD response (read Ms. Freno's brief) [.33]; email to SR requesting a ruling of 3-10-20 --- ; | .33 |
| 3-25-20 | email to SR regarding RP Taylor issue ideas [.20]; email to JS regarding millage vote and surrounding circumstances ---; work on response to JNPSD status report [1.50] | 1.70 |
| 3-30-20 | work on response to JNPSD facilities status report [1.25]; review portion of Curtis Johnson deposition [.75] | 2.00 |
| 3-31-20 | review part of CJ deposition | 1.33 |
| 4-1-20 | work on facility status report response | 8.00 |
| 4-2-20 | complete facility status report response and send to AP | 2.50 |
| | <u>time claimed for Doc. 5583 for JNPSD work is</u> | 5.00 |

[****]

| | | |
|---|---|---|
| 4-16-20 | review JNPSD achievement discovery response, made on 4-13-20 | .50 |
| 4-17-20 | discuss with AP and JS seeking modification of hearing schedule | .66 |
| 4-23-20 | study JNPSD discipline documents | .75 |
| 4-27-20 | draft request for delay in JNPSD hearing and discuss with AP | .58 |
| 4-29-20 | monthly meeting of parties (1-2 of preparation and meeting time) | 1.00 |
| 4-30-20 | study the plan which each school prepared for School Board work session | 2.33 |
| 5-5-20 | study 5 of the JNPSD responses to Intervenors' achievement obligation discovery | 3.00 |
| 5-6-20 | preparation for status hearing [3.00]; hearing [2.00] | 2.00 |
| 5-11-20 | review new scheduling Order | ---- |

5-11-20 through 5-13-20; read a transcript of part of State proceeding regarding JNPSD's challenge to the decisions made regarding partnership funding for Taylor and Bayou Meto Elementary schools; Dr. Stein and Murray Britton on: Taylor walls/sound issue; relatively new all purpose structures; past funding practices in partnership program; informed AP and JS about this testimony  .66

| | | |
|---|---|---|
| 6-22-20 | on or about 6-1-2020, the Districts filed a joint motion and a joint brief regarding allocation of the burden of proof; Intervenors filed a response to the motion and a brief, Docs. 5642 and 5643, on 6-2-20; time records show a total of 35.90 hours in responding, as follows: 6-1:2.50; 6-16: 1.33; 6-17: 7.75; 6-18: 8.33; 6-19: 8.33; 6-21: 1.75; 6-22: 4.75; one half allocated to PCSSD and one-half to JNPSD | 17.95 |
| 8-12-20 | discuss facts to develop in JNPSD hearing with JS | .75 |
| 8-19-20 | discuss JNPSD discovery responses with JS | .33 |

| | | |
|---|---|---|
| 8-26-20 | discuss JNPSD L.(3) documents with JS | .33 |
| 8-27-20 | discuss JNPSD Motion in Limnie with AP | .16 |

Intervenors' exhibit list; work with JS to prepare; 9-21-20: 4.00; 9-23: 1.33;
    9-24: 1.08        6.41

9-8-20    on 8-7-20, JNPSD filed a motion for unitary status and supporting brief, including exhibits (Docs. 5686, 5687); the brief incorporated by reference like filings with exhibits, filed prematurely on 10-24-19, Docs. 5534, 5535; on this date (9-8), Intervenors filed a response to the JNPSD motion and brief Doc. 5693, 5694 [55 pages]; work in response was 8-13: 3.33; 8-14:1.00; 8-17:5.25; 8-18:1.50; 8-19: 5.00; 8-20: 1.00; 8-21: 3.50; 8-22: 2:00; 8-23: 2.50; 8-24: 5.00; 8-25: 3.00; 8-26: 2.84 (consulted JS on a point); 8-27: 5.25; 8-28: 3.00; 8-30: 4.00; 8-31: 4.00; 9-1: 3.00; 9-2: 5.50; 9-3: 4.00; 9-4: [3.50;] [.50] (work with JS on exhs.); 9-5: 4.00; 9-6: 7.00; 9-7: [5.58] [1.00] (work with JS on exhs.); 9-8: 1.00 (including email to JS); Intervenors' brief included 17 exhibits; <u>time claimed:</u>   81.67

9-9-20    provide input to AP on response to JNPSD Motion in Limine    .75

9-14-20    filed Intervenors' Pretrial Disclosure Sheet; work jointly with JS was 9-9: .25; 9-10: 1.75; 9-11: 1.50; 9-13: 3.00; 9-14: 4.00; <u>claimed</u>:   10.50

9-14-20    JNPSD filed its Pretrial Disclosure Sheet [Doc. 5696]; in part, its EX. A, headed JNPSD Exhibit List, consisted of 4 and 1-5 pages, single spaced, and evidenced providing documents to Intervenors through page 8850 time to review content of Disclosure Sheet   1.50

9-16-20    review some JNPSD documents identified on 9-14 "Exhibit List"   2.50

9-21-20    listened to SR take deposition of class representative Ms. Linda

|  |  |  |
|---|---|---|
|  | Morgan ( as of then, listed on JNPSD witness list) | 1.50 |
| 9-21-20 | study of content of JNPSD exhibit list (reviewed some exhibits) (190 exhibits) | 4.00 |

9-23-20 through 9.28-20  work to prepare exhibits on discipline disparity and
　　　　　achievement disparity and results　　　　　　　　　　　　　　　　3.80

9-24-20　　status hearing; preparation [.25]; hearing [.33]　　　　　　　　　.58

period 10-1-20 through 10-4-20   prepared questions on L.(3) staffing incentives
　　　　　issue for AP　　　　　　　　　　　　　　　　　　　　　　　　1.33


prior to commencement of October hearing; estimate of  some of additional
time  studying the more than 8,000 pages of JNPSD  documentary discovery
responses  provided electronically　　　　　　　　　　　　　　　　　10.00


| 10-6-20 | ideas regarding closing argument | .50 |
| 10-7-20 | discuss hearing to that point with AP and JS | .75 |
| 10-8-20 | ideas regarding closing argument | .33 |
| 10-9-20 | analyze SR chart with poverty and achievement; discuss this along with J. Smith evidence with AP and JS | .75 |
| 10-10-20 | work on ideas for closing argument, including by reviewing my many pages of handwritten notes for important evidence regarding Intervenors' position | 3.50 |
| 11-11-20 | additional review of handwritten notes; and closing argument ideas | 2.50 |
| 10-14-20 | final argument preparation | 2.00 |
| 10-15-20 | final argument prep. | 1.50 |
| 10-16-20 | final argument prep. | 2.50 |


10-5-20 through 10-9-20; 10-10-13 through 10-16-20,  JNPSD hearing ; Court in session
hearing time, based on use of Clerk's minutes, estimated to be  48 hrs; listened; made

184 pages of handwritten notes, with the content drawn upon in my closing arguments on 10-16, to which Court gave a positive review; <u>time claimed for Court in session hearing time without closing argument time on 10-16-20 is</u>     44.25

10-16-20    closing argument participation                                        3.75

      <u>Total Time Above:</u>     293.93

      <u>part of time for time record:</u>     3.00

      296.93 times $350 per hour:     $103,925.50

## Declaration of Robert Pressman
## ADE



EXHIBIT 2

Robert Pressman declares as follows:

### A. Time on the ADE Motion for Release and Other ADE Work

[1.] My participation in the representation of the Joshua class, which began in May 1996, is discussed below. Exhibit 1, attached to this Declaration, shows my work and time relating to the ADE Motion for Release [time from January 2013 through January 20, 2014], as well as some earlier ADE-related work and time [2000 and 2001]. It includes work involved in the effort to secure an award of fees and costs for the overall ADE-related work of Joshua counsel. Exhibit 1 documents 308.48 hours.

[2.] My participation in Joshua's work addressing the Motion for Release included the following areas: communicating with John W. Walker and Joy Springer on the handling of the case; responding to ADE's written discovery to Joshua; preparing written discovery directed to ADE; reviewing ADE's responses and participating in following-up with ADE counsel, where Joshua viewed responses to be incomplete; participating along with Mr. Walker in 6 meetings of counsel for the parties opposing the release motion [discussions of legal theories, proof, and settlement]; looking to a hearing, building my knowledge of pertinent facts [reading expert reports, identifying articles by ADE experts, reading depositions conducted in 2011; participating in some of the most important current depositions; reading other parties' discovery responses]; writing Joshua's trial brief; preparing Joshua's pre-trial sheet; providing comments on the two notices to the class; listening to the three hearings conducted by the court concerning settlement [a necessity given my need in the circumstances to understand fully all aspects of the litigation]; preparing documents for a fee petition.

### B. Earlier Work in this Case

[3.] I first participated in court in this case in May 1996, before Judge Wright, in a hearing which her honor scheduled to hear expert testimony on racial achievement disparity. Doctors David Armor and Herbert Walberg provided testimony in this hearing. This testimony was cited at later points in the litigation. Mr. Walker was unable to attend this hearing due to an important argument in the Court of Appeals for the Eighth Circuit.

[4.] When the LRSD moved for unitary status, I assisted Mr. Walker in opposing the motion, including in hearings conducted by Judges Wright and Wilson. The court [Judge Wilson] ruled in favor of the LRSD, except in the area of assessment/evaluation of programs, where the court entered a compliance remedy. This remedy led to formal evaluations of some programs with regard to effectiveness in reducing achievement disparity. I assisted Mr. Walker in efforts, at first successful, to defeat LRSD motions to end the compliance remedy. Judge Wilson ultimately ruled that LRSD had earned unitary status in this area; and the Court of Appeals affirmed that ruling [decisions in 2007 and 2009]. Nevertheless, Joshua's efforts in securing the text of the revised LRSD desegregation plan and in court proceedings yielded formal program evaluations during the duration of the remedy and the creation of a Department in the system [PRE], which continued to prepare formal program evaluations after the district achieved unitary status.

[5.] Turning to PCSSD. In 1997-98 and 1999, I prepared memoranda and other documents utilized by Mr. Walker in the overall effort to respond to two PCSSD motions for unitary status. See case documents 3211 [9-28-98] and 3282 [7-19-99], Orders of Judge Wright concerning theses

motions. In 1998 and 1999, I participated in the drafting of a revised PCSSD desegregation plan, "Plan 2000." Judge Wright approved this Plan in Orders entered in February and March 2000. See Documents 3337 [2-22-2000] and 3347 [3-20-2000]. In the period November 2005 through March 2007, I worked with Mr. Walker and Ms. Springer in negotiations resulting from Joshua's written complaint, pursuant to Plan 2000, that PCSSD had not adequately implemented multiple features of Plan 2000. As of March 1, 2007, my PCSSD work encompassed 308.91 hours.

[6.] PCSSD filed another motion for unitary status in 2007. In the period August 2009 through May 20, 2011, I worked 495.38 hours in assisting Mr. Walker on the PCSSD unitary status issues tried by Judge Miller. My work included preparing and responding to discovery; writing documents, including proposed findings of fact and conclusions of law; and questioning 9 witnesses during the hearing held in March, 2010.

[7.] Regarding the NLRSD. NLRSD filed a motion for unitary status in 2007. In the period August 2009 through June 2010, I worked 395.14 hours in assisting Mr. Walker on the NLRSD unitary status issues tried by Judge Miller. My work included preparing and responding to discovery; writing documents, including legal memoranda and proposed findings of fact and conclusions of law; and questioning 6 witnesses during the hearing held in January-February of 2010.

[8.] When both PCSSD and NLRSD appealed from Judge Miller's May 2011 rulings on their motions for unitary status, I assisted the Legal Defense Fund attorneys who prepared Joshua's responsive brief. This entailed 90.3 hours of work on the PCSSD issues and 32.58 hours on the single area, where Judge Miller had found inadequate plan compliance by NLRSD.

[9.] Since the beginning of 2013, I have worked 84.42 hours on issues directly related to PCSSD compliance with the continuing elements of Plan 2000.

[10.] As shown in the remainder of this declaration, I began working on school desegregation issues in 1966 and had very considerable experience in that area prior to the work described in paragraphs [1.]-[9.].

C. My Prior Experience in School Desegregation Issues and the Federal Courts

[11.] Following my graduation from the Columbia Law School in June 1965, I worked for 5 years in the Civil Rights Division, United States Department of Justice [8-2-65 through 7-31-70]. My work involved enforcement of the various civil rights mandates, including for the desegregation of schools. My first desegregation-related experiences in federal court, in 1966, concerned the Carroll County [Mississippi] schools, once involving non-compliance with a court order and once regarding revision of the desegregation plan to conform to newly articulated standards. I also investigated the status of desegregation in other Mississippi systems (Lee County, Pontotoc County, Tunica County, City of Corinth). Later, I developed the facts leading to the filing of the government's first northern school desegregation case, United States v. School District 151 of Cook County, Illinois, and participated in two lengthy hearings, with successful results. See 286 F.Supp. 786, 787 (N.D.Ill. 1968); 301 F.Supp. 201, 205 (N.D.Ill. 1969). In calendar 1970, as a part of the Division's "education section," I was the lead counsel for the United States in Lee v. Macon County Board of Education, a case involving the desegregation of more than 100 Alabama school districts. A three-judge court [Circuit Judge Richard Rives, and District Judges Frank M. Johnson, Jr. and H.H. Grooms] handled this case, filed in the Northern District of Alabama. During the period of my involvement, the court revised many desegregation plans to conform to the standards, which the Supreme Court had set forth in Green v.

County School Board (1968). I prepared separate memoranda for the court regarding necessary revisions in more than 30 school districts and frequently appeared before the court. I also appeared before Judge Johnson in the separate Montgomery County school desegregation case and prepared for the Department briefs in two appeals from the decisions of the three-judge court in the Lee case. See, for example, Lee v. Macon County Board of Education, 448 F.2d 746, 747 (5thCir. 1971).

[12.] On December 15, 1969, in the Attorney General's Twentieth Annual Awards Ceremony, I received a Certificate of Award for outstanding work. The Department honored four of the Division's ninety attorneys at this time.

[13.] In the period from August 1970 through September 1995, I was employed at the Center for Law and Education, a component of the federally-funded program of legal services for low income persons, located in Cambridge, Massachusetts. The Center, "a back-up center," provided assistance to legal services attorneys in local programs throughout the country to strengthen the representation of clients presenting education problems. My work included: providing assistance on individual client's problems; writing materials (including on racial discrimination issues and school desegregation litigation); providing training; and serving as co-counsel in some cases. While employed at the Center for Law and Education, I had very considerable involvement in cases involving racial segregation in public education at both the elementary-secondary and higher education levels.

[a] In the period from 1972 through 1995, I was one of the attorneys representing the plaintiff class in the Boston school desegregation case. With co-counsel, I worked many thousands of hours on the case, although there were periods when I was relatively inactive and other attorneys had the laboring oar. I had a substantial role in developing the evidence underlying the court's liability findings. See, for example, Morgan v. Hennigan, 379 F.Supp. 410, 414 (D.Mass. 1974) (liability opinion) and Morgan v. McDonough, 540 F.2d 527, 528 (1stCir. 1976) (argued appeal in which court upheld placing of a high school in receivership).

[b] See Exhibit 2 (declaration of Thomas I. Atkins, a past General Counsel of the NAACP, concerning my work; Mr. Atkins provided this declaration in 1996, for our use in seeking attorneys' fees for my work in this case).

[c] In the 1970s, I worked more than 1,000 hours to assist local legal services attorneys in the representation of plaintiffs-intervenors in the Omaha school desegregation case, United States v. School District of Omaha. This work included participation in the initial hearing on liability, a successful appeal to the Court of Appeals for the Eighth Circuit after the district court ruled for the school district, and a later district court hearing. See 389 F.Supp. at 293 (dismissal of action by district court); 521 F.2d 530 (reversing adverse ruling on liability; the court drew heavily on the factual portion of the intervenors' brief of which I was the principal writer).

[d] In January 1987, I began assisting the North Mississippi Rural Legal Services program in the representation of the plaintiffs and class members in the case then styled Ayers v. Allain, Civ. Action No. 4:75CV009-B-O, Northern District of Mississippi. Ayers addressed the obligations of Mississippi officials regarding the State's eight public universities, three historically black and five historically white, a system long operated in a racially discriminatory and racially segregated manner. I have worked more than 8,000 hours on this case, with some monitoring of a consent decree continuing to the present. My overall work has also included: discovery; participating in lengthy liability hearings in April 1987 and May-June 1994, with the latter hearing more than 40 days; writing appellate briefs and arguing appeals; and participating in writing a successful petition for Supreme Court review and the brief on the merits [see United States v. Fordyce, 112 S.Ct. 2727 (1992) (dismissal of case reversed and governing remedial standard set forth)]. See the following citations evidencing my participation in the Ayers case: 893 F.2d at 732 (argued in panel appeal after first district court hearing); 914 F.2d at 676-77 (argued before Fifth Circuit en banc); 879 F.Supp at 1423 (district court ruling after hearing

following Supreme Court decision); 111 F.3d at 1188 (on brief for appeal to Fifth Circuit).

[e] The parties ultimately settled the Ayers case, with the financial aspects of the State's obligations requiring expenditures of of 384 million dollars. In July 2002, Trial Lawyers for Public Justice honored my co-counsel and me as "Trial Lawyer of the Year," for our work in attaining this settlement. See Exhibit 3 hereto.

[14.] In October 1995, I began working with John W. Walker and other persons in his firm. In my Arkansas work, overall, I have appeared before eight federal district court judges and five magistrate judges. In addition to school desegregation matters, I have worked on cases involving employment discrimination, voting rights, and citizens' Fourth and Fourteenth Amendment rights (arrest and detention, search, and use of force issues). See Taylor v. Howe, 225 F.3d 993 (8thCir. 2000) (voting rights); Young v. City of Little Rock, 249 F.3d 730 (8thCir. 2000) (continued detention and strip search, after court determined plaintiff not the subject of warrant and ordered her release).

I swear under the pains and penalties of perjury that the foregoing information, including that in my time records, is truthful to the best of my knowledge.

January 20, 2014

/s/ Robert Pressman
22 Locust Avenue
Lexington, MA 02421
781-862-1955
EHPressman@Verizon.net
Mass. Bar 405900