IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

LITTLE ROCK SCHOOL DISTRICT, *et al.*                                         PLAINTIFFS

VS.                                   CASE NO. 4:82-CV-00866 DPM

PULASKI COUNTY SPECIAL SCHOOL
DISTRICT, JACKSONVILLE/NORTH
PULASKI SCHOOL DISTRICT, *et al.*                                           DEFENDANTS

EMILY MCCLENDON, TAMARA EACKLES,
VALERIE STALLINGS, TIFFANY ELLIS,
and LINDA MORGAN                                                           INTERVENORS

INTERVENORS' BRIEF IN SUPPORT FOR THEIR
UNAPPOSED MOTION FOR ATTORNEY'S FEES AND COSTS

Introduction

      This class action school desegregation case commenced in 1982, when the Little Rock

School District (LRSD) sued the Pulaski County Special School District, and the North Little Rock

School District contending that said school districts committed constitutional violations that

resulted in white students fleeing from the LRSD, resulting in said school district becoming

resegregated.  Joshua Intervenors later renamed McClendon Intervenors joined in said lawsuit in

order to protect the rights of African American students and parents of said school districts.  The

parties entered into a consent decree (Plan 2000) in November 1999 to govern the school districts'

obligations toward African American students.  After years of litigation, and prodding from the

intervenors, on May 6, 2021, the Court entered an order finding that the  Pulaski County Special

School District had obtained unitary status, with the exception of its facilities' obligations, relative

to Mills High School project.  The Court directed the Pulaski County Special School District to

come up with a plan that will make the Mills High School campus equal to that of the Robinson

1

Middle School.  The Jacksonville/North Pulaski School District was found unitary, with the exception of presenting its 2018 Facilities Master Plan, as modified. [**Doc.  # 5730, p. 67**].  The Court also encouraged the parties to meet and confer about a reasonable attorneys' fees incurred by the Intervenors.  After negotiations having taken place, the parties have reached an agreement of $130,000.00 as an appropriate fee.

<u>Statement of Relevant Facts</u>

In 1982, the Little Rock School District (LRSD) sued the Pulaski County Special School District and the North Little Rock School District, contending that these school districts committed certain constitutional violations that resulted in the LRSD becoming re-segregated.  At this juncture, it will be helpful to provide the court with some historical perspective about this case, which the Intervenors concede that the Court is quite familiar with.

The United States Supreme Court decided the case of <u>Brown v. Board of Education of Topeka, Kansas</u> 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed 873 (1954).  As the Honorable Judge Henry Woods found, it was not until the 1971-1972 school year that the Pulaski County Special School District filed its desegregation plan, which was some seventeen (17) years after the mandate of <u>Brown v. Board of Education</u>, *supra*.  In a 1968 desegregation lawsuit that was filed in the case of <u>Zinnamon v. Board of Education of the Pulaski County Special School District</u>, United States District Court No. LR-68-154, the parties entered into a consent decree in June 1973.  As was mentioned by Judge Henry Woods, pursuant to the terms of the consent decree, the Pulaski County Special School District agreed *inter alia*, to the following terms:

A.      At least six black elementary school principals and two black secondary principals.

B.      School construction plans which are not racially discriminatory.

2

C.      Bi-Racial Committees and the appointment of two blacks as ex-officio members of the School Board.

D.      Use of the criteria found in *Swann* in the construction of new schools.

E.      Black teachers to be employed in proportion to the ratio of black pupils in the district.

F.      The assignment of pupils to various schools so that there would be no racially identifiable schools.

"In summary, the Pulaski County Special School District Board has failed to demonstrate any efforts or intentions to comply with the directives of the *Zinnamon* decree or to eliminate the last vestiges of segregation as required by Judge Henley's order." Little Rock School District v. Pulaski County Special School District, et al., 584 F.Supp. 328, 336-337 (1984).

On November 17, 1999, the Pulaski County Special School District filed a motion to have Plan 2000 approved by the court, and included in Plan 2000 was the Ross Plan. [**Doc # 3309**]. The remaining obligations of the PCSSD in reference to Plan 2000 are as follows: Section F – Student Discipline. Section (F)(1) obligates the PCSSD to gather data in order to allow a full assessment of its "success in achieving its objectives of eliminating racial disparities in the imposition of school discipline." The PCSSD is supposed to keep disciplinary records on school suspensions, expulsions and any disciplined imposed on students. The district is also supposed to identify the staff and teacher who imposed the discipline. Section (F)(2) requires the PCSSD to keep records on teachers and staff members who experience disparities in their disciplinary actions of students, and identify schools that have "atypically high racial disparities in discipline. Section (F)(3) requires the PCSSD to take remedial measures to assist any teacher or staff member and personnel to assist with achieving the goal of eliminating disparities in discipline. Section (F)(4) requires the PCSSD to conduct a comprehensive study of African-American students for the purpose of determining the causes of discipline disparities. The PCSSD is also required to conduct surveys

3

of African-American students in order to determine their experience in the school district and their views on disciplinary actions towards African-American students. Section (F)(5) requires the PCSSD to develop initiatives with the goal of reducing the disparities in discipline. Section (F)(6) requires the PCSSD to adhere to its student handbook when it comes to administering student discipline.

Section H deals with Facilities.  Section (H)(1) requires the PCSSD to have schools that are "clean, safe, attractive and equal."  The PCSSD has agreed that any schools built are to be equal, with Maumelle High School being the standard for construction.

Section M – Student Achievement.  The PCSSD obligated itself to adopt the Ross Plan and to improve student achievement.  The Education Plan for the PCSSD incorporated the goals of the Ross Plan adopts the following goals:

- to improve educational achievement by all students, with special attention to African-American students and others who are at-risk of academic failure due to socioeconomic disadvantages, or other factors.

- to decrease the performance gap between white students and African-American students through the systematic design/selection and implementation of intervention that provide effective remediation and/or adaptation to individual or group needs.

- to increase the number and proportion of African American and disadvantaged students participating in extracurricular activities, gifted programs and honors, enriched, and advanced placement courses.

- to reduce the number of discipline problems and classroom disruptions caused by all students, regardless of race or background.

- to increase student attendance and reduce suspensions and grade retentions for all students, regardless of race or background.

- to establish an ongoing, systematic evaluation system at individual schools and the district level to:

  - assess the progress made at the school and the district levels in achieving the educational goals

  - provided direction for "Education Plan" and educational program improvements, where indicated.

Section N – Monitoring.  Section (N)(1), imposed upon the Assistant Superintendent for Equity and Pupil Services the responsibility to develop a plan so that their staff will be able to monitor their compliance efforts on the specific elements of Plan 2000.  Section (N)(3) requires the PCSSD to develop statistical reports that (a) provide the enrollment of each school, (b) provide the enrollment for the gifted and talented programs, honors program, and advanced placement programs, (c) deals with special education, (d) for each school provide disciplinary numbers by race and by sex, (e) the racial make-up in each school, including administrators, faculty, other professional staff and support staff, (f) racial make-up for the various administrators, faculty, support staff, and other workers employed by the PCSSD.  Section N [sic] also provides for the court's continuing jurisdiction.

Plan 2000 was approved and adopted by the Court on February 22, 2000. [**Doc. # 3337**].

The Pulaski County Special School District filed its third motion for release from federal court supervision on March 25, 1999.  That motion was denied by Judge Susan Webber Wright. On October 29, 2007, the Pulaski County Special School District filed a motion for unitary status. After conducting a hearing on the petition for unitary status, The Honorable Brian S. Miller made

the following observations: "[i]n listening to Pulaski County's witnesses, it seems that Pulaski County has given very little thought, and even less effort, to complying with its desegregation plan. Complying with its plan obligations seems to have been an afterthought." [**Doc. #4507, p. 44**]. Judge Miller found that many of the district's student assignment reports were inadequate. "Although many reports were submitted, they fail to meet the requirements of the desegregation plan." The Court noted that many reports were missing, and "[t]he majority of reports fail to include a description of steps taken to eliminate one-race classes or the reasons it may be infeasible to eliminate such." [**Doc. # 4507, p. 49**].

On the issue of discipline, Judge Miller also found PCSSD had not complied with Plan 2000. "While Pulaski County may have implemented some portions of the discipline section of Plan 2000, the efforts made fall short of substantial compliance in good faith." [**Doc. # 4507, p. 60**]. Pulaski County presented the testimony of Dr. Christine Rossell. Dr. Rossell testified that it was not important for the PCSSD to comply with Plan 2000, only the outcome was important. [**Doc. # 4507, p. 61**]. During the hearing, PCSSD relied on the ACSIP plans, contending that it met the requirement to identify the race of the students disciplined. Pulaski County Special School District also created District Wide Management Plans (DMP). The Court found that the ASCIP plans that were relied upon by PCSSD did not focus on discipline disparities. The PCSSD also relied on Pathwise to address discipline issues, but this plan also failed to address discipline disparities. The Court found that "[f]or the past five years of Plan 2000, Pulaski County did little to nothing to comply with this subsection." [**Doc. 4507, p. 66**]. Judge Miller also found that the PCSSD failed to conduct a discipline study, that would come up with suggestions for prevention and intervention measures. [**Doc. 4507, p. 67**].

As it relates to facilities, Judge Miller found that the PCSSD failed to substantially comply with Plan 2000's facilities section. Judge Miller found that although the PCSSD complied with Plan 2000 by building Bates Elementary, the facility cost $6,291,462, and had equipment cost of $740,000.00  However, PCSSD built Chenal Elementary at a cost of $13,002,063 for 550 students in the affluent area of West Little Rock.  This broke down to a cost of $25,429.20 per student, while Bates was built for 863 students.  Dr. Brenda Bowles described the schools as Mercedes Benz (Chenal).   Chenal was like a $250,000.00 house versus that of Bates, which was a $100,000.00 house. [**Doc. # 4507, p. 75**].  Judge Miller also found that PCSSD built Maumelle High School at a cost of $58,000,000, when it was not necessary to do so.  Judge Miller found that the PCSSD failed to follow the recommendations of its construction experts "The Kahan" study. [**Doc. # 4507, p. 76**].  "The decision to build a state-of-the-art high school in Maumelle while other schools in less affluent communities languish in relative poor condition was not justified during the hearings."  [**Doc. # 4507, p. 76**].  Judge Miller concluded by saying,

> [s]imply put, the facilities in Pulaski County are not equal.  Children who live in predominantly black zones of the district attend older and smaller schools that are less instructionally functional and are less aesthetically attractive.  Yet children from the Maumelle and Chenal Valley area are privileged to attend newer, state-of-the-art schools.  Although the district argues that those serve a substantial number of black students, those black students are overwhelmingly interdistrict M-to-M transfers. Without those transfers, the schools in Maumelle and Chenal would be overwhelmingly white.

[**Doc. # 4507, p. 77**].

Judge Miller next dealt with the PCSSD's commitment to student achievement. Plan 2000 requires that the PCSSD address the student achievement gap between black and white students. Judge Miller noted:

> According to these goals [Ross Plan Goals], Pulaski County must in good faith implement and comply with a plan to improve general educational achievement while making good-faith efforts to close the achievement gap between white and

black students.  As such, the plan requires Pulaski Count to do more than simply
increase student achievement across the board; instead it requires Pulaski County
to pay specific attention to its black students and the achievement disparities that
attain between them and white students.

[**Doc. # 4507, p. 94**].

Pulaski County Special School District relied on its ACSIP plans.  Judge Miller found that

although PCSSD has ACSIP plans, this does not mean that it was meeting its obligations under

Plan 2000.  "Pulaski County must show that its ACSIPs specifically or effectively addressed the

general goals set forth in the Ross Plan, and these goals include targeting black students

specifically to decrease the achievement gap." [**Doc. # 4507, p. 95**].  Judge Miller noted that the

PCSSD hired an independent research group called The Research Group for the purpose of

assessing its implementation of the Ross Plan.  Judge Miller found that the PCSSD ignored the

recommendations of its own consultant.  Judge Miller stated that "Pulaski County needs to focus

on implementing and documenting intervention programs that are specifically targeted at

narrowing this achievement gap."  [**Doc. # 4507, p. 99**].  Judge Miller further stated that "[i]n

many ways, it appears that Pulaski County lost the Ross Plan amidst the requirements of the

Department of Education, as if desegregation became just an afterthought."  [**Doc. #4507, p. 99**].

Judge Miller found that the PCSSD failed to demonstrate good faith compliance to implement the

Ross Plan.  [**Doc. # 4507, p. 99**].

The PCSSD has a history of failing to honor its commitments under Plan 2000, as well as

other consent decrees that have been entered throughout the history of this case.  The PCSSD can

best be described as a school district that has resisted the mandates of *Brown v. Board of Education*

*I & II* throughout the remainder of the 20th Century, and is still putting up a fight well into the 21st

Century.  Judge Henry Woods found that "[t]he Pulaski County Special School District Board has

failed to demonstrate any efforts or intentions to comply with the directives of the *Zinnamon* [now

Plan 2000] decree or to eliminate the last vestiges of segregation as required by Judge Henley's order." 584 F.Supp at 337. That still holds true today.

Jacksonville North/Pulaski is an offspring of the Pulaski County Special School District. As this Court noted, "[t]he new District inherited all of PCSSD's remaining obligations under Plan 2000, the 'particularization of federal law applicable to these parties.'" [**Doc. # 5445, p. 1**], *citing* Knight v. Pulaski County Special School District, 112 F.3d 953, 955 (8th Cir. 1997).

Facilities

Dr. Janice Warren was hired as the Director of Elementary Education by Dr. Jerry Guess, when the PCSSD was under state control due to fiscal distress. Dr. Warren later became the Assistant Superintendent for Equity and Pupil Services. As the Assistant Superintendent for Equity and Pupil Services, part of Dr. Warren's job was to ensure that the district was operating in compliance with Plan 2000.

It was brought to Dr. Warren's attention by a parent that there existed disparities in the Mills and Robinson athletic facilities during August/September 2017. Dr. Warren asked Will Reid, the Director of Information Technology, to go to the school to take some video footage of the two (2) facilities. Dr. Warren stated that when Mr. Reid brought the video footage to her, he stated that "Janice, we are in %#$ trouble." Dr. Warren stated that after seeing the video footage of the two (2) schools, she realized that the district was out of compliance with Plan 2000 obligation when it came to equality of the facilities. Dr. Warren stated that after she saw the video footage of the two (2) athletic facilities, one at Mills and one at Robinson, she was convinced that the facilities were not equal, and that this was a *Plan 2000* violation. Dr. Warren also testified that she could not believe that the district spent the same amount of money on constructing a Middle School (Robinson), as was spent on building a new high school (Mills). Dr. Warren stated that a

high school needed more resources than a middle school, because a high school needed laboratories for science and chemistry, and other departments, that are not needed in a middle school.  Dr. Warren stated that she spoke with the football coach at Mills, after the school was almost completed, and he was initially excited about the new athletic facilities at Mills.  Dr. Warren stated that she then invited the Mills coach to take a tour of Robinson's facilities, and he came back sad and dejected, because he saw the inherent inequities between the two facilities.

Dr. Warren stated that after seeing the video footage, she contacted the board members, and the attorney for the district, Sam Jones, to report what she had found. At the time that Dr. Warren discovered the Plan 2000 violation in September 2017, the PCSSD Board of Education had seven (7) members – five (5) Caucasian and two (2) African-American.  Dr. Warren stated that when everyone saw the video footage, they all walked away with the same impression, that the facilities were not equal and that the district had a problem. After Dr. Warren had a conversation with Sam Jones, and told him about the inequities of the facilities, he filed a supplemental report with the Court.  Prior to this information coming to Dr. Warren's attention, Mr. Jones had just filed a report with the court indicating that the PCSSD had made good faith efforts.  Mr. Jones filed a report with the court bringing this matter to the Court's attention, and the district was investigating the matter.  [**Doc.# 5322**].  After this report was filed with the Court, Judge Marshall directed Margie Powell to go out and look into the matter, and report back to the Court.  Dr. Warren also testified that Derek Scott developed a plan for changing attendance zones and feeder patterns.  While his presentation suggested neutrality, when it actually occurred, Dr. Warren became aware that the changes were suppressing the school enrollment in schools in the Southeast sector in the PCSSD, and she was very concerned.

Dr. Warren talked about the inequities of the facilities as it relates to the Mills' construction, as compared to Robinson Middle School, Maumelle High School, and now Sylvan Hills High School.  Dr. Warren stated that comparing Mills High School to Robinson Middle School was like comparing "apples to oranges."  Dr. Warren also testified that when you compare Mills High School to the new Sylvan Hills High School, there is "no comparison."  Dr. Warren stated that when she presented the video to other district officials, they all walked away with the impression that there was definitely an inequity between the two (2) facilities, and that the district was in trouble.

<u>Unitary Status Hearing – October 2020</u>

Jacksonville/North Pulaski School District presented its case during  the  October 2020 school unitary hearing.  Intervenors vigorously opposed the district's motion for unitary status. The Court ultimately found  the Jacksonville/North School District unitary, but ordered that it must complete its 2018 Facilities Master plan as modified, in order to be declared unitary.  Intervenors have been working with the Jacksonville/North School District towards this end. [**Doc.  # 5730, p. 67**].

<u>Statement of Law</u>

**<u>Plaintiff is the Prevailing Party for Purposes of 42 U.S.C. § 1988 Fee Award</u>**

"A prevailing party must be one who has succeeded on any significant claim affording it some of the relief sought, either *pendente lite* or at the conclusion of the litigation."  <u>Texas Teachers v. Garland School District</u>, 489 U.S. 782, 791, 103 L.Ed.2d 866, 876, 109 S.Ct. 1486 (1989), (emphasis added).  The Court in *Garland* went on to say that "[i]f the plaintiff has succeeded on 'any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit,' the plaintiff has crossed the threshold to a fee award of some kind.'  489

U.S. at 792, 103 L.Ed.2d at 877, *quoting* Nadeau v. Helgence, 581 F.2d 275 (1ˢᵗ Cir. 1978).  "It is generally true that status assessment of how a party fares on each motion along the way."  Jenkins by Jenkins v. State of Missouri, 115 F.3d 554, 557 (8ᵗʰ Cir. 1997).

> The United States Supreme Court held that:

> [i]n order to qualify for attorney's fees under § 1988, a plaintiff must be a 'prevailing party.'  Under our 'generous formulation' of the term, 'plaintiffs may be considered 'prevailing parties' for attorney fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'  Hensley v. Eckerhart, 461 U.S. 424, 433, 76 L.Ed.2d 40, 103 S.Ct. 1933 (1983) (*quoting* Nadueau v. Helgenmoe, 581 F.2dd 275, 278-279 (CA1 1978).

Farrar v. Hobby, 506  U.S. 103, 109, 121 L.Ed.2d 494, 113 S.Ct. 566 (1992).  *See also*, Allen v. Higgin, 902 F.2d 682 (8ᵗʰ Cir. 1990).  The Supreme Court in *Hobby* went on to hold that "[i]n short, a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff."  121 L.Ed.2d at 503.

In the case at bar, the Intervenors had an obligation of defending *Plan 2000*.  Intervenors played a vital role in getting the Jacksonville/North Pulaski School District to the point of unitary status.  Intervenors acted like an agitator in a washing machine.  Without the agitator, clothes cannot become clean.  As demonstrated herein, this has been a long-standing school desegregation case, whereby the intervenors as prevailing parties have been defending a consent decree (*Plan 2000*) for the past twenty-one (21) years.  As the Eighth Circuit stated:

> Complex civil rights cases seldom end with the grant of a permanent injunction. The injunction must be implemented, that process must be monitored, and lingering or new disputes over interpretation of the decree must often be presented to the court for resolution.  These functions take time and effort by the prevailing party's attorney.  Therefore, it is generally accepted that prevailing plaintiffs are entitled to post-judgment fee awards for legal services necessary for reasonable monitoring of the decree.

<u>Association for Retarded Citizens of North Dakota, et al., v. Schafer, et al</u>., 83 F.3d 1008, 1010-1011 (8th Cir. 1996), *citing*, <u>Stewart v. Gates</u>, 987 F.2d 1450, 1452 (9th Cir. 1993); <u>Garrity v. Sununu</u>, 752 F.2d 727, 738 (1st Cir. 1984).

Intervenors had an obligation to get involved in this case some thirty (30) years ago in order to protect the rights of African American parents and children of then three school districts. Intervenors had to participate in every stage of this case, due to the constitutional violations of the school districts. Although both districts (Pulaski County Special School District [PCSSD] and Jacksonville/North Pulaski School District) have achieved unitary status, with the exception of tying up some loose ends, this was due to the prodding of the intervenors, to get the districts to a place whereby the rights of African American children are being better protected. It took the efforts of the intervenors, along with the Court, to get a constitutional violator to come into compliance; to do what it should have a long time ago.

> This procedure certainly called for reasonable post-judgment monitoring. Plaintiffs could not simply walk away from the Panel's inquiry; the district court expected them to participate. Thus, as in <u>Plyler v. Evatt</u>, 902 F.2d 273, 281 (4th Cir. 1990), 'plaintiffs' counsel were under clear obligation to make the defensive effort,' and in such situations, even largely unsuccessful defensive efforts may be compensable. *See also* <u>Hatfield v. Hayes</u>, 877 F.2d 717, 720 (8th Cir. 1989).

<u>Association for Retarded Citizens of North Dakota, et al. v. Schafer, et al</u>., 83 F.3d 1008, 1010-1011 (8th Cir. 1996) (emphasis added).

As the Fourth Circuit stated:

> Plaintiff's class had no option but to incur the related costs; plaintiffs' counsel were under clear obligation to make the defensive effort. *See* <u>Ustrak v. Fairman</u>, 851 F.2d 983 (7th Cir. 1988) (civil rights plaintiff was entitled to fees in connection with largely unsuccessful appellate defense because 'he had no choice but to incur them or forfeit his victory in district court'). To deny attorney fees for such an effort, whether successful in detail or not, would obviously thwart the underlying purpose of the attorney fee provision of 42 U.S.C. § 1988. For that reason and because the litigation in *Plyler I* involved comprehensive inquiry into 'the significance of the

overall relief claimed,' <u>Hensley</u>, 461 U.S. at 435, 103 S.Ct. at 1940, the district court did not abuse its discretion or err as a matter of law in concluding that the matters at issue in *Plyler I* were so intertwined with the original claims that attorney's fees for work on those proceedings should be awarded as to a still 'prevailing party.'

<u>Plyler, et al. v. Evatt, et al</u>., 902 F.2d 273, 281 (4th Cir. 1990).

In conclusion, the Court should award intervenors their *negotiated* attorneys' fees.  Counsel for intervenors have spent considerable time and effort, and costs in having to defend the consent decree (*Plan 2000*) in this case.  The parties have engaged in negotiations over the proper fees to award counsel for intervenors, and these negotiations have resulted in a significant amount of time being thrown to the wind.  Therefore, the Court should  award intervenors' counsel fees as negotiated herein.

Respectfully submitted,

Austin Porter Jr., No. 86145
PORTER LAW FIRM
323 Center Street, Suite 1035
Little Rock, Arkansas 72201
Telephone: 501-244-8200
Facsimile: 501-372-5567
Email: aporte5640@aol.com

Robert Pressman
22 Locust Avenue
Lexington, MA  02421
Telephone: 781-862-1955
Email: pressmanrp@gmail.com

Joyce Raynor Carr
JOHN W. WALKER, P.A.
1723 S. Broadway
Little Rock, Arkansas 72206
Telephone: 501-374-3758
Facsimile: 501-374-4187

jraynorcarr@gmail.com

Shawn G. Childs
Lawrence A. Walker
WALKER & CHILDS, PLLC
1815 S. State Street
P. O. Box 3462
Little Rock, Arkansas 72206
Telephone: 501-287-8680
Facsimile: 501-222-8872

schilds@walkerandchilds.com
lwalker@walkerandchilds.com

ATTORNEYS FOR INTERVENORS


## CERTIFICATE OF SERVICE

I, Austin Porter Jr., do hereby certify that a copy of the foregoing pleading was electronically filed with the Clerk of the United States District Court for the Eastern District of Arkansas, on this 6th day of August 2021, by using the CM/ECF system, which is designed to send notification of such filing to the following person:

M. Samuel Jones III.
Devin R. Bates
MITCHELL, WILLIAMS, SELIG,
GATES & WOODYARD, PLLC
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201

sjones@mwlaw.com
dbates@mwlaw.com

Jay Bequette
Bequette, Billingsley & Kees, P.A.
Attorneys at Law
425 West Capitol Avenue, Suite 3200
Little Rock, Arkansas 72201-3469

jbequette@bbpalaw.com

Scott P. Richardson
McDaniel, Richardson & Calhoun PLLC
1020 West 4th Street, Suite 410
Little Rock, Arkansas 72201

scott@mrcfirm.com

Austin Porter Jr.