## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

**LITTLE ROCK SCHOOL DISTRICT,**                    **PLAINTIFFS**
*et al.*

**v.**                          **No. 4:82-cv-866-DPM**

**NORTH LITTLE ROCK SCHOOL DISTRICT,**              **DEFENDANTS**
**et al.**

**EMILY MCCLENDON, et al.**                         **INTERVENORS**

**STATE OF ARKANSAS,**                              **THIRD-PARTY**
**SECRETARY OF EDUCATION JOHNNY KEY,**              **DEFENDANTS**
**IN HIS OFFICIAL CAPACITY;**
**DIRECTOR TIM CAIN,**
**IN HIS OFFICIAL CAPACITY**

## THIRD-PARTY COMPLAINT

Jacksonville/North Pulaski School District (JNPSD), through its attorneys

Scott P. Richardson, states as follows for its *Third-Party Complaint*:

## I. <u>RESIDENCY & PARTIES</u>

1.      At the time of the events material to this Complaint, Defendant/Third

Party Plaintiff Jacksonville North Pulaski School District is a school district in

Pulaski County, Arkansas.

2.      Third-Party Defendant, the State of Arkansas .

3.      Third-Party Defendant Johnny Key, is the Cabinet Secretary of the

Department of Education for Arkansas and is the Commissioner of Education with

the Division of Elementary and Secondary Education (or "DESE" formerly the



1

Arkansas Department of Education). Secretary Key is responsible for implementing the education funding priorities of the State of Arkansas.

4.      Third-Party Defendant Tim Cain is the Director of the Arkansas Division of Public School Academic Facilities and Transportation. Dir. Cain is responsible, in part, for overseeing school facilities projects in Arkansas and helping to meet the State's obligation to provide adequate and equitable facilities to students across the State including in the Jacksonville North Pulaski School District.

5.      Third-Party Defendants will be collectively referred to herein as "the State."

## II. JURISDICTION & VENUE

6.      This is an action for declaratory relief and injunctive relief to redress deprivation of rights secured to the Plaintiffs, Intervenors, and the students and parents of JNPSD. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. §§ 1981, 1983, 1988.

7.      Alternatively, the Court has ancillary jurisdiction over JNPSD's claims because they are incidental to other matters properly before this Court; because the claims raised herein are interdependent with the claims currently before this Court; and because the relief requested herein will enable the court to function successfully, to manage its proceedings, vindicate its authority, and effectuate its decrees.

8.     Venue is proper pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to this claim occurred in the Eastern District of Arkansas.

### III.  BASIC PREMISE

9.     The State of Arkansas has exacerbated one of the remaining vestiges of segregation in this case by refusing to partner with JNPSD to remedy the unequal facilities in the District.

### IV.  FACTS

10.     The unconstitutionally segregated condition of school facilities in JNPSD stretches back to the early days of this case. On August 7, 1968, a group of students and parents of Pulaski County Special School District ("PCSSD") lead by Karen and Duiella Zinnamon brought suit to integrate the PCSSD. The Zinnamon plaintiffs alleged among other things that the schools operated by PCSSD were racially identifiable as black and white schools and that those "schools operated by defendants for Negro pupils are inferior to those schools operated for and attended by predominantly white student bodies." Zinnamon Complaint p. 3-4. The Zinnamon Plaintiffs specifically alleged that the "physical facilities" of the schools for black students were "inferior" to those provided for white students

11.     On August 14, 1970, the Court held that the PCSSD did remain segregated and made findings regarding the dual nature of the school buildings in the District. Zinnamon Order p. 8-9.

12.     The State of Arkansas, for its part, has never taken any affirmative steps to address the racially segregated facilities in PCSSD.

13.     On November 22, 2013, the Court gave preliminary approval to a settlement of the State's involvement in this case. The settlement agreement included a provision allowing for "the creation of a Jacksonville/North Pulaski area school district consistent with state law." DE # 5063, Consent Judgment Ex. 1 p. 5.

14.     The purpose of this provision was to address the substantial facilities issues that faced PCSSD. At the time of the Settlement Agreement, the State of Arkansas had adopted a facilities funding program by which it would partner with school districts to provide funding for facilities construction, maintenance, and upgrade; known as the Academic Facilities Partnership Program. Ark. Code Ann. § 6-20-2507.

15.     The Partnership Program utilized the Academic Facilities Wealth Index (among other things) to determine what level of funding the State would provide to qualifying facilities projects. The Index provided a list that allowed school districts with a lower local wealth[1] to receive more state funds to assist with facilities projects, while school districts with higher local wealth received less state funds to assist with facilities projects.

---

[1]     Generally, a district's "local wealth" means the amount of money that may be generated through passage of property taxes measured in mills per assessed value of property. Districts leverage the property taxes through sale of bonds to generate funds up front to fund facilities projects. Districts with higher property values can generate more funds per mill, which in turn allows them to fund more projects. Districts with lower property values generate less funds per mill.

16.     PCSSD qualified for only minimal assistance under the Partnership Program because it had one of the highest assessed values in the State. The State would only provide up to 5% of any qualifying project (e.g. $5,000 on a $100,000 project).

17.     At the time of the Settlement Agreement, it was understood that if Jacksonville and the North Pulaski area detached from PCSSD, that new school district would have a lower wealth index and, thus, qualify for significant State funds for facilities projects.

18.     The facilities needs in Jacksonville were serious at the time.

19.     The inadequacy and poor condition of JNPSD's facilities has been recognized for decades. *See LRSD v. PCSSD*, 2011 WL 1935332 p. 37-39.  Judge Brian Miller relied, in part, on the poor condition of facilities in Jacksonville to deny unitary status to PCSSD in 2011. He specifically cited testimony about the facilities including "broken commodes, falling ceiling tiles, holes in the ceiling, exposed wiring, and an unsound stage floor." *Id.* at 38.

20.     Judge Miller specifically found that "given the deteriorating facilities in Jacksonville, it seems Pulaski County does not care whether it provides equal facilities to all of the students in the district." *Id. see also LRSD v. PCSSD,* 664 F.3d 738, 752 (8th Cir. 2011)(noting Jacksonville's school facilities were "deteriorating").

21.     Accordingly, in the 2013 and 2014 hearings regarding settlement of the State's continuing role in the case, the Court heard testimony about the continuing poor condition of the school facilities in the Jacksonville area.

22.     At the preliminary approval hearing on November 22, 2013, counsel for

the State represented to the Court:

> in 2003 when Jacksonville tried before and the Court rejected that
> effort, the state was not assisting in building facilities for school
> districts. Now the state has the partnership program by which it
> assists some school districts with facilities construction programs and
> that Jacksonville, if it was created, would qualify for some level of
> participation in the partnership program, which would assist in
> addressing the facilities issues in Jacksonville.

Transcript p. 8.

23.     Counsel for the Joshua Intervenors represented to the Court that the

Intervenors agreed to the creation of a new Jacksonville area school district

because:

> Jacksonville will be in a position where it can take advantage of
> substantial resources not otherwise available to Pulaski County in
> order to cause the facilities in that portion of the district to be made
> more equal to those which have recently been authorized, I have
> contended unwisely to the Court, such as those in Chenal and
> Maumelle.
>
> The reason for that is that, as I understand it, the state funding will
> provide more than 50 to 60 percent of the equalization cost for those
> new schools, those schools that they may authorize themselves.

Transcript p. 10-11.

24.     Counsel for PCSSD represented to the Court:

> when [PCSSD] was declared by the state to be in fiscal distress, looked
> at the matter, determined that it would be better off and more nearly
> able to attain unitary status in the area of facilities sooner if it did not
> have continued responsibility for the Jacksonville facilities.
>
> As it turns out, in one of the quirks of state school funding, if you
> waved a magic wand and created a Jacksonville School District
> tomorrow, and this is a slightly moving target, it would qualify for a
> partnership share from the state for the building or remodeling of new
> facilities in the order of magnitude of around 50 percent. It varies

either side of that line, depending on how many kids are there and what the local wealth is there at a particular time. Whereas in the Pulaski District today, if we were to apply to the state with the district configured as it is for partnership assistance, our state share would be 1/2 of 1 percent.

Transcript p. 13-14.

25.     Moreover, the State committed prior to the preliminary fairness hearing that "PCSSD's pursuit of unitary status will remain a priority for the Commissioner and the ADE." DE # 4938, *Brief in Support of Joint Motion For Preliminary Approval of Class Action Settlement* p. 9; *see also* Transcript p. 37.

26.     On January 13, 2014, following a fairness hearing, the Court approved the settlement agreement. DE # 4980, Order.

27.     On or about November 13, 2014, the Arkansas State Board of Education authorized the creation of JNPSD subject to a two-year transition period during which it would operate under the administration of PCSSD.

28.     At that time, PCSSD remained non-unitary in the area of school facilities in this case.

29.     Pursuant to an earlier Consent Judgment of this Court, (DE # 5063) upon its creation, JNPSD inherited the remaining obligations of PCSSD in this case.

30.     In the Consent Judgment, the Court broadly held that it "retains jurisdiction as necessary should a Jacksonville North Pulaski Area School District be created by the State."

31.     This retention of jurisdiction was a carve out from the broad dismissal of the State in this matter otherwise effectuated by the Consent Judgment.

7

32.     The purpose of this carve out was to allow the Court to exercise jurisdiction over the State if any disputes arose regarding the new proposed District.

33.     The State of Arkansas nor it agencies, such as the Division of Elementary and Secondary Education, have requested release of this retention of jurisdiction.

34.     This retention of jurisdiction has not been released by the Court.

35.     At the time of the Consent Judgment, JNPSD did not exist and was not a party to this case.

36.     JNPSD was not a party to the settlement agreement.

37.     The State Board of Education created the JNPSD by order dated November 14, 2014.

38.     The Court initially denied JNPSD party status. DE 5118, Order filed May 19, 2015.

39.     Although, counsel for JNPSD was allowed to appear and file papers with the Court as needed.

40.     Five months later, the Court recognized for the first time JNPSD's responsibility "to this Court for achieving unitary status in facilities. . . ." DE 5165, Order p. 2, filed Oct. 14, 2015. The Court also first required JNPSD to file its Facilities Master Plan with the Court for approval. *Id.* at p. 3.

41.    From that point, the Court has actively monitored JNPSD's facilities planning for compliance with JNPSD's constitutional obligations as particularized in Plan 2000 and the Court's orders.

42.    On December 2, 2015, JNPSD filed its first Status Report and submitted its first draft facilities master plan. DE 5171, Status Report.

43.    That master plan called for building a new school to replace Arnold Drive Elementary and Tolleson Elementary Schools, building a new High School, and adding multi-purpose buildings to the remaining four elementary schools.

44.    The Court did not accept this master plan, but required the parties to negotiate over the plan. DE # 5178, Order filed December 18, 2015.

45.    The Joshua Intervenors opposed JNPSD's proposed master plan. DE # 5183 *Joshua Intervenors Response to JNPSD's Proposed Facilities Master Plan, etc.* They argued that JNPSD should not focus on Arnold Drive and Tolleson Elementary Schools, but, instead, should focus on "the black area schools" (in particular, Taylor Elementary School). *Id.* p. 4-5. The Intervenors rejected JNPSD's contention that these school facilities were in adequate condition.

46.    The Joshua Intervenors insisted that all schools in JNPSD be replaced as soon as reasonably possible. *Id.* p. 7-8.

47.    On January 14, 2016, the Court ruled on the propriety of JNPSD's proposed master facilities plan. DE # 5187 Order. The Court noted that "all the elementary schools need replacing sooner rather than later." *Id.* p. 2. It approved the plan as written, but required a "plan or timetable for replacing the other four

9

elementary schools (Bayou Meto, Dupree, Pinewood, Taylor)." *Id.* The new plan was required to be filed by 31 December 2016. *Id.* p. 4-5.

48.     On March 9, 2016, JNPSD provided to the Court Facilities Condition Index ("FCI") reviews by DPSAFT that showed FCI of less than 65% for four facilities in JNPSD, including Bayou Meto and Taylor Elementary Schools. DE # 5201, *JNPSD Response to Joshua Intervenors' Report to the Court* p. 2-3. JNPSD posed the question to the Court: "whether full, new construction is required by the Court's Order for every JNPSD facility, or, if the facts demonstrate that renovation of one or more facilities would satisfy the requirement of substantial equality, is renovation an option that may be considered by the District." *Id.*

49.     The Joshua Intervenors offered a resounding "NO" to the question JNPSD posed. DE # 5204, *Joshua's Comments to the Court Regarding JNPSD's Response to Joshua Intervenors Report Court.*

50.     At a March 16, 2016, status conference, the Court agreed with the Joshua Intervenors. Only full replacement of the facilities would bring about constitutional compliance for JNPSD.

51.     The Court ruled this way, in part, because of the poor, inadequate condition of the facilities (including Taylor Elementary School).

52.     On April 4, 2016, JNPSD was granted full party status. DE # 5210, Order.

53.     On November 23, 2016, JNPSD submitted to the Court it's 2017 Preliminary Master Facilities Plan with additions intended to comply with the

Court's January 14, 2016, Order. DE # 5278, *Status Report*. The plan anticipated replacement of Jacksonville High School, replacement of Arnold Drive and Tolleson Elementary Schools (which was occurring at the time), replacement of Pinewood and Dupree Elementary Schools with one school building by August 2022, replacement of Taylor Elementary by August 2033, and Bayou Meto Elementary by 2033. DE # 5278-1, *Status Report* Ex. 1. The Middle school (housed in the former North Pulaski High School facility) was planned for substantial renovation.

54.     The Joshua Intervenors responded that the proposed plan failed to meet constitutional requirements. DE # 5279, *Joshua Intervenors' Response to JNPSD's Facilities Plan* filed Nov. 29, 2016.  The Joshua Intervenors specifically contended that a shorter replacement schedule was needed because of the "woeful facilities, especially those attended primarily by African American students." *Id.* at p. 2.

55.     The Court did not rule at that time on whether the 2017 Preliminary Master Facilities Plan complied with JNPSD's constitutional obligations. DE # 5286, *Order* entered Dec. 9, 2016. Instead, a trial date was set for February 5, 2018 on the question. *Id.* and DE # 5300, *Final Scheduling Order – JNPSD Staffing and Facilities* entered April 7, 2017.

56.     The Intervenors vigorously pursued the theme of inadequate facilities that must be replaced as quickly as possible. DE # 5325, *Joshua's Comments for the Status Conference*, filed Sept. 7, 2017.

57.     In their response to JNPSD's Motion for Unitary Status (DE # 5328, Motion, 5329 Brief in Support), the Joshua Intervenors noted testimony from former PCSSD Superintendent Dr. Jerry Guess (hired by the State): "I am certainly aware of the condition of the facilities in Jacksonville and agree with you that they are in horrific shape. The students in Jacksonville/North Pulaski School District should have better facilities." DE # 5335, *Joshua Intervenors' Brief in Opposition to the JNPSD Unitary Status Motion*, filed October 6, 2017, p. 14 *quoting* May 19, 2015, *Status Hearing Transcript.*

58.     The Intervenors singled out for particular criticism the "proposal for delaying replacement of the Taylor Elementary School until 2035." *Id.*

59.     The facilities issue came for trial before the Court beginning February 5, 2018. The issues were fully contested between the parties.

60.     On September 25, 2018, the Court entered an order determining that the vestiges of segregation in the area of facilities continued in JNPSD, but that "[i]f JNPSD implements and completes its 2018 master facilities plan, as modified, it will be unitary in facilities." DE # 5445, p. 8.

61.     The Court held: "The intervenors are right. Sixteen years is just too long to make the children attending Taylor, about 70% of whom are black, and Bayou Meto, more than 80% of whom are white, wait for facilities that are equal to other JNPSD elementary schools, especially the new one." *Id.* at 5.

62.     The Court required JNPSD to modify its facilities plan including:

- The replacement elementary schools will be completed as quickly as possible;

- JNPSD will apply for state funding through the partnership program, or the then-existing equivalent program, no later than year one of the 2023-2025 project funding cycle for support of the Taylor elementary and Bayou Meto elementary replacement projects;

DE # 5445, *Order* p. 7.

63.    Prior to 2019, the State calculated the Academic Facilities Wealth Index (Wealth Index) as a function of a districts millage and assessment as compared to other school districts.

64.    The State uses the Wealth Index to calculate the proportion of funding for a given academic facilities project that will come from the State.

65.    "Academic facilities" is defined narrowly under State law to include only a building or space . . . where students receive instruction that is an integral part of an adequate education as described in [Ark. Code Ann.] § 6-20-2302." Ark. Code Ann. § 6-20-2502(2).

66.    The Program of Requirements is the tool used by DPSAFT to establish the minimum adequate components of a given academic facilities project.

67.    In brief, the Program of Requirements is based on the projected maximum enrollment of a school. When planning a new campus a school district inputs the projected enrollment, then the POR calculates total square footage for the Academic Facilities and the required minimums for the various spaces within the Academic Facility.

68.    The Wealth Index is applied to a total cost (i.e. the Project Cost) derived from the square footage determined by the Program of Requirements multiplied by a per square foot amount known as the Project Cost Funding Factor.

69.     Currently, the Project Cost Funding Factor is set at $200 per square foot.

70.     DPSAFT will not fund projects above the Project Cost Funding Factor even if the actual costs are well above $200 per square foot.

71.     In the 2019 legislative session, the 92nd General Assembly changed the Wealth Index so that beginning in fiscal year[2] 2024-2025 the Wealth Index would adjust for the household median income in the district. Act 1080 of 2019 codified at Ark. Code Ann. 6-20-2502(1) (Repl. 2019).

72.     Prior to 2019, JNPSD's Wealth Index was about 47%, meaning that the State would fund 47% of a given academic facilities project in JNPSD with the District expected to contribute 53% of the total allowable cost.

73.     On or about April 11, 2019, DPSAFT released calculations of each school district's Wealth Index under the revised formula.

74.     In that calculation, JNPSD's Wealth Index dropped from about 47% to about 43.6%.

75.     The change in Wealth Index was set to take place beginning with the 2024-25 fiscal year.

76.     Thus, JNPSD decided to apply for funding for the Bayou Meto Elementary and Taylor Elementary projects early so that it could take advantage of the 47% Wealth Index.

---

[2]     The State fiscal year runs from July 1 to June 30 of the following year.

77.     On September 6, 2019, JNPSD submitted to DPSAFT the Bayou Meto and Taylor Elementary projects for preliminary review for the 2021-23 project funding cycle.

78.     For the Taylor Elementary replacement project, DPSAFT projected state funding of $1,385,017.47 of the expected $16,000,000 total cost of the project. Ex. 1, Preliminary Project Review Summary Report.

79.     DPSAFT determined that Taylor Elementary "was not eligible for state participation for total replacement." Ex. 2, DPSAFT Response to Appeal.

80.     DPSAFT denied funding for total replacement because of the low FCI and the "relatively young age (38+ years)" of the facility.

81.     DPSAFT knew that this Court had required JNPSD to replace Taylor Elementary as part of JNPSD's desegregation obligations.

82.     DPSAFT did not consider JNPSD's desegregation obligations when making its funding decisions.

83.     DPSAFT did not consider this Court's rulings regarding Taylor Elementary when making its funding decisions.

84.     What funding DPSAFT agreed to provide was based on the difference between the projected size of an adequate facility under the Program of Requirements and the actual size of Taylor Elementary.

85.     For the Bayou Meto Elementary replacement project, DPSAFT projected state funding of $4,163,167.46 of an expected $14,500,000 total cost of the project. Ex. 1, Preliminary Project Review Summary Report.

86.     The State subtracted 9,000 square feet from the total project square footage for each school based on the multi-purpose buildings at each school.

87.     This resulted in a reduction for each project of over $800,000 in Partnership Program Funding.

88.     DPSAFT knew that this Court had required JNPSD to replace Taylor Elementary as part of JNPSD's desegregation obligations.

89.     DPSAFT did not consider JNPSD's desegregation obligations when making its funding decisions.

90.     DPSAFT did not consider this Court's rulings regarding Taylor Elementary when making its funding decisions.

91.     JNPSD appealed DPSAFT's preliminary review decision to the Academic Facilities Review Board ("the Board"). Ark. Code Ann. 6-20-2513.

92.     DPSAFT opposed JNPSD's appeal.

93.     DPSAFT took the position that this Court's rulings had no bearing on whether Taylor Elementary should be approved for replacement.

94.     The Board denied JNPSD's appeal.

95.     In its order the Board made no reference to JNPSD's desegregation obligations or this Court's orders.

96.     The Board's order was drafted by an attorney employed by DESE.

97.     JNPSD then appealed the Board's decision to the Commission for Arkansas Public School Academic Facilities and transportation (the "Commission"). Ark. Code Ann. 6-20-2513(a)(2).

98.     The Commission consists of the Secretary of the Department of Finance and Administration, the Commissioner of Elementary and Secondary Education, and the President of the Arkansas Development Finance Authority. Ark. Code Ann. 6-21-114(a).

99.     DPSAFT in both appeals was represented by DESE General Counsel who works directly for the Commissioner of Elementary and Secondary Education.

100.    DPSAFT's Response made explicit its position that neither this case nor the Fourteenth Amendment to the U.S. Constitution had any bearing on its funding decisions vis-à-vis JNPSD.

101.    DPSAFT specifically rejected the notion that "the Division should consider that JNP needs money to meet its federal desegregation obligation when making Partnership Program determinations."

102.    DPSAFT also recognized that Arkansas statutes and regulations require school districts (including JNPSD) "to adhere to their civil rights obligations. . ., to continue efforts toward attaining unitary status . . ., and to follow federal and state law."  Ex. 2, DPSAFT Response p. 14.

103.    DPSAFT argued, however, that none of these laws or regulations had any applicability to its decisions under the Partnership Program.

104.    DPSAFT tacitly acknowledged that if JNPSD failed to comply with this Court's orders "the District could lose accreditation and its state funding would be at risk." *Id.*

105.   DPSAFT countered that "these arguments currently are hypothetical because neither of these actions have been taken or threatened." *Id.*

106.   The Commission met June 3, 2020 and unanimously voted to deny the District's appeal. Ex. 4, Order.

107.   The State of Arkansas, the Arkansas Department of Education, and the State Board of Education have been found by federal courts to have intentionally segregated schools in Arkansas.

108.   No court has ever declared the State of Arkansas, the Arkansas Department of Education, or the State Board of Education unitary in education.

109.   No court has ever found that the State of Arkansas, the Arkansas Department of Education, or the State Board of Education have remedied the vestiges of segregation in Arkansas public schools because of their violations of or participation in violations of the Fourteenth Amendment.

## Count I
## Injunctive Relief *Ex parte Young*

110.   District Courts are authorized to issue injunctive relief "as necessary to permit the federal courts to vindicate federal rights." *Virginia Office for Protection and Advocacy v. Stewart*, 563 U.S. 247, 254-55 (2011).

111.   A lawsuit may proceed under *Ex parte Young*, where the "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Id.*

112.   While money damages are not available under *Ex parte Young*, injunctive relief may issue even though it may have "substantial ancillary effect on the state treasury." *Papasan v. Allain*, 478 U.S. 265, 278 (1986).

113.   The Fourteenth Amendment of the United States Constitution imposes on states an affirmative obligation to assist school districts with their desegregation efforts. LRSD v. PCSSD, 597 F.Supp. 1220, 1227 (E.D. Ark. 1984).

114.   Arkansas educational agencies in particular have this obligation. Their "failure or refusal to fulfill this affirmative duty continues the violation of the Fourteenth Amendment." *LRSD v. PCSSD*, 778 F.2d 404, 410 (8th Cir. 1984).

115.   This affirmative duty arises under federal case law and federal statutory law. 20 U.S.C. 1703. "No State shall deny equal educational opportunity to an individual on account of his or her race [or] color . . . by . . . the failure of an educational agency which has formerly practiced such deliberate segregation to take affirmative steps . . . to remove the vestiges of a dual school system." 20 U.S.C. 1703(b).

116.   Secretary Key and Director Cain have violated their obligations under the Fourteenth Amendment by refusing to consider the desegregation obligations of JNPSD in this case.

117.   Secretary Key and Director Cain know that this Court has held that the current condition of the facilities in JNPSD is a vestige of segregation.

118.    Secretary Key and Director Cain know that this Court has issued remedial orders designed to remedy the vestiges of segregation in JNPSD in the area of facilities.

119.    Secretary Key and Director Cain also know that the Partnership Program is an important component of JNPSD's ability to comply with the desegregation obligations imposed on it by this Court.

120.    JNPSD has made every effort to comply with its desegregation obligations in this matter.

121.    Secretary Key and Director Cain, however, have refused to give any weight to this Court's desegregation orders in determining whether replacement of Taylor Elementary School is warranted.

122.    Secretary Key and Director Cain have rejected this Court's determination that Taylor Elementary School requires replacement.

123.    Secretary Key and Director Cain have taken the position that the State is under no obligation to consider the segregative impact in JNPSD of their decisions under the Partnership Program.

124.    As such, Secretary Key and Director Cain have refused to allow the DPSAFT to approve funding for the replacement of Taylor Elementary School even though they know that DPSAFT's approval is necessary for JNPSD to comply with its desegregation obligations in this matter.

125.    By refusing approval of replacement of Taylor Elementary School, Secretary Key and Director Cain are causing segregation to continue in JNPSD.

126.    Injunctive relief is necessary to prevent Secretary Key and Director Cain from continuing the constitutional violation that currently exists in JNPSD.

## Count II
## Desegregation Remedial Relief

127.    In the desegregation context, District Courts are invested with "broad remedial powers." *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 16 (1971). "Injunctions issued to enforce school desegregation orders are part of the equity powers of federal courts, and the scope of these remedial powers is broad." *Hoots v. Commonwealth of Pa.*, 703 F.2d 722, 726 (3rd Cir. 1983).

128.    A district court's remedial powers in a desegregation case includes the authority to "enjoin[] the operation of state laws" and it may enforce the guarantees of the Fourteenth Amendment even if that enforcement operates as money judgement against the State. *Missouri v. Jenkins*, 495 U.S. 33, 54 (1990) *citing Milliken v. Bradley*, 438 U.S. 267, 291 (1977).

129.    Here, the State has refused to authorize replacement of Taylor Elementary School or to approve the necessary funds to replace Bayou Meto Elementary School.

130.    The State has also refused to authorize full funding for the two schools because it is deducting from the overall square footage of the two projects the square footage of the multi-purpose buildings added to address the vestiges of segregation at the two schools in the interim while JNPSD prepare for full replacement of the two schools.

131.    Defendants know that their actions continue a vestige of segregation that this Court has held must be remedied.

132.    Accordingly, Defendants should be enjoined from continuing this Constitutional violation.

133.    Defendants should be ordered to provide full funding, without penalties, as required under the Partnership Program to replace Bayou Meto Elementary School and Taylor Elementary School on the timeline imposed by this Court.

WHEREFORE, JNPSD respectfully requests that the Court enjoin the State of Arkansas, Secretary Key, and Director Cain from continuing the constitutional violation this Court has found to exist in JNPSD's facilities and for all other relief to which JNPSD is entitled.


Respectfully Submitted,


By:    Scott P. Richardson  (2001208)
       McDaniel, Richardson, & Calhoun PLLC
       1020 West 4th St., Suite 410
       Little Rock, AR 72201
       501.235.8336
       501.588.2104 fax
       scott@mrcfirm.com

       Attorney for Jacksonville/North Pulaski
       School District