IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**LITTLE ROCK SCHOOL DISTRICT**                                    **PLAINTIFF**

v.                    NO. 4:82-cv-866-DPM

**PULASKI COUNTY SPECIAL SCHOOL**
**DISTRICT NO. 1, ET AL.**                                         **DEFENDANTS**

**EMILY McCLENDON, ET AL.**                                        **INTERVENORS**

**PULASKI COUNTY SPECIAL SCHOOL DISTRICT'S**
**REPLY IN SUPPORT OF ITS FACILITIES PROPOSAL**

Pulaski County Special School District, for its reply in support of its facilities proposal, *Doc. 5736*, submits the following.

**I.      Intervenors' Proclivity Toward "Scope Creep"**

Intervenors discuss the "***next*** phase of the case." *Doc. 5747, p. 20*. By contrast, PCSSD filed a facilities proposal designed to wind down the ***final*** phase of the case. *Doc. 5736, p. 7*. PCSSD's facilities proposal attempts to lay the groundwork for future facilities resulting in finality, but Intervenors' response seems more interested in laying the groundwork for future monitoring. This monitoring would include "making inquiries, reviewing plans and other documents, and observing construction progress" that leads to status hearings and other unspecified relief. *Doc. 5747, p. 2*. Intervenors request formal reports every 30 days, demand separate "periodic updates" on project changes, and yet still separate "prompt" notification of funding events. That's a lot of District time, and a lot of costly monitoring.

PCSSD leads with these observations to temper Intervenors' proclivity toward "scope creep"—repeatedly attempting to obtain modifications, concessions, et cetera, not included in the

1

requirements of Plan 2000. As it has in the recent past, PCSSD finds itself needing to address scope creep head-on, because otherwise the entire point of this case could be lost.

The Intervenors seek an ROTC building built to the Jacksonville standard, *Doc. 5747, p. 10*, a Multi-Purpose Arena built to the Sylvan Hills standard, *Id., p. 12*, a Performing Arts Center built to the Maumelle standard, *Id., p. 13*, and new classrooms built to an undefined standard established through innuendo and hearsay in a declaration signed by Rep. Joy Springer. *Id., p. 8*. Frankly, this approach seems to be an implicit concession that PCSSD **has** put forward a proposal that improves Mills up to the Robinson standard, but that is not good enough for Intervenors so the scope must be expanded to resuscitate a 38 year old case that is currently on its last legs.

Intervenors implicitly concede that their modus operani is scope creep by explaining that PCSSD should not "limit its search for [a] model solely to its own boundaries." *Id., p. 9.* While that is an admirable education policy goal for school administration, this case is about righting constitutional wrongs. Reasoning like this runs the risk of transmogrifying this case into a 21st century *Jenkins*. Grappling with the line between education policy and constitutional adjudication, Justice Kennedy wrote of elaborate school facilities that "these items are a part of legitimate political debate over educational policy and spending priorities, not the Constitution's command of racial equality." *Missouri v. Jenkins*, 495 U.S. 33, 77, 110 S. Ct. 1651, 1677, 109 L. Ed. 2d 31 (1990) (Kennedy, J. concurring). In this case, Plan 2000 was never meant to remedy all inequity across district lines. And Plan 2000 never established that every new construction must combine the best elements of all existing schools. Indeed, Plan 2000 was never meant to last in perpetuity.

More to the point, the Court already set the standard at this stage of the case. While other campuses and other projects have historically been a part of this litigation, the Court's most recent order narrows down the focus to a comparison between Mills University Studies High School ("Mills") and Robinson Middle School ("Robinson"). The Court directed PCSSD to "square up" an "A" facility to an "A++" facility. *Id., p. 29*. The Court ordered PCSSD to develop a proposal for facilities work to be done at Mills to "comply … and square up" the inequity between Mills and Robinson (the "Mills-Robinson Inequity"). *Doc. 5730, p. 30*. Following that opinion, this is now a "square-up" case, not an open-ended "good school facilities" case. The Court did not show interest in chiseling out a larger scope. If Intervenors disagreed with this approach, the time to address these issues was in a motion for reconsideration, or filing an appeal. Intervenors did neither. The current task was set by Court order, and most of what Intervenors attempt in their recent response is to ask the Court to reconsider its prior ruling. The Court should reject this untimely request and instead evaluate whether PCSSD did what the Court asked it to do on May 6th in developing a facilities proposal. *Scope creep* and the Court's conclusion that *it is time* are ideologically and fundamentally incompatible.

II.     **The Procedure Followed to Develop the Proposal**

Other than alleging that certain people were not sufficiently involved in the development of the criteria, the Intervenors are silent on the fairness of the process that PCSSD followed to develop its facilities proposal, effectively conceding that they do not take issue with the process. At bottom, Dr. McNulty is the Superintendent, and he approved the Proposal. The Court has specifically praised Dr. McNulty's efforts and good faith. *Doc. 5730, pp. 13, 38, 41*. The Board unanimously approved the Proposal. Regardless, this process is governed by Plan 2000, § H(3). Since May 6, 2021, PCSSD has absolutely met its notice obligations thereunder. Actually,

PCSSD has gone above and beyond what Plan 2000 § H(3) requires, and the proposal's lengthy procedure section establishes that to be true. *Doc. 5736, pp. 2-5*. PCSSD did this because it desired to work with Intervenors in good faith, and PCSSD indeed did so throughout the process.

### III. The Substance of the Proposal

Other than trying to change the applicable standard to be *anything but* a comparison of Mills to Robinson, despite its length Intervenors' response has a surprisingly low level of detailed criticism of the criteria that PCSSD submitted with its Proposal. It is clear that Intervenors do not like the criteria, but they never meaningfully explain why. Nor do Intervenors offer competing criteria, instead they just seem to outright reject what PCSSD has offered and leave it at that. While the Proposal is not purely a function of money, a $19 million add-on to a $50 million existing facility does seem to suggest that PCSSD has put forward an adequate "square up" of an "A" facility to an "A++" facility. *See Doc. 5730, p. 29*.

Beyond the four areas that PCSSD has addressed for an estimated $19 million, Intervenors also seek to add in the construction of a brand new 800 seat Performing Arts Center, new water fountains, and a new office for a registrar. *Doc. 5747, pp. 13-16*. In an ideal world these items, plus more, would make their way into the Proposal, but PCSSD was forced to weigh all of the options and make choices. As the Intervenors acknowledge, Mills has a Performing Arts Center and Robinson does not. So with that in mind, the seating capacity of the Mills Performing Arts Center was not a primary focus of squaring up the Mills-Robinson Inequity.

### IV. Funding and Practicability

The Court's most recent opinion wisely directed PCSSD to eliminate past segregation "to the extent practicable" noting that "[t]he qualifying phrase is important." *Doc. 5730, p. 14*. Noticeably absent from Intervenors' response is any statement, let alone proof, that an ROTC

4

building built to the Jacksonville standard, a Multi-Purpose Arena built to the Sylvan Hills standard, a Performing Arts Center built to the Maumelle standard, and new classrooms built to an undefined standard are all practicable. PCSSD seeks to follow the Court's earlier guidance to "[f]inish[] the job at Mills" in a way that does not "hobble" PCSSD's many needs including the "other pressing facility needs." *Doc. 5730, p. 31*. PCSSD is concerned that Intervenors' scope creep proposal could be hobbling, especially because with scope creep there is always something new to add along the way. This is true as Intervenors' response is drafted today, but is even more true if the scope creep approach to Plan 2000 is given an environment in which to thrive with limitless monitoring being sanctioned and paid for.[1]

## V.     Context of the Proposal in the District

Intervenors did not address the District's other needs with even so much as a passing thought. Nor did they object to inclusion and consideration of proposed Mills spending alongside expenditures in other parts of the district. *See* comparison of facility construction projects since the implementation of Plan 2000, *Doc. 5736-21*. While PCSSD certainly wants to serve its students at Mills and has done so with the Proposal, and while Mills does have the highest percentage of black students, PCSSD is a diverse district. The facilities needs of other schools may be considered for many reasons, not the least of which in the context of this case is that black students at other schools must be served as well. *See Doc. 5690, p. 3* (reporting that black students make up 44.8% of Sylvan Hills High School, 44.4% of Maumelle High School, and 39.8% of Robinson High School). Presumably, the needs of those black students should matter to Intervenors, however, those needs are not even acknowledged by Intervenors' response.

---

[1] The last two fee awards against PCSSD were for $1.4 million dollars on 9/2/2016, *Doc. 5242*, and $210,400 on 11/17/2017. (Undocketed). The final amount of an upcoming fee payment to Intervenors is currently unknown, but is being negotiated.

**VI.     The Perception of a Lack of Final Plan**

Much of Intervenors' concern seems to be over a perceived lack of a "final" facilities plan. First, it must be acknowledged that nothing about the plan is "final" until this Court issues a ruling. The Court tasked PCSSD with presenting a "proposal." *Doc. 5730, p. 31*. Over the better part of the intervening three months, PCSSD sought to put together the "proposal" that the Court ordered. Developing the Proposal also required conferring with Intervenors, developing a financing plan, and seeking Board approval of all of this. Such a procedural reality, coupled with the Court's use of the word "proposal" necessarily contains a lack of finality until the Court addresses the District's submission. Because the Court asked for a "proposal" and PCSSD had less than three months to put it together, the District did its best to understand what His Honor requested and deliver on that request. This short timeframe, and the ordering of a "proposal" did not call for hard numbers and architectural deliverables that could be included as exhibits. Additionally, it would not make sense to spend large amounts of money and time drawing up formal and final plans for facility improvements that had not yet been approved by the Court. Had PCSSD taken all of those steps, it would have opened the District up to criticism from Intervenors that the District had acted presumptuously and in derogation of the authority of federal court oversight. The District respects the Court and His Honor's ability to make the final call on whether the proposal remedies past wrongs to the extent practicable.

Beyond that, as was shared with Intervenors throughout the process, there are no final budgets, drawings, or other architect documents to share at this early stage. It seems as though Intervenors perceive that PCSSD is holding something back, when in reality, the District does not yet know what Intervenors want. At this stage, architects have not completed final designs, plans, or drawings. If approved by the Court, and upon completion of same, it is possible that

some detail of the facilities proposal may need to be adjusted. Once professional architects draw up formal plans, modification is possible. PCSSD hopes this will not happen, but the possibility must at least be acknowledged. Acknowledging that possibility is not bad faith. If PCSSD were to include absolute details in the Proposal, in the event that there were any modification later, there is no doubt that Intervenors would shift into high gear. What this will look like is "making inquiries, reviewing plans and other documents, and observing construction progress" that all lead to status hearings and other unspecified relief. *Doc. 5747, p. 2* (Intervenors' Response describing the monitoring efforts that they see going forward into the "***next*** phase of the case."). Intervenors would complain that reports were not received "promptly" and would cry bad faith. With the reality of this requested monitoring, of course PCSSD must allow some space for reality, lest monitoring be executed as rigid adherence to a document that was always intended as a "proposal" not a polished final draft. This is where good faith comes in, and the Court's findings of PCSSD's good faith cannot be ignored.

## VII.   Equal to the Extent Practicable

Intervenors refer to PCSSD's arguments about modification of the strict equality standard as "belated." However, in PCSSD's counsel's July 31, 2020 closing argument on the history of the "clean, safe, attractive, equal" standard, three main points were argued: (1) this standard was always intended to be contractual, not constitutional, (2) this standard was introduced and accepted in the m*aintenance* context, not a *construction* context, and (3) this all shows that the correct standard is effectively "clean, safe, attractive, equal" *to the extent practicable*. Those arguments were before the Court at the submission of the case. Of course, the Court did not adopt that reasoning in its most recent opinion, so in its Proposal PCSSD sought to incorporate its prior arguments and renew its objection to use of the "clean, safe, attractive, equal" standard.

There was nothing belated about this. If the Court desires supplemental briefing on this point PCSSD is happy to oblige, but counsel does not want to belabor an argument that the Court previously did not accept.

This is no doubt a thorny part of the case, but for the reasons that PCSSD previously identified, it is an issue that must be addressed. *Doc. 5736, pp. 5-7*. Without addressing the strict equality standard, this case can never practically end, and PCSSD will be beholden to inefficient and unhelpful outcomes as explained in the Proposal. Other than reject what PCSSD put forward, Intervenors offered no competing argument, and did not engage with this philosophical wrinkle in the law at issue here. Thus, PCSSD urges this Court to adopt the only reasoned solution put before it, and for the rationale previously explained, relax the strict equality standard to account for PCSSD's good faith pursuit of equity.

## VIII. Request for Unitary Status

By meeting the criteria set out in its Proposal, PCSSD argued that it will conclusively cure the facilities component of the existing Mills-Robinson Inequity. Intervenors bristle at the idea of finality.

The standard to achieve unitary status is not perfection, complete compliance with Plan 2000, nor is it complete elimination of every possible issue. Commenting on a district court's wide discretion and explaining when unitary status is achieved, it has been written that "[a]lthough [*Freeman v. Pitts*] gives district courts a great deal of discretion to continue to implement desegregation decrees, it also allows them to withdraw control from school districts long before desegregation has actually occurred." Harvard Law Review Ass'n, *3. Public School Desegregation - Withdrawal of Judicial Control*, 106 HARV. L. REV. 249, 250 (1992) (citing *Freeman*, 503 U.S. 467, 112 S. Ct. 1430). There is no magic number of years which federal court

supervision is needed over construction, and the general standard for compliance with a consent decree is for "a reasonable period of time." *Dowell*, 498 U.S. at 248, 111 S. Ct. at 637; Monika L. Moore, *Unclear Standards Create an Unclear Future: Developing A Better Definition of Unitary Status*, 112 YALE L.J. 311, 317 (2002) (collecting cases and commenting on the length of compliance that must be shown to achieve unitary status). In its most recent opinion, the Court seemed to be inclined to rule that this threshold of a reasonable period of time had been met.

Since the installation of a new school board, and under the tutelage of Dr. Warren and then Dr. McNulty, the Court found that PCSSD had been operating in good faith since the 2017-2018 school year. As such, PCSSD is now in its fourth school year of complete and total good faith operation. On this record, a finding of complete unitary status would be in keeping with the Court's stated "flexible approach to the Rule 60 inquiry, prompted by a good dose of horse sense." *Doc. 5730, p. 8*. PCSSD believes that the facts presented in its Proposal further bolster the Court's findings of good faith, and also show changed circumstances such that modification of Plan 2000 is appropriate. By submitting the Proposal, however characterized and regardless of which Rule under which it is considered, PCSSD believes that full unitary status would be justified. PCSSD is not "entitled" to this outcome because awarding unitary status would fall well within the Court's broad discretion, but PCSSD believes that the record supports it.

Devin R. Bates (2016184)
M. Samuel Jones III (76060)
Amanda G. Orcutt (2019102)
MITCHELL, WILLIAMS, SELIG,
  GATES & WOODYARD, P.L.L.C.
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Telephone: (501) 688-8800
Facsimile: (501) 688-8807
dbates@mwlaw.com
sjones@mwlaw.com
aorcutt@mwlaw.com
and

Jay Bequette
Cody Kees
Bequette Billingsley & Kees, P.A.
425 West Capitol Ave., Suite 3200
Little Rock, Arkansas 72201
Telephone: (501) 374-1107
Facsimile: (501) 374-5092
Mobile: (501 590-4500
jbequette@bbpalaw.com
ckees@bbpalaw.com

***Attorneys for Pulaski County Special School District***