Transcript of the Testimony of

# Springer, Joy

**Date:** May 15, 2020

**Case:** Little Rock School District v. Pulaski County Special
School District, et al

**Bushman Court Reporting**
Janess Ferguson Smith
Phone:  (501) 372-5115
Fax: (501) 378-0077
<www.bushmanreporting.com>

**EXHIBIT
7**

### Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

---

LITTLE ROCK SCHOOL DISTRICT       PLAINTIFF

VS.      CASE NO. 4:82-CV-00866 DPM

PULASKI COUNTY SPECIAL SCHOOL
DISTRICT, ET AL.      DEFENDANTS
EMILY MCCLENDON, ET AL.      INTERVENORS

---

ORAL DEPOSITION OF JOY SPRINGER
May 15, 2020

---

BUSHMAN COURT REPORTING
620 West Third, Suite 302
Little Rock, Arkansas  72201
501.372.5115

### Page 2

```
 1          A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFF:
 3   AUSTIN PORTER, JR., ESQ.
       Porter Law Firm
 4     323 Center Street
       Suite 1035
 5     Little Rock, Arkansas  72201
 6
 7
 8   ON BEHALF OF PCSSD:
 9   CODY KEES, ESQ.
       Bequette Billingsley & Kees, P.A.
10     425 West Capitol
       Suite 3200
11     Little Rock, Arkansas  72201
12
     DEVIN R. BATES, ESQ.
13   AMANDA G. ORCUTT, ESQ.
       Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.
14     425 West Capitol
       Suite 1800
15     Little Rock, Arkansas 72201
16
17
18   ON BEHALF OF JACKSONVILLE SCHOOL DISTRICT:
19   SCOTT RICHARDSON, ESQ.
       McDaniel Richardson & Calhoun
20     1020 West Fourth Street
       Little Rock, Arkansas  72201
21
22
23
24
25
```

### Page 3

```
 1                I N D E X
 2   EXAMINATION
       By Mr. Bates . . . . . . . . . . . . . .    5
 3
 4   EXAMINATION
       By Mr. Richardson. . . . . . . . . . . .  162
 5
 6   EXAMINATION
       By Mr. Bates . . . . . . . . . . . . . .  247
 7
 8            E X H I B I T S
 9
10   Exhibit No. 1 (Amended Notice) . . . . . . . .    9
     Exhibit No. 2 (5-7-20 Email) . . . . . . . . .   54
11   Exhibit No. 3 (Classroom Observation Forms). .   93
     Exhibit No. 4 (Invoice and Progress Report). .  113
12   Exhibit No. 5 (Educator License) . . . . . . .  168
     Exhibit No. 6 (3-20-17 Email). . . . . . . . .  118
13   Exhibit No. 7 (Intervenors Responses to JNPSD)  252
     Exhibit No. 8 (Classroom Observation Form) . .  252
14   Exhibit No. 9 (2018-'19 Proposed Plan) . . . .  252
     Exhibit No. 10 (2019-'20 Proposed Plan). . . .  252
15   Exhibit No. 11 (Classroom Observation Forms) .  252
     Exhibit No. 12 (Educator License). . . . . . .  252
16
17
18
19
20
21
22
23
24
25
```

### Page 4

```
 1        ANSWERS AND DEPOSITION OF JOY SPRINGER, a
 2   witness produced at the request of the Defendants,
 3   was taken via Zoom in the above-styled and numbered
 4   cause on the 15th day of May, 2020, before Janess
 5   Ferguson Smith, Certified Court Reporter and Notary
 6   Public in and for Saline County, Arkansas, at the
 7   Offices of Bushman Court Reporting, 620 West Third,
 8   Suite 302, Little Rock, Arkansas, at 10:02 a.m.
 9            * * * * * * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Springer, Joy 5/15/2020                                           Little Rock School District v. Pulaski County Special School District, et al

---

**Page 5**

1          JOY SPRINGER,
2    the witness hereinbefore named, having first been
3    duly cautioned and sworn or affirmed to tell the
4    truth, the whole truth and nothing but the truth,
5    testified as follows:
6               EXAMINATION
7    BY MR. BATES:
8    Q.   Good morning, Representative Springer.
9    **A.   Good morning.**
10   Q.   We've met before but, for the record, I'm Devin
11   Bates.  As you know, I'm here today on behalf of
12   Pulaski County Special School District.
13   **A.   Yes.**
14   Q.   I know you've given several depositions before,
15   and I know you've been to many depositions, so I'm
16   not going to belabor all of the formalities and
17   introduction points, but this one new one that's new
18   to me with Zoom is if the internet cuts out at any
19   point, and you miss something that I say, or if it
20   cuts out on my end, and I miss something you say, I
21   might just ask you to repeat something, and I'll ask
22   you to do the same if you missed what I said.  Is
23   that fair?
24   **A.   Yes.**
25   Q.   Thank you.  Will you please state your full

---

**Page 6**

1    name for the record?
2    **A.   Joy Springer.**
3    Q.   And what is your work address?  Are you still
4    at John Walker's office on Broadway?
5    **A.   1723 Broadway Street, Little Rock, Arkansas**
6    **72206.**
7    Q.   And do you have any social media accounts?
8    **A.   I have a Facebook account.  And, also, when I**
9    **was running for the position of State Representative,**
10   **persons created an Elect Joy Springer account.**
11   Q.   Any other social media?
12   **A.   Well, there may be something called Snapchat**
13   **and Twitter.  I am not the person that operates those**
14   **accounts.**
15   Q.   So would it be fair to say those are for
16   campaign purposes?
17   **A.   They are.**
18   Q.   Have you ever posted anything about PCSSD on
19   any of your social media accounts?
20   **A.   Never.**
21   Q.   Have you ever posted anything on any social
22   media accounts about this case generally?
23   **A.   Never.**
24   Q.   On your personal social media accounts, do you
25   follow any of PCSSD's accounts?

---

**Page 7**

1    **A.   No.**
2    Q.   Your email address is
3    jspringer@gabrielmail.com; is that correct?
4    **A.   Yes.**
5    Q.   And you also use johnwalkeratty@aol.com; is
6    that correct?
7    **A.   Yes.**
8    Q.   Do you have any other email addresses?
9    **A.   No.**
10   Q.   That johnwalkeratty@aol.com address, how long
11   have you had the password for that email address?
12   **A.   I guess since I've worked for John W. Walker,**
13   **P.A., since I've been employed there.  So that's more**
14   **than 25 years, so maybe 29 years.**
15   Q.   How do you decide whether you are going to use
16   an email using the J Springer address versus the John
17   Walker attorney address?
18   **A.   For the most part, when I use the John Walker**
19   **address -- well, first of all, let me get**
20   **clarification.  For what period of time are we**
21   **speaking of?**
22   Q.   We'll say the past ten years.
23   **A.   Okay.  Mr. Walker was not computer literate and**
24   **did not type his emails, so for the past ten years, I**
25   **was the person that typed his emails in that address,**

---

**Page 8**

1    at that address.
2    Q.   What about since his passing, how have you
3    decided when to use the John Walker email versus the
4    J Springer email?
5    **A.   When there's correspondence, I'm left with the**
6    **responsibility of communicating with the parties with**
7    **respect to our monthly meetings, so I use the John**
8    **Walker email address for that account.**
9            **And then if there's a need to send out**
10   **information to the parties with respect to discovery,**
11   **and that sort of thing, I use the John W. Walker,**
12   **P.A., account.**
13   Q.   Fair enough.  Do you have access to John
14   Walker's CM/ECF account?
15   **A.   Yes.**
16   Q.   And do you use any other CM/ECF account for any
17   other attorney?
18   **A.   No.**
19   Q.   Mr. Walker, I believe it was --
20   **A.   May I, may I just -- I think that I'm linked to**
21   **the other attorneys in the office.  My email address**
22   **is linked to theirs, but I don't use those.  So**
23   **hopefully that's some additional clarification with**
24   **respect to that.**
25   Q.   Thank you for that.  I believe it was Monday,

---

Springer, Joy 5/15/2020                                                      Little Rock School District v. Pulaski County Special School District, et al

Page 9

1  October 28th, 2019, that Mr. Walker passed.  Does
2  that sound right?
3  **A.   I remember that day, yes.**
4  Q.   I want to ask you about the documents that were
5  filed on Mr. Walker's CM/ECF account after his
6  passing.  How many documents did you file using
7  Mr. Walker's account after his passing?
8  **A.   I don't remember; however, that was corrected.**
9  **I think I know where you're going.  That was done in**
10 **error.**
11 Q.   So for the documents that were filed on CM/ECF
12 using Mr. Walker's account after his passing, which
13 attorney authorized the filing of those documents --
14        COURT REPORTER:  You cut out at the
15        end.
16 Q.   For the documents that were filed using CM/ECF
17 after October 28th, 2019, which attorney authorized
18 the filing of those documents?
19 **A.   After discussions with Robert Pressman and**
20 **Austin Porter.**
21        (Exhibit No. 1 was marked.)
22 BY MR. BATES:
23 Q.   All right.  Representative Springer, if you can
24 please turn to Exhibit 1 in that binder in front of
25 you.  Have you seen this before?

Page 10

1  **A.   Late yesterday evening.**
2  Q.   All right.  And if you could please turn to the
3  fourth page of that exhibit, the notice of your
4  deposition.
5  **A.   (Witness complies.)**
6  Q.   And if you could please read item number one on
7  that list.
8  **A.   All documentation related to visits to PCSSD**
9  **schools, including any documents gathered when**
10 **visited, calendars showing dates when visited, when,**
11 **when visited schools, and any notes taken by you**
12 **while visiting.**
13 Q.   I know that some items were provided to us on a
14 CD that you had on May 8th, 2020, so I want to give
15 you a pass for everything that's on that CD; okay?
16        Other than the things that are on that CD,
17 do you have anything responsive to item number one?
18 **A.   Well, I guess I need better clarification as to**
19 **what period of time you're speaking of.  And -- I**
20 **guess that's the first question.  I'm not clear as to**
21 **what you're asking.**
22 Q.   So from the last time that PCSSD had a trial in
23 this matter in 2010 to the present, so for the past
24 ten years, do you have anything responsive to number
25 one that wasn't included on that CD?

Page 11

1        MR. PORTER:  Devin, just for the
2  record, the subpoena -- I guess we're
3  treating this as a subpoena duces tecum --
4  it was provided -- apparently, it was filed
5  on May 13th, or at least given to us -- the
6  Amended Notice of Deposition Duces Tecum
7  for Representative Joy Springer was
8  provided on May 13, 2020.
9        And you're asking her to provide or at
10 least bring all of these documents with her
11 and, of course, you know, it wasn't done in
12 a timely fashion.
13       I think during the course of discovery
14 a lot of the stuff has been provided, and
15 I -- there is also a disk or a CD that
16 Ms. Springer has provided as well, as you
17 mentioned, on May the 8th.
18       So to expect her to have all of these
19 documents for this deposition in a two-day
20 period certainly does not comport with the
21 Rules of Civil Procedure, but, you know,
22 she can ask -- she can answer the questions
23 as best as she can, if she has any of these
24 documents that respond to this.
25       So just -- that's just an objection

Page 12

1  that I have; okay?
2        MR. BATES:  That's fine.  Yeah, and, I
3  mean, I think you know this too, but we did
4  provide this Notice of Deposition within a
5  couple of hours after receiving the time
6  when the deposition would take place.
7        MR. PORTER:  Yeah, I understand.
8        MR. BATES:  So we did our best to get
9  this to you.  I think you probably know
10 where I'm going with this, but if there's
11 anything that's going to show -- I don't
12 want to debate the question here, of
13 course, but if there's anything that's
14 going to show up at trial, we just want to
15 know about it.  So that's what I'm trying
16 to get at.
17       MR. PORTER:  Our position is, Devin,
18 that whatever documents we have, we're
19 going to provide those to you.
20       We have provided those to you.  We're
21 not -- I don't play games.  You know, I
22 don't, I don't play games.  If I haven't
23 given you something during the course of
24 discovery, then I will not be expecting to
25 use that document during the course of the

Page 13

1    trial.
2              MR. BATES:  Yes, sir.
3              MR. PORTER:  All right.
4    BY MR. BATES:
5    Q.   All right.  Representative Springer, as you sit
6    here today, other than the things that were on that
7    CD that y'all sent May 7th, is there anything
8    responsive to number one that you can think of?
9    A.   There probably are.  If you will recall, I
10   don't know that you saw -- I sent an email message to
11   Mr. Porter and Mr. Pressman, and I think all of the
12   remaining lawyers, including yourself, and I
13   indicated that there will probably be a number of
14   emails over the years between myself and members of
15   the staff in the Pulaski County Special School
16   District.
17            And I indicated that that would probably
18   take some time for me to go through those documents,
19   given the fact that I'm having thousands of documents
20   already to go through.
21            So as I am able to identify documents and
22   say that they will support anything related to this
23   case, I'm happy to share those with you.
24            But at this time I'm just overwhelmed with
25   thousands of pages of documents, and it's going to

Page 14

1    take some time for me to produce any additional
2    documents.
3              And I think Mr. Porter has already
4    indicated, and I concur with him, if there's anything
5    that I locate that I believe that is responsive to
6    this request, I promise that you will receive those
7    documents.
8    Q.   Thank you for that.
9              MR. RICHARDSON:  Can I butt in real
10   quick to --
11             MR. BATES:  Go ahead.  Sure.
12             MR. RICHARDSON:  -- than Devin
13   providing you notice on it, and we provided
14   you, basically, the same list, Austin, I'm
15   not going to file any motions on that, just
16   so you know.
17             We will visit about it a little bit,
18   and I understand what Joy just explained.
19   I trust you.  We're not going to get in a
20   big fight over the list that I sent.
21             MR. PORTER:  Okay.
22   BY MR. BATES:
23   Q.   All right.  Representative Springer, looking
24   down that list to item number two, it asked for
25   copies of correspondence, emails, text messages,

Page 15

1    phone logs related to your communications between any
2    PCSSD employee or board member.
3              I want to take emails out of the equation,
4    because I know you justed addressed those, and you
5    said, also in a separate email you addressed those,
6    but text messages, do you ever text back and forth
7    between any employees of PCSSD?
8    A.   There may be a text message between myself and
9    Dr. Warren, and there may be a text message between
10   myself and Mr. Johnson.
11            And to tell you exactly what the subject of
12   those text messages were, I can't at this time.  So
13   if you have those and produce them, I will
14   acknowledge that I did have text messages between the
15   two of them.  Dr. Warren and Dr. Johnson are the
16   persons that I recall.
17   Q.   And are these text messages substantive in
18   nature?  Are you discussing a case, or are they
19   logistical?
20   A.   Oh, that was probably prior to the time, prior
21   to the time that I received the directive from Sam
22   Jones saying that I should not have any contact with
23   any of the employees of the Pulaski County Special
24   School District, and that's kind of hard to do, but
25   that was his directive.

Page 16

1    Q.   Okay.  And I mean did you discuss the case with
2    them, or was it a text message asking things like,
3    Hey, what time is the meeting, or something like
4    that?
5    A.   As I said before, I really don't call.  I guess
6    I need clarification on that.  What do you mean
7    discussing the case?  To me that's very broad.
8    Q.   Well, then let's do this.  Let's just table
9    that one for now, and on a break I would ask you to
10   just look at your phone and see what those text
11   messages are about, so that I can ask you about then.
12   A.   Okay.  Well, I can tell you now that there are
13   no text messages on my phone between myself and Dr.
14   Warren and Mr. Johnson at this point in time, so you
15   will -- I will not be able to locate that.  I can
16   tell you that right now.
17            And I think I have previously testified to
18   that I believe that those text messages took place
19   prior to the directive from Sam Jones saying that I
20   could not have any contact with any of the employees
21   of the Pulaski County Special School District, when
22   previously that was not the case.
23   Q.   So, to the best of your recollection, when were
24   these texts messages exchanged?
25   A.   Once again, I do not recall that date.

Springer, Joy 5/15/2020                                          Little Rock School District v. Pulaski County Special School District, et al

---

Page 17

1    Q.   Can you ballpark it for me?
2    A.   It was prior to receipt of that email from Sam
3    Jones indicating that I should not have any contact
4    with the members of the Pulaski County Special School
5    District.
6    Q.   Do you think it was in early 2020?
7    A.   I don't, I don't remember.  It could have been.
8    To tell you an exact date, I don't want to be held to
9    saying a certain date, and that's incorrect.
10        All I know, it was communication prior to
11   that directive, and I think I have said that about
12   three times now.
13   Q.   Yes, ma'am, and I understand it was prior to
14   that directive.  I'm just trying to have a ballpark
15   that it was 2019, 2018, recently, and I just don't
16   know.  That's why I'm asking.
17   A.   Well, I'm trying to understand what the
18   relevance is of when -- what difference does it make
19   when it was, if, if they were before the
20   communication from Sam Jones?
21   Q.   Let me ask you this.  You said they are no
22   longer on your phone; is that correct?
23   A.   That's correct.
24   Q.   And how did they come to not be on your phone
25   anymore?

---

Page 18

1    A.   Well, after a certain time period, they go
2    away.  I mean, all the -- I mean, I've had hundreds
3    of text messages on my phone, and they're not all
4    there, so they're not there.
5    Q.   Does your phone have a feature where it
6    automatically deletes text messages after a certain
7    age?
8    A.   Yes.
9    Q.   So is it your testimony today that any text
10   messages exchanged with Dr. Warren and Mr. Johnson
11   would be from a period far enough back where they
12   would have been automatically deleted?
13   A.   No, I'm not saying that.  I'm just telling you
14   that those text messages that I had between those
15   individuals are not on my phone at this time.
16   Q.   Did you manually delete those text messages?
17   A.   I manually delete text messages all of the
18   time.
19   Q.   Do you remember manually deleting the text
20   messages between Dr. Warren and Mr. Johnson?
21   A.   I do not.  I don't sit down and decide which
22   ones I'm going to delete, and there would be no
23   reason for me to try to delete those anyway, because
24   the conversations that we were having were open and
25   things that we have done in the, you know, things

---

Page 19

1    that are in compliance with what has taken place
2    previously.
3        So I don't have any reason to try and hide
4    anything or any communications between myself and
5    Mr. Johnson.  Those communications were open.
6        So I guess another thing could be that you
7    could ask them if they still have those text
8    messages.  You know, I don't mind you knowing about
9    them.
10       It's not that I don't want you to know
11   about them.  It's just that I don't have them.  I'm
12   happy for you to know the content of those text
13   messages.  I don't have anything to hide here.
14   Q.   Going back to number two on that list, we
15   talked about emails and text messages.  I want to ask
16   you about phone calls, which is also contemplated by
17   number two on that page four of Exhibit 1.
18       Anytime that you call PCSSD do you keep a
19   log of those phone calls?
20   A.   Never.  Well, let me just say this.  Now, if
21   I'm calling PCSSD about -- I keep time records, so
22   you have some of my time records.  So I guess -- are
23   you referring to telephone logs the same as time
24   records?  So the answer to that --
25   Q.   Well, I --

---

Page 20

1    A.   So the answer to that question is yes.  So
2    that's -- okay.  So telephone -- when I make a
3    telephone call to someone to have a discussion about
4    something in the Pulaski County Special School
5    District, I usually make a telephone, I mean, a time
6    log of that, but not all of the time, because a lot
7    of times I have conversations with them, and they're
8    not documented.
9        But there are occasions when I feel that I
10   should document that time record.  That's there.  So
11   you're happy to receive my time records too.  I'm
12   happy to give those to you as well.
13   Q.   And so just to clarify, I think you and I know
14   what we're talking about.  I just want to make sure
15   it's clear on the record.  When you say "time
16   records," you're referring to the billing entries;
17   correct?
18   A.   Yes.  That's right.
19   Q.   Other than the time records that you keep for
20   billing purposes, do you keep any other sort of
21   independent phone record of when you called PCSSD?
22   A.   Never.
23   Q.   Let's move on to number three on page four of
24   Exhibit Number 1.  Can you take a minute to read that
25   please?  You can read it aloud.

---

Janess Ferguson Smith

Bushman Court Reporting                                                           501-372-5115

Page 21

1    A.   Am I in school here?  You want me to read it
2    aloud?  Is that what you asked me.
3    Q.   Yes, ma'am.
4    A.   Okay.  Any photographs, videos, or similar
5    images in your possession depicting any PCSSD
6    employee, board member, or facility.
7    Q.   Other than the photographs, videos, or other
8    similar images in your possession that were shared
9    with us on that CD on May 7th, do you have any other
10   thing that might be responsive to that question?
11   A.   No.
12   Q.   Going on to number four, it asks about audio
13   recording.  Do you ever make audio recordings when
14   you visit PCSSD?
15   A.   Never.  So -- and let me just make a
16   clarification.  Your question was do I ever make them
17   when I visit, so that's all of the time.
18        I mean, I, I take that to mean anytime I go
19   there I make a recording.  Is that your question?
20   And I answered, Never; however, there was an occasion
21   on the date that Mr. Curtis Johnson held the
22   facilities public meeting, there is a recording on my
23   telephone regarding that meeting, and I'm sure
24   that --
25   Q.   Was that?

Page 22

1    A.   -- and I'm sure that the county should have a
2    recording of that meeting as well.
3    Q.   Are you referring to the facilities meeting in
4    early 2020?
5    A.   Yes.
6    Q.   Other than that one facilities meeting in early
7    2020, have you ever made any audio recordings of
8    meetings at PCSSD?
9    A.   As I previously testified, never.
10   Q.   Number five asks you about photographs, videos,
11   similar images, audio recordings that are in any way
12   relevant to the litigation.  It might seem
13   duplicative, but is there anything responsive to
14   that?
15   A.   I think I've already answered that question.
16   Q.   So is the answer to that question "no"?
17   A.   That's correct.
18   Q.   Okay.  Number six on there asks about social
19   media activity.  I know you previously testified that
20   you don't make posts about PCSSD, but do you have in
21   your possession any screen shots of posts that might
22   have been made about PCSSD by parents, guardians, or
23   anyone in the community?
24   A.   Well, I guess I need clarification on that one.
25   What do you mean by "in my possession"?

Page 23

1    Q.   On your phone or in files anywhere.
2    A.   There are social -- there are copies of social
3    media posts in files in John W. Walker, P.A.
4    Q.   And those are posts that were made by -- I know
5    they weren't made by you, but who made them?
6    A.   They were made by some of the PCSSD school
7    board members, and they were made by members of the
8    community that live in the area of Mills High School
9    and College Station areas.
10        And you probably have those posts already
11   as well.  They were the subject of a big controversy
12   after the visits to Mills and Robinson schools.
13   Q.   Okay.  Let's move on to number seven, which
14   asks for reports, documents, memorandum, and
15   correspondence.
16        I understand that you shared on that CD on
17   May 7th quite a bit of that.  Is there anything you
18   have responsive to number seven that wasn't on the
19   CD?
20   A.   Well, that's what I have indicated, and we're
21   talking about the period of time from the last
22   hearing, so I'm having to go through my computer to
23   locate those documents.
24        There may be some attachments to emails, so
25   as I previously stated, if I come across any of that,

Page 24

1    I will gladly share that with you.
2    Q.   Thank you.  Is it fair to say that your answers
3    for number eight, nine, and ten will be the same?  It
4    seems like it's going to be the same answer --
5    A.   Thank you.
6    Q.   -- but I just wanted to be sure to ask.
7    A.   Yes.  Thank you very much.
8    Q.   All right.  We will set aside Exhibit Number 1
9    for a moment and move on.  Some of these questions I
10   understand you probably have answered at some point
11   in your deposition, but you will have to bear with
12   me, because I am new on the case, so I might ask some
13   of these things again.
14        Do you have any kids of your own?
15   A.   No.
16   Q.   And do you --
17   A.   But let me just say this.  I claim all of the
18   children of the Pulaski County Special School
19   District, and at one time -- well, I guess I still
20   do -- all of the children that were members of the
21   class of African-American children that lived in
22   Pulaski County, Arkansas.
23        So I do, in fact, claim them as my
24   children, so I have a special place in my heart for
25   all of those children, because of the obligations

6  (Pages 21 to 24)

Springer, Joy 5/15/2020                                    Little Rock School District v. Pulaski County Special School District, et al

Page 25

1  that these districts promised to ensure that they
2  would keep with respect to their educational
3  opportunities. So I would say yes to that, so I
4  consider them all my children.
5  Q.  Are there any kids in particular that you have
6  a closer relationship than others?
7  A.  I would say so. You know, we have a tendency
8  to care more about immediate family members than we
9  do others, so I would say yes.
10  Q.  So do you have any nieces or nephews or any
11  other family members, in particular, that you would,
12  I know aren't your biological kids, but maybe you
13  would consider closer, as your kids that you keep up
14  with?
15  A.  Well, yes, there are some that I keep up with,
16  yes.
17  Q.  And who are those people?
18       MR. PORTER:  Are you talking about who
19       attends Pulaski County Special School
20       District?
21       MR. BATES:  Sure.
22  BY MR. BATES:
23  Q.  Let's make -- that's a good clarification.
24  Let's make sure to limit it just to PCSSD students,
25  so that we can move this along as quickly as

Page 26

1  possible.
2  A.  Thank you. As this point in time, I cannot
3  think of anyone that are actually students in the
4  Pulaski County Special School District.
5  Q.  And do you serve as a mentor for any kids that
6  are currently in the PCSSD, maybe any Big Brother,
7  Big Sister, as a reader with AR Kids Read, anything
8  like that? Do you volunteer or mentor any children?
9  A.  Is that question related solely to the Pulaski
10  County Special School District?
11       MR. PORTER:  Yeah, I think so.
12  Q.  Yes, ma'am.
13  A.  Well, I guess -- well, let me just say this.
14  You didn't ask me any questions about my, my work
15  within the community.
16       I am a member of Alpha Kappa Alpha
17  Sorority, Incorporated. And we are a service
18  organization, and we come in contact with students
19  within the Pulaski County Special School District,
20  the North Little Rock School District, the
21  Jacksonville School District, and all of the students
22  within Pulaski, a number of the students within
23  Pulaski County.
24       So I would say that I am mentors, based
25  upon our partnerships that we have with respect to

Page 27

1  those school districts, and I forgot to say and
2  including Little Rock School District as well.
3       So I would say, yes, there are. And to
4  tell you their names, all I know is I have contact
5  with a number of those students in those districts.
6  Q.  So I want to narrow the question to those
7  students that are in PCSSD. And in your role as a
8  mentor through AKA, do you advocate or mentor any
9  specific students?
10  A.  Well, that -- I'm -- I was trying to answer
11  that, so I would -- I have answered yes, but to tell
12  you specifically what their names are, if -- so if
13  one of the parents would come to me and ask me to do
14  certain things for them, I would, I will do that, and
15  there have been occasions.
16  Q.  How --
17  A.  And there have been occasions in the past that
18  I have done that. So to tell you, give you names
19  right now, I can't tell you names.
20       But if one of those parents in the past
21  would come to me and ask me to be a mentor, at this
22  point in time, I would continue to do so.
23       So it's really hard to tell you names at
24  this point in time, because like I said -- like I
25  answered earlier, all of those children within the

Page 28

1  Pulaski County School District I consider to be
2  children that I have deep admiration for.
3       MR. PORTER:  And, Devin, you know, to
4       try to name students, I don't know if that
5       would encroach upon student privacy rights
6       or something. That may be a concern, but I
7       think we kind of --
8       MR. BATES:  Well, let me ask --
9       MR. PORTER:  We need to tread lightly
10       around that.
11       MR. BATES:  Yes, sir, I understand,
12       and I certainly agree.
13  BY MR. BATES:
14  Q.  Let me ask the question this way. Are you
15  going to come to trial this summer and talk about any
16  specific students, whether by name, or just
17  generally, and talk about any mentoring or advocacy
18  efforts that you have done on behalf of those kids,
19  specifically through your role as a mentor through
20  AKA?
21  A.  I'm not sure. I don't -- so here's the
22  situation. Going through 20,000 or more pages of
23  documents, and trying to decide the, you know, in
24  preparing for the case, I have no idea at this point
25  in time what the trial outline, or what the questions

7  (Pages 25 to 28)

Springer, Joy 5/15/2020                                           Little Rock School District v. Pulaski County Special School District, et al

Page 29

1    are going to be, or what's going to be asked of me at
2    this point in time.
3          So if there's a need to supplement the
4    discovery, I'm sure -- Mr. Porter has already told
5    you that, that he would share that information with
6    you. So I can't answer that question at this time as
7    to what may be discussed, or who may be discussed.
8    Q.   Okay. And if you come across a certain
9    document that names a student, or something, I
10   understand that, but as you sit here today, you can't
11   think of any particular students or instances of
12   advocacy or membership through that role as an AKA
13   member that you're going to talk about at trial.
14   Correct?
15   A.   Well, right now I can't think of it. As far as
16   mentorship, it's with respect to my role as a monitor
17   as well, so it's not only AKA.
18         So I don't want it to be saying that it's
19   only my mentorship -- my membership only relates to
20   me being a member of the sorority, but it also has to
21   be with respect to my role as a monitor on behalf of
22   the Intervenors as well.
23   Q.   And we're going to ask you quite a few
24   questions about your role as an Intervenor, or as a
25   monitor, or as an advocate for the Intervenors.

Page 30

1          I'm really just asking through your
2    mentorship efforts with AKA, and I think you have
3    answered that.
4          I want to ask you now about your education.
5    I know that this has been the subject of deposition
6    testimony in the past, so I don't want to go back to
7    any time prior to 2010.
8          So since 2010 have you attended any formal
9    education?
10   A.   Formal, no. And, I guess, clarifying -- let me
11   just say this. Since 2010 I have served on the, as a
12   member of the Teacher Education Committee at
13   Philander Smith College here in Little Rock.
14         And as a member of that committee, we meet,
15   and interview, and screen students who are being
16   considered for the Teacher Education Program there at
17   Philander Smith College.
18         So for many years, more than ten years, I
19   have been on that committee. And I'm happy this
20   morning -- let me just tell you.
21         We received notification last night -- I'm
22   getting off the subject now, because I think it's a
23   wonderful thing that has taken place -- we received
24   certification last night from an accreditation agency
25   indicating that Philander Smith College has met all

Page 31

1    of the standards to be an accrediting agency for
2    teacher education students, and that accreditation is
3    going to last for the next seven years.
4          So I am deeply proud and honored to say
5    that I was a member of that team that allowed
6    students to come through that program at Philander
7    Smith and be prepared to teach in the schools, not
8    only in Pulaski County, but across this state, and
9    possibly this nation.
10   Q.   Well, congratulations. That sounds like great
11   news.
12   A.   It is.
13         MR. PORTER: It is.
14   Q.   Through your role in Philander Smith there that
15   you were just talking about, have you received any
16   training from Philander Smith?
17   A.   Ongoing, all of the time.
18   Q.   What types of things does Philander Smith train
19   you on?
20   A.   Well, we, we -- they train us on the, the
21   rubric that is utilized for interviewing and
22   determining whether a student is eligible to
23   participate in a program.
24         So to tell -- and I recall the acronym
25   being called the FORCE, and there are certain other

Page 32

1    things that they have to be schooled in, I guess, for
2    lack of a better word, to make sure that they
3    understand what's expected of them to be a teacher
4    within any school district. So we have ongoing
5    training all of the time.
6          And that was a part, and that was a part of
7    the certification process, that that sort of training
8    was taking place. So that takes place on a regular
9    basis.
10   Q.   Any other type of training from Philander
11   Smith?
12   A.   Not from Philander Smith, but there have been
13   occasions, if you want me to go back ten years.
14   There were opportunities provided to me by the
15   Pulaski County Special School District with respect
16   to additional training, particularly in the area of
17   Special Education.
18         For some reason within the last couple of
19   years I have not been invited to participate in that,
20   and that had to do with the Special Education
21   program.
22         They had staff development every year that
23   they would invite me to come and participate in, and
24   that, for some reason, I have no idea why, but I was
25   not invited for the past year or so to participate in

                                        8 (Pages 29 to 32)

Springer, Joy 5/15/2020                                          Little Rock School District v. Pulaski County Special School District, et al

---

Page 33

1    that particular training.
2         And, also, there were opportunities by the
3    Pulaski County School District to come and
4    participate in their -- I don't know if you are
5    familiar with those feeder pattern meetings -- have
6    you heard that term before -- where the different
7    administrators and teachers within the schools sit
8    down, and they talk about what they are doing with
9    respect to making sure that teachers are properly
10   trained, and that they understand what is needed for
11   them to move the educational process along, with
12   respect to the students that they're teaching there
13   in the district.
14   Q.   Any other training you have received over the
15   past ten years?
16   A.   I can't, I can't think of any additional at
17   this time.
18   Q.   Okay.  Moving right along, I understand that
19   you are married; correct?
20   A.   Yes.
21   Q.   Have you been married at any other point in the
22   past, or is this your only marriage?
23   A.   My one marriage, my only marriage.
24   Q.   What other names have you gone by in the past
25   besides joy Springer?

---

Page 34

1    A.   Joy Charles.
2    Q.   Is that your maiden name?
3    A.   It is.
4    Q.   Once again going through the background
5    questions here, have you ever been arrested?
6    A.   No.
7    Q.   Have you ever been sued?
8    A.   I'm sorry?
9    Q.   Have you ever been sued?
10   A.   No.
11   Q.   Have you ever sued anyone?
12   A.   Yes.
13   Q.   Who did you sue?
14   A.   Allstate Insurance Company.
15   Q.   Anyone else?
16   A.   I believe that's all I can recall at this time.
17   Q.   And what year was that lawsuit against Allstate
18   Insurance Company?
19   A.   That would have been probably in 1990 or '91,
20   maybe '89, between -- okay.  I was, I was terminated
21   in 1989, so somewhere between 1989 and 1991.  I don't
22   remember the exact date.  I'm not --
23   Q.   Let's --
24   A.   I'm not sure what that has to do with this
25   lawsuit, though.

---

Page 35

1    Q.   Let's talk a little bit about your work
2    history.  Have you ever been a public school teacher?
3    A.   I have not been a public school teacher;
4    however, I have been a teacher within the schools
5    doing my student teaching.  I actually took over the
6    classrooms and taught the lessons within the
7    classroom --
8    Q.   In what year --
9    A.   -- so I have been a teacher.
10   Q.   What year, or what years would that have been?
11   A.   That would have been --
12   Q.   And you can ballpark it --
13   A.   That would have been --
14   Q.   -- a while ago.
15   A.   That would have been in the nineties, during
16   the time that I went back to school and received my
17   degree in elementary education.
18        So it would have been during that time, in
19   the nineties, right after I went to work as, became
20   employed by John W. Walker, P.A.
21        I went back to school to receive any degree
22   in education, and subsequently I received a Master's
23   Degree in Education Administration.  So it would have
24   been during -- you know, that would have been in the
25   nineties, between '90 and 2001.

---

Page 36

1    Q.   And how many school years are we talking about
2    here?
3    A.   I, I don't understand your question.
4    Q.   So you talked about your work as a teacher, and
5    I'm asking you how many school years did that take
6    place?
7    A.   Oh, that would have been one school year.  I
8    think the teacher -- yeah, that would have been one
9    school year.  That program would have lasted -- you
10   do student teaching for one year.
11   Q.   In which district did you complete that
12   teaching?
13   A.   Little Rock School District.
14   Q.   Have you ever worked as a school administrator?
15   A.   No.
16   Q.   Other than that one school year that you
17   already talked about being a teacher with Little Rock
18   School District, have you ever worked for a school
19   district at any other point?
20   A.   No, I have not, but I have many, many years of
21   working with teachers, attending teacher workshops,
22   and that sort of thing.
23        So we're talking -- as you know, I've been
24   around on this case for a number of years, and as a
25   result of that, I attended the meetings that the

---

Springer, Joy 5/15/2020                                                Little Rock School District v. Pulaski County Special School District, et al

## Page 37

1    teachers attended, went through the same sort of
2    staff development in the Little Rock School District.
3           I attended certain meetings, particularly
4    in the Little Rock School District.  The Little Rock
5    School District had some similar obligations as
6    Pulaski County.
7           They had an obligation to implement
8    programs that would address the academic achievement
9    of, of the students, African-American students
10   similar to Pulaski County.
11          So I had the opportunity of going to those
12   same teacher training sessions, getting the same type
13   of training that they received.
14          I worked very closely -- they had what was
15   called a Program Research and Evaluation Department.
16   That department was particularly implemented in order
17   to make evaluations of whether or not certain
18   programs were being effective.
19          So I had that sort of training as well, and
20   determining how to do that by the use of qualitative
21   and quantitative data.  So I'm familiar with those
22   concepts.
23          So I understand clearly what's necessary in
24   order for a person to receive certain training, and
25   for that training to be applied, and for certain

## Page 38

1    persons to go in classrooms and make certain
2    observations and determine whether or not things are
3    taking place within the classroom.
4           So I have all of that knowledge for years.
5    So I've been there, and I've done that.  Even though
6    I have not actually taught in the classroom, I have
7    been in those meetings where that sort of thing was
8    taking place.
9    Q.   All right.  Have you ever been disciplined by
10   an employer?
11   A.   Are you, are you referring back when I worked
12   for Allstate Insurance Company; is that your
13   question?  Is that the question that you want me to
14   answer?
15   Q.   Just all times.  So, yes, it would encompass
16   your time at Allstate.
17   A.   Yes.
18   Q.   Other than Allstate have you ever been
19   disciplined by an employer?
20   A.   No.
21   Q.   Have you ever failed to disclose any conflicts
22   of interests?
23   A.   Well, just recently I -- no, I'm not aware that
24   I have, and no one has brought that to my attention.
25   I've held several -- this makes my second public

## Page 39

1    office, recently elected as State Representative.
2           I previously held the position of school
3    board member for the Little Rock School District, so
4    with respect to that position, you also have to
5    determine -- you know, you have to reveal whether or
6    not you have conflicts of interest, and it has not
7    been brought to my attention that I have failed to do
8    that, because that's something that people check on
9    and do that sort of thing.  So I would not think so,
10   so no.
11   Q.   Have you ever been involved in a legal
12   proceeding where a judge found your testimony to be
13   not credible?
14   A.   I have not -- I'm not aware of anything of that
15   nature.  In fact, I'm aware that previously, in this
16   particular case, that Judge Miller found, when the
17   school district filed its motion a few years ago with
18   respect to staffing, and I gave testimony with
19   respect to their application process and whether or
20   not they were hiring certain persons, teachers, in
21   accordance with the plan obligation, Judge Miller did
22   not indicate that he thought my testimony was not
23   credible.
24          In fact he cited my testimony in that, in
25   his order.  So, no, I'm not aware of anything like,

## Page 40

1    such as that.
2    Q.   Other than Judge Miller, any other judge?
3    A.   Well, I have only, I have only testified in
4    this particular case, so I don't know of any other
5    cases that I've had to testify in, other than this
6    particular case, that's relevant to this particular
7    proceeding that we're here today about.
8    Q.   I just want to make sure I understand your
9    answer.  So the question was have you ever been
10   involved in a legal proceeding where a judge found
11   your answer to be not credible?  And your answer is
12   "No"; correct?
13   A.   I'm -- and my answer is I'm not aware of a
14   judge indicating that my testimony has been not, was
15   not credible.  I'm not aware of such a finding.
16   Q.   Are you related to anyone who presently works
17   at PCSSD?
18   A.   I am.
19   Q.   Who is that?
20   A.   Proud of it.  I'm sorry?
21   Q.   Who is that?
22   A.   The principal of Mills High School.  His name
23   is Duane Clayton, C-l-a-y-t-o-n.
24   Q.   Anyone else?
25   A.   And I believe his, his daughter works for the

Bushman Court Reporting                          Janess Ferguson Smith                                501-372-5115

Springer, Joy 5/15/2020                                                      Little Rock School District v. Pulaski County Special School District, et al

Page 41

1    Pulaski County Special School District.  She is in
2    the Special Education department.
3             And I had a sister --
4    Q.   What --
5    A.   And I had a sister that worked for the Pulaski
6    County School District.  She retired from teaching in
7    Magnolia, Arkansas, came here, and she taught for a
8    little while and decided that she wanted to be
9    retired, rather than teach.
10   Q.   So other than Mr. Clayton, his daughter, and
11   your sister are you related to anyone else who
12   presently works at PCSSD?
13   A.   I'm trying to think now.  Oh, yes,
14   Mr. Clayton's daughter works in Pulaski County
15   Special School District.  She works at Sylvan Hills.
16   I think she works with the students in that AVID
17   program.
18   Q.   Anyone else?
19   A.   If I think of anybody else, I'll let you know.
20   At this point in time, those are the -- you know,
21   those are immediate family members.
22             There may be some cousins, distant cousins
23   that I'm not aware of at this time.  So if I find out
24   about anybody else, I'll let you know.
25   Q.   And you mentioned, I believe it was your sister

Page 42

1    that had worked for PCSSD in the past.  Did I hear
2    you correctly?
3    A.   You did.
4    Q.   What years -- and if you don't know exactly,
5    you can ballpark it -- what years did he work at
6    PCSSD?
7    A.   Okay.  She was a substitute teacher this past
8    school year.  I mean, in 2018-'19 she substituted in
9    the district.  And then for this particular school
10   year, '19-'20, she worked in the school district.
11             And then after, after coming out of
12   retirement and going back to work, she decided that
13   she needed to be retired, rather than teach.
14             So she didn't, she didn't work very long
15   this year, is what she told me.  That's, that's,
16   that's hearsay from her.
17   Q.   And what has she told you about her time
18   working at PCSSD?
19   A.   Will you repeat your question?
20   Q.   What has she told you about her time working at
21   PCSSD?
22   A.   I'm not sure I understand your question.  What
23   has she told me about her time?
24             MR. PORTER:  About her experience.
25   Q.   About her experience.  What has she told you

Page 43

1    about working at PCSSD?
2    A.   Well, to be -- nothing very specific.  Are you
3    trying to relate this to the plan?  I -- basically, I
4    think I tried to tell you what she's told me.
5             She determined that she wanted to be
6    retired, rather than be in the classroom teaching, is
7    basically what she told me.  She thought that she
8    wanted to do that, but she decided that she did not,
9    that it was time for her to be retired.
10   Q.   Okay.  Did she indicate any negative
11   impressions to you about PCSSD?
12   A.   My, my conversations with my sister did not
13   formulate any negative opinions about it.  I've -- my
14   opinions were formulated prior to her telling me
15   that.
16   Q.   Same question, but for Mr. Clayton.
17   A.   Same response.
18   Q.   Same question, but for any of Mr. Clayton's
19   daughters.
20   A.   My, my opinions about Pulaski County Special
21   School District are formulated not by conversations
22   that I've had with either of those persons that I've
23   identified.
24   Q.   Can you tell me about your involvement with the
25   Little Rock School District's PRE program, PRE

Page 44

1    Department?
2    A.   Very close relationship with the PRE
3    Department.  In fact, participated -- as I stated
4    before, I was a part of -- they invited me to
5    participate in the team that collected the
6    qualitative and quantitative data with respect to
7    certain programs within that district, who would sit
8    down and have meetings about the data that were
9    collected.
10             That would be a group of persons, parents
11   from the community, teachers, and then
12   administrators, and then the staff of the PRE.
13   Q.   What years are we talking about here?
14   A.   Oh, that's in the 2000s, between 2000 and 2004.
15   Q.   Okay.  What about your involvement with the Ivy
16   Foundation of Little Rock?
17   A.   The Ivy -- okay.  That's the fundraising --
18   I-v-y, is that what you're asking me?  Ivy
19   Foundation?
20   Q.   Yes.
21   A.   Okay.  That's the fundraising arm of Beta Pi
22   Omega chapter of Alpha Kappa Alpha Sorority,
23   Incorporated.
24             So our fundraising efforts go through the
25   Ivy Foundation of Little Rock.  Do you need to know

11  (Pages 41 to 44)

Springer, Joy 5/15/2020                                      Little Rock School District v. Pulaski County Special School District, et al

## Page 45

1  anything else --
2  Q.  Does that --
3  A.  Do you need to know anything else about that?
4  Q.  Does that have to do anything with PCSSD?
5  A.  I'm sorry?
6  Q.  Does that have anything to do with PCSSD?
7  A.  The Ivy Foundation of Little Rock?
8  Q.  Yes, ma'am.
9  A.  Okay.  The Ivy Foundation of Little Rock may
10  award some scholarships to students in the Pulaski
11  County Special School District, if that's what you're
12  asking me.
13      Yeah, I'm sure, I'm sure that there have
14  been students within Pulaski County that have
15  received scholarships from the Ivy Foundation of
16  Little Rock and Alpha Kappa Alpha sorority, Beta Pi
17  Omega chapter.
18      So it's the two entities that work
19  together, but the Ivy Foundation is the fundraising
20  arm of the organization for federal tax purposes, and
21  the, you know, what is it, 501(c)(3) status?  So
22  that's how it works.
23  Q.  Okay.  Let's shift gears a little bit.  I want
24  to ask you about your involvement with the
25  desegregation case.

## Page 46

1      Before I do that, though, I do want to say
2  we have been going almost about an hour, and I
3  believe you know from other depositions, but when you
4  need a break, just let us know, and we will take a
5  break.
6  A.  I have my water here, so.  I may have to go to
7  the ladies room maybe after another hour.
8  Q.  Well, you just let us know.  Your history with
9  this case, I believe John Walker hired you as a
10  paralegal in 1992; is that correct?
11  A.  I don't know that I actually had a title, but
12  that's fine.  You can call me -- that's okay.  I
13  would say I was a gopher here, or gopher there.
14  Whatever was needed, I did it, basically.  So, yeah,
15  paralegal is fine.
16  Q.  Have you served as a lead monitor in the case
17  since 1992?
18  A.  I -- well, I didn't think -- I didn't consider
19  myself as the lead monitor back in 1992, because I
20  was really learning about the case, so I would say no
21  to that question.
22      After a period of time when I learned more
23  about the case and what was taking place, and after I
24  received additional education and attended school,
25  and attended meetings, and workshops, and those sort

## Page 47

1  of things, I think that I eventually received that
2  title.
3      I think Mr. Walker has, basically, been the
4  lead monitor in this case.  So I would say he's
5  actually the -- he was actually the lead monitor for
6  this case.
7  Q.  So in the time period from 2010 until present,
8  what would you say your title is in this case?
9  A.  He gave me that title.  Mr. Walker gave me that
10  title, but he was actually the lead monitor.
11  Q.  And, of course, Mr. Walker, as we have already
12  mentioned, has passed, and Mr. Porter has taken over
13  as the lead counsel for the Intervenors.  How has
14  your involvement in this case changed, if at all,
15  since the passing of Mr. Walker?
16  A.  I can't say that it has.  It seems like I have
17  more work now, probably more work now to do, in
18  communicating with, you know, persons.
19      And I think Mr. Porter has already
20  indicated that, you know, he, he, he was involved in
21  the case, but he didn't have, you know, the little
22  details about certain things that were taking place.
23      So I'm having to communicate with him and
24  tell him about certain things that have transpired.
25  So, you know, that takes some time, but, you know,

## Page 48

1  Mr. Porter, you know, he has been around, and knows
2  the history, and all of that.  So -- but, you know,
3  the little details about certain things, I'm having
4  to assist with that.
5  Q.  All right.  Let's talk about some of the
6  different roles you have or different hats that you
7  wear.  You are a State Representative for District
8  34; correct?
9  A.  Yes.
10  Q.  And --
11  A.  And I brought my tablet for that, just in case.
12  Q.  Okay.  Well, I don't want to go into that too
13  much.  I know that would take a whole day in and of
14  itself.
15      Has your role serving as a State Rep for
16  District 34, has that been involved with the deseg
17  suit at all?
18  A.  I'm sorry?  Repeat your question.  I guess I'm
19  not understanding your question.
20  Q.  Yeah, it probably was a bad question.  Let me
21  put it this way.  Through your involvement working as
22  a State Rep, have you -- strike that.
23      Is there any overlap between your role
24  working as a State Rep and your involvement in this
25  desegregation lawsuit?

Bushman Court Reporting                    Janess Ferguson Smith                    501-372-5115

Springer, Joy 5/15/2020                                    Little Rock School District v. Pulaski County Special School District, et al

Page 49

1    A.   I guess I'm still not understanding your
2    question.  What do you -- I don't understand your
3    question.
4    Q.   When you are out working as a State Rep, do you
5    ever take care of any business that's also relevant
6    to this deseg lawsuit?
7    A.   Okay.  Let me, let me just let you know, say
8    this to you.  I was elected as State Representative
9    on March the 3rd.  I was sworn in on March the 17th.
10         Since that time, Rona, Covid 19 has taken
11   place, so there has not been very much of my having
12   to go out, as you say, and try to relate to
13   constituents of the district and talk about my role
14   with respect to this case and meeting people within
15   the district.  So that has not happened because of
16   the current pandemic that's taking place.
17         And I guess let me just say this.  Persons
18   now are more concerned, which I think we ought to be
19   too, about the pandemic and them being unemployed and
20   wondering where they're going to live and how they're
21   going to live from day to day.
22         So most of the contact that I have had
23   within the last, what is it, two months, has been
24   about making sure that they're safe, and they have
25   the things that they need in order to survive.  So

Page 50

1    that's what's been taking place.
2         And here's the other thing too, as a State
3    Representative, I have analysts in the House of
4    Representatives, special persons that assist me with
5    those sort of things.
6         So if a person calls me up and asks me
7    about certain things, I can assign that task to an
8    analyst, and they can investigate those sort of
9    things.
10         So praise the Lord that there is some
11   assistance for me with respect to that.  I usually
12   have a conversation with the persons about whatever
13   their concerns are, and then I can refer them to an
14   assistant, who helps me with responding to whatever
15   needs that they have.  So, I mean, that's just -- you
16   know, that's wonderful the way that that process
17   works.
18         And so you will know, I'm on the Education
19   Committee.  I was elected to finish out the term of
20   Mr. Walker, and that terms ends the end of this year.
21         And while I'm serving as State
22   Representative for the end of the year, I will be
23   serving on the Education Committee, and I have had
24   some conversations with members of that committee.
25         And so our first committee meeting, given

Page 51

1    this pandemic, and probably they won't last very
2    long, hopefully, and we won't be in rooms together,
3    will be on Monday and Tuesday.  I'm hoping that they
4    don't last very long.
5    Q.   I guess this is a little bit of a hypothetical
6    question, because I understand that since you've
7    taken office it's pretty much been Covid 19 all of
8    the time, but those analysts that you mentioned that
9    you have the ability to work with to help investigate
10   issues, are they about to do any work investigating
11   any desegregation-related issues?
12   A.   I guess I'm not understanding your question.
13   Q.   You referenced just a few moments ago some
14   analysts that you are able to work with through your
15   role as State Representative.
16         Do those people, are they able to assist in
17   any way with this case, or is that something totally
18   different?
19   A.   Well, I think that's different.  The persons
20   that would be -- if there is a concern about this
21   particular case, that will be referred to Mr. Porter,
22   Mr. Pressman, Mr. Childs, or Mr. Walker, Mr. Lawrence
23   Walker.
24         So they're the persons that are dealing
25   with this case.  I mean, I don't, I don't see me

Page 52

1    referring them to the Arkansas House of
2    Representatives.
3    Q.   What are the names of those analysts that you
4    work with?
5    A.   Oh, I mainly work with Ms. Smith, Shannon
6    Smith, and I can't think of the other lady's name.  I
7    will have to tell you, give you her name later on.
8    But the person that's in charge of the member
9    services, her name is Martha Jarrow, J-a-r-r-o-w.
10         And let me just say this, I don't think I
11   would -- in fact, if a person calls about a
12   desegregation issue, I would either be able to answer
13   that question if it relates to the plan, or, like I
14   said earlier, refer them to one of the counsel.
15         So there's no need for me to have to have a
16   legislative analyst respond to any question that
17   someone would have about this case.  That's not
18   necessary.
19   Q.   Thank you for explaining that to me.  You, of
20   course, are a woman of many talents, and you wear a
21   lot of hats, so I'm just trying to understand how it
22   all goes together or doesn't go together, so I
23   appreciate that explanation.
24   A.   Thank you.
25   Q.   I want to move on and ask you about some of

13  (Pages 49 to 52)

Page 53

1    your work with monitoring.
2                 MR. PORTER:  Hey, Devin?
3                 MR. BATES:  Yeah, go ahead.
4                 MR. PORTER:  This may be a good
5          opportunity to take a break.  I know our
6          court reporter has been going pretty
7          strong, and Ms. Springer has, you know, she
8          talks a lot, and she's having to type a
9          lot.  So we may want to just take a break,
10         if that's all right.
11                THE WITNESS:  Yeah, I think I am
12         talking too much.
13                MR. BATES:  It's a great time.
14                MR. PORTER:  All right.  Thank you.
15                (Eleven-minute break.)
16   BY MR. BATES:
17   Q.   We are back on the record, and before we dive
18   into it here, I just want to clarify, Representative
19   Springer, have we been communicating clearly so far
20   in this deposition?
21   **A.   I believe I have heard your questions.**
22   Q.   Okay.
23   **A.   If not, I'll correct you.**
24   Q.   And you have been doing a good job so far of
25   asking me to repeat when the internet cuts out, or

Page 54

1    whenever there's a misunderstanding.  So thank you so
2    much for that.
3            What is monitoring?
4    **A.   Well, the definition of monitoring can be a**
5    **variety of things, and I think I told you what I**
6    **believe monitoring encompassed when I sent that email**
7    **to you the other day.**
8            **And so to answer that question, I think**
9    **the, it's, it's answered within the email that I sent**
10   **to you.  And I don't, I don't recall any judge at the**
11   **district level or at the, at the federal level**
12   **saying, This is what you've got to do in order to**
13   **monitor.**
14           **(Exhibit No. 2 was marked.)**
15   BY MR. BATES:
16   Q.   And just for purposes of the record, if you
17   could turn in your binder in front of you to Exhibit
18   Number 2.
19   A.   (Witness complies.)
20   Q.   I believe it's the second page.  Is that the
21   email that you're referring to?
22   **A.   Yes.**
23   Q.   Could monitoring ever interfere with
24   instruction?
25   **A.   Not, not my, not the monitors that I've worked**

Page 55

1    with.
2    Q.   Has the monitoring that has been done by the
3    Joshua, now McClendon, Intervenors ever interfered
4    with instruction?
5    **A.   I think there is the belief that it has, but**
6    **the monitors that have worked with the Intervenors,**
7    **Joshua Intervenors, take specific care with respect**
8    **to not interfere with instruction.**
9            **So if there's an allegation that monitoring**
10   **has interfered, has interfered with instruction,**
11   **that's new to me.**
12   Q.   What is enough monitoring?
13   **A.   I don't -- I couldn't answer that.  I don't**
14   **even know what that means.**
15   Q.   Well, how do you know when you have monitored
16   enough?
17                MR. PORTER:  Object to the form, but
18         if you can --
19   **A.   I'm not quite sure.  I don't -- in fact, I**
20   **don't even understand the question.  I don't know how**
21   **that relates to why we're here today.**
22   Q.   When it comes to monitoring, would you agree
23   that it's just the more the better?
24   **A.   Well, see, I can't answer that question either,**
25   **because I don't know what has taken place with**

Page 56

1    respect to, whether things have taken place with
2    respect to what the district is supposed to be doing,
3    and the communications between the parties involved,
4    so you -- I can't answer your question.
5    Q.   Relating to the monitoring that's been done by
6    Joshua and McClendon Intervenors, what is too much
7    monitoring?
8    **A.   Once again, I can't answer that question, not**
9    **knowing what you're talking about.  I have no idea as**
10   **to what you're talking about.**
11                MR. PORTER:  I guess that's something
12         for the Court to decide, Devin.
13   Q.   Well, I guess the question is when y'all are
14   monitoring PCSSD schools, at what point do you say,
15   Okay.  Enough is enough.  We've spent enough time on
16   this monitoring effort?
17   **A.   I still have the same response to that**
18   **question.  I don't -- I have no idea what, how you**
19   **arrive at enough is enough, and we don't need to do**
20   **anything anymore so.  I'm sorry.  I just -- I can't**
21   **answer that question.**
22   Q.   On what type of issues do you monitor PCSSD?
23   **A.   Well, I'll answer it this way, the remaining**
24   **obligations under the plan that are before the Court**
25   **include discipline, facilities, student achievement,**

14  (Pages 53 to 56)

Springer, Joy 5/15/2020                                      Little Rock School District v. Pulaski County Special School District, et al

Page 57

1   and monitoring. Those are the areas that we continue
2   to monitor.
3          And also with respect to that, there are
4   certain things that are supposed to be taking place
5   in order to show good faith that relate to those
6   particular areas.
7          For instance, we continue to monitor your
8   statistics that relate to Special Education
9   placements, because that's a part of a, that's a part
10  of achievement.
11         In addition, and then discipline, you know,
12  that's already a part. But those are the sort of
13  things that we monitor. So anything that's still
14  pending that relates to the obligations under the
15  plan are being monitored.
16  Q.  I don't want to put words in your mouth, but I
17  think I can probably short circuit some of this and
18  save us a little time.
19         Is it fair to say that you receive phone
20  calls by people in the community, parents, guardians,
21  anyone really, and they report to you about perceived
22  issues at Pulaski County Special School District? Is
23  that fair to say?
24  A.  That is true, yes. And once they tell me about
25  those issues, I communicate those issues to the

Page 58

1   Pulaski County Special School District, or either,
2   you know, Jacksonville, for example. So, yes.
3          And that is monitoring, because if those
4   issues relate to those obligations under the plan,
5   then they are communicated to the respective persons
6   within that district. That is monitoring, because
7   that remains a concern of the community.
8   Q.  How many calls of that nature would you say you
9   receive each year?
10  A.  I have not kept up with those.
11  Q.  How many would you say you receive each month?
12  A.  I haven't kept it on a monthly basis.
13  Q.  What basis do you keep it on?
14  A.  Well, I can give you an estimate. During the
15  school year, they are more frequent, so -- and that's
16  between, let's say -- let me just give you a number.
17  Q.  Yeah, I'm looking for a ballpark.
18  A.  I'm trying to add. I'm not like Mr. Walker.
19  It will take me a while. He was able to add in his
20  head. I need to probably write it down a minute.
21  Let me use my pen.
22         I would say between 150 to 200,
23  approximately. That's a rough estimate during the
24  course of a school year, and that's starting in,
25  like, August until May, June, when school is out.

Page 59

1   Q.  And how do those people --
2   A.  And those calls not only come from parents.
3   Those calls come from teachers, who don't want to be
4   identified. So that's a rough estimate.
5   Q.  How do those people reach you? Are they
6   calling your personal cell phone, or are they calling
7   John Walker, P.A.?
8   A.  They are calling John W. Walker, P.A.
9   Q.  Do you keep any sort of log or record of those
10  phone calls?
11  A.  I think we have -- no.
12  Q.  Can you tell me the names of any of those
13  people?
14  A.  Not at this time. I didn't know that I was
15  going to have to do that. I may be able to go back
16  and look at some records, like emails and those sort
17  of things, and if Mr. Porter says it's okay to
18  release those names of those individual, I'll, I'll
19  do that.
20  Q.  With there being -- did I understand you, did
21  you say 150 to 200?
22  A.  Yeah, over the course of the school year,
23  August until May, June.
24  Q.  I acknowledge that this is a broad question, so
25  you probably can just give me a few examples, but

Page 60

1   what types of topics do those people bring up when
2   they call?
3   A.  The majority, the majority of them have to do
4   with treatment of their children with respect to
5   discipline.
6          And then the others relate to educational
7   services, making sure that their kids are in the,
8   receiving the proper services. And then there are
9   complaints about their children not being in certain
10  programs.
11         So discipline is the main one, how students
12  are being treated by staff within the schools. And
13  then we get a number of calls of kids being referred
14  to the juvenile system too.
15         And I, and I guess I'm talking too much,
16  but we've even -- we have such a relationship with
17  the juvenile center that Charles Bolden received an
18  email that was shared with him about the problems
19  that they're having within the district of sending
20  kids to the juvenile system for little reasons.
21         So that was a concern of the juvenile
22  system that we received. Charles has a personal
23  relationship with those folks down there.
24  Q.  In the 150 to 200 calls, approximately, that
25  you receive each year at John W. Walker, P.A., is it

Bushman Court Reporting                    Janess Ferguson Smith                    501-372-5115

Springer, Joy 5/15/2020                                        Little Rock School District v. Pulaski County Special School District, et al

## Page 61

1    fair to say that not every single one of those calls
2    relates to the current monitoring efforts of PCSSD?
3    **A.   Please ask your question again.**
4    Q.   I will ask it a different way.  Of those 150 to
5    200 calls that you receive each year, does every
6    single one of them relate to the current monitoring
7    efforts of PCSSD?
8    **A.   I thought that that was your initial question.**
9    **Maybe I misunderstood your question.  I thought your**
10   **question asked me about monitoring, and I thought I**
11   **answered the question about monitoring and what the**
12   **monitoring encompassed, so it relates to the**
13   **remaining obligations under the plan.**
14          **And they include discipline, student**
15   **achievement, facilities, and monitoring itself.  So I**
16   **think that was -- that, that's what I was responding**
17   **to.**
18   Q.   Do you receive any calls at John W. Walker,
19   P.A. where different people in the community are
20   calling you, but actually it turns out it doesn't
21   relate to Plan 2000 monitoring efforts at this time?
22   **A.   Oh, of course.  You know, John W. Walker, P.A.**
23   **is known for handling cases that involve other,**
24   **things other than this case.**
25          **Little Rock School District versus Pulaski**

## Page 62

1    **County Special School District is not the only case**
2    **that is being handled by John W. Walker, P.A.**
3          **If that were the case, I would not be**
4    **sitting here today.  We could not survive.  I would**
5    **not be paid.**
6    Q.   So can you give me an example of a situation
7    where someone called John W. Walker, P.A., presumably
8    to get assistance for this deseg lawsuit, but it
9    turned out that it was on something that wasn't
10   related?
11   **A.   I guess I'm not, still not understanding your**
12   **question.  I'm not sure what you're talking about.**
13   Q.   Can you think of one example where someone
14   called John W. Walker, P.A., to get assistance with
15   their student at PCSSD, but it turns out it actually
16   wasn't related to Plan 2000?
17   **A.   I'm thinking.  I'm trying to see if I recall a**
18   **situation.  Right now I can't recall a situation.**
19   **After 25 years, I'm, it's hard to remember.**
20   Q.   And I want to make sure, before we move on from
21   this, 150 to 200 calls approximately per year, is
22   that just related to PCSSD, or were there any
23   Jacksonville calls in there?
24   **A.   Oh, that includes Jacksonville too.**
25   Q.   So your 150 to 200, estimating, includes PCSSD

## Page 63

1    and JNPSD?
2    **A.   Yeah.  Yes.  And I thought that's what your**
3    **question said about this case.**
4    Q.   Was that number higher in the past when Little
5    Rock and North Little Rock were also in the case?
6    **A.   In fact, we had more people working on -- yes.**
7    Q.   That's fair.  I want to shift away from your
8    monitoring efforts for a moment and ask you about
9    some advocacy work for students.
10          I understand that as I ask these questions
11   some of your answers might get to work that you have
12   done through John W. Walker, P.A., representing
13   students, so I don't want to encroach on any
14   attorney-client privileged information which would
15   include names.  But does John W. Walker ever
16   represent specific students at PCSSD, I mean, outside
17   of this case?
18   **A.   I'm trying to think.  That's, that's -- right**
19   **now I don't have an answer to that.  You know, there**
20   **may be some, but right now I'm trying to think of who**
21   **that would be.  I can't -- you're asking hard**
22   **questions.  I can't answer that.**
23   Q.   Does John W. Walker, P.A., ever represent
24   students who are seeking to receive modifications or
25   accommodations under a 504?

## Page 64

1    **A.   That's a good question.  Yes.**
2    Q.   Okay.  Does John W. Walker, P.A., ever
3    represent students who are seeking to ensure that
4    they receive a free and appropriate education under
5    the IDEA?
6    **A.   I, I think that's the same question.**
7    Q.   So the answer is "yes"?
8          MR. PORTER:  I think he has a pending
9          question.  Are you waiting for -- I think
10         she has already answered the question,
11         Devin.
12   Q.   So the answer is "yes," Special Ed?
13   **A.   Oh, okay, yes.  I'm sorry.  Oh, I thought by me**
14   **saying -- oh, okay.  I said that was the same**
15   **question that you just asked me.**
16   Q.   I want to ask you specifically about ███████
17   (phonetic), 2018.  Do you remember Ms. ██████?
18   **A.   I didn't know that I would -- right now you**
19   **have to refresh my memory.  The name doesn't ring a**
20   **bell.  Give me, give me something about it, then that**
21   **will help me remember.**
22          **Please understand, I've been going through**
23   **pages and pages of document, not only in this case**
24   **but doing other work, so I'm -- you know, I did not**
25   **prepare for this deposition, so you have to give me**

Springer, Joy 5/15/2020                                                                          Little Rock School District v. Pulaski County Special School District, et al

Page 65

1  more information, tell me, than what you've
2  indicated.
3  Q.   Are you able to see a screen share that I have
4  put up there?
5  A.   (Witness reviews document.)
6  Q.   It looks like you are reading, so is that a
7  "yes," just to make sure?
8  A.   Yeah.  Okay, yes.
9  Q.   For the record, I am showing you an email, it
10 looks like October 22nd, 2018.  This is concerning a
11 student whose parent's name is ███████; is that
12 correct?
13 A.   Yes.
14 Q.   Does this help you remember the situation that
15 I'm referring to?
16 A.   Yes.
17 Q.   So your work with Ms. ███████ and her student,
18 is that related to monitoring, or is that related to
19 a separate representation by John W. Walker,P.A.?
20 A.   Oh, that was related to monitoring.  So, yes.
21 I will wait for your next question.
22 Q.   And so how did Ms. ███████ become a part of
23 the monitoring efforts at PCSSD?
24 A.   Well, to me that was, that relates -- as I
25 recall that now, that related to a discipline issue

Page 66

1  that took place within that classroom.
2  Q.   So how did Ms. ███████ become a part of the
3  monitoring?  Did she call John W. Walker, P.A.; do
4  you remember?
5  A.   She called -- probably one of the teachers told
6  her to call.  I'm thinking that's what she -- as I
7  recall, she told me that she was advised by a staff
8  member to call the office, to have our office deal
9  with that.
10       And she didn't tell me who the teacher was,
11 and she told me that she was told not to indicate who
12 referred her to us.
13 Q.   So this was all part of your monitoring
14 efforts; is that what you're saying?
15 A.   Yes.  And what did you --
16 Q.   And so what did you -- go ahead.
17 A.   I was just going to say, most of the time
18 that's what takes place.  Teachers within the
19 district have parents call the office, call us and
20 tell us about similar, you know, similar incidents,
21 such as this.
22 Q.   And it looks like from this email you have
23 read, it looks like this is pertaining to 504
24 eligibility, that Ms. Blackmon was looking to receive
25 for her student?

Page 67

1  A.   Yes.  And so, as I testified to earlier, the
2  district has an obligation to continue to -- we
3  still -- there's an obligation by the district to
4  continue to monitor to ensure that students are being
5  placed properly and received proper services with
6  respect to that.
7        And so that is part of the monitoring
8  piece, because there's an obligation for them to
9  continue to keep up and track those numbers.
10       And that also relates to academic
11 achievement.  When children have certain
12 disabilities, teachers ought to monitor and adjust
13 their instructions to ensure that they are being
14 taught.
15       And then I see where they taught, where
16 they say they talked about RTI process.  I think you
17 all take the position that you all are implementing
18 that process in order to address behavior that's
19 taking place within your district.  So it's
20 definitely a situation that relates to the
21 monitoring.
22 Q.   Now that you've had a chance to receive this
23 email and refresh your memory about Ms. Blackmon,
24 what else did you do?
25       Were there any meetings?  Was there any

Page 68

1  sort of follow-up?  What else did you do in response
2  to --
3  A.   If I remember correctly, I believe there was a
4  hearing in the district, and then, I believe -- and
5  I'm thinking he's one of the students that got
6  referred to the juvenile justice system as well.  And
7  Charles Bolden assisted him with that.  And that was
8  part of our monitoring activity as well.
9        So here's what takes place, so you'll
10 understand, and I guess I'm talking too much.  A lot
11 of times these parents come to our office.  A lot of
12 them don't have means, and Mr. Walker has instructed
13 us to assist them as best that we can with going
14 through the process.  And so we do those sort of
15 things.
16       That child, as I recall now, was referred
17 and, and had possibilities of charges being brought
18 before him.
19       And so Charles has this relationship.  He
20 went with them and was able to work something out
21 with him.  And I'm thinking I attended a, a hearing
22 on his behalf.
23       So when parents call and talk to us about
24 difficulties that they're experiencing, we go the
25 extra mile to try and assist them and make sure --

                                                17  (Pages 65 to 68)

Springer, Joy 5/15/2020                                    Little Rock School District v. Pulaski County Special School District, et al

Page 69

1  and then these sort of things are discussed when we
2  have our meetings with, those monthly meetings with
3  the district.
4  Q.   So your attendance at any sort of hearing for
5  this student, and Mr. Bolden's work with this
6  student, that was all part of the monitoring efforts;
7  is that correct?
8  A.   I would say so, yes, because had, had, had the
9  parent had better communication about the process
10 from the people within the school -- and I -- and as
11 I recall, as I indicated before, I'm thinking one of
12 your staff members referred them to us and told us,
13 You need to call the Joshua Intervenors.
14       You know, sometimes people don't
15 understand.  I don't know if it was still Joshua or
16 if it was McClendon at that particular time, but
17 they'll say, Call the Joshua Intervenors, and they'll
18 help you with this.
19       So the people in your district know that if
20 there's an issue that's not being properly handled,
21 they will have those parents call our office, and we
22 have to assist them.
23 Q.   Okay.  I would like to shift gears now and ask
24 you about another situation.  And I'm referring now,
25 the parent's name is Ms. ███████.  Do you

Page 70

1  remember ███████?
2  A.   Was she over in -- was that Sylvan Hills?  Did
3  she attend school at Sylvan Hills?
4  Q.   I believe so.
5  A.   Okay.  Yes.  And I -- yeah, I remember that
6  too, and I think you all involved -- what's the
7  lawyer's name that -- I attended some conferences on
8  that one too.  What is her -- the lawyer?
9        MR. PORTER:  Teresa Caldwell?
10 A.   Not Teresa Caldwell, for the district.  She,
11 she was -- in fact, you all sent one of, a lawyer to
12 be in on that conference.
13       Janet Pulliam, is she a lawyer that does
14 some hearings for you all?  What is her name?  I'm
15 thinking she, she may have done a school board
16 hearing.  What is her name?
17       MR. RICHARDSON:  Is it Stephanie
18 Streat?
19 A.   I'm thinking it may have been --
20       MR. KEES:  It --
21       THE WITNESS:  Who is it ████? You
22 know the lady's name.  She was involved in
23 that conference.
24 BY MR. BATES:
25 Q.   At any rate, for purposes of the record, I'm

Page 71

1  showing you an email from April 13th, 2016.  It looks
2  like an email, Representative Springer, that you
3  sent, and it relates to ███████ and her
4  student, whose name I don't really need to say on the
5  record.
6  A.   Yes.
7  Q.   But you are familiar with the situation I'm
8  referencing; correct?
9  A.   If I remember correctly, yeah.  My memory is
10 being refreshed.
11 Q.   And it looks like this is stemming from
12 protesting and appealing of suspension of
13 ███████ daughter following a physical
14 altercation, and it does happen to relate to Sylvan
15 Hills.
16 A.   Yeah.
17 Q.   So is it your understanding that this situation
18 and any work that you performed here also relates to
19 your monitoring efforts?
20 A.   Yes, it does because, once again, and let me
21 just tell you, and so we kind of come to the school
22 district, and that was an appeal hearing.  We go into
23 those hearings.
24       There was a problem with due process, and
25 so students have to receive due process.  And we

Page 72

1  previously have had discussions about that.
2        A lot of the times kids receive a behavior
3  document.  They're not asked questions about what has
4  taken place.  There is no investigation.  They go
5  straight to the student hearing office.
6        And so this provides an opportunity for us
7  to monitor, to determine whether or not due process
8  has taken place with respect to students when these
9  suspensions take place.
10       So that is part of the monitoring, because
11 there was a time when, early on -- remember, I have
12 been on this case 20 some odd years -- where students
13 were not being afforded due process.
14       So this is an opportunity for us to monitor
15 to see if due process is taking place.  And then it
16 also is an opportunity for us to see whether or not
17 the hearing officer is fair, because, remember, there
18 was a time -- no, you don't remember this -- where
19 they had a committee, and the committee would hear
20 the appeals.
21       And based on the -- the appeals were heard
22 by other principals.  So when a principal refers a
23 student for discipline, suspension, or something of
24 that nature, other principals would hear the
25 suspension.

18  (Pages 69 to 72)

Springer, Joy 5/15/2020                                      Little Rock School District v. Pulaski County Special School District, et al

Page 73

1      And we determined that that was not a fair
2    way to do it, so that's how it came into being there
3    being just the one hearing officer with respect to
4    this. And then, so, the process evolved from there.
5    So this is a part of the monitoring that we did.
6    Q.   Okay. I just have kind of a simple question,
7    but remember that I am new to this case, so just take
8    a step back with me for a moment.
9    A.   I understand. I understand. So that's why,
10   that's why I'm saying to you -- I appreciate that, so
11   I'm just wanting you to understand what has taken
12   place.
13        So all of these little emails that you pull
14   up about what has taken place, let me just say it
15   once again, Mr. Walker did not charge these people
16   for a separate case outside of that.
17        We received no fees for these things. It
18   was our responsibility to go with these parents and
19   have these meetings and hearings with them with no
20   pay being paid directly to John W. Walker, P.A., by
21   these people.
22        So if that's what you're trying to
23   establish, that did not take place. So it is part of
24   our monitoring process. So, thank you.
25   Q.   Thank you for that clarification. I think you

Page 74

1    were able to get to what I was trying to understand
2    better than I was able to ask it.
3        I want to make sure I understand. So you
4    went to these due process hearings with situations
5    like the one for ██████████ here and the other one
6    we mentioned for ████████ -- and I'm sure there were
7    others as well -- you were actually representing, not
8    you, but John W. Walker, P.A., was actually
9    representing the student; correct?
10   A.   Well, what was taking place was we were
11   actually monitoring the process that was taking
12   place. I don't -- so if you -- if John W. Walker
13   was -- he -- I guess John W. Walker does represent
14   these class of students within the district, but he
15   was representing them based upon the obligations
16   under Plan 2000, which included monitoring.
17        This was part of the monitoring process.
18   We were seeing whether or not student discipline
19   actions being taken by the personnel within the
20   district was being done fairly.
21        As you know, there was a disparity in
22   disciplining African-American students, so this was
23   our opportunity to monitor and to determine whether
24   or not lack of due process, these sort of things,
25   contributed to the disparity.

Page 75

1      And as I said before, it was determined
2    that there was a need to change from a suspension
3    process and hearing process to one person, the person
4    within the central office.
5        The district realized that there was a need
6    to change that process. And so that was changed
7    after years, and then now we have this one person
8    hearing officer, and we continue to monitor that
9    process as well.
10   Q.   Okay. We have talked about some of the
11   different hats that you wear. We have talked about
12   the fact that you're a State Representative for
13   District 34.
14        We've talked about the fact that you do,
15   broadly speaking, paralegal work. We've talked about
16   the fact that you're the lead monitor, and we've
17   talked about the monitoring efforts.
18        We's talked about some specific students
19   and advocacy that you've done, Blackmon and Collins
20   being among them, and that, I understand now, are
21   under the monitoring of these.
22        What other hats do you wear in your
23   professional life?
24   A.   A lot. I am a life member of the National
25   Association for the Advancement of Colored People.

Page 76

1    I'm not an active member of their executive board,
2    but I am a member.
3        I have communications with members of the
4    NAACP, not only in the Little Rock branch, but also
5    in the Jacksonville branch, and all over the State of
6    Arkansas. So I'm very active in that.
7        I'm also active -- years ago there was an
8    organization called Community Advocates for Public
9    Education. That included community members, as well
10   as teachers within the Little Rock School District.
11        We formulated that organization in order to
12   ensure that certain things were taking place with
13   respect to public education, to make sure that there
14   was fairness taking place.
15        Teachers -- not only students receiving due
16   process, but teachers as well, we worked together to
17   ensure that that process took place.
18        There is an organization, and I think that,
19   that -- CAPE, as it was called, Community Advocates
20   For Public Education -- I think that group has
21   evolved into what's called Grassroots.
22        I participate in that, and it's kind of,
23   it's similar, because there are teachers that are
24   involved in that organization, as well as community
25   members.

Bushman Court Reporting                    Janess Ferguson Smith                    501-372-5115

## Page 77

1    Basically since I left my employment with
2 Allstate Insurance Company, I have, basically, become
3 a community advocate.
4        And so I guess that was my calling all
5 along, that I was not going to be a corporate person,
6 that I needed to be in the community to work with
7 individuals.
8        So that's what I have taken on:  The
9 sorority and our community service work, working with
10 John W. Walker, P.A., and on this case that involves
11 students, I mean, that's who I am, and I am trying to
12 ensure that.
13 Q.   Because you brought up the NAACP and your
14 involvement with them, let me ask, are they still
15 actively involved with this case?
16 A.   Please ask, please ask your -- repeat your
17 question.
18 Q.   So you brought up the NAACP and your
19 involvement with them, and I just want to know are
20 they still involved with this case?  I know they are
21 not formerly a party or anything, but I mean just
22 behind the scenes.
23 A.   Yes.  And that has been -- the Jacksonville
24 branch and the Little Rock branch are very interested
25 in this case, and we do -- and I do have discussions,

## Page 78

1 Mr. Walker has had discussions with them about the
2 case, and I get Mr. Porter as well.
3        So they are very concerned about this case,
4 and I can, I can talk very specifically with respect
5 to Jacksonville.
6 Q.   Okay.  Well, I'll let Mr. Richardson get into
7 that if he wants to.  Let's move along here.  I want
8 to ask you next about some of the monitoring efforts.
9        And from review of some of these records in
10 past depositions, I have seen several names that are
11 involved as monitors, so I want to ask you about
12 these people and what their involvement has been.
13        My question really is over the past ten
14 years, so from 2010, the last time there was a trial
15 for PCSSD, until present, who the monitors were and
16 what they were doing.
17        And the names that I have come across, of
18 course Mr. Bolden.  There's a Crystal Okoro Ashley.
19 There's a Marva Walker Smith, Bridgette Frazier, of
20 course, Rizelle Aaron, and Dr. Ronnie Wrigley
21 (phonetic).
22        So over the past ten years, of those
23 people, who has been involved in monitoring PCSSD?
24 A.   I would have to go back and look at some
25 documents.  I don't believe -- let me just say this.

## Page 79

1 Within the last ten years -- so that would have been
2 2010 -- so that would have been Charles Bolden, Marva
3 Smith, and myself and Crystal Okoro.
4        MR. PORTER:  Spell that.
5 A.   O-k-o-r-o.  And he made her -- he put her last
6 name on an "Ashley."  I think she goes by Okoro, even
7 though she is married, and her married name is
8 Ashley.
9 Q.   All right.  So let's go through -- well, I
10 listed off a bunch of names, but I guess I should
11 also ask you, other than the names that I listed, are
12 there any additional people that have been involved
13 with monitoring?
14 A.   Are you saying within the last ten years, or
15 forever?
16 Q.   The last ten years for PCSSD.
17 A.   Well, I guess the lawyers, John W. Walker,
18 P.A., Austin Porter, Jr., Robert Pressman, Shawn
19 Childs, Lawrence Walker.
20        The, the NAACP, I think they've assisted
21 in, maybe in some -- let's see.  I'm not sure.  Maybe
22 not in the last ten years -- but The Legal Defense
23 Fund in New York.  So we have -- all of those persons
24 have had a role.
25 Q.   Okay.  So let me ask you about Mr. -- let's

## Page 80

1 start with Mr. Bolden.  Over the past ten years, when
2 was the last time he has been involved in monitoring
3 for PCSSD?
4 A.   I'm sorry.  Repeat your question.
5 Q.   So, once again, I'm keeping the timeframe
6 narrowed to just the past ten years, and I want to
7 ask you about Mr. Bolden specifically.  So what has
8 his involvement with monitoring been over the past
9 ten years?
10 A.   Going to schools, making observations.  Some of
11 the pictures that you've, that were produced to you,
12 Mr. Bolden took those.
13        He has reviewed reports, monitoring
14 reports, discipline reports, gathered information,
15 attended conferences with parents and students.
16        He has attended, handled committee
17 meetings, I mean, a number of the things.  I just
18 can't tell you everything.  He's done a number of
19 things.
20 Q.   What about Ms. Smith, similar answer?
21 A.   Yes.
22 Q.   And what about Ms. Okoro?
23 A.   Similar, similar things.
24 Q.   And what about yourself, have you done similar
25 things?  Have you done more things?

Page 81

1    A.   I would say I've done more things.  I have been
2    actively involved in some of the documents that have
3    been filed in this case, and provided information
4    with respect to that, and that results from
5    monitoring.
6    Q.   If I wanted to understand what each one of
7    these people has done on the case, and when they did
8    it, would it be fair to say that the best way to do
9    that would be to look at the time records, meaning
10   the billing records that y'all kept up with?
11   A.   Yes, yes.
12   Q.   And those billing records were provided to us
13   on the CD that you shared on May 7th; correct?
14   A.   I don't remember everything that was on there.
15   I didn't review it to know -- that's been a year ago,
16   so probably.
17   Q.   You know, it did look to me that there were
18   some time records on there, but there haven't been
19   any sort of time records for the past -- I don't have
20   the dates right in front of me -- but definitely over
21   the past year I haven't seen any time records.
22        So where are those time records showing
23   over the past year what you, and Mr. Bolden, and
24   Ms. Smith have done?
25   A.   Okay.  If -- I'm looking at the documents that

Page 82

1    you produced.
2    Q.   Yes, ma'am.
3    A.   All right.  So ask your question.  So you -- so
4    these, these, this particular document does not
5    relate to the past year.  Those, those, those records
6    are still in the computer.  They have not been
7    produced.
8    Q.   Let me interrupt you.  Are you referring to
9    Exhibit Number 4 to your deposition?
10   A.   Yes.
11   Q.   Okay.  If I understand correctly, these were
12   time records, Exhibit Number 4, and they, of course,
13   have a document number at the top, 5367-1.  So we
14   know these have been filed with the court.
15        I believe these are all related to time
16   done to Jacksonville North Pulaski, but it looks like
17   this record has both PCSSD and JNPSD kind of all
18   mixed in; correct?
19   A.   That is correct.
20   Q.   Okay.  And you are saying that there are
21   additional time records other than what's in here for
22   you for the past year?
23   A.   Oh yes.
24   Q.   And where are those time records?
25   A.   In the computer.

Page 83

1    Q.   Okay.  Is that something that you can produce
2    to us?
3    A.   It will take me a while to produce it.
4    Q.   Well, let me --
5    A.   Yes.
6    Q.   I'm going to --
7    A.   Yes.
8    Q.   I'm going to make a request to see those time
9    records, and I will let Mr. Porter visit with you
10   about whether or how he wants to produce those.
11        MR. PORTER:  We'll, we'll, yeah, think
12        about that.
13        MR. BATES:  Yes, sir.
14   BY MR. BATES:
15   Q.   Now let's take Mr. Bolden for an example.
16   After he goes into a PCSSD school, how does he report
17   back to you about what he observed?
18   A.   We have a meeting, and he communicates to me
19   his findings.  He tells me what has been found.
20   Q.   And over the past year has he been going into
21   these schools?
22   A.   Are you speaking of this particular school
23   year, from August of 2019 until present?
24   Q.   Yes, ma'am.
25   A.   Yes, he has gone to some schools.  Not like he

Page 84

1    has in the past.
2    Q.   What do you mean by that?
3    A.   There will not be as many visits to the schools
4    as in the past.
5    Q.   And why is that?
6    A.   Can I go off the record and have a discussion
7    with Mr. Porter?
8    Q.   Well, there is an outstanding question, so I
9    would like for you to just answer.
10   A.   Well, I think that that has to do with
11   privilege.  That's between the lawyers and the...
12   Q.   Okay.
13        MR. BATES:  Mr. Porter, are you
14        directing her not to answer because of
15        privilege?
16        MR. PORTER:  I would have to make that
17        determination.  I don't know exactly what
18        the issue is so, yeah, we'll just take a
19        break, and I need to make that
20        determination.
21        MR. KEES:  While we take a break, can
22        the court reporter read back that question?
23        MR. PORTER:  Yeah.
24   (Court reporter read back the question.)
25        (Sixteen-minute break.)

21  (Pages 81 to 84)

Page 85

1    BY MR. BATES:
2    Q.    Representative Springer, there was a question
3    on the table, I believe, when we took a recess.  Do
4    you have an answer for us?
5    A.    Yes.  I guess the reason why I was hesitant
6    about telling you this is because Mr. Walker and I
7    had a discussion about what was going to take place
8    with respect to monitoring, involving the monitors,
9    and I figured that that was one of his strategies
10   that he was going to be utilizing.
11        So I didn't want to have to have a
12   discussion with you all about his strategy.  And so
13   since his passing and having a discussion with
14   Mr. Porter, he tells me it's okay for me to say to
15   you all that he did decide that he had enough
16   information, as I said before, with respect to them
17   having gone to the schools, and he decided that he
18   didn't need for them to continue to go to schools.
19        And this related to personal expenses for
20   the office.  And so he had them doing other things,
21   and working on other projects.
22   Q.    And those other things and other projects, were
23   those related to this case, PCSSD?
24   A.    Some of it did.  Some of it did not.
25   Q.    Okay.  The work that Mr. Bolden and the other

Page 86

1    folks were doing on other cases or other matters that
2    John W. Walker, P.A., was handing, I don't need to
3    know about those, but for the stuff that relates to
4    PCSSD, can you explain to me what they transitioned
5    to doing instead of going to schools?
6    A.    Okay.  They were doing little tasks, such as if
7    there was a question about something that was going
8    on in a particular school, they did those things.
9         If there was a question about facilities
10   needing certain things about a concern at a
11   particular facility, they did those things.
12        And Ms. Smith was assisting one of the
13   ladies at Philander Smith College with some
14   monitoring there of the CWDSA students.  In other
15   words, he cut their time.
16   Q.    Okay.  So the -- I believe, and I might have
17   written this down wrong -- you can correct me -- I
18   believe what my notes say is they were doing
19   facilities needing things, other things going on with
20   schools.  And with regard to Ms. Smith, she was
21   monitoring the Donaldson Scholars.  Did I sum up that
22   correctly?
23   A.    She was assisting with -- I guess you would
24   call it counseling with some of the Donaldson
25   Scholars.

Page 87

1    Q.    Okay.  Well, I understand what that means, but
2    I want to ask you a little more about the first two
3    things you mentioned.
4         You said if the facilities are needing
5    things, and other things at schools, and I'm asking
6    you just to elaborate a little more on what each one
7    of those means.
8    A.    Okay.  You know that we've been -- the Court
9    gave us notice about the case some time ago, and
10   there's been status reports filed by the district
11   with respect to facilities.
12        So when those things were filed, the checks
13   were being made on that.  And when parents called,
14   Charles would go and assist with parents on those
15   sort of things.  So that's what I'm speaking of.
16   Q.    And for the records of what those monitoring
17   efforts look like, I think I probably know the answer
18   to this, but I need to ask.  That would be reflected
19   in the time records?
20   A.    I'm not sure if those things are going to be
21   reflected in the time records.  I would have to go
22   back and check with Charles.
23        I know, particularly, probably if he was
24   going out looking at a school, and looking at a
25   facility based upon a report that was received, those

Page 88

1    for sure should be reflected there.
2    Q.    Would there be any other record other than time
3    records showing what Mr. Bolden and Ms. Smith did in
4    this, we'll say in the past year?
5    A.    Well, I think that's -- I definitely think that
6    that's privileged, John W. Walker, P.A., the records
7    that they would have kept for what he had asked them
8    to do.
9         MR. PORTER:  So attorney work product.
10        If you're asking for, if there are any
11        monitoring reports that Mr. Bolden or the
12        other monitors would have done, then that's
13        different, but...
14   Q.    And I'm just trying to understand what it was
15   that --
16   A.    I --
17   Q.    -- happened.
18   A.    Here's what happens.  I do the reports based
19   upon what they tell me.  They don't do any reports.
20   All they do is keep up with their time.
21   Q.    And those reports that you're mentioning, those
22   are work product privileged; is that what the answer
23   is?
24        MR. PORTER:  No, no.  I mean, the
25        monitoring reports, those would be

Page 89

1 reflected in some of the pleadings, I
2 guess, that have been filed.
3      For instance, Ms. Joy Springer had a
4 declaration that I was looking at that was
5 actually filed, and I'm referring to
6 document number 5404-12, and document
7 number 5577-2, which were filed -- one was
8 filed July 4th, 2018, and it was also -- it
9 looks like it was filed again March 30th,
10 2020.
11      Yeah, and so those -- I believe we
12 turned over those reports to you during the
13 course of discovery, that Ms. Springer
14 would have prepared.
15 BY MR. BATES:
16 Q.   So the reports that -- the documents we
17 received during discovery is what we got on that May
18 7th CD that you sent over; is that correct?
19 A.   Yes.  And then if there were any writings by
20 Mr. Bolden or Ms. Smith, those were included on there
21 as well.  But those probably relate to, prior to this
22 particular school year, so they would have been back
23 in 2018, '18-'19.  I think your question, you asked
24 me about '19-'20.
25 Q.   Okay.  Let me ask the question this way.  Other

Page 90

1 than what was on that May 7th CD, and other than what
2 was filed on the record at the document numbers that
3 Mr. Porter just referenced, and potentially other
4 document numbers, I'm just trying to understand, are
5 there other reports, or notes, or anything else out
6 there that we haven't seen yet that relate to the
7 monitoring efforts?
8 A.   So that's what I have indicated early on.  When
9 I go through all of these documents, if something
10 comes up, you will be sure to receive copies.
11 Q.   I understand that.  As you sit here today, are
12 you thinking of a certain document that we haven't
13 seen yet, or you're just saying if you come across
14 something you are going to share it?  I just want to
15 make sure I understand.
16 A.   Well, as we are sitting here talking today, I
17 can think of, you know, a couple of documents.
18 Q.   Okay.  Without telling me about the content in
19 those documents, can you tell me what they are?
20 A.   In fact -- my memory is refreshed -- a day or
21 two ago I asked for a copy of a, of a Steering
22 Committee document that was shared at a particular
23 meeting, as I was going through some of the emails,
24 so that particular document can be shared, a document
25 from a Steering Committee meeting.

Page 91

1 Q.   And is that a document that you created, or is
2 that a document that was created by the committee?
3 A.   A document that was created by, I guess,
4 someone in the -- I don't know that the committee
5 created it, because it was at the committee meeting
6 once I got there.
7      So I'm not sure if it was created by Dr.
8 Warren, or doctor, Ms. Smith, Alisha Smith
9 (phonetic), or who created the document.
10 Q.   Other than that Steering Committee document,
11 other than the ones that have been filed on the
12 record, and other than the documents that were
13 produced to us on the May 7th CD, are there any other
14 specific documents that you are thinking of as you
15 sit here today that have not been produced to us?
16 A.   Yes, there's another one.  When we started
17 talking about evaluations, and you asked me about
18 PRE, I thought about another document.
19      There was a meeting that was held with the
20 members of CREP, the Center for Research Evaluation
21 and Policy out of Memphis, the University of Memphis,
22 there was a meeting back in -- I believe it was April
23 of 2018 -- that was shared with us at a particular
24 meeting, and it talked about them having presented to
25 officials there at the meeting about whether or not

Page 92

1 there had been compliance with Plan 2000 and the
2 questions that needed to be answered.  So I can think
3 of that particular document as well.
4 Q.   Any others?
5 A.   Right now I can't, but I will assure you, you
6 will get -- if I can think of anything else, I will
7 make sure that you get those.  I'm not trying to hide
8 anything.
9 Q.   And I'm not trying to be difficult.  We just
10 asked for all of those reports and records, and I
11 understand there was an objection, and you produced
12 some things.  I just want to get an understanding of
13 what's out there and what might show up.
14 A.   I don't have anything.
15 Q.   You mentioned that you might have prepared some
16 reports based on what you heard from Mr. Bolden and
17 Mr. Smith; is that correct?
18 A.   Yeah.  Or for Mr. Walker, yes.
19 Q.   And are those reports that you prepared within
20 the past year?
21 A.   For this particular school year, you mean
22 '19-'20?
23 Q.   Yes.
24 A.   No.
25 Q.   Who assigned Mr. Bolden and Ms. Smith to go out

Springer, Joy 5/15/2020                                                      Little Rock School District v. Pulaski County Special School District, et al

Page 93

1  and do certain monitoring?  Was that you, or did that
2  come from Mr. Walker?
3  **A.   Mr. Walker.**
4         **(Exhibit No. 3 was marked.)**
5  BY MR. BATES:
6  Q.   If you could, please turn to Exhibit Number 3
7  in the binder in front of you.  This is from a CD
8  that was shared on May 7th.
9         There were a number of forms similar to
10  these in there, and this is just an example of a few.
11  Looking at pages one and two of Exhibit Number 3, can
12  you tell me what we are looking at here?
13  **A.   Let me make sure I am in the right one.  You**
14  **say Exhibit 3?**
15  Q.   Yes, ma'am, the first two pages of it.
16  **A.   And the first two pages.  It's entitled Joshua**
17  **Intervenors Classroom Observation Form, Secondary**
18  **Staffing, 2016-17.**
19  Q.   And who filled this out?
20  **A.   That looks like Charles Bolden's handwriting,**
21  **Charles Bolden.**
22  Q.   Okay.  Is this the type of form that Mr. Bolden
23  or any other Intervenors, for that matter, filled out
24  when they went into a classroom?
25  **A.   I can't tell you that they filled these out**

Page 94

1  **every time that they went into a classroom, but it**
2  **appears that this particular classroom he did fill**
3  **this one out.**
4  Q.   Is this the type of form he would give to you
5  to report back on what he saw at the school?
6  **A.   Oh no.  No.**
7  Q.   What did you do with this form after he filled
8  it out?
9  **A.   He, he and Ms. Smith, they would get together,**
10  **and they would compile this data and then give it to**
11  **me.  Whatever they observed, they would compile it**
12  **and then give it to me.  So, no, I wouldn't have**
13  **possession of these.**
14  Q.   Now, once again, on the first two pages of
15  Exhibit 3, it looks like this is an observation that
16  took place at Sylvan Hills, and it looks like it took
17  place on December 6th, 2016; correct?
18  **A.   Yes.**
19  Q.   And can you tell from looking at this form
20  which teacher this was that Mr. Bolden was observing?
21  **A.   Well, it looks -- I can't tell the name.  It**
22  **looks like it's S-a-u-h -- it's hard for me to tell**
23  **who that person is.**
24  Q.   But that name is scribbled out, and W/F is
25  written there.

Page 95

1  **A.   Yes.**
2  Q.   So what does that mean to you?
3         MR. PORTER:  It looks like a Fabing,
4         F-a-b-i-n-g.
5         MR. BATES:  Oh, I think you're on page
6         three, Austin.
7         MR. PORTER:  Okay.  I'm sorry.
8         MR. BATES:  You're fine.
9  BY MR. BATES:
10  Q.   So on page one I see that the teacher's name is
11  scribbled out, and W/F is written there, so what does
12  that mean to you?
13  **A.   Well, I guess -- I would say that the "W"**
14  **stands for white, and the "F" stands for female,**
15  **white female.**
16  Q.   Okay.
17  **A.   That would be my conclusion.**
18  Q.   So we know it's an unnamed white female teacher
19  at Sylvan Hills.  The first section there where it
20  says Classroom, slash, Student Assignment, do you see
21  that section?
22  **A.   Yes.**
23  Q.   And it looks like on this form it's blank, so
24  what does that mean to you?
25  **A.   Well, I can't speak for Charles.  He didn't**

Page 96

1  **fill that portion out.  I'm not sure what, what, why**
2  **that was left blank.**
3  Q.   Did you receive any training, or did you give
4  any training about how to fill this out, or when he
5  should leave a blank, versus when he should fill it
6  out?
7  **A.   We had -- we did have discussions.  See, here's**
8  **the deal.  There were certain times when certain**
9  **forms were to be filled out, and so I'm not sure what**
10  **this form is about.  And so it may be correct; it may**
11  **not be correct.  So I don't know.  I don't know**
12  **what --**
13  Q.   Okay.
14  **A.   -- I don't know what the subject of the**
15  **observation was at the time.**
16  Q.   Okay.  Turn to the second page, if you could.
17  I understand this follows from the first page there.
18  There's a section at the bottom for Comments,
19  Concerns, slash, Notes.  Do you see what I'm talking
20  about?
21  **A.   Yes.**
22  Q.   And what did Mr. Bolden write at the bottom
23  there?
24  **A.   Ooh, that's hard -- let's see.  It looks like**
25  **Smart Board.  Diversity --**

Bushman Court Reporting                        Janess Ferguson Smith                         501-372-5115

Springer, Joy 5/15/2020 — Little Rock School District v. Pulaski County Special School District, et al

**Page 97**

MR. PORTER:  Diversity visual aids.

A.   Diversity visual, it looks like, aids.

Q.   So the fact that there were, according to Mr. Bolden, diversity visual aids and a Smart Board in this classroom, why would he note those two particular things over other things?

A.   Ooh, that's -- I don't know that I can answer that question.

Q.   Well, I know you didn't fill this out, but is this any sort of training that you received as monitors or that you gave to the monitors about looking for Smart Boards and diversity visual aids?

A.   Let me just say this.  I was not the only person that gave training to the monitors.  Mr. Walker did as well, so.

     See, so -- let me just go back again.  I'm not sure what's -- I don't want to have to speculate about what this relates to.

     I know that there were classrooms that had Smart Boards, and he made a notation that there were -- he wrote on there -- evidently there was a Smart Board in this classroom.

     He also wrote on here "Diversity visual aids."  So I don't know what that relates to, based upon this form.

**Page 98**

Q.   Now on that CD that we got on May 7th, there were some of these forms from Mr. Bolden.  There were some from Ms. Smith.  I didn't see any from you.  Is it fair to say that you have not filled out sheets like this?

A.   I have not.

Q.   Okay.

A.   That's fair.

Q.   If you can turn to page three, I want to look at just a few more of these.  I'm not going to go through every one with you, but it looks like this one, maybe there's a teacher name up there.  I think Mr. Porter noted the name earlier.

     But now in the first box there, Classroom, slash, Student Assignment, it says 1, One race class, number of black students, number of white students.  Do you see what I'm talking about?

A.   Okay.  At the top where it says Class; okay.

Q.   And so what was the breakdown of this class at Sylvan Hills?

A.   All right.  So you want -- so it looks like, if you go back up to the top of the page, it says -- it looks like the number of students in the classroom were 23, and so the breakdown under that would be 12 black, 11 white.  So that adds up to 23.

**Page 99**

Q.   Do you have any idea how long monitors were in the classrooms when they were filling out these sheets?

A.   I, I couldn't tell you.  It probably varied, depending on what was taking place in the classroom, so.

Q.   Is there any sort of minimum, like you're supposed to be in there for five minutes, or ten minutes, or anything like that?

A.   I'm not aware of that.

Q.   How would you know from being in the classroom -- I know not you specifically, but the monitors, how would the monitors determine how many black students and how many white students were present?

A.   Ask your question again.  I'm sorry.

Q.   How would -- so taking this classroom for an example, how would the monitor know when they walk in that there are 12 black students and 11 white students?

A.   Are you wanting me to speak for Mr. Bolden to -- I'll just have to conclude, and I don't personally know that this is correct or incorrect, but I would have to assume that Mr. Bolden counted the number of students in the classroom, or either he

**Page 100**

had some other way to know that, or maybe he asked the teacher, and then he wrote this down.

     So he may have gotten this from the teacher, or he may have written it down based upon observation.  So I would not know how he filled that out, because I just wouldn't know that.

Q.   Is there any sort of training given to the monitors about how to determine the classroom make-up, whether they should ask the teacher, or whether they should just count students by the way they appear?

A.   Not from me.  I've not given that specific directive.

Q.   Do you know if anyone else in the office gave a directive of how to determine whether a student was white or black for making this calculation?

A.   Well, let me just say this, that's a hard, that's kind of a hard question to answer that.  You have to determine in a certain way to know how many black and how many white are in a particular class.

     So I'm not sure that I can answer that -- I guess the answer that you're trying to get from me, I would just have to assume that Mr. Bolden and Ms. Smith know how to determine if a person is black or white by looking at them, and then by counting the

Bushman Court Reporting          Janess Ferguson Smith          501-372-5115

Springer, Joy 5/15/2020                                    Little Rock School District v. Pulaski County Special School District, et al

Page 101

1 number to determine how many black and how many
2 white.
3        I would, I would just have to assume that
4 they know that. I don't know that there would be a
5 need to have a session on knowing that. You know, I,
6 I just don't -- I don't remember me having to tell
7 them to do it a certain way.
8 Q.  Now let me ask you maybe just one more question
9 about these Classroom Observation Forms that together
10 comprise Exhibit Number 3. To your knowledge, all of
11 these forms that exist, are they on that CD that was
12 provided on May 7th?
13 A.  I'm sorry.  Ask that again.
14 Q.  These Classroom Observation Forms, the ones
15 that make up Exhibit 3, and I have already
16 represented to you that this is just a small sample.
17 There's probably hundreds of them on that CD that you
18 provided --
19 A.  Uh-huh.
20 Q.  -- on May 7th. Is that -- what's on that May
21 7th CD, is that all of the Classroom Observation
22 Forms that you know about?
23 A.  Well, when the disk was provided, I didn't look
24 to see what was placed on that disk, so I'm, I'm not
25 sure.

Page 102

1 Q.  Okay. Well, then I guess I'll ask you, or
2 really this is a question for Mr. Porter, but if
3 there are any other Classroom Observation Forms other
4 than the ones that were on that May 7th CD, I will
5 just ask that they please be produced.
6        MR. PORTER:  All right.
7 Q.  I want to direct your attention, please, to
8 Exhibit Number 2 to your deposition, specifically the
9 second page of it, which we have already discussed is
10 the email that you sent to me outlining the
11 monitoring efforts; correct?
12 A.  Would you repeat? You went out. I didn't hear
13 it.
14 Q.  So page number two to Exhibit Number 2 is an
15 email that you sent to me about, essentially,
16 summarizing the monitoring efforts in this case;
17 correct?
18 A.  Yes.
19 Q.  So for numbers 1 through 18, I'm not going to
20 read them all at this time -- I know you recently
21 read this email -- are these all things that you have
22 done?
23 A.  Well, I can think I can, I can think of
24 additional ones, like the documents that are being
25 produced here now, so, as a result of the requests

Page 103

1 that have been made.
2        So that's going to be part of monitoring,
3 because at some point in time, some of the documents
4 that have been produced were not shared with us
5 during the course of these years, and so I'm having
6 to go back now and look at those documents and
7 understand what they consist of and what they mean.
8        So that's an additional task. So that's
9 going to be part of the monitoring process as well.
10 There are other hundreds of documents for the first
11 time that I've seen.
12        And we've had meetings on many occasions
13 where we've asked about certain documents, and
14 they've not been produced as well, so I'm having to
15 go through and look at these documents myself.
16 Q.  Okay. So it sounds like you are adding number
17 19 to the list, which is fine. I didn't take this to
18 be an exhaustive list.
19 A.  It is not.
20 Q.  I just have numbers 1 through 18, and -- well,
21 I would say 19, because I think you just added one to
22 it -- are these all tasks that you performed yourself
23 on this case?
24 A.  Let me go through. And I guess you need to ask
25 me for what period of time, too. So these --

Page 104

1 Q.  We'll say from 2010 until present.
2 A.  (Witness reviews document.) Yes.
3 Q.  And you just added number 19. As you sit here
4 today are there any other things that you would add
5 to this list that would summarize your monitoring
6 efforts at PCSSD over the past ten years?
7 A.  Not as I sit here today; however, if I think of
8 an additional one, or ones, I will let you know.
9 Q.  Okay. Number 11 says Attendance at IEP
10 conferences. Which section of Plan 2000 does that
11 pertain to?
12 A.  Academic achievement, student achievement. It
13 also refers to the obligation for, for the district
14 to continue to monitor its assignments of students
15 needing Special Education services when, when Special
16 Ed, you know, is -- this is part of the Special
17 Education, so, and it's part of the monitoring piece
18 of a report that is supposed to be produced by the
19 districts.
20 Q.  Okay. I would like to ask you a question about
21 number 15, which is Email exchanges to Dr. Guess, Dr.
22 Warren, Sherman Whitfield, and Yolundra Richards.
23 That last name there, who are you referring to?
24 A.  Ms. Richards is Dr. Warren's administrative
25 person. So there were occasions when she would

26 (Pages 101 to 104)


Page 105

1  summarize meetings, and so we would have email
2  exchanges about meetings that were held, those
3  monthly meetings.
4        And prior to the court-ordered monthly
5  meetings, there were, like, quarterly meetings that
6  we had.
7  Q.  Okay.  And I think you have answered the
8  question.
9        MR. BATES:  Just for the record, I
10       believe the witness is referring to Yolanda
11       Richards, which is Y-o-l-a-n-d-a --
12       THE WITNESS:  Oh, okay.
13       MR. BATES:  -- Richards.  And the only
14       reason why I make that clarification is
15       because there's also a Yolaundra Williams,
16       and that's Y-o-l-a-u-n-d-r-a Williams.
17  BY MR. BATES:
18  Q.  So I just wanted to make sure that we are
19  talking about the same person, and I think we are.
20  A.  Okay. I didn't hear you. I'm sorry. I didn't
21  hear what you said. I couldn't make out what you
22  said.
23  Q.  I said I was just clarifying that there's one,
24  two, three, four names on that item number 15 there,
25  and it sounds like the fourth name there, you're

Page 106

1  referring to Yolanda Richards, who is working with
2  Dr. Warren.
3        And I make that distraction of
4  Y-o-l-a-n-d-a Richards, because there's also a Dr.
5  Yolaundra Williams.
6  A.  Oh, okay.
7  Q.  I just wanted to make sure we were talking
8  about the same person.
9  A.  Yes.
10  Q.  All right.  Let's talk a little bit about your
11  communication with the people out at PCSSD, and I'm
12  going to ask you first some questions about
13  communication, and then I'm going to follow up by
14  asking you some questions about visits that you have
15  made. So let's start by just focusing on the
16  communication, if we could.
17        So when you communicate with the folks out
18  at PCSSD are you communicating as a monitor, as an
19  assistant for John W. Walker, P.A., as a legislator,
20  all of the above?
21  A.  Well, that's a -- ask them one at a time,
22  because -- so, so let me just say this.  As I
23  indicated before, I just became a legislator,
24  Representative.
25        And so there has not been any time for that

Page 107

1  to take place, for me to try to intervene, as far as
2  a legislator is concerned.
3        John W. Walker, P.A., we've already gone
4  over this before, so it sounds like it's the same
5  question, so anytime that I have made communications
6  with any of those persons, it related to monitoring
7  activities, related to their implementation of Plan
8  2000 obligations.
9  Q.  When you communicate with folks out at PCSSD at
10  the school level, so we're talking about teachers, or
11  principals, or anyone else that works for the school,
12  who do you talk to.
13  A.  Please repeat your question.
14  Q.  When you go out to schools, or you communicate
15  with schools, and we're talking about the school
16  level district people, not Dr. Whitfield, and Dr.
17  Warren, and Dr. McNulty, but when you get to school
18  level people, who do you talk to?
19  A.  Well that's a broad question.  It depends on
20  why, for what reason and why I'm going there.  So I
21  guess I really can't answer that question, but if you
22  can kind of break it down.
23  Q.  Well, give me an example of a time you
24  communicated with a school level person and what you
25  communicated about.

Page 108

1  A.  Okay.  So, for instance, I can answer that one
2  now.  Regarding those reports, I'm back again at
3  those, those quarter, those reports, facilities
4  reports that were submitted by the district with
5  respect to what was taking place regarding
6  facilities.
7        So one of those reports had to do with
8  Mills High School and about things that were taking
9  place, and I think you should probably have a copy of
10  that in some of those things that were produced to
11  you.
12        And when I went there, I go to the office,
13  and at that particular time when I went out there I
14  spoke with Mr., the assistant principal.
15        I did not speak with Mr. Clayton.  It was
16  Mr. -- what is the -- I can't even think of his name
17  now.  He's no longer there, but he was the person
18  that guided me through the school for me to make
19  those observations that I made and to make the notes
20  that were made.  He was the person that communicated
21  to me, and he was the administrator.
22  Q.  At that time did you talk to any classroom
23  teachers?
24  A.  I did.
25  Q.  Is that something you typically do, talk to

27 (Pages 105 to 108)

## Page 109

1   classroom teachers when you go out to a school?
2   A.   Well, mostly they come up to me and talk to me
3   and tell me things.
4   Q.   So on that particular visit, we'll stick with
5   that example, what classroom teachers did you talk
6   to?
7   A.   In the areas where the comments were made.
8   Like I think it was -- I went to a health class, P.E.
9   class.  In the area where the coaches were, I think I
10  made notations about that.
11       I talked to the assistant principal.  He's
12  the one that gave me most of the information that's
13  indicated in that report, the assistant principal,
14  and then my conversations with the other persons.
15       And then I observed most of that, and I
16  just noted their comments in support of what was
17  observed.
18  Q.   I heard you mention AP.  I heard you mention a
19  health class teacher and a PE class teacher.  Did you
20  talk to any other teachers?
21  A.   I'm trying to remember.  I would have to go
22  back and review my, that, that summary that I made,
23  and then I can tell you whether or not I did or not.
24  But those are the ones I remember right now.  I don't
25  have it in front of me, so, I know --

## Page 110

1   Q.   Do you remember -- sorry.  I cut you off there.
2   Go ahead.
3   A.   Yeah, I just remember, because they were -- I
4   remember going to the gym, and the coaches and the PE
5   teachers were in there, and I remember going over to
6   the offices where the coaches were, their offices,
7   and back in the weight room, and then that little
8   facility where they do the -- I'll call it physical
9   therapy for the, for the students, and get in that
10  whirl pool.  I remember going in there and talking to
11  the, the persons in there.
12       Then I remember going to the auditorium,
13  then going to the band room, the choir room.  So it
14  would have been those persons.  And then I remember
15  going into the auditorium, and in the kitchen area.
16  Q.   And when you went to these different areas, do
17  you remember the names of the people who you talked
18  to?
19  A.   Well, see, that's, that's what I'm saying.  I
20  would have to go back and look at the notes to see if
21  I recall a name.  Right now I can't recall a name.
22       In fact, I can't even recall the name of
23  the assistant principal, and I should know his name.
24  It seems like to me it starts with a "B."
25  Q.   When you say "look at the notes," are you

## Page 111

1   referring to the response that the Intervenors filed
2   in court, or are you talking about some other sort of
3   notes?
4   A.   I'm talking about that response that's attached
5   to that.
6   Q.   The thing that was filed in court?
7   A.   Okay.  The report, yeah.  Let me just call it
8   the report notes that was attached to the response.
9   There were notations.
10  Q.   Other than the report notes that were attached
11  to the response, the notations in there, other than
12  those are there any other sort of notes that show who
13  you talked to on that day?
14  A.   No.  So those would have been --
15  Q.   How often --
16  A.   -- those would have been done soon after my
17  visit.
18  Q.   In talking about visits to PCSSD now, how
19  often -- and let's say over the past year, okay --
20  how often do you go into the schools themselves?
21  A.   So are we talking about the '19-'20 school
22  year, or --
23  Q.   Sure.
24  A.   -- are we talking about --
25  Q.   Let's limit it to the '19-'20 school year.  How

## Page 112

1   often did you go in that school year?
2   A.   So I will have to use the same response that I
3   used before, about the change in the, conversations
4   that we had with Mr. Walker during the beginning of
5   that school year.
6        We were focusing more on collecting data
7   and looking at information in preparation for this
8   case.  So my, most of my time was spent doing that,
9   looking to see, making sure that certain reports had
10  been received from the districts, that sort of thing.
11       When I did go, I would say, have I gone
12  this year, it would have been to probably Mills,
13  Robinson.  I'm not sure if I have gone to Sylvan
14  Hills, but it would have been the Mills -- the
15  Robinson schools and the Mills schools.
16  Q.   Okay.  What about the 2018-2019 school year,
17  how often were you going into schools during that
18  time?
19  A.   All right.  So let me just say this.  I would
20  have to refer to my time records.  It would be noted
21  in those.
22       In fact, you can look to see, on the
23  records that you have, to see when I was there.  It
24  should be notated in there.  Right now I don't have a
25  recollection.

Page 113

1      **So I think I have kept pretty good time**
2   **records with respect to whenever I have visited a**
3   **school, I would make that notation.**
4              **(Exhibit No. 4 was marked.)**
5   BY MR. BATES:
6   Q.   Okay.  And if you could turn over to Exhibit 4.
7   Those are the only time records that I have for you,
8   and that covers a period in 2016 to 2017.
9              Is it fair to say that, and I was just
10  asking you about the '18-'19 school year.  Is it fair
11  to say that we would have to look at the time records
12  that haven't been produced yet?
13  A.   **I'm sorry.  Repeat that again.**
14  Q.   So we were just talking about your monitoring
15  efforts in the 2018-2019 school year, and you said
16  you would have to look at the time records to know
17  exactly how often you were going to school.
18             I guess my point is that I don't have the
19  time records from '18-'19, because Exhibit 4 is just
20  covering '16-'17.
21  A.   **I'm not sure that you, you requested those.**
22  Q.   Well, I'm asking you now about your efforts,
23  and you are referring back to the time notes.
24  A.   **Okay.**
25  Q.   So I'm just asking you how else can I determine

Page 114

1   what you did during the '18-'19 school year?
2   A.   **Well, now, if you're asking for those, I'm**
3   **happy to try to get those to you.  The people know in**
4   **the county when I was there.**
5             **They know that I visited the schools.  I**
6   **guess there's an issue as to whether or not I**
7   **actually went to the schools and was there?**
8   Q.   I'm not trying to imply that there's anything
9   about that, and I'm definitely not trying to imply
10  that you didn't do something you say you did.
11            I'm just trying to get my mind wrapped
12  around what all happened with the monitoring efforts,
13  just for the record.
14  A.   **So --**
15  Q.   And, for the record, I would like to request
16  all of your time records, since this one that we have
17  here in Exhibit 4.
18  A.   **I'm sorry.  Since when?**
19  Q.   Since the records -- essentially the ones that
20  you have in Exhibit 4 start on, it looks like,
21  June 7th, 2016, and they end at May 1st, 2017.  So
22  I'm requesting your time records from that time until
23  present.
24  A.   **Okay.  Very good.  Thank you.**
25            MR. RICHARDSON:  This is Scott.  I'll

Page 115

1   join that request.
2             THE WITNESS:  And let me just say,
3   some of those records for Scott, your
4   request, you already have those.  They have
5   been filed with the Court, so they are part
6   of the court records.
7             MR. RICHARDSON:  Well, I don't want to
8   make any duplication for you.
9             THE WITNESS:  Okay.  All right.  Well,
10  that's extra work, so, I'm just saying, you
11  won't get them tomorrow, or the next day or
12  two.
13  BY MR. BATES:
14  Q.   And while we are requesting time records, I do
15  also want to request for the same time period.  I
16  know that some of them were filed in the Court, and
17  this all gets back to a few requests from
18  Jacksonville, but for Ms. Smith and for Mr. Bolden,
19  and, for that matter, any other monitors as well, and
20  whatever was filed from the last time forward, I want
21  to request those as well, just to see what has
22  happened.
23            MR. PORTER:  We'll see what we can
24  pull up; all right?
25            MR. BATES:  Yes, sir.

Page 116

1             MR. PORTER:  Thank you.
2             MR. BATES:  Thank you.
3             THE WITNESS:  Let me get
4   clarification.  So are you asking back to
5   when, 2016?
6             MR. PORTER:  No.  From, from May 31st,
7   2017, forward.
8             THE WITNESS:  Okay.
9             MR. BATES:  Yeah, and that's document
10  number 5367.
11            THE WITNESS:  Okay.
12            MR. BATES:  And that -- it looks like
13  in there there's a fee request from John
14  Walker, Bob Pressman, and Joy Springer, and
15  monitors.
16            And so I'm aware of those records, of
17  course, because they've already been filed.
18  I'm talking about everything that's
19  happened since then.
20            MR. PORTER:  All right.  We will look
21  for it.
22            THE WITNESS:  Thank you.
23            MR. BATES:  All right.  Thank you.
24  BY MR. BATES:
25  Q.   All right.  One more line of questioning about

                        29 (Pages 113 to 116)

Springer, Joy 5/15/2020                                                    Little Rock School District v. Pulaski County Special School District, et al

---

Page 117

1    your communication with PCSSD.  I have gone back
2    through some of the older emails, and it looks like
3    some of the time, Representative Springer, you copied
4    Sam Jones and Allen Roberts on emails when you were
5    emailing with the district folks, and some of the
6    time you didn't copy Sam Jones and Allen Roberts when
7    you were emailing with the district folks.
8          I am aware from reading prior transcripts
9    at hearings that that has been a subject of much
10   debate, especially as it relates to Jacksonville, and
11   I want to try and sidestep all of that.
12         I just want to understand when you were
13   emailing with the district, how come sometimes you
14   copied the attorneys, and sometimes you didn't?  I
15   just want to understand.
16   **A.   Well, because the attorneys were present when**
17   **that information was being asked, and I wanted to**
18   **make sure that they were part of the response and the**
19   **questions being asked.**
20   Q.   So if the attorney wasn't present when the
21   information was being requested, then you wouldn't
22   copy the attorneys in the email; is that correct?
23   **A.   Yes.  Because it -- there were times -- part of**
24   **the monitoring process, the attorneys are not always**
25   **available, or not always there when I ask for**

Page 118

1    **information.  So I would contact them directly.**
2    **And I think Sam Jones is aware of that, and**
3    **was very much aware of that.  And so I sent -- like,**
4    **for instance, if I got a monitoring report from them,**
5    **if I had a question, I would send them an email**
6    **directly.**
7    **So if we were in a group setting, and there**
8    **were questions about what had taken place, and the**
9    **lawyers were present, I would make sure that they**
10   **were cc'd on the correspondence.**
11   **So it's not like I'm contacting folks**
12   **without their lawyers knowing about it.  They, they**
13   **are aware.  And that has not been an issue anyway,**
14   **until Jacksonville became in the case.  I guess I'm**
15   **just saying that.**
16   Q.   That's what I was trying to reference and say
17   that I'm not trying to get into that issue.
18   **A.   Well, yeah, that's right.  I mean, that's been**
19   **a concern.**
20         **(Exhibit No. 6 was marked.)**
21   BY MR. BATES:
22   Q.   If you could please turn with me to Exhibit
23   Number 6 to your deposition, the first page there,
24   and I will give you a minute to read it.
25   **A.   (Witness reviews document.)**

Page 119

1    Q.   I believe this goes to cheerleader tryouts at
2    Maumelle and Sylvan Hills.  Which monitors were
3    attempting to watch the cheerleader tryouts?
4    **A.   It was probably Charles Bolden and Marva Smith,**
5    **more than likely.**
6    Q.   And why did Charles Bolden and Marva Smith need
7    to watch cheerleader tryouts?
8    **A.   I would call your attention to paragraph three.**
9    Q.   Okay.  So based on your recollection and what
10   you see in paragraph three, what was the reason why
11   Mr. Bolden and Ms. Smith would need to see
12   cheerleader tryouts?
13   **A.   It's in paragraph three.  I'm trying to cut**
14   **down on my talking, so I think that pretty much**
15   **refreshes, is the reason why.  It's stated there in**
16   **paragraph three.**
17   Q.   Academic achievement and student participation
18   in extracurricular activities, are you saying that's
19   the reason why the monitors needed to watch the
20   cheerleader tryouts?
21   **A.   Well, okay.  Once again, a part of student**
22   **achievement, there's what's called the Ross Plan.**
23   **And within that Ross Plan, the districts were obliged**
24   **to implement the Ross Plan.**
25         **Within the Ross Plan there are particulars**

Page 120

1    **about student participation, and extracurricular**
2    **activities to address student achievement, their**
3    **participation with respect to advanced placement,**
4    **those kind of courses.**
5    **And so the, this just goes to that, I mean,**
6    **African-American students receiving those type of**
7    **opportunities in order to address their student**
8    **achievement.**
9    **If they are being excluded, then that's a**
10   **concern, because the evidence shows that their**
11   **participation in extracurricular activities and**
12   **advanced placement in those kind of courses addresses**
13   **student achievement.**
14   **And, in addition, you probably received a**
15   **complaint from a parent about that as well, and**
16   **that's just -- that's not, that's not addressed in**
17   **there, and so it was probably brought up in a**
18   **meeting, a face-to-face meeting.**
19   Q.   Which parent complained to you about
20   cheerleading?
21   **A.   Well, see, this was back in 2017, and so I**
22   **could not tell you the name of the parent at this**
23   **particular time, but I'm sure that it related to a**
24   **parent having a concern about participation in**
25   **extracurricular activities.**

30  (Pages 117 to 120)

Springer, Joy 5/15/2020     Little Rock School District v. Pulaski County Special School District, et al

Page 121

1   Q.  All right.  Who is Ms. Guthrie?
2   **A.  Are you -- help me refresh.  I have seen a**
3   **whole lot of names.  Help me out.  Ms. Duffery, are**
4   **you referring to a document?**
5   Q.  I'm not referring to a document.  I'm just
6   asking if you have any recollection of someone named
7   Ms. Guthrie and whether she was ever involved in the
8   deseg issue.
9   **A.  Ms. ██████  Oh,██████████████████**
10  Q.  Yes, ma'am.
11  **A.  I still need my memory refreshed right now.**
12  Q.  All right.  We might come back to that.  What
13  about, who is ███████████
14  **A.  ██████████████?**
15  Q.  Yes, ma'am.
16  **A.  So I may know a number of ████████, so**
17  **which ████████████ are you speaking of?  I know a**
18  **number...**
19  Q.  Is there any ██████████ involved in any of
20  the deseg issues?
21  **A.  Oh ██████ -- oh, okay.**
22         MR. PORTER:  For the record, I
23         represented a ██████████ a case, I
24         believe, against Pulaski County Special
25         School District, and Cody and Jay Bequette,

Page 122

1         I think they were involved in that case.
2         MR. BATES:  Okay.  Well, at the risk
3         of getting off into a separate lawsuit, I
4         think we'll move on from that topic.
5         MR. PORTER:  I mean, it was a -- the
6         case is over.  I don't know if that's --
7         MR. KEES:  For the record, that's
8         correct, Austin.
9         THE WITNESS:  And I was trying to
10        figure out ██████████, one of the ███
11        ██████ I know, she's a parent of a child
12        in the Little Rock School District.
13        MR. PORTER:  Yeah, I don't know if
14        that's the same ██████████ you're
15        referring to.
16        MR. BATES:  Okay.  I will just move on
17        from that.  It sounds like something maybe
18        if we have extra time we can get into.
19  BY MR. BATES:
20  Q.  All right.  I want to switch gears here, but
21  before I do that, do you need a break, or do you want
22  to keep going?
23  **A.  If you all have a little bit left, we can go --**
24        MR. PORTER:  How much, how much more
25        time do you think you have, Devin, with

Page 123

1   her?
2         MR. BATES:  Well --
3         MR. PORTER:  I know Scott is going to
4         take some time too.
5         MR. BATES:  Yeah, the next question is
6         asking her about any of the reasons that
7         she believes PCSSD is not unitary in the
8         area of discipline, so I would imagine that
9         may be an answer that's on the longer side
10        and will require some follow-up.
11        MR. PORTER:  Is that --
12        MR. BATES:  We can keep going for now.
13        MR. PORTER:  Yeah.  Do you want to
14        take a break?
15        THE WITNESS:  No.
16        MR. PORTER:  Okay.  Yeah, we can, we
17        can go ahead and keep going.
18        MR. BATES:  Okay.
19  BY MR. BATES:
20  Q.  All right.  So the question, Representative
21  Springer, is moving now to your opinions, and, of
22  course, I'm going to do my best to take diligent
23  notes and follow up on each one.
24        I'd like to ask you every reason that you
25  believe PCSSD is not unitary in the area of

Page 124

1   discipline?
2   **A.  Well, I think the main reason is, and I'll be**
3   **more specific after discussions with counsel in**
4   **preparation for the case, but the main reason is that**
5   **the reason cited by the Court in 2011 remains a**
6   **concern.**
7   **       The findings of fact that he pointed out**
8   **with respect to the district's compliance back then,**
9   **I think those areas are still prevalent.**
10        MR. PORTER:  And, Devin, I mean, for
11        the record, you know, keep in mind that the
12        burden of proof is on the district to
13        demonstrate and to show that they are
14        unitary in these areas, and so it's not our
15        burden to prove that.  So that's the burden
16        of the district.
17        MR. BATES:  Oh, yes, sir.  I'm well
18        aware.  I just want to make sure that based
19        on this conversation today, my
20        understanding of Ms. Springer's role in
21        this litigation, if she is going to come to
22        trial and potentially testify about that
23        and offer evidence about that, I want to
24        understand what the evidence that she has
25        to offer will be?

Bushman Court Reporting       Janess Ferguson Smith       501-372-5115

Springer, Joy 5/15/2020                                   Little Rock School District v. Pulaski County Special School District, et al

Page 125

1    MR. PORTER: Yeah.
2         MR. BATES: So I am aware that is our
3    burden, yes.
4         THE WITNESS: And probably my answer
5    to the rest of those is going to be the
6    same thing.
7         I concur with what the Court found
8    previously, and that -- you know, you
9    didn't ask me when I came into the meeting,
10   but I have a Bible -- well, I said that I
11   was going to make a joke and say that --
12   well, anyway, I have Plan 2000 in a book,
13   and I have the court order from 2011.
14        So this is my, the Bible and the
15   daily -- I guess the Plan is the daily
16   word, and then the Bible is the court order
17   with the Eighth Circuit Court of Appeals.
18   So those are the things that I rest on.
19   BY MR. BATES:
20   Q.  All right.
21   A.  And I would say, and I would say that those
22   findings still remain, so -- and I was part of that
23   case and the evidence back then, and so I would
24   probably be able to testify with respect to those
25   findings and then say that since that time there have

Page 126

1    been a number of superintendent changes, and that
2    some, persons always have a way to address certain
3    things.
4         With respect to student achievement, they
5    get started, and then they never follow through.
6    They have poor follow-through with respect to the
7    plan obligations. So I would say that that's it in a
8    nutshell. They're never consistent.
9    Q.  Okay. Other than the reasons cited in the
10   Judge Miller 2011 order -- well, I guess I should ask
11   you to, if you're referencing that today -- you're
12   talking about the, it's, like, a hundred and
13   something pages written by Judge Miller? Are we
14   talking about the same order?
15   A.  Yes. And then, and then I also have the Eighth
16   Circuit Court of Appeals in this same book, and so
17   they affirmed what he said, so the reasons stated by
18   the Court in, in that 2011 opinion with respect to
19   discipline, student achievement, and facilities, and
20   then monitoring.
21        So there's an obligation with respect to
22   monitoring, and I think you've seen the, the, the
23   responses that we gave with respect to the expert
24   Margie Powell's report.
25        I assisted in preparation of those

Page 127

1    responses and bringing up the issue about the
2    fairness, or the biasness of her reports.
3         And so I assisted in pointing out those
4    things, so I don't think that there's a need for us
5    to have to go through all of those things again.
6         I mean, that's basically reasons to why we
7    indicated that they weren't in compliance, for those
8    reasons cited in those responses to those reports.
9         So I don't know why, the need for us to go
10   individually through each one of those things. That
11   would be my testimony.
12        And, and as I understand it, the rules
13   allow for supplementation. As I've said before, if
14   there are any additional reasons why, then I'm sure
15   that counsel will let you all know.
16   Q.  Okay. So I do need to follow up on some of
17   those things that you just said, because I do want to
18   understand.
19        I know it's been written, and I've
20   certainly read the Miller, the Judge Miller order and
21   the Eighth Circuit appeal, but I want to understand
22   what your testimony is going to be this summer, which
23   is why I need to follow up.
24        So other than the reasons that were already
25   stated by Judge Miller and the Eighth Circuit Court

Page 128

1    of Appeals' ruling, and other than the superintendent
2    changes that you mentioned, and what you phrased as
3    the follow-through issue, lack of consistency issue,
4    are there any other things that you would point to to
5    say that the district is not unitary in the area of
6    discipline?
7    A.  Well, so consistency and bad faith. So if
8    you're, if you're not consistent in it, then there's
9    a demonstration of bad faith, in my opinion.
10        So if you're not implementing the plan in
11   good faith, then that's a, that's a reason for there
12   to be noncompliance. So I believe that there has not
13   been good faith implementation of the plan
14   obligations.
15   Q.  Anything else?
16   A.  And then I -- and I also mentioned to you,
17   there are some documents that, that will support my
18   position, and I'll, and I'll get those to you.
19        So here's where we are. Once again,
20   discipline still is disparate. If you look at the
21   reports, they show that. If you go over and look at
22   the reports, there's still a disparity in discipline.
23        If you look to see whether or not there has
24   been identification of persons causing that
25   disparity, and having discussions in what you have

32  (Pages 125 to 128)

Page 129

1    done with respect to that, then that still remains.
2           And then with respect to student
3    achievement, the disparity still remains there with
4    respect to student achievement.  In fact, as time
5    goes along, the disparity gets greater.
6           So I don't know how you're addressing the
7    disparity there, especially when you change over, and
8    over, and over.  So that in itself is not good faith.
9           And then when you don't do the reports that
10   you are supposed to do to monitor to see where you
11   are, and nobody knows what the status is of these
12   things, that, in itself, shows bad faith as well.
13          So I'm not sure what else I can tell you at
14   this point, other than, basically, the evidence, in
15   my opinion, is still the same.
16   Q.   What monitoring reports are you claiming were
17   not completed that show bad faith, in your opinion?
18   A.   The monitoring reports of the district, if you
19   go back and look at the, if you look at the response
20   that we did -- so look at the response.
21   Q.   Well, is that going to be your testimony this
22   summer, to just look at the response?
23   A.   Well, if the -- well, I don't have the, I don't
24   have the --
25          MR. PORTER:  Devin, one of the

Page 130

1           things we're going to --
2    A.   I don't have that report in front of me, but
3    I've already indicated to you that prior to this
4    deposition I have not gone over and prepared for it.
5           During the testimony in court, I will have
6    reviewed and will be able to articulate those
7    specifics areas.  They're there because I assisted
8    with that.
9           So right now -- and let me just say this,
10   right now, to let you know, they are still -- it's
11   still going to be the same thing then, now, and when
12   we go to court.
13          MR. PORTER:  Devin, for the record,
14   Ms. Springer, there's a document number
15   5577-2 that was filed on March 30th, 2020,
16   that, that talks about the inadequacies as
17   it relates to Mills' facilities.
18          And, you know, that document is, like,
19   a four-page document, I believe, that's
20   pretty specific that deals with a lot of
21   inadequacies of the Mills Middle, as well
22   as Mills High School, as well.  And it goes
23   to the issue of good faith compliance with
24   Plan 2000.
25          MR. BATES:  Okay.  And that's about

Page 131

1    facilities; correct?
2           MR. PORTER:  Correct.  It is also, and
3    also her declaration as shown at document
4    number 5577-2, as well.  Her declaration is
5    in there.
6    BY MR. BATES:
7    Q.   Okay.  Well, let's follow up on a few of the
8    things that you have just shared, Representative
9    Springer, and we will probably come back to that
10   5577-2 document that Mr. Porter referenced.
11          When you say that the reasons why, in your
12   opinion, PCSSD is not achieving unitary status are
13   the same as those that were written in 2011, are you
14   saying that PCSSD has made no progress since 2011?
15   A.   What I'm saying is they, they start out to do
16   things that you would think that they're making
17   progress, and then at some point in time it derails.
18          So it's been that way for years.  You get
19   optimistic about what's taking place, and then -- and
20   you, and you compliment, you talk about what's taking
21   place, and then for whatever reason, things don't
22   follow through.
23          And, I guess, for example, let me just tell
24   you, I was optimistic about how things were going
25   with respect to student achievement, and you know

Page 132

1    that we have this case.
2           Well, the district decided, the Board of
3    Education decided to cut the entire curriculum
4    department within Pulaski County, those, those
5    persons that were assigned that, to address
6    curriculum and make sure that teachers were teaching,
7    and those sort of things taking place.
8           There were four ladies that were cut, and
9    so now they had to start all over again, with, with
10   respect to addressing that particular area.  So
11   that's an example.
12          And then another example, this is one of
13   those phone calls that I received, and I'll just
14   share this with you, because I don't know who the
15   person was, but I'll just tell you, when Dr. McNulty
16   came on board, he decided that he, that he agreed
17   with the board cutting those positions, and said that
18   he would change, you know, basically, keep those
19   positions and then change the name of those positions
20   and continue, and continue, basically, what was
21   taking place.
22          Well, I get a phone call the other day
23   telling me that those positions are not even -- that
24   the people are not even doing the work that they are,
25   that he promised would take place with respect to

Page 133

1    those positions, because they were going to be
2    similar to the positions that the women that were,
3    that had those positions initially.  So to me, that's
4    not good faith.
5            And so, and so I'll have to follow up to
6    decide, you know -- so that, that's just an example.
7    Maybe there will be testimony -- we can ask Dr.
8    Warren.
9            So there was a time when I could call Dr.
10   Warren and ask her did that actually take place, and
11   so, you know, maybe we could work from that.
12           But right now I can't call her and ask her,
13   Are they cutting down the strategist positions?  So,
14   once again, you're starting all over again.
15           You don't have anybody to give that type of
16   assistance to the teachers that need it in order to
17   make sure that instruction is taking place, and
18   there's a focus in on African-American students.
19           Because that's what their positions were to
20   do is to assist those folks within the building in
21   order to address student achievement.  And so now
22   you're starting all over again, and I'm not sure what
23   they have now.
24   Q.   You mentioned someone that called you.  Who was
25   it that called you?

Page 134

1    A.   Well, that's what I told you.
2            MR. PORTER:  She can't remember the
3        names?
4    A.   No, it's not -- they wouldn't tell me their
5    names.
6            MR. PORTER:  Oh.
7    A.   These are anonymous phone calls.  And so that's
8    kind of like the call that I got that I got chewed
9    out about when I, when I asked, asked Dr. Warren
10   whether or not they were cutting AP classes at Mills
11   High School.  And so, you know, those are the kind of
12   questions.
13           So then I get the email saying that I don't
14   need to be talking to Dr. Warren anymore, because I'm
15   having a discussion with her about very, the very
16   thing that's being litigated at this point.
17           So I'm, I'm not understanding how that's
18   the case, when I'm trying to find out information,
19   so.  And, you know, I think it's bad faith for me not
20   to even get the question answered.
21           So if you are cutting AP classes at Mills,
22   Mills is one of the schools that have a majority
23   African-American population, and the Ross Plan talks
24   about making sure that there are AP classes for
25   students at that particular school, then why would

Page 135

1    you cut those kind of classes?
2    Q.   Which AP classes are you saying are cut at
3    Mills?
4    A.   I don't, I don't know, so that's what I was
5    trying to find out.  So, then, that would be, that
6    would be a question, then, that needs to be asked of
7    someone.
8            I was trying to get the answer to the
9    question, and so there was never a response made.  It
10   was -- I mean, I -- it's kind of frustrating, really.
11   Q.   Who, who told you that AP classes were being
12   cut at Mills?
13   A.   I received -- once again, and I'm sorry, this
14   is unbelievable, but they identified themselves as
15   teachers in the school, and they told me this.
16           And so -- and then -- let me just say this.
17   Can we take a break?  I just need to ask Mr. Porter.
18   As you know, we do have another case with a
19   particular person that is, has a responsibility of
20   making sure that AP classes and that sort of
21   instruction takes place within the school district.
22           I don't know if you're familiar with that
23   case.  It's part of the people -- she's one of the
24   ones that, that was cut out of the Curriculum
25   Department.

Page 136

1    Q.   Okay.  We can take a break, but just one more
2    question before we do, and I want to make sure I'm
3    understanding.
4            It's, essentially, your testimony that you
5    got a call about AP classes at Mills, and you're
6    saying it was from an anonymous teacher --
7    A.   It was --
8    Q.   -- is that you said?
9    A.   Yes.  And then I, and then I was able to
10   confirm whether or not that took place based upon
11   attorney-client information privilege, meaning that
12   one, one of the persons that has direct knowledge
13   about that is one, now has a lawsuit against the
14   Pulaski County Special School District for cutting
15   her position.
16   Q.   Okay.  All right.  Well, we can take a break.
17   A.   We don't have to.  I guess I've told you enough
18   for you to know who it is.  We can continue.  So do
19   you understand now what I'm saying?
20   Q.   I believe I do.  Thank you.
21   A.   All right.  We can go forward then.
22   Q.   You mentioned -- one of the other things that
23   you mentioned was cutting the entire Curriculum
24   Department.  What are you basing that on?  Where did
25   you get your information about that?

34  (Pages 133 to 136)

Springer, Joy 5/15/2020                                                    Little Rock School District v. Pulaski County Special School District, et al

Page 137

1    A.   Well, I was in a hearing where there was
2    testimony from the superintendent.  That was,
3    basically, her testimony before the Board of
4    Education.
5    Q.   Okay.  One of the other things you mentioned
6    was -- and I was just trying to get everything down
7    that you talked about -- that there are still people
8    causing a disparity in discipline.  Who, who is it
9    that you're saying is causing a disparity in
10   discipline?
11   A.   Well, well, well, that was part of the
12   obligation.  So the district was to -- okay.  Okay.
13   You can, you can determine who has all of the
14   referrals, and who is making the referrals for
15   suspensions.
16        You can look at those referral documents,
17   and you can see the names of the teachers.  And so
18   that's a part of Plan 2000.
19        The district is to identify those teachers
20   that have that problem.  They were supposed to take
21   them through a training course and determine what it
22   is that's causing that, and then come up with some
23   type of solution in order to address that.
24        I have never seen a report indicating that
25   they've, teachers have been identified, and that

Page 138

1    certain things, that they discovered this.  So you
2    make an assessment, you collect data, and then you,
3    you determine a finding.
4         Well, I have not seen a finding as to what
5    was causing that, even though they identified the
6    teachers.  They said it was a personnel issue, and
7    that it's something that shouldn't be communicated.
8         So I don't really know what the findings
9    were.  Well, I don't think either Mr. Porter or none
10   of us know what the actual findings were with respect
11   to those teachers that were causing the high number
12   of referrals.
13        It's not like we want to know their names
14   and, and publicize it to the world, because you've
15   already asked me as to whether or not I have
16   discussions about this case and post on Facebook.
17   No.
18        You can, you can ask my husband.  He knows
19   that I do not have discussions about particular
20   things about this case with him.  Particular as it
21   relates to personnel issues, I do not.
22        I understand that, that that's not supposed
23   to be done, so I've been around long enough not to do
24   that sort of thing.
25             MR. PORTER:  And, for the record,

Page 139

1    Devin, we've asked for that information in
2    discovery, and, of course, your guys
3    objected to it.
4         MR. BATES:  Yes, sir.
5         MR. PORTER:  The teachers.
6    BY MR. BATES:
7    Q.   Okay.  One of the other things you mentioned,
8    Representative Springer, was a, I believe the way you
9    phrased it, it was lack of consistency is bad faith.
10   Did I understand you correctly?
11   A.   Well, when it's, when it's lack of consistency,
12   that's my, that's what I say.  To me, that's bad
13   faith, because if you start to do things, and then
14   you do it for a year, and then you stop doing it,
15   what is that but bad faith?
16        You make people think that you are going to
17   do certain things, and then after you get them to
18   think that that's what's taking place, and then when
19   somebody calls you up and asks you questions during a
20   meeting, Well, where is your data?  What do you have
21   with respect to that?  And then you can't produce
22   anything.
23        So what is that?  Nothing but bad faith, if
24   you can't produce anything to show what you've done.
25   And like Mr. Porter said, and I guess I should have

Page 140

1    said this earlier, our monitoring, we're not -- we
2    don't have to -- there's nothing in the plan that
3    calls for us to produce any kind of report or
4    anything.
5         We, we agree to sit down and have
6    discussions and talk about these things.  And at some
7    point in time, there was an agreement, and you're
8    probably not aware of this.
9         Jerry Guest and the lawyer before Cody,
10   they decided that we did not need to write reports
11   and give to them, because they thought that that
12   would be bad publicity.
13        They wanted us to sit down and have
14   conversations with them about what was taking place,
15   so that that wouldn't be out there, for us to try to
16   work together.
17        So when you have that understanding about
18   sitting down, and having discussions, and bringing
19   things to a person's attention about what your
20   concerns are, you would expect for them to follow
21   through and, and correct it.  Well, when that doesn't
22   take place, to me, that's nothing but bad faith.
23   Q.   What meeting are you referring to where you
24   asked for some data to back something up, and
25   something wasn't provided?

35 (Pages 137 to 140)

Page 141

1    A.   Almost every -- most of the meetings that we've
2    had, when we sit down and have those monthly
3    meetings.
4    Q.   And you're saying that lunch meetings -- well,
5    I guess they used to be lunch meetings, I guess.  Now
6    they're just phone conference meetings -- you're
7    saying that those are the meetings you're referring
8    to when you asked for things, and data wasn't
9    provided; is that correct?
10   A.   Well, I specifically asked for, where is the
11   data to show what you've done and that it's working?
12   So you say you've implemented certain things, and
13   you've done certain things, well, where, where, where
14   is the evidence of that?
15         The district has to show that.  They have
16   to show their evidence of what they're doing.  And so
17   that's what I'm saying to you.
18         I have not seen, I have not seen any
19   evidence to show what they are actually doing and
20   then the results.
21         So, so the idea is to implement, show the
22   results, and then if something is not working, then
23   you change it and do something different.  So I don't
24   know what it is that they're doing, whether or not it
25   even works or not.

Page 142

1    Q.   What evidence are you saying that hasn't been
2    shown to you?
3    A.   Well, well, like say, for instance, Mr. Porter
4    just talked about it, the teachers -- so as a result
5    of them identifying the teachers, and finding out
6    what, what it is that they're doing, and what they're
7    doing wrong.
8          Without even telling us who the teachers
9    are, you could at least say that we found out that,
10   for the most part, the teachers were referring kids
11   to, suspending them for a particular rule infraction,
12   or something of that nature, or because -- as I, as I
13   recall, there was an incident that was brought out in
14   the last hearing where this teacher was not aware of
15   what was taking place with this particular student,
16   and this student was being referred for a suspension,
17   when that particular incident should not have even
18   taken place, and then got a board member involved in
19   the situation.  So things of that nature.  So those
20   sort of things, when you identify things.
21         And then early on I told you about the fact
22   that when students were being suspended, they would,
23   and the parents would appeal those suspensions, they
24   would go to, even being recommended for expulsion.
25         They would go to a committee of principals,

Page 143

1    and those principals had the responsibility of
2    determining whether or not that suspension or that
3    expulsion recommendation should be overturned, and
4    then that changed.  So things like that.
5          When you find out that there's a problem,
6    what is it that you're doing in order to correct that
7    problem.  Can you tell me where you found your
8    problems, and what you're doing to correct those
9    problems?
10   Q.   What other evidence are you saying you didn't
11   receive?
12   A.   Well, the same thing for student achievement,
13   same thing.  So when you monitor, if your -- and the
14   same thing for monitoring.
15         When you monitor and collect data about
16   these certain areas, you should have some data that
17   tells you something about what you are collecting.
18         Someone should be able to go in and look at
19   it and analyze it and come to some type of
20   conclusions regarding the data that you collected.
21         So are you just collecting the information
22   and not doing anything with it?  What are you doing
23   with it once you collect it and find out the
24   disparities, or something that's wrong, with respect
25   to the data that you collected.

Page 144

1          What do you do once you get the data?  If
2    you do nothing, then that's bad faith too.  When you
3    actually see it, and you take no action, bad faith.
4          MR. BATES:  Okay.  Let's go ahead a
5          take a break.  I think we've been going for
6          a little while now, and we'll come back.
7          MR. PORTER:  Okay.
8    BY MR. BATES:
9    Q.   All right.  Representative Springer, other than
10   the Plan 2000 and Judge Miller's 2011 order, and the
11   Eighth Circuit opinion that you referenced, did you
12   bring any other documents with you today?
13   A.   No.  Oh, I have some AKA documents with me.  My
14   sorority documents are in this folder too.
15   Q.   Are those relevant to the case, or did they
16   just happen to come along for the ride?
17   A.   They just happened to come along for the ride.
18   Q.   Fair enough.
19   A.   And I have my -- I haven't looked at this.  I
20   have my legislative tablet with me.
21   Q.   Anything on there relating to this case?
22   A.   Oh, no.  These people are talking about Covid.
23   I get people emailing me about Covid 19.  We should
24   be concerned about it.  It doesn't appear that we
25   are.

36 (Pages 141 to 144)

Springer, Joy 5/15/2020                                Little Rock School District v. Pulaski County Special School District, et al

## Page 145

1    Q.   Okay.
2    A.   **They, they definitely are.**
3    Q.   Well, if we start talking about Covid 19, we're
4    going to be here the rest of the day just on that, so
5    I think we will limit that.
6         Okay.  Getting back to where we were when
7    we took a break, you referenced and Mr. Porter
8    referenced several documents that have been filed in
9    this case, and I know there's been many more
10   documents filed in this case.
11        You have given several declarations.
12   There's been a lot of opinions and everything
13   represented.
14        Other than what's been filed on the docket,
15   and other than what we've discussed here today, are
16   there any other opinions or reasons that you believe
17   that PCSSD has not achieved unitary status?
18   A.   **Okay.  Once again, I have not been able to go**
19   **through all of my emails on documents that have been**
20   **shared, so if I get some of those off, once, again,**
21   **I'll promise to share those with you.**
22   Q.   As you sit here today, other than the things
23   that have been filed in court, and other than the
24   things that we've already discussed, as you sit here
25   today, is there anything that you can think of that

## Page 146

1    is another reason why PCSSD should not achieve
2    unitary status?
3    A.   **I'm thinking.  Do you want me to think for a**
4    **minute, let me.**
5    Q.   That's fine.  No rush.
6    A.   **I can't think of anything right now, but if I**
7    **do, I will have Mr. Porter supplement.**
8    Q.   Okay.  Just a few more questions, then.  Is it
9    your opinion that PCSSD needs to eliminate the
10   achievement gap in order to achieve unitary status in
11   student achievement?
12   A.   **Let's, let's go to the plan and read what it**
13   **says.  The goals within the Ross Plan, those are the**
14   **goals that the district has.**
15        **And they're on the first page of -- that's**
16   **what -- these are the things that the district is to**
17   **do, and I can't just answer your, that question**
18   **directly.**
19        **My answer would be they need to implement**
20   **these goals within the Ross Plan, and I think the**
21   **Court talked about it being -- he didn't use the term**
22   **"good faith," but it has to be sustained -- I think**
23   **he may have used the word "sustained" over a period**
24   **of time to show that they are doing it within, in a,**
25   **with a good faith effort.**

## Page 147

1         **So I'm reversing that using the word "bad**
2    **faith," because based upon what I've previously**
3    **talked about, their efforts to implement these goals**
4    **have not been in, in good faith.**
5         **And they're -- and so there, there are**
6    **things that avoid to show, they're not -- I don't**
7    **think that they've demonstrated that they've tried to**
8    **implement these goals over the same period of time in**
9    **good faith.**
10        **There has to be some kind of documentation**
11   **to show that that's what's being done, and I don't**
12   **think the district has done that.**
13   Q.   What is Joy Springer's definition of "good
14   faith"?
15   A.   **I'm sorry.  Repeat your question.  I didn't**
16   **hear it.**
17   Q.   What is Joy Springer's definition of "good
18   faith"?
19   A.   **What I just said.  All of the things that I've**
20   **previously said that they haven't done, and the**
21   **things that have taken place.**
22        **If, if those things that I said are not**
23   **evident, then there will be, that would be a good**
24   **faith effort.**
25        **But there are things that have transpired**

## Page 148

1    based upon board actions, superintendent's actions,
2    and other persons within the districts, their
3    actions, caused there not to be good faith, the
4    actions of the persons within the school district
5    itself.
6    Q.   Okay.  I understand what you're saying, but my
7    question is a little bit different than that.  My
8    question is what is your definition of "good faith"?
9    A.   **That's my definition of "good faith," as it**
10   **relates to this case.  I mean, that's the, that's the**
11   **only definition that we're concerned about, so that's**
12   **my definition.  That's good faith.**
13        **Good faith is when they implement the**
14   **obligations under this plan.  They can, then they can**
15   **show good faith.  Regardless of what --**
16   Q.   Okay.
17   A.   **Regardless of what Webster's says, or any other**
18   **dictionary says, I'm talking about good faith as it**
19   **applies to this plan implementation.  And I think**
20   **that's the only definition of good faith that we need**
21   **to be talking about here today.**
22   Q.   You mentioned board actions, and I believe you
23   mentioned board actions in the same sentence as bad
24   faith, so I need to follow up on that.
25        What board actions are you pointing to that

37 (Pages 145 to 148)

Page 149

1  are not good faith?
2  A.   The board action, the board action to eliminate
3  the Curriculum Department in the PCSSD.  They
4  approved that, that action, and that action didn't
5  come from Dr. Warren.
6        That came from somebody -- it didn't come
7  from the -- and here's, here's what's in bad faith.
8  It didn't come from the superintendent, the
9  recommendation to get rid of the Curriculum
10 Department, and superintendents are the persons that
11 make recommendations to the board.
12       It came from somebody else.  They made her
13 sign those letters of nonrenewal in order to get rid
14 of those persons.  I mean, that's just totally bad
15 faith, for that to have taken place.  The board did
16 that.
17 Q.   I understand --
18 A.   The board did that in a special -- they had a
19 special meeting to have that take place.  That's just
20 totally unheard of.
21 Q.   Other than the curriculum position that we've
22 talked about, what other actions are you pointing to
23 to the board that shows anything other than good
24 faith?
25 A.   Well, the board has an obligation -- so the

Page 150

1  district, I guess -- the board is the district.  Is
2  that, is that -- as I understand it.
3        So the board has an obligation to make sure
4  that this plan is implemented.  So the board, the
5  persons on the board need to have conversations with
6  the persons that are responsible for implementation
7  of these plans, of the plan to make sure that that
8  takes place.
9        So I'm not, I'm not aware of any evidence
10 that the board has consistently questioned the, the
11 persons responsible for the implementation and called
12 them to task or taken any kind of action against
13 them, rather it's been, like, the opposite of.
14       I don't want to be here all day, but that
15 brings to my mind another example.  When, when the
16 Intervenors entered into the agreement with your
17 district about staffing, and part of the agreement
18 was that, that the district would look into some
19 concerns, some staffing concerns that were had,
20 there's email documentation to show that the board
21 was furious about the idea of John Walker telling the
22 superintendent and Mr. Roberts about making sure that
23 they investigated some complaints that other staff
24 members had.
25       They did totally didn't like that idea, and

Page 151

1  as a result, in my opinion, and doctor, and Dr. Guess
2  hasn't pushed this, but in my opinion Dr. Guess got
3  terminated because he had those kind of conversations
4  with Mr. Walker about addressing staffing matters.
5        And here's the other thing, when, when they
6  entered into that staffing agreement, there was a
7  provision in that staffing agreement that talked
8  about settings aside a hundred thousand, I think it
9  was a hundred thousand dollars a year.
10       I can't remember now, but, anyway, monies
11 were to be set aside to ensure that there would be
12 hiring taking place in certain teacher areas that
13 were deficient, like you, in, in in the plan, Early
14 Childhood, your core subjects, and that sort of
15 thing.
16       I even asked about a report on where we are
17 with respect to that.  You know, the district does a
18 staffing report, and it talks about a whole lot of
19 things in that report.
20       But there's nothing -- but they're unitary
21 with respect to the specific obligation, but they
22 still have to monitor staffing as a part of
23 monitoring.
24       And then that stipulation said that they
25 would do, make these payments to teachers in order to

Page 152

1  make them certified in certain areas.
2        Well, that has not taken place either.
3  They have not given reports on that particular area
4  of staffing either, and I've asked about that.  And
5  nobody -- and it goes to deaf ear.
6        And to me that's bad faith.  When you
7  commit, especially in the stipulation that you've had
8  the Court approve, and you don't give a report -- and
9  here's the other thing too.
10       For whatever reason, when I asked Shawn
11 Burgess about it, she didn't know anything about it.
12 She didn't know that there was such, that that
13 stimulation was shared.
14       So we talk about sharing things.  And the
15 Intervenors that have been deposed, you know, you
16 all, for lack of a better word, make a big deal about
17 them not being aware of certain documents being filed
18 in the court, and, basically, those are common
19 people.
20       They shouldn't have to know about these.
21 They get their information from the lawyers.  But for
22 people that have responsibility of implementing
23 certain obligations under the plan, and they don't
24 have any knowledge, I mean, that's what you need to
25 look at, not little people that you -- well, I don't

Springer, Joy 5/15/2020                    Little Rock School District v. Pulaski County Special School District, et al

Page 153

1   call them little people -- but persons, or parents
2   that have children that attend school, they shouldn't
3   have to know about things, specific things with
4   respect to this plan in detail, like court filings.
5       They get that information, that's
6   communicated to them by the lawyers.  But when you
7   have staff people that are supposed to be doing
8   specific things, then I think that's bad faith, when
9   you don't follow through and do those things.
10      It's been 20, it's been 20 some odd years.
11  We don't have enough time to, to hear all, all of the
12  things, and the judge is not going to allow all of
13  the things that I have to say to be said.
14      He has given us five days, and everything
15  that needs to be said, that I would say about what
16  has taken place over the years, I will not be able to
17  testify to that.
18      So Mr. Porter has to focus in on what it is
19  he wants me to say.  And so you -- I don't think it's
20  fair for you to try to get me to talk about all of
21  those things when the judge is not going to allow me.
22      So that's why I say we're going to have to
23  focus in on the things that we think, in response to
24  your case that we think are pertinent and then have
25  testimony about that.

Page 154

1       So if I think of anything else, I promise
2   you I will tell you, but right now -- if we sit here,
3   and you want me to sit and think, I -- we would be
4   here a long time, and I don't think you all want to
5   do that.
6       I don't think that's good time to be used.
7   I have other things to take care of.  John W. Walker
8   still is in business, and there are other cases that
9   are pending other than this particular case.
10  Q.  Well, let me address something you just raised
11  with Mr. Porter, who asked me how long, how much
12  longer we're going to be going.
13      I was thinking five more minutes left, but
14  you raised a few more things, though, that I do need
15  to follow up on, okay, and I'm hoping this won't take
16  too much longer.
17      But you mentioned Dr. Guess, and you
18  brought up that whole issue of his departure, and you
19  also, right before the break, were talking about what
20  you termed as a lack of consistency in the
21  administration.
22      So I want to ask this question carefully,
23  because I'm hoping you will have a shorter response,
24  and we can get done with this sooner, rather than
25  later.  How does Dr. Guess's departure tell anything

Page 155

1   other than good faith?
2       MR. PORTER:  I thought she had
3       testified to that earlier.
4       MR. BATES:  I heard her mention Dr.
5       Guess's departure, but I don't know that I
6       was able to understand how that represented
7       anything other than good faith.
8       MR. PORTER:  She testified about
9       staff, of staff that was in agreement
10      between Mr. Walker, about some, a staffing
11      agreement, staffing issues.  And the board
12      was furious about that, and that led to Dr.
13      Guess being terminated.  So I think...
14  BY MR. BATES:
15  Q.  Other than that -- if that's the case, so other
16  than that, Representative Springer, is there anything
17  else about Dr. Guess's departure that you're saying
18  represents anything other than good faith?
19  A.  Right now I can't think of anything else, but
20  if I do, I'll be sure to communicate it to Mr. Porter
21  and let you know.
22  Q.  What is your opinion of Dr. Guess?
23  A.  I'm sorry?
24  Q.  Where is your opinion of Dr. Guess?
25  A.  I, I don't have -- so I guess my opinion really

Page 156

1   doesn't matter, really, because of -- it really
2   doesn't matter.
3       I could, I could -- I think Dr. Guess was
4   doing some things that were influences other than
5   what he wanted to do, so I'll just leave it at that.
6       So Dr. Guess was not -- what did the, what
7   did the judge say -- driving the ship, or steering
8   the ship?
9   Q.  Captain of the ship?
10  A.  The captain of the ship, like he was supposed
11  to be.
12      MR. PORTER:  Judge Miller said the
13      empty suit.  Not about Dr. Guess.  Not
14      about Dr. Guess, but in another case.
15  Q.  So explain a little more to me when you -- you
16  said something, and it was a little bit vague, and I
17  didn't quite understand what you mean, that Dr. Guess
18  was doing some things.  What do you mean by that?
19  A.  Oh, some of the, some of the, some of the
20  actions that were taking place with respect to
21  implementation of Plan 2000.
22      I think that -- during that time Dr. Guess
23  was not really in charge of things.  When he came on
24  board, for a, a great period of time, remember, they
25  were under supervision by the state of Arkansas.

39 (Pages 153 to 156)

Page 157

1    They were in fiscal distress.
2         So he had a, he had a board, he had another
3    board that was directing him, and it was not until
4    right before he, about -- I guess, what, about a year
5    before he left that the actual board came back on
6    board.
7    Q.   So help me to understand here.  So are you
8    saying that -- are you pointing the finger at the
9    state?  I'm not quite understanding what you're doing
10   here.
11   A.   Well, you asked me my opinion about Dr. Guess.
12   This is an opinion, so I don't want you to get in
13   court and say that Joy Springer said this, that, and
14   the other.  That's -- that was an opinion response.
15   Q.   Any other opinions about Dr. Guess?
16   A.   My -- as I said before, there were other
17   outside influences, in my opinion, about what was to
18   take place with respect to implementation of Plan
19   2000.
20   Q.   What other outside influences are you referring
21   to?
22   A.   What I, what I just said.  He was not -- Dr.
23   Guess had a board that he had to report to.
24   Q.   So you are not referring to the PCSSD board?
25   A.   That's right.  And so, so here's the other

Page 158

1    thing.  There's, there's -- in my opinion, there's
2    history that you're not aware of.
3         The school out in Maumelle was built based
4    upon influences other than the superintendent's
5    influences, because board members at that particular
6    time certain influences on what would take place,
7    and things that they wanted.
8         And so the same thing here, certain things
9    took place because of outside forces taking place, in
10   my opinion, persons in the community, people that are
11   affluent within the community.
12        We still have a culture where those sort of
13   things take place.  We call it culture, but, rather
14   than use "discrimination."  That's the proper --
15   that's the word, the nice way of saying it now, the
16   cultural differences that take place within our
17   school district, and within our society, and within
18   this city, and within Pulaski County.
19        There are a whole lot of cultural
20   differences that still exist.  Discrimination still
21   takes place within our country.
22   Q.   Which years -- you are being a little bit
23   vague, and that's why I'm trying to understand here.
24   You keep saying that I don't, there's something I
25   don't know.  I want to -- this is my chance to, to

Page 159

1    learn from you; okay?
2    A.   Well, I --
3    Q.   Which years are you talking about?
4    A.   Well, I --
5    Q.   I'm a little bit lost on what you're talking
6    about.
7    A.   I'm, I'm being vague because it's, you asked me
8    for opinion testimony, so I'm giving you opinion.
9    Q.   Okay.  Are we still talking about Dr. Guess's
10   time, when you started talking about Maumelle and all
11   of this, or are you going back even further?
12   A.   Oh, well, you -- Maumelle was built years
13   before Guess got here, so yes.
14   Q.   Right.
15   A.   So I'm just talking about my opinion about
16   certain factors that take place that influence and
17   affect implementation of Plan 2000.
18   Q.   Okay.
19   A.   Like the, like the letter that the judge
20   received from persons within the community that he
21   shared.  They're ready for this case to be over with.
22   Why is it still taking place?
23        You know, for whatever reason, you know,
24   it's still taking place because the district's
25   failure to implement Plan 2000, the agreement.

Page 160

1         And a lot of people don't understand that,
2    so I think we do -- there's not been a good job of
3    communicating what actually has taken place.  More
4    opinion testimony that you solicited.
5    Q.   Give me just a minute, please.
6    A.   Okay.
7    Q.   Representative Springer, have you been able to
8    understand all of the questions that I have asked you
9    today?
10   A.   Sometimes I did not.  Remember, I had to ask
11   you to repeat.
12   Q.   But when I repeated them, were you then able to
13   understand my questions?
14   A.   I believe so.
15   Q.   And have I been polite and courteous to you
16   today in my questioning?
17   A.   Is that an issue?  I don't know why that
18   question is necessary.
19        MR. PORTER:  It doesn't matter.  You
20   have been fine, Devin.
21   A.   Yeah.  I don't know, I don't know why that's a,
22   even a question to ask.
23        MR. PORTER:  Lawyers like to ask.
24   A.   Why, why is that relevant?
25   Q.   Okay.  If I had been anything other than

Springer, Joy 5/15/2020                                    Little Rock School District v. Pulaski County Special School District, et al

## Page 161

1    polite, I know that you and your attorney would have
2    correction me, so.
3              MR. PORTER:  That's true.
4              MR. BATES:  So with that being said, I
5    will pass the witness.
6              MR. PORTER:  Thank you.
7              THE WITNESS:  Oh, you've got Cody up
8    there again.
9              MR. KEES:  Well, you laugh at that.  I
10   always ask that, because I don't want you
11   then saying that we weren't nice to you
12   during questioning.
13             THE WITNESS:  Oh, no.  Hey, I'm able
14   to take care of myself.  You know, I'm not
15   worried about no one being courteous to me.
16   That's not a concern.
17             MR. BATES:  There are not doubts about
18   that.
19             MR. RICHARDSON:  I'll vouch that
20   Representative Springer can take care of
21   herself.
22             Are you ready for me to begin?
23             MR. BATES:  Yeah, we are.
24             MR. PORTER:  Go ahead.
25                  EXAMINATION

## Page 162

1    BY MR. RICHARDSON:
2    Q.   Representative Springer, you testified earlier
3    that you received about 150 calls a year from
4    students or parents in the PCSSD and Jacksonville
5    North Pulaski School District.  Do you recall that?
6    **A.   Yeah.  And they're probably --**
7    Q.   And --
8    **A.   And they're probably not all documented either,**
9    **and I think I said that as well.**
10   Q.   I'll take that as an estimate.  You did a
11   little calculation to come up with that number.  What
12   was the calculation you did?
13   **A.   Oh, I was trying to think about the number that**
14   **I get a week, and then multiply that by the month,**
15   **and then times the school year, from August to June,**
16   **May or June.  That's how I came up with it.**
17   Q.   Okay.  So about how many do you get a week?
18   **A.   I will say -- I used the number five, five a**
19   **week, times -- then there are four weeks in the**
20   **month, so I guess -- and I guess that --**
21   Q.   And --
22   **A.   And I guess that, my math is right.  So I just**
23   **estimated that.  So four times five is 20.**
24   Q.   I'm fine with that.  I'm fine with that.  And I
25   don't remember if Mr. Bates asked you how far back

## Page 163

1    that goes, but it's kind of my understanding that's a
2    fair average for many years in this case.  Is that --
3    **A.   Yes.**
4    Q.   Probably until LRSD and North Little Rock
5    School District were released.  Prior to that, it was
6    probably more; is that fair?
7    **A.   Ask your question again.  I want to make sure I**
8    **understand.**
9    Q.   Well, I'm just saying it was probably five a
10   week after LRSD and NLRSD were released from the
11   case, and before that you probably received more than
12   five a week?
13   **A.   Oh yes.  I agree.**
14   Q.   Okay.  And I think you testified earlier that
15   as a Representative you now have access to analysts
16   through the Bureau of Legislative Research; is that
17   right?
18   **A.   No.**
19   Q.   Well, who are the analysts that you were
20   talking about?
21   **A.   Contingency Services.  They're in the House of**
22   **Representatives.**
23   Q.   Oh, okay, directly employed by the House.  Was
24   that true for Representative Walker, when he was in
25   the Legislature?

## Page 164

1    **A.   I'm not sure.**
2    Q.   Well, you said that -- and I think you
3    testified that you would get calls from parents or
4    students, and then you could ask for help from that
5    Contingency Services in the house.  Is that --
6    **A.   No, that's not my testimony.**
7    Q.   Okay.  How would you correct that?
8    **A.   My testimony is that I have not had calls from**
9    **parents of students in -- I, I said never.  I have**
10   **not referred any parents of students to Contingency**
11   **Services as it relates to implementation of Plan**
12   **2000.**
13        **All of my contact and referrals to**
14   **Contingency Services and analysts relate to Covid**
15   **issues, nothing about Pulaski County or any school**
16   **issues.  Remember, I've only been there since March**
17   **3rd.**
18   Q.   Yes, ma'am.
19   **A.   And the Covid -- so that was my testimony.**
20   Q.   I gotcha there.  Okay.  Well, I thought you had
21   said that there were times when you received calls
22   from parents or students, and then you would contact
23   Contingency Services or somebody to do some research
24   about the questions raised by the parents or
25   students.  Did I misunderstand that?

41  (Pages 161 to 164)

Page 165

1   A.   You surely did.
2   Q.   Okay.  So I'm going to try to ask one more
3   question and wrap that line of questions up.  Have
4   you received a call either during your tenure with
5   the Legislature or during Representative Walker's
6   tenure with the Legislature, did you ever receive a
7   call from a parent or student in the Jacksonville
8   North Pulaski School District that caused a call to
9   Contingency Services for a research project?
10  A.   I'm not aware of that.
11  Q.   All right.  And since we're on the legislative
12  issue, I have up the Legislature website, and it says
13  that you're on the Education- House K-12,
14  Vocational-Technical Institutions Subcommittee; is
15  that right?
16  A.   That's my understanding.
17  Q.   Okay.
18  A.   I have not attended a single meeting of the
19  Education, nor the Aging Committee since I've been
20  sworn in as Representative.
21  Q.   Yeah, let's do that right now.  Because of the
22  Covid crisis, the meetings have been closed at the
23  Legislature.  Have you attended any committee
24  meetings at the Legislature since you were sworn?
25  A.   Yes.

Page 166

1   Q.   Okay.  What meetings have you attended?
2   A.   Budget hearing.
3   Q.   What committee -- I'm sorry.  Not specific
4   meetings, but what committees have you attended their
5   meetings?
6   A.   Budget hearings of the legislative committee,
7   Legislative Counsel.
8   Q.   Okay.  So the website also says you're on the
9   Aging Children and Youth Legislative and Military
10  Affairs House Committee; is that right?
11  A.   That's correct.
12  Q.   You're on Aging and Legislative Affairs House
13  Aging Subcommittee; is that right?
14  A.   Yes.
15  Q.   And then you're on the House Education
16  Committee; is that right?
17  A.   Yes.
18  Q.   But none of those four committee, I don't think
19  any of them have had meetings since you've been sworn
20  in, so you probably haven't attended any meetings of
21  those committees; is that right?
22  A.   That's correct.  My testimony also was that
23  there is a meeting scheduled for the Education
24  Committee on Monday and Tuesday.  Do you recall that?
25  Q.   Yes, ma'am, I am aware of that.  I will

Page 167

1   probably see you there.
2   A.   Okay.  We're going to learn about adequacy.
3   Q.   Yes, ma'am.  You talked with Mr. Bates a little
4   bit about a role at Philander Smith in some
5   admissions capacity.
6        I'll have to apologize.  I just kind of
7   missed what that committee was.  What's the name of
8   that committee that you're on?
9   A.   Teacher Preparation.
10  Q.   And that committee is in charge of admissions
11  to the Teacher Preparation Program?
12  A.   Yes.
13  Q.   Do you have, hold a specific office, like
14  Treasurer/Secretary, or something like that?
15  A.   Oh, no.
16  Q.   Okay.  And how many people are on the
17  committee?
18  A.   It varies.  Well --
19  Q.   Can you estimate?
20  A.   I'm sure -- let me just take that back.  I'm
21  sure there's a certain number that they have
22  appointed, but not all of the time the persons that
23  are on the committee show up for particular meetings.
24  So I'm not sure the total number.
25  Q.   And how long have you served on that committee?

Page 168

1   A.   Ooh, it's been more than ten years.
2        (Exhibit No. 5 was marked.)
3   BY MR. BATES:
4   Q.   Okay.  I think we have your teacher license
5   there.  How long have you had a lifetime teaching
6   license?
7   A.   You're trying to find out my age now.  I think
8   you're eligible to receive that license, I think, 60,
9   between 60 and 62, so around, around that time.  When
10  you get, when you get a certain age.  I think, I
11  think it's 60.
12  Q.   I wasn't going to ask your age.
13  A.   Yeah, that's right.
14  Q.   I was going to ask --
15  A.   That's the basic -- sorry.
16  Q.   Well, what I'm trying to get at is, like you
17  said, the lifetime teaching license allows you to not
18  continue to do professional development; isn't that
19  right?
20  A.   That's correct.
21  Q.   And so once you receive a lifetime, you're not
22  required to do professional development anymore, so I
23  was just trying to get a sense of that time period
24  when you stopped doing professional development to
25  maintain your teaching license.

42  (Pages 165 to 168)

Page 169

1  A.  Oh, well, here's, here's the situation. I
2  think, I think I applied for that license about a
3  couple of years ago, and I, I continued to do
4  professional development until this particular year,
5  because of all that, you know, transpired, I didn't,
6  some things, personal things that transpired, I
7  didn't do professional development this year, with
8  respect to --
9  Q.  I guess --
10  A.  -- with respect to turning it in to the state
11  department.
12  Q.  You mean 2020?
13  A.  Yeah. I didn't, I didn't turn it in for the
14  ending of 2019.
15  Q.  Okay.
16  A.  Even though, even though I participated in
17  some, I did not turn in it.
18  Q.  So I sent you a Notice of Deposition that
19  mirrored the one from PCSSD, except for one category
20  of information.
21        And so the last thing I tacked on there was
22  I asked for a printout of the professional
23  development that you've attended.
24        Are you familiar with -- I asked that
25  because in 2018 when I took your deposition, you said

Page 170

1  you did all of your professional development through
2  Arkansas Learns. I'm sorry, not Arkansas Learns,
3  Arkansas Ideas. Has that, has that been the case
4  since 2018?
5  A.  Well, and I guess I need to change that,
6  because I did get some hours of professional
7  development at Pulaski County when they were allowing
8  me to come and participate in that Special Education
9  professional development that they were having. So I
10  had forgotten about that.
11  Q.  About when was that?
12  A.  So, so, let's see, the years that I
13  participated in, probably around 2014-'15, up until
14  the last, until -- what is this -- so up until maybe
15  '18.
16  Q.  So from the '14-'15 school year to about the
17  '18 school year, you did some professional
18  development in Special Educations through PCSSD; is
19  that right?
20  A.  Yes.
21  Q.  Okay. The remainder of your professional
22  development was through Ideas?
23  A.  Yes.
24  Q.  And are you aware that you can go on Ideas and
25  print out a list of all of the professional

Page 171

1  development that you have taken through them?
2  A.  I am.
3  Q.  Could you do that for us?
4  A.  Okay.
5  Q.  Thank you. All right. Have you ever been
6  provided -- well, let me back up. I'm sorry. Strike
7  that.
8        Since you became involved in the case in
9  1992, has one of your jobs been to monitor the docket
10  in the case and the orders issued by the court?
11  A.  Yes. I, I pull those off, and they are
12  maintained in a file. I have a file, so that's part
13  of the file. I'm helping to keep up with file
14  organization, so that's part of it.
15  Q.  Sure. But you also read those orders too;
16  right?
17  A.  I do.
18  Q.  Have you ever seen an order from the court
19  holding that PCSSD violated the Constitution in the
20  area of student achievement?
21  A.  That's one of those questions that Austin
22  should be objecting on.
23  Q.  Well, you just said you reviewed the orders.
24  A.  I'm sorry. Well, since 19 --
25        MR. PORTER: You're not asking for --

Page 172

1  you're not asking her for a legal opinion;
2  are you?
3        THE WITNESS: Well, he is. That's
4  where he's going to.
5        MR. PORTER: If you are --
6  BY MR. RICHARDSON:
7  Q.  No. I'm just asking if you've ever seen an
8  order that says PCSSD violated the Constitution in
9  student achievement?
10  A.  My, my answer to that question is, is that the
11  PCSSD and the Little Rock School District entered
12  into what's called a consent decree, and they agreed
13  that there were certain things that needed to take
14  place, so then they came up with the settlement plan.
15  So I, I'm not sure how that relates to this now,
16  so -- and it's my understanding that --
17        MR. PORTER: Scott, I guess I object
18        to the form of the question, because they
19        would, the issue is whether or not Pulaski
20        County Special School District has stayed
21        compliant with Plan 2000, and I think
22        that's really kind of the issue of the
23        case.
24  Q.  I'm just -- from your knowledge, Joy, somebody
25  who has been watching the docket in this case for

Springer, Joy 5/15/2020                                      Little Rock School District v. Pulaski County Special School District, et al

## Page 173

1  over 20, 30 years, have you ever seen an order that
2  said PCSSD violated the Constitution in the area of
3  student academics?
4  **A.   I don't recall.**
5  Q.   Have you ever seen an order from the Court
6  holding that PCSSD violated the Constitution in
7  student discipline?
8            MR. PORTER:  Same objection; object to
9        the form.
10 **A.   Same answer.**
11 Q.   Well, you don't recall ever seeing one?
12 **A.   I don't know that there is one.  I wasn't**
13 **looking for a particular order since 1992, and it's**
14 **my understanding that the judge's rulings took place**
15 **prior to me becoming involved in the case.**
16         **So I wouldn't have any knowledge of that**
17 **anyway.  I have not gone back to look at any order**
18 **prior to my coming, being, or coming on to the case.**
19         **So the -- I wouldn't have that -- now that**
20 **I think about it, I wouldn't have that knowledge**
21 **anyway, only what has been communicated to me since**
22 **that time.**
23            MR. PORTER:  And I think --
24 Q.   And if there is one out there, you just don't
25 know about it?

## Page 174

1            MR. PORTER:  Are you including Judge
2        Henry Wood's initial finding Scott, that
3        came --
4            MR. RICHARDSON:  I'm asking
5        Ms. Springer of her knowledge, and I think
6        what she said is if there's one out there,
7        she hasn't seen it, and she doesn't know
8        about it.
9  BY MR. RICHARDSON:
10 Q.   Is that right, Ms. Springer?
11 **A.   And there may be one out there.  I don't know.**
12 Q.   Okay.
13 **A.   I, I don't think --**
14            MR. RICHARDSON:  All right.  Is there
15        a stack of documents there at the table
16        that my office provided?
17            COURT REPORTER:  Yes.
18            MR. RICHARDSON:  They may be in a
19        binder.
20            COURT REPORTER:  Well, they're in a
21        big clip.
22            MR. RICHARDSON:  Yes, ma'am.  Will you
23        provide those to the witness.
24            THE WITNESS:  Are they Covid free?
25

## Page 175

1  BY MR. RICHARDSON:
2  Q.   I printed them out this morning, and I, I don't
3  have any symptoms, and my paralegal doesn't, so by
4  the time she dropped them off, they were Covid free.
5        If you want to take a break and spray them
6  with Lysol, I'm okay with it.
7  **A.   No, I don't.  Mr. Bates put his in a binder and**
8  **had plastic on it, and I could lift up the tab on**
9  **his.**
10 Q.   Let's take a break for a second and go off the
11 record and talk about it.
12            MR. PORTER:  All right.
13            (Off-the-record discussion)
14 BY MR. RICHARDSON:
15 Q.   Okay.  I have in front of you a document titled
16 Joshua Intervenors Classroom Observation Form,
17 Secondary Staffing 2016-17.  Do you see that?
18 **A.   Yes.**
19 Q.   Who developed this form?
20 **A.   It was developed by me with input from the**
21 **monitors.**
22 Q.   Okay.  And it looks like just kind of an
23 observation form that they used when they would go
24 out to the schools; is that right?
25 **A.   Yes.**

## Page 176

1  Q.   And at the time it says Secondary Staffing on
2  this one we're looking at, but it covers Classroom/
3  Student Assignment; right?
4  **A.   I'm sorry.  Repeat your question.**
5  Q.   It covers Classroom/Student Assignment?
6  **A.   Yes.**
7  Q.   And that's because at one time there was an
8  obligation with regard to one race classrooms; isn't
9  that right?
10 **A.   Yes.**
11 Q.   And then it covers Staffing, Student
12 Discipline, Academic Achievement, Classroom
13 Maintenance/Resources, and then Facility Condition.
14 Did I cover all of the areas?
15 **A.   That's what this form says.**
16 Q.   Okay.  And then on the right side there's check
17 marks made, I assume, by whoever the monitor is that
18 fills out the form of what they observe or don't
19 observe in the classroom.  Is that fair?
20 **A.   That's, that's fair.**
21 Q.   All right.  So there's three columns on the
22 right side, Fully Observed, blank, and Not Observed.
23 There's -- is the middle column, the blank column,
24 used for something?
25 **A.   There's nothing there.**

Springer, Joy 5/15/2020                                                  Little Rock School District v. Pulaski County Special School District, et al

Page 177

1    Q.   Was there, was there any expectation for the
2    monitors to use that for any purpose?
3    A.   I'm not aware of that.
4    Q.   Okay.  So I want to look at the Student
5    Discipline here.  I just want to try to understand
6    the form.
7         So, number one, Students were on task or
8    engaged during instructional time.  And it says,
9    Fully Observed.
10        So that means when this monitor went into
11   the school, they saw all of those things -- they saw
12   those things happen.  Am I understanding that right?
13   A.   On October the 11th, 2016, they observed this
14   taking place in this particular classroom of --
15   Q.   Right.
16   A.   -- it looks like the teacher Ms. Woods.  They
17   observed that on that particular day in 2016.
18   Q.   Right.  And for all of these questions, we'll
19   just assume that it's at that date and time, in this
20   classroom, with this teacher.  Okay?
21   A.   That's correct.
22   Q.   And then, number two is Students actively
23   participated in the lesson/activity/discussions.  And
24   she checked, Fully Observed, which means she saw that
25   going on in that classroom at that time; is that

Page 178

1    right?
2    A.   Yes.
3    Q.   New let's skip down to number five.  Students
4    observed in hallway during instructional time.  And
5    then it says, Not Observed.  Do you see that?
6    A.   Yes.
7    Q.   I assume that on number five the positive
8    result would be they're not out in the hallway during
9    instructional time.  They're actually in the
10   classroom learning.  Is that -- do I understand this
11   form right?
12   A.   Well, no.  The form says what it says, whether
13   or not they observed, what they observed.
14   Q.   Okay.  But if I am interpreting this form, they
15   are not observing students in the hallway during
16   instructional time.  Do you consider that a positive
17   or a negative towards student discipline?
18   A.   Well, it sounds like your question, that you're
19   trying to relate it to the entire school at that
20   particular time, and I don't think that you can do
21   that.  So I can't --
22   Q.   That's not what I'm talking about.
23   A.   I, I can't answer that question for you to say
24   that that took, that was taking place.  So I can't --
25   Q.   I'm sorry.  I --

Page 179

1    A.   Because I wasn't there, so I don't know.
2    Q.   I thought I agreed that these would only apply
3    to this date and time, and this class, and this
4    teacher.
5    A.   Oh, okay.  Only with respect to -- so this
6    teacher didn't have any students in the hallway on
7    this particular time on that particular day, on that
8    particular day, yes.
9    Q.   Right.  In looking at it on the form, is that a
10   positive or a negative in terms of student
11   discipline?
12   A.   Well, I'm not sure, because it doesn't talk
13   about what else was going on with respect to -- it's,
14   it's not saying anything else, other than they were
15   not in the hallway.
16   Q.   You created this form; right?
17   A.   Well, actually, it was created by the
18   Department of PRE in the Little Rock School District.
19   Q.   And you adopted the form for the Joshua
20   monitors?
21   A.   And we, and we had discussions about it, and it
22   was adopted by us to when they went into the
23   classroom.  The monitors agreed to use this.
24   Q.   So it says Observer, Smith, I assume that's
25   Marva Smith; is that right?

Page 180

1    A.   Yes.
2    Q.   So when Ms. Smith, after she made this
3    observation, she, who would she bring this document
4    back to to turn it in to?
5    A.   As I testified earlier, she maintained -- all
6    of these were maintained by the, the monitors, and
7    they did a summary of what their findings were and
8    gave them to me.  So they were not given to me.
9    Q.   Okay.  Then where did they maintain the file of
10   these documents?
11   A.   I have no idea.
12   Q.   Okay.  Well, let's look at the Request for
13   Production Number 17, page 24 of the Interrogatory
14   Responses.
15        Initially it asked the Intervenors to
16   produce all correspondence, emails, memoranda,
17   documents, and any other writing, whether in physical
18   or electric form, generated to report the findings of
19   persons monitoring JNPSD for compliance with Plan
20   2000 -- I'm sorry -- or desegregation obligations on
21   behalf of the Joshua Intervenors.
22        This observation form looks like a writing
23   to report findings by a monitor who is monitoring
24   JNPSD.  Would you disagree with that
25   characterization?

45 (Pages 177 to 180)

Springer, Joy 5/15/2020                                          Little Rock School District v. Pulaski County Special School District, et al

Page 181

1    A.   Well, as I testified earlier, the, the disk
2    that was produced to the Pulaski County Special
3    School District was completed, was developed by
4    Charles Bolden and submitted to them, so I did not
5    have access to that information.
6    Q.   I didn't ask you about the disk. I asked you
7    about that question and whether or not this form is a
8    writing generated to report findings of persons
9    monitoring JNPSD for compliance with Plan 2000.
10   A.   It, it is. It was completed by them.
11   Q.   Okay, good. Then why were none of these forms
12   produced to JNPSD in response to Request for
13   Production Number 17?
14   A.   I just answered that question.
15   Q.   You said that they were produced to PCSSD, but
16   that doesn't answer why they were not produced to
17   JNPSD.
18   A.   I did --
19           MR. PORTER:  Did you get a copy of the
20       disk, Scott?
21   A.   I, I just testified that I did not have these
22   documents in my possession. They were maintained by
23   someone else, so they were not documents that I had.
24   Q.   Oh, I'm sorry. I think I understand what
25   you're saying. So was Mr. Bolden responsible for

Page 182

1    producing documents in response to PCSSD's discovery
2    requests?
3    A.   No, I'm not saying that.
4    Q.   Okay. Did he have any responsibility or share
5    in any responsibility to produce documents in
6    response to Jacksonville North Pulaski's discovery
7    requests?
8    A.   I'm not saying that either.
9    Q.   Okay. So why is it relevant that Mr. Bolden
10   produced the disk to PCSSD?
11   A.   Because, obviously, that's probably where you
12   got them from, because I wasn't aware that there were
13   any documents such as this to be produced to either
14   of you.
15   Q.   When did you first see this Classroom
16   Observation Form?
17   A.   Which one?
18   Q.   Any Classroom Observation Form that was
19   completed by one of the monitors?
20   A.   Do you want me to give you a date?
21   Q.   I want you to answer to the best of your
22   ability.
23   A.   As I testified before, the monitors used these
24   forms. They came back, and they compiled the
25   information and produced the summary of their

Page 183

1    findings to me.
2    Q.   Have you ever seen one of these completed
3    Classroom Observation Forms before today?
4    A.   Yes, I have.
5    Q.   Okay. Have you ever seen one of these
6    Classroom Observation Forms completed by a monitor
7    prior to January 1, 2020?
8    A.   Yes.
9    Q.   Have you seen one completed by a Joshua monitor
10   before January 1, 2019?
11   A.   Yes. It would have been, it would have been
12   back during this particular time.
13   Q.   Okay. So you saw these in the 2016-'17 school
14   year?
15   A.   On -- you asked me have I seen one of these.
16   You -- the question was have I seen one of these,
17   yes. I'm -- that's the question.
18           Now you're saying -- are you asking me have
19   I seen the ones that you have now in your possession?
20   The answer to that is "no."
21   Q.   In the '16-'17 school year you were aware that
22   monitors were filling out these forms for the purpose
23   of reporting findings of their monitoring efforts in
24   the districts; right?
25   A.   Yes.

Page 184

1    Q.   Were you aware of them doing that in the
2    2017-'18 school year?
3    A.   Yes.
4    Q.   Were you aware of them filling out these forms
5    in the '18-'19 school year?
6    A.   Yes.
7    Q.   Are you aware of them filling out any of these
8    forms in the '19-'20 school year?
9    A.   The '19 school year, I'm not sure that there
10   was any specific observations made of this, based
11   upon my testimony earlier. The change --
12   Q.   All right.
13   A.   The change in their duties and
14   responsibilities.
15   Q.   So my understanding is that there would be
16   observation forms like this completed by monitors
17   Bolden and Smith for the '16-'17, '17-'18, and
18   '18-'19 school years?
19   A.   Well, let me just say this. We will look for
20   those forms. I'm not sure that they will be
21   available to you.
22           So I -- Mr. Porter is supposed to check
23   with us and see if they're available, and I will let
24   you all know. So that's my understanding.
25   Q.   All right. Did you assist in responding to the

46  (Pages 181 to 184)

Page 185

1    Jacksonville North Pulaski School District's
2    Interrogatories or Requests for Production of
3    Documents?
4    **A.  I did.**
5    Q.   Did you assist in gathering documents to
6    produce in response to those?
7    **A.   Some of them, yes.**
8    Q.   Okay.  Look to page 26, Request for Production
9    Number 20.  Here we ask for all documents, reports
10   not produced in response to the foregoing
11   interrogatories and requests for production that may
12   support the proposition that JNPSD should not be
13   immediately released from its obligations under
14   Section M for Plan 2000 and the Court's orders in
15   this case.
16   **A.   Now what, where are you reading?**
17          MR. PORTER:  Page 26, Request for
18          Production Number 20.
19   Q.   Yeah, Page 26, RFP 20.  Are you with me?
20   **A.   Okay.  So what was the, what's your question?**
21   Q.   Okay.  So in response to Request For Production
22   Number 20, we were not provided any of these
23   Classroom Observation Forms from any of the school
24   years we've discussed.  Are you aware of that?
25   **A.   Well, I've already testified to that.  I don't**

Page 186

1    **think that they're responsive to the request that's**
2    **being made here, as I stated before, that I did not**
3    **produce that disk with those documents on it, and so**
4    **they were -- that was done without my knowledge.**
5           **And then I'm not saying that I take the**
6    **position that, and I don't know that anybody here**
7    **takes the position that those documents support that.**
8    Q.   Yeah, that was my next question.  I take it
9    that because none of these documents were produced,
10   they would not support the proposition that JNPSD
11   should not be released from its obligations.
12   **A.   The document that I just --**
13          MR. PORTER:  Object to the form.  I
14          mean, Scott, if you've got an issue --
15          obviously what we've done, we've
16          supplemented our discovery responses by
17          providing these documents to you.  And so,
18          I mean, I'm just trying to understand what
19          the point is.
20   Q.   Well, Ms. Springer, you're aware that these
21   documents existed; right?
22          MR. PORTER:  And we supplemented our
23          responses to you by giving you --
24          MR. RICHARDSON:  I'm sorry, Austin.
25          That is a question for Ms. Springer.

Page 187

1           MR. PORTER:  I understand that, Scott.
2           THE WITNESS:  I can answer the
3           question.
4    BY MR. RICHARDSON:
5    Q.   Okay.
6    **A.   So I've already testified that I was not aware**
7    **that these documents existed, that I wasn't aware**
8    **that Charles Bolden put these documents on that disk**
9    **that was submitted to Pulaski County.**
10          **And, you know, other than that, I don't**
11   **know what else you want me to tell you, other than I**
12   **wasn't aware that these were the documents that were**
13   **placed on there, in particular because --**
14   Q.   I'm not asking about that disk.
15   **A.   Well --**
16   Q.   I'm asking you as a general matter, you were
17   aware that these documents existed when you were
18   assisting to respond to these Requests For
19   Production.
20   **A.   No, I was not aware of that.  That's my point**
21   **to you, is that I know that these documents were**
22   **utilized by the monitors to go and make these**
23   **classrooms observations.**
24          **I was not aware that they existed, because**
25   **let me, let me just tell you, and this relates to**

Page 188

1    office business.
2           **These, these documents, I was told, were**
3    **not available, because they were placed in storage.**
4    **And we had a storage facility that was damaged by**
5    **weather, and those documents were damaged and**
6    **destroyed there.**
7           **So I was under the impression that there**
8    **were not documents available, until this document is**
9    **produced, and some of these documents are on this**
10   **disk.**
11          **So in order to be candid and fair to you,**
12   **that is my information that I have that I am telling**
13   **you today.**
14   Q.   Okay.
15   **A.   And I didn't know that Charles had put these,**
16   **these documents on this particular disk that related**
17   **to Pulaski County.**
18   Q.   When was that storage facility destroyed?
19   **A.   I didn't say it was destroyed.  I said that**
20   **there was damage to it to cause water damage.  So**
21   **these documents are dated back in 2016, so that would**
22   **have been within the last year or so.**
23   Q.   I'm sorry.  I didn't follow you.  So when did
24   the damage to the documents occur at the storage
25   facility?

47  (Pages 185 to 188)

Springer, Joy 5/15/2020                                                Little Rock School District v. Pulaski County Special School District, et al

---

Page 189

1    A.   That would have been in the last year or so. I
2    don't know the specific date.  So -- I don't know the
3    specific date, because here is what has taken place.
4          When questions were asked about these
5    documents, I communicated to Mr. Pressman that I was
6    not aware that those documents were available.  So we
7    couldn't produce what was not available.
8    Q.   How often were documents related to this case
9    moved to that storage facility?
10   A.   Well, since these, since these are dated back
11   in 2016-'17, probably, huh, every year or so
12   documents are moved to that storage facility, like
13   files are moved to the storage facility, like, every
14   year.
15   Q.   Who is responsible for deciding which files
16   related to this case are moved to the document
17   storage facility?
18   A.   Well, that's another issue.  They were supposed
19   to be maintained to the office, and they got
20   transferred there in error.
21   Q.   Who transferred them?
22   A.   Charles Bolden is responsible for file
23   maintenance.
24   Q.   Okay.  And when did they get transferred to the
25   document storage facility?

---

Page 190

1    A.   Once again, it had to be within the last year
2    or so.
3    Q.   When did you discover that water had damaged
4    the documents?
5    A.   Within the last year or so.
6    Q.   And were any electronic backups maintained of
7    any of these documents?
8    A.   And, and that's my testimony to you.
9    Obviously, Charles, at the time -- so, so he produced
10   -- so a year or so ago, in 2018, evidently Charles
11   must have scanned these documents to a particular
12   disk, and these documents were shared with Pulaski
13   County, and it included those ones that you have.  So
14   that's --
15   Q.   Was there any --
16   A.   -- that's how that happened.
17   Q.   Was there any inventory made of the documents
18   that were transferred to the storage facility?  And
19   just documents related to this case.
20   A.   What do you mean, inventory for -- so that's
21   what I'm just telling you is that these documents
22   were transferred to the facility in error.
23          There's usually -- so there's usually an
24   inventory that lists the files that are transferred.
25   Is that what you're asking me?  Yes.  And these files

---

Page 191

1    were transferred there in error.
2    Q.   Who maintains the list of documents transferred
3    to the storage facility?
4    A.   Charles Bolden.
5    Q.   And I'm not quite sure how to ask this
6    question, but I'm trying to get a sense of the scope
7    of the documents related to this case that were in
8    the storage facility.
9          It sounds like it may be several years
10   worth.  Can you give me any testimony or give me some
11   sense of the scope of the documents that were there
12   when the damage occurred?
13   A.   I guess you need to be more specific.  What do
14   you mean "the scope of the documents"?
15   Q.   Well, I mean, I guess there were these
16   Classroom Observation Forms.  Were there any other
17   documents, monitor reports, you know, messages,
18   letters, anything relating to the districts and their
19   compliance with Plan 2000 that might have been in the
20   document storage facility?
21   A.   Well, probably some -- when they, and I'm, I'm
22   just -- I'm guessing.  There probably were other
23   documents that related to when they went to the
24   school, like when they picked up staff rosters and
25   things of that nature.

---

Page 192

1          So maybe probably discipline statistics,
2    and ACT scores, and benchmark scores, and those sort
3    of documents were probably in there as well.
4    Q.   Were all of the documents related to this case
5    in the storage facility, were they all destroyed?
6    A.   No, they were not.  We still -- as I stated
7    before, we have a pleadings file that's still in the
8    office.
9    Q.   Okay.  I guess I was just trying to -- if we
10   look at Mr. Bolden's inventory with all of the
11   documents listed on that inventory of documents in
12   the storage facility, they have all been destroyed?
13   A.   Well, that's what I just said earlier.  You're
14   probably not going to find these particular documents
15   on his inventory, because they were transferred there
16   in error.  They should not have been transferred
17   there, for this particular year.
18          Anything prior to 2011, 2010, they would
19   probably be in the storage facility.  They were
20   probably transferred.
21          But anything since that date, they
22   probably, they should not have been transferred to
23   the storage facility, so they're not going to be
24   reflected on that inventory sheet of files
25   transferred.

---

48  (Pages 189 to 192)

Springer, Joy 5/15/2020                                                      Little Rock School District v. Pulaski County Special School District, et al

Page 193

1    Q.   Did Mr. Bolden engage in any effort to identify
2    what documents newer than 2010-'11 were in the
3    facility and were destroyed?
4    A.   Ask your question again.
5    Q.   It was a long one.  So I took it from what you
6    just said that the only documents that were supposed
7    to be in the storage facility were ones that
8    pre-dated the 2010-'11 school year.  Is that fair?
9    A.   Thank you, yes.
10   Q.   But there may -- there were documents after
11   that school year that were in the facility?
12   A.   Yes.
13   Q.   So what I'm asking is, is there any way to know
14   what documents that were after 2010-'11 that were in
15   the storage facility and weren't destroyed?
16   A.   No.  And let me just say, for the record, as
17   I've said to Devin, if there are documents that are
18   available that we have in our possession, we'll turn
19   those over to you.
20        We're not trying to hide things.  You make
21   it seem like we're trying to hide things from you.
22   So I don't see how this particular form relates to
23   what you're saying that you think that it does.
24   Q.   Okay.  I'm just trying to get a sense of what
25   was destroyed, and it sounds like the only reason

Page 194

1    that we have these documents from '16-'17 is because
2    Mr. Bolden just happened to make an electronic copy
3    of these documents.  Is that --
4    A.   That's exactly -- that's what I'm trying to
5    communicate to you.
6    Q.   And have you checked with Mr. Bolden or
7    Ms. Smith if they have any other copies of these
8    documents?
9    A.   No, I have not.  I can't -- if you would like
10   for me to do that, I will.
11   Q.   So with regard to those documents from
12   2016-'17, there's a number of them.  And in Request
13   For Production 20 we asked for all documents,
14   memoranda, reports not produced in response to the
15   foregoing that may support the proposition that JNPSD
16   should not be immediately released from its
17   obligations under Section M of Plan 2000.  And none
18   of these documents from '16-'17 were produced in
19   response to that; right?
20   A.   Well, that was a long question, and it talked
21   about some other things.  So if you want to break it
22   up and ask in parts, I'll be happy to answer it.
23   Q.   Okay.  Request For Production Number 20, at the
24   time this was responded to, back in February of 2020,
25   you were aware that there were these Classroom

Page 195

1    Observation Forms; right?
2    A.   That is correct.
3    Q.   And Request For Production 20 asks for
4    documents that may support the proposition that
5    Jacksonville should not be immediately released from
6    Section M of Plan 2000; right?
7    A.   That's correct.
8    Q.   And none of these Classroom Observation Forms
9    were produced in response to that; right?
10   A.   I think that's been asked and answered.
11   Q.   And the response, it doesn't say, Well, there
12   are Classroom Observation Forms that may have
13   existed, but they have been destroyed that might be
14   responsive to this interrogatory.  There's nothing
15   like that; right?
16   A.   There is not, and you didn't specifically ask
17   for Classroom Observation Forms.
18   Q.   Then the inference is these Classroom
19   Observation Forms would not demonstrate
20   noncompliance --
21        MR. PORTER:  Object to the form.
22   Q.   -- for Section M of Plan 2000; right?
23   A.   Well, see, now you're -- you're twisting the
24   testimony now.  I'm, I'm confused about your question
25   now, so you will have to repeat it.

Page 196

1    Q.   Well, if these Classroom Observation Forms
2    supported the proposition that Jacksonville should
3    not be immediately released from its obligations
4    under Section M of Plan 2000, then they should have
5    been produced in response to that RFP; right?
6    A.   I, I would agree that they should have been
7    produced, but they were not, because they were not
8    available, to my knowledge.
9    Q.   Well, you knew about them, and you didn't tell
10   us that they weren't available.
11        MR. PORTER:  Scott, I don't know why
12        we're going down this rabbit hole.  If
13        there's some kind of issue about us not
14        producing these documents at the time we
15        supplemented it, then I guess that's
16        something to be used, you know, something
17        you can argue to the Court.
18        And, are you presuming that we're
19        going to be using these documents for this
20        trial.
21        So if you've got some kind of issue
22        about us not producing these documents when
23        you propounded these Requests For
24        Production of Documents, we have
25        supplemented these, and if you've got an

49 (Pages 193 to 196)

Springer, Joy 5/15/2020                                                                    Little Rock School District v. Pulaski County Special School District, et al

Page 197

1    issue with it, then that's something you
2    need to take up with the Court.
3        But taking it up with this witness is
4    not getting us anywhere, and we're just
5    wasting a lot of time.
6        THE WITNESS:  And he, he -- I think
7    he's getting to the point to where he's
8    trying to badger me too, because I've
9    already indicated --
10       MR. PORTER:  Hold on a second.
11       THE WITNESS:  -- I've already
12   indicated that if there, if there are any
13   additional documents found that they will
14   be produced.
15       So this is on the borderline of
16   badgering me, going over the same question,
17   and he's asked it three or four times now.
18       MR. PORTER:  So we just, we just need
19   to move on, then.
20       MR. RICHARDSON:  Austin, my response,
21   since you're doing speaking objections
22   here, then I'll respond.
23       MR. PORTER:  Well, we just need to
24   move on.  We've beat this horse enough.
25       MR. RICHARDSON:  Excuse me.

Page 198

1        MR. PORTER:  Yeah.
2        MR. RICHARDSON:  Excuse me.
3        MR. PORTER:  Go ahead.
4        MR. RICHARDSON:  Excuse me.  There's a
5    difference between supplementing an answer
6    and changing an answer; okay?
7        These documents were not identified
8    here, not produced.  They were not produced
9    to Jacksonville.  They were produced to
10   PCSSD.
11       MR. PORTER:  Well, I guess when these
12   documents were created in 2016, was
13   Jacksonville a district at the time?
14       MR. RICHARDSON:  Yes.
15       MR. PORTER:  In 2016?
16       THE WITNESS:  Yeah, they were.
17       MR. RICHARDSON:  Yes.
18       MR. PORTER:  Okay.  All right.  Well,
19   fine.  You know, we've dealt with this
20   issue long enough, man.  Let's just move
21   on.
22       THE WITNESS:  He's, he's trying to
23   make the same --
24       MR. PORTER:  Don't worry about it,
25   Joy.

Page 199

1        THE WITNESS:  Okay.
2        MR. PORTER:  Don't worry about it.
3        THE WITNESS:  Well, I want the Court
4    -- I don't want him going to the Court
5    saying that I'm, I'm trying to be
6    dishonest.  I really don't appreciate that.
7    I'm a person --
8        MR. RICHARDSON:  I'm sorry.
9        THE WITNESS:  I'm a Representative of
10   this state, and I swore to make sure that I
11   uphold the Constitution and do other
12   things.  So for you to continue to do this,
13   I think, is inappropriate.
14       MR. RICHARDSON:  I was --
15       THE WITNESS:  And I've, and I've
16   already said to you if we locate any other
17   documents, that they will be produced, and
18   I'm being as honest as possible about this.
19   And so you just need to --
20       MR. RICHARDSON:  I didn't intend to
21   impugn your honesty.  I didn't intend to
22   suggest anything about your honesty, or
23   lack thereof.
24       I'm taking your answers at face value
25   here, and I took the answer to the Request

Page 200

1    For Production 20 at face value.
2        MR. PORTER:  We will supplement.
3        MR. RICHARDSON:  And I'm pointing
4    out that we requested --
5        MR. PORTER:  Scott, we will supplement
6    our responses.
7        MR. RICHARDSON:  Hold on, Austin.
8        MR. PORTER:  No, no, no.  I'm saying
9    this --
10       MR. RICHARDSON:  No.
11       MR. PORTER:  -- we will supplement our
12   responses to show that these documents --
13   we provided these documents to you, and we
14   will supplement those responses to these
15   Requests For Production of Documents.
16       You got the documents, so what's the
17   problem?
18       MR. RICHARDSON:  Well --
19       THE WITNESS:  He, he -- oh, go ahead.
20       MR. RICHARDSON:  There's --
21       THE WITNESS:  I've already said, he's
22   trying to show that we're trying to --
23       MR. RICHARDSON:  I'm not saying
24   there's a problem.  I'm just asking
25   questions about the response and making

Page 201

1    sure I understand the response to the
2    Request for Production.
3        MR. PORTER:  Okay.
4        MR. RICHARDSON:  As I sit here today
5    and look at this Request For Production,
6    the fact that these were not produced in
7    response to it suggests to me that they do
8    not support the proposition that JNPSD
9    shouldn't be released from its obligations,
10   and that's why they weren't produced.
11       MR. PORTER:  Well, that --
12       MR. RICHARDSON:  Otherwise, you would
13   have produced them.
14       MR. PORTER:  Well, that's your --
15       MR. RICHARDSON:  I'm assuming --
16       MR. PORTER:  -- interpretation.
17       MR. RICHARDSON:  -- in response to
18   these Interrogatories and Requests For
19   Production.
20       MR. PORTER:  That's your
21   interpretation.  We'll supplement our
22   answers; okay?
23       MR. RICHARDSON:  Okay.  Make sure to
24   reflect the initial answer when you
25   supplement.

Page 202

1        MR. PORTER:  Yeah.  Let's move on.
2    BY MR. RICHARDSON:
3    Q.   Okay.  Just another issue, on page 27, I
4    accidentally had two Requests For Production Number
5    22's, so the second Request For Production Number 22
6    at the bottom of page 27; are you with me there?
7    A.   Yes.  Page 27?
8    Q.   Yes, ma'am.  Have you had a chance to review
9    the second Request For Production 22?
10   A.   I have looked at it, and I think my previous
11   testimony has been I was not aware that there, that
12   there were documents in electronic form that were
13   part on a disk.
14       So, once again, this has been asked and
15   answered, and I think you're, we're getting to the
16   point where, once again, you're badgering me again
17   about this particular question.
18       Scott, you and I, you and I know have --
19   you and I have differences of opinion about things,
20   and so this is your opportunity to bring that to
21   light.
22       So I think we should move on, and I'll be
23   more than happy to answer your questions, because at
24   this point in time, I think you're getting to the
25   point where this should not be continued.

Page 203

1    Q.   Section M and Section F are different sections
2    of Plan 2000; right?
3    A.   Repeat your question.
4    Q.   Section M and Section F are two different
5    portions of Plan 2000; right?
6    A.   Section M and Section F?  I guess I'm not
7    understanding your question.
8    Q.   Section F of Plan 2000 covered discipline;
9    right?
10   A.   Yes.
11   Q.   Section M of Plan 2000 covers academics; right?
12   Student achievement?
13       MR. PORTER:  Student achievement,
14   right.
15   A.   Yes.
16   Q.   Okay.  The prior one I asked you about was
17   Section M, student achievement; right?
18   A.   Yes.
19   Q.   This one asks you about Section F, which is
20   student discipline; right?
21   A.   You're cutting out.  I didn't hear you.
22   Q.   This, the second Request For Production 22 on
23   page 27 asks you about Section F, which is student
24   discipline; right?
25   A.   Yes.

Page 204

1    Q.   So it's a different question.  It asks for
2    documents that might support the proposition that
3    JNPSD shouldn't be immediately released from its
4    obligations under Section F of Plan 2000.  You see
5    that; right?
6    A.   It's a different question, but it has the same
7    kind of documentation and responses that have already
8    been stated before.  So it basically is the same
9    question.
10       You're, you're trying to say that we, we
11   didn't produce documents that we should have
12   produced, and that's not a fact.
13   Q.   I'm -- whether or not you should have produced
14   them, that's, that's up to y'all, but the fact that
15   they were not produced, I can draw inferences from.
16       So that one you referred me to RFP Number
17   9, which is on page 22.  It starts there.
18   A.   That I referred you?  What are you -- I'm not
19   sure I understand your question.
20       MR. PORTER:  On page 22.
21       THE WITNESS:  Well, he's saying that I
22   referred him to.
23   BY MR. RICHARDSON:
24   Q.   Maybe I misspoke.  The response to the second
25   Request For Production Number 22 refers us to the

51  (Pages 201 to 204)

Page 205

1  response to Request For Production Number 9; right?
2  **A.   That's what, that's what --**
3  Q.   And your response --
4  **A.   That's what, that's what the lawyers wrote**
5  **here.**
6  Q.   And that gets us over to page 22.  And so in
7  response to Request For Production Number 9, I didn't
8  see any reference to any Classroom Observation Forms
9  generated by the monitors.  Did I miss anything
10 there?
11        MR. PORTER:  I think the witness has
12     already testified she wasn't aware at the
13     time we produced or responded to your
14     discovery requests that these documents
15     existed.
16        MR. RICHARDSON:  Austin, I've been
17     patient with the speaking objections.
18        MR. PORTER:  Well, I mean --
19        MR. RICHARDSON:  I would like --
20        MR. PORTER:  Well, Scott, you're
21     asking a question that she's already asked
22     about, answered about four or five
23     different times, and I don't understand why
24     you keep going over the same questions that
25     you are going over before.  She has already

Page 206

1     given the answers.
2        MR. RICHARDSON:  I haven't asked her
3     about Request For Production Number 9.
4        MR. PORTER:  And what has her response
5     been to the previous question that you
6     asked, about not being aware of it?
7        MR. RICHARDSON:  I haven't asked her
8     about Request For Production 9 yet, and she
9     hasn't answered any questions about that.
10 BY MR. RICHARDSON:
11 Q.   All I asked was I didn't see any reference to
12 any Classroom Observation Forms of the monitors.  Did
13 I miss anything in Request For Production Number 9?
14 Is there something that refers to these documents in
15 Request For Production Number 9?
16 **A.   Scott, once again, this is border -- this is on**
17 **the --**
18        MR. PORTER:  Just go to your previous
19     answer.  Go to your previous answer.
20 **A.   The same answer as I previously stated.**
21        MR. RICHARDSON:  Okay.  Madam court
22     reporter, could you read back the question
23     where I referenced, prior to these last two
24     or three, Request For Production Number 9?
25        COURT REPORTER:  Yes.  Give me just a

Page 207

1     second.
2  (Court reporter read back the question.)
3        MR. RICHARDSON:  Right.  Prior to that
4     are there any references to Request For
5     Production 9 on the record?
6        COURT REPORTER:  Hang on one second.
7  (Court reporter read back the question.)
8  BY MR. RICHARDSON:
9  Q.   Okay.  And then is no other reference to
10 Request For Production Number 9 because this was a
11 new question.
12       And all I'm asking is in the language that
13 was drafted in response to Request For Production
14 Number 9, is there anything in there that refers to
15 these Classroom Observation Forms or any other
16 documents produced by the monitors?  I just want to
17 make sure I'm reading it right.
18 **A.   Since I, since the lawyers responded to this, I**
19 **think that's a question that you need to ask the**
20 **lawyers at this point.**
21       **I think I've tried to do my best to answer**
22 **your question, so at this point in time, I'm really**
23 **not understanding your question, so you can get that**
24 **response from them.**
25 Q.   Sure.  Can you look at page 22 and page 23, and

Page 208

1  I'll see if I can clarify that.
2  **A.   Okay.**
3  Q.   So it says in response to Request For
4  Production Number 9, the first sentence says, See
5  email from Chastity Scifres dated 3-26-19 attached in
6  response to RFP Number 1.
7        Is there anything in that sentence that
8  refers to Classroom Observation Forms or documents
9  produced by the monitors?
10 **A.   That's, that's the whole point.  Since I**
11 **assisted the lawyers with the response to this,**
12 **they -- I was not aware, nor were they aware of this.**
13 **They were not aware of the classroom observations**
14 **either.**
15 Q.   The next sentence is Intervenors also have the
16 following documents, a, Documents provided to court
17 expert for use in preparation of her JNPSD discipline
18 report.
19       Is there something about that that refers
20 to these Classroom Observation Forms?
21 **A.   Once again, that preparation was done by the**
22 **lawyers, and so I'm not sure that I can answer that**
23 **question.**
24 Q.   Did you review the documents provided to
25 Ms. Powell for use in preparation of her discipline

52  (Pages 205 to 208)

Page 209

1    report?
2    A.   I did.
3    Q.   Were any of these Classroom Observation Forms
4    among that set of documents?
5    A.   The documents that Doctor, that Margie Powell
6    had?
7    Q.   Yes, ma'am.
8    A.   I guess, I guess I'm confused about your
9    question.  Why would, why would Margie Powell have
10   the classroom observations that were on the disk that
11   was given to Pulaski County Special School District?
12   I'm not understanding your question.
13   Q.   I'm just trying to find out, was that part of
14   those documents?  It sounds like you are saying it
15   was not.
16   A.   Documents that Margie Powell produced to me?
17   I'm not sure why she would have those documents.
18   Q.   Okay.  So as far as you're aware, this part of
19   the response to Request For Production 9, Documents
20   provided to court expert for use in preparation of
21   her JNPSD discipline report, that does not include
22   these Classroom Observation Forms or monitoring
23   reports from the monitors --
24   A.   I, I think --
25   Q.   -- is that right?

Page 210

1    A.   I think you're misreading that.  So this answer
2    is talking about, as I recall, you -- I asked you to
3    produce documents that, that JNPSD shared with the
4    court monitor.
5         We went back, back and forth several
6    occasions, several emails for you to provide those
7    documents.  You did not provide those documents, so I
8    had to ask Margie Powell to produce those documents.
9         So she and I met at a certain place, or
10   maybe she dropped them off at the office.  And so
11   those are the documents that's, that's been
12   referenced here, documents that you failed to provide
13   to us when we asked you to provide those documents to
14   us.
15        So I had to get Margie Powell to provide
16   those documents to us.  That's what that's making
17   reference to.
18   Q.   Okay.  And so as far as you're aware, that set
19   of documents does not include documents from the
20   monitors, like these Classroom Observation Forms?
21        MR. PORTER:  Scott, for the record,
22        our response on 22, Analysis of these
23        documents is not complete.  Do you see
24        that?
25        MR. RICHARDSON:  Austin, I would

Page 211

1    really appreciate --
2         MR. PORTER:  No, no, no.  I'm asking
3    you do you see that?  Do you see that?
4         MR. RICHARDSON:  She's the witness.
5         MR. PORTER:  Do you see that?
6         MR. RICHARDSON:  I'm asking her
7    questions.
8         MR. PORTER:  In other words, we're
9    saying --
10        MR. RICHARDSON:  Let me cross --
11        MR. PORTER:  No, no, no.  We're
12   saying --
13        MR. RICHARDSON:  Do you want --
14        MR. PORTER:  We're still, we're still
15   saying that.  We're making an analysis of
16   the documents to see whether or not other
17   documents should be coming forward.
18        And that's what that is, that's a
19   reference to.  So you're being unfair to
20   this witness.
21        MR. RICHARDSON:  Austin, are you ready
22   to testify?
23        MR. PORTER:  You're being unfair to
24   this witness.  That's what I'm saying.
25   We're saying analysis of these documents is

Page 212

1    not complete.  And so that's why, after
2    looking further, we found these observation
3    form.
4         MR. RICHARDSON:  Okay.  I'll get
5    there.  Okay.  I'll get there, Austin.
6         THE WITNESS:  Well, let me make
7    sure --
8    BY MR. RICHARDSON:
9    Q.   Right now I'd like an answer to my question,
10   just so I'm sure that this clause here about
11   documents provided to court expert, provided for use
12   in preparation of her JNPSD discipline report, that's
13   not referring to any of these Classroom Observation
14   Forms or similar forms from the monitors; am I right?
15   A.   No.  That's talking about you, that's talking
16   about you, JNPSD having provided documents to the
17   court expert, as I said before.
18        Once again, those documents are documents
19   that you failed to produce that were requested, and
20   we had to get those from Margie Powell after numerous
21   requests to you.  So I think the issue here is
22   getting a little bit out of hand, Mr. Richardson.
23   Q.   So, a, the documents provided to the court
24   expert, that's only documents from JNPSD; is that
25   right?

53  (Pages 209 to 212)

Springer, Joy 5/15/2020

Little Rock School District v. Pulaski County Special School District, et al

---

Page 213

1   A.  I think I have answered that question.
2   Q.  Okay.  B, periodic discipline reports provided
3  to JNPSD pursuant to Plan 2000.  That, that doesn't
4  include any Intervenor documents; right?
5   A.  I, I -- Scott, I think these responses are
6  pretty specific, and I think that you are just trying
7  to badger me and make me upset about the question, so
8  I think that this is unnecessary.
9   Q.  Well --
10   A.  It's pretty clear, it's pretty clear that
11  that's --
12   Q.  I asked you --
13   A.  Well, may I finish --
14   Q.  No.
15   A.  -- so that we can --
16   Q.  I asked initially if these documents were
17  covered by the description and response to Request
18  For Production Number 9, and you refused to answer
19  that, so I had to go through each sentence.
20      If you just want to go ahead and tell me
21  that the response to Request For Production Number 9,
22  there's nothing in there that refers to these
23  Classroom Observation Forms or similar monitoring
24  forms, then we can move on.
25   A.  I think I've already answered that and told you

---

Page 214

1  what has taken place, and you refuse to listen to
2  that, and you choose to continue to ask me the same
3  questions over and over again, badgering the witness.
4   Q.  Okay.  Flip over to page 15, Interrogatory
5  Number 15.  Did you assist in the preparation of the
6  response to Interrogatory Number 15?
7   A.  (Witness complies.)
8   Q.  By that I mean did you, you provide information
9  to help respond to Interrogatory Number 15?
10   A.  That question I can answer yes.
11   Q.  Okay.  In response to Interrogatory Number 15,
12  I didn't see any reference to these Classroom
13  Observation Forms or any other similar monitoring
14  forms filled out by the Intervenors' monitors.  Did I
15  miss something?
16   A.  Well, obviously, I didn't read this, because
17  they don't even talk about monitors going to the
18  school.
19      Let me, let me just take a minute and read
20  this, because monitors did make visits to the
21  schools, and that, that probably needs to be
22  supplemented.  Let me read them.
23      (Witness reviews document.)  Okay.  They
24  are -- not included in this response is the
25  monitoring visits during the school years 2016-'17

---

Page 215

1  and 2017-'18.
2      I note on page 18 in the response that it
3  says, under number i, As of the 2018-'19 school year,
4  when the monitors made school visits, JNPSD
5  principals commenced declining to fulfill the
6  monitors' request for documents bearing on Plan 2000
7  compliance.
8   Q.  Okay.  So that subject line makes reference to
9  school visits.  We know that they made school visits.
10  So these observation forms, those would be responsive
11  to Interrogatory Number 15; right?
12   A.  They would be had they been available to make
13  reference to.
14   Q.  Okay.  Well, we know the ones that we have
15  today that were produced to PCSSD, those would be
16  responsive to Interrogatory Number 15; right?
17   A.  They would be, and I have already given an
18  explanation as to what has transpired.
19   Q.  I'm not intending to replow that ground.
20   A.  I want the record to be clear, too, for you to
21  use in, in testimony that I answered a question a
22  particular way without giving a full response.
23      So that question has been asked, and I want
24  to make sure that the record reflects the full
25  response, so that you won't try to use it to say that

---

Page 216

1  I have not been truthful in this, and try to impeach
2  me with respect to my testimony.
3   Q.  I think the final two documents that I put in
4  that packet are the Ross Plan, and there's some
5  handwritten notes on it.  Do you see that?
6   A.  Yes.
7   Q.  And there's one District 2018-'19.  Do you see
8  that?
9   A.  Yes.
10   Q.  Whose handwriting is this on here?
11   A.  Mine.  This is my handwriting, Joy Springer.
12   Q.  Okay.  And you produced a number of these to
13  us.  I didn't include them all.  This is just kind of
14  a sample of them, and I really just wanted to kind of
15  understand.  So this one that says District 2018-'19,
16  what does that mean, that hand notation up there?
17   A.  Okay.  That means that I reviewed the
18  district's school improvement plan for 2018-'19 to
19  determine whether or not the educational goals were
20  included within the district's plan.
21      And the check marks mean that these are the
22  only goals that were included in the district's
23  school improvement plan, i.e., their obligations
24  under Plan 2000.
25   Q.  Okay.  And so the check mark means you found

---

54 (Pages 213 to 216)

Page 217

1    that those goals were there?
2    A.   Yes.
3    Q.   And if there's not a check mark, that means the
4    goals were not there --
5    A.   Well, no --
6    Q.   -- right?
7    A.   -- this -- yes, that's what it means, that they
8    made a notation of that.
9    Q.   Okay.  And the district is -- it's the
10   district-wide school improvement plan for '18-'19;
11   right?
12   A.   Yes.
13   Q.   And then if you flip the page, the next one, It
14   says Bayou Meto 2018-'19.  Do you see that?
15   A.   Yes.
16   Q.   I took it that you sat down with each school's
17   school improvement plan and went through the same
18   analysis; is that right?
19   A.   That is correct.
20   Q.   Okay.  And then the next set of documents --
21   A.   And then --
22   Q.   -- for District '19-'20 --
23   A.   And then the one that you also have here says
24   no goals from the Ross Plan are indicated in it.  So
25   I did -- so part of my monitoring activities, when I

Page 218

1    looked at school improvement plans, and those sort of
2    things, I made a notation as to whether those things
3    were included.  So that's what this --
4         MR. PORTER:  What school was that?
5         THE WITNESS:  That's Bobby, the new
6         school.  Bobby Lester, for 2018-'19, none
7         of the goals were in their school
8         improvement plan, and there's a list of
9         other schools that indicates similar items.
10   BY MR. RICHARDSON:
11   Q.   Okay.  So then the next set of documents start
12   District 2019-'20.  Do you see that?
13   A.   Yes.
14   Q.   I assume it's the same analysis, but for the
15   strategic plans for, are school improvement plans for
16   2019-'20 school year; is that right?
17   A.   That's correct.  And all --
18   Q.   Okay.
19   A.   -- and all of the schools are not here.  You
20   just pulled out a sampling is what you said; right?
21   Q.   Yes, ma'am, that's right.  I was just trying to
22   get a sense of them.  I didn't intend to go all of
23   the way through.
24        When did you sit down and do this analysis
25   for the '19-'20 school year?

Page 219

1    A.   When I reviewed -- so when I went on,
2    probably -- you will have to go back and look at my
3    time records to see notations of when I reviewed the
4    plans.  So there should be a time record showing
5    that.
6    Q.   Can you give me just a rough guestimate, and
7    we'll assume the time records will show accurately
8    when --
9    A.   Well, whenever the district posted those, there
10   was a time when they weren't posted on the, on the
11   school website.  And so when, when asked for certain
12   documents, you know, you know, I --
13   Q.   I see.
14   A.   -- there was a time period where we couldn't
15   get documents from you all, so I had to use the time
16   when the district actually posted the documents on
17   the website.  So I'm not sure --
18   Q.   So when --
19   A.   I'm not sure when that was.  So if you, if you
20   would like for me to, I can go back and look at my
21   time records, and I can tell you when that was.  They
22   are notated in my time records.
23   Q.   Hold on.  So at some point you saw and unloaded
24   the strategic plans for '19-'20, and so you went
25   through the website and made this checklist?

Page 220

1    A.   Yes.
2    Q.   And can I assume that the one for '18-'19 was
3    similar -- whenever you saw that the district had
4    uploaded the '18-'19 strategic plans, you went
5    through this checklist?
6    A.   Yeah, that was part of the monitoring process,
7    yes.
8    Q.   Okay.  There would have been two separate
9    times.  You did the '19-'20 at one time, and you did
10   the '18-'19 ones at a different point?
11   A.   And I -- you know what, and I'll look to see if
12   I, if I did the -- so that's probably correct,
13   because between the 2016-'17 and '17-'18 school
14   years, the district had not started to develop school
15   improvement plans, nor was it implementing or had any
16   documentation to show its efforts to implement the
17   achievement goals within Plan 2000.
18        So these are the first -- now that I
19   recall, these are the first opportunities during this
20   particular school year that they actually put school
21   improvement plans on the website and inputted these
22   goals, because during the '20 -- now that I recall,
23   during the 2016-'17, '17-'18, they did not have these
24   type of documents.  They didn't have school
25   improvement -- they didn't have these plans

Springer, Joy 5/15/2020                                          Little Rock School District v. Pulaski County Special School District, et al

Page 221

1  developed.
2  Q.   How often have you personally gone to
3  Jacksonville North Pulaski schools to monitor them?
4  A.   Oh, I can't count.  They would be in my time
5  records.
6  Q.   Oh, no, ma'am, I'm not asking you to count them
7  up.  Just a rough estimate.  And it can be once a
8  month, you know, a hundred times a year, or whatever.
9  A.   Me, me personally, I did not go to them often.
10  The monitors did.  Mr. Bolden and Ms. Smith did.  So
11  I made periodic visits, so I'll be happy to count
12  those times for you.
13  Q.   I was just trying to get a sense of it.  Once a
14  month?  Once every two months?
15  A.   I think I would, I think I would, I would like
16  to make a notation and let you know.  I'll count them
17  up and provide that to you.
18  Q.   As we sit here, you can't estimate?  Is that --
19  A.   I would say --
20  Q.   When you --
21  A.   Let me just say this.  I would say that during
22  the course of the school year, I'll just name the
23  schools that I recall going to over the, over the
24  time that Jacksonville School District had been into
25  being.

Page 222

1       So I've been to Murrell Taylor, Pinewood,
2  Warren Dupree, Bobby Lester, the high school, and the
3  middle school.
4  Q.   Okay.  When you went to monitor those schools,
5  did you take a Classroom Observation Form with you?
6  A.   I did not.
7  Q.   Did you take any kind of form, report, rubric,
8  something to organize your notes on that visit?
9  A.   Well, if you look at my time records, they will
10  be reflected in that, so I can share those with you.
11  And I can also go back and look at email
12  transmissions between myself and members of your
13  district to see if I have any of those to share.
14       And I think we did produce some of those
15  records to you that I pulled off of the computer.  So
16  I can probably go back and look for those as well.
17  Q.   Okay.  I am just asking generally.  When you
18  went to monitor schools, did you have some kind of
19  form or something that you took with you to use as a
20  monitoring instrument?
21  A.   I answered that, and then you asked me
22  whether or not there was any notes, and my response
23  to you was that my notes would be in the form of time
24  records that are documented and/or emails.  And if
25  you don't already have those, I'll look to see if

Page 223

1  there are any to share with you.
2  Q.   Okay.  Maybe I missed it in there, and I
3  apologize by asking my question again.  I didn't hear
4  if you had a form that you used, like the Classroom
5  Observation Form, or something else like that.
6  A.   I did not use that form when I went.
7  Q.   Okay.  And there wasn't another form that you
8  might have used?
9  A.   I did not use a form at all when I went to the
10  school.  How I made notation of what I did are either
11  in emails or in the time records.
12       Or, let me just say this, my, my findings
13  at schools are also reflected during the monthly
14  meetings as will, because there were discussions
15  about what I found when I went to different schools
16  during that time.
17  Q.   Okay.  I am going to ask you a little bit about
18  the Donaldson Scholars program.  Did Charles Bolden
19  and Marva Smith work for the Donaldson Scholars
20  program for a time?
21  A.   Yes.
22  Q.   Do you recall about how long they worked there,
23  about how many years?
24  A.   I don't, I don't remember when they started.  I
25  think that they are still doing some things for them

Page 224

1  as of, as of to date.
2  Q.   Okay.  In the back of the discovery requests,
3  page six, Interrogatory Number 5, this one asks for
4  all vestiges of segregation that the Intervenors
5  allege currently exists in Jacksonville in the area
6  of academics, student achievement.  Are you aware of
7  any vestiges of segregation in Jacksonville North
8  Pulaski in the area of student achievement?
9       MR. PORTER:  Objection.  I think it
10       requires a legal response, Scott.  She's
11       not a lawyer.
12       So I think that requires her to make
13       some type of legal conclusion.  But if she
14       can give whatever answer, she's free to do
15       so.  That's my objection.
16  Q.   If you don't think you're qualified to respond
17  to it, that's fine.  Ms. Springer, do you have any
18  response to that question?
19  A.   I think the, the lawyers have answered that
20  question.
21  Q.   So you, you have no response to that question?
22  A.   Based upon the lawyer instructions.
23  Q.   Okay.  So the next page, Interrogatory Number
24  6, asks about every vestige of segregation that
25  exists in JNPSD in regard to student discipline.

56 (Pages 221 to 224)

Page 225

1    Same question, are you aware of any vestiges of
2    segregation in regards to the area of student
3    discipline in JNPSD?
4         MR. PORTER:  Same objection, Scott.
5         It requires her to draw a legal conclusion.
6    Q.   And that's fine.  If you're not the right
7    person to ask, that's fine.
8         MR. RICHARDSON:  But if she's going to
9         testify about some, I think I'm entitled to
10        know about it.
11        MR. PORTER:  Right.  She's not going
12        to be giving legal opinions.
13   BY MR. RICHARDSON:
14   Q.   Okay.  So, Ms. Springer, you have no testimony
15   on Interrogatory Number 6 and that question?
16   **A.   Oh, are you asking me?  I thought you and**
17   **Mr. Porter were having a discussion.**
18   Q.   All of my questions have been for you,
19   Ms. Springer.
20   **A.   Well, you all were just talking.  I didn't know**
21   **that that was a question.**
22   Q.   Do you have a response on whether or not there
23   are any vestiges of segregation in the Jacksonville
24   North Pulaski School District with regard to the area
25   of student discipline?

Page 226

1    **A.   The same response that I gave for the previous**
2    **question.**
3    Q.   And that's you don't have an answer for that;
4    correct?
5         MR. PORTER:  Yeah, Scott, you're
6         asking for, asking to identify
7         Constitutional violations, and, again, that
8         requires a legal conclusion.  Ms. Springer
9         is not going to be giving any kind of legal
10        conclusions.
11        MR. RICHARDSON:  And that's fine.  I'm
12        not, I'm not trying to argue with you
13        there, Austin.
14        If she's going to testify to some, I'm
15        entitled to know about any vestiges of
16        segregation that she thinks are there, but
17        if she's not going to testify, that's fine.
18        We will get that answer, and we'll move on.
19        MR. PORTER:  All right.  Thank you.
20        MR. RICHARDSON:  I need to hear it
21        from her.
22        MR. PORTER:  Object to form.
23        THE WITNESS:  I haven't, I haven't
24        been told, and, once again, I'm not sure
25        what's going to be testified to, so that's

Page 227

1    the best that I can do.
2         I don't know, and they would have the
3         answer better to that question than I would
4         anyway.
5    BY MR. RICHARDSON:
6    Q.   This isn't a take-home test here.  I need to
7    know -- this is my opportunity to ask you before we
8    go to trial are you aware of any vestiges of
9    segregation in the area of student discipline at
10   JNPSD?
11        If the answer is "No," that's fine.  If
12   it's, "I'm not the right person to ask," that's fine.
13   I just need an answer from you on it.
14   **A.   I just gave you an answer.**
15   Q.   No, you just told me that you're going to think
16   about it.
17   **A.   No, I did not.**
18   Q.   No.  If you can't answer the question today,
19   that's fine.
20        MR. RICHARDSON:  Austin, I'm trying to
21        be friendly here.
22        MR. PORTER:  Yeah, I'm trying to be
23        friendly too, Scott.  I mean, you know, I
24        mean, I'm, I'm really trying to be
25        friendly, but, you know, this is, this is

Page 228

1    kind of getting a little ridiculous.
2         And I think what you're, what you're
3         asking for her is a legal conclusion, a
4         legal opinion, and we're not calling on
5         Ms. Springer to make legal conclusions and
6         give legal opinions.
7         And, and also our response indicates
8         that it's the district's responsibility to
9         prove whether or not it's unitary.
10        And so we're not, we're not going to
11        be calling on Ms. Springer.  So you're
12        going down this rabbit hole for nothing.
13        We're not going to be calling on her
14        to make any kind of legal conclusion or
15        legal opinions.
16        MR. RICHARDSON:  Okay.  So she has no
17        testimony relative to Interrogatory Number
18        6?
19        MR. PORTER:  That's correct.
20        MR. RICHARDSON:  Okay.  Okay.  That's
21        all you had to say.
22   BY MR. RICHARDSON:
23   Q.   I want to ask you about a part of the response
24   to Interrogatory Number 7.  We asked for you all to
25   identify every violation by JNPSD of Section M,

57 (Pages 225 to 228)

Springer, Joy 5/15/2020                                                    Little Rock School District v. Pulaski County Special School District, et al

Page 229

1   student achievement.
2           And over on page ten, the second to last
3   paragraph, JNPSD has not undertaken and disseminated
4   evaluations or assessments of program effectiveness.
5           And I wanted to get your understanding of
6   the terms "evaluations" or "assessments."  What do
7   you mean by that?
8   A.   As it relates to Plan 2000.  I'll just call
9   your attention to the Ross Plan.  The Ross Plan has
10  six goals, and the sixth goal says that the district
11  will establish an ongoing, systematic evaluation
12  system at individual schools and the district level.
13  And then it goes on to talk about assessing, and so
14  forth.
15  Q.   Do you have a particular type of evaluation or
16  assessment in mind?
17  A.   I'm sorry.  You keep breaking up.  I'm sorry.
18  Say --
19  Q.   My apologies.
20  A.   Repeat your question.
21  Q.   So either from the Ross Plan or this response
22  to Interrogatory Number 7, do you have a particular
23  type of evaluation or assessment in mind that you're
24  referring to?
25  A.   Well, no, that's for the district to do.

Page 230

1   That's not my responsibility.
2   Q.   Okay.
3   A.   They're supposed --
4   Q.   So --
5   A.   They're supposed to produce information to --
6   in fact, here, here we go again.  Let me just back
7   up.
8           So I think you were there.  We had a
9   meeting with the people from the University of
10  Memphis and, back in April of 2018, and they outlined
11  what was supposed to take place with respect to the
12  Ross Plan, and what the, what the expectations were.
13          And I believe those are documented, so I'll
14  share with you that document that they outlined for
15  the districts.  You were there.  You probably got a
16  copy.  And so those are the expectations that we
17  expect to take place, based upon this plan.
18          That's what I'm -- that's what, that's what
19  we're looking for.
20  Q.   If I understood you correctly, in terms of
21  evaluation, the type of evaluation or assessment to
22  conduct, that's for the distract to select, and the
23  district can choose what evaluation or assessment it
24  deems appropriate in response to this Ross Plan
25  obligation?

Page 231

1   A.   Well, that's not what I said.  There's supposed
2   to be certain information within that plan, and I
3   think that was covered during that process.
4           And that was covered with the school
5   districts during that process, and they agreed to it.
6   There's supposed to be quantitative and qualitative
7   data that they're supposed to secure.
8           Qualitative means from parents, teachers,
9   students, members of the community about different
10  programs, and then there should be observations and
11  things of that nature from the teachers.
12          So those sort of things -- as I recall,
13  those sort of things were discussed within that
14  document that was shared with, with us.
15          You were there too, I believe.  Maybe you
16  weren't.  It was sometime, like, in April of 2018, I
17  think.  Do you remember that?
18          And then after that I think you all took
19  the position that you all weren't going to do it, as
20  I recall.  Correct me if I'm wrong.
21          And then after that meeting, because at the
22  time, people -- oh, my memory is being refreshed now.
23  At the time, I was asked, I had been asking about the
24  Steering Committee, and the plan called for there
25  being a Steering Committee, so that that Steering

Page 232

1   Committee could assist the, the district principals
2   in the respective schools in the development of their
3   school improvement plans.
4           And in that process, they were supposed to
5   collect this qualitative and quantitative data.  And
6   then at that particular time, as of that time that we
7   met in April, the University of Memphis was producing
8   some of that qualitative data for the Pulaski County
9   Special School District.
10          And after that meeting, the district
11  stopped, said -- they sent us a letter maybe a few
12  months later saying that they were going to stop
13  using the data that the University of Memphis was
14  providing.
15          And, also, the University of Memphis even
16  offered -- as I recall now, my memory has been
17  refreshed -- they even offered to assist the
18  districts, to assist both districts in assisting, in
19  developing these evaluations that the plan called
20  for, because the question was asked, What do you do
21  once you collect all of this data?
22          And then they told you all, as I recall, in
23  the meeting, that they can assist you with making
24  evaluation of the data that's being collected, so
25  that you can know what programs to continue to use,

58  (Pages 229 to 232)

## Page 233

1    those programs that needed to be done away with.  So
2    I recall all of that conversation taking place.
3           And since that time, you all took the
4    position, Jacksonville took the position that you all
5    didn't need that.  You all thought that that plan was
6    outdated, and you weren't going to use it, is what I
7    recall.
8           And then Pulaski County decided that they
9    would not use the Felsy (phonetic) data, the data
10   that was being collected by the University of
11   Memphis.
12          They decided that they would use some other
13   qualitative data that I think that the State
14   Department of Education had asked them to collect, so
15   they were going to use that.
16          And then soon after that is when Pulaski
17   County reconvened the Steering Committee meetings,
18   after they had been dormant or done away with, I
19   think, the right time, right after Brenda Bowles,
20   when she was there.  That was, like, in 2015 or '16.
21   She was still --
22   Q.   Can I pause for a second?
23   A.   She was still there, and --
24   Q.   I'm sorry.  It's getting on 4:00 o'clock, but
25   when I --

## Page 234

1    A.   I'm just explaining -- I'm explaining to you.
2    Q.   I understand, and I appreciate that history.
3    Let me ask you a question that might help.  Is it
4    your opinion that JNPSD was required to use the
5    University of Memphis to perform evaluations or
6    assessments of programs?
7    A.   Well, you -- I don't, I don't know of any
8    document where you all asked the Court to relieve you
9    all of that.
10   Q.   So are you --
11   A.   Or either, or either, here's the other thing,
12   too.  I don't know of any communications from the
13   JNPSD telling us that you were not going to use them.
14          Sam Jones sent a document saying that they
15   weren't going to use them anymore.  I don't, I don't
16   remember Jacksonville saying that you all were not.
17          You all took the position that you weren't
18   going to even do what was recommended within the
19   plan.
20   Q.   So is it your opinion that Jacksonville was
21   required to use the University of Memphis to conduct
22   evaluations or assessments of program effectiveness?
23   A.   Yes, to assist you --
24   Q.   Let --
25   A.   -- to assist you all with it, because you, as a

## Page 235

1    new district, you all did not have anything else
2    available to you, and you all were learning what the
3    process was, because you all had not heard about it,
4    and you all weren't familiar with it, the people that
5    were there.
6           So there was a time lag in between the time
7    that you were to start implementing those things.
8    And, as I said before, you brought up these
9    documents.
10          You -- Jacksonville had not even developed
11   a school improvement plan until the '18-'19, '19-'20
12   school year, so you all didn't even have anything in
13   place to address student achievement, as it relates
14   to the obligations under Plan 2000.
15   Q.   Over on page 14 of the discovery requests,
16   Interrogatory 11 and 12 kind of go together, and they
17   talk about the achievement gap.
18          We asked the question if you believe
19   there's an achievement gap, identify the percentage
20   of that achievement gap that is causally related to
21   de jure segregation.  Do you see that?
22   A.   I see the question.
23   Q.   Do you have the --
24   A.   Those --
25   Q.   -- training --

## Page 236

1    A.   That, that, once again, is a lawyer --
2    Q.   Ms. Springer --
3    A.   -- a lawyer response.
4    Q.   -- let me ask my question.  Let me ask my
5    question.  Do you have the training and expertise to
6    determine what percentage of the achievement gap is
7    causally related to de jure segregation?
8    A.   I haven't seen anything produced by either
9    district that says that, that it's not.
10   Q.   Assume that we produced that information.
11   Would you have the expertise to analyze that and come
12   to a reliable conclusion, scientifically valid
13   conclusion about what percentage of this gap is
14   causally related to de jure segregation?
15   A.   Unless you all are going to supplement your,
16   your responses to the discovery, I have not seen
17   anything of that nature.  So I would be interested to
18   see that.
19   Q.   Well, my question was more about your
20   qualifications.  Are you an expert on the achievement
21   gap and what portion of it can be related to
22   segregation?
23   A.   I don't consider myself as an expert, but I
24   understand what has taken place, based upon my, as I
25   testified earlier, based upon my many years of being

Springer, Joy 5/15/2020  Little Rock School District v. Pulaski County Special School District, et al

Page 237

1   on this case and having participated with the
2   program, research and evaluation department of the
3   Little Rock School District.  They investigated, and
4   they did evaluations and reports related to that very
5   thing.
6   Q.   Did they teach you how to evaluate what
7   percentage of the student achievement gap is causally
8   related to the de jure segregation?
9   A.   That, that is not my testimony.
10  Q.   Okay.  I guess back on Interrogatory Number 15
11  on page 16 there's a bracketed letter "c" that says
12  that you reviewed all minutes of JNPSD school
13  director meetings?
14  A.   That is true.
15  Q.   And you -- did your review the board packets of
16  those school director meetings?
17  A.   I sure did.
18  Q.   Okay.  Page 19, Interrogatory Number 16, we ask
19  about the disparity and discipline rates between
20  African-American students and non-African-American
21  students and whether that was the result of de jure
22  segregation.
23  A.   I think I --
24  Q.   Do you intend to testify that any amount of the
25  disparity between discipline rates as identified here

Page 238

1   is the result of de jure segregation?
2           MR. PORTER:  Scott, we're not going
3       to -- again, we're not going to call on
4       Ms. Springer to make any type of legal
5       conclusion or give legal opinions.
6   Q.   All right.  So, Ms. Springer, you're not going
7   to testify about that; right?
8   A.   I think Mr. Porter has answered that question.
9   Q.   Okay.  And you're going to follow that
10  direction; huh?
11  A.   Oh, is that supposed to be a joke?
12  Q.   Oh, no, that was, that was a real question.  I
13  just want to make sure that I'm clear on it.  If you
14  intend to provide testimony on that, I need to hear
15  what it is.  But if not, that's fine.
16          Okay.  When I took your deposition back in
17  2018, I think you told me that you got, you graduated
18  from UALR with your master's in about 2001; is that
19  about right?
20  A.   I think that's right.  I wasn't really sure on
21  the dates.  That sounds about right.
22  Q.   And you did --
23  A.   The records, the records -- the documents will
24  reflect it.
25  Q.   That's fine.  And you did a four-year

Page 239

1   Bachelor's in Education and a two-year Master's; is
2   that right?
3   A.   Yes.  I'm not sure, I'm not sure that it took
4   that long for me to do those things.
5   Q.   Okay.  That's, that's fine.  I'm just trying to
6   place it in time.  So are you aware in 1999 is when
7   the state passed ACTAAP, the Arkansas Comprehensive
8   Testing Assessment, and something else, Program?
9   A.   I'm not, I'm not aware of those dates; right?
10  At this point in time after being here all day long,
11  I can't remember any dates now.
12  Q.   Well, just about the time you were in school is
13  when that program passed, and I was going to ask if
14  you had any training on it.
15  A.   Probably back then, when it was passed.
16  Q.   Oh, okay.  I'm just saying, you don't recall
17  that training right now?
18  A.   I do not.
19  Q.   Are you aware that --
20  A.   And probably, and probably that's, those sort
21  of discussions took place in those meetings back,
22  back way then, those many years ago when, when it
23  came out.
24          So I'm sure we had discussions regarding
25  that when I participated in those program evaluations

Page 240

1   meetings and all of those kinds of meetings that were
2   taking place at the time.
3   Q.   Okay.  So are you aware, or did you provide
4   testimony about the change that caused and how
5   schools were required to, and the state, were
6   required to monitor and assess education, educational
7   achievement?
8   A.   I don't understand your question.
9   Q.   I'm just asking do we need to get in a
10  discussion about, could we get in a discussion about
11  how ACTAAP changed the assessment of educational
12  performance of students?
13  A.   Do we -- I, I don't understand your question.
14  Do we need to get into a discussion about?
15  Q.   Are you familiar with the change that ACTAAP
16  brought about with the assessment of the education
17  performance of students?
18  A.   Probably at the time.  I couldn't tell you what
19  it is now.
20  Q.   Okay.  That's fair.  Shortly after that, No
21  Child Left Behind was passed by the federal
22  government.  You're aware of that; right?
23  A.   Yes.
24  Q.   And are you familiar with the changes that No
25  Child Left Behind brought about in the assessment of

60  (Pages 237 to 240)

Page 241

1  educational performance of students?
2  A.  Yes.  So I'm -- so to help us, help you out,
3  I'm not aware that I'm going to be testifying about
4  any test scores that the districts have at this
5  particular time.
6        I haven't been told that, but, you know, I
7  don't know.  At this point in time, I've not had the
8  opportunity to look at those documents to see how
9  they've changed over the years.
10        So at this point in time, I cannot answer
11  any specific questions that you have with respect to
12  how they have changed and what the scores look like,
13  or anything of that nature.
14        As I indicated --
15  Q.  Well --
16  A.  -- as I indicated earlier, I am aware that
17  there is a document that the University of Memphis
18  created that talked about, here recently, that talked
19  about the scores, particularly in Pulaski County, and
20  how the achievement, as students go along, that the
21  achievement gap has widened.  It has not decreased.
22  That was the conclusion that was made from that data.
23  Q.  Okay.
24  A.  And I don't, and I don't think, and I don't
25  think Jacksonville was any different.  So let me just

Page 242

1  say this.
2  Q.  Well, hold on.  Hold on.  You're going in a
3  different direction than I was --
4  A.  Well --
5  Q.  -- going.
6  A.  -- well, I'm trying to respond to your
7  question, because you're trying, you're trying to see
8  if I --
9  Q.  No.
10  A.  -- you're trying to see what my expertise --
11        MR. PORTER:  Joy --
12  A.  -- field is in that.
13        MR. PORTER:  Joy --
14  Q.  Hold on.  Well, I think you are aware that No
15  Child Left Behind was a significant, produced
16  significant change in how education was assessed and
17  managed in the state; isn't that right?
18  A.  Yes.
19  Q.  It changed the, the planning process by school
20  districts, or how they were going to deliver
21  educational services; isn't that right?
22  A.  So what year, so what year are we talking
23  about?
24  Q.  Just before No Child Left Behind versus after
25  No Child Left Behind.

Page 243

1  A.  So what years were those?
2  Q.  No Child --
3  A.  So here's what I'm trying to get at.  I'm
4  trying to see what, what, what you're, what you're
5  trying to say with respect to test scores between a
6  certain period of time, because I need to know that,
7  because I've seen documents regarding test scores.
8        And to me the documents that I have seen do
9  not show that the achievement gap has improved, that
10  it, that it has decreased.  So I'm trying to
11  understand where you're going.
12        So I don't, I don't, I don't have the
13  knowledge right now to have a discussion with you
14  about certain levels of achievement, and comparing
15  this particular test with another test.
16  Q.  I'm --
17  A.  I'm not prepared to have that discussion with
18  you.
19  Q.  I'm not asking you about achievement test
20  results; okay?  I'm asking you about the planning
21  process for schools and for districts.  No Child Left
22  Behind significantly changed that; didn't it?
23  A.  I'm not sure that I can answer that question.
24  Q.  And --
25        MR. PORTER:  Scott, I guess isn't it

Page 244

1        Jacksonville's position that No Child Left
2        Behind no longer obligates Jacksonville to
3        comply with Plan 2000?
4  Q.  Are you familiar with the changes in the
5  education delivery system brought about by the
6  Lakeview reports?
7  A.  I'm not able to answer that question.
8  Q.  Are you familiar with the Every Student
9  Succeeds Act?
10  A.  I'm not able to answer that question.  If, if
11  this is a, a lesson on education --
12  Q.  Do you know --
13  A.  -- on education, maybe I should go and get
14  versed on those questions, so I can be prepared to
15  answer your questions at the time.  Right now I'm not
16  prepared to answer those questions.  I did no
17  preparation for this deposition.
18  Q.  I'm just asking you generally, do you know what
19  the Every Student Succeeds Act is?
20  A.  Generally.  To tell you specifically, no.  So I
21  can't answer -- I'm not able to answer any specific
22  questions about it.
23  Q.  Are you familiar with the, the flexibility and
24  the change brought about from the No Child Left
25  Behind Act under the Obama administration?

61  (Pages 241 to 244)

Page 245

1    A.   Same response.
2    Q.   Okay.
3              MR. PORTER:  Scott, we need to take
4    about a ten-minute break, five-minute
5    break.
6              MR. RICHARDSON:  That's fine.
7              MR. PORTER:  All right.
8              MR. RICHARDSON:  I'm looking at my
9    notes.  I think I'm done.
10             MR. PORTER:  All right.
11             (Four-minute break.)
12             MR. RICHARDSON:  Okay.  Representative
13   Springer, and I want to say this to Austin
14   too, we had a little bit of a sharp
15   disagreement in there.  I hope none of that
16   felt personal.  I apologize if it did.  I
17   didn't mean any of that personal, just a
18   good legal disagreement.
19             MR. PORTER:  Uh-huh.
20             MR. RICHARDSON:  Thank you, and I'm
21   finished.
22             MR. PORTER:  All right.
23             MR. BATES:  I have a few follow-up
24   questions.  Okay.  First of all, there was
25   a -- this is really a housekeeping matter,

Page 246

1    but the exhibit binder that you were
2    looking at today, Representative Springer,
3    for PCSSD, did you write on any of those
4    exhibits at all.
5              THE WITNESS:  Let's see, I don't think
6    I did.
7              MR. BATES:  If you didn't I was just
8    going to email a copy of --
9              COURT REPORTER:  I don't think you
10   did, because I don't think you got your pen
11   out.
12             THE WITNESS:  I never could get it
13   out; could I?
14             MR. BATES:  Okay.  Well, then, you're,
15   you're free to either take that with you or
16   leave it, but I can email the court
17   reporter electronic copies, so we can
18   have --
19             COURT REPORTER:  I've got a copy too.
20             MR. PORTER:  The court reporter has a
21   copy as well.
22             MR. BATES:  Okay, great.
23                  EXAMINATION
24   BY MR. BATES:
25   Q.   Just a few other follow-up questions.

Page 247

1    Mr. Richardson asked you a series of questions, which
2    I know you remember, about documents in a storage
3    facility.
4              You kept testifying just about documents,
5    and I don't want to open that can of worms again.
6    But is there any -- were you making any distinction
7    between PCSSD documents and Jacksonville documents,
8    or were you just talking about documents generally?
9    A.   I was talking about all documents, those
10   documents, all of the documents.
11   Q.   That's fine.
12   A.   Remember, I kept saying that the disk that was
13   given to you, that I was not aware that Charles
14   Bolden had placed those documents on there.  He is
15   the one that developed that disk, and so that was
16   without my knowledge.
17   Q.   Okay.
18   A.   It's news to me today.  You know, you see I was
19   kind of shocked that they were given on there.
20   Q.   Okay.  Exhibit 4 to your deposition, which is
21   the time records that have been filed in court.  I
22   meant to ask this earlier, and it's --
23   A.   I'm sorry.  I'm not hearing you.
24   Q.   Exhibit 4 to your deposition, which is the time
25   records, I needed to ask you this.  It's an obvious

Page 248

1    question I forgot to ask.  Those are accurate
2    records; correct?
3    A.   As I testified before, they probably include
4    some time that is not even reflected in there.  So
5    they're accurate with respect to what's reported
6    there, but there -- I'm, I'm positive, I know for
7    sure that there are a lot of things that were done
8    that are not included in these records.
9    Q.   Okay.  But if it was in there, then you did it;
10   right?
11   A.   If it was -- if it's in here, I did it, yes.
12   For sure.  And the time and the -- the time is
13   probably reduced too.
14   Q.   Okay.  We were talking about, and this kind of
15   gets back to the time records a little bit.  I
16   believe I asked you about which schools you had
17   visited for Pulaski County.
18             And I know that that's going to be
19   reflected in those time records, but as you sit here
20   today, can you recall the specific schools that you
21   visited for PCSSD in the 2019-2020 school year?
22   A.   '19-'20, I think you, I think you've asked me
23   that question before.  So if it's inconsistent with
24   what I've previously said, I apologize.
25             But I think I told you before that I went

Page 249

1    to the Robinson schools during the '19-'20 school
2    year, and the Mills schools.  I think those are the
3    only ones that I told you that I went to.
4    Q.   Okay.
5    A.   Unless -- let's see, I can't remember now.
6    It's getting late in the day.  When was the court
7    visit that we, we did the court visit?  Was that in
8    '18?  That must have been in '18.
9             MR. PORTER:  College Station, Harris.
10   A.   We went to College Station, Harris, and Sylvan
11   Hills.  And then --
12   Q.   Any other --
13   A.   And then -- I guess I probably need to look at
14   the records, because I may have gone to Sylvan Hills
15   in the county, now that I think about it, because --
16   yeah, I may have gone to Sylvan Hills during this
17   period of time too.
18   Q.   Okay.  As we sit here today reflecting back on
19   the 2018-2019 school year, and I know that there
20   might be records somewhere that show exactly what you
21   did, but as you sit here today, can you think of what
22   PCSSD schools you visited during this '18-'19 school
23   year?
24   A.   Probably more, more -- probably more than
25   Robinson schools.  Probably -- College Station was

Page 250

1    probably for sure, Harris.
2             MR. PORTER:  And, Devin, I'm assuming
3         you're not, you're not including the
4         court-ordered tours; is that correct?
5    Q.   Yeah, let's exclude the court-ordered tours,
6    because we all -- there's a record of when those
7    happened, and I know you were there for those.  But
8    just outside of the court-ordered tours?
9    A.   So I think I went to Harris and College Station
10   outside of the court-ordered tours, I believe.
11   Q.   Okay.
12   A.   And, and Maumelle, and, and probably Sylvan
13   Hills in '18-'19.  And then the Mills schools, and
14   the Robinson schools.
15   Q.   And I know you are going off of your
16   recollection here.  Is it fair to say the best
17   reflection of exactly which schools you visited would
18   be those time records?
19   A.   Well, not necessarily.  As I testified before,
20   there may be some times that I went there that I
21   didn't even make a notation of having gone there.
22   Q.   So if you don't remember --
23   A.   So --
24   Q.   Go ahead.
25   A.   So that's why I say, don't hold me to that,

Page 251

1    because there may be some times when I didn't do a
2    time record, and I was there, and I have gone there.
3    Q.   Was there any document you have that you can
4    look at to refresh your memory on that?
5    A.   Well, yeah, that's what I said.  I will go
6    through my emails to see if there is any
7    documentation of that.
8    Q.   Okay.  And this is not meant to be a
9    contentious question, but Mr. Richardson asked you
10   with regard to Jacksonville North Pulaski, so I need
11   to ask the question with regard to PCSSD.  You're not
12   going to be offering any legal conclusions against
13   PCSSD; correct?
14   A.   Asked and answered.
15   Q.   Well, I think you answered it, or maybe Austin
16   answered it with regard to Jacksonville North
17   Pulaski, but I need to ask you with regard to Pulaski
18   County Special School District.
19   A.   Well, ask the lawyer.
20            MR. PORTER:  We won't be offering Ms.
21        Springer to make any type of legal
22        conclusion in this case, period.
23            MR. BATES:  Okay.  Those are the last
24        of my questions.  Thank you.
25            MR. PORTER:  Thank you.

Page 252

1         (Exhibit Nos. 7-12 were marked.)
2            MR. PORTER:  She would like to read
3         and sign.
4         (The deposition was concluded at 4:30 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                          63  (Pages 249 to 252)

Page 253

```
 1              WITNESS' SIGNATURE
 2        I, JOY SPRINGER, hereby certify that I have
 3    thoroughly read the transcript of my deposition taken
 4    on the 15th day of May, 2020, and that said
 5    transcript and corrections, if any, that appear on
 6    the attached errata sheet, are a true and accurate
 7    accounting of my testimony given on that day.
 8    _____
 9    WITNESS
10    _____
11    DATE
12
13    ********************************************************
14
      STATE OF        )
15                    )ss.
      COUNTY OF       )
16
17        SUBSCRIBED AND SWORN TO before me, a Notary
18    Public in and for the aforesaid county and state on
19    this, the ____ day of _____, 2020.
20
21                    _____
22                    Notary Public
23                    My Commission Expires:
24                    _____
25
```

Page 255

```
 1              COURT REPORTER'S CERTIFICATE
 2    STATE OF ARKANSAS)
                       )ss.
 3    COUNTY OF SALINE )
 4        I, JANESS FERGUSON SMITH, CCR, RPR, a
 5    Notary Public in and for Saline County, Arkansas do
 6    hereby certify that the facts stated by me in the
 7    caption of the foregoing matter are true; and that
 8    the foregoing matter was transcribed by me, to the
 9    best of my ability and understanding, from my machine
10    shorthand notes taken at the time and place set out
11    in the caption hereto.
12        In accordance with Rule 30(e) of the Rules
13    of Civil Procedure, review of the transcript was
14    requested by the deponent or a party thereto.
15        I FURTHER CERTIFY that I am neither counsel
16    for, related to, nor employed by any of the parties
17    to the action in which this proceeding was taken;
18    and, further that I am not a relative or employee of
19    any attorney or counsel employed by the parties
20    hereto, not financially interested or otherwise, in
21    the outcome of this action.
22        GIVEN UNDER MY HAND AND SEAL OF OFFICE on,
      this, the 15th day of May, 2020.
23
24    JANESS FERGUSON SMITH, CCR
      Notary Public for Saline County
25        and Court Reporter.
```

Page 254

```
 1              ERRATA SHEET
 2        If there are any corrections to your
 3    deposition, indicate them on this sheet of paper,
 4    giving the change, page number, line number, and
 5    reason for the change.
 6    The reasons for making changes are:
 7        (1) To clarify the record;
 8        (2) To conform to the facts; or
 9        (3) To correct major transcription errors.
10    Page number _____ Line Number_____ Reason for change _____
11    Change_____to_____
12    Page number _____ Line Number_____ Reason for change _____
13    Change_____to_____
14    Page number _____ Line Number_____ Reason for change _____
15    Change_____to_____
16    Page number _____ Line Number_____ Reason for change _____
17    Change_____to_____
18    Page number _____ Line Number_____ Reason for change _____
19    Change_____to_____
20    Page number _____ Line Number_____ Reason for change _____
21    Change_____to_____
22    Page number _____ Line Number_____ Reason for change _____
23    Change_____to_____
24    _____
25              SIGNATURE OF DEPONENT
```

Springer, Joy 5/15/2020                                    Little Rock School District v. Pulaski County Special School District, et al

| | | | | |
|---|---|---|---|---|
| **A** | 119:22 120:2,8 | **addition** 57:11 | 75:19 | **AKA** 27:8 28:20 |
| **a.m** 4:8 | 120:13 126:4 | 120:14 | **advocate** 27:8 | 29:12,17 30:2 |
| **Aaron** 78:20 | 126:19 129:3,4 | **additional** 8:23 | 29:25 77:3 | 144:13 |
| **ability** 51:9 | 131:25 133:21 | 14:1 32:16 | **Advocates** 76:8 | **AL** 1:6,7 |
| 182:22 255:9 | 143:12 146:10 | 33:16 46:24 | 76:19 | **Alisha** 91:8 |
| **able** 13:21 16:15 | 146:11 171:20 | 79:12 82:21 | **Affairs** 166:10 | **allegation** 55:9 |
| 51:14,16 52:12 | 172:9 176:12 | 102:24 103:8 | 166:12 | **allege** 224:5 |
| 58:19 59:15 | 203:12,13,17 | 104:8 127:14 | **affect** 159:17 | **Allen** 117:4,6 |
| 65:3 68:20 | 220:17 224:6,8 | 197:13 | **affirmed** 5:3 | **allow** 127:13 |
| 74:1,2 125:24 | 229:1 235:13 | **address** 6:3 7:2 | 126:17 | 153:12,21 |
| 130:6 136:9 | 235:17,19,20 | 7:10,11,16,17 | **affluent** 158:11 | **allowed** 31:5 |
| 143:18 145:18 | 236:6,20 237:7 | 7:19,25 8:1,8 | **afforded** 72:13 | **allowing** 170:7 |
| 153:16 155:6 | 240:7 241:20 | 8:21 37:8 | **aforesaid** 253:18 | **allows** 168:17 |
| 160:7,12 | 241:21 243:9 | 67:18 120:2,7 | **African-Amer...** | **Allstate** 34:14 |
| 161:13 244:7 | 243:14,19 | 126:2 132:5 | 24:21 37:9 | 34:17 38:12,16 |
| 244:10,21 | **achieving** | 133:21 137:23 | 74:22 120:6 | 38:18 77:2 |
| **above-styled** 4:3 | 131:12 | 154:10 235:13 | 133:18 134:23 | **aloud** 20:25 21:2 |
| **academic** 37:8 | **acknowledge** | **addressed** 15:4 | 237:20 | **Alpha** 26:16,16 |
| 67:10 104:12 | 15:14 59:24 | 15:5 120:16 | **age** 18:7 168:7 | 44:22,22 45:16 |
| 119:17 176:12 | **acronym** 31:24 | **addresses** 7:8 | 168:10,12 | 45:16 |
| **academics** 173:3 | **Act** 192:2 244:9 | 120:12 | **agency** 30:24 | **altercation** |
| 203:11 224:6 | 244:19,25 | **addressing** | 31:1 | 71:14 |
| **access** 8:13 | **ACTAAP** 239:7 | 129:6 132:10 | **Aging** 165:19 | **AMANDA** 2:13 |
| 163:15 181:5 | 240:11,15 | 151:4 | 166:9,12,13 | **Amended** 3:10 |
| **accidentally** | **action** 144:3 | **adds** 98:25 | **ago** 35:14 39:17 | 11:6 |
| 202:4 | 149:2,2,4,4 | **adequacy** 167:2 | 51:13 76:7 | **amount** 237:24 |
| **accommodati...** | 150:12 255:17 | **adjust** 67:12 | 81:15 87:9 | **analysis** 210:22 |
| 63:25 | 255:21 | **administration** | 90:21 169:3 | 211:15,25 |
| **account** 6:8,10 | **actions** 74:19 | 35:23 154:21 | 190:10 239:22 | 217:18 218:14 |
| 8:8,12,14,16 | 148:1,1,3,4,22 | 244:25 | **agree** 28:12 | 218:24 |
| 9:5,7,12 | 148:23,25 | **administrative** | 55:22 140:5 | **analyst** 50:8 |
| **accounting** | 149:22 156:20 | 104:24 | 163:13 196:6 | 52:16 |
| 253:7 | **active** 76:1,6,7 | **administrator** | **agreed** 132:16 | **analysts** 50:3 |
| **accounts** 6:7,14 | **actively** 77:15 | 36:14 108:21 | 172:12 179:2 | 51:8,14 52:3 |
| 6:19,22,24,25 | 81:2 177:22 | **administrators** | 179:23 231:5 | 163:15,19 |
| **accreditation** | **activities** 107:7 | 33:7 44:12 | **agreement** | 164:14 |
| 30:24 31:2 | 119:18 120:2 | **admiration** 28:2 | 140:7 150:16 | **analyze** 143:19 |
| **accrediting** 31:1 | 120:11,25 | **admissions** | 150:17 151:6,7 | 236:11 |
| **accurate** 248:1,5 | 217:25 | 167:5,10 | 155:9,11 | **and/or** 222:24 |
| 253:6 | **activity** 22:19 | **adopted** 179:19 | 159:25 | **anonymous** |
| **accurately** 219:7 | 68:8 | 179:22 | **ahead** 14:11 | 134:7 136:6 |
| **achieve** 146:1,10 | **actual** 138:10 | **advanced** 120:3 | 53:3 66:16 | **answer** 11:22 |
| **achieved** 145:17 | 157:5 | 120:12 | 110:2 123:17 | 19:24 20:1 |
| **achievement** | **add** 58:18,19 | **Advancement** | 144:4 161:24 | 22:16 24:4 |
| 37:8 56:25 | 104:4 | 75:25 | 198:3 200:19 | 27:10 29:6 |
| 57:10 61:15 | **added** 103:21 | **advised** 66:7 | 213:20 250:24 | 38:14 40:9,11 |
| 67:11 104:12 | 104:3 | **advocacy** 28:17 | **aids** 97:1,2,4,12 | 40:11,13 52:12 |
| 104:12 119:17 | **adding** 103:16 | 29:12 63:9 | 97:24 | 54:8 55:13,24 |

56:4,8,21,23
63:19,22 64:7
64:12 80:20
84:9,14 85:4
87:17 88:22
97:7 100:18,21
100:22 107:21
108:1 123:9
125:4 135:8
146:17,19
172:10 173:10
178:23 181:16
182:21 183:20
187:2 194:22
198:5,6 199:25
201:24 202:23
206:19,19,20
207:21 208:22
210:1 212:9
213:18 214:10
224:14 226:3
226:18 227:3
227:11,13,14
227:18 241:10
243:23 244:7
244:10,15,16
244:21,21
**answered** 21:20
22:15 24:10
27:11,25 30:3
54:9 61:11
64:10 92:2
105:7 134:20
181:14 195:10
202:15 205:22
206:9 213:1,25
215:21 222:21
224:19 238:8
251:14,15,16
**answers** 4:1 24:2
63:11 199:24
201:22 206:1
**anybody** 41:19
41:24 133:15
186:6
**anymore** 17:25
56:20 134:14
168:22 234:15

**anytime** 19:18
21:18 107:5
**anyway** 18:23
118:13 125:12
151:10 173:17
173:21 227:4
**AP** 109:18
134:10,21,24
135:2,11,20
136:5
**apologies** 229:19
**apologize** 167:6
223:3 245:16
248:24
**apparently** 11:4
**appeal** 71:22
127:21 142:23
**appealing** 71:12
**appeals** 72:20,21
125:17 126:16
**Appeals'** 128:1
**appear** 100:11
144:24 253:5
**appears** 94:2
**application**
39:19
**applied** 37:25
169:2
**applies** 148:19
**apply** 179:2
**appointed**
167:22
**appreciate**
52:23 73:10
199:6 211:1
234:2
**appropriate**
64:4 230:24
**approve** 152:8
**approved** 149:4
**approximately**
58:23 60:24
62:21
**April** 71:1 91:22
230:10 231:16
232:7
**AR** 26:7
**area** 23:8 32:16

109:9 110:15
123:8,25 128:5
132:10 152:3
171:20 173:2
224:5,8 225:2
225:24 227:9
**areas** 23:9 57:1
57:6 109:7
110:16 124:9
124:14 130:7
143:16 151:12
152:1 176:14
**argue** 196:17
226:12
**Arkansas** 1:1,24
2:5,11,15,20
4:6,8 6:5 24:22
41:7 52:1 76:6
156:25 170:2,2
170:3 239:7
255:2,5
**arm** 44:21 45:20
**arrested** 34:5
**arrive** 56:19
**articulate** 130:6
**Ashley** 78:18
79:6,8
**aside** 24:8 151:8
151:11
**asked** 14:24 21:2
29:1 61:10
64:15 72:3
88:7 89:23
90:21 91:17
92:10 100:1
103:13 117:17
117:19 134:9,9
135:6 138:15
139:1 140:24
141:8,10
151:16 152:4
152:10 154:11
157:11 159:7
160:8 162:25
169:22,24
180:15 181:6
183:15 189:4
194:13 195:10

197:17 202:14
203:16 205:21
206:2,6,7,11
210:2,13
213:12,16
215:23 219:11
222:21 228:24
231:23 232:20
233:14 234:8
235:18 247:1
248:16,22
251:9,14
**asking** 10:21
11:9 16:2
17:16 30:1
36:5 44:18
45:12 53:25
63:21 87:5
88:10 106:14
113:10,22,25
114:2 116:4
121:6 123:6
171:25 172:1,7
174:4 183:18
187:14,16
190:25 193:13
200:24 205:21
207:12 211:2,6
221:6 222:17
223:3 225:16
226:6,6 228:3
231:23 240:9
243:19,20
244:18
**asks** 21:12 22:10
22:18 23:14
50:6 139:19
195:3 203:19
203:23 204:1
224:3,24
**assess** 240:6
**assessed** 242:16
**assessing** 229:13
**assessment**
138:2 229:16
229:23 230:21
230:23 239:8
240:11,16,25

**assessments**
229:4,6 234:6
234:22
**assign** 50:7
**assigned** 92:25
132:5
**Assignment**
95:20 98:15
176:3,5
**assignments**
104:14
**assist** 48:4 50:4
51:16 68:13,25
69:22 87:14
133:20 184:25
185:5 214:5
232:1,17,18,23
234:23,25
**assistance** 50:11
62:8,14 133:16
**assistant** 50:14
106:19 108:14
109:11,13
110:23
**assisted** 68:7
79:20 126:25
127:3 130:7
208:11
**assisting** 86:12
86:23 187:18
232:18
**Association**
75:25
**assume** 99:24
100:23 101:3
176:17 177:19
178:7 179:24
218:14 219:7
220:2 236:10
**assuming**
201:15 250:2
**assure** 92:5
**attached** 111:4,8
111:10 208:5
253:6
**attachments**
23:24
**attempting**

119:3
**attend** 70:3
    153:2
**attendance** 69:4
    104:9
**attended** 30:8
    36:25 37:1,3
    46:24,25 68:21
    70:7 80:15,16
    165:18,23
    166:1,4,20
    169:23
**attending** 36:21
**attends** 25:19
**attention** 38:24
    39:7 102:7
    119:8 140:19
    229:9
**attorney** 7:17
    8:17 9:13,17
    88:9 117:20
    161:1 255:19
**attorney-client**
    63:14 136:11
**attorneys** 8:21
    117:14,16,22
    117:24
**audio** 21:12,13
    22:7,11
**auditorium**
    110:12,15
**August** 58:25
    59:23 83:23
    162:15
**Austin** 2:3 9:20
    14:14 79:18
    95:6 122:8
    171:21 186:24
    197:20 200:7
    205:16 210:25
    211:21 212:5
    226:13 227:20
    245:13 251:15
**authorized** 9:13
    9:17
**automatically**
    18:6,12
**available** 117:25

184:21,23
188:3,8 189:6
189:7 193:18
196:8,10
215:12 235:2
**average** 163:2
**AVID** 41:16
**avoid** 147:6
**award** 45:10
**aware** 38:23
    39:14,15,25
    40:13,15 41:23
    99:10 116:16
    117:8 118:2,3
    118:13 124:18
    125:2 140:8
    142:14 150:9
    152:17 158:2
    165:10 166:25
    170:24 177:3
    182:12 183:21
    184:1,4,7
    185:24 186:20
    187:6,7,12,17
    187:20,24
    189:6 194:25
    202:11 205:12
    206:6 208:12
    208:12,13
    209:18 210:18
    224:6 225:1
    227:8 239:6,9
    239:19 240:3
    240:22 241:3
    241:16 242:14
    247:13

——————
**B**
**B** 3:8 110:24
    213:2
**Bachelor's**
    239:1
**back** 15:6 18:11
    19:14 30:6
    32:13 35:16,21
    38:11 42:12
    46:19 53:17
    59:15 73:8

78:24 83:17
84:22,24 87:22
89:22 91:22
94:5 97:16
98:22 103:6
108:2 109:22
110:7,20
113:23 115:17
116:4 117:1
120:21 121:12
124:8 125:23
129:19 131:9
140:24 144:6
145:6 157:5
159:11 162:25
167:20 171:6
173:17 180:4
182:24 183:12
188:21 189:10
194:24 206:22
207:2,7 210:5
210:5 219:2,20
222:11,16
224:2 230:6,10
237:10 238:16
239:15,21,22
248:15 249:18
**background**
    34:4
**backups** 190:6
**bad** 48:20 128:7
    128:9 129:12
    129:17 134:19
    139:9,12,15,23
    140:12,22
    144:2,3 147:1
    148:23 149:7
    149:14 152:6
    153:8
**badger** 197:8
    213:7
**badgering**
    197:16 202:16
    214:3
**ballpark** 17:1,14
    35:12 42:5
    58:17
**band** 110:13

**based** 26:24
    72:21 74:15
    87:25 88:18
    92:16 97:24
    100:4 119:9
    124:18 136:10
    147:2 148:1
    158:3 184:10
    224:22 230:17
    236:24,25
**basic** 168:15
**basically** 14:14
    43:3,7 46:14
    47:3 77:1,2
    127:6 129:14
    132:18,20
    137:3 152:18
    204:8
**basing** 136:24
**basis** 32:9 58:12
    58:13
**Bates** 2:12 3:2,6
    5:7,11 9:22
    12:2,8 13:2,4
    14:11,22 25:21
    25:22 28:8,11
    28:13 53:3,13
    53:16 54:15
    70:24 83:13,14
    84:13 85:1
    89:15 93:5
    95:5,8,9 105:9
    105:13,17
    113:5 115:13
    115:25 116:2,9
    116:12,23,24
    118:21 122:2
    122:16,19
    123:2,5,12,18
    123:19 124:17
    125:2,19
    130:25 131:6
    139:4,6 144:4
    144:8 155:4,14
    161:4,17,23
    162:25 167:3
    168:3 175:7
    245:23 246:7

246:14,22,24
    251:23
**Bayou** 217:14
**bear** 24:11
**bearing** 215:6
**beat** 197:24
**becoming**
    173:15
**beginning** 112:4
**behalf** 2:2,8,18
    5:11 28:18
    29:21 68:22
    180:21
**behavior** 67:18
    72:2
**belabor** 5:16
**belief** 55:5
**believe** 8:19,25
    14:5 16:18
    34:16 40:25
    41:25 46:3,9
    53:21 54:6,20
    68:3,4 70:4
    78:25 82:15
    85:3 86:16,18
    89:11 91:22
    105:10 119:1
    121:24 123:25
    128:12 130:19
    136:20 139:8
    145:16 148:22
    160:14 230:13
    231:15 235:18
    248:16 250:10
**believes** 123:7
**bell** 64:20
**benchmark**
    192:2
**Bequette** 2:9
    121:25
**best** 11:23 12:8
    16:23 68:13
    81:8 123:22
    182:21 207:21
    227:1 250:16
    255:9
**Beta** 44:21 45:16
**better** 10:18

Little Rock School District v. Pulaski County Special School District, et al

69:9 74:2
152:16 227:3
**biasness** 127:2
**Bible** 125:10,14
125:16
**big** 14:20 23:11
26:6,7 152:16
174:21
**billing** 20:16,20
81:10,12
**Billingsley** 2:9
**binder** 9:24
54:17 93:7
174:19 175:7
246:1
**biological** 25:12
**bit** 14:17 23:17
35:1 45:23
51:5 106:10
122:23 148:7
156:16 158:22
159:5 167:4
212:22 223:17
245:14 248:15
**black** 98:16,25
99:14,19
100:16,20,24
101:1
**Blackmon** 64:16
64:17 65:11,17
65:22 66:2,24
67:23 74:6
75:19
**blank** 95:23 96:2
96:5 176:22,23
**board** 15:2 21:6
23:7 39:3
70:15 76:1
96:25 97:4,22
132:2,16,17
137:3 142:18
148:1,22,23,25
149:2,2,11,15
149:18,23,25
150:1,3,4,5,10
150:20 155:11
156:24 157:2,3
157:5,6,23,24

158:5 237:15
**Boards** 97:12,20
**Bob** 116:14
**Bobby** 218:5,6
222:2
**Bolden** 60:17
68:7 78:18
79:2 80:1,7,12
81:23 83:15
85:25 88:3,11
89:20 92:16,25
93:21,22 94:20
96:22 97:4
98:2 99:21,24
100:23 115:18
119:4,6,11
181:4,25 182:9
184:17 187:8
189:22 191:4
193:1 194:2,6
221:10 223:18
247:14
**Bolden's** 69:5
93:20 192:10
**book** 125:12
126:16
**border** 206:16
**borderline**
197:15
**bottom** 96:18,22
202:6
**Bowles** 233:19
**box** 98:14
**bracketed**
237:11
**branch** 76:4,5
77:24,24
**break** 16:9 46:4
46:5 53:5,9,15
84:19,21,25
107:22 122:21
123:14 135:17
136:1,16 144:5
145:7 154:19
175:5,10
194:21 245:4,5
245:11
**breakdown**

98:19,24
**breaking** 229:17
**Brenda** 233:19
**Bridgette** 78:19
**bring** 11:10 60:1
144:12 180:3
202:20
**bringing** 127:1
140:18
**brings** 150:15
**broad** 16:7
59:24 107:19
**broadly** 75:15
**Broadway** 6:4,5
**Brother** 26:6
**brought** 38:24
39:7 48:11
68:17 77:13,18
120:17 142:13
154:18 235:8
240:16,25
244:5,24
**Budget** 166:2,6
**building** 133:20
**built** 158:3
159:12
**bunch** 79:10
**burden** 124:12
124:15,15
125:3
**Bureau** 163:16
**Burgess** 152:11
**Bushman** 1:23
4:7
**business** 49:5
154:8 188:1
**butt** 14:9

**C**
**c** 2:1 237:11
**C-l-a-y-t-o-n**
40:23
**calculation**
100:16 162:11
162:12
**Caldwell** 70:9
70:10
**calendars** 10:10

**Calhoun** 2:19
**call** 16:5 19:18
20:3 46:12
60:2 66:3,6,8
66:19,19 68:23
69:13,17,21
86:24 110:8
111:7 119:8
132:22 133:9
133:12 134:8
136:5 153:1
158:13 165:4,7
165:8 229:8
238:3
**called** 6:12
20:21 31:25
37:15 62:7,14
66:5 76:8,19
76:21 87:13
119:22 133:24
133:25 150:11
172:12 231:24
232:19
**calling** 19:21
59:6,6,8 61:20
77:4 228:4,11
228:13
**calls** 19:16,19
50:6 52:11
57:20 58:8
59:2,3,10
60:13,24 61:1
61:5,18 62:21
62:23 132:13
134:7 139:19
140:3 162:3
164:3,8,21
**campaign** 6:16
**candid** 188:11
**capacity** 167:5
**CAPE** 76:19
**Capitol** 2:10,14
**captain** 156:9,10
**caption** 255:7,11
**care** 25:8 49:5
55:7 154:7
161:14,20
**carefully** 154:22

**Calhoun** 2:19
**case** 1:4 6:22
13:23 15:18
16:1,7,22
24:12 28:24
36:24 39:16
40:4,6 45:25
46:9,16,20,23
47:4,6,8,14,21
48:11 49:14
51:17,21,25
52:17 61:24
62:1,3 63:3,5
63:17 64:23
72:12 73:7,16
77:10,15,20,25
78:2,3 81:3,7
85:23 87:9
102:16 103:23
112:8 118:14
121:23 122:1,6
124:4 125:23
132:1 134:18
135:18,23
138:16,20
144:15,21
145:9,10
148:10 153:24
154:9 155:15
156:14 159:21
163:2,11 170:3
171:8,10
172:23,25
173:15,18
185:15 189:8
189:16 190:19
191:7 192:4
237:1 251:22
**cases** 40:5 61:23
86:1 154:8
**category** 169:19
**causally** 235:20
236:7,14 237:7
**cause** 4:4 188:20
**caused** 148:3
165:8 240:4
**causing** 128:24
137:8,9,22
138:5,11

Springer, Joy 5/15/2020

Little Rock School District v. Pulaski County Special School District, et al

cautioned 5:3
cc'd 118:10
CCR 255:4,24
CD 10:14,15,16
  10:25 11:15
  13:7 21:9
  23:16,19 81:13
  89:18 90:1
  91:13 93:7
  98:1 101:11,17
  101:21 102:4
cell 59:6
center 2:4 60:17
  91:20
central 1:2 75:4
certain 17:9
  18:1,6 27:14
  29:8 31:25
  37:3,17,24,25
  38:1 39:20
  44:7 47:22,24
  48:3 50:7 57:4
  60:9 67:11
  76:12 86:10
  90:12 93:1
  96:8,8 100:19
  101:7 103:13
  112:9 126:2
  138:1 139:17
  141:12,13
  143:16 151:12
  152:1,17,23
  158:6,8 159:16
  167:21 168:10
  172:13 210:9
  219:11 231:2
  243:6,14
certainly 11:20
  28:12 127:20
CERTIFICATE
  255:1
certification
  30:24 32:7
certified 4:5
  152:1
certify 253:2
  255:6,15
chance 67:22

158:25 202:8
change 75:2,6
  112:3 129:7
  132:18,19
  141:23 170:5
  184:11,13
  240:4,15
  242:16 244:24
  254:4,5,10,11
  254:12,13,14
  254:15,16,17
  254:18,19,20
  254:21,22,23
changed 47:14
  75:6 143:4
  240:11 241:9
  241:12 242:19
  243:22
changes 126:1
  128:2 240:24
  244:4 254:6
changing 198:6
chapter 44:22
  45:17
characterizati...
  180:25
charge 52:8
  73:15 156:23
  167:10
charges 68:17
Charles 34:1
  60:17,22 68:7
  68:19 79:2
  87:14,22 93:20
  93:21 95:25
  119:4,6 181:4
  187:8 188:15
  189:22 190:9
  190:10 191:4
  223:18 247:13
Chastity 208:5
check 39:8 87:22
  176:16 184:22
  216:21,25
  217:3
checked 177:24
  194:6
checklist 219:25

220:5
checks 87:12
cheerleader
  119:1,3,7,12
  119:20
cheerleading
  120:20
chewed 134:8
child 68:16
  122:11 240:21
  240:25 242:15
  242:24,25
  243:2,21 244:1
  244:24
Childhood
  151:14
children 24:18
  24:20,21,24,25
  25:4 26:8
  27:25 28:2
  60:4,9 67:11
  153:2 166:9
Childs 51:22
  79:19
choir 110:13
choose 214:2
  230:23
circuit 57:17
  125:17 126:16
  127:21,25
  144:11
cited 39:24
  124:5 126:9
  127:8
city 158:18
Civil 11:21
  255:13
claim 24:17,23
claiming 129:16
clarification
  7:20 8:23
  10:18 16:6
  21:16 22:24
  25:23 73:25
  105:14 116:4
clarify 20:13
  53:18 208:1
  254:7

clarifying 30:10
  105:23
class 24:21
  74:14 98:15,18
  98:19 100:20
  109:8,9,19,19
  179:3
classes 134:10
  134:21,24
  135:1,2,11,20
  136:5
classroom 3:11
  3:13,15 35:7
  38:3,6 43:6
  66:1 93:17,24
  94:1,2 95:20
  97:5,22 98:14
  98:23 99:5,12
  99:17,25 100:8
  101:9,14,21
  102:3 108:22
  109:1,5 175:16
  176:12,19
  177:14,20,25
  178:10 179:23
  182:15,18
  183:3,6 185:23
  191:16 194:25
  195:8,12,17,18
  196:1 205:8
  206:12 207:15
  208:8,13,20
  209:3,10,22
  210:20 212:13
  213:23 214:12
  222:5 223:4
Classroom/
  176:2
Classroom/St...
  176:5
classrooms 35:6
  38:1 97:19
  99:2 176:8
  187:23
clause 212:10
Clayton 40:23
  41:10 43:16
  108:15

clarifying 30:10
Clayton's 41:14
  43:18
clear 10:20
  20:15 213:10
  213:10 215:20
  238:13
clearly 37:23
  53:19
clip 174:21
close 44:2
closed 165:22
closely 37:14
closer 25:6,13
CM/ECF 8:14
  8:16 9:5,11,16
coaches 109:9
  110:4,6
Cody 2:9 70:21
  121:25 140:9
  161:7
collect 138:2
  143:15,23
  232:5,21
  233:14
collected 44:5,9
  143:20,25
  232:24 233:10
collecting 112:6
  143:17,21
College 23:9
  30:13,17,25
  86:13 249:9,10
  249:25 250:9
Collins 69:25
  70:1 71:3 74:5
  75:19
Collins' 71:13
Colored 75:25
column 176:23
columns 176:21
come 17:24
  23:25 26:18
  27:13,21 28:15
  29:8 31:6
  32:23 33:3
  59:2,3 68:11
  71:21 78:17

Springer, Joy 5/15/2020

Little Rock School District v. Pulaski County Special School District, et al

Page 261

90:13 93:2
109:2 117:13
121:12 124:21
131:9 137:22
143:19 144:6
144:16,17
149:5,6,8
162:11 170:8
236:11
**comes** 55:22
90:10
**coming** 42:11
173:18,18
211:17
**commenced**
215:5
**comments** 96:18
109:7,16
**Commission**
253:23
**commit** 152:7
**committee** 30:12
30:14,19 50:19
50:23,24,25
72:19,19 80:16
90:22,25 91:2
91:4,5,10
142:25 165:19
165:23 166:3,6
166:10,16,18
166:24 167:7,8
167:10,17,23
167:25 231:24
231:25 232:1
233:17
**committees**
166:4,21
**common** 152:18
**communicate**
47:23 57:25
106:17 107:9
107:14 155:20
194:5
**communicated**
58:5 107:24,25
108:20 138:7
153:6 173:21
189:5

**communicates**
83:18
**communicating**
8:6 47:18
53:19 106:18
160:3
**communication**
17:10,20 69:9
106:11,13,16
117:1
**communicatio...**
15:1 19:4,5
56:3 76:3
107:5 234:12
**community**
22:23 23:8
26:15 44:11
57:20 58:7
61:19 76:8,9
76:19,24 77:3
77:6,9 158:10
158:11 159:20
231:9
**Company** 34:14
34:18 38:12
77:2
**comparing**
243:14
**compile** 94:10
94:11
**compiled** 182:24
**complained**
120:19
**complaint**
120:15
**complaints** 60:9
150:23
**complete** 36:11
210:23 212:1
**completed**
129:17 181:3
181:10 182:19
183:2,6,9
184:16
**compliance** 19:1
92:1 124:8
127:7 130:23
180:19 181:9

191:19 215:7
**compliant**
172:21
**complies** 10:5
54:19 214:7
**compliment**
131:20
**comply** 244:3
**comport** 11:20
**Comprehensive**
239:7
**comprise** 101:10
**computer** 7:23
23:22 82:6,25
222:15
**concepts** 37:22
**concern** 28:6
51:20 58:7
60:21 86:10
118:19 120:10
120:24 124:6
161:16
**concerned** 49:18
78:3 107:2
144:24 148:11
**concerning**
65:10
**concerns** 50:13
96:19 140:20
150:19,19
151:4
**conclude** 99:22
**concluded** 252:4
**conclusion**
95:17 224:13
225:5 226:8
228:3,14
236:12,13
238:5 241:22
251:22
**conclusions**
143:20 226:10
228:5 251:12
**concur** 14:4
125:7
**Condition**
176:13
**conduct** 230:22

234:21
**conference**
70:12,23 141:6
**conferences**
70:7 80:15
104:10
**confirm** 136:10
**conflicts** 38:21
39:6
**conform** 254:8
**confused** 195:24
209:8
**congratulations**
31:10
**consent** 172:12
**consider** 25:4,13
28:1 46:18
178:16 236:23
**considered**
30:16
**consist** 103:7
**consistency**
128:3,7 139:9
139:11 154:20
**consistent** 126:8
128:8
**consistently**
150:10
**constituents**
49:13
**Constitution**
171:19 172:8
173:2,6 199:11
**Constitutional**
226:7
**contact** 15:22
16:20 17:3
26:18 27:4
49:22 118:1
164:13,22
**contacting**
118:11
**contemplated**
19:16
**content** 19:12
90:18
**contentious**
251:9

**Contingency**
163:21 164:5
164:10,14,23
165:9
**continue** 27:22
57:1,7 67:2,4,9
75:8 85:18
104:14 132:20
132:20 136:18
168:18 199:12
214:2 232:25
**continued** 169:3
202:25
**contributed**
74:25
**controversy**
23:11
**conversation**
50:12 124:19
233:2
**conversations**
18:24 20:7
43:12,21 50:24
109:14 112:3
140:14 150:5
151:3
**copied** 117:3,14
**copies** 14:25
23:2 90:10
194:7 246:17
**copy** 90:21
108:9 117:6,22
181:19 194:2
230:16 246:8
246:19,21
**core** 151:14
**corporate** 77:5
**correct** 7:3,6
17:22,23 20:17
22:17 29:14
33:19 40:12
46:10 48:8
53:23 65:12
69:7 71:8 74:9
81:13 82:18,19
86:17 89:18
92:17 94:17
96:10,11 99:23

Springer, Joy 5/15/2020                                    Little Rock School District v. Pulaski County Special School District, et al

102:11,17
117:22 122:8
131:1,2 140:21
141:9 143:6,8
164:7 166:11
166:22 168:20
177:21 195:2,7
217:19 218:17
220:12 226:4
228:19 231:20
248:2 250:4
251:13 254:9
**corrected** 9:8
**correction** 161:2
**corrections**
253:5 254:2
**correctly** 42:2
68:3 71:9
82:11 86:22
139:10 230:20
**correspondence**
8:5 14:25
23:15 118:10
180:16
**counsel** 47:13
52:14 124:3
127:15 166:7
255:15,19
**counseling**
86:24
**count** 100:10
221:4,6,11,16
**counted** 99:24
**counting** 100:25
**country** 158:21
**county** 1:5 4:6
5:12 13:15
15:23 16:21
17:4 20:4 22:1
24:18,22 25:19
26:4,10,19,23
28:1 31:8
32:15 33:3
37:6,10 41:1,6
41:14 43:20
45:11,14 57:22
58:1 62:1
114:4 121:24

132:4 136:14
158:18 164:15
170:7 172:20
181:2 187:9
188:17 190:13
209:11 232:8
233:8,17
241:19 248:17
249:15 251:18
253:15,18
255:3,5,24
**couple** 12:5
32:18 90:17
169:3
**course** 11:11,13
12:13,23,25
47:11 52:20
58:24 59:22
61:22 78:18,20
82:12 89:13
103:5 116:17
123:22 137:21
139:2 221:22
**courses** 120:4,12
**court** 1:1,23 4:5
4:7 9:14 53:6
56:12,24 82:14
84:22,24 87:8
111:2,6 115:5
115:6,16 124:5
125:7,13,16,17
126:16,18
127:25 130:5
130:12 145:23
146:21 152:8
152:18 153:4
157:13 171:10
171:18 173:5
174:17,20
196:17 197:2
199:3,4 206:21
206:25 207:2,6
207:7 208:16
209:20 210:4
212:11,17,23
234:8 246:9,16
246:19,20
247:21 249:6,7

255:1,25
**Court's** 185:14
**court-ordered**
105:4 250:4,5
250:8,10
**courteous**
160:15 161:15
**cousins** 41:22,22
**cover** 176:14
**covered** 203:8
213:17 231:3,4
**covering** 113:20
**covers** 113:8
176:2,5,11
203:11
**Covid** 49:10
51:7 144:22,23
145:3 164:14
164:19 165:22
174:24 175:4
**created** 6:10
91:1,2,3,5,7,9
179:16,17
198:12 241:18
**credible** 39:13
39:23 40:11,15
**CREP** 91:20
**crisis** 165:22
**cross** 211:10
**Crystal** 78:18
79:3
**cultural** 158:16
158:19
**culture** 158:12
158:13
**current** 49:16
61:2,6
**currently** 26:6
224:5
**curriculum**
132:3,6 135:24
136:23 149:3,9
149:21
**Curtis** 21:21
**cut** 9:14 86:15
110:1 119:13
132:3,8 135:1
135:2,12,24

**cuts** 5:18,20
53:25
**cutting** 132:17
133:13 134:10
134:21 136:14
136:23 203:21
**CWDSA** 86:14

---

**D**

**D** 3:1
**daily** 125:15,15
**damage** 188:20
188:20,24
191:12
**damaged** 188:4
188:5 190:3
**data** 37:21 44:6
44:8 94:10
112:6 138:2
139:20 140:24
141:8,11
143:15,16,20
143:25 144:1
231:7 232:5,8
232:13,21,24
233:9,9,13
241:22
**date** 16:25 17:8
17:9 21:21
34:22 177:19
179:3 182:20
189:2,3 192:21
224:1 253:11
**dated** 188:21
189:10 208:5
**dates** 10:10
81:20 238:21
239:9,11
**daughter** 40:25
41:10,14 71:13
**daughters** 43:19
**day** 4:4 9:3
48:13 49:21,21
54:7 90:20
111:13 115:11
132:22 145:4
150:14 177:17
179:7,8 239:10

249:6 253:4,7
253:19 255:22
**days** 153:14
**de** 235:21 236:7
236:14 237:8
237:21 238:1
**deaf** 152:5
**deal** 66:8 96:8
152:16
**dealing** 51:24
**deals** 130:20
**dealt** 198:19
**debate** 12:12
117:10
**December** 94:17
**decide** 7:15
18:21 28:23
56:12 85:15
133:6
**decided** 8:3 41:8
42:12 43:8
85:17 132:2,3
132:16 140:10
233:8,12
**deciding** 189:15
**declaration** 89:4
131:3,4
**declarations**
145:11
**declining** 215:5
**decreased**
241:21 243:10
**decree** 172:12
**deems** 230:24
**deep** 28:2
**deeply** 31:4
**Defendants** 1:6
4:2
**Defense** 79:22
**deficient** 151:13
**definitely** 67:20
81:20 88:5
114:9 145:2
**definition** 54:4
147:13,17
148:8,9,11,12
148:20
**degree** 35:17,21

35:23
**delete** 18:16,17
  18:22,23
**deleted** 18:12
**deletes** 18:6
**deleting** 18:19
**deliver** 242:20
**delivery** 244:5
**demonstrate**
  124:13 195:19
**demonstrated**
  147:7
**demonstration**
  128:9
**department**
  37:15,16 41:2
  44:1,3 132:4
  135:25 136:24
  149:3,10
  169:11 179:18
  233:14 237:2
**departure**
  154:18,25
  155:5,17
**depending** 99:5
**depends** 107:19
**depicting** 21:5
**deponent** 254:25
  255:14
**deposed** 152:15
**deposition** 1:10
  4:1 10:4 11:6
  11:19 12:4,6
  24:11 30:5
  53:20 64:25
  82:9 102:8
  118:23 130:4
  169:18,25
  238:16 244:17
  247:20,24
  252:4 253:3
  254:3
**depositions** 5:14
  5:15 46:3
  78:10
**derails** 131:17
**description**
  213:17

**deseg** 48:16 49:6
  62:8 121:8,20
**desegregation**
  45:25 48:25
  52:12 180:20
**desegregation...**
  51:11
**destroyed** 188:6
  188:18,19
  192:5,12 193:3
  193:15,25
  195:13
**detail** 153:4
**details** 47:22
  48:3
**determination**
  84:17,20
**determine** 38:2
  39:5 72:7
  74:23 99:13
  100:8,15,19,24
  101:1 113:25
  137:13,21
  138:3 216:19
  236:6
**determined** 43:5
  73:1 75:1
**determining**
  31:22 37:20
  143:2
**develop** 220:14
**developed**
  175:19,20
  181:3 221:1
  235:10 247:15
**developing**
  232:19
**development**
  32:22 37:2
  168:18,22,24
  169:4,7,23
  170:1,7,9,18
  170:22 171:1
  232:2
**Devin** 2:12 5:10
  11:1 12:17
  14:12 28:3
  53:2 56:12

64:11 122:25
  124:10 129:25
  130:13 139:1
  160:20 193:17
  250:2
**dictionary**
  148:18
**difference** 17:18
  198:5
**differences**
  158:16,20
  202:19
**different** 33:6
  48:6,6 51:18
  51:19 61:4,19
  75:11 88:13
  110:16 141:23
  148:7 203:1,4
  204:1,6 205:23
  220:10 223:15
  231:9 241:25
  242:3
**difficult** 92:9
**difficulties**
  68:24
**diligent** 123:22
**direct** 102:7
  136:12
**directing** 84:14
  157:3
**direction** 238:10
  242:3
**directive** 15:21
  15:25 16:19
  17:11,14
  100:13,15
**directly** 73:20
  118:1,6 146:18
  163:23
**director** 237:13
  237:16
**disabilities**
  67:12
**disagree** 180:24
**disagreement**
  245:15,18
**discipline** 56:25
  57:11 60:5,11

61:14 65:25
  72:23 74:18
  80:14 123:8
  124:1 126:19
  128:6,20,22
  137:8,10 173:7
  176:12 177:5
  178:17 179:11
  192:1 203:8,20
  203:24 208:17
  208:25 209:21
  212:12 213:2
  224:25 225:3
  225:25 227:9
  237:19,25
**disciplined** 38:9
  38:19
**disciplining**
  74:22
**disclose** 38:21
**discover** 190:3
**discovered**
  138:1
**discovery** 8:10
  11:13 12:24
  29:4 89:13,17
  139:2 182:1,6
  186:16 205:14
  224:2 235:15
  236:16
**discrimination**
  158:14,20
**discuss** 16:1
**discussed** 29:7,7
  69:1 102:9
  145:15,24
  185:24 231:13
**discussing** 15:18
  16:7
**discussion** 20:3
  84:6 85:7,12
  85:13 134:15
  175:13 225:17
  240:10,10,14
  243:13,17
**discussions** 9:19
  72:1 77:25
  78:1 96:7

124:3 128:25
  138:16,19
  140:6,18
  179:21 223:14
  239:21,24
**dishonest** 199:6
**disk** 11:15
  101:23,24
  181:1,6,20
  182:10 186:3
  187:8,14
  188:10,16
  190:12 202:13
  209:10 247:12
  247:15
**disparate**
  128:20
**disparities**
  143:24
**disparity** 74:21
  74:25 128:22
  128:25 129:3,5
  129:7 137:8,9
  237:19,25
**disseminated**
  229:3
**distant** 41:22
**distinction**
  247:6
**distract** 230:22
**distraction**
  106:3
**distress** 157:1
**district** 1:1,1,3,6
  2:18 5:12
  13:16 15:24
  16:21 17:5
  20:5 24:19
  25:20 26:4,10
  26:19,20,21
  27:2 28:1 32:4
  32:15 33:3,13
  36:11,13,18,19
  37:2,4,5 39:3
  39:17 41:1,6
  41:15 42:9,10
  43:21 44:7
  45:11 48:7,16

49:13,15 54:11
56:2 57:22
58:1,6 60:19
61:25 62:1
66:19 67:2,3
67:19 68:4
69:3,19 70:10
71:22 74:14,20
75:5,13 76:10
87:10 104:13
107:16 108:4
117:5,7,13
121:25 122:12
124:12,16
128:5 129:18
132:2 135:21
136:14 137:12
137:19 141:15
146:14,16
147:12 148:4
150:1,1,17,18
151:17 158:17
162:5 163:5
165:8 172:11
172:20 179:18
181:3 198:13
209:11 216:7
216:15 217:9
217:22 218:12
219:9,16 220:3
220:14 221:24
222:13 225:24
229:10,12,25
230:23 232:1,9
232:10 235:1
236:9 237:3
251:18
**district's** 43:25
124:8 159:24
185:1 216:18
216:20,22
228:8
**district-wide**
217:10
**districts** 25:1
27:1,5 104:19
112:10 119:23
148:2 183:24

191:18 230:15
231:5 232:18
232:18 241:4
242:20 243:21
**dive** 53:17
**diversity** 96:25
97:1,2,4,12,23
**DIVISION** 1:2
**docket** 145:14
171:9 172:25
**doctor** 91:8
151:1 209:5
**document** 12:25
20:10 29:9
64:23 65:5
72:3 82:4,13
89:6,6 90:2,4
90:12,22,24,24
91:1,2,3,9,10
91:18 92:3
104:2 116:9
118:25 121:4,5
130:14,18,19
131:3,10
175:15 180:3
186:12 188:8
189:16,25
191:20 214:23
230:14 231:14
234:8,14
241:17 251:3
**documentation**
10:8 147:10
150:20 204:7
220:16 251:7
**documented**
20:8 162:8
222:24 230:13
**documents** 9:4,6
9:11,13,16,18
10:9 11:10,19
11:24 12:18
13:18,19,21,25
14:2,7 23:14
23:23 28:23
78:25 81:2,25
89:16 90:9,17
90:19 91:12,14

102:24 103:3,6
103:10,13,15
128:17 137:16
144:12,13,14
145:8,10,19
152:17 174:15
180:10,17
181:22,23
182:1,5,13
185:3,5,9
186:3,7,9,17
186:21 187:7,8
187:12,17,21
188:2,5,8,9,16
188:21,24
189:5,6,8,12
190:4,7,11,12
190:17,19,21
191:2,7,11,14
191:17,23
192:3,4,11,11
192:14 193:2,6
193:10,14,17
194:1,3,8,11
194:13,18
195:4 196:14
196:19,22,24
197:13 198:7
198:12 199:17
200:12,13,15
200:16 202:12
204:2,11
205:14 206:14
207:16 208:8
208:16,16,24
209:4,5,14,16
209:17,19
210:3,7,7,8,11
210:12,13,16
210:19,19,23
211:16,17,25
212:11,16,18
212:18,23,24
213:4,16 215:6
216:3 217:20
218:11 219:12
219:15,16
220:24 235:9

238:23 241:8
243:7,8 247:2
247:4,7,7,8,9
247:10,10,14
**doing** 33:8 35:5
53:24 56:2
64:24 78:16
85:20 86:1,5,6
86:18 112:8
132:24 139:14
141:16,19,24
142:6,7 143:6
143:8,22,22
146:24 153:7
156:4,18 157:9
168:24 184:1
197:21 223:25
**dollars** 151:9
**Donaldson**
86:21,24
223:18,19
**dormant** 233:18
**doubts** 161:17
**DPM** 1:4
**Dr** 15:9,15,15
16:13 18:10,20
78:20 91:7
104:21,21,24
106:2,4 107:16
107:16,17
132:15 133:7,9
134:9,14 149:5
151:1,2 154:17
154:25 155:4
155:12,17,22
155:24 156:3,6
156:13,14,17
156:22 157:11
157:15,22
159:9
**drafted** 207:13
**draw** 204:15
225:5
**driving** 156:7
**dropped** 175:4
210:10
**Duane** 40:23
**duces** 11:3,6

**due** 71:24,25
72:7,13,15
74:4,24 76:15
**Duffery** 121:3,9
**duly** 5:3
**duplication**
115:8
**duplicative**
22:13
**Dupree** 222:2
**duties** 184:13

---

### E

**E** 2:1,1 3:1,8
**ear** 152:5
**earlier** 27:25
52:14 67:1
98:13 140:1
155:13 162:2
163:14 180:5
181:1 184:11
192:13 236:25
241:16 247:22
**early** 17:6 22:4,6
72:11 90:8
142:21 151:13
**EASTERN** 1:1
**Ed** 64:12 104:16
**education** 30:4,9
30:12,16 31:2
32:17,20 35:17
35:22,23 41:2
46:24 50:18,23
57:8 64:4 76:9
76:13,20
104:15,17
132:3 137:4
165:19 166:15
166:23 170:8
233:14 239:1
240:6,16
242:16 244:5
244:11,13
**Education-**
165:13
**educational** 25:2
33:11 60:6
216:19 240:6

Springer, Joy 5/15/2020

Little Rock School District v. Pulaski County Special School District, et al

240:11 241:1
242:21
**Educations**
170:18
**Educator** 3:12
3:15
**effective** 37:18
**effectiveness**
229:4 234:22
**effort** 56:16
146:25 147:24
193:1
**efforts** 28:18
30:2 44:24
61:2,7,21 63:8
65:23 66:14
69:6 71:19
75:17 78:8
87:17 90:7
102:11,16
104:6 113:15
113:22 114:12
147:3 183:23
220:16
**eight** 24:3
**Eighth** 125:17
126:15 127:21
127:25 144:11
**either** 43:22
52:12 55:24
58:1 99:25
138:9 152:2,4
162:8 165:4
182:8,13
208:14 223:10
229:21 234:11
234:11 236:8
246:15
**elaborate** 87:6
**Elect** 6:10
**elected** 39:1 49:8
50:19
**electric** 180:18
**electronic** 190:6
194:2 202:12
246:17
**elementary**
35:17

**Eleven-minute**
53:15
**eligibility** 66:24
**eligible** 31:22
168:8
**eliminate** 146:9
149:2
**email** 3:10,12
7:2,8,11,16 8:3
8:4,8,21 13:10
15:5 17:2 54:6
54:9,21 60:18
65:9 66:22
67:23 71:1,2
102:10,15,21
104:21 105:1
117:22 118:5
134:13 150:20
208:5 222:11
246:8,16
**emailing** 117:5,7
117:13 144:23
**emails** 7:24,25
13:14 14:25
15:3 19:15
23:24 59:16
73:13 90:23
117:2,4 145:19
180:16 210:6
222:24 223:11
251:6
**EMILY** 1:7
**employed** 7:13
35:20 163:23
255:16,19
**employee** 15:2
21:6 255:18
**employees** 15:7
15:23 16:20
**employer** 38:10
38:19
**employment**
77:1
**empty** 156:13
**encompass**
38:15
**encompassed**
54:6 61:12

**encroach** 28:5
63:13
**ends** 50:20
**engage** 193:1
**engaged** 177:8
**ensure** 25:1 64:3
67:4,13 76:12
76:17 77:12
151:11
**entered** 150:16
151:6 172:11
**entire** 132:3
136:23 178:19
**entities** 45:18
**entitled** 93:16
225:9 226:15
**entries** 20:16
**equation** 15:3
**errata** 253:6
254:1
**error** 9:10
189:20 190:22
191:1 192:16
**errors** 254:9
**especially**
117:10 129:7
152:7
**ESQ** 2:3,9,12,13
2:19
**essentially**
102:15 114:19
136:4
**establish** 73:23
229:11
**estimate** 58:14
58:23 59:4
162:10 167:19
221:7,18
**estimated**
162:23
**estimating** 62:25
**ET** 1:6,7
**evaluate** 237:6
**evaluation** 37:15
91:20 229:11
229:15,23
230:21,21,23
232:24 237:2

**evaluations**
37:17 91:17
229:4,6 232:19
234:5,22 237:4
239:25
**evening** 10:1
**eventually** 47:1
**evidence** 120:10
124:23,24
125:23 129:14
141:14,16,19
142:1 143:10
150:9
**evident** 147:23
**evidently** 97:21
190:10
**evolved** 73:4
76:21
**exact** 17:8 34:22
**exactly** 15:11
42:4 84:17
113:17 194:4
249:20 250:17
**EXAMINATI...**
3:2,4,6 5:6
161:25 246:23
**example** 58:2
62:6,13 83:15
93:10 99:18
107:23 109:5
131:23 132:11
132:12 133:6
150:15
**examples** 59:25
**exchanged**
16:24 18:10
**exchanges**
104:21 105:2
**exclude** 250:5
**excluded** 120:9
**Excuse** 197:25
198:2,4
**executive** 76:1
**exhaustive**
103:18
**exhibit** 3:10,10
3:11,11,12,12
3:13,13,14,14

3:15,15 9:21
9:24 10:3
19:17 20:24
24:8 54:14,17
82:9,12 93:4,6
93:11,14 94:15
101:10,15
102:8,14 113:4
113:6,19
114:17,20
118:20,22
168:2 246:1
247:20,24
252:1
**exhibits** 246:4
**exist** 101:11
158:20
**existed** 186:21
187:7,17,24
195:13 205:15
**exists** 224:5,25
**expect** 11:18
140:20 230:17
**expectation**
177:1
**expectations**
230:12,16
**expected** 32:3
**expecting** 12:24
**expenses** 85:19
**experience**
42:24,25
**experiencing**
68:24
**expert** 126:23
208:17 209:20
212:11,17,24
236:20,23
**expertise** 236:5
236:11 242:10
**Expires** 253:23
**explain** 86:4
156:15
**explained** 14:18
**explaining** 52:19
234:1,1
**explanation**
52:23 215:18

expulsion
142:24 143:3
extra 68:25
115:10 122:18
extracurricular
119:18 120:1
120:11,25

**F**

F 95:14 203:1,4
203:6,8,19,23
204:4
F-a-b-i-n-g 95:4
Fabing 95:3
face 199:24
200:1
face-to-face
120:18
Facebook 6:8
138:16
facilities 21:22
22:3,6 56:25
61:15 86:9,19
87:4,11 108:3
108:6 126:19
130:17 131:1
facility 21:6
86:11 87:25
110:8 176:13
188:4,18,25
189:9,12,13,17
189:25 190:18
190:22 191:3,8
191:20 192:5
192:12,19,23
193:3,7,11,15
247:3
fact 13:19 24:23
39:15,24 44:3
52:11 55:19
63:6 70:11
75:12,14,16
90:20 97:3
110:22 112:22
124:7 129:4
142:21 201:6
204:12,14
230:6

factors 159:16
facts 254:8
255:6
failed 38:21 39:7
210:12 212:19
failure 159:25
fair 5:23 6:15
8:13 24:2
57:19,23 61:1
63:7 72:17
73:1 81:8 98:4
98:8 113:9,10
144:18 153:20
163:2,6 176:19
176:20 188:11
193:8 240:20
250:16
fairly 74:20
fairness 76:14
127:2
faith 57:5 128:7
128:9,11,13
129:8,12,17
130:23 133:4
134:19 139:9
139:13,15,23
140:22 144:2,3
146:22,25
147:2,4,9,14
147:18,24
148:3,8,9,12
148:13,15,18
148:20,24
149:1,7,15,24
152:6 153:8
155:1,7,18
familiar 33:5
37:21 71:7
135:22 169:24
235:4 240:15
240:24 244:4,8
244:23
family 25:8,11
41:21
far 18:11 29:15
53:19,24 107:1
162:25 209:18
210:18

fashion 11:12
feature 18:5
February
194:24
federal 45:20
54:11 240:21
fee 116:13
feeder 33:5
feel 20:9
fees 73:17
Felsy 233:9
felt 245:16
female 95:14,15
95:18
Ferguson 4:5
255:4,24
field 242:12
fight 14:20
figure 122:10
figured 85:9
file 9:6 14:15
171:12,12,13
171:13 180:9
189:22 192:7
filed 9:5,11,16
11:4 39:17
81:3 82:14
87:10,12 89:2
89:5,7,8,9 90:2
91:11 111:1,6
115:5,16,20
116:17 130:15
145:8,10,14,23
152:17 247:21
files 23:1,3
189:13,15
190:24,25
192:24
filing 9:13,18
filings 153:4
fill 94:2 96:1,4,5
97:9
filled 93:19,23
93:25 94:7
96:9 98:4
100:5 214:14
filling 99:2
183:22 184:4,7

fills 176:18
final 216:3
financially
255:20
find 41:23
134:18 135:5
143:5,23 168:7
192:14 209:13
finding 40:15
138:3,4 142:5
174:2
findings 83:19
124:7 125:22
125:25 138:8
138:10 180:7
180:18,23
181:8 183:1,23
223:12
fine 12:2 46:12
46:15 95:8
103:17 146:5
160:20 162:24
162:24 198:19
224:17 225:6,7
226:11,17
227:11,12,19
238:15,25
239:5 245:6
247:11
finger 157:8
finish 50:19
213:13
finished 245:21
Firm 2:3
first 5:2 7:19
10:20 50:25
87:2 93:15,16
94:14 95:19
96:17 98:14
103:10 106:12
118:23 146:15
182:15 208:4
220:18,19
245:24
fiscal 157:1
five 22:10 99:8
153:14 154:13
162:18,18,23

163:9,12 178:3
178:7 205:22
five-minute
245:4
flexibility
244:23
flip 214:4 217:13
focus 133:18
153:18,23
focusing 106:15
112:6
folder 144:14
folks 60:23 86:1
106:17 107:9
117:5,7 118:11
133:20
follow 6:25
106:13 123:23
126:5 127:16
127:23 131:7
131:22 133:5
140:20 148:24
153:9 154:15
188:23 238:9
follow-through
126:6 128:3
follow-up 68:1
123:10 245:23
246:25
following 71:13
208:16
follows 5:5
96:17
FORCE 31:25
forces 158:9
foregoing
185:10 194:15
255:7,8
forever 79:15
forgot 27:1
248:1
forgotten 170:10
form 3:13 55:17
93:17,22 94:4
94:7,19 95:23
96:10 97:25
172:18 173:9
175:16,19,23

Springer, Joy 5/15/2020                                                    Little Rock School District v. Pulaski County Special School District, et al

176:15,18
177:6 178:11
178:12,14
179:9,16,19
180:18,22
181:7 182:16
182:18 186:13
193:22 195:21
202:12 212:3
222:5,7,19,23
223:4,5,6,7,9
226:22
**formal** 30:8,10
**formalities** 5:16
**formerly** 77:21
**forms** 3:11,15
93:9 96:9 98:2
101:9,11,14,22
102:3 181:11
182:24 183:3,6
183:22 184:4,8
184:16,20
185:23 191:16
195:1,8,12,17
195:19 196:1
205:8 206:12
207:15 208:8
208:20 209:3
209:22 210:20
212:14,14
213:23,24
214:13,14
215:10
**formulate** 43:13
**formulated**
43:14,21 76:11
**forth** 15:6 210:5
229:14
**forward** 115:20
116:7 136:21
211:17
**found** 39:12,16
40:10 83:19
125:7 142:9
143:7 197:13
212:2 216:25
223:15
**Foundation**

44:16,19,25
45:7,9,15,19
**four** 19:17 20:23
21:12 105:24
132:8 162:19
162:23 166:18
197:17 205:22
**Four-minute**
245:11
**four-page**
130:19
**four-year**
238:25
**fourth** 2:20 10:3
105:25
**Frazier** 78:19
**free** 64:4 174:24
175:4 224:14
246:15
**frequent** 58:15
**friendly** 227:21
227:23,25
**front** 9:24 54:17
81:20 93:7
109:25 130:2
175:15
**frustrating**
135:10
**fulfill** 215:5
**full** 5:25 215:22
215:24
**Fully** 176:22
177:9,24
**Fund** 79:23
**fundraising**
44:17,21,24
45:19
**furious** 150:21
155:12
**further** 159:11
212:2 255:15
255:18

_____ G _____

**G** 2:13
**G-u-t-h-r-i-e**
121:9
**games** 12:21,22

**gap** 146:10
235:17,19,20
236:6,13,21
237:7 241:21
243:9
**Gates** 2:13
**gathered** 10:9
80:14
**gathering** 185:5
**gears** 45:23
69:23 122:20
**general** 187:16
**generally** 6:22
28:17 222:17
244:18,20
247:8
**generated**
180:18 181:8
205:9
**getting** 30:22
37:12 122:3
145:6 197:4,7
202:15,24
212:22 228:1
233:24 249:6
**give** 10:14 20:12
27:18 52:7
58:14,16 59:25
62:6 64:20,20
64:25 94:4,10
94:12 96:3
107:23 118:24
133:15 140:11
152:8 160:5
182:20 191:10
191:10 206:25
219:6 224:14
228:6 238:5
**given** 5:14 11:5
12:23 13:19
50:25 100:7,12
145:11 152:3
153:14 180:8
206:1 209:11
215:17 247:13
247:19 253:7
255:22
**giving** 159:8

186:23 215:22
225:12 226:9
254:4
**gladly** 24:1
**go** 13:18,20
14:11 18:1
21:18 23:22
30:6 32:13
38:1 44:24
46:6 48:12
49:12 52:22
53:3 59:15
66:16 68:24
71:22 72:4
73:18 78:24
79:9 84:6
85:18 87:14,21
90:9 92:25
97:16 98:10,22
103:6,15,24
107:14 108:12
109:1,21 110:2
110:20 111:20
112:1,11
122:23 123:17
127:5,9 128:21
129:19 130:12
136:21 142:24
142:25 143:18
144:4 145:18
146:12 161:24
170:24 175:10
175:23 187:22
198:3 200:19
206:18,19
213:19,20
218:22 219:2
219:20 221:9
222:11,16
227:8 230:6
235:16 241:20
244:13 250:24
251:5
**goal** 229:10
**goals** 146:13,14
146:20 147:3,8
216:19,22
217:1,4,24

218:7 220:17
220:22 229:10
**goes** 52:22 79:6
83:16 119:1
120:5 129:5
130:22 152:5
163:1 229:13
**going** 5:16 7:15
9:9 12:10,11
12:14,19 13:25
14:15,19 18:22
19:14 21:12
24:4 28:15,22
29:1,1,13,23
31:3 34:4
37:11 42:12
46:2 49:20,21
53:6 59:15
64:22 66:17
68:13 77:5
80:10 83:6,8
83:20 85:7,10
86:5,7,19
87:20,24 90:14
90:23 98:10
102:19 103:2,9
106:12,13
107:20 110:4,5
110:10,12,13
110:15 112:17
113:17 122:22
123:3,12,17,22
124:21 125:5
125:11 127:22
129:21 130:1
130:11 131:24
133:1 139:16
144:5 145:4
153:12,21,22
154:12,12
159:11 165:2
167:2 168:12
168:14 172:4
177:25 179:13
192:14,23
196:12,19
197:16 199:4
205:24,25

Springer, Joy 5/15/2020                                    Little Rock School District v. Pulaski County Special School District, et al

214:17 221:23
223:17 225:8
225:11 226:9
226:14,17,25
227:15 228:10
228:12,13
231:19 232:12
233:6,15
234:13,15,18
236:15 238:2,3
238:6,9 239:13
241:3 242:2,5
242:20 243:11
246:8 248:18
250:15 251:12
**good** 5:8,9 25:23
53:4,24 57:5
64:1 113:1
114:24 128:11
128:13 129:8
130:23 133:4
146:22,25
147:4,9,13,17
147:23 148:3,8
148:9,12,13,15
148:18,20
149:1,23 154:6
155:1,7,18
160:2 181:11
245:18
**gopher** 46:13,13
**gotcha** 164:20
**gotten** 100:3
**government**
240:22
**graduated**
238:17
**Grassroots**
76:21
**great** 31:10
53:13 156:24
246:22
**greater** 129:5
**ground** 215:19
**group** 44:10
76:20 118:7
**guardians** 22:22
57:20

**guess** 7:12 10:18
10:20 11:2
16:5 19:6,22
22:24 24:19
26:13 30:10
32:1 48:18
49:1,17 51:5
51:12 56:11,13
60:15 62:11
68:10 74:13
77:4 79:10,17
85:5 86:23
89:2 91:3
95:13 100:22
102:1 103:24
104:21 107:21
113:18 114:6
118:14 125:15
126:10 131:23
136:17 139:25
141:5,5 150:1
151:1,2 154:17
155:13,22,24
155:25 156:3,6
156:13,14,17
156:22 157:4
157:11,15,23
159:13 162:20
162:20,22
169:9 170:5
172:17 191:13
191:15 192:9
196:15 198:11
203:6 209:8,8
237:10 243:25
249:13
**Guess's** 154:25
155:5,17 159:9
**guessing** 191:22
**Guest** 140:9
**guestimate**
219:6
**guided** 108:18
**Guthrie** 121:1,7
121:9
**guys** 139:2
**gym** 110:4

---
### H
---

**H** 3:8
**hallway** 178:4,8
178:15 179:6
179:15
**hand** 212:22
216:16 255:22
**handing** 86:2
**handled** 62:2
69:20 80:16
**handling** 61:23
**handwriting**
93:20 216:10
216:11
**handwritten**
216:5
**Hang** 207:6
**happen** 71:14
144:16 177:12
**happened** 49:15
88:17 114:12
115:22 116:19
144:17 190:16
194:2 250:7
**happens** 88:18
**happy** 13:23
19:12 20:11,12
30:19 114:3
194:22 202:23
221:11
**hard** 15:24
27:23 62:19
63:21 94:22
96:24 100:17
100:18
**Harris** 249:9,10
250:1,9
**hats** 48:6 52:21
75:11,22
**head** 58:20
**health** 109:8,19
**hear** 42:1 72:19
72:24 102:12
105:20,21
147:16 153:11
203:21 223:3
226:20 238:14
**heard** 33:6

53:21 72:21
92:16 109:18
109:18 155:4
235:3
**hearing** 23:22
68:4,21 69:4
70:16 71:22
72:5,17 73:3
75:3,8 137:1
142:14 166:2
247:23
**hearings** 70:14
71:23 73:19
74:4 117:9
166:6
**hearsay** 42:16
**heart** 24:24
**held** 17:8 21:21
38:25 39:2
91:19 105:2
**help** 51:9 64:21
65:14 69:18
121:2,3 157:7
164:4 214:9
234:3 241:2,2
**helping** 171:13
**helps** 50:14
**Henry** 174:2
**hereinbefore** 5:2
**hereto** 255:11,20
**hesitant** 85:5
**Hey** 16:3 53:2
161:13
**hide** 19:3,13
92:7 193:20,21
**high** 23:8 40:22
108:8 130:22
134:11 138:11
222:2
**higher** 63:4
**Hills** 41:15 70:2
70:3 71:15
94:16 95:19
98:20 112:14
119:2 249:11
249:14,16
250:13
**hired** 46:9

**hiring** 39:20
151:12
**history** 35:2
46:8 48:2
158:2 234:2
**hold** 167:13
197:10 200:7
219:23 242:2,2
242:14 250:25
**holding** 171:19
173:6
**hole** 196:12
228:12
**honest** 199:18
**honesty** 199:21
199:22
**honored** 31:4
**hope** 245:15
**hopefully** 8:23
51:2
**hoping** 51:3
154:15,23
**horse** 197:24
**hour** 46:2,7
**hours** 12:5 170:6
**house** 50:3 52:1
163:21,23
164:5 165:13
166:10,12,15
**housekeeping**
245:25
**huh** 189:11
238:10
**hundred** 126:12
151:8,9 221:8
**hundreds** 18:2
101:17 103:10
**husband** 138:18
**hypothetical**
51:5

---
### I
---

**I-v-y** 44:18
**i.e** 216:23
**idea** 28:24 32:24
56:9,18 64:5
99:1 141:21
150:21,25

180:11
**Ideas** 170:3,22
  170:24
**identification**
  128:24
**identified** 43:23
  59:4 135:14
  137:25 138:5
  198:7 237:25
**identify** 13:21
  137:19 142:20
  193:1 226:6
  228:25 235:19
**identifying**
  142:5
**IEP** 104:9
**images** 21:5,8
  22:11
**imagine** 123:8
**immediate** 25:8
  41:21
**immediately**
  185:13 194:16
  195:5 196:3
  204:3
**impeach** 216:1
**implement** 37:7
  119:24 141:21
  146:19 147:3,8
  148:13 159:25
  220:16
**implementation**
  107:7 128:13
  148:19 150:6
  150:11 156:21
  157:18 159:17
  164:11
**implemented**
  37:16 141:12
  150:4
**implementing**
  67:17 128:10
  152:22 220:15
  235:7
**imply** 114:8,9
**impression**
  188:7
**impressions**

43:11
**improved** 243:9
**improvement**
  216:18,23
  217:10,17
  218:1,8,15
  220:15,21,25
  232:3 235:11
**impugn** 199:21
**inadequacies**
  130:16,21
**inappropriate**
  199:13
**incident** 142:13
  142:17
**incidents** 66:20
**include** 56:25
  61:14 63:15
  209:21 210:19
  213:4 216:13
  248:3
**included** 10:25
  74:16 76:9
  89:20 190:13
  214:24 216:20
  216:22 218:3
  248:8
**includes** 62:24
  62:25
**including** 10:9
  13:12 27:2
  174:1 250:3
**inconsistent**
  248:23
**Incorporated**
  26:17 44:23
**incorrect** 17:9
  99:23
**independent**
  20:21
**indicate** 39:22
  43:10 66:11
  254:3
**indicated** 13:13
  13:17 14:4
  23:20 47:20
  65:2 69:11
  90:8 106:23

109:13 127:7
  130:13 197:9,12
  217:24 241:14
  241:16
**indicates** 218:9
  228:7
**indicating** 17:3
  30:25 40:14
  137:24
**individual** 59:18
  229:12
**individually**
  127:10
**individuals**
  18:15 77:7
**inference** 195:18
**inferences**
  204:15
**influence** 159:16
**influences** 156:4
  157:17,20
  158:4,5,6
**information**
  8:10 29:5
  63:14 65:1
  80:14 81:3
  85:16 109:12
  112:7 117:17
  117:21 118:1
  134:18 136:11
  136:25 139:1
  143:21 152:21
  153:5 169:20
  181:5 182:25
  188:12 214:8
  230:5 231:2
  236:10
**infraction**
  142:11
**initial** 61:8
  174:2 201:24
**initially** 133:3
  180:15 213:16
**input** 175:20
**inputted** 220:21
**instance** 57:7
  89:3 108:1
  118:4 142:3

**instances** 29:11
**Institutions**
  165:14
**instructed** 68:12
**instruction**
  54:24 55:4,8
  55:10 133:17
  135:21
**instructional**
  177:8 178:4,9
  178:16
**instructions**
  67:13 224:22
**instrument**
  222:20
**Insurance** 34:14
  34:18 38:12
  77:2
**intend** 199:20,21
  218:22 237:24
  238:14
**intending**
  215:19
**interest** 39:6
**interested** 77:24
  236:17 255:20
**interests** 38:22
**interfere** 54:23
  55:8
**interfered** 55:3
  55:10,10
**internet** 5:18
  53:25
**interpretation**
  201:16,21
**interpreting**
  178:14
**interrogatories**
  185:2,11
  201:18
**interrogatory**
  180:13 195:14
  214:4,6,9,11
  215:11,16
  224:3,23
  225:15 228:17
  228:24 229:22
  235:16 237:10

237:18
**interrupt** 82:8
**intervene** 107:1
**Intervenor**
  29:24 213:4
**Intervenors** 1:7
  3:13 29:22,25
  47:13 55:3,6,7
  56:6 69:13,17
  93:17,23 111:1
  150:16 152:15
  175:16 180:15
  180:21 208:15
  224:4
**Intervenors'**
  214:14
**interview** 30:15
**interviewing**
  31:21
**introduction**
  5:17
**inventory**
  190:17,20,24
  192:10,11,15
  192:24
**investigate** 50:8
  51:9
**investigated**
  150:23 237:3
**investigating**
  51:10
**investigation**
  72:4
**invite** 32:23
**invited** 32:19,25
  44:4
**Invoice** 3:11
**involve** 61:23
**involved** 39:11
  40:10 47:20
  48:16 56:3
  70:6,22 76:24
  77:15,20 78:11
  78:23 79:12
  80:2 81:2
  121:7,19 122:1
  142:18 171:8
  173:15

Springer, Joy 5/15/2020                                                          Little Rock School District v. Pulaski County Special School District, et al

| | | | | |
|---|---|---|---|---|
| **involvement** 43:24 44:15 45:24 47:14 48:21,24 77:14 77:19 78:12 80:8 | 196:2 198:9,13 221:3,24 224:5 224:7 225:23 233:4 234:16 234:20 235:10 241:25 244:2 | 150:21 154:7 **Johnson** 15:10 15:15 16:14 18:10,20 19:5 21:21 | **justed** 15:4 **justice** 68:6 **juvenile** 60:14 60:17,20,21 68:6 | 248:14 **kinds** 240:1 **kitchen** 110:15 **knew** 196:9 **know** 5:11,14,15 9:9 10:13 |
| **involves** 77:10 **involving** 85:8 **issue** 52:12 65:25 69:20 | 247:7 251:10 251:16 **Jacksonville's** 244:1 | **johnwalkeratt...** 7:5,10 **join** 115:1 | **K** | 11:11,21 12:3 12:9,15,21 13:10 14:16 15:4 17:10,16 |
| 84:18 114:6 118:13,17 121:8 127:1 128:3,3 130:23 | **Janess** 4:4 255:4 255:24 **Janet** 70:13 **January** 183:7 | **joke** 125:11 238:11 **Jones** 15:22 16:19 17:3,20 | **K-12** 165:13 **Kappa** 26:16 44:22 45:16 **keep** 19:18,21 | 18:25 19:8,10 19:12 20:13 22:19 23:4 25:7,12 27:4 |
| 138:6 154:18 160:17 165:12 172:19,22 186:14 189:18 | 183:10 **Jarrow** 52:9 **Jay** 121:25 **Jerry** 140:9 | 117:4,6 118:2 234:14 **Joshua** 55:3,7 56:6 69:13,15 | 20:19,20 25:2 25:13,15 58:13 59:9 67:9 88:20 122:22 | 28:3,4,23 30:5 33:4 35:24 36:23 39:5 40:4 41:19,20 |
| 196:13,21 197:1 198:20 202:3 212:21 | **JNPSD** 3:13 63:1 82:17 180:19,24 | 69:17 93:16 175:16 179:19 180:21 183:9 | 123:12,17 124:11 132:18 158:24 171:13 | 41:24 42:4 44:25 45:3,21 46:3,4,8,11 |
| **issued** 171:10 **issues** 51:10,11 56:22 57:22,25 | 181:9,12,17 185:12 186:10 194:15 201:8 | **joy** 1:10 4:1 5:1 6:2,10 11:7 14:18 33:25 | 205:24 229:17 **keeping** 80:5 **Kees** 2:9,9 70:20 | 47:18,20,21,25 47:25 48:1,2 48:13 49:7 |
| 57:25 58:4 121:20 138:21 155:11 164:15 | 204:3 208:17 209:21 210:3 212:12,16,24 | 34:1 89:3 116:14 147:13 147:17 157:13 | 84:21 122:7 161:9 **kept** 58:10,12 | 50:16,18 53:5 53:7 55:14,15 55:20,25 57:11 |
| 164:16 **item** 10:6,17 14:24 105:24 | 213:3 215:4 224:25 225:3 227:10 228:25 | 172:24 198:25 216:11 242:11 242:13 253:2 | 81:10 88:7 113:1 247:4,12 **kids** 24:14 25:5 | 58:2 59:14 61:22 63:19 64:18,24 66:20 |
| **items** 10:13 218:9 **Ivy** 44:15,17,18 | 229:3 234:4,13 237:12 **job** 53:24 160:2 | **Jr** 2:3 79:18 **jspringer@ga...** 7:3 | 25:12,13 26:5 26:7 28:18 60:7,13,20 | 69:14,15,19 70:22 74:21 77:19,20 81:15 |
| 44:25 45:7,9 45:15,19 | **jobs** 171:9 **John** 6:4 7:12,16 7:18 8:3,7,11 | **judge** 39:12,16 39:21 40:2,2 40:10,14 54:10 | 72:2 142:10 **Kim** 65:11 **kind** 15:24 28:7 | 81:17 82:14 84:17 86:3 87:8,17,23 |
| **J** | 8:13 23:3 35:20 46:9 59:7,8 60:25 | 126:10,13 127:20,25 144:10 153:12 | 71:21 73:6 76:22 82:17 100:18 107:22 | 90:17 91:4 95:18 96:11,11 96:14 97:7,9 |
| **J** 7:16 8:4 **J-a-r-r-o-w** 52:9 **Jacksonville** | 61:18,22 62:2 62:7,14 63:12 63:15,23 64:2 | 153:21 156:7 156:12 159:19 174:1 | 120:4,12 134:8 134:11 135:1 135:10 140:3 | 97:19,24 99:11 99:12,18,23 100:1,5,6,14 |
| 2:18 26:21 58:2 62:23,24 76:5 77:23 | 65:19 66:3 73:20 74:8,12 74:13 77:10 | **judge's** 173:14 **July** 89:8 **June** 58:25 | 147:10 150:12 151:3 163:1 167:6 172:22 | 100:19,24 101:4,4,5,22 102:20 104:8 |
| 78:5 82:16 115:18 117:10 118:14 162:4 | 79:17 86:2 88:6 106:19 107:3 116:13 | 59:23 114:21 162:15,16 **jure** 235:21 236:7,14 237:8 237:21 238:1 | 175:22 196:13 196:21 204:7 216:13,14 222:7,18 226:9 228:1,14 235:16 247:19 | 104:16 109:25 110:23 113:16 114:3,5 115:16 |
| 165:7 182:6 185:1 195:5 | | | | |

Bushman Court Reporting                          Janess Ferguson Smith                          501-372-5115

Springer, Joy 5/15/2020                                                    Little Rock School District v. Pulaski County Special School District, et al

121:16,17
122:6,11,13
123:3 124:11
125:8 127:9,15
127:19 129:6
130:10,18
131:25 132:14
132:18 133:6
133:11 134:11
134:19 135:4
135:18,22
136:18 138:8
138:10,13
141:24 145:9
151:17 152:11
152:12,15,20
153:3 155:5,21
158:25 159:23
159:23 160:17
160:21,21
161:1,14 169:5
173:12,25
174:7,11 179:1
184:24 186:6
187:10,11,21
188:15 189:2,2
191:17 193:13
196:11,16
198:19 202:18
215:9,14
219:12,12
220:11 221:8
221:16 225:10
225:20 226:15
227:2,7,23,25
232:25 234:7
234:12 241:6,7
243:6 244:12
244:18 247:2
247:18 248:6
248:18 249:19
250:7,15
**knowing** 19:8
56:9 101:5
118:12
**knowledge** 38:4
101:10 136:12
152:24 172:24

173:16,20
174:5 186:4
196:8 243:13
247:16
**known** 61:23
**knows** 48:1
129:11 138:18

———————
**L**
**lack** 32:2 74:24
128:3 139:9,11
152:16 154:20
199:23
**ladies** 46:7 86:13
132:8
**lady's** 52:6
70:22
**lag** 235:6
**Lakeview** 244:6
**language** 207:12
**lasted** 36:9
**late** 10:1 249:6
**laugh** 161:9
**Law** 2:3
**Lawrence** 51:22
79:19
**lawsuit** 34:17,25
48:25 49:6
62:8 122:3
136:13
**lawyer** 70:8,11
70:13 140:9
224:11,22
236:1,3 251:19
**lawyer's** 70:7
**lawyers** 13:12
79:17 84:11
118:9,12
152:21 153:6
160:23 205:4
207:18,20
208:11,22
224:19
**lead** 46:16,19
47:4,5,10,13
75:16
**learn** 159:1
167:2

**learned** 46:22
**learning** 46:20
178:10 235:2
**Learns** 170:2,2
**leave** 96:5 156:5
246:16
**led** 155:12
**left** 8:5 77:1 96:2
122:23 154:13
157:5 240:21
240:25 242:15
242:24,25
243:21 244:1
244:24
**legal** 39:11
40:10 79:22
172:1 224:10
224:13 225:5
225:12 226:8,9
228:3,4,5,6,14
228:15 238:4,5
245:18 251:12
251:21
**legislative** 52:16
144:20 163:16
165:11 166:6,7
166:9,12
**legislator** 106:19
106:23 107:2
**Legislature**
163:25 165:5,6
165:12,23,24
**lesson** 244:11
**lesson/activity...**
177:23
**lessons** 35:6
**Lester** 218:6
222:2
**let's** 16:8,8
20:23 23:13
25:23,24 34:23
35:1 45:23
48:5 58:16
78:7 79:9,21
79:25 83:15
96:24 106:10
106:15 111:19
111:25 131:7

144:4 146:12
146:12 165:21
170:12 175:10
178:3 180:12
198:20 202:1
246:5 249:5
250:5
**letter** 159:19
232:11 237:11
**letters** 149:13
191:18
**level** 54:11,11
107:10,16,18
168:25 169:2
107:24 229:12
**levels** 243:14
**license** 3:12,15
168:4,6,8,17
168:25 169:2
**life** 75:23,24
**lifetime** 168:5,17
168:21
**lift** 175:8
**light** 202:21
**lightly** 28:9
**limit** 25:24
111:25 145:5
**line** 116:25
165:3 215:8
254:4,10,12,14
254:16,18,20
254:22
**linked** 8:20,22
**list** 10:7 14:14
14:20,24 19:14
103:17,18
104:5 170:25
191:2 218:8
**listed** 79:10,11
192:11
**listen** 214:1
**lists** 190:24
**literate** 7:23
**litigated** 134:16
**litigation** 22:12
124:21
**little** 1:3,24 2:5
2:11,15,20 4:8
6:5 14:17

26:20 27:2
30:13 35:1
36:13,17 37:2
37:4,4 39:3
41:8 43:25
44:16,25 45:7
45:9,16,23
47:21 48:3
51:5 57:18
60:20 61:25
63:4,5 73:13
76:4,10 77:24
86:6 87:2,6
106:10 110:7
122:12,23
144:6 148:7
152:25 153:1
156:15,16
158:22 159:5
162:11 163:4
167:3 172:11
179:18 212:22
223:17 228:1
237:3 245:14
248:15
**live** 23:8 49:20
49:21
**lived** 24:21
**locate** 14:5
16:15 23:23
199:16
**log** 19:19 20:6
59:9
**logistical** 15:19
**logs** 15:1 19:23
**long** 7:10 42:14
51:2,4 99:1
138:23 154:4
154:11 167:25
168:5 193:5
194:20 198:20
223:22 239:4
239:10
**longer** 17:22
108:17 123:9
154:12,16
244:2
**look** 16:10 59:16

Bushman Court Reporting                     Janess Ferguson Smith                          501-372-5115

Springer, Joy 5/15/2020                                    Little Rock School District v. Pulaski County Special School District, et al

78:24 81:9,17
87:17 98:9
101:23 103:6
103:15 110:20
110:25 112:22
113:11,16
116:20 128:20
128:21,23
129:19,19,20
129:22 137:16
143:18 150:18
152:25 173:17
177:4 180:12
184:19 185:8
192:10 201:5
207:25 219:2
219:20 220:11
222:9,11,16,25
241:8,12
249:13 251:4
**looked** 144:19
202:10 218:1
**looking** 14:23
58:17 66:24
81:25 87:24,24
89:4 93:11,12
94:19 97:12
100:25 112:7,9
173:13 176:2
179:9 212:2
230:19 245:8
246:2
**looks** 65:6,10
66:22,23 71:1
71:11 82:16
89:9 93:20
94:15,16,21,22
95:3,23 96:24
97:2 98:11,21
98:23 114:20
116:12 117:2
175:22 177:16
180:22
**Lord** 50:10
**lost** 159:5
**lot** 11:14 20:6
52:21 53:8,9
68:10,11 72:2

75:24 121:3
130:20 145:12
151:18 158:19
160:1 197:5
248:7
**LRSD** 163:4,10
**lunch** 141:4,5
**Lysol** 175:6

---

**M**

**M** 185:14 194:17
195:6,22 196:4
203:1,4,6,11
203:17 228:25
**ma'am** 17:13
21:3 26:12
45:8 82:2
83:24 93:15
121:10,15
164:18 166:25
167:3 174:22
202:8 209:7
218:21 221:6
**machine** 255:9
**Madam** 206:21
**Magnolia** 41:7
**maiden** 34:2
**main** 60:11
124:2,4
**maintain** 168:25
180:9
**maintained**
171:12 180:5,6
181:22 189:19
190:6
**maintains** 191:2
**maintenance**
189:23
**Maintenance/...**
176:13
**major** 254:9
**majority** 60:3,3
134:22
**make-up** 100:9
**making** 33:9
49:24 60:7
80:10 100:16
112:9 131:16

134:24 135:20
137:14 150:22
200:25 210:16
211:15 232:23
247:6 254:6
**man** 198:20
**managed** 242:17
**manually** 18:16
18:17,19
**March** 49:9,9
89:9 130:15
164:16
**Margie** 126:24
209:5,9,16
210:8,15
212:20
**mark** 216:25
217:3
**marked** 9:21
54:14 93:4
113:4 118:20
168:2 252:1
**marks** 176:17
216:21
**marriage** 33:22
33:23,23
**married** 33:19
33:21 79:7,7
**Martha** 52:9
**Marva** 78:19
79:2 119:4,6
179:25 223:19
**master's** 35:22
238:18 239:1
**math** 162:22
**matter** 10:23
93:23 115:19
156:1,2 160:19
187:16 245:25
255:7,8
**matters** 86:1
**Maumelle** 119:2
158:3 159:10
159:12 250:12
**McClendon** 1:7
55:3 56:6
69:16
**McDaniel** 2:19

**McNulty** 107:17
132:15
**mean** 12:3 16:1
16:6 18:2,2
20:5 21:18,18
22:25 42:8
50:15 51:25
63:16 77:11,21
80:17 84:2
88:24 92:21
95:2,12,24
103:7 118:18
120:5 122:5
124:10 127:6
135:10 148:10
149:14 152:24
156:17,18
169:12 186:14
186:18 190:20
191:14,15
205:18 214:8
216:16,21
227:23,24
229:7 245:17
**meaning** 81:9
136:11
**means** 55:14
68:12 87:1,7
177:10,24
216:17,25
217:3,7 231:8
**meant** 247:22
251:8
**media** 6:7,11,19
6:22,24 22:19
23:3
**meet** 30:14
**meeting** 16:3
21:22,23 22:2
22:3,6 49:14
50:25 83:18
90:23,25 91:5
91:19,22,24,25
120:18,18
125:9 139:20
140:23 149:19
165:18 166:23
230:9 231:21

232:10,23
**meetings** 8:7
22:8 33:5
36:25 37:3
38:7 44:8
46:25 67:25
69:2,2 73:19
80:17 103:12
105:1,2,3,5,5
141:1,3,4,5,6,7
165:22,24
166:1,4,5,19
166:20 167:23
223:14 233:17
237:13,16
239:21 240:1,1
**member** 15:2
21:6 26:16
29:13,20 30:12
30:14 31:5
39:3 52:8 66:8
75:24 76:1,2
142:18
**members** 13:14
17:4 23:7,7
24:20 25:8,11
41:21 50:24
69:12 76:3,9
76:25 91:20
150:24 158:5
222:12 231:9
**membership**
29:12,19
**memoranda**
180:16 194:14
**memorandum**
23:14
**memory** 64:19
67:23 71:9
90:20 121:11
231:22 232:16
251:4
**Memphis** 91:21
91:21 230:10
232:7,13,15
233:11 234:5
234:21 241:17
**mention** 109:18

Springer, Joy 5/15/2020                                          Little Rock School District v. Pulaski County Special School District, et al

109:18 155:4
**mentioned**
11:17 41:25
47:12 51:8
74:6 87:3
92:15 128:2,16
133:24 136:22
136:23 137:5
139:7 148:22
148:23 154:17
**mentioning**
88:21
**mentor** 26:5,8
27:8,8,21
28:19
**mentoring** 28:17
**mentors** 26:24
**mentorship**
29:16,19 30:2
**message** 13:10
15:8,9 16:2
**messages** 14:25
15:6,12,14,17
16:11,13,18,24
18:3,6,10,14
18:16,17,20
19:8,13,15
191:17
**met** 5:10 30:25
210:9 232:7
**Meto** 217:14
**middle** 130:21
176:23 222:3
**mile** 68:25
**Military** 166:9
**Miller** 39:16,21
40:2 126:10,13
127:20,20,25
156:12
**Miller's** 144:10
**Mills** 23:8,12
40:22 108:8
112:12,14,15
130:21,22
134:10,21,22
135:3,12 136:5
249:2 250:13
**Mills'** 130:17

**mind** 19:8
114:11 124:11
150:15 229:16
229:23
**Mine** 216:11
**minimum** 99:7
**minute** 20:24
58:20 118:24
146:4 160:5
214:19
**minutes** 99:8,9
154:13 237:12
**mirrored** 169:19
**misreading**
210:1
**missed** 5:22
167:7 223:2
**misspoke** 204:24
**misunderstand**
164:25
**misunderstan...**
54:1
**misunderstood**
61:9
**Mitchell** 2:13
**mixed** 82:18
**modifications**
63:24
**moment** 24:9
63:8 73:8
**moments** 51:13
**Monday** 8:25
51:3 166:24
**monies** 151:10
**monitor** 29:16
29:21,25 46:16
46:19 47:4,5
47:10 54:13
56:22 57:2,7
57:13 67:4,12
72:7,14 74:23
75:8,16 99:18
104:14 106:18
129:10 143:13
143:15 151:22
171:9 176:17
177:10 180:23
183:6,9 191:17

210:4 221:3
222:4,18 240:6
**monitored** 55:15
57:15
**monitoring** 53:1
54:3,4,6,23
55:2,9,12,22
56:5,7,14,16
57:1 58:3,6
61:2,6,10,11
61:12,15,21
63:8 65:18,20
65:23 66:3,13
67:7,21 68:8
69:6 71:19
72:10 73:5,24
74:11,16,17
75:17,21 78:8
78:23 79:13
80:2,8,13 81:5
85:8 86:14,21
87:16 88:11,25
90:7 93:1
102:11,16
103:2,9 104:5
104:17 107:6
113:14 114:12
117:24 118:4
126:20,22
129:16,18
140:1 143:14
151:23 180:19
180:23 181:9
183:23 209:22
213:23 214:13
214:25 217:25
220:6 222:20
**monitors** 54:25
55:6 78:11,15
85:8 88:12
97:11,11,14
99:1,13,13
100:8 115:19
116:15 119:2
119:19 175:21
177:2 179:20
179:23 180:6
182:19,23

183:22 184:16
187:22 205:9
206:12 207:16
208:9 209:23
210:20 212:14
214:14,17,20
215:4 221:10
**monitors'** 215:6
**month** 58:11
162:14,20
221:8,14
**monthly** 8:7
58:12 69:2
105:3,4 141:2
223:13
**months** 49:23
221:14 232:12
**morning** 5:8,9
30:20 175:2
**motion** 39:17
**motions** 14:15
**mouth** 57:16
**move** 20:23
23:13 24:9
25:25 33:11
52:25 62:20
78:7 122:4,16
197:19,24
198:20 202:1
202:22 213:24
226:18
**moved** 189:9,12
189:13,16
**moving** 33:18
123:21
**multiply** 162:14
**Murrell** 222:1

——————
**N**
**N** 2:1 3:1
**NAACP** 76:4
77:13,18 79:20
**name** 6:1 28:4
28:16 34:2
40:22 52:6,7,9
64:19 65:11
69:25 70:7,14
70:16,22 71:4

79:6,7 94:21
94:24 95:10
98:12,13
104:23 105:25
108:16 110:21
110:21,22,23
120:22 132:19
167:7 221:22
**named** 5:2 121:6
**names** 27:4,12
27:18,19,23
29:9 33:24
52:3 59:12,18
63:15 78:10,17
79:10,11
105:24 110:17
121:3 134:3,5
137:17 138:13
**narrow** 27:6
**narrowed** 80:6
**nation** 31:9
**National** 75:24
**nature** 15:18
39:15 58:8
72:24 142:12
142:19 191:25
231:11 236:17
241:13
**necessarily**
250:19
**necessary** 37:23
52:18 160:18
**need** 8:9 10:18
16:6 22:24
28:9 29:3
44:25 45:3
46:4 49:25
52:15 56:19
58:20 69:13
71:4 75:2,5
84:19 85:18
86:2 87:18
101:5 103:24
119:6,11
121:11 122:21
127:4,9,16,23
133:16 134:14
135:17 140:10

Little Rock School District v. Pulaski County Special School District, et al

146:19 148:20
148:24 150:5
152:24 154:14
170:5 191:13
197:2,18,23
199:19 207:19
226:20 227:6
227:13 233:5
238:14 240:9
240:14 243:6
245:3 249:13
251:10,17
**needed** 33:10
42:13 46:14
77:6 92:2
119:19 172:13
233:1 247:25
**needing** 86:10
86:19 87:4
104:15
**needs** 50:15
135:6 146:9
153:15 214:21
**negative** 43:10
43:13 178:17
179:10
**neither** 255:15
**nephews** 25:10
**never** 6:20,23
19:20 20:22
21:15,20 22:9
126:5,8 135:9
137:24 164:9
246:12
**new** 5:17,17
24:12 55:11
73:7 79:23
178:3 207:11
218:5 235:1
**newer** 193:2
**news** 31:11
247:18
**nice** 158:15
161:11
**nieces** 25:10
**night** 30:21,24
**nine** 24:3
**nineties** 35:15

35:19,25
**NLRSD** 163:10
**non-African-...**
237:20
**noncompliance**
128:12 195:20
**nonrenewal**
149:13
**North** 26:20
63:5 82:16
162:5 163:4
165:8 182:6
185:1 221:3
224:7 225:24
251:10,16
**Nos** 252:1
**Notary** 4:5
253:17,22
255:5,24
**notated** 112:24
219:22
**notation** 97:20
113:3 216:16
217:8 218:2
221:16 223:10
250:21
**notations** 109:10
111:9,11 219:3
**note** 97:5 215:2
**noted** 98:13
109:16 112:20
**notes** 10:11
86:18 90:5
96:19 108:19
110:20,25
111:3,8,10,12
113:23 123:23
216:5 222:8,22
222:23 245:9
255:10
**notice** 3:10 10:3
11:6 12:4
14:13 87:9
169:18
**notification**
30:21
**number** 10:6,17
10:24 13:8,13

14:24 19:14,17
20:23,24 21:12
22:10,18 23:13
23:18 24:3,8
26:22 27:5
36:24 54:18
58:16 60:13
63:4 80:17,18
82:9,12,13
89:6,7 93:6,9
93:11 98:16,16
98:23 99:25
101:1,10 102:8
102:14,14
103:16 104:3,9
104:21 105:24
116:10 118:23
121:16,18
126:1 130:14
131:4 138:11
162:11,13,18
167:21,24
177:7,22 178:3
178:7 180:13
181:13 185:9
185:18,22
194:12,23
202:4,5 204:16
204:25 205:1,7
206:3,13,15,24
207:10,14
208:4,6 213:18
213:21 214:5,6
214:9,11 215:3
215:11,16
216:12 224:3
224:23 225:15
228:17,24
229:22 237:10
237:18 254:4,4
254:10,10,12
254:12,14,14
254:16,16,18
254:18,20,20
254:22,22
**numbered** 4:3
**numbers** 67:9
90:2,4 102:19

103:20
**numerous**
212:20
**nutshell** 126:8

━━━━━━━━
**O**
━━━━━━━━
**o'clock** 233:24
**O-k-o-r-o** 79:5
**Obama** 244:25
**object** 55:17
172:17 173:8
186:13 195:21
226:22
**objected** 139:3
**objecting** 171:22
**objection** 11:25
92:11 173:8
224:9,15 225:4
**objections**
197:21 205:17
**obligates** 244:2
**obligation** 37:7
39:21 67:2,3,8
104:13 126:21
137:12 149:25
150:3 151:21
176:8 230:25
**obligations**
24:25 37:5
56:24 57:14
58:4 61:13
74:15 107:8
126:7 128:14
148:14 152:23
180:20 185:13
186:11 194:17
196:3 201:9
204:4 216:23
235:14
**obliged** 119:23
**observation**
3:11,13,15
93:17 94:15
96:15 100:5
101:9,14,21
102:3 175:16
175:23 180:3
180:22 182:16

182:18 183:3,6
184:16 185:23
191:16 195:1,8
195:12,17,19
196:1 205:8
206:12 207:15
208:8,20 209:3
209:22 210:20
212:2,13
213:23 214:13
215:10 222:5
223:5
**observations**
38:2 80:10
108:19 184:10
187:23 208:13
209:10 231:10
**observe** 176:18
176:19
**observed** 83:17
94:11 109:15
109:17 176:22
176:22 177:9
177:13,17,24
178:4,5,13,13
**Observer**
179:24
**observing** 94:20
178:15
**obvious** 247:25
**obviously**
182:11 186:15
190:9 214:16
**occasion** 21:20
**occasions** 20:9
27:15,17 32:13
103:12 104:25
210:6
**occur** 188:24
**occurred** 191:12
**October** 9:1,17
65:10 177:13
**odd** 72:12
153:10
**Off-the-record**
175:13
**offer** 124:23,25
**offered** 232:16

232:17
**offering** 251:12
251:20
**office** 6:4 8:21
39:1 51:7 66:8
66:8,19 68:11
69:21 72:5
75:4 85:20
100:14 108:12
167:13 174:16
188:1 189:19
192:8 210:10
255:22
**officer** 72:17
73:3 75:8
**offices** 4:7 110:6
110:6
**officials** 91:25
**oh** 15:20 36:7
41:13 44:14
52:5 61:22
62:24 64:13,13
64:14 65:20
82:23 94:6
95:5 105:12
106:6 121:9,21
121:21 124:17
134:6 144:13
144:22 156:19
159:12 161:7
161:13 162:13
163:13,23
167:15 169:1
179:5 181:24
200:19 221:4,6
225:16 231:22
238:11,12
239:16
**okay** 7:23 10:15
12:1 14:21
16:1,12 20:2
21:4 22:18
23:13 29:8
33:18 34:20
42:7 43:10
44:15,17,21
45:9,23 46:12
48:12 49:7

53:22 56:15
59:17 64:2,13
64:14 65:8
69:23 70:5
73:6 75:10
78:6 79:25
81:25 82:11,20
83:1 84:12
85:14,25 86:6
86:16 87:1,8
89:25 90:18
93:22 95:7,16
96:13,16 98:7
98:18,18 102:1
103:16 104:9
104:20 105:7
105:12,20
106:6 108:1
111:7,19
112:16 113:6
113:24 114:24
115:9 116:8,11
119:9,21
121:21 122:2
122:16 123:16
123:18 126:9
127:16 130:25
131:7 136:1,16
137:5,12,12
139:7 144:4,7
145:1,6,18
146:8 148:6,16
154:15 159:1,9
159:18 160:6
160:25 162:17
163:14,23
164:7,20 165:2
165:17 166:1,8
167:2,16 168:4
169:15 170:21
171:4 174:12
175:6,15,22
176:16 177:4
177:20 178:14
179:5 180:9,12
181:11 182:4,9
183:5,13 185:8
185:20,21

187:5 188:14
189:24 192:9
193:24 194:23
198:6,18 199:1
201:3,22,23
202:3 203:16
206:21 207:9
208:2 209:18
210:18 212:4,5
213:2 214:4,11
214:23 215:8
215:14 216:12
216:17,25
217:9,20
218:11,18
220:8 222:4,17
223:2,7,17
224:2,23
225:14 228:16
228:20,20
230:2 237:10
237:18 238:9
238:16 239:5
239:16 240:3
240:20 241:23
243:20 245:2
245:12,24
246:14,22
247:17,20
248:9,14 249:4
249:18 250:11
251:8,23
**Okoro** 78:18
79:3,6 80:22
**older** 117:2
**Omega** 44:22
45:17
**once** 16:25 34:4
56:8 57:24
71:20 73:15
80:5 91:6
94:14 119:21
128:19 133:14
135:13 143:23
144:1 145:18
145:20 168:21
190:1 202:14
202:16 206:16

208:21 212:18
221:7,13,14
226:24 232:21
236:1
**ones** 18:22 91:11
101:14 102:4
102:24 104:8
109:24 114:19
135:24 183:19
190:13 193:7
215:14 220:10
249:3
**ongoing** 31:17
32:4 229:11
**Ooh** 96:24 97:7
168:1
**open** 18:24 19:5
247:5
**operates** 6:13
**opinion** 126:18
128:9 129:15
129:17 131:12
144:11 146:9
151:1,2 155:22
155:24,25
157:11,12,14
157:17 158:1
158:10 159:8,8
159:15 160:4
172:1 202:19
228:4 234:4,20
**opinions** 43:13
43:14,20
123:21 145:12
145:16 157:15
225:12 228:6
228:15 238:5
**opportunities**
25:3 32:14
33:2 120:7
220:19
**opportunity**
37:11 53:5
72:6,14,16
74:23 202:20
227:7 241:8
**opposite** 150:13
**optimistic**

131:19,24
**ORAL** 1:10
**ORCUTT** 2:13
**order** 37:16,24
39:25 49:25
54:12 57:5
67:18 76:11
120:7 125:13
125:16 126:10
126:14 127:20
133:16,21
137:23 143:6
144:10 146:10
149:13 151:25
171:18 172:8
173:1,5,13,17
188:11
**orders** 171:10
171:15,23
185:14
**organization**
26:18 45:20
76:8,11,18,24
171:14
**organize** 222:8
**ought** 49:18
67:12
**outcome** 255:21
**outdated** 233:6
**outline** 28:25
**outlined** 230:10
230:14
**outlining** 102:10
**outside** 63:16
73:16 157:17
157:20 158:9
250:8,10
**outstanding**
84:8
**overlap** 48:23
**overturned**
143:3
**overwhelmed**
13:24

---
**P**
**P** 2:1,1
**P.A** 2:9 7:13

Springer, Joy 5/15/2020

Little Rock School District v. Pulaski County Special School District, et al

8:12 23:3
35:20 59:7,8
60:25 61:19,22
62:2,7,14
63:12,23 64:2
66:3 73:20
74:8 77:10
79:18 86:2
88:6 106:19
107:3
**P.E** 109:8
**P.L.L.C** 2:13
**p.m** 252:4
**packet** 216:4
**packets** 237:15
**page** 10:3 19:17
20:23 54:20
95:5,10 96:16
96:17 98:9,22
102:9,14
118:23 146:15
180:13 185:8
185:17,19
202:3,6,7
203:23 204:17
204:20 205:6
207:25,25
214:4 215:2
217:13 224:3
224:23 229:2
235:15 237:11
237:18 254:4
254:10,12,14
254:16,18,20
254:22
**pages** 13:25
28:22 64:23,23
93:11,15,16
94:14 126:13
**paid** 62:5 73:20
**pandemic** 49:16
49:19 51:1
**paper** 254:3
**paragraph**
119:8,10,13,16
229:3
**paralegal** 46:10
46:15 75:15

175:3
**parent** 69:9
120:15,19,22
120:24 122:11
165:7
**parent's** 65:11
69:25
**parents** 22:22
27:13,20 44:10
57:20 59:2
66:19 68:11,23
69:21 73:18
80:15 87:13,14
142:23 153:1
162:4 164:3,9
164:10,22,24
231:8
**part** 7:18 32:6,6
44:4 57:9,9,12
65:22 66:2,13
67:7 68:8 69:6
72:10 73:5,23
74:17 103:2,9
104:16,17
115:5 117:18
117:23 119:21
125:22 135:23
137:11,18
142:10 150:17
151:22 171:12
171:14 202:13
209:13,18
217:25 220:6
228:23
**participate**
31:23 32:19,23
32:25 33:4
44:5 76:22
170:8
**participated**
44:3 169:16
170:13 177:23
237:1 239:25
**participation**
119:17 120:1,3
120:11,24
**particular** 25:5
25:11 29:11

33:1 39:16
40:4,6,6 42:9
51:21 57:6
69:16 82:4
83:22 86:8,11
89:22 90:22,24
91:23 92:3,21
94:2 97:6
100:20 108:13
109:4 120:23
132:10 134:25
135:19 138:19
138:20 142:11
142:15,17
152:3 154:9
158:5 167:23
169:4 173:13
177:14,17
178:20 179:7,7
179:8 183:12
187:13 188:16
190:11 192:14
192:17 193:22
202:17 215:22
220:20 229:15
229:22 232:6
241:5 243:15
**particularly**
32:16 37:3,16
87:23 241:19
**particulars**
119:25
**parties** 8:6,10
56:3 255:16,19
**partnerships**
26:25
**parts** 194:22
**party** 77:21
255:14
**pass** 10:15 161:5
**passed** 9:1 47:12
239:7,13,15
240:21
**passing** 8:2 9:6,7
9:12 47:15
85:13
**password** 7:11
**patient** 205:17

**pattern** 33:5
**pause** 233:22
**pay** 73:20
**payments**
151:25
**PCSSD** 2:8 6:18
10:8,22 15:2,7
19:18,21 20:21
21:5,14 22:8
22:20,22 23:6
25:24 26:6
27:7 40:17
41:12 42:1,6
42:18,21 43:1
43:11 45:4,6
56:14,22 61:2
61:7 62:15,22
62:25 63:16
65:23 78:15,23
79:16 80:3
82:17 83:16
85:23 86:4
104:6 106:11
106:18 107:9
111:18 117:1
123:7,25
131:12,14
145:17 146:1,9
149:3 157:24
162:4 169:19
170:18 171:19
172:8,11 173:2
173:6 181:15
182:10 198:10
215:15 246:3
247:7 248:21
249:22 251:11
251:13
**PCSSD's** 6:25
182:1
**PE** 109:19 110:4
**pen** 58:21
246:10
**pending** 57:14
64:8 154:9
**people** 25:17
39:8 49:14
51:16 57:20

59:1,5,13 60:1
61:19 63:6
69:10,14,19
73:15,21 75:25
78:12,23 79:12
81:7 106:11
107:16,18
110:17 114:3
132:24 135:23
137:7 139:16
144:22,23
152:19,22,25
153:1,7 158:10
160:1 167:16
230:9 231:22
235:4
**perceived** 57:21
**percentage**
235:19 236:6
236:13 237:7
**perform** 234:5
**performance**
240:12,17
241:1
**performed**
71:18 103:22
**period** 7:20
10:19 11:20
18:1,11 23:21
46:22 47:7
103:25 113:8
115:15 146:23
147:8 156:24
168:23 219:14
243:6 249:17
251:22
**periodic** 213:2
221:11
**person** 6:13 7:25
37:24 50:6
52:8,11 75:3,3
75:7 77:5
94:23 97:14
100:24 104:25
105:19 106:8
107:24 108:17
108:20 132:15
135:19 199:7

Springer, Joy 5/15/2020                                    Little Rock School District v. Pulaski County Special School District, et al

Page 277

person's 140:19
personal 6:24
  59:6 60:22
  85:19 169:6
  245:16,17
personally 99:23
  221:2,9
personnel 74:19
  138:6,21
persons 6:10
  15:16 38:1
  39:20 43:22
  44:10 47:18
  49:17 50:4,12
  51:19,24 58:5
  79:23 107:6
  109:14 110:11
  110:14 126:2
  128:24 132:5
  136:12 148:2,4
  149:10,14
  150:5,6,11
  153:1 158:10
  159:20 167:22
  180:19 181:8
pertain 104:11
pertaining 66:23
pertinent 153:24
Philander 30:13
  30:17,25 31:6
  31:14,16,18
  32:10,12 86:13
  167:4
phone 15:1
  16:10,13 17:22
  17:24 18:3,5
  18:15 19:16,19
  20:21 23:1
  57:19 59:6,10
  132:13,22
  134:7 141:6
phonetic 64:17
  78:21 91:9
  233:9
photographs
  21:4,7 22:10
phrased 128:2

139:9
physical 71:13
  110:8 180:17
Pi 44:21 45:16
picked 191:24
pictures 80:11
piece 67:8
  104:17
Pinewood 222:1
place 12:6 16:18
  19:1 24:24
  30:23 32:8,8
  36:6 38:3,8
  46:23 47:22
  49:11,16 50:1
  55:25 56:1
  57:4 66:1,18
  67:19 68:9
  72:4,8,9,15
  73:12,14,23
  74:10,12 76:12
  76:14,17 85:7
  94:16,17 99:5
  107:1 108:5,9
  118:8 131:19
  131:21 132:7
  132:21,25
  133:10,17
  135:21 136:10
  139:18 140:14
  140:22 142:15
  142:18 147:21
  149:15,19
  150:8 151:12
  152:2 153:16
  156:20 157:18
  158:6,9,9,13
  158:16,21
  159:16,22,24
  160:3 172:14
  173:14 177:14
  178:24 189:3
  210:9 214:1
  230:11,17
  233:2 235:13
  236:24 239:6
  239:21 240:2
  255:10

placed 67:5
  101:24 187:13
  188:3 247:14
placement 120:3
  120:12
placements 57:9
PLAINTIFF 1:3
  2:2
plan 3:14,14
  39:21 43:3
  52:13 56:24
  57:15 58:4
  61:13,21 62:16
  74:16 92:1
  104:10 107:7
  119:22,23,24
  119:25 125:12
  125:15 126:7
  128:10,13
  130:24 134:23
  137:18 140:2
  144:10 146:12
  146:13,20
  148:14,19
  150:4,7 151:13
  152:23 153:4
  156:21 157:18
  159:17,25
  164:11 172:14
  172:21 180:19
  181:9 185:14
  191:19 194:17
  195:6,22 196:4
  203:2,5,8,11
  204:4 213:3
  215:6 216:4,18
  216:20,23,24
  217:10,17,24
  218:8 220:17
  229:8,9,9,21
  230:12,17,24
  231:2,24
  232:19 233:5
  234:19 235:11
  235:14 244:3
planning 242:19
  243:20
plans 150:7

218:1,15,15
  219:4,24 220:4
  220:15,21,25
  232:3
plastic 175:8
play 12:21,22
pleadings 89:1
  192:7
please 5:25 9:24
  10:2,6 20:25
  61:3 64:22
  77:16,16 93:6
  102:5,7 107:13
  118:22 160:5
point 5:19 16:14
  24:10 26:2
  27:22,24 28:24
  29:2 33:21
  36:19 41:20
  56:14 103:3
  113:18 128:4
  129:14 131:17
  134:16 140:7
  186:19 187:20
  197:7 202:16
  202:24,25
  207:20,22
  208:10 219:23
  220:10 239:10
  241:7,10
pointed 124:7
pointing 127:3
  148:25 149:22
  157:8 200:3
points 5:17
Policy 91:21
polite 160:15
  161:1
pool 110:10
poor 126:6
population
  134:23
Porter 2:3,3
  9:20 11:1 12:7
  12:17 13:3,11
  14:3,21 25:18
  26:11 28:3,9
  29:4 31:13

42:24 47:12,19
  48:1 51:21
  53:2,4,14
  55:17 56:11
  59:17 64:8
  70:9 78:2 79:4
  79:18 83:9,11
  84:7,13,16,23
  85:14 88:9,24
  90:3 95:3,7
  97:1 98:13
  102:2,6 115:23
  116:1,6,20
  121:22 122:5
  122:13,24
  123:3,11,13,16
  124:10 125:1
  129:25 130:13
  131:2,10 134:2
  134:6 135:17
  138:9,25 139:5
  139:25 142:3
  144:7 145:7
  146:7 153:18
  154:11 155:2,8
  155:20 156:12
  160:19,23
  161:3,6,24
  171:25 172:5
  172:17 173:8
  173:23 174:1
  175:12 181:19
  184:22 185:17
  186:13,22
  187:1 195:21
  196:11 197:10
  197:18,23
  198:1,3,11,15
  198:18,24
  199:2 200:2,5
  200:8,11 201:3
  201:11,14,16
  201:20 202:1
  203:13 204:20
  205:11,18,20
  206:4,18
  210:21 211:2,5
  211:8,11,14,23

218:4 224:9
225:4,11,17
226:5,19,22
227:22 228:19
238:2,8 242:11
242:13 243:25
245:3,7,10,19
245:22 246:20
249:9 250:2
251:20,25
252:2
**portion** 96:1
236:21
**portions** 203:5
**position** 6:9
12:17 39:2,4
67:17 128:18
136:15 149:21
186:6,7 231:19
233:4,4 234:17
244:1
**positions** 132:17
132:19,19,23
133:1,2,3,13
133:19
**positive** 178:7
178:16 179:10
248:6
**possession** 21:5
21:8 22:21,25
94:13 181:22
183:19 193:18
**possibilities**
68:17
**possible** 26:1
199:18
**possibly** 31:9
**post** 138:16
**posted** 6:18,21
219:9,10,16
**posts** 22:20,21
23:3,4,10
**potentially** 90:3
124:22
**Powell** 208:25
209:5,9,16
210:8,15
212:20

**Powell's** 126:24
**praise** 50:10
**PRE** 43:25,25
44:2,12 91:18
179:18
**pre-dated** 193:8
**preparation**
112:7 124:4
126:25 167:9
167:11 208:17
208:21,25
209:20 212:12
214:5 244:17
**prepare** 64:25
**prepared** 31:7
89:14 92:15,19
130:4 243:17
244:14,16
**preparing** 28:24
**present** 10:23
47:7 78:15
83:23 99:15
104:1 114:23
117:16,20
118:9
**presented** 91:24
**presently** 40:16
41:12
**Pressman** 9:19
13:11 51:22
79:18 116:14
189:5
**presumably**
62:7
**presuming**
196:18
**pretty** 51:7 53:6
113:1 119:14
130:20 213:6
213:10,10
**prevalent** 124:9
**previous** 202:10
206:5,18,19
226:1
**previously** 16:17
16:22 19:2
22:9,19 23:25
39:2,15 72:1

125:8 147:2,20
206:20 248:24
**principal** 40:22
72:22 108:14
109:11,13
110:23
**principals** 72:22
72:24 107:11
142:25 143:1
215:5 232:1
**print** 170:25
**printed** 175:2
**printout** 169:22
**prior** 15:20,20
16:19 17:2,10
17:13 30:7
43:14 89:21
105:4 117:8
130:3 163:5
173:15,18
183:7 192:18
203:16 206:23
207:3
**privacy** 28:5
**privilege** 84:11
84:15 136:11
**privileged** 63:14
88:6,22
**probably** 12:9
13:9,13,17
15:20 23:10
24:10 34:19
47:17 48:20
51:1 57:17
58:20 59:25
66:5 81:16
87:17,23 89:21
99:4 101:17
108:9 112:12
119:4 120:14
120:17 125:4
125:24 131:9
140:8 162:6,8
163:4,6,9,11
166:20 167:1
170:13 182:11
189:11 191:21
191:22 192:1,3

192:14,19,20
192:22 214:21
219:2 220:12
222:16 230:15
239:15,20,20
240:18 248:3
248:13 249:13
249:24,24,25
250:1,12
**problem** 71:24
137:20 143:5,7
200:17,24
**problems** 60:18
143:8,9
**Procedure** 11:21
255:13
**proceeding**
39:12 40:7,10
255:17
**process** 32:7
33:11 39:19
50:16 67:16,18
68:14 69:9
71:24,25 72:7
72:13,15 73:4
73:24 74:4,11
74:17,24 75:3
75:3,6,9 76:16
76:17 103:9
117:24 220:6
231:3,5 232:4
235:3 242:19
243:21
**produce** 14:1
15:13 83:1,3
83:10 139:21
139:24 140:3
180:16 182:5
185:6 186:3
189:7 204:11
210:3,8 212:19
222:14 230:5
**produced** 4:2
80:11 82:1,7
91:13,15 92:11
102:5,25 103:4
103:14 104:18
108:10 113:12

181:2,12,15,16
182:10,13,25
185:10 186:9
188:9 190:9
194:14,18
195:9 196:5,7
197:14 198:8,8
198:9 199:17
201:6,10,13
204:12,13,15
205:13 207:16
208:9 209:16
215:15 216:12
236:8,10
242:15
**producing** 182:1
196:14,22
232:7
**product** 88:9,22
**production**
180:13 181:13
185:2,8,11,18
185:21 187:19
194:13,23
195:3 196:24
200:1,15 201:2
201:5,19 202:4
202:5,9 203:22
204:25 205:1,7
206:3,8,13,15
206:24 207:5
207:10,13
208:4 209:19
213:18,21
**professional**
75:23 168:18
168:22,24
169:4,7,22
170:1,6,9,17
170:21,25
**program** 30:16
31:6,23 32:21
36:9 37:15
41:17 43:25
167:11 223:18
223:20 229:4
234:22 237:2
239:8,13,25

**programs** 37:8
37:18 44:7
60:10 231:10
232:25 233:1
234:6
**progress** 3:11
131:14,17
**project** 165:9
**projects** 85:21
85:22
**promise** 14:6
145:21 154:1
**promised** 25:1
132:25
**proof** 124:12
**proper** 60:8 67:5
158:14
**properly** 33:9
67:5 69:20
**Proposed** 3:14
3:14
**proposition**
185:12 186:10
194:15 195:4
196:2 201:8
204:2
**propounded**
196:23
**protesting** 71:12
**proud** 31:4
40:20
**prove** 124:15
228:9
**provide** 11:9
12:4,19 174:23
210:6,7,12,13
210:15 214:8
221:17 238:14
240:3
**provided** 10:13
11:4,8,14,16
12:20 14:13
32:14 81:3,12
101:12,18,23
140:25 141:9
171:6 174:16
185:22 200:13
208:16,24

209:20 212:11
212:11,16,23
213:2
**provides** 72:6
**providing** 14:13
186:17 232:14
**provision** 151:7
**public** 4:6 21:22
35:2,3 38:25
76:8,13,20
253:18,22
255:5,24
**publicity** 140:12
**publicize** 138:14
**Pulaski** 1:5 5:12
13:15 15:23
16:21 17:4
20:4 24:18,22
25:19 26:4,9
26:19,22,23
28:1 31:8
32:15 33:3
37:6,10 41:1,5
41:14 43:20
45:10,14 57:22
58:1 61:25
82:16 121:24
132:4 136:14
158:18 162:5
164:15 165:8
170:7 172:19
181:2 185:1
187:9 188:17
190:12 209:11
221:3 224:8
225:24 232:8
233:8,16
241:19 248:17
251:10,17,17
**Pulaski's** 182:6
**pull** 73:13
115:24 171:11
**pulled** 218:20
222:15
**Pulliam** 70:13
**purpose** 177:2
183:22
**purposes** 6:16

20:20 45:20
54:16 70:25
**pursuant** 213:3
**pushed** 151:2
**put** 48:21 57:16
65:4 79:5
175:7 187:8
188:15 216:3
220:20

_____
**Q**
**qualifications**
236:20
**qualified** 224:16
**qualitative**
37:20 44:6
231:6,8 232:5
232:8 233:13
**quantitative**
37:21 44:6
231:6 232:5
**quarter** 108:3
**quarterly** 105:5
**question** 10:20
12:12 20:1
21:10,16,19
22:15,16 26:9
27:6 28:14
29:6 36:3
38:13,13 40:9
42:19,22 43:16
43:18 46:21
48:18,19,20
49:2,3 51:6,12
52:13,16 54:8
55:20,24 56:4
56:8,13,18,21
59:24 61:3,8,9
61:10,11 62:12
63:3 64:1,6,9
64:10,15 65:21
73:6 77:17
78:13 80:4
82:3 84:8,22
84:24 85:2
86:7,9 89:23
89:25 97:8
99:16 100:18

101:8 102:2
104:20 105:8
107:5,13,19,21
118:5 123:5,20
134:20 135:6,9
136:2 146:17
147:15 148:7,8
154:22 160:18
160:22 163:7
165:3 172:10
172:18 176:4
178:18,23
181:7,14
183:16,17
185:20 186:8
186:25 187:3
191:6 193:4
194:20 195:24
197:16 202:17
203:3,7 204:1
204:6,9,19
205:21 206:5
206:22 207:2,7
207:11,19,22
207:23 208:23
209:9,12 212:9
213:1,7 214:10
215:21,23
223:3 224:18
224:20,21
225:1,15,21
226:2 227:3,18
229:20 232:20
234:3 235:18
235:22 236:4,5
236:19 238:8
238:12 240:8
240:13 242:7
243:23 244:7
244:10 248:1
248:23 251:9
251:11
**questioned**
150:10
**questioning**
116:25 160:16
161:12
**questions** 11:22

24:9 26:14
28:25 29:24
34:5 53:21
63:10,22 72:3
92:2 106:12,14
117:19 118:8
134:12 139:19
146:8 160:8,13
164:24 165:3
171:21 177:18
189:4 200:25
202:23 205:24
206:9 211:7
214:3 225:18
241:11 244:14
244:15,16,22
245:24 246:25
247:1 251:24
**quick** 14:10
**quickly** 25:25
**quite** 23:17
29:23 55:19
156:17 157:9
191:5

_____
**R**
**R** 2:1,12
**rabbit** 196:12
228:12
**race** 98:15 176:8
**Rafeca** 69:25
71:3
**raised** 154:10,14
164:24
**rate** 70:25
**rates** 237:19,25
**reach** 59:5
**read** 10:6 20:24
20:25 21:1
26:7 66:23
84:22,24
102:20,21
118:24 127:20
146:12 171:15
206:22 207:2,7
214:16,19,22
252:2 253:3
**reader** 26:7

**reading** 65:6
117:8 185:16
207:17
**ready** 159:21
161:22 211:21
**real** 14:9 238:12
**realized** 75:5
**really** 16:5 27:23
30:1 46:20
57:21 71:4
78:13 102:2
107:21 135:10
138:8 155:25
156:1,1,23
172:22 199:6
207:22 211:1
216:14 227:24
238:20 245:25
**reason** 18:23
19:3 32:18,24
85:5 105:14
107:20 119:10
119:15,19
123:24 124:2,4
124:5 128:11
131:21 146:1
152:10 159:23
193:25 254:5
254:10,12,14
254:16,18,20
254:22
**reasons** 60:20
123:6 126:9,17
127:6,8,14,24
131:11 145:16
254:6
**recall** 13:9 15:16
16:25 31:24
34:16 54:10
62:17,18 65:25
66:7 68:16
69:11 110:21
110:21,22
142:13 162:5
166:24 173:4
173:11 210:2
220:19,22
221:23 223:22

231:12,20
232:16,22
233:2,7 239:16
248:20
**receipt** 17:2
**receive** 14:6
20:11 35:21
37:24 57:19
58:9,11 60:25
61:5,18 63:24
64:4 66:24
67:22 71:25
72:2 90:10
96:3 143:11
165:6 168:8,21
**received** 15:21
30:21,23 31:15
33:14 35:16,22
37:13 45:15
46:24 47:1
60:17,22 67:5
73:17 87:25
89:17 97:10
112:10 120:14
132:13 135:13
159:20 162:3
163:11 164:21
165:4
**receiving** 12:5
60:8 76:15
120:6
**recess** 85:3
**recollection**
16:23 112:25
119:9 121:6
250:16
**recommendati...**
143:3 149:9
**recommendati...**
149:11
**recommended**
142:24 234:18
**reconvened**
233:17
**record** 5:10 6:1
11:2 20:10,15
20:21 53:17
54:16 59:9

65:9 70:25
71:5 82:17
84:6 88:2 90:2
91:12 105:9
114:13,15
121:22 122:7
124:11 130:13
138:25 175:11
193:16 207:5
210:21 215:20
215:24 219:4
250:6 251:2
254:7
**recording** 21:13
21:19,22 22:2
**recordings**
21:13 22:7,11
**records** 19:21,22
19:24 20:11,16
20:19 59:16
78:9 81:9,10
81:12,18,19,21
81:22 82:5,12
82:21,24 83:9
87:16,19,21
88:3,6 92:10
112:20,23
113:2,7,11,16
113:19 114:16
114:19,22
115:3,6,14
116:16 219:3,7
219:21,22
221:5 222:9,15
222:24 223:11
238:23,23
247:21,25
248:2,8,15,19
249:14,20
250:18
**reduced** 248:13
**refer** 50:13
52:14 112:20
**reference**
118:16 205:8
206:11 207:9
210:17 211:19
214:12 215:8

215:13
**referenced**
51:13 90:3
131:10 144:11
145:7,8 206:23
210:12
**references** 207:4
**referencing** 71:8
126:11
**referral** 137:16
**referrals** 137:14
137:14 138:12
164:13
**referred** 51:21
60:13 66:12
68:6,16 69:12
142:16 164:10
204:16,18,22
**referring** 19:23
20:16 22:3
38:11 52:1
54:21 65:15
69:24 82:8
89:5 104:23
105:10 106:1
111:1 113:23
121:4,5 122:15
140:23 141:7
142:10 157:20
157:24 212:13
229:24
**refers** 72:22
104:13 204:25
206:14 207:14
208:8,19
213:22
**reflect** 201:24
238:24
**reflected** 87:18
87:21 88:1
89:1 192:24
222:10 223:13
248:4,19
**reflecting**
249:18
**reflection**
250:17
**reflects** 215:24

**refresh** 64:19
67:23 121:2
251:4
**refreshed** 71:10
90:20 121:11
231:22 232:17
**refreshes** 119:15
**refuse** 214:1
**refused** 213:18
**regard** 86:20
176:8 194:11
224:25 225:24
251:10,11,16
251:17
**regarding** 21:23
108:2,5 143:20
239:24 243:7
**Regardless**
148:15,17
**regards** 225:2
**regular** 32:8
**relate** 43:3 49:12
57:5,8 58:4
60:6 61:6,21
71:14 82:5
89:21 90:6
164:14 178:19
**related** 10:8
13:22 15:1
26:9 40:16
41:11 62:10,16
62:22 65:18,18
65:20,25 82:15
85:19,23 107:6
107:7 120:23
188:16 189:8
189:16 190:19
191:7,23 192:4
235:20 236:7
236:14,21
237:4,8 255:16
**relates** 29:19
52:13 55:21
57:14 61:2,12
65:24 67:10,20
71:3,18 86:3
97:18,24
117:10 130:17

Springer, Joy 5/15/2020

Little Rock School District v. Pulaski County Special School District, et al

138:21 148:10
164:11 172:15
187:25 193:22
229:8 235:13
**relating** 56:5
144:21 191:18
**relationship**
25:6 44:2
60:16,23 68:19
**relative** 228:17
255:18
**release** 59:18
**released** 163:5
163:10 185:13
186:11 194:16
195:5 196:3
201:9 204:3
**relevance** 17:18
**relevant** 22:12
40:6 49:5
144:15 160:24
182:9
**reliable** 236:12
**relieve** 234:8
**remain** 125:22
**remainder**
170:21
**remaining** 13:12
56:23 61:13
**remains** 58:7
124:5 129:1,3
**remember** 9:3,8
17:7 18:19
34:22 62:19
64:17,21 65:14
66:4 68:3 70:1
70:5 71:9
72:11,17,18
73:7 81:14
101:6 109:21
109:24 110:1,3
110:4,5,10,12
110:14,17
134:2 151:10
156:24 160:10
162:25 164:16
223:24 231:17
234:16 239:11

247:2,12 249:5
250:22
**Rep** 48:15,22,24
49:4
**repeat** 5:21
42:19 48:18
53:25 77:16
80:4 102:12
107:13 113:13
147:15 160:11
176:4 195:25
203:3 229:20
**repeated** 160:12
**replow** 215:19
**report** 3:11
57:21 83:16
87:25 94:5
104:18 109:13
111:7,8,10
118:4 126:24
130:2 137:24
140:3 151:16
151:18,19
152:8 157:23
180:18,23
181:8 208:18
209:1,21
212:12 222:7
**reported** 248:5
**reporter** 4:5
9:14 53:6
84:22,24
174:17,20
206:22,25
207:2,6,7
246:9,17,19,20
255:25
**REPORTER'S**
255:1
**reporting** 1:23
4:7 183:23
**reports** 23:14
80:13,14,14
87:10 88:11,18
88:19,21,25
89:12,16 90:5
92:10,16,19
108:2,3,4,7

112:9 127:2,8
128:21,22
129:9,16,18
140:10 152:3
185:9 191:17
194:14 209:23
213:2 237:4
244:6
**represent** 63:16
63:23 64:3
74:13
**representation**
65:19
**Representative**
5:8 6:9 9:23
11:7 13:5
14:23 39:1
48:7 49:8 50:3
50:22 51:15
53:18 71:2
75:12 85:2
106:24 117:3
123:20 131:8
139:8 144:9
155:16 160:7
161:20 162:2
163:15,24
165:5,20 199:9
245:12 246:2
**Representatives**
50:4 52:2
163:22
**represented**
101:16 121:23
145:13 155:6
**representing**
63:12 74:7,9
74:15
**represents**
155:18
**request** 4:2 14:6
83:8 114:15
115:1,4,15,21
116:13 180:12
181:12 185:8
185:17,21
186:1 194:12
194:23 195:3

199:25 201:2,5
202:5,9 203:22
204:25 205:1,7
206:3,8,13,15
206:24 207:4
207:10,13
208:3 209:19
213:17,21
215:6
**requested**
113:21 117:21
200:4 212:19
255:14
**requesting**
114:22 115:14
**requests** 102:25
115:17 182:2,7
185:2,11
187:18 196:23
200:15 201:18
202:4 205:14
212:21 224:2
235:15
**require** 123:10
**required** 168:22
234:4,21 240:5
240:6
**requires** 224:10
224:12 225:5
226:8
**research** 37:15
91:20 163:16
164:23 165:9
237:2
**respect** 8:7,10
8:24 25:2
26:25 29:16,21
32:15 33:9,12
39:4,18,19
44:6 49:14
50:11 55:7
56:1,2 57:3
60:4 67:6 72:8
73:3 76:13
78:4 81:4 85:8
85:16 87:11
108:5 113:2
120:3 124:8

125:24 126:4,6
126:18,21,23
129:1,2,4
131:25 132:10
132:25 138:10
139:21 143:24
151:17,21
153:4 156:20
157:18 169:8
169:10 179:5
179:13 216:2
230:11 241:11
243:5 248:5
**respective** 58:5
232:2
**respond** 11:24
52:16 187:18
197:22 214:9
224:16 242:6
**responded**
194:24 205:13
207:18
**responding**
50:14 61:16
184:25
**response** 43:17
56:17 68:1
111:1,4,8,11
112:2 117:18
129:19,20,22
135:9 153:23
154:23 157:14
181:12 182:1,6
185:6,10,21
194:14,19
195:9,11 196:5
197:20 200:25
201:1,7,17
204:24 205:1,3
205:7 206:4
207:13,24
208:3,6,11
209:19 210:22
213:17,21
214:6,11,24
215:2,22,25
222:22 224:10
224:18,21

Bushman Court Reporting

Janess Ferguson Smith

501-372-5115

225:22 226:1
228:7,23
229:21 230:24
236:3 245:1
**responses** 3:13
126:23 127:1,8
180:14 186:16
186:23 200:6
200:12,14
204:7 213:5
236:16
**responsibilities**
184:14
**responsibility**
8:6 73:18
135:19 143:1
152:22 182:4,5
228:8 230:1
**responsible**
150:6,11
181:25 189:15
189:22
**responsive**
10:17,24 13:8
14:5 21:10
22:13 23:18
186:1 195:14
215:10,16
**rest** 125:5,18
145:4
**result** 36:25
102:25 142:4
151:1 178:8
237:21 238:1
**results** 81:4
141:20,22
243:20
**retired** 41:6,9
42:13 43:6,9
**retirement**
42:12
**reveal** 39:5
**reversing** 147:1
**review** 78:9
81:15 109:22
202:8 208:24
237:15 255:13
**reviewed** 80:13

130:6 171:23
216:17 219:1,3
237:12
**reviews** 65:5
104:2 118:25
214:23
**RFP** 185:19
196:5 204:16
208:6
**Richards** 104:22
104:24 105:11
105:13 106:1,4
**Richardson** 2:19
2:19 3:4 14:9
14:12 70:17
78:6 114:25
115:7 161:19
162:1 172:6
174:4,9,14,18
174:22 175:1
175:14 186:24
187:4 197:20
197:25 198:2,4
198:14,17
199:8,14,20
200:3,7,10,18
200:20,23
201:4,12,15,17
201:23 202:2
204:23 205:16
205:19 206:2,7
206:10,21
207:3,8 210:25
211:4,6,10,13
211:21 212:4,8
212:22 218:10
225:8,13
226:11,20
227:5,20
228:16,20,22
245:6,8,12,20
247:1 251:9
**rid** 149:9,13
**ride** 144:16,17
**ridiculous** 228:1
**right** 9:2,23 10:2
13:3,5 14:23
16:16 20:18

24:8 27:19
29:15 33:18
35:19 38:9
48:5 53:10,14
62:18 63:18,20
64:18 79:9
81:20 82:3
92:5 93:13
98:21 102:6
106:10 109:24
110:21 112:19
112:24 115:9
115:24 116:20
116:23,25
118:18 121:1
121:11,12
122:20 123:20
125:20 130:9
130:10 133:12
136:16,21
144:9 146:6
154:2,19
155:19 157:4
157:25 159:14
162:22 163:17
165:11,15,21
166:10,13,16
166:21 168:13
168:19 170:19
171:5,16
174:10,14
175:12,24
176:3,9,16,21
176:22 177:12
177:15,18
178:1,11 179:9
179:16,25
183:24 184:12
184:25 186:21
194:19 195:1,6
195:9,15,22
196:5 198:18
203:2,5,9,11
203:14,17,20
203:24 204:5
205:1 207:3,17
209:25 212:9
212:14,25

213:4 215:11
215:16 217:6
217:11,18
218:16,20,21
225:6,11
226:19 227:12
233:19 238:6,7
238:19,20,21
239:2,9,17
240:22 242:17
242:21 243:13
244:15 245:7
245:10,22
248:10
**rights** 28:5
**ring** 64:19
**risk** 122:2
**Rizelle** 78:20
**Robert** 9:19
79:18
**Roberts** 117:4,6
150:22
**Robinson** 23:12
112:13,15
249:1,25
250:14
**Rock** 1:3,24 2:5
2:11,15,20 4:8
6:5 26:20 27:2
30:13 36:13,17
37:2,4,4 39:3
43:25 44:16,25
45:7,9,16
61:25 63:5,5
76:4,10 77:24
122:12 163:4
172:11 179:18
237:3
**role** 27:7 28:19
29:12,16,21,24
31:14 48:15,23
49:13 51:15
79:24 124:20
167:4
**roles** 48:6
**Rona** 49:10
**Ronnie** 78:20
**room** 46:7 110:7

110:13,13
**rooms** 51:2
**Ross** 119:22,23
119:24,25
134:23 146:13
146:20 216:4
217:24 229:9,9
229:21 230:12
230:24
**rosters** 191:24
**rough** 58:23
59:4 219:6
221:7
**RPR** 255:4,24
**RTI** 67:16
**rubric** 31:21
222:7
**rule** 142:11
255:12
**rules** 11:21
127:12 255:12
**ruling** 128:1
**rulings** 173:14
**running** 6:9
**rush** 146:5

———————
**S**
———————
**S** 2:1 3:8
**S-a-u-h** 94:22
**safe** 49:24
**Saline** 4:6 255:3
255:5,24
**Sam** 15:21 16:19
17:2,20 117:4
117:6 118:2
234:14
**sample** 101:16
216:14
**sampling** 218:20
**sat** 217:16
**save** 57:18
**saw** 13:10 94:5
177:11,11,24
183:13 219:23
220:3
**saying** 15:22
16:19 17:9
18:13 29:18

Springer, Joy 5/15/2020                                                          Little Rock School District v. Pulaski County Special School District, et al

54:12 64:14
66:14 73:10
79:14 82:20
90:13 110:19
115:10 118:15
119:18 131:14
131:15 134:13
135:2 136:6,19
137:9 141:4,7
141:17 142:1
143:10 148:6
155:17 157:8
158:15,24
161:11 163:9
179:14 181:25
182:3,8 183:18
186:5 193:23
199:5 200:8,23
204:21 209:14
211:9,12,15,24
211:25 232:12
234:14,16
239:16 247:12
**says** 59:17 95:20
98:15,18,22
104:9 146:13
148:17,18
165:12 166:8
172:8 176:1,15
177:8 178:5,12
178:12 179:24
208:3,4 215:3
216:15 217:14
217:23 229:10
236:9 237:11
**scanned** 190:11
**scenes** 77:22
**scheduled**
166:23
**Scholars** 86:21
86:25 223:18
223:19
**scholarships**
45:10,15
**school** 1:3,5 2:18
5:12 13:15
15:24 16:21
17:4 20:4 21:1

23:6,8 24:18
25:19 26:4,10
26:19,20,21
27:1,2 28:1
32:4,15 33:3
35:2,3,16,21
36:1,5,7,9,13
36:14,16,18,18
37:2,4,5 39:2,3
39:17 40:22
41:1,6,15 42:8
42:9,10 43:21
43:25 45:11
46:24 57:22
58:1,15,24,25
59:22 61:25
62:1 69:10
70:3,15 71:21
76:10 83:16,22
86:8 87:24
89:22 92:21
94:5 107:10,11
107:15,17,24
108:8,18 109:1
111:21,25
112:1,5,16
113:3,10,15,17
114:1 121:25
122:12 130:22
134:11,25
135:15,21
136:14 148:4
153:2 158:3,17
162:5,15 163:5
164:15 165:8
170:16,17
172:11,20
177:11 178:19
179:18 181:3
183:13,21
184:2,5,8,9,18
185:1,23
191:24 193:8
193:11 209:11
214:18,25
215:3,4,9,9
216:18,23
217:10,17

218:1,4,6,7,15
218:16,25
219:11 220:13
220:14,20,20
220:24 221:22
221:24 222:2,3
223:10 225:24
231:4 232:3,9
235:11,12
237:3,12,16
239:12 242:19
248:21 249:1
249:19,22
251:18
**school's** 217:16
**schooled** 32:1
**schools** 10:9,11
23:12 31:7
33:7 35:4
56:14 60:12
80:10 83:21,25
84:3 85:17,18
86:5,20 87:5
107:14,15
111:20 112:15
112:15,17
114:5,7 134:22
175:24 214:21
218:9,19 221:3
221:23 222:4
222:18 223:13
223:15 229:12
232:2 240:5
243:21 248:16
248:20 249:1,2
249:22,25
250:13,14,17
**scientifically**
236:12
**Scifres** 208:5
**scope** 191:6,11
191:14
**scores** 192:2,2
241:4,12,19
243:5,7
**Scott** 2:19
114:25 115:3
123:3 172:17

174:2 181:20
186:14 187:1
196:11 200:5
202:18 205:20
206:16 210:21
213:5 224:10
225:4 226:5
227:23 238:2
243:25 245:3
**screen** 22:21
30:15 65:3
**scribbled** 94:24
95:11
**SEAL** 255:22
**second** 38:25
54:20 96:16
102:9 175:10
197:10 202:5,9
203:22 204:24
207:1,6 229:2
233:22
**Secondary**
93:17 175:17
176:1
**section** 95:19,21
96:18 104:10
185:14 194:17
195:6,22 196:4
203:1,1,4,4,6,6
203:8,11,17,19
203:23 204:4
228:25
**sections** 203:1
**secure** 231:7
**see** 16:10 51:25
55:24 62:17
65:3 67:15
72:15,16 79:21
83:8 95:10,20
96:7,19,24
97:16 98:3,17
101:24 110:19
110:20 112:9
112:22,23
115:21,23
119:10,11
120:21 128:23
129:10 137:17

144:3 167:1
170:12 175:17
178:5 182:15
184:23 193:22
195:23 204:4
205:8 206:11
208:1,4 210:23
211:3,3,5,16
214:12 216:5,7
217:14 218:12
219:3,13
220:11 222:13
222:25 235:21
235:22 236:18
241:8 242:7,10
243:4 246:5
247:18 249:5
251:6
**seeing** 74:18
173:11
**seeking** 63:24
64:3
**seen** 9:25 78:10
81:21 90:6,13
103:11 121:2
126:22 137:24
138:4 141:18
141:18 171:18
172:7 173:1,5
174:7 183:2,5
183:9,15,16,19
236:8,16 243:7
243:8
**segregation**
224:4,7,24
225:2,23
226:16 227:9
235:21 236:7
236:14,22
237:8,22 238:1
**select** 230:22
**Selig** 2:13
**send** 8:9 118:5
**sending** 60:19
**sense** 168:23
191:6,11
193:24 218:22
221:13

sent 13:7,10
  14:20 54:6,9
  70:11 71:3
  89:18 102:10
  102:15 118:3
  169:18 232:11
  234:14
sentence 148:23
  208:4,7,15
  213:19
separate 15:5
  65:19 73:16
  122:3 220:8
series 247:1
serve 26:5
served 30:11
  46:16 167:25
service 26:17
  77:9
services 52:9
  60:7,8 67:5
  104:15 163:21
  164:5,11,14,23
  165:9 242:21
serving 48:15
  50:21,23
session 101:5
sessions 37:12
set 24:8 151:11
  209:4 210:18
  217:20 218:11
  255:10
setting 118:7
settings 151:8
settlement
  172:14
seven 23:13,18
  31:3
Shannon 52:5
share 13:23 24:1
  29:5 65:3
  90:14 132:14
  145:21 182:4
  222:10,13
  223:1 230:14
shared 21:8
  23:16 60:18
  81:13 90:22,24

91:23 93:8
103:4 131:8
145:20 152:13
159:21 190:12
210:3 231:14
sharing 152:14
Sharon 121:13
  121:14,16,17
  121:19,21,23
  122:10,10,14
sharp 245:14
Shawn 79:18
  152:10
sheet 192:24
  253:6 254:1,3
sheets 98:4 99:3
Sherman 104:22
shift 45:23 63:7
  69:23
ship 156:7,8,9
  156:10
shocked 247:19
short 57:17
shorter 154:23
shorthand
  255:10
Shortly 240:20
shots 22:21
show 12:11,14
  57:5 92:13
  111:12 124:13
  128:21 129:17
  139:24 141:11
  141:15,16,19
  141:21 146:24
  147:6,11
  148:15 150:20
  167:23 200:12
  200:22 219:7
  220:16 243:9
  249:20
showing 10:10
  65:9 71:1
  81:22 88:3
  219:4
shown 131:3
  142:2
shows 120:10

129:12 149:23
side 123:9
  176:16,22
sidestep 117:11
sign 149:13
  252:3
SIGNATURE
  253:1 254:25
significant
  242:15,16
significantly
  243:22
similar 21:4,8
  22:11 37:5,10
  66:20,20 76:23
  80:20,23,23,24
  93:9 133:2
  212:14 213:23
  214:13 218:9
  220:3
simple 73:6
single 61:1,6
  165:18
sir 13:2 28:11
  83:13 115:25
  124:17 139:4
sister 26:7 41:3
  41:5,11,25
  43:12
sit 13:5 18:21
  29:10 33:7
  44:7 90:11
  91:15 104:3,7
  140:5,13 141:2
  145:22,24
  154:2,3 201:4
  218:24 221:18
  248:19 249:18
  249:21
sitting 62:4
  90:16 140:18
situation 28:22
  62:6,18,18
  65:14 67:20
  69:24 71:7,17
  142:19 169:1
situations 74:4
six 22:18 224:3

229:10
Sixteen-minute
  84:25
sixth 229:10
skip 178:3
slash 95:20
  96:19 98:15
small 101:16
Smart 96:25
  97:4,12,20,22
Smith 4:5 30:13
  30:17,25 31:7
  31:14,16,18
  32:11,12 52:5
  52:6 78:19
  79:3 80:20
  81:24 86:12,13
  86:20 88:3
  89:20 91:8,8
  92:17,25 94:9
  98:3 100:24
  115:18 119:4,6
  119:11 167:4
  179:24,25
  180:2 184:17
  194:7 221:10
  223:19 255:4
  255:24
Snapchat 6:12
social 6:7,11,19
  6:21,24 22:18
  23:2,2
society 158:17
solely 26:9
solicited 160:4
solution 137:23
somebody
  139:19 149:6
  149:12 164:23
  172:24
soon 111:16
  233:16
sooner 154:24
sorority 26:17
  29:20 44:22
  45:16 77:9
  144:14
sorry 34:8 40:20

45:5 48:18
56:20 64:13
80:4 95:7
99:16 101:13
105:20 110:1
113:13 114:18
135:13 147:15
155:23 166:3
168:15 170:2
171:6,24 176:4
178:25 180:20
181:24 186:24
188:23 199:8
229:17,17
233:24 247:23
sort 8:11 20:20
32:7 36:22
37:1,19 38:7
39:9 46:25
50:5,8 57:12
59:9,16 68:1
68:14 69:1,4
74:24 81:19
87:15 97:10
99:7 100:7
111:2,12
112:10 132:7
135:20 138:24
142:20 151:14
158:12 192:2
218:1 231:12
231:13 239:20
sound 9:2
sounds 31:10
103:16 105:25
107:4 122:17
178:18 191:9
193:25 209:14
238:21
speak 95:25
99:21 108:15
speaking 7:21
10:19 75:15
83:22 87:15
121:17 197:21
205:17
special 1:5 5:12
13:15 15:23

16:21 17:4
20:4 24:18,24
25:19 26:4,10
26:19 32:15,17
32:20 41:1,2
41:15 43:20
45:11 50:4
57:8,22 58:1
62:1 64:12
104:15,15,16
121:24 136:14
149:18,19
170:8,18
172:20 181:2
209:11 232:9
251:18
**specific** 27:9
28:16 43:2
55:7 63:16
75:18 91:14
100:12 124:3
130:20 151:21
153:3,8 166:3
167:13 184:10
189:2,3 191:13
213:6 241:11
244:21 248:20
**specifically**
27:12 28:19
64:16 78:4
80:7 99:12
102:8 141:10
195:16 244:20
**specifics** 130:7
**speculate** 97:17
**Spell** 79:4
**spent** 56:15
112:8
**spoke** 108:14
**spray** 175:5
**Springer** 1:10
4:1 5:1,8 6:2
6:10 7:16 8:4
9:23 11:7,16
13:5 14:23
33:25 53:7,19
71:2 85:2 89:3
89:13 116:14

117:3 123:21
130:14 131:9
139:8 144:9
155:16 157:13
160:7 161:20
162:2 174:5,10
186:20,25
216:11 224:17
225:14,19
226:8 228:5,11
236:2 238:4,6
245:13 246:2
251:21 253:2
**Springer's**
124:20 147:13
147:17
**ss** 253:15 255:2
**stack** 174:15
**staff** 13:15 32:22
37:2 44:12
60:12 66:7
69:12 150:23
153:7 155:9,9
191:24
**staffing** 39:18
93:18 150:17
150:19 151:4,6
151:7,18,22
152:4 155:10
155:11 175:17
176:1,11
**standards** 31:1
**stands** 95:14,14
**start** 80:1
106:15 114:20
131:15 132:9
139:13 145:3
218:11 235:7
**started** 91:16
126:5 159:10
220:14 223:24
**starting** 58:24
133:14,22
**starts** 110:24
204:17
**state** 5:25 6:9
31:8 39:1 48:7
48:15,22,24

49:4,8 50:2,21
51:15 75:12
76:5 156:25
157:9 169:10
199:10 233:13
239:7 240:5
242:17 253:14
253:18 255:2
**stated** 23:25
44:3 119:15
126:17 127:25
186:2 192:6
204:8 206:20
255:6
**STATES** 1:1
**Station** 23:9
249:9,10,25
250:9
**statistics** 57:8
192:1
**status** 45:21
87:10 129:11
131:12 145:17
146:2,10
**stayed** 172:20
**steering** 90:21
90:25 91:10
156:7 231:24
231:25,25
233:17
**stemming** 71:11
**step** 73:8
**Stephanie** 70:17
**stick** 109:4
**stimulation**
152:13
**stipulation**
151:24 152:7
**stop** 139:14
232:12
**stopped** 168:24
232:11
**storage** 188:3,4
188:18,24
189:9,12,13,17
189:25 190:18
191:3,8,20
192:5,12,19,23

193:7,15 247:2
**straight** 72:5
**strategic** 218:15
219:24 220:4
**strategies** 85:9
**strategist** 133:13
**strategy** 85:12
**Streat** 70:18
**Street** 2:4,20 6:5
**strike** 48:22
171:6
**strong** 53:7
**student** 28:5
29:9 31:22
35:5 36:10
56:25 61:14
62:15 65:11,17
66:25 69:5,6
71:4 72:5,23
74:9,18 95:20
98:15 100:15
104:12 119:17
119:21 120:1,2
120:7,13 126:4
126:19 129:2,4
131:25 133:21
142:15,16
143:12 146:11
165:7 171:20
172:9 173:3,7
176:3,11 177:4
178:17 179:10
203:12,13,17
203:20,23
224:6,8,25
225:2,25 227:9
229:1 235:13
237:7 244:8,19
**students** 25:24
26:3,18,21,22
27:5,7,9 28:4
28:16 29:11
30:15 31:2,6
33:12 37:9,9
41:16 45:10,14
60:11 63:9,13
63:16,24 64:3
67:4 68:5

71:25 72:8,12
74:14,22 75:18
76:15 77:11
80:15 86:14
98:16,16,23
99:14,14,19,20
99:25 100:10
104:14 110:9
120:6 133:18
134:25 142:22
162:4 164:4,9
164:10,22,25
177:7,22 178:3
178:15 179:6
231:9 237:20
237:21 240:12
240:17 241:1
241:20
**stuff** 11:14 86:3
**Subcommittee**
165:14 166:13
**subject** 15:11
23:11 30:5,22
96:14 117:9
215:8
**subjects** 151:14
**submitted** 108:4
181:4 187:9
**subpoena** 11:2,3
**SUBSCRIBED**
253:17
**subsequently**
35:22
**substantive**
15:17
**substitute** 42:7
**substituted** 42:8
**Succeeds** 244:9
244:19
**sue** 34:13
**sued** 34:7,9,11
**suggest** 199:22
**suggests** 201:7
**suit** 48:17
156:13
**Suite** 1:24 2:4,10
2:14 4:8
**sum** 86:21

summarize
104:5 105:1
summarizing
102:16
summary
109:22 180:7
182:25
summer 28:15
127:22 129:22
superintendent
126:1 128:1
137:2 149:8
150:22
superintenden...
148:1 158:4
superintendents
149:10
supervision
156:25
supplement 29:3
146:7 200:2,5
200:11,14
201:21,25
236:15
supplementati...
127:13
supplemented
186:16,22
196:15,25
214:22
supplementing
198:5
support 13:22
109:16 128:17
185:12 186:7
186:10 194:15
195:4 201:8
204:2
supported 196:2
supposed 56:2
57:4 99:8
104:18 129:10
137:20 138:22
153:7 156:10
184:22 189:18
193:6 230:3,5
230:11 231:1,6
231:7 232:4

238:11
sure 14:11 20:14
21:23 22:1
24:6 25:21,24
28:21 29:4
32:2 33:9
34:24 40:8
42:22 45:13,13
49:24 55:19
60:7 62:12,20
65:7 68:25
74:3,6 76:13
79:21 87:20
88:1 90:10,15
91:7 92:7
93:13 96:1,9
97:17 100:21
101:25 105:18
106:7 111:23
112:9,13
113:21 117:18
118:9 120:23
124:18 127:14
129:13 132:6
133:17,22
134:24 135:20
136:2 150:3,7
150:22 155:20
163:7 164:1
167:20,21,24
171:15 172:15
179:12 184:9
184:20 191:5
199:10 201:1
201:23 204:19
207:17,25
208:22 209:17
212:7,10
215:24 219:17
219:19 226:24
237:17 238:13
238:20 239:3,3
239:24 243:23
248:7,12 250:1
surely 165:1
survive 49:25
62:4
suspended

142:22
suspending
142:11
suspension
71:12 72:23,25
75:2 142:16
143:2
suspensions
72:9 137:15
142:23
sustained
146:22,23
switch 122:20
swore 199:10
sworn 5:3 49:9
165:20,24
166:19 253:17
Sylvan 41:15
70:2,3 71:14
94:16 95:19
98:20 112:13
119:2 249:10
249:14,16
250:12
symptoms 175:3
system 60:14,20
60:22 68:6
229:12 244:5
systematic
229:11

_____ T _____
T 3:8
tab 175:8
table 16:8 85:3
174:15
tablet 48:11
144:20
tacked 169:21
take 12:6 13:18
14:1 15:3
20:24 21:18
36:5 46:4
48:13 49:5
53:5,9 55:7
58:19 67:17
72:9 73:7,23
83:3,15 84:18

84:21 85:7
103:17 107:1
123:4,14,22
132:25 133:10
135:17 136:1
136:16 137:20
140:22 144:3,5
149:19 154:7
154:15 157:18
158:6,13,16
159:16 161:14
161:20 162:10
167:20 172:13
175:5,10 186:5
186:8 197:2
214:19 222:5,7
230:11,17
245:3 246:15
take-home
227:6
taken 4:3 10:11
19:1 30:23
47:12 49:10
51:7 55:25
56:1 72:4,8
73:11,14 74:19
77:8 118:8
142:18 147:21
149:15 150:12
152:2 153:16
160:3 171:1
189:3 214:1
236:24 253:3
255:10,17
takes 32:8 47:25
66:18 68:9
135:21 150:8
158:21 186:7
talents 52:20
talk 28:15,17
29:13 33:8
35:1 48:5
49:13 68:23
78:4 106:10
107:12,18
108:22,25
109:2,5,20
131:20 140:6

152:14 153:20
175:11 179:12
214:17 229:13
235:17
talked 19:15
36:4,17 67:16
75:10,11,14,15
75:17,18 91:24
109:11 110:17
111:13 137:7
142:4 146:21
147:3 149:22
151:7 167:3
194:20 241:18
241:18
talking 20:14
23:21 25:18
31:15 36:1,23
44:13 53:12
56:9,10 60:15
62:12 68:10
90:16 91:17
96:19 98:17
105:19 106:7
107:10,15
110:10 111:2,4
111:18,21,24
113:14 116:18
119:14 126:12
126:14 134:14
144:22 145:3
148:18,21
154:19 159:3,5
159:9,10,15
163:20 178:22
210:2 212:15
212:15 225:20
242:22 247:8,9
248:14
talks 53:8
130:16 134:23
151:18
task 50:7 103:8
150:12 177:7
tasks 86:6
103:22
taught 35:6 38:6
41:7 67:14,15

Springer, Joy 5/15/2020                                                    Little Rock School District v. Pulaski County Special School District, et al

tax 45:20
Taylor 222:1
teach 31:7 41:9
  42:13 237:6
teacher 30:12,16
  31:2 32:3 35:2
  35:3,4,9 36:4,8
  36:17,21 37:12
  42:7 66:10
  94:20 95:18
  98:12 100:2,4
  100:9 109:19
  109:19 136:6
  142:14 151:12
  167:9,11 168:4
  177:16,20
  179:4,6
teacher's 95:10
teachers 33:7,9
  36:21 37:1
  39:20 44:11
  59:3 66:5,18
  67:12 76:10,15
  76:16,23
  107:10 108:23
  109:1,5,20
  110:5 132:6
  133:16 135:15
  137:17,19,25
  138:6,11 139:5
  142:4,5,8,10
  151:25 231:8
  231:11
teaching 33:12
  35:5 36:10,12
  41:6 43:6
  132:6 168:5,17
  168:25
team 31:5 44:5
tecum 11:3,6
telephone 19:23
  20:2,3,5 21:23
tell 5:3 15:11
  16:12,16 17:8
  27:4,11,18,19
  27:23 30:20
  31:24 43:4,24
  47:24 52:7

57:24 59:12
65:1 66:10,20
71:21 80:18
88:19 90:19
93:12,25 94:19
94:21,22 99:4
101:6 109:3,23
120:22 129:13
131:23 132:15
134:4 143:7
154:2,25
187:11,25
196:9 213:20
219:21 240:18
244:20
telling 18:13
  43:14 85:6
  90:18 132:23
  142:8 150:21
  188:12 190:21
  234:13
tells 83:19 85:14
  143:17
ten 7:22,24
  10:24 24:3
  30:18 32:13
  33:15 78:13,22
  79:1,14,16,22
  80:1,6,9 99:8
  104:6 168:1
  229:2
ten-minute
  245:4
tendency 25:7
tenure 165:4,6
Teresa 70:9,10
term 33:6 50:19
  146:21
termed 154:20
terminated
  34:20 151:3
  155:13
terms 50:20
  179:10 229:6
  230:20
test 227:6 241:4
  243:5,7,15,15
  243:19

testified 5:5
  16:17 22:9,19
  40:3 67:1
  155:3,8 162:2
  163:14 164:3
  180:5 181:1,21
  182:23 185:25
  187:6 205:12
  226:25 236:25
  248:3 250:19
testify 40:5
  124:22 125:24
  153:17 211:22
  225:9 226:14
  226:17 237:24
  238:7
testifying 241:3
  247:4
testimony 18:9
  30:6 39:12,18
  39:22,24 40:14
  127:11,22
  129:21 130:5
  133:7 136:4
  137:2,3 153:25
  159:8 160:4
  164:6,8,19
  166:22 184:11
  190:8 191:10
  195:24 202:11
  215:21 216:2
  225:14 228:17
  237:9 238:14
  240:4 253:7
Testing 239:8
text 14:25 15:6,6
  15:8,9,12,14
  15:17 16:2,10
  16:13,18 18:3
  18:6,9,14,16
  18:17,19 19:7
  19:12,15
texts 16:24
thank 5:25 8:25
  14:8 24:2,5,7
  26:2 52:19,24
  53:14 54:1
  73:24,25

114:24 116:1,2
116:22,23
136:20 161:6
171:5 193:9
226:19 245:20
251:24,25
theirs 8:22
therapy 110:9
thereof 199:23
thereto 255:14
thing 8:11 19:6
  21:10 30:23
  36:22 38:7
  39:9 50:2
  111:6 112:10
  125:6 130:1
  134:16 138:24
  143:12,13,14
  151:5,15 152:9
  158:1,8 169:21
  234:11 237:5
things 10:16
  13:6 16:2
  18:25,25 24:13
  27:14 31:18
  32:1 38:2 47:1
  47:22,24 48:3
  49:25 50:5,7,9
  54:5 56:1 57:4
  57:13 59:17
  61:24 68:15
  69:1 73:17
  74:24 76:12
  80:17,19,23,25
  80:25 81:1
  85:20,22 86:8
  86:10,11,19,19
  87:3,5,5,12,15
  87:20 92:12
  97:6,6 102:21
  104:4 108:8,10
  109:3 125:18
  126:3 127:4,5
  127:10,17
  128:4 129:12
  130:1 131:8,16
  131:21,24
  132:7 136:22

137:5 138:1,20
139:7,13,17
140:6,19 141:8
141:12,13
142:19,20,20
143:4 145:22
145:24 146:16
147:6,19,21,22
147:25 151:19
152:14 153:3,3
153:8,9,12,13
153:21,23
154:7,14 156:4
156:18,23
158:7,8,13
169:6,6 172:13
177:11,12
191:25 193:20
193:21 194:21
199:12 202:19
218:2,2 223:25
231:11,12,13
235:7 239:4
248:7
think 8:20 9:9
  11:13 12:3,9
  13:8,11 14:3
  16:17 17:6,11
  20:13 22:15
  26:3,11 28:7
  29:11,15 30:2
  30:22 33:16
  36:8 39:9
  41:13,16,19
  43:4 46:18
  47:1,3,19
  49:18 51:19
  52:6,10 53:11
  54:5,8 55:5
  57:17 59:11
  61:16 62:13
  63:18,20 64:6
  64:8,9 67:16
  70:6 73:25
  76:18,20 79:6
  79:20 83:11
  84:10 87:17
  88:5,5 89:23

Bushman Court Reporting                                    Janess Ferguson Smith                                           501-372-5115

Springer, Joy 5/15/2020

Little Rock School District v. Pulaski County Special School District, et al

Page 288

90:17 92:2,6
95:5 98:12
102:23,23
103:21 104:7
105:7,19 108:9
108:16 109:8,9
113:1 118:2
119:14 122:1,4
122:25 124:2,9
126:22 127:4
131:16 134:19
138:9 139:16
139:18 144:5
145:5,25 146:3
146:6,20,22
147:7,12
148:19 151:8
153:8,19,23,24
154:1,3,4,6
155:13,19
156:3,22 160:2
162:9,13
163:14 164:2
166:18 168:4,7
168:8,10,11
169:2,2 172:21
173:20,23
174:5,13
178:20 181:24
186:1 193:23
195:10 197:6
199:13 202:10
202:15,22,24
205:11 207:19
207:21 209:24
210:1 212:21
213:1,5,6,8,25
216:3 221:15
221:15 222:14
223:25 224:9
224:12,16,19
225:9 227:15
228:2 230:8
231:3,17,18
233:13,19
237:23 238:8
238:17,20
241:24,25

242:14 245:9
246:5,9,10
248:22,22,25
249:2,15,21
250:9 251:15
**thinking** 62:17
66:6 68:5,21
69:11 70:15,19
90:12 91:14
146:3 154:13
**thinks** 226:16
**Third** 1:24 4:7
**thoroughly**
253:3
**thought** 39:22
43:7 61:8,9,10
63:2 64:13
91:18 140:11
155:2 164:20
179:2 225:16
233:5
**thousand** 151:8
151:9
**thousands** 13:19
13:25
**three** 17:12
20:23 95:6
98:9 105:24
119:8,10,13,16
176:21 197:17
206:24
**time** 7:20 10:19
10:22 12:5
13:18,24 14:1
15:12,20,21
16:3,14 18:1
18:15,18 19:21
19:22,23 20:5
20:6,10,11,15
20:19 21:17
23:21 24:19
26:2 27:22,24
28:25 29:2,6
30:7 31:17
32:5 33:17
34:16 35:16,18
38:16 41:20,23
42:17,20,23

43:9 46:22
47:7,25 49:10
51:8 53:13
56:15 57:18
59:14 61:21
66:17 69:16
72:11,18 78:14
80:2 81:9,18
81:19,21,22
82:12,15,21,24
83:8 86:15
87:9,19,21
88:2,20 94:1
96:15 102:20
103:3,11,25
106:21,25
107:23 108:13
108:22 112:8
112:18,20
113:1,7,11,16
113:19,23
114:16,22,22
115:14,15,20
117:3,6 120:23
122:18,25
123:4 125:25
129:4 131:17
133:9 140:7
146:24 147:8
153:11 154:4,6
156:22,24
158:6 159:10
167:22 168:9
168:23 173:22
175:4 176:1,7
177:8,19,25
178:4,9,16,20
179:3,7 183:12
190:9 194:24
196:14 197:5
198:13 202:24
205:13 207:22
219:3,4,7,10
219:14,15,21
219:22 220:9
221:4,24 222:9
222:23 223:11
223:16,20

231:22,23
232:6,6 233:3
233:19 235:6,6
239:6,10,12
240:2,18 241:5
241:7,10 243:6
244:15 247:21
247:24 248:4
248:12,12,15
248:19 249:17
250:18 251:2
255:10
**timeframe** 80:5
**timely** 11:12
**times** 17:12 20:7
38:15 68:11
72:2 96:8
117:23 162:15
162:19,23
164:21 197:17
205:23 220:9
221:8,12
250:20 251:1
**title** 46:11 47:2,8
47:9,10
**titled** 175:15
**today** 5:11 13:6
18:9 29:10
40:7 55:21
62:4 90:11,16
91:15 104:4,7
124:19 126:11
144:12 145:15
145:22,25
148:21 160:9
160:16 183:3
188:13 201:4
215:15 227:18
246:2 247:18
248:20 249:18
249:21
**told** 29:4 42:15
42:17,20,23,25
43:4,7 54:5
66:5,7,11,11
69:12 134:1
135:11,15
136:17 142:21

188:2 213:25
226:24 227:15
232:22 238:17
241:6 248:25
249:3
**tomorrow**
115:11
**top** 82:13 98:18
98:22
**topic** 122:4
**topics** 60:1
**total** 167:24
**totally** 51:17
149:14,20
150:25
**tours** 250:4,5,8
250:10
**track** 67:9
**train** 31:18,20
**trained** 33:10
**training** 31:16
32:5,7,10,16
33:1,14 37:12
37:13,19,24,25
96:3,4 97:10
97:14 100:7
137:21 235:25
236:5 239:14
239:17
**transcribed**
255:8
**transcript** 253:3
253:5 255:13
**transcription**
254:9
**transcripts**
117:8
**transferred**
189:20,21,24
190:18,22,24
191:1,2 192:15
192:16,20,22
192:25
**transitioned**
86:4
**transmissions**
222:12
**transpired**

Bushman Court Reporting

Janessa Ferguson Smith

501-372-5115

Springer, Joy 5/15/2020

Little Rock School District v. Pulaski County Special School District, et al

47:24 147:25
169:5,6 215:18
**tread** 28:9
**Treasurer/Sec...**
167:14
**treated** 60:12
**treating** 11:3
**treatment** 60:4
**trial** 10:22 12:14
13:1 28:15,25
29:13 78:14
124:22 196:20
227:8
**tried** 43:4 147:7
207:21
**true** 57:24 161:3
163:24 237:14
253:6 255:7
**trust** 14:19
**truth** 5:4,4,4
**truthful** 216:1
**try** 18:23 19:3
28:4 49:12
68:25 107:1
114:3 117:11
140:15 153:20
165:2 177:5
215:25 216:1
**trying** 12:15
17:14,17 27:10
28:23 41:13
43:3 52:21
58:18 62:17
63:18,20 73:22
74:1 77:11
88:14 90:4
92:7,9 100:22
109:21 114:8,9
114:11 118:16
118:17 119:13
122:9 134:18
135:5,8 137:6
158:23 162:13
168:7,16,23
178:19 186:18
191:6 192:9
193:20,21,24
194:4 197:8

198:22 199:5
200:22,22
204:10 209:13
213:6 218:21
221:13 226:12
227:20,22,24
239:5 242:6,7
242:7,10 243:3
243:4,5,10
**tryouts** 119:1,3
119:7,12,20
**Tuesday** 51:3
166:24
**turn** 9:24 10:2
54:17 93:6
96:16 98:9
113:6 118:22
169:13,17
180:4 193:18
**turned** 62:9
89:12
**turning** 169:10
**turns** 61:20
62:15
**twisting** 195:23
**Twitter** 6:13
**two** 14:24 15:15
19:14,17 45:18
49:23 87:2
90:21 93:11,15
93:16 94:14
97:5 102:14
105:24 115:12
177:22 202:4
203:4 206:23
216:3 220:8
221:14
**two-day** 11:19
**two-year** 239:1
**type** 7:24 32:10
37:12 53:8
56:22 93:22
94:4 120:6
133:15 137:23
143:19 220:24
224:13 229:15
229:23 230:21
238:4 251:21

**typed** 7:25
**types** 31:18 60:1
**typically** 108:25

_____
**U**
**UALR** 238:18
**Uh-huh** 101:19
245:19
**unbelievable**
135:14
**understand** 12:7
14:18 17:13,17
23:16 24:10
28:11 29:10
32:3 33:10,18
36:3 37:23
40:8 42:22
49:2 51:6
52:21 55:20
59:20 63:10
64:22 68:10
69:15 73:9,9
73:11 74:1,3
75:20 81:6
82:11 87:1
88:14 90:4,11
90:15 92:11
96:17 103:7
117:12,15
124:24 127:12
127:18,21
136:19 138:22
139:10 148:6
149:17 150:2
155:6 156:17
157:7 158:23
160:1,8,13
163:8 177:5
178:10 181:24
186:18 187:1
201:1 204:19
205:23 216:15
234:2 236:24
240:8,13
243:11
**understanding**
48:19 49:1
51:12 62:11

71:17 92:12
124:20 134:17
136:3 140:17
157:9 163:1
165:16 172:16
173:14 177:12
184:15,24
203:7 207:23
209:12 229:5
255:9
**understood**
230:20
**undertaken**
229:3
**unemployed**
49:19
**unfair** 211:19,23
**unheard** 149:20
**unitary** 123:7,25
124:14 128:5
131:12 145:17
146:2,10
151:20 228:9
**UNITED** 1:1
**University** 91:21
230:9 232:7,13
232:15 233:10
234:5,21
241:17
**unloaded** 219:23
**unnamed** 95:18
**unnecessary**
213:8
**uphold** 199:11
**uploaded** 220:4
**upset** 213:7
**use** 7:5,15,18 8:3
8:7,11,16,22
12:25 37:20
58:21 112:2
146:21 158:14
177:2 179:22
179:23 208:17
208:25 209:20
212:11 215:21
215:25 219:15
222:19 223:6,9
232:25 233:6,9

233:12,15
234:4,13,15,21
**usually** 20:5
50:11 190:23
190:23
**utilized** 31:21
187:22
**utilizing** 85:10

_____
**V**
**vague** 156:16
158:23 159:7
**valid** 236:12
**value** 199:24
200:1
**varied** 99:4
**varies** 167:18
**variety** 54:5
**versed** 244:14
**versus** 7:16 8:3
61:25 96:5
242:24
**vestige** 224:24
**vestiges** 224:4,7
225:1,23
226:15 227:8
**videos** 21:4,7
22:10
**violated** 171:19
172:8 173:2,6
**violation** 228:25
**violations** 226:7
**visit** 14:17 21:14
21:17 83:9
109:4 111:17
222:8 249:7,7
**visited** 10:10,10
10:11 113:2
114:5 248:17
248:21 249:22
250:17
**visiting** 10:12
**visits** 10:8 23:12
84:3 106:14
111:18 214:20
214:25 215:4,9
215:9 221:11
**visual** 97:1,2,4

97:12,23
**Vocational-Te...**
165:14
**volunteer** 26:8
**vouch** 161:19
**VS** 1:4

**W**

**W** 7:12 8:11
23:3 35:20
59:8 60:25
61:18,22 62:2
62:7,14 63:12
63:15,23 64:2
65:19 66:3
73:20 74:8,12
74:13 77:10
79:17 86:2
88:6 95:13
106:19 107:3
154:7
**W/F** 94:24 95:11
**wait** 65:21
**waiting** 64:9
**walk** 99:18
**Walker** 7:12,17
7:18,23 8:3,8
8:11,19 9:1
23:3 35:20
46:9 47:3,9,11
47:15 50:20
51:22,23 58:18
59:7,8 60:25
61:18,22 62:2
62:7,14 63:12
63:15,23 64:2
66:3 68:12
73:15,20 74:8
74:12,13 77:10
78:1,19 79:17
79:19 85:6
86:2 88:6
92:18 93:2,3
97:15 106:19
107:3 112:4
116:14 121:13
121:14,17,19
121:23 122:10

122:14 150:21
151:4 154:7
155:10 163:24
**Walker's** 6:4
8:14 9:5,7,12
165:5
**Walker,P.A**
65:19
**Walkers** 121:16
122:11
**want** 9:4 10:14
12:12,14 15:3
17:8 19:10,15
20:14 21:1
27:6 29:18
30:4,6 32:13
38:13 40:8
45:23 46:1
48:12 52:25
53:9,18 57:16
59:3 62:20
63:7,13 64:16
74:3 77:19
78:7,11 80:6
85:11 87:2
90:14 92:12
97:17 98:9,21
102:7 115:7,15
115:20 117:11
117:12,15
122:20,21
123:13 124:18
124:23 127:17
127:21 136:2
138:13 146:3
150:14 154:3,4
154:22 157:12
158:25 161:10
163:7 175:5
177:4,5 182:20
182:21 187:11
194:21 199:3,4
207:16 211:13
213:20 215:20
215:23 228:23
238:13 245:13
247:5
**wanted** 24:6

41:8 43:5,8
81:6 105:18
106:7 117:17
140:13 156:5
158:7 216:14
229:5
**wanting** 73:11
99:21
**wants** 78:7
83:10 153:19
**Warren** 15:9,15
16:14 18:10,20
91:8 104:22
106:2 107:17
133:8,10 134:9
134:14 149:5
222:2
**Warren's**
104:24
**wasn't** 10:25
11:11 23:18
62:9,16 117:20
140:25 141:8
168:12 173:12
179:1 182:12
187:7,12
205:12 223:7
238:20
**wasting** 197:5
**watch** 119:3,7
119:19
**watching** 172:25
**water** 46:6
188:20 190:3
**way** 22:11 28:14
48:21 50:16
51:17 56:23
61:4 73:2 81:8
89:25 100:1,10
100:19 101:7
126:2 131:18
139:8 158:15
193:13 215:22
218:23 239:22
**we'll** 7:22 83:11
83:11 84:18
88:4 104:1
109:4 115:23

122:4 144:6
177:18 193:18
201:21 219:7
226:18
**we're** 11:2 12:18
12:20 14:19
20:14 23:20
29:23 36:23
40:7 55:21
107:10,15
130:1 140:1
145:3 148:11
153:22 154:12
165:11 167:2
176:2 193:20
193:21 196:12
196:18 197:4
200:22 202:15
211:8,11,14,14
211:15,25
228:4,10,10,13
230:19 238:2,3
**We's** 75:18
**we've** 5:10 56:15
60:16 75:14,15
75:16 87:8
103:12,13
107:3 139:1
141:1 144:5
145:15,24
149:21 185:24
186:15,15
197:24 198:19
**wear** 48:7 52:20
75:11,22
**weather** 188:5
**website** 165:12
166:8 219:11
219:17,25
220:21
**Webster's**
148:17
**week** 162:14,17
162:19 163:10
163:12
**weeks** 162:19
**weight** 110:7
**went** 35:16,19

35:21 37:1
68:20 74:4
93:24 94:1
102:12 108:12
108:13 109:8
110:16 114:7
177:10 179:22
191:23 210:5
217:17 219:1
219:24 220:4
222:4,18 223:6
223:9,15
248:25 249:3
249:10 250:9
250:20
**weren't** 23:5
161:11 193:15
196:10 201:10
219:10 231:16
231:19 233:6
234:15,17
235:4
**West** 1:24 2:10
2:14,20 4:7
**whirl** 110:10
**white** 95:14,15
95:18 98:16,25
99:14,19
100:16,20,25
101:2
**Whitfield**
104:22 107:16
**widened** 241:21
**Williams** 2:13
105:15,16
106:5
**witness** 4:2 5:2
10:5 53:11
54:19 65:5
70:21 104:2
105:10,12
115:2,9 116:3
116:8,11,22
118:25 122:9
123:15 125:4
161:5,7,13
172:3 174:23
174:24 187:2

Springer, Joy 5/15/2020

Little Rock School District v. Pulaski County Special School District, et al

Page 291

197:3,6,11
198:16,22
199:1,3,9,15
200:19,21
204:21 205:11
211:4,20,24
212:6 214:3,7
214:23 218:5
226:23 246:5
246:12 253:9
**WITNESS'**
253:1
**woman** 52:20
**women** 133:2
**wonderful** 30:23
50:16
**wondering**
49:20
**Wood's** 174:2
**Woods** 177:16
**Woodyard** 2:13
**word** 32:2
125:16 146:23
147:1 152:16
158:15
**words** 57:16
86:15 211:8
**work** 6:3 26:14
35:1,19 36:4
42:5,12,14
45:18 47:17,17
51:9,10,14
52:4,5 53:1
63:9,11 64:24
65:17 68:20
69:5 71:18
75:15 77:6,9
85:25 88:9,22
115:10 132:24
133:11 140:16
223:19
**worked** 7:12
36:14,18 37:14
38:11 41:5
42:1,10 54:25
55:6 76:16
223:22
**working** 36:21

42:18,20 43:1
48:21,24 49:4
63:6 77:9
85:21 106:1
141:11,22
**works** 40:16,25
41:12,14,15,16
45:22 50:17
107:11 141:25
**workshops**
36:21 46:25
**world** 138:14
**worms** 247:5
**worried** 161:15
**worry** 198:24
199:2
**worth** 191:10
**wouldn't** 94:12
100:6 117:21
134:4 140:15
173:16,19,20
**wrap** 165:3
**wrapped** 114:11
**Wrigley** 78:20
**write** 58:20
96:22 140:10
246:3
**writing** 180:17
180:22 181:8
**writings** 89:19
**written** 86:17
94:25 95:11
100:4 126:13
127:19 131:13
**wrong** 86:17
142:7 143:24
231:20
**wrote** 97:21,23
100:2 205:4

---
**X**
---
**X** 3:1,8

---
**Y**
---
**y'all** 13:7 56:13
81:10 204:14
**Y-o-l-a-n-d-a**
105:11 106:4

**Y-o-l-a-u-n-d-...**
105:16
**yeah** 12:2,7
26:11 36:8
45:13 46:14
48:20 53:3,11
58:17 59:22
63:2 65:8 70:5
71:9,16 83:11
84:18,23 89:11
92:18 110:3
111:7 116:9
118:18 122:13
123:5,13,16
125:1 160:21
161:23 162:6
165:21 168:13
169:13 185:19
186:8 198:1,16
202:1 220:6
226:5 227:22
249:16 250:5
251:5
**year** 32:22,25
34:17 35:8,10
36:7,9,10,16
42:8,10,15
50:20,22 58:9
58:15,24 59:22
60:25 61:5
62:21 81:15,21
81:23 82:5,22
83:20,23 88:4
89:22 92:20,21
111:19,22,25
112:1,5,12,16
113:10,15
114:1 139:14
151:9 157:4
162:3,15 169:4
169:7 170:16
170:17 183:14
183:21 184:2,5
184:8,9 188:22
189:1,11,14
190:1,5,10
192:17 193:8
193:11 215:3

218:16,25
220:20 221:8
221:22 235:12
242:22,22
248:21 249:2
249:19,23
**years** 7:14,14,22
7:24 10:24
13:14 30:18,18
31:3 32:13,19
33:15 35:10
36:1,5,20,24
38:4 39:17
42:4,5 44:13
62:19 72:12
75:7 76:7
78:14,22 79:1
79:14,16,22
80:1,6,9 103:5
104:6 131:18
153:10,16
158:22 159:3
159:12 163:2
168:1 169:3
170:12 173:1
184:18 185:24
191:9 214:25
220:14 223:23
236:25 239:22
241:9 243:1
**yesterday** 10:1
**Yolanda** 105:10
106:1
**Yolaundra**
105:15 106:5
**Yolundra**
104:22
**York** 79:23
**Youth** 166:9

---
**Z**
---
**Zoom** 4:3 5:18

---
**0**
---

---
**1**
---
**1** 3:10 9:21,24
19:17 20:24

24:8 98:15
102:19 103:20
183:7,10 208:6
254:7
**10** 3:14
**10:02** 4:8
**1020** 2:20
**1035** 2:4
**11** 3:15 98:25
99:19 104:9
235:16
**113** 3:11
**118** 3:12
**11th** 177:13
**12** 3:15 98:24
99:19 235:16
**13** 11:8
**13th** 11:5 71:1
**14** 235:15
**14-'15** 170:16
**15** 1:11 104:21
105:24 214:4,5
214:6,9,11
215:11,16
237:10
**150** 58:22 59:21
60:24 61:4
62:21,25 162:3
**15th** 4:4 253:4
255:22
**16** 233:20
237:11,18
**16-'17** 113:20
183:21 184:17
194:1,18
**162** 3:4
**168** 3:12
**17** 180:13
181:13
**17-'18** 184:17
220:13,23
**1723** 6:5
**17th** 49:9
**18** 102:19
103:20 170:15
170:17 215:2
249:8,8
**18-'19** 89:23

Bushman Court Reporting

Janessa Ferguson Smith

501-372-5115

113:10,19
114:1 184:5,18
217:10 220:2,4
220:10 235:11
249:22 250:13
**1800** 2:14
**19** 49:10 51:7
103:17,21
104:3 144:23
145:3 171:24
184:9 237:18
**19-'20** 42:10
89:24 92:22
111:21,25
184:8 217:22
218:25 219:24
220:9 235:11
248:22 249:1
**1989** 34:21,21
**1990** 34:19
**1991** 34:21
**1992** 46:10,17
46:19 171:9
173:13
**1999** 239:6
**1st** 114:21

———————
**2**
**2** 3:10 54:14,18
102:8,14 254:8
**20** 72:12 153:10
153:10 162:23
173:1 185:9,18
185:19,22
194:13,23
195:3 200:1
220:22
**20,000** 28:22
**200** 58:22 59:21
60:24 61:5
62:21,25
**2000** 44:14
61:21 62:16
74:16 92:1
104:10 107:8
125:12 130:24
137:18 144:10
156:21 157:19

159:17,25
164:12 172:21
180:20 181:9
185:14 191:19
194:17 195:6
195:22 196:4
203:2,5,8,11
204:4 213:3
215:6 216:24
220:17 229:8
235:14 244:3
**2000s** 44:14
**2001** 35:25
238:18
**2004** 44:14
**2010** 10:23 30:7
30:8,11 47:7
78:14 79:2
104:1 192:18
**2010-'11** 193:2,8
193:14
**2011** 124:5
125:13 126:10
126:18 131:13
131:14 144:10
192:18
**2014-'15** 170:13
**2015** 233:20
**2016** 71:1 94:17
113:8 114:21
116:5 177:13
177:17 188:21
198:12,15
**2016-'17** 183:13
189:11 194:12
214:25 220:13
220:23
**2016-17** 93:18
175:17
**2017** 113:8
114:21 116:7
120:21
**2017-'18** 184:2
215:1
**2018** 17:15
64:17 65:10
89:8,23 91:23
169:25 170:4

190:10 230:10
231:16 238:17
**2018-'19** 3:14
42:8 215:3
216:7,15,18
217:14 218:6
**2018-2019**
112:16 113:15
249:19
**2019** 9:1,17
17:15 83:23
169:14 183:10
**2019-'20** 3:14
218:12,16
**2019-2020**
248:21
**2020** 1:11 4:4
10:14 11:8
17:6 22:4,7
89:10 130:15
169:12 183:7
194:24 253:4
253:19 255:22
**22** 202:5,9
203:22 204:17
204:20,25
205:6 207:25
210:22
**22's** 202:5
**22nd** 65:10
**23** 98:24,25
207:25
**24** 180:13
**247** 3:6
**25** 7:14 62:19
**252** 3:13,13,14
3:14,15,15
**26** 185:8,17,19
**27** 202:3,6,7
203:23
**28th** 9:1,17
**29** 7:14

———————
**3**
**3** 3:11 93:4,6,11
93:14 94:15
101:10,15
254:9

**3-20-17** 3:12
**3-26-19** 208:5
**30** 173:1
**30(e)** 255:12
**302** 1:24 4:8
**30th** 89:9 130:15
**31st** 116:6
**3200** 2:10
**323** 2:4
**34** 48:8,16 75:13
**3rd** 49:9 164:17

———————
**4**
**4** 3:11 82:9,12
113:4,6,19
114:17,20
247:20,24
**4:00** 233:24
**4:30** 252:4
**4:82-CV-00866**
1:4
**425** 2:10,14
**4th** 89:8

———————
**5**
**5** 3:2,12 168:2
224:3
**5-7-20** 3:10
**501(c)(3)** 45:21
**501.372.5115**
1:25
**504** 63:25 66:23
**5367** 116:10
**5367-1** 82:13
**54** 3:10
**5404-12** 89:6
**5577-2** 89:7
130:15 131:4
131:10

———————
**6**
**6** 3:12 118:20,23
224:24 225:15
228:18
**60** 168:8,9,11
**62** 168:9
**620** 1:24 4:7
**6th** 94:17

———————
**7**
**7** 3:13 228:24
229:22
**7-12** 252:1
**72201** 1:24 2:5
2:11,15,20
**72206** 6:6
**7th** 13:7 21:9
23:17 81:13
89:18 90:1
91:13 93:8
98:1 101:12,20
101:21 102:4
114:21

———————
**8**
**8** 3:13
**89** 34:20
**8th** 10:14 11:17

———————
**9**
**9** 3:10,14 204:17
205:1,7 206:3
206:8,13,15,24
207:5,10,14
208:4 209:19
213:18,21
**90** 35:25
**91** 34:19
**93** 3:11