IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

LITTLE ROCK SCHOOL DISTRICT, *et al.*                          PLAINTIFFS

VS.                          CASE NO. 4:82-CV-00866 DPM

PULASKI COUNTY SPECIAL SCHOOL
DISTRICT, JACKSONVILLE/NORTH
PULASKI SCHOOL DISTRICT, *et al.*                          DEFENDANTS

EMILY MCCLENDON, TAMARA EACKLES,
VALERIE STALLINGS, TIFFANY ELLIS,
and LINDA MORGAN                          INTERVENORS

| | |
|---|---|
| Austin Porter Jr., No. 86145<br>PORTER LAW FIRM<br>323 Center Street, Suite 1035<br>Little Rock, Arkansas 72201<br>Telephone: 501-244-8220<br>Facsimile: 501-372-5567<br>Email: Aporte5640@aol.com<br><br>Attorney for Intervenors | M. Samuel Jones III., No. 76060<br>Devin R. Bates, No. 2016184<br>MITCHELL, WILLIAMS, SELIG,<br>GATES & WOODYWARD, PLLC<br>425 West Capitol Avenue, Suite 1800<br>Little Rock, Arkansas 72201<br>Telephone: 501-688-8864<br>Facsimile: 501-918-7864<br><br>sjones@mwlaw.com<br>dbates@mwlaw.com<br><br>Attorney for Pulaski County Special School District (PCSSD) |
| Robert Pressman<br>22 Locust Avenue<br>Lexington, MA  02421<br>Telephone: 781-862-1955<br>Email: pressmanrp@gmail.com<br><br>Attorney for Intervenors | Scott P. Richardson, No. 2001208<br>McDaniel, Wolff & Benca, PLLC<br>1307 West 4th Street<br>Little Rock, Arkansas 72201<br>Telephone: 501-954-8000<br>Facsimile: 866-954-1601<br><br>scott@mwbfirm.com<br><br>Attorney for Jacksonville/North Pulaski School District |
| Joyce Raynor Carr<br>JOHN W. WALKER, P.A. | Jay Bequette, No. 87012<br>Cody Kees, No. 2012118<br>Bequette Billingsley & Kees, P. A. |

| 1723 S. Broadway<br>Little Rock, Arkansas 72206<br>Telephone: 501-374-3758<br>Facsimile: 501-374-4187<br><br>jraynorcarr@gmail.com<br><br>Attorney for Intervenors | 425 West Capitol Avenue, Suite 3200<br>Little Rock, Arkansas 72201<br>Telephone: 501-374-1107<br>Facsimile: 501-374-5092<br><br>jbequette@bbplaw.com<br>ckees@bbplaw.com<br><br>Attorneys for Pulaski County Special School District |

<u>INTERVENORS' BRIEF IN SUPPORT OF THEIR
MOTION FOR RELIEF FROM THE ORDER</u>

## TABLE OF CONTENTS

Page

ISSUES PRESENTED ……………………………………………………..        iv

CONTROLLING AUTHORITY ……………………………………………        v

INTRODUCTION ………………………………………………………….        1

STATEMENT OF FACTS …………………………………………………        2

STATEMENT OF LAW …………………………………………………..        2

CONCLUSION …………………………………………………………….        23

CERTIFICATE OF SERVICE …………………………………………..        25

## ISSUES PRESENTED

1.  WHETHER THE COURT'S REASONING IS BASED ON A MISTAKE OF
    FACT THAT ENTITLES THE INTERVENORS TO RELIEF FROM THE
    ORDER THAT WAS ENTERED HEREIN ON JANUARY 28, 2022?

    Intervenors: Yes.
    Defendant: No.

2.  WHETHER COUNSEL FOR THE INTERVENORS WERE OBLIGATED TO
    DEFEND THE COLLATERAL ATTACK ON *PLAN 2000*, MAKING THEIR
    TIME AND EFFORT COMPENSABLE, EVEN ON THOSE CLAIMS THAT
    THEY DID NOT SUCCEED ON?

    Intervenors: Yes.
    Defendant: No.

3.  WHETHER THE INTERVENORS' CLAIMS INVOLVED A COMMON CORE OF
    FACTS OR WERE BASED ON RELATED LEGAL THEORIES, WHICH MAKES
    COMPENSABLE EVEN THE CLAIMS THAT WERE NOT SUCCESSFUL?

    Intervenors: Yes
    Defendant: No.

<u>CONTROLLING AUTHORITY</u>

<u>CASES</u>:                                                                                                            <u>Page</u>

*Association for Retarded Citizens of North Dakota, et al. v. Schafer, et al.*,
    83 F.3d 1008 (8th Cir. 1996) …………………………………………………   16

*Bryant v. Jeffery Sand Co.*, 919 F.3d 520 (8th Cir. 2019) ……………………………   12

*Collins v. Thomas, et al.*, 649 F.2d 1203 (5th Cir. 1981) ……………………………   5

*Dependahl, et al v. Falstaff Brewing Corporation, et al.*, 653 F.2d 1208
    (8th Cir. 1981). ……………………………………………………………………   21

*Frazier v. Iowa Beef Processors, Inc.*, 200 F.3d 1190 (8th Cir. 2000) ………………   21

*Gates v. Collier*, 616 F.2d 1268, 1272 (5th Cir. 1980). ………………………………   5, 8, 15,
    21

*In re: Guidant Corp. Implantable Defibrillators Products Liability Litigation
– Gaydos v. Guidant Corporation*, 496 F.3d 863 (8th Cir. 2007) ……………………   3

*Jenkins, et al. v. State of Missouri, et al.* 115 F.3d 554, 560 (8th Cir. 1997) …………   16, 17, 18
    19, 20

*Johnson, et al. v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) …….   9

*Plyler, et al. v. Evatt, et al.*, 902 F.2d 273 (4th Cir. 1990) ……………………………   16

*Preston, et al. v. Thompson, et al.*, 565 F.Supp. 294, 297 (N.D. Ill. 1983). …………..   4

*Roesch v. Lawrence P. Ryan, D.D.S, M.D., et al.*, 841 F.Supp. 288
    (E.D. Missouri 1993) ……………………………………………………………   8

*R.W.T., K.M.R., and T.S.C., et al. v. Dalton, et al.*, 712 F.2d 1225 (8th Cir. 1983) ….   20

*Sanders v. Clemco Industries, et al.,* 862 F.2d 161 (8th Cir. 1988).

*Spain v. Mountanos*, 690 F.2d 742 (9th Cir. 1982). …………………………………   4

*Townsend v. Terminal Packaging Co.*, 853 F.2d 623, 624 (8th Cir. 1988) …………..   3

<u>Publications</u>:                                                                                                    <u>Page</u>


King, *Letter from the Birmingham Jail*, April 16, 1963 …………………………..          6

Clermont and Schwab, *Employment Discrimination Plaintiffs In Federal Court:*
    *From Bad to Worse?* 3 Harv. L.& Pol'y Rev. 1 (Winter 2009) …………….          10



<u>Rules</u>:                                                                                                             <u>Page</u>


FRCP Rule 60(b)   …………………………………………………………..          2

<u>Introduction</u>

This class action school desegregation case commenced in 1982, when the Little Rock School District (LRSD) sued the Pulaski County Special School District, North Little Rock School District, and State Authorities contending that state authorities and said districts committed constitutional violations that resulted in white students fleeing from the LRSD, resulting in said school district becoming resegregated.   Joshua Intervenors later renamed McClendon Intervenors joined in said lawsuit in order to protect the rights of African American students and parents of said school districts.  The parties entered  into a consent decree (*Plan 2000*) in November 1999 to govern the school districts' obligations toward African American students.   After years of litigation, and prodding from the intervenors, on May 6, 2021, the Court entered an order finding that the Pulaski County Special School District had obtained unitary status, with the exception of its facilities' obligations, relative to the Mills High School project.  The Court directed the Pulaski County Special School District to come up with a plan that will make the Mills High School campus equal to that of the Robinson Middle School.  The Jacksonville/North Pulaski School District was found unitary, with the exception of the requirement of completing implementation of its 2018 Facilities Master Plan, as modified.  [**Doc. #5730, p. 67**].

The Intervenors were the prevailing parties, in that the Pulaski County Special School District was declared unitary, except with the Mills High School/Robinson Middle School inequity.  The Court directed the parties on May 6, 2021 to attempt to resolve the issue of attorney's fees.   The Intervenors and Jacksonville/North Pulaski School District resolved the issue of attorney's fees.  However, the Intervenors and Pulaski County Special School District were not able to resolve the issue of attorney's fees.  On September 15, 2021, Intervenors filed their first motion for attorney's fees, and the district filed a response in opposition. On January 28, 2022, the

Court entered an Order on attorneys' fees and costs, based on errors of facts and law, and the Intervenors are entitled relief from this Order pursuant to Rule 60(b)(1) & (6) of the Federal Rules of Civil Procedure.

Statement of Relevant Facts

The Intervenors and Pulaski County Special School District (PCSSD) attempted to resolve the attorney's fees issue, but were unable to do so.  One of the sticking points in the negotiations was the PCSSD's request to pay the attorney's fees over time.  The Intervenors objected to this request, as well as other issues, and filed its motion for attorney's fees and costs.  In the Court's Order, it stated that the PCSSD requested that it be allowed to pay the attorneys' fees in twelve (12) monthly installments.  The Court adopted this installment plan, stating that the "Intervenors have not objected to this arrangement."  This is in error.  This was a major point of contention between the parties in their negotiations, which the intervenors objected to.  The Intervenors specifically stated in their reply brief: "[t]he PCSSD is requesting that this court should spread out the fee award over a period of twelve (12) months.  Intervenors should not have to wait to be paid their attorney's fees."  [**Doc. # 5763, p. 7**].  The Intervenors are also objecting to the reduction of hourly rates as well as the reduction in hours for their legal team.

Statement of Law

<u>Rule 60(b)</u>

Rule 60 provides in pertinent part:

(a)     **Corrections Based On Clerical Mistakes; Oversight And Omissions**.
The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice.  But after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave.

(b)     **Grounds for Relief From A Final Judgment, Order, or Proceeding**.

2

On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

> (1)      mistake, inadvertence, surprise, or excusable neglect;
> . . .
> (6)      any other reason that justifies relief.

"To prevent its use as a substitute for a timely appeal on the underlying merits, a Rule 60(b) motion must be made within thirty days of the judgment if the alleged error could have been corrected by appeal of that judgment.  Townsend v. Terminal Packaging Co., 853 F.2d 623, 624 (8th Cir. 1988) (*per curiam*); Chester v. St. Louis Hous. Auth., 820 F.2d 259, 260 (8th Cir.) (*per curiam*), *cert. denied*, ___ U.S. ___, 108 S.Ct. 236, 98 L.Ed.2d 195 (1987).  Sanders v. Clemco Industries, et al., 862 F.2d 161, 169 (8th Cir. 1988).

> The denial of a Rule 60(b) motion is reviewed for an abuse of discretion.  Noah v. Bond Cold Storage, 408 F.3d 1043, 1045 (8th Cir. 2005).  'We will find an abuse of discretion only when the district court's judgment was based on clearly erroneous fact-findings or erroneous conclusions of law.'  *Id.*  'Reversal of a district court's denial of a Rule 60(b) motion is rare because Rule 60(b) authorizes relief in only the most exceptional of cases.'  Id. (*quoting* Int'l Bhd. of Elec. Workers v. Hope Elec. Corp., 293 F.3d 408, 415 (8th Cir. 2002)).

In re: Guidant Corp. Implantable Defibrillators Products Liability Litigation – Gaydos v. Guidant Corporation, 496 F.3d 863, 866 (8th Cir. 2007).

In the case at bar, the Court allowed the PCSSD to pay the attorney's fees in twelve (12) monthly installments.  This is an abuse of discretion.  In essence, the district court is allowing a violator of civil rights to determine when and how attorney's fees are to be paid.

> One of the acknowledged aims of Congress in passing §1988 was to encourage private actions to enforce civil rights statutes in cases such as this one where the appropriate relief is injunctive rather than monetary.  The Senate Report quoted with approval the following language from Newman v. Piggie Park, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968):

> > When a plaintiff brings an action under [Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a-3(a) 1976)] he cannot recover

> damages.  If he obtains an injunction, he does not for himself alone
> but also as a 'private attorney general,' vindicating a policy that
> Congress considered of the highest priority.  If successful plaintiffs
> were routinely forced to bear their own attorney's fees, few
> aggrieved parties would be in a position to advance the public
> interest by invoking the injunctive powers of the federal courts.
> Congress therefore enacted the provision for counsel fees [42 U.S.C.
> § 2000a-3(b) (1976) to encourage individuals injured by racial
> discrimination to seek judicial relief under Title II.

S.Rep. No. 94-1011.  94th Cong., 2d Sess. (1976), reprinted in 1976 U.S. Code Cong. & Ad.
News 5908, 5910.

Preston, et al. v. Thompson, et al., 565 F.Supp. 294, 297 (N.D. Ill. 1983).

The PCSSD is being allowed to delay the payment of attorneys' fees.  The McClendon

Intervenors are entitled to have their attorneys' fees paid promptly, and *with interest*, which will

be discussed later.  "Given the purposes of § 1988, it would be anomalous to permit the state in

effect to reduce the attorney's fees award by withholding payment for a considerable length of

time."  Preston, et al. v. Thompson, 565 F.Supp. 294, 298 (N.D. Ill. 1983), *citing*, Spain v.

Mountanos, 690 F.2d 742, 748 (9th Cir. 1982).

When the State of California refused to pay attorney's fees that the court awarded, the 9th

Circuit held that the district court had the power to order state officials to withdraw the funds from

the state coffers.

> However, under the extraordinary circumstances here where the judgment is
> against a state, which refuses to appropriate funds through the normal process
> provided by state law, the district court should not necessarily be reduced to
> satisfying a judgement through the cumbersome procedure of attempting to execute
> against state property or bank accounts.  It may, instead, pursue any remedy
> provided in Rule 69 or Rule 70 to enforce the award, including ordering state
> officials to pay the claim.

Spain v. Mountanos, 690 F.2d 742, 745 (9th Cir. 1982).

"We agree with the Fifth Circuit that a state cannot frustrate the intent of section 1988 by setting

up state law barriers to block enforcement of an attorney's fees award."  690 F.2d at 46.

4

In another case, the plaintiff instituted litigation against the State of Mississippi over the conditions at Mississippi's Parchman Penitentiary.  The litigation started in 1971, and in 1974, the court found that the practices of the prison violated the constitution.  The court also awarded attorney's fees pursuant to 42 U.S.C. § 1988. However, the State of Mississippi refused to pay the attorney's fees.  The State of Mississippi contended that state law prohibited the satisfaction of any judgment, unless the legislature approved the appropriation.  "The issue here is not one of judicial confrontation with the state.  It is one of *implementation* of a Congressional mandate. . . Congress has declared that states and their officials who violate federal civil rights laws must reimburse the successful plaintiff for costs incurred in seeking redress." Gates v. Collier, 616 F.2d 1268, 1272 (5ᵗʰ Cir. 1980).  The State of Mississippi took the position that the Court could order them to pay the attorney's fees, but they were not going to pay.  "[W]here a state expresses its unwillingness to comply with a valid judgment of a federal court, the court may use any of the weapons generally at its disposal to ensure compliance. '[F]ederal courts are not reduced to issuing [judgments] against state officers and hoping for compliance." *Id*. at 690, 98 S.Ct. at 2574.

When the Sheriff of Dallas County violated his deputies' civil rights by firing them, they sued.  After reaching a settlement, the Court then awarded the deputies their attorney's fees.  Dallas County tried to get out of having to pay the attorney's fees awarded by the court arguing that it was never a party to the lawsuit, and that this was the sheriff's doing, and the county should not have to pay.  The 5ᵗʰ Circuit saw it differently. "The district court's authority to award attorney's fees is established by § 1988 which is a Congressional enactment pursuant to Section 5 of the Fourteenth Amendment." Collins v. Thomas, et al., 649 F.2d 1203, 1206 (5ᵗʰ Cir. 1981).  "The County may not successfully hide behind state procedural shields to avoid the consequences of a

valid district court judgment effectuating an appropriate § 1988 award." Collins v. Thomas, et al., 649 F.2d 1203, 1206 (5th Cir. 1981).

The PCSSD relegated the Mills Construction project to that of a second-class construction project.  The Intervenors were successful in pointing out the inequities that exist between the construction of Robinson Middle School and Mills High School.  As the Court pointed out, the PCSSD is now having to spend some $19 million in order to remedy the inequities that it allowed to happen.[1]  [**Doc. No. 5780, p. 6**].  Now the PCSSD is wanting to relegate the McClendon Intervenors' legal team to that of second class as well, by having the payment of legal fees delayed.  Why should the Intervenors have to wait?   As Dr. Martin Luther King Jr. stated in his "Letter from the Birmingham Jail,"

> We know through painful experience that freedom is never voluntarily given by the oppressor; it must be demanded by the oppressed.  Frankly, I have yet to engage in a direct action campaign that was 'well timed' in the view of those who have not suffered unduly from the disease of segregation.  For years now I have heard the word 'Wait!' It rings in the ear of every Negro with piercing familiarity.  This 'Wait' has almost always meant 'Never.' We must come to see, with one of our distinguished jurists, that 'justice too long delayed is justice denied.'

King, *Letter from a Birmingham Jail*, April 16, 1963.

As this Court is well aware, undersigned counsel is engaged in a solo practice.  Lead counsel for the Intervenors has been engaged in private practice for thirty-three (33) of his thirty-five (35) years in practice., representing private citizens in civil rights cases.

> Plaintiffs who suffer discrimination and other infringements of their civil rights are usually not wealthy people.  The organization [private lawyers] who have helped them bring their cases are frequently not well financed.  The Justice Department does not have the resources to bring suit for every civil rights violation.  Thus, many people, deprived of their civil rights, may not as a practical matter be able to do anything about it.  It is not right to deny people who cannot afford to pay attorney's fees the availability of justice through our courts.

---

[1] The district's latest facilities master plan scaled this back to $15,000,000.00, which could be another point of contention.

Gates v. Collier, 616 F.2d 1268, 1274 (5th Cir. 1980), *quoting*, 122 Cong.Rec. H 12164 (daily ed. Oct. 1, 1976).

When opposing counsel submits its bill to the PCSSD for payment of legal fees, they do not have to wait.  The Court expert is allowed to submit her bill for payment, and she does not have to wait.  By the Court allowing the PCSSD to spread out its obligation to pay the prevailing party its legal fees and costs, places them in a compromised position of possibly having to rely on companies like JG Wentworth, in order to get cash now.  Such companies purchase annuities and other installment agreements possibly paying as little as .60¢ on the $1.00.

The Court has also significantly cut the customary hourly rates of undersigned counsel from $350.00 to $310.00, again stating that "[t]he requested hourly rates are too high in the circumstances."  [**Doc. No. 5780, p. 2**].  The Court's reduction of Ms. Springer's request from $137.50 to $110.00 was also an abuse of discretion.   Ms. Springer's rate is a rate that she customarily charges the clients of John W. Walker, P.A., for her services, including the Arkansas Education Association, which oftentimes hired John W. Walker, P.A., to represent teachers.  As the Court is keenly award, Ms. Springer has been a steadfast force in fighting for the rights of black children in this case for the past twenty-five (25) plus years.

As the legislative history of § 1988 makes clear, Congress believed that the awarding of attorneys' fees is critical to the enforcement of the civil rights laws. The House Report, H.Rep.No. 1558, 94th Cong., 2d Sess. (1976) (House Report) states:

The effective enforcement of Federal civil rights statutes depends largely on the efforts of private citizens.  Although some agencies of the United States have civil rights responsibilities, their authority and resources are limited.  In many instances where these laws are violated, it is necessary for the citizen to initiate court action to correct the illegality.  *Unless the judicial remedy is full and complete, it will remain a meaningless right.*  Because a vast majority of the victims of civil rights violations cannot afford legal counsel, they are unable to present their cases to the courts.  In

> authorizing an award of reasonable attorney's fees, [the proposed legislation] is designed to give such persons effective access to the judicial process where their grievances can be resolved according to law.

Gates v. Collier, 616 F.2d 1268, 1274 (5th Cir. 1980), *quoting*, The House Report, H.Rep. No. 1558, 94th Cong., 2d Sess. (1976), at 1.  (emphasis added).

In a claim involving medical malpractice, the plaintiff had elective jaw surgery, and experienced a severe injury at the hands of the dentist.  The plaintiff sued for malpractice, and the jury awarded her $550,000.00 in damages, with $380,000.00 going for future damages.  The attorney's had a 1/3 contingency fee arrangement with the client.  The State of Missouri had passed tort reformed, that allowed the defendant to have any award that exceeds $100,000.00 to be paid in installments.  The defendants even tried to get the attorney's fees paid in monthly installments over a period of three years.  The district court judge refused to do so, stating, "the Court agrees that the sum of $230,000 for attorneys' fees and expenses should be included in the amount to be paid *immediately* upon entry of the judgment."   Roesch v. Lawrence P. Ryan, D.D.S, M.D., et al., 841 F.Supp. 288, 292 (E.D. Missouri 1993) (emphasis added).

The Court's allowing a violator of civil rights to dictate the terms of the payment of attorney fees sets a bad precedent.  If a private party was found liable for violating a person's civil rights, and it was allowed to pay the judgment and attorney's fees in monthly installments, then this will not do much to deter such conduct.  Since the court is allowing the PCSSD to pay the Intervenor's attorney fees in monthly installment for one year, then will the next violator be allowed three (3) years to pay, or five (5) years to pay?  This places the court on a slippery slope. Also, this will make it even more difficult for civil rights litigants to obtain counsel.

> The statute was not passed for the benefit of attorneys but to enable litigants to obtain competent counsel worthy of a contest with the caliber of counsel available to their opposition and to fairly place the economical burden of Title VII litigation.

Adequate compensation is necessary however, to enable an attorney to serve his client effectively and to preserve the integrity and independence of the profession.

Johnson, et al. v. Georgia Highway Express, Inc., 488 F.2d 714, 719-720 (5th Cir. 1974).

One of the *Johnson* factors, talked about the "undesirability" of taking on civil rights cases. Down through the years, this Court has shared letters from people throughout the state wanting to get rid of this litigation. There have been letters in the *Arkansas Democrat/Gazette's* editorial section criticizing the lawyers handling the litigation on behalf of black children.

As a civil rights lawyer, representing plaintiff's, undersigned counsel is only able to get paid a legal fee, when he tries cases and wins them. As this Court is well aware, COVID-19 has basically brought commerce, and the court system to a screeching halt. The only jury trial that undersigned counsel had in 2020, was the case of Doris Smith v. The Arkansas Department of Finance and Administration, United States District Court No. 4:17-CV-00857 JM, which was tried during the week of June 8, 2020. That case resulted in a plaintiff's verdict in excess of $330,000.00. Then the Courts closed due COVID-19. The only case that undersigned counsel tried during 2021, was sitting as second chair in the case of Da'Vetta Flowers v. Major General Kendall Penn, United States District Court No. 4:18-CV-577 DPM, which was tried before this Honorable Court. The Flowers case resulted in a jury verdict in excess of $130,000.00. COVID-19 has made it even more difficult for lawyers representing civil rights litigants. If undersigned counsel is not trying and winning cases, he is unable to meet his financial challenges. Defense counsel take advantage of plaintiff's counsel not being able to get into court. There is really no incentive to settle, especially when getting into court to try cases is no longer an option.

Another reason why lawyers are not willing to take civil rights cases is the fact that they take so long to resolve. Employment discrimination cases take years to resolve, again with many of them being lost due to adverse summary judgment rulings. Now the Court is establishing a

precedent which will allow a violator of civil rights to delay having to pay out a jury verdict and attorney's fees.

In the *Harvard Law & Policy Review*, authors Kevin M. Clermont and Stewart J. Schwab, write about the difficulties that employment discrimination plaintiffs have in winning their cases. According to the research conducted by Clermont and Schwab, employment discrimination litigants, as compared to other civil litigants, "[m]anage fewer resolutions early in litigation, and so they have to proceed to trial more often.  They win lower proportion of cases during pretrial and at trial.  Then, more of their successful cases undergo appeal.  On appeal, they have a harder time both in upholding their successes and in reversing adverse outcomes."  Clermont and Schwab, *Employment Discrimination Plaintiffs In Federal Court: From Bad To Worse?* 3 Harv. L. & Pol'y Rev. 1 (Winter 2009).   Authors Clermont and Schwab also found that when the employment discrimination plaintiff wins their trial, they have a 41.10% chance of having the verdict reversed, as opposed to when the defendant wins at the trial level, they have a 9% chance of having the case reversed on appeal.  3 Harv. L. & Pol'y Rev.1, p. 10.  "For a plaintiff victorious at trial in an employment discrimination case, the appellate process offers a chance of retaining victory that cannot meaningfully be distinguished from a coin flip.  Meanwhile, a defendant victorious at trial can be assured of retaining that victory after appeal."  The authors went on to say that "[e]mployment discrimination plaintiffs constitute one of the least successful plaintiff classes at the district court level, in that they win a very small percentage of their actions and fare worse than almost any other category of civil cases."  3 Harv. L. & Pol'y Rev. 1, p. 13.

<u>Reduction in Hourly Rates</u>

"Let the elders that rule well be counted worthy of double honour, especially they who labour in the word and doctrine.  For the scripture saith, Thou shalt not muzzle the ox that treadeth out the corn.  And, The labourer *is* worthy of his reward."  **1 Timothy 5:17-18**.

In addition to significantly cutting the time spent in having to defend an attack on *Plan 2000* by 60%, which is a consent decree, the Court has also reduced the customary hourly rates of counsel for the Intervenors.  Both Mr. Pressman and Mr. Porter have worked extremely hard in advocating on behalf of African American children.  As the Court stated, "[a]ll the lawyers, including Intervenors' counsel, worked hard getting the case ready and presenting it well during the three-week bench trial held in July 2020.  Ms. Springer did too."  [**Doc. No. 5780, p. 5**].  Yet this Court has refused to award the requested hourly rates of $350.00 for both Pressman and Porter, who are both seasoned civil rights lawyers, cutting the rates to $310.00 per hour, which is just $10.00 more per hour than the hourly rate for Margie Powell, the Court's expert, who is a non-lawyer.  The Court also erred in limiting Ms. Springer's rate to $110.00 per hour, which is $190.00 per hour lower than the Court's expert, and $27.50 per hour lower than Ms. Springer's demonstrated market rate.

As previously mentioned herein, Porter has been awarded $350.00 per hour by The Honorable Brian Miller in 2018 for work that spanned over a period of time from 2014 to 2018.[2] As the Eighth Circuit stated in justifying Mr. Porter's requested hourly rate of $350.00,

> [h]e supported that statement by providing a list of recent fee awards he had obtained, including one from only a few months prior in which the same district court had concluded his $350 rate was reasonable.  Jeffery Sand has produced no

---

[2] In the case of <u>Sylvia Perkins, et al v. Joshua Hastings</u>, United States District Court No. 4:15-CV-00310, the Court awarded $350.00 per hour.  In the case of <u>Adrian Bryant v. Jeffery Sand Company</u>, 919 F.3d 520, 529 (8th Cir. 2019), both the trial court and the Eighth Circuit awarded $350.00 per hour.  Also, in the case of <u>Doris A. Smith v. Arkansas Department of Finance and Administration</u>, United States District Court No. 4:17-CV-00857 JM, Porter was awarded his customary hourly rate of $350.00.

evidence undermining the reasonableness of the rate.  The district court's decision
to accept the rate as reasonable, in light of its own experience and knowledge, was
not an abuse of discretion.

Bryant v. Jeffery Sand Co, 919 F.3d 520, 529 (8ᵗʰ Cir. 2019).

Yet without any reasoning, or justification, this Court decided that $350.00 per hour was "too

high" for this type of work, and that $310.00 per hour was more appropriate.  Undersigned counsel

understands that awarding attorney's fees is within the broad discretion of the Court, but to go

against recent awards by other judges, cuts against the grain.

Again, this Court opined that $350.00 per hour for "this type" of work is too high.  Again,

the enforcement of our civil rights laws is of the utmost importance.  The following is just a sample

of some of the cases that undersigned counsel prosecuted on behalf of civil rights litigants, who

would not agree that such an hourly rate is "too high":

- A seventy (70) year old African American marine veteran of the Vietnam War, and
  who spent 25 years serving his country in the military, was tased and hogtied while
  in court fighting a traffic ticket.  He was then taken to jail. The only crime that the
  plaintiff had been accused of committing was allegedly "eyeballing" some
  deputies, who were standing some 20 feet away against a wall. This veteran had
  done nothing wrong to warrant this type of treatment.       Colbert v. City of
  Monticello, Arkansas, 775 F.3d 1006 (8ᵗʰ Cir. 2014);

- A mother of a bi-racial child, who was being bullied, subjected to racial name
  calling, and then had his neck cut with a pair of scissors by a white child, who had
  called him the "n" word.  This child was also being discriminated against by the
  football coach, who would not allow him and other black players to get as much

playing time, as their white peers.  <u>Tonia Matthias, Individually and Next Friend to</u>
<u>Mason Jones</u>, United States District Court No. 4:11-CV-0651 BRW;

- An African American female employee who worked at a factory, and was allowed
  to work in the administrative offices on a "trial basis," where no black had worked
  in over ten (10) years.  This employee was not allowed to answer the phones,
  because she was told that the company's customers were not used to hearing an
  "ethnic voice."  This employee was also told by a co-worker on her first day in the
  administrative offices, who was tasked with the responsibility to train her, that "I
  don't like blacks, and if you stay out of my way, I may be able to tolerate you."
  Finally, when this employee noticed that her white supervisor was jumping up and
  down mimicking a gorilla behind her back, she decided that was enough, and she
  quit, left in tears. <u>Carol Fuller v. Fiber Glass Systems, L.P.</u>, 618 F.3d 858 (8th Cir.
  2010);

- When an African American male employee noticed that a white person, who was
  hired some six (6) months after the plaintiff was hired, and was making
  approximately $7,000.00 more per year than he was making, when they had the
  same title, and did the same work, with the black employee actually doing more
  work, he questioned management why that was so.  When he did not get a
  satisfactory answer, he sued.  <u>Melvin Smith v. URS Corporation</u>, 803 F.3d 964 (8th
  Cir. 2014);

- When a mother of seven (7) children was arrested, and taken to jail, and was denied
  her asthma pump, despite suffering from chronic asthma, which the jail knew, and
  later died from asphyxiation, within 24 hours of her arrest, due to not getting her

asthma pump, the family sued.   <u>Porcha Alexander, Individually and as Administratrix for the Estate of Sharon Alexander v. Pulaski County, Arkansas, et al.</u>, United States District Court No. 4:18-CV-0046 BSM

- When an African American male was walking down a street in the City of Monticello, Arkansas, and was accosted by a police officer, who ended up tasing the plaintiff, who then fell and hit his head, and suffered brain injury.  The plaintiff in this case was simply trying to get home, and the tasering happened just a few feet from his yard.  <u>Sheldon Thompson v. City of Monticello, et al.</u>, 894 F.3d 993 (8th Cir. 2018);

- When an African American male, who worked on a river barge, dredging sand, was being bombarded with racial epithets on almost a daily basis.  Despite the fact that he complained to management about it, nothing was done to remedy the situation. <u>Adrian Bryant v. Jeffery Sand Co</u>., 919 F.3d 520, 529 (8th Cir. 2019);

- When an African American female working for the State of Arkansas was denied a pay increase after the state reorganized its pay structure, and saw her white counterparts move up to a higher pay grade, making $15,000.00 more per year than what she was making.  When the plaintiff complained about it, she was ultimately terminated from her job.  <u>Doris Smith v. Arkansas Department of Finance and Administration</u>, United States District Court No. 4:17-CV-00857 JM;

- When an African American female student was expelled from school for carrying a knife to school in order to defend herself from imminent attack by other students, the mother sought out legal services, when she learned that a white male student was only given ten (10) suspension after being caught with having two (2) loaded

shotguns at school.  <u>Regan Pettus v. Lonoke School District, et al</u>., United States District Court No. 4:15-CV-627 JM.

- When a military veteran was jailed, and suffering from back problems, was unable to get out of his bunk when ordered to do so.  After not being able to get out of his bunk, the jailers tased him on three (3) separate occasions, forcing him out of his bunk.  Tasering a person for simply failing to obey an order, was not permissible under the Fourth Amendment to the United States Constitution.  <u>Dwain Smith v. Conway County, Arkansas</u>, 759 F.3d 853 (8th Cir. 2014)

Also, Intervenors' fee petition provides ample support for the $350.00 per hour for Mr. Pressman. It describes extensive school desegregation and other racial discrimination work, beginning in 1965, including participation in this case, since 1996.

The above-named plaintiffs would not agree that the hourly rates requested for "this type" of work is too high.  Victims of race discrimination in their employment endure humiliation, pain and suffering, and loss of income, because they have been denied a benefit based on their race. These clients cannot afford to pay their lawyers for the work that they do in prosecuting their claims for civil rights violations.  "Section 1988 was enacted by Congress in 1976 in response to the Supreme Court's decision in <u>Alyeska Pipeline Service Co. v. Wilderness Society</u>, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), which held that only Congress, not the Courts, could determine which laws were important enough to justify the awarding of attorney's fees under the 'private attorney general' principle."  <u>Gates v. Collier</u>, 616 F.2d 1268, 1273 (5th Cir. 1980).

<u>Reduction In Hours</u>

Not only did the Court reduce the hourly rate, the court also reduced the number of hours spent by as much as 60%.  Again, this is a clear abuse of discretion.  The actions of the Intervenors

resulted in $19 million more in construction improvements for the Mills High School campus.  As

the Court stated, "[t]his is a signal achievement."  [**Doc. No. 5780, p. 6**].   Under the False Claim

Act, the whistle-blower is typically entitled to an award of 15% to 30% of the amount involved.

An attorneys' fees award and costs, in the amount of $325,098.13 is just 1.7% of $19,000,000.00.

This is just for purposes of analogy, and not to suggest that the attorneys for the Intervenors are

entitled to 15% to 30% of the $19,000,000.00.  However, the attorneys for the Intervenors are

definitely more deserving than the paltry amount of 1.7% of $19,000,000.00.

The Court awarded the Intervenors just 40% of their time in defending *Plan 2000* from a

collateral attack by the PCSSD.

> It is generally true that status as a prevailing party is determined on the outcome of
> the case as a whole, rather than by piecemeal assessment of how a party fares on
> each motion along the way.  'Any given civil action can have numerous phases.
> While the parties postures on individual matters may be more or less justified, the
> [Equal Access to Justice Act] − like other fee-shifting statutes − favors treating a
> case as an inclusive whole, rather than as atomized line items.'  Commissioner, INS
> v. Jean, 496 U.S. 154, 161-62, 110 S.Ct. 2316, 2320, 110 L.Ed.2d 134 (1990).
> (citing section 1988 case, among others). This is true of matters decided after
> judgment on the merits, as well as those decided before. *See id*.

Jenkins, et al. v. State of Missouri, et al. 115 F.3d 554, 557 (8th Cir. 1997).

Although the Intervenors did not succeed on all of the claims, they still succeeded on the case as a

whole.  The Court agreed that the claims were "somewhat intertwined."

> Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), gives
> the paradigm for determining whether fees are compensable under section 1988 in
> cases in which the plaintiff has prevailed on some, but not all, of his claims.  If any
> issues on which the plaintiff lost are unrelated to those on which he won, the
> unreleated issues must be treated as if they were separate cases and no fees can be
> awarded.  *See id*. at 434-35, 103 S.Ct. at 1940.  If, however, the claims on which
> the plaintiff lost are related to those on which he won, the court may award a
> reasonable fee.  *See id*.  The most important factor in determining what is a
> reasonable fee is the magnitude of the plaintiff's success in the case as a whole.  *See
> id*., at 436, 103 S.Ct. at 1941; Farrar v. Hobby, 506 U.S. 103, 114, 113 S.Ct. 566,
> 574, 121 L.Ed.2d 494 (1992).  If the plaintiff has won excellent results, he is entitled

to a fully compensatory fee award, which will normally include time spend on matters on which he did not win.  *See* Hensley, 461 U.S. at 435, 103 S.Ct. at 1940.

Jenkins, et al. v. State of Missouri, et al. 115 F.3d 554, 558 (8th Cir. 1997).

In the case at bar, the Intervenors were having to defend against attacks on *Plan 2000*.  Also, the Intervenors were having to spend time monitoring the district's compliance with this consent decree.  When the district contended that it was unitary in all aspects, the Intervenors disagreed, and had to go to court to fight against these claims of unitary status.  Intervenors could not simply just walk away.

> This procedure certainly called for reasonable post-judgment monitoring.  Plaintiffs could not simply walk away from the Panel's inquiry; the district court expected them to participate.  Thus, as in Plyler v. Evatt, 902 F.2d 273, 281 (4th Cir. 1990), 'plaintiffs' counsel were under clear obligation to make the defensive effort,' and in such situations, even largely unsuccessful defensive efforts may be compensable.  *See also* Hatfield v. Hayes, 877 F.2d 717, 720 (8th Cir. 1989).

Association for Retarded Citizens of North Dakota, et al. v. Schafer, et al., 83 F.3d 1008, 1010-1011 (8th Cir. 1996) (emphasis added).

As the Fourth Circuit stated:

> Plaintiff's class had no option but to incur the related costs; plaintiffs' counsel were under clear obligation to make the defensive effort.  *See* Ustrak v. Fairman, 851 F.2d 983 (7th Cir. 1988) (civil rights plaintiff was entitled to fees in connection with largely unsuccessful appellate defense because 'he had no choice but to incur them or forfeit his victory in district court').  To deny attorney fees for such an effort, whether successful in detail or not, would obviously thwart the underlying purpose of the attorney fee provision of 42 U.S.C. § 1988.  For that reason and because the litigation in *Plyler I* involved comprehensive inquiry into 'the significance of the overall relief claimed,' Hensley, 461 U.S. at 435, 103 S.Ct. at 1940, the district court did not abuse its discretion or err as a matter of law in concluding that the matters at issue in *Plyler I* were so intertwined with the original claims that attorney's fees for work on those proceedings should be awarded as to a still 'prevailing party.'

Plyler, et al. v. Evatt, et al., 902 F.2d 273, 281 (4th Cir. 1990).

A plaintiff's attorney may engage in several kinds of post-judgment activity.  Some types of post-judgment activities are readily seen to be necessary adjuncts to the initial litigation, whereas other types of activities are more like a new, separate lawsuit and requires a fee determination independent of the underlying case.  Thus, monitoring the defendant's compliance with court orders and enforcing the remedy are generally compensable as part of the underlying case.  *See* Pennsylvania v. Delaware Valley Citizens' Council, 478 U.S. 546, 559, 106 S.Ct. 3088, 3095, 92 L.Ed.2d 439 (1986). (various monitoring and enforcement activities, including work before administrative agencies that could have adversely affected rights under consent decree); *ARC*, 83 F.3d at 1010-11; Duran v. Carruthers, 885 F.2d 1492 (10th Cir. 1989) (monitoring). We have also stressed the importance of allowing the plaintiff in such cases fees for *successfully* defending the remedy against attacks. In Jenkins v. Missouri, 967 F.2d 1248 (8th Cir. 1992) (*Jenkins Fees IV*), we said:

> [G]iven the special nature of desegregation cases withholding from the plaintiffs the means for paying their attorneys could be devasting to the national policy of enforcing civil rights laws through the use of private attorneys general.  School desegregation cases can continue for years and affect nearly everyone in the community in one way or another.  Various interventions and collateral attacks are not only predictable, but inevitable in litigation affecting so many people in so many different capacities.  Furthermore, a school desegregation case differs from much other litigation in that the main action does not result in a monetary recovery that might enable plaintiffs to finance a defense against collateral attacks on their judgments.  The only monetary award received by the plaintiffs in a desegregation case is simply payment of their attorney's fees, and its is inequitable to require the attorney for the class to defend against collateral attacks on the award.  Such service is just as much a part of the representation of the plaintiff class as obtaining relief in the first instance.  To deny plaintiffs fees in a desegregation case would be to deny them the means to respond to attacks on the remedy.

Where, however, the plaintiff asks for remedial measures that are ultimately denied, he cannot be said to be 'defending' the remedy, because the thing he sought has been declared not to be part of the remedy.  Assuming the plaintiff can still be characterized as the prevailing party in the case as a whole, the question arises whether he is entitled to fees despite his failure on the particular matter, and if so, whether the fees should be reduced to reflect his lack of success.  Under *Hensley* the first inquiry is whether the issues in the post-judgment litigation are inextricably intertwined with those on which the plaintiff prevails in the underlying suit or whether they are distinct.  The Fourth Circuit has applied this distinction to deny

fees in civil rights cases where the parties entered a consent decree and further litigation concerned contractual issues under the consent decree, not the underlying civil rights claim.  *See* Willie M. v. Hunt, 732 F.2d 383, 386 (4th Cir. 1984).  In Arvinger v. Mayor of Baltimore, 31 F.3d 196 (4th Cir. 1994, the Fourth Circuit summarized its cases on this issue:

> Thus, when subsequent litigation seeks to enforce or interpret a settlement agreement or consent decree, involving facts and principles different from those considered in the underlying litigation, the second is not considered 'inextricably intermingled' with the first.  On the other hand, a subsequent litigation initiated against the successful party to modify or 'replay' the issues of the first litigation may be so intermingled.  Plyer [v. Evatt, 902 F.2d 273 (4th Cir. 1990)] applies to carry forward prevailing party status only in this latter circumstance, and only that when the plaintiffs are forced to litigate to preserve the relief originally obtained.

*Id*. at 202.  We applied this distinction in Schafer, where we held that the plaintiffs' post-judgment activities were so much greater than would have been necessary for monitoring the decree that they amounted to the assertion of distinct, new claims for relief, which could not be compensated on the strength of the plaintiffs' prevailing party status in the underlying suit. 83 F.3d. at 1011.

Jenkins, et al. v. State of Missouri, et al. 115 F.3d 554, 558-559 (8th Cir. 1997).

The Court reduced the hours claimed by counsel as well as the hourly rates, based on "limited success."  The Intervenors were forced to defend against this collateral attack on *Plan 2000* by the districts.

For instance, in People Who Care v. Rockford Bd. of Educ., 90 F.3d 1307, 1314 (7tth Cir. 1996), the Seventh Circuit reversed the district court's denial of fees for a certain appeal.  The district court had refused to award fees because the appeal had been dismissed.  The Seventh Circuit stated:

> A court's focus should not be limited to the success/failure of each of the attorney's actions. Rather, it should be upon whether those actions were reasonable. In other words, the court should not look to whether F & H 'won' the 1990 appeal, but should instead look to whether the fees F & H requests for that appeal were reasonably incurred.

*Id*. ad 1314.  The Fourth Circuit stated that the court should consider whether the position the fee applicant unsuccessfully advocated was 'essential to the

preservation of the integrity of the consent decree as a whole.' <u>Plyler</u>, 902 F.2d at 281.

<u>Jenkins, et al. v. State of Missouri, et al</u>. 115 F.3d 554, 560 (8th Cir. 1997).

> If the plaintiffs' attorneys in extended civil rights cases must succeed on every matter they litigate, they are likely to be less vigorous in their representation of the class.  The Ninth Circuit rejected an argument that section 1988 only permit fees for phases of the litigation in which the plaintiff won:
>
>> Lawsuits usually involve many reasonably disputed issues and a lawyer who takes on only those battles he is certain of winning is probably not serving his client vigorously enough; losing is part of winning.  The County would have us scalpel out attorney's fees for every setback, no matter how temporary, regardless of its relationship to the ultimate disposition of the case.  This makes little sense.
>
> <u>Cabrales v. County of Los Angles</u>, 935 F.2d 1050, 1053 (9th Cir. 1991).  Awarding fees that were reasonably incurred, though perhaps they did not lead to a success in court, is more likely to result in responsible management of the remedial phase of desegregation suits.

<u>Jenkins, et al. v. State of Missouri, et al</u>. 115 F.3d 554, 560 (8th Cir. 1997).

The Court should revisit its decision to reduce the fee award by 60%.  The Court's decision did not take into account the Intervenors having to defend this collateral attack on Plan 2000.  Intervenors believe that allowing 75% of their time in litigation would be more appropriate considering the circumstances involved in this long-standing school desegregation case.

> <u>Interest On Attorney's Fees</u>

This Court awarded the Intervenors $319,129.38 on its attorney's fees and monitoring fees and $5,968.75 in costs, for a total award of $325,098.13.  The Intervenors are also entitled to an award of interest, both prejudgment and post-judgment until the amount is paid.

> In analyzing the nature of the interest award, it must be understood that the awarding of interest is in no sense a windfall.  Because a dollar today is worth more than a dollar in the future, 'the only way [a party] can be made whole is to award him interest from the time he should have received the money.' <u>Louisiana & Arkansas Railway Co. v. Export Drum Co</u>., 359 F.2d 311, 317 (5th Cir. 1966).

20

> Indeed, this case dramatizes the need for interest on attorney's fees if the attorneys for the prevailing party are to be adequately compensated. Most of the fees at issue in this case were awarded in 1973. Because of inflation, these awards are worth far less today than they were seven years ago. Had the awards been made in 1973, the attorneys could have been drawing interest on that amount for the last seven years.

Gates v. Collier, 616 F.2d 1268, 1276 (5th Cir. 1980).

The Court in *Gates* went on to say that, "[w]e believe that § 1988 should be liberally construed to permit the awarding of interest on attorneys' fees. Such a liberal approach finds general support both in the legislative history of § 1988 and in the various cases interpreting it." Gates, 616 F.2d at 1279.

The Eighth Circuit reversed the district court judge who refused to award interest on attorney's fees.

> [T]he District Court should, in our view, have awarded interest on the plaintiff's award of fees and costs from March 30, 1982, the date of that award. We agree with the Ninth Circuit's rationale in Perkins v. Standard Oil Co., 487 F.2d 672 (9th Cir. 1973):
>
>> In our view there exists no real distinction between judgments for attorneys' fees and judgments for other items of damages…. [O]nce a judgment is obtained, interest thereon is mandatory without regard to the elements of which that judgment is composed.
>
> *Id*. at 675. *Accord*, Copper Liquor, Inc. v. Adolph Coors Co., 701 F.2d 542 (5th Cir. 1983) (en banc) (per curiam) (interest allowed automatically on attorneys' fees and costs). Any other rule would effectively reduce the judgment for attorneys' fees and costs, because a certain sum of money paid at a certain time in the future is worth less than the same sum of money paid today. Failing to allow awards of attorneys' fees to bear interest would give parties against whom such awards have been entered an artificial and undesirable incentive to appeal or otherwise delay payment.

R.W.T., K.M.R., and T.S.C., et al. v. Dalton, et al., 712 F.2d 1225, 1234-1235 (8th Cir. 1983).

Pre-Judgment Interest

Intervenors are entitled to pre-judgment interest on the amount of $325,098.13 from the date of May 7, 2021 to the date of February 28, 2022, the question is the appropriate rate. In

deciding what was the appropriate rate of interest in a case involving ERISA, the Eighth Circuit

stated:

> A subsidiary questioned is the rate at which the award of interest should be computed.  28 U.S.C. § 1961 (1976) allows post-judgment interest on all civil judgments in federal court at the rate provided under state law.  We believe that section 1961 provides useful guidance in the area of prejudgment interest.  In the interest of uniformity, we therefore hold that while federal law governs the issue of interest and its rate, state law should be incorporated in the determination of the proper rate to be allowed, once an independent finding is made concerning whether any prejudgment interest should be awarded.

Dependahl, et al v. Falstaff Brewing Corporation, et al., 653 F.2d 1208, 1219 (8th Cir. 1981).

The Eighth Circuit also stated that it was not an abuse of discretion for the district judge to compute

prejudgment interest based on the law of Iowa, while basing post-judgment interest based on

federal law.  "Accordingly, the district court's award of prejudgment interest as computed under

Iowa Code § 535.3 and postjudgment interest as computed pursuant to 28 U.S.C. § 1961 was not

an abuse of discretion."  Frazier v. Iowa Beef Processors, Inc., 200 F.3d 1190, 1194 (8th Cir. 2000).

Under Arkansas Law, the rate of interest for prejudgment and post-judgment should be

based on the Federal Reserve primary credit rate in effect on the date of the judgment, plus two

percentage points.  Ark. Code Ann. § 16-65-114 provides in pertinent part:

(a)

> (1)     Except as provided in subdivision (a)(2) of this section, a judgment
>
> entered by a court shall bear post-judgment interest and, if appropriate
>
> under the facts of the case, prejudgment interest:
>
> (A)     In an action on a contract at the rate provided by the contract or at
>
> a rate equal to the Federal Reserve primary credit rate in effect on the date
>
> on which the judgment is entered plus two percent (2%), whichever is
>
> greater; and

> (B)    In any other action at a rate equal to the Federal Reserve primary
>
> credit rate in effect on the date on which the judgment is entered plus two
>
> percent (2%).

The Federal Reserve primary credit rate is .25%.  *See* 12 U.S.C. § 501.51(a).  Therefore, in accordance to Ark. Code Ann. § 16-65-114(a)(1)(B), the appropriate prejudgment interest rate should be 2.25%.  The Court awarded fees and costs in the amount of $325,098.13 x .0225 = $7,314.71 in interest per year, which gives a daily interest rate of $20.04.  Therefore, the amount of prejudgment interest from May 6, 2021 to January 28, 2022 (date of order) = $5,370.72.[3]  From May 6, 2021 to January 28, 2022 there are 268 days – 268 x $19.67 = $5,370.72.  Therefore, the total amount of prejudgment interest is $5,370.72.  This will give the plaintiff a total fee and cost amount of $330,468.85.[4]

### Post-Judgment Amount

The total judgment amount of $330,468.85 is based on a rate of .28.  The yearly amount of interest based $330,468.85 is $925.31 ($330,468.85 x .0028 = $925.31); this gives a daily rate of $2.53.

### CONCLUSION

In conclusion, the Court should revisit its decision to allow the PCSSD to pay the Intervenors' attorneys' fees and costs in twelve (12) monthly installments.  This is something that the Intervenors never agreed to.  Also, the court should reconsider its decision to reduce the hourly rates and the number of hours that counsel for the Intervenors have spent in defending the consent decree in this case.  The number of hours that Intervenors' team has spent was necessary in

---

[3] This is based on 268 days of interest.
[4] Intervenors believe that once the court revisits the reduction in hourly rates and the reduction in time, this amount will significantly change.

23

fulfilling its obligation to the class members to defend the consent decree.  Intervenors' legal team

has worked long and hard for their clients.  The Intervenors were successful in pointing out the

inequities that existed between the facilities at Mills High School and Robinson Middle School,

which resulted in the PCSSD being required to spend $19,000,000.00 more in trying to remedy

this inequity between these facilities.  The Intervenors are entitled to recover the full amount of

their fees in this matter, or no less than 75% of their time.  Furthermore, Intervenors are also

entitled to get the requested hourly rates of $350.00 for both Pressman and Porter, as well as the

rate of $137.50 for Ms. Springer.

Respectfully submitted,

Austin Porter Jr., No. 86145
PORTER LAW FIRM
323 Center Street, Suite 1035
Little Rock, Arkansas 72201
Telephone: 501-244-8200
Facsimile: 501-372-5567
Email: aporte5640@aol.com

Robert Pressman
22 Locust Avenue
Lexington, MA  02421
Telephone: 781-862-1955
Email: pressmanrp@gmail.com

Joyce Raynor Carr
JOHN W. WALKER, P.A.
1723 S. Broadway
Little Rock, Arkansas 72206
Telephone: 501-374-3758
Facsimile: 501-374-4187

jraynorcarr@gmail.com

ATTORNEYS FOR INTERVENORS

24

## <u>CERTIFICATE OF SERVICE</u>

I, Austin Porter Jr., do hereby certify that a copy of the foregoing pleading was electronically filed with the Clerk of the United States District Court for the Eastern District of Arkansas, on this 2nd  day of February 2022, by using the CM/ECF system, which is designed to send notification of such filing to the following person:

M. Samuel Jones III.
Devin R. Bates
MITCHELL, WILLIAMS, SELIG,
GATES & WOODYARD, PLLC
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201

sjones@mwlaw.com
dbates@mwlaw.com

Jay Bequette
Bequette, Billingsley & Kees, P.A.
Attorneys at Law
425 West Capitol Avenue, Suite 3200
Little Rock, Arkansas 72201-3469

jbequette@bbpalaw.com

Scott P. Richardson
McDaniel, Richardson & Calhoun PLLC
1020 West 4th Street, Suite 410
Little Rock, Arkansas 72201

scott@mrcfirm.com

Austin Porter Jr.