**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**LITTLE ROCK SCHOOL DISTRICT**                                                              **PLAINTIFF**

**V.**                                          **NO. 4:82-cv-866-DPM**

**PULASKI COUNTY SPECIAL SCHOOL**
**DISTRICT NO. 1, ET AL.**                                                        **DEFENDANTS**

**EMILY McCLENDON, ET AL.**                                              **INTERVENORS**

**PCSSD'S RESPONSE IN OPPOSITION TO**
**INTERVENORS' MOTION FOR RELIEF FROM ORDER**

Pulaski County Special School District ("PCSSD"), for its Response in Opposition to Intervenors' Motion for Relief from Order, *Doc. 5782*, (the "Motion") submits the following:

**I.**     **Intervenors' Rule 60(b) Motion Does Not Warrant Review**

Intervenors filed the Motion under Rules 60(b)(1) and 60(b)(6). Rule 60(b) permits relief "under certain enumerated circumstances, including the existence of 'mistake, inadvertence, surprise, or excusable neglect.'"  *See Duquette v. Pac-Perl, LLC,* 2014 WL 6908007, *1 (W.D. Ark., Dec. 8, 2014) (quoting Fed. R. Civ. P. 60(b)).  This rule "'provides for extraordinary relief which may be granted only upon an adequate showing of exceptional circumstances.'"  *Id*. (quoting *United States v. Young*, 806 F.2d 805, 806 (8th Cir. 1986)).  "'[Rule 60(b)] is not a vehicle for simple reargument on the merits.'"  *Id*. (quoting *Broadway v. Norris*, 193 F.3d 987, 990 (8th Cir. 1999)).  In *Duquette*, the court denied the plaintiff's Rule 60(b) motion, explaining, "Duquette's motion has not only failed to show any of the exceptional circumstances that would warrant the extraordinary relief provided by Rule 60(b), but has merely rehashed her prior arguments on the merits . . . ."  *Id*.

In *Thompson v. Bank of New York Mellon Trust Co.*, Judge Susan Webber Wright addressed the application of Rule 60(b), stating:

> Rules 59(e) and 60(b)
>
> are simply *not* designed to furnish a vehicle by which a disappointed party may reargue matters already argued and disposed of, nor are they aimed at providing a mechanism by which new arguments or legal theories, which could and should have been raised prior to the issuance of judgment, can be later advanced. Attempts to take a "second bite at the apple" or pad the record for purposes of appeal (especially when new legal theories or issues are not previously argued, but subsequently come to the mind of the losing party) are thus beyond the intended scope of Rules 59 and 60. Therefore, when issues have been carefully analyzed and a judgment has been rendered, only a change in the law or the facts upon which the court's decision was based generally justify a reconsideration or amendment of a court's previous order. Such motions are thus granted sparingly and properly viewed as an extraordinary remedy.

Case No. 4:13-CV-00120-SWW, 2014 WL 1887341, at *2 (E.D. Ark. May 12, 2014) (quoting *in re DEF Investments, Inc.*, 186 B.R. 671, 681 (Bkr. D. Minn. 1995)).

Rule 60(b)(1) applies only in the case of "mistake, inadvertence, surprise, or excusable neglect." U*.S. ex rel. Roop v. Hypoguard USA, Inc.,* 559 F.3d 818, 823 (8th Cir. 2009).

Rule 60(b)(6) applies only "where exceptional circumstances have denied the moving party a full and fair opportunity to litigate his claim and have prevented the moving party from receiving adequate redress." *Id*. "Reversal of a district court's denial of a Rule 60(b) motion is rare because Rule 60(b) authorizes relief in only the most exceptional of cases." *In re Guidant Corp. Implantable Defibrillators Prod. Liab. Litig*., 496 F.3d 863, 866 (8th Cir. 2007) (citations omitted). *See generally* Wright & Miller, § 2864 Other Reasons Justifying Relief, 11 Fed. Prac. & Proc. Civ. § 2864 (3d ed.).

The denial of a Rule 60(b) motion is reviewed for an abuse of discretion. *Holmes v. United States*, 898 F.3d 785, 792 (8th Cir. 2018). The Eighth Circuit has stated that it will "find

an abuse of discretion only when the district court's judgment was based on clearly erroneous fact-findings or erroneous conclusions of law." *Id*.

The Motion never fully explains, let alone develops through citation to legal authority, which specific ground under Rules 60(b)(1) or 60(b)(6) applies. Nonetheless, to the extent the Court determines that it is necessary to again review Intervenors' arguments, PCSSD respectfully submits that the Motion should be denied on its merits.

## II.   <u>The Hourly Rates Awarded to Intervenors' Counsel Are Justifiable</u>

Intervenors' counsel continue to insist on the following rates: John Walker ($450/hour), Austin Porter ($350/hour), Bob Pressman ($350/hour), Joy Springer ($137.50/hour), and monitors ($70/hour). These rates are claimed uniformly for all work performed between 2017 and 2021. The problem lies in the fact that for some of this same time period, this Court already awarded fees against JNPSD at the following rates: John Walker ($350/hour), Austin Porter ($300/hour), Bob Pressman ($300/hour), Joy Springer ($100/hour), and monitors ($70/hour). *See Doc. 5507*. In light of that precedent in this case, what Intervenors continue asking this Court to do is to bill PCSSD at higher rates than those billed to JNPSD for some of the same tasks on this same case for the same time period. If Intervenors disagreed with this Court's decision to award the 2019 rates and establish that precedent in this case, then the time to address that disagreement was by filing an appeal. No appeal was filed. And the Motion provides no justification or alternate way of rectifying what exists in this record.

To account for the record in this case, the Court used "blended rates" which the Court explained would "embody some increases, but also the fact that earlier PCSSD-related work should be compensated at the rates used for JNPSD-related work for the same period." *Doc. 5780, p. 3*. Of course, that was not what PCSSD asked the Court to do, so this was not a victory

3

for PCSSD. However, PCSSD recognizes that the Court was balancing the various requests made by the parties and fashioning an award that was thoughtful and fair. In any event, the record, mainly the Court's order on JNPSD fees, *Doc. 5507*, presents a reasonable and justifiable basis for the blended rate approach adopted by the Court. This was not error and warrants no amendment.

III.     **The Adjustment in Fee Award for the "Extent Prevailed" was Reasonable**

The Court previously directed that Intervenors are entitled to a "[r]easonable attorney's fee … for the litigation about PCSSD facilities issues, on which Intervenors have prevailed." *Doc. 5730, p. 68*. The Motion does nothing to show that focusing on this directive was legal error. Meaningfully absent from the Motion is any criticism of the methodology adopted by the Court to draw the line between monitoring and litigation, or any detailed criticism of the Court's rationale for arriving at the 40% figure on its determination of the "extent prevailed." The Motion instead mostly raises new arguments that the Court did not consider, in large part because those arguments were not made until now.

To be clear, 40% is higher than the 25% or 33% that PCSSD argued was a fair measure. *Doc. 5761, p. 5*. This is mentioned to emphasize that this was not a victory for PCSSD, but rather, reflects the Court balancing the various requests made by the parties, and fashioning an award that was thoughtful and fair. In any event, the record supports the Court's existing decision. Considering the time actually spent in the courtroom at trial, a 40% payout rate for facilities significantly overestimated the percent of litigation devoted to facilities. That is to say, the 40% payout rate was already quite favorable to Intervenors. This is true especially because the Court even acknowledged that "[a] fee award of 25 % of the amount sought would reflect

these results." *Doc. 5780, p. 6*. The Court went on, of course, to explain its pursuit of reasonableness.

The facilities litigation was certainly important, but the case that PCSSD put forward in support of its quest for unitary status on facilities in July 2020 was actually quite narrow, and was more of a legal argument than anything else. *See Doc. 5619, Doc. 5620*. Frankly, PCSSD's entire facilities case effectively fell when the Court declined to grant PCSSD's motion in limine on facilities, thus signalizing that the Court was not inclined to adopt PCSSD's "reduced to currency" argument. *Doc. 5619*. PCSSD litigated accordingly, not belaboring the point. PCSSD's case on facilities lasted one morning at trial, whereas its cases on student achievement, discipline, and monitoring were far lengthier, involving many more witnesses and documents. PCSSD intentionally did ***not*** argue that there was no inequity between Mills and Robinson, just that alternatively, there was a contractual basis on which to decide the case. The point here is not to minimize the role of Intervenors, but rather to temper their assertion, or implied assertion, that they were singlehandedly responsible for the Court's ruling on facilities.

This all illustrates that PCSSD respectfully disagrees with Intervenors' characterization of the outcome of the July 2020 trial that Intervenors litigated "result[ing] in the PCSSD being required to spend $19,000,000.00 more in trying to remedy this inequity between these facilities." *Doc. 5783, p. 30*. The Court ordered PCSSD to submit a facilities proposal due on 1 August 2021. *Doc. 5730, p. 67*. The Court did not set maximum or minimum spend thresholds, and rather, left such details to PCSSD. The Intervenors did not demand specific spend thresholds. PCSSD affirmatory put forward a plan that Intervenors disputed on its fringes, but did not substantially disagree with. *See Doc. 5776, pp. 2-3*. PCSSD did not try to determine how little it could do to get by, but rather, PCSSD did its best to put forward an impressive plan to do

everything that it could practicably do for the students at Mills University Studies High School.[1] The Court said of PCSSD's submission that "[t]he proposal as a whole is impressive, another indication of the District's strong commitment to equal educational opportunities for all students." *Doc. 5776, p. 2*. This is all to emphasize that the facilities proposal with a $19 million price tag was a product of PCSSD's good faith.

Accordingly, PCSSD rejects Intervenors' belated assertion that their fee award in this desegregation case is in any way analogous to fees awarded in whistle-blower cases. *Doc. 5783, p. 22*. The above observations about the genesis of, and intent behind, the $19 million proposal all underscore that this factual scenario does not line up with that seen in a whistle-blower case. To now award Intervenors a fee based on a percentage of the $19 million facilities proposal would effectively create a windfall in favor of Intervenors that was made larger because of the degree of PCSSD's good faith. The fact that this is not analogous to a fee award in a whistle-blower case is also made plain by the source of the funds that will be used to pay Intervenors' fee award. Because the Court found that paying for the $19 million proposal was a matter left for PCSSD to sort out without a Court prescription, *Doc. 5776, p. 3*, PCSSD will avoid getting into the details of that issue here. However, it is worth pointing out here that the $19 million facilities project is proposed to be funded using some combination of ARP funds under the direction of the Arkansas Department of Education, *Doc. 5736, p. 13, fn. 8*, and using funds from bonds. *Doc. 5736, pp. 13-14*. By contrast, the attorneys' fees awarded to Intervenors will be paid out of PCSSD's operations budget. *Doc. 5761, p. 11*. Bond laws, and restrictions on the spending of

---

[1] In July 2021, PCSSD explained this $19 million facilities proposal to Intervenors as follows: "PCSSD has made a substantial financial commitment to invest in Mills University Studies High School. The proposal is not a low-ball offer. Nor is it an opening offer. It is not a negotiating tactic. It reflects PCSSD working diligently to develop a plan to do everything that it can practicably do for Mills. This is good faith in action." *Doc. 5736-9, p. 1*.

federal ARP funds, will not allow those earmarked funds to be spent on paying attorneys fees. The point is this: diligently seeking funding sources to maximize available funds for facilities projects does not equate to excess cash in an operations budget. That, too, counsels against awarding Intervenors a large fee award because the facilities project ultimately comes with an estimated price tag of $19 million.

Finally, the intertwined nature of the issues. To the extent that the issues were intertwined, this was already adequately accounted for by the Court's existing fee award. The Court explained:

> The issues were somewhat intertwined. Though student achievement and discipline were focal points at the trial, the Mills High School/Robinson Middle School facilities issues were focal points of earlier hearings, many filings, and all the school tours. This effort spanned several years.

*Doc. 5780, p. 6.* The Court split the Intervenors' time into two categories: monitoring and litigation. *Doc. 5780, p. 8.* To do this, the Court adopted the methodology used by, and the numbers calculated by, PCSSD. *Compare Doc. 5780, p. 8 with Doc. 5761, pp. 5-8.* Intervenors have not objected to this, and even if they did, Intervenors offered no criticism or alternative. That methodology, explained in full elsewhere in the record,[2] involved the following: drawing a dividing line at the end of 2019, generally (with exceptions) classifying every billing entry prior

---

[2] *Doc. 5761, pp. 3-4.* PCSSD carefully reviewed Intervenors' entire fee petition. PCSSD sought to determine whether each billing entry was an entry about monitoring, or litigation. PCSSD employed the following analytical framework. Each time entry submitted by Intervenors was manually reviewed. Most of the time entries before 1 January 2020 were classified as "monitoring" unless the description made it clear that it was applicable to "litigation" in which case it was coded as such. Most of the time entries after 31 December 2019 were classified as "litigation" unless the description made it clear that it was applicable to "monitoring" in which case it was coded as such. If any error was made here, this end of 2019 dividing line was favorable to Intervenors, as the Court's then operative scheduling order technically opened discovery on 15 November 2019. *Doc. 5503.* PCSSD would have been justified in making 15 November 2019 the dividing line but seeking to err on the side of fairness to Intervenors, and in part because the billing entries seemed to support it, PCSSD instead used a later date.

to January 1, 2020, as "monitoring" and classifying everything after that point "litigation." This matters, because of the Court's juxtaposition of "focal points at the trial" as opposed to "focal points of earlier hearings, many filings, and all the school tours" which the Court noted "spanned several years." *Doc. 5780, p. 6*. Using the methodology described above and adopted by the Court, the Court's existing fee award effectively made all of that compensable monitoring activity. *See Doc. 5780, p. 8* (showing an award of 90% or 100% of monitoring fees). Thus, to the extent that the facilities issues predominated this case in the years prior to 2020, Intervenors were awarded payment in full for those efforts, with the exception of the 10% reductions for Rep. Joy Springer and the other monitors, whose awards were reduced for irregularities in billing practices. This all shows that the record in this case supports the Court's order, and no amendment is required to the "extent prevailed" adjustment.

IV.   <u>**Intervenors Should not Receive an Award of Interest**</u>

First of all, Intervenors never requested that the Court award interest. *See Docs. 5754, 5755, 5762*. For this reason alone, it was not error for the Court to not award same.

Further, under Arkansas law, prejudgment interest is only permitted when the amount of damages is definitively ascertainable by mathematical computation, or if the evidence furnishes data that makes it possible to compute the amount of damages without reliance on opinion or discretion. *Woodline Motor Freight v. Troutman Oil Co*., 938 S.W.2d 565 (Ark. 1997). Here, of course, the amount of fees due was contested, and the parties had to rely on the opinion and discretion of this Court to determine the amount due. The suggestion that PCSSD somehow delayed in paying and should be penalized with interest is not supported by the record. The fact that the Court awarded an amount lower than what Intervenors sought actually proves that it was not unreasonable for PCSSD to contest the award in Court. *See S. Farm Bureau Cas. Ins. Co. v.*

*Brinker*, 350 Ark. 15, 19, 84 S.W.3d 846, 848 (2002) (discussing that it would be unconstitutional to force a defendant to pay penalties and attorneys fees for contesting a claim that it did not owe, and that defendants "have the right to resist the payment of a demand that they do not owe.").

Intervenors' request for post-judgment interest should be denied for lack of ripeness. Post-judgment interest is not yet warranted by the law and the record in this case. Interpreting Arkansas law, Judge Richard S. Arnold, explained that the purpose of post-judgment interest is "to compensate the judgment creditor for the fact that he has not had the use of a certain sum of money that has been adjudged to be his." *Equifax, Inc. v. Luster,* 463 F. Supp. 352 (E.D. Ark. 1978) (quoted favorably by *S. Farm Bureau Cas. Ins. Co. v. Brinker*, 350 Ark. 15, 21, 84 S.W.3d 846, 849 (2002)). Here, the Court ordered payment of fees "in twelve monthly installments." *Doc. 5780, p. 2.* As such, each monthly payment is not due to Intervenors until it was ordered to be paid. Accordingly, Intervenors have not been deprived of any sum that belongs to them, as the Court's order shows that the judgment does not belong to Intervenors until it is due to be paid. Judge Arnold's use of the term "judgment creditor" is also telling, because the whole point behind post-judgment interest is to make a party whole when another party wrongfully fails to pay a judgment when payment is due. Here, of course, PCSSD has not delayed in paying the judgment. One-twelfth of the judgment was due on February 15, 2022, and it was paid on time. The remaining eleven-twelfths of the judgment are not yet due. The Court should deny without prejudice Intervenors' request for post-judgment interest for lack of ripeness.

At bottom, under these circumstances, mainly the fact that Intervenors did not seek fees for the better part of the past five years and have allowed the amount to accumulate into a large sum, it would be unfair to reward Intervenors with any accumulation of interest on that large

sum. But regardless, the law does not support Intervenors' requests for interest as explained above.

**V.      Both the Record, and the Court's Experience with this Case, Present Justification for the Court's Decision to Order the Payment of Fees Over Time.**

The Court stated that Intervenors did not object to PCSSD's request ordering the payment of fees over time, but Intervenors latch onto one sentence to claim that statement was error. First of all, the Court must address the issue of whether one sentence in one brief posed a meaningful objection.

The filings and briefing on the attorneys' fees issue were extensive. On September 15, 2021, Intervenors filed a Motion for Attorneys Fees, *Doc. 5754*, and a Brief in Support of same. *Doc. 5755*. On September 16, 2021, Intervenors substituted a correction of the Motion for Attorneys Fees substituting part of *Doc. 5754*. *Doc. 5756*. On October 19, 2021, Intervenors filed a Motion to Amend/Correct its Motion for Attorneys fees. *Doc. 5762*. On October 19, 2021, Intervenors filed a Reply in Support of their Motion for Attorneys' Fees. *Doc. 5763*. On October 26, 2021, Intervenors filed an "Updated Identification of Docket Entry Cites for Elements of Their Motion for Fees and Costs and Correction." *Doc. 5764*. In all of that briefing and filing, Intervenors point to only one sentence which they say is sufficient enough to develop an objection. *Doc. 5783, p. 8 (citing Doc. 5763, p. 7)*. And yet, contrary to that record, Intervenors now characterize their objection as a "major point of contention" among the parties. *Doc. 5783, p. 8*.

"[A] party wishing to raise an objection and preserve an issue for appeal must 'pu[t] the court on notice as to [its] concern.'" *Williams v. Hobbs*, 562 U.S. 1097, 131 S. Ct. 558, 559, 178 L. Ed. 2d 542 (2010) (*quoting Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 174, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988)). *See also United States v. Thornberg*, 844 F.2d 573, 575 (8th Cir.

1988) (preserving issue is matter of making timely objection to trial court and clearly stating grounds for objection, so that trial court has opportunity to prevent or correct error in first instance; it is not duty of trial court to anticipate and evaluate every possible error that might be alleged, but role of counsel to bring such matters to court's attention). One sentence in the midst of Intervenors' large amount of briefing is not enough to put the Court on notice of an objection, let alone explain to the Court the reason for the objection and allow this Court an opportunity to address it. *See e.g. Regions Bank v. Lamb*, No. 4:16-CV-00078-SWW, 2016 WL 4707995, at *5 (E.D. Ark. Sept. 8, 2016) (rejecting "a bare, one sentence objection to [a bank's] motion for an award of attorney's fees and costs" that did "not set forth any argument why [the bank] is not entitled to such an award.")." As pointed out above in the section regarding Rule 60, "[a]ttempts to take a 'second bite at the apple' or pad the record for purposes of appeal (especially when new legal theories or issues are not previously argued, but subsequently come to the mind of the losing party) are thus beyond the intended scope of Rules 59 and 60." *Thompson v. Bank of New York Mellon Tr. Co.*, No. 4:13-CV-00120-SWW, 2014 WL 1887341, at *2 (E.D. Ark. May 12, 2014) (quoting *In re DEF Investments, Inc.*, 186 B.R. 671, 681 (Bkr. D. Minn. 1995)). For failure to meaningfully raise this objection and develop a record on it, the Court committed no error by not finding that Intervenors objected to this.

But beyond that point, the law does not support the Intervenors' position. Intervenors have advocated for a *per se* rule that a court can never order fees to be paid over time. No case cited by Intervenors stands for this proposition.

First, the case law cited by Intervenors does not meaningfully help their argument that PCSSD is somehow defiant of federal court authority. Almost all of the case law cited by Intervenors involves, for example, a defendant's "unwillingness to comply with a valid judgment

of a federal court" *Doc. 5783, p. 11* (citing *Gates v. Collier*, 616 F.2d 1268, 1272 (5th Cir. 1980)). The situation at hand is distinguishable. PCSSD recognizes this Court's fee order of 28 January 2022 as a valid judgment of a federal court. In fact, PCSSD has already begun complying therewith by making the first of twelve-monthly payments that the Court ordered due on 15 February 2022. Despite the Motion, which some might consider to be a basis to delay payment since Intervenors are apparently now attempting to set aside this Court's fee order of 28 January 2022, PCSSD instead moved forward with compliance. And this was after PCSSD timely complied with this Court's 6 May 2021 order which set a due date for PCSSD's facilities proposal due on 1 August 2021. *Doc. 5730, p. 67*. Even in responding to the Intervenors' petition for fees, and throughout the negotiations on same, PCSSD never took the position that Intervenors were entitled to nothing. *Doc. 5761*. Rather, the main sticking point was the amount of fees, not whether PCSSD owed fees at all. This all demonstrates that the Intervenors' case law in the Motion deals with defendants that had a much different posture regarding federal court authority and compliance therewith.

Intervenors cited *Spain v. Mountanos* for the proposition that "a state cannot frustrate the intent of section 1988 by setting up state law barriers to block enforcement of an attorney's fees award." 690 F.2d 742, 746 (9th Cir. 1982). There, the State of California argued that there was a barrier to paying a court ordered judgment because of a state statute that provided "money may be drawn from the Treasury only through an appropriation made by law." *Id.*, 690 F.2d at 745. Likewise *Collins v. Thomas* involved a county attempting to "hide behind state procedural shields to avoid the consequences of a valid district court judgment." 649 F.2d 1203, 1206 (5th Cir. 1981). Here, PCSSD has not attempted to work around a court order and has not invoked any statute or state law. Rather, the very terms of the Court order balance the terms of the

12

payment with the amount ordered to be paid. The payment was ordered by this Court to be paid over time, and this was not any sort of post-judgment avoidance scheme by PCSSD. Although the record is silent on this point, it could have very well been that the Court would have ordered a lower amount paid immediately, or a larger amount paid over time. The Intervenors have cited no authority stating that when a Court weighs the facts and circumstances of a unique situation, it is prohibited from ordering the payment of a certain fee award over time when the record justifies it.

Second, other existing cases show that there is nothing novel or improper about spreading out the payment of an award of attorneys' fees. In *Phelps v. Buchele*, a court awarded attorney's fees under 42 U.S.C. § 1988 and ordered that the award be paid in monthly installments. Case No. 84-4371-C, 1992 WL 190708, at *1–*2 (D. Kan. July 6, 1992) ("To assure that this award will not work an extreme hardship … the court will permit the plaintiff to pay this award in monthly installments."). In *Murphy v. Board of Education of Rochester City School District*, a court awarded attorney's fees in a civil rights action and allowed them to be paid out over time. 420 F. Supp. 2d 131, 140 (W.D.N.Y. 2006) (collecting cases). This also happens in Arkansas state courts. *See e.g. Ard v. Death and Permanent Total Disability Fund*, 2011 Ark. App. 774, at 3, 2011 WL 6189493, at *2 (unpublished) (affirming worker's compensation award of attorney's fees that were to be paid, in part, over time); *Young v. Young*, No. CA 08-159, 2008 WL 4062081, at *2 (Ark. Ct. App. Sept. 3, 2008) (unpublished)[3] (Judge D.P. Marshall, Jr., sitting on the Arkansas Court of Appeals, wrote an opinion which affirmed a trial court order on a family law case that ordered the payment of attorneys' fees over time.).

---

[3] This decision is not precedential. The Court here need not consider it or rely upon it. It is cited only for the illustrative general proposition that Arkansas courts (and indeed this specific Court sitting on a prior bench) often take this practical and realistic approach to the logistical concerns of paying attorneys' fees.

Third, the record in this case more than justifies the Court's decision to order the payment of fees over time. PCSSD is returning to fiscal stability and normalcy, but this comes on the heels of a tumultuous past decade. This Court has previously acknowledged and discussed PCSSD's "fiscal problems." *Doc. 4761, p. 1.* The State of Arkansas disbanded the PCSSD Board of Education upon identifying the district as being in fiscal distress. The State pointed to

> a number of fiscal issues over the past few years that negatively impact the continuation of educational services by the district (material State fiscal audit exceptions; audit reports that found inadequate controls for reconciling bank statements and documenting funding sources for employees' salaries; misappropriation of funds; issuing blanket purchase orders exceeding the district's policy of limiting contracts to $1,000 per vendor per month; and other issues).

*Doc. 4548, p. 1.* In 2016 PCSSD experienced a one-time 26% enrollment decrease with the advent of the JNPSD detachment, which had a significant effect on cash flow. *See Doc. 5075-1.* Shortly thereafter, PCSSD ceased receiving $20.4 million in desegregation funds from the State. *Doc. 5063.* This all hit just as PCSSD was emerging from State takeover. At the July 2020 trial, the Court heard testimony from Dr. Warren and Dr. McNulty about how a $5 million deficit in 2018 resulted in significant operational budget cuts accompanied with a round of layoffs, and further heard about how Dr. McNulty's administration commenced with a $15 million budget deficit. These events are not highlighted to imply that the sky is falling at PCSSD. Rather, for purposes of responding to the Motion, all of this provides a reasonable justification that exists in the record to explain why it was not unreasonable for the Court to order the payment of fees over time.

Fourth, the example of Margie Powell. Intervenors briefly mention the Court appointed expert. The consistent and relatively frequent bills of Margie Powell illustrate the crux of the issue here. Ms. Powell diligently kept up with her time and frequently sought payment for same.

Her expert witness fees were expensed over the years which made it such that any one invoice did not create a crunch in the operations budget. By contrast, Intervenors waited for nearly five years, allowing their fees to build to a large amount.

**VI.**    **Conclusion**

WHEREFORE, the Pulaski County Special School District respectfully requests that the Court DENY Intervenors' Motion for Reconsideration, and instead leave the existing award in place.

Devin R. Bates (2016184)
M. Samuel Jones III (76060)
MITCHELL, WILLIAMS, SELIG,
GATES & WOODYARD, P.L.L.C.
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Telephone:  (501) 688-8800
Facsimile:  (501) 688-8807
dbates@mwlaw.com
sjones@mwlaw.com

and

Jay Bequette
Cody Kees
Bequette Billingsley & Kees, P.A.
425 West Capitol Ave., Suite 3200
Little Rock, Arkansas 72201
Telephone:  (501) 374-1107
Facsimile:  (501) 374-5092
Mobile: (501 590-4500
jbequette@bbpalaw.com
ckees@bbpalaw.com

***Attorneys for Pulaski County Special School District***