IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**LITTLE ROCK SCHOOL DISTRICT**                                                        **PLAINTIFF**

V.                                    NO. 4:82-cv-866-DPM

**PULASKI COUNTY SPECIAL SCHOOL**
**DISTRICT NO. 1, ET AL.**                                                             **DEFENDANTS**

**EMILY McCLENDON, ET AL.**                                                            **INTERVENORS**

**REPLY TO INTERVENORS' RESPONSE TO**
**OCTOBER SPECIAL FACILITIES STATUS REPORT**

Pulaski County Special School District ("PCSSD"), for its Reply to Intervenors' Response to the October 2024 Special Facilities Status Report, *Docs. 5866, 5867* (the "Response"), submits the following.

Intervenors' Response weaves together various court orders and assorted historical observations over the decades, and then attempts to selectively draw from separate, unrelated court cases to bolster its argument. The main substance of the Response, however, largely fails to engage with this Court's recent controlling orders that interpret the consent decree and set the bounds of this case.

While the Intervenors' filing is labeled as a "Response" to a status report, the Court should analyze it for what it is: a request under Rule 60 to modify and change Plan 2000. *Doc. 5730, pp. 7-8*. At this point, Plan 2000 has been amended by the Court in recent years, but subject to its amendments it is still the controlling consent decree. *Doc. 5859, pp. 2-3*. The recent modifications have been a narrowing of the issues, not an expansion of them. *See e.g., Doc. 5776, pp. 2, 4* (the "remaining issues have narrowed."). As the party seeking to modify and amend Plan 2000, Intervenors bear the burden of proof to show that the facts presented are good cause and changed

1

circumstances such that modification of Plan 2000 is appropriate. The Response from Intervenors does not carry this burden, and it certainly does not carry the burden to massively expand the scope of this case as proposed.

Even examining everything that Intervenors have placed into the record, the facts before the Court demonstrate that PCSSD's actions continue to be in-line with the controlling Court orders. The Court has ordered PCSSD as follows: "the District's facility needs continue to change and no stand-still order exists. The Court's directive is simply to keep prioritizing the Mills projects, as the District has done." *Doc. 5804, pp. 2-3.* At the PCSSD Board meeting on 12 November 2024, PCSSD passed a resolution speaking to this difficult balancing act that the District must make. *Exhibit 14*. Prominently placed on the first page of that resolution is the following: "**BE IT FURTHER RESOLVED,** that the Board reaffirms that it will continue to prioritize Mills High in accordance with existing Federal Court Orders and Court-approved plans." There is no proof in the record that the District's actions have failed to prioritize the ongoing work at Mills University Studies High School. The various other cases and issues Intervenors attempt to smuggle into this inquiry do not change this reality.

Because the Intervenors have questioned where facilities money is being spent, the Court may find it helpful to review some data on the subject of facilities spending. Any comparison of facilities spending in various parts of the District must take enrollment into account.[1] PCSSD

---

[1] Evaluating facilities spending against the *dollars spent per student* metric was Intervenors' idea in the first place. In Intervenors' Hearing Brief Regarding PCSSD filed on January 11, 2010, Intervenors filed "proposed findings of fact" for Judge Miller's consideration. *Doc. 4306*. Therein, Intervenors urged Judge Miller to make findings such as "[t]he Maumelle

2

submits herewith a comparison of facility construction projects since the implementation of Plan 2000. *Exhibit 15*. These numbers were previously reported in 2020, *Doc. 5690, p. 28*, and are updated now in light of changed projects and student enrollment numbers. While numbers do not always tell the whole story, the numbers still provide the most objective snapshot of where PCSSD has committed its facilities dollars. These numbers can be considered by the Court as a datapoint.

These numbers undercut, rather than support, the Intervenors' argument. According to Intervenors, PCSSD's actions have resulted in "spending most of its money in the white areas of the district, [leaving] the black schools to die on the vine." *Doc. 5867, p. 9*. These numbers do not support the picture that the Intervenors have painted. Rather, they support that PCSSD has committed significant resources to facilities in the Southeast quadrant of its District. While being mindful of the Court's findings about efficiency in spending, *Doc. 5730, p. 30*, even assuming that the spending on Mills University Studies High School in the 2016-2018 timeframe should be given a discount, the numbers still show PCSSD's commitment to facilities in the Southeast quadrant of its District.

---

Middle School facility cost was $16,717,259; its equipment cost $1,703,772; and the cost for each student for whom the school has capacity, $21,929.79." *Doc. 4306, p. 35*. In the Court's 2011 opinion following the bench trial, Judge Miller adopted Intervenors' proposed findings of fact. *See e.g.*, *Doc. 4507, p. 75* ("The facility itself cost $16,717,259, and its equipment cost $1,703,772. *Id.* This resulted in a cost per student of $21,929.79"). As the source for these factual findings Judge Miller cited "Joshua Ex. 6-5." *Doc. 4507, p. 75*. As such, surely Intervenors do not object to the Court relying on these metrics since calculating them was Intervenors' idea in the first place.

Intervenors' Response also glosses over some meaningful nuance by painting in broad racial strokes. For example, the Intervenors alleged that "PCSSD has demonstrated over and over again, that unless ordered, it will not provide facilities in the black areas of the county that are equal to those schools as enjoyed by its white students in the predominantly white areas of the county." *Doc. 5867, p. 7*. As they have done in the past, s*ee e.g., Doc. 5699, p. 2*, Intervenors repeatedly speak in terms of "black schools," *Doc. 5867, p. 9*, and "white students in the predominantly white areas of the county." *Doc. 5867, p. 7.* Describing schools in this manner based on historical assumptions masks the reality of who actually sits in those seats in 2024. The numbers do not support Intervenors' conclusory and historical labels. Here is a snapshot of these schools today:

|                  | **Black** | **White** |
|------------------|-----------|-----------|
| **Sylvan Hills HS** | 48 %      | 35 %      |
| **Maumelle HS**     | 50 %      | 35 %      |
| **Mills HS**        | 59 %      | 10 %      |
| **Robinson HS**     | 37 %      | 47 %      |

*ADE Data Center*, October 2024 enrollment numbers.[2] As noted above, black students outnumber white students except at Robinson where the black and white percentages of the student body are within 10 percentage point of each other. None of these schools can be simply called "black" or "white" schools. Moreover, Intervenors' conclusion that aggregate PCSSD facilities spending benefits white students more than black students is not supported when comparing the above

---

[2] All public-school enrollment data by race is available online through the Arkansas Department of Education Data Center at:

https://adedata.arkansas.gov/statewide/reportlist/schools/EnrollmentByRace.aspx

demographic numbers to the *facilities cost per student* chart. *Exhibit 15*. The Intervenors' "white school" vs. "black school" narrative simply does not fit the facts.

The Intervenors' Response is also problematic in that it resurrects the standard of building "clean, safe, attractive, and equal" facilities across the entire District, including schools such as College Station Elementary that are not a part of the true-up work happening at Mills University Studies High School to satisfy a comparison to Robinson Middle School. PCSSD objects to Intervenors' position that the District must make all schools "equal" before it can be declared unitary, or before it can spend any money except where the Intervenors say it should be spent. This argument is objectionable as to the scope of this case. *Doc. 5859, pp. 2-3*. But even beyond the scope creep that this argument embraces, applying the standard of "equal" to all facilities is highly problematic for several reason.

First, applying the standard of "equal" is violative of the controlling stipulation. A joint motion to amend Plan 2000 (the "Joint Motion" or the "Stipulation") was filed wherein the parties represented to the Court:

> PCSSD'S quest for ***full unitary status*** through cooperation with Joshua demands an alternative commitment, a Plan B as it were, to remediate that need in the event of a negative vote on the aforesaid millage increase. Therefore, PCSSD commits to the *circa* $50,000,000.00 new Mills High School, and the *circa* $5,000,000.00 conversion of existing Mills to a middle school, regardless of the success of the millage election. It is the intention of this Plan B commitment to bind PCSSD irrevocably, regardless of its future governance and administration, to the construction of a replacement facility for Mills, to begin promptly after any millage election.

*Doc. 5084, p. 3*. (emphasis added). The Stipulation of full unitary status was emphasized in the penultimate sentence of the Joint Motion, which stated that this was a plan to "make PCSSD fully constitutional." *Doc. 5084, p. 4*. Margie Powell approved of this approach. *Doc. 5087, p. 2*. Although this Joint Motion contained several alternative plans, it is undisputed that this is the one

5

that came to be controlling by virtue of a negative vote on the contemplated millage increase. That leaves PCSSD with the requirement to build a new Mills University Studies High School. At the July 2020 trial, the Court decided PCSSD had not made it there yet on this point. *Doc. 5730.* While PCSSD is not yet unitary on facilities and is engaged in ongoing work at Mills University Studies High School following from the outcome of the July 2020 trial, this is work undertaken to "comply … and square up" the inequity between Mills University Studies High School and Robinson Middle School. *Doc. 5730, p. 30*. Stated another way by the Court, PCSSD is engaged in a "Plan-2000-required true-up" following the July 2020 trial. *Doc. 5776, p. 3*. All of this work is being done under the Stipulation.

The Stipulation to amend Plan 2000 contained what was effectively a merger/integration clause, stating that "[a]ll earlier plans and studies adopted pursuant to Plan 2000, Section H (School Facilities), should be considered negated to the extent they are inconsistent with PCSSD's undertakings and agreements contained herein." *Doc. 5084, p. 1*. In other words, what matters for wrapping up this desegregation case is whether the requirements of the Joint Motion were met. The Joint Motion required spending at Mills University Studies High School, and the Court held that PCSSD had not satisfied that requirement due to the lack of efficiency in spending, *Doc. 5730, p. 30*, and the other issues observed by the Court. The Court did not, however, throw out the Joint Motion and Stipulation effectively hitting a reset button as Intervenors seem to argue. Rather, those controlling case events are now interpreted through the lens of the facilities Proposal, *Doc. 5736, pp. 11-13*, the Plan, *Doc. 5798*, and the Court orders stemming therefrom. This is a "square up" and "true-up" case still proceeding under the Stipulation. As such, the "clean, safe, attractive, and equal" standard in Plan 2000 applying across the entire District was replaced by the Stipulation and is no longer the controlling standard.

Second, applying the standard of "equal" to new construction goes beyond the originally intended meaning of that standard. The genesis of the "equal" prong of the "clean, safe, attractive, and equal" standard arose in a proposed desegregation plan in 1991. *Doc. 1467*. Judge Susan Webber Wright denied adoption of this standard, raising these vexing questions: "Equal in what way? Size? Square footage of the library or computer labs or the teachers' lounge? The amount of playground equipment? The number of volumes in the library?" *Doc. 1484*. Judge Wright described this "equal" standard as "not of constitutional proportions" and she wisely cautioned that its adoption "potentially could create more problems than [it] might solve." *Id*. Judge Wright was prophetic. When the "clean, safe, attractive, and equal" standard was eventually adopted into the 1992 desegregation plan, its application was cabined off to being a standard for facility maintenance, *not* a standard for new facility construction. *Doc. 1587* ("Facilities will be maintained so that they are clean, safe, attractive, and equal."). An accurate historical understanding of the "equal" prong of this standard shows that it was never intended to be a standard applied to new construction. To the extent it is applied at all, it should be read in light of that history.

Third, applying the standard of "equal" is problematic and potentially never attainable. The "clean, safe, attractive, and equal" standard in Plan 2000 is a higher one than the constitutional "to the extent practicable" standard found in *Freeman v. Pitts*. 503 U.S. 467 (1992).[3] Judge Wright recognized this as noted above, and Intervenors agree, having previously conceded this point. *Doc. 5645, p. 12, n. 2*, *citing Doc. 5635, p. 10*, *see also Doc. 5622, p. 47, n. 17*. As explained in those

---

[3] The controlling legal standard is briefed more fully at *Doc. 5622, pp. 6-9*, and stated by this Court in its 2018 Order. *Doc. 5445, p. 2*.

7

other filings, PCSSD has repeatedly objected to the applicability of the "clean, safe, attractive, and equal" standard applied as Intervenors have argued. While this standard was adopted into Section H of Plan 2000, it has since been replaced due to the Stipulation described above, or alternatively, its application is narrowed to the comparison being made between Mills and Robinson. If this standard is applied across the District broadly as Intervenors have argued, it is likely that this case may never end.

PCSSD faces a reality that is a perennial conundrum facing many public schools: there are more facilities needs than there are dollars to go around. While PCSSD is among good company in schools navigating this quandary, that must be cold comfort to the parents of all races in many corners of the District that want to see the best facilities built in their backyard for their students. While Intervenors are representatives that theoretically advocate for all black students in the District, their arguments start to strain credulity where, as here, they take positions to advance the interests of the 132 students at College Station Elementary, *Exhibit 14, p. 4*, without even acknowledging facility spending that has benefited the collectively 1,686 black students at Maumelle High School (50% black), Sylvan Hills High School (48% black), and Robinson High School (37% black). PCSSD has had to make difficult decisions to do what is right for all students, while facing significant political headwinds and staggering macroeconomic realities. To say that the decision-making process weighs many factors that cannot be detailed here would be an understatement, but the decisions have been made with careful consideration. *See Exhibit 14*. These are the types of difficult decisions that all schools make. And while they are complex decisions, the ones made by PCSSD here have not been shown to be within the scope of this desegregation case, nor has proof been submitted to justify expanding the scope of the

desegregation case beyond the Stipulation to encompass these new issues at a standard higher than that constitutionally mandated.

The exhibits noted below are attached to this filing. The exhibits are numbered consecutively with those previously submitted, starting with Exhibit 1 to the Plan located at *Doc. 5798, p. 9*.

*Exhibit*

PCSSD Board Resolution 12 November 2024 ..................................................................14

Facilities Spending Per Student Chart (updated November 2024) ...............................15

Maumelle High School Facility Spending (referenced in Exhibit 15) ..........................16

Sylvan Hills High School Band Facility Spending (referenced in Exhibit 15) ............17

ADE Enrollment Count (supporting Exhibit 15) ............................................................18

Devin R. Bates (2016184)
MITCHELL, WILLIAMS, SELIG,
GATES & WOODYARD, P.L.L.C.
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Phone: (501) 688-8800
Fax:  (501) 688-8807
dbates@mwlaw.com

*and*

Jay Bequette
Cody Kees
Bequette Billingsley & Kees, P.A.
425 West Capitol Ave., Suite 3200
Little Rock, Arkansas 72201
Telephone:  (501) 374-1107
Facsimile:  (501) 374-5092
jbequette@bbpalaw.com
ckees@bbpalaw.com

***Attorneys for Pulaski County Special School District***