## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

| | |
|---|---|
| **LITTLE ROCK SCHOOL DISTRICT** | **PLAINTIFF** |
| V.                    NO. 4:82-cv-866-DPM | |
| **PULASKI COUNTY SPECIAL SCHOOL DISTRICT NO. 1, ET AL.** | **DEFENDANTS** |
| **EMILY McCLENDON, ET AL.** | **INTERVENORS** |

### PULASKI COUNTY SPECIAL SCHOOL DISTRICT'S
### <u>BRIEF IN SUPPORT OF ITS MOTION FOR UNITARY STATUS</u>

Pulaski County Special School District for its Brief in Support of its Motion for Unitary Status, submits the following.

**I.  INTRODUCTION**

There comes a time in every desegregation case where a district must independently fly its own course. PCSSD has been in the federal nest long enough; it is ready to use its wings. *See LRSD v. PCSSD*, 237 F. Supp. 2d 988, 1087 (E.D. Ark. 2002) (cleaned up) (employing fledging analogy for the proposition that in a desegregation case a district must exit the "federal nest" and "*begin making its own decisions,* guided by the Constitution, applicable case law, and its best professional judgment."). That time has come.

This conclusion has been a long time in the making, this being a 42-year-old case. Yet such an observation belies the genesis of the Central Arkansas school litigation, a history summarized perhaps most extensively in the opinion that placed this case "as the last in a long line of

desegregation cases, dating back to 1956." *Id.*, at 996. Succinctly stated, this case's unique history is "complex to say the least." *LRSD v. Armstrong*, 359 F.3d 957, 959 (8th Cir. 2004).[1]

Complex as this case may have been at points in the past, in recent years it has become far simpler. PCSSD is grateful to this Court for its discernment and shrewdness in this regard. On May 6, 2021, the Court declined PCSSD's request for unitary status in the area of facilities, and ordered PCSSD to "comply … and square up" the inequity between Mills University Studies High School and Robinson Middle School (the "Mills-Robinson Inequity"). *Doc. 5730, p. 30*. Stated another way by the Court, PCSSD was ordered to engage in a "Plan-2000-required true-up" following the July 2020 trial. *Doc. 5776, p. 3*. To carry out the true-up process, PCSSD submitted a Proposal, *Doc. 5736, pp. 11-13* (the "Proposal"), and later a Plan (the "Plan"). *Doc. 5798*. The Court approved the Proposal and the Plan and cleared PCSSD to move forward. *Doc. 5804*.

With that recent history at the forefront, it cannot reasonably be argued by anyone that this case proceeded with business as usual. The Court's 2021 opinion on unitary status was a watershed moment, as the Court held that the District was already at the point of being unitary with "the exception of some facilities issues." *Doc. 5730, p 1*. Consistent with that understanding, all Court orders in recent years have honed the district's attention to this true-up work at Mills. *See e.g., Doc. 5776, pp. 2, 4* (the "remaining issues have narrowed"); *Doc 5871, p. 2* ("The Court declines the Intervenors' request to expand this case at this point."). Because PCSSD has now trued-up the facilities issues identified by this Court, and has manifested its good faith throughout the process, now it is time for a complete, final, and unequivocal declaration of unitary status for PCSSD.

---

[1] Judge Richard S. Arnold's sixteenth and final opinion in this case, written a few months prior to his passing. Polly J. Price, *The Little Rock School Desegregation Cases in Richard Arnold's Court*, 58 Ark. L. Rev. 611, 613 (2005).

II.     PROCEDURAL HISTORY

In 2011 the Eighth Circuit affirmed this Court's finding that the district had "devoted a disproportionate share of its facilities spending to predominantly white areas." *LRSD v. Ark.*, 664 F.3d 738, 753 (8th Cir. 2011). Thereafter, in 2014 the parties were engaged in negotiations to create a path forward toward resolution of the case on the issue of facilities. Out of those negotiations came a joint motion to amend Plan 2000 (the "Joint Motion" or the "Stipulation"), wherein the parties jointly represented to the Court:

> PCSSD'S quest for ***full unitary status*** through cooperation with Joshua demands an alternative commitment, a Plan B as it were, to remediate that need in the event of a negative vote on the aforesaid millage increase. Therefore, PCSSD commits to the *circa* $50,000,000.00 new Mills High School, and the *circa* $5,000,000.00 conversion of existing Mills to a middle school, regardless of the success of the millage election. It is the intention of this Plan B commitment to bind PCSSD irrevocably, regardless of its future governance and administration, to the construction of a replacement facility for Mills, to begin promptly after any millage election.

*Doc. 5084, p. 3*. (emphasis added). The Stipulation of full unitary status was emphasized in the penultimate sentence of the Joint Motion, which stated that this was a plan to "make PCSSD fully constitutional." *Doc. 5084, p. 4*. Margie Powell approved of this approach. *Doc. 5087, p. 2*. Although this Joint Motion contained several alternative plans, this is the one—known as "Plan B"—that came to be controlling by virtue of a negative vote on the contemplated millage increase. *Doc. 5730, p. 26* (summarizing this history). That left PCSSD with the requirement to build a new Mills University Studies High School. PCSSD built the school and filed for unitary status. *Doc. 5622*.

This Court held a trial on this issue in 2020. At the conclusion of the trial, the Court agreed with the district that "Plan B was in good faith" but the Court declined to award unitary status because the Court held that "Plan B's implementation was not." *Doc. 5730, p. 29*. The Court

ordered a "Plan-2000-required true-up" on the issue of facilities. *Doc. 5776, p. 3; Doc. 5730, p. 31*.

Notably, the 2014 Stipulation to amend Plan 2000 that started this chapter of the case contained what was effectively a merger/integration clause, stating that "[a]ll earlier plans and studies adopted pursuant to Plan 2000, Section H (School Facilities), should be considered negated to the extent they are inconsistent with PCSSD's undertakings and agreements contained herein." *Doc. 5084, p. 1*. In other words, what matters for wrapping up this desegregation case is whether the requirements of the Joint Motion were met. The Joint Motion is now interpreted through the lens of the Proposal, *Doc. 5736, pp. 11-13,* the Plan, *Doc. 5798*, and the Court's approval of same. *Doc. 5804*. The Court explained that this true-up process "is how PCSSD can substantially comply with Plan 2000 on facilities." *Doc. 5730, p. 31*.

### III.    APPLICABLE LAW

The goal of institutional reform litigation is to return power to local authorities as quickly as possible. *Horne v. Flores*, 557 U.S. 433, 450, 129 S. Ct. 2579, 2595 (2009); *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 368, 112 S. Ct. 748, 752 (1992). That is, of course, when the circumstances warrant such a change. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 442, 124 S. Ct. 899, 906 (2004). This guardrail on federal power is seeded in American democracy, and it can be traced back to the agreement among Federalist era Federalists and Anti-Federalists alike on the issue of limited powers given to Federal Courts. *Compare* Letters from The Federal Farmer to The Republican No. 3 (Oct. 10, 1787) (Anti-Federalist concerns about federal courts) *with* The Federalist No. 78 (Alexander Hamilton) (May 28, 1788) (Federalist response outlining the limitations on federal courts).

Yet compelling problems require creative solutions. Staring down the evils of school segregation, in 1955 the Supreme Court ushered in an era of system-wide institutional reform litigation to bring government agencies into compliance with the law. *Brown v. Bd. of Educ.*, 349 U.S. 294, 301 (1955). Institutional reform litigation flourished. But by 2009, the Supreme Court reigned it in, expressing the Court's "growing skepticism of institutional reform litigation." Jason Parkin, *Aging Injunctions and the Legacy of Institutional Reform Litigation*, 70 Vand. L. Rev. 167, 220 (2017) (harmonizing case law and citing *Horne v. Flores*, 557 U.S. 433, 129 S. Ct. 2579, 2585, 174 L. Ed. 2d 406 (2009)).

This growing skepticism has been displayed prominently in recent Eighth Circuit jurisprudence. In reviewing south Arkansas school desegregation cases, the Eighth Circuit has been quick to lament that "part of the problem in these cases stems from the nature of the litigation—namely, these are institutional-reform cases." *United States v. Junction City Sch. Dist.*, 14 F.4th 658, 667 (8th Cir. 2021). The Eighth Circuit reiterated that "[c]onsent decrees entered in such cases 'bind state and local officials to the policy preferences of their predecessors and may thereby "improperly deprive future officials of their designated legislative and executive powers."'" *Id.*, (quoting *Horne*, 129 S. Ct. at 2585).

In seeking unitary status, a movant seeks relief from a court's prior order based on changed circumstances pursuant to Federal Rule of Civil Procedure 60(b)(5). *See e.g., United States v. Junction City Sch. Dist. No. 75*, No. 1:66-CV-1095-SOH, 2024 WL 3488074, at *2 (W.D. Ark. July 19, 2024). This Court rightfully employs a "flexible approach to the Rule 60 inquiry, prompted by a good dose of horse sense." *Doc. 5730, p. 8*. PCSSD bears the burden of proof. *Doc. 5730, p. 7*. On appeal, a district court's decision to modify a consent decree is reviewed for abuse of discretion. *United States v. Junction City Sch. Dist.*, 14 F.4th 658, 666 (8th Cir. 2021).

IV.   **ARGUMENT**

Section H of Plan 2000 requires that "existing school facilities are clean, safe, attractive, and equal." Plan 2000, § (H)(1) (emphasis added). As explained above, the entirety of Section H was reduced to the 2014 stipulation to "achieve full unitary status." *Doc. 5084, p. 3*. That is now interpreted through the Proposal, *Doc. 5736, pp. 11-13,* the Plan, *Doc. 5798*, and the Court's approval of same. *Doc. 5804*. There have been some Court approved changes since the Proposal and the Plan were approved. *See e.g., Doc. 5813*. Below in this section is a checklist with citations to relevant filings and orders. It is believed that this is a complete guide for meeting the Proposal and the Plan.

But first, it is worth reflecting on how these criteria came to be. PCSSD put forward a path to full unitary status that is a function of outcomes. In the spirit of pursuing finality while maintaining the upmost integrity, PCSSD endeavored to set out a series of objective and observable criteria for each part of the project.

By meeting the criteria set out below, at the outset PCSSD set out its belief that these criteria would help it to accomplish the following in a measurable, transparent, and fair fashion: (1) eliminate the Mills-Robinson Inequity to the extent practicable such that it has achieved unitary status, and (2) demonstrate its good faith in a manner that creates a legal presumption of good faith. *Doc. 5736, p. 7*. To those ends, the following are the criteria that have been met in the recent construction work at Mills University Studies High School.

1.   <u>Classroom Addition</u>

- ☑ Substantially similar in size and quality to the "Robinson standard"—which means substantially similar to Robinson Middle School classroom number 207 (a typical Robinson classroom in the new part of the school) (a minimum of 870 square feet) (Doc. 5736, p. 8)
- ☑ Technology enabled, meaning power outlets in convenient locations to support technology (Doc. 5736, p. 8)

- ☑ Wi-Fi enabled (Doc. 5736, p. 8)
- ☑ One or more screens for presentations (Doc. 5736, p. 8)
- ☑ At least one wall will be of the material that it can be written on with dry erase markers (Doc. 5736, p. 8)
- ☑ new building space attached to existing Mills (Doc. 5736, p. 8) (Doc. 5798, p. 2).
- ☑ 6 classrooms that meet the itemized criteria stated above. (Doc. 5798, p. 3).
- ☑ space in the new construction that is devoted to academics and is the functional equivalent of 4 more classrooms

    2.   ROTC Space

- ☑ minimum of 2 classrooms. These 2 classrooms represent necessary and adequate classrooms. (Doc. 5736, p. 10) (Doc. 5813, p. 3).
- ☑ 2 administrative offices. These 2 offices represent necessary and adequate offices. (Doc. 5736, p. 10) (Doc. 5813, p. 3).
- ☑ Desks, chairs, and computer equipment in the offices, which serve as office equipment. (Doc. 5736, p. 10) (Doc. 5813, p. 4)
- ☑ Drill space. The regulations allow that this can exist in the immediate vicinity of the institution as required. The ROTC program has historically been using the Mills indoor practice facility for drills and shooting. The architectural drawings attached hereto denote this new space as "ROTC Lab." (Doc. 5813, p. 4)
- ☑ A room that can be locked for the storage of arms. This is already present at the Mills indoor practice facility, however, it is anticipated that this will be moved into the new ROTC space once complete. (Doc. 5736, p. 10) (Doc. 5813, p. 4).
- ☑ Storage space for ROTC materials. The architectural drawings attached hereto denote several storage spaces to be constructed. (Doc. 5736, p. 10) (Doc. 5813, p. 4).
- ☑ A private telecommunications line suitable for voice transfer. (Doc. 5813, p. 4)
- ☑ Internet connectivity which enables data transfer. (Doc. 5813, p. 4)

    3.   Softball Field

- ☑ A regulation size field. (Doc. 5736, p. 11).
- ☑ Infield made of artificial turf, grass outfield. (Doc. 5736, p. 11).
- ☑ Two dugouts. (Doc. 5736, p. 11).
- ☑ Lights to enable night play. (Doc. 5736, p. 11).
- ☑ Bleacher capacity that is substantially similar to Robinson. (Doc. 5736, p. 11).
- ☑ A scoreboard that is substantially similar to Robinson. (Doc. 5736, p. 11).

    4.   Multi-Purpose Arena

☑ an "arena" style space rather than the "gym" style space presently at Mills. (Doc. 5736, p. 12)
☑ Seating capacity of 2,200 (seating capacity is based on a minimum width of 18 inches. Using the formula of number of feet times 12 divided by 18). (Doc. 5736, p. 12)
☑ Four dressing rooms, each with showers, hot water, toilets, and washbasins. (Doc. 5736, p. 12)
☑ Two rest rooms for public use. (Doc. 5736, p. 12)

☑ Floor dimensions equal to or in excess of 48 x 84 feet. (Doc. 5736, p. 12)
☑ There shall be at least three feet of unobstructed space outside the court adjacent to the sidelines and at least five feet of unobstructed space outside the end lines. (Doc. 5736, p. 12)
☑ There shall be a time clock visible from both directions of the playing court. (Doc. 5736, p. 12)

*Additional Representations*

- Attached to the North side of Mills. (Doc. 5805, p. 2).
- A facility that is capable of hosting 5A tournaments. (Doc. 5736, p. 12)
- To the extent that some of the above is already in place at Mills (i.e.: two public restrooms), brand new construction is not necessarily required. The above criteria, based on AAA standards, are set out to show what Mills will, at the end of the project, be able to accommodate for tournament hosting purposes. (Doc. 5736, p. 13).

As will be shown at an upcoming facilities tour, PCSSD has met the criteria summarized above. This presents changed circumstances to justify the award of unitary status. PCSSD seeks relief from this Court's prior Order, *Doc. 5730*, based on changed circumstances pursuant to Federal Rule of Civil Procedure 60(b)(5). Federal Rule of Civil Procedure 60(b)(6) also permits the Court to relieve a party from any order for "any other reason that justifies relief." The Court previously summarized its authority to entertain the relief sought herein. *Doc. 5730, p. 6*.

At bottom, PCSSD has dedicated significant resources to Mills as a priority, and it has done so while balancing the other pressing facilities needs that are next up for consideration. This is consistent with the Court's direction that PCSSD engage in a complex balancing act as follows:

> The Court recognizes the constraints: dollars are finite and needs are many. For example, PCSSD has other pressing facility needs, which [Curtis] Johnson described. Finishing the job at Mills High School must not hobble those efforts … The District must also be a faithful steward of teachers, curriculum, and everything else necessary to educate students … The District must, after balancing all the other District needs, and after consulting with the Intervenors, propose a plan for [achieving unitary status on facilities].

*Doc. 5730, p. 31*. The District's needs are many, and they are not concentrated in any one part of the District. *Doc. 5868-1, p. 6.* The District has prioritized the work at Mills as against other needs. *Compare Doc. 5868-1, p. 6* (PCSSD's facilities to-do list circa 2021 showing $80 million of

8

projects, estimating that Mills would take $15 million) *with Doc. 5837, p. 3* (reporting PCSSD's actual spending commitment on Mills is $37.8 million). These financial realities present further justification for declaring PCSSD unitary. *See Parton v. White*, 203 F.3d 552, 555 (8th Cir. 2000) (per curiam) ("Modification may be appropriate when changed factual conditions make compliance with the decree substantially more onerous, a decree proves to be unworkable because of unforeseen obstacles, or enforcement of the decree without modification would be detrimental to the public interest.")

## V. CONCLUSION

PCSSD is deserving of a declaration of complete unitary status. Not only has PCSSD done the work that it told the Court that it would do, it completed this work substantially on time, and it demonstrated to students, parents, stakeholders, and the community that it was making good on its promises. As stated by this Court when this milestone was reached for LRSD,

> [t]his means that LRSD is no longer under any supervision and monitoring obligations from me, ODM, or Joshua. LRSD's Board can now operate the district as it sees fit; answerable to no one except LRSD's students and patrons and the voters who elected them to office. While the road has been long and at times frustrating-for LRSD and for me-I want to express my heartfelt best wishes as LRSD begins to operate, as our Founders intended, under control of the citizens of the City of Little Rock.

*LRSD v. PCSSD*, 2007 WL 624054, at *25 (E.D. Ark. Feb. 23, 2007), *aff'd sub nom. LRSD v. NLRSD*, 561 F.3d 746 (8th Cir. 2009).

As has been accomplished by the other districts in this case save PCSSD, the record shows that PCSSD has grown and matured in the federal nest. It respectfully requests the freedom to use its wings to carry it across the winds of change, through the political storms that may arise, and into the bright future, just as the Founders intended those wings to carry it.

9

Respectfully submitted,

Devin R. Bates (2016184)
MITCHELL, WILLIAMS, SELIG,
  GATES & WOODYARD, P.L.L.C.
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Telephone:  (501) 688-8800
Facsimile:   (501) 688-8807
dbates@mwlaw.com

*and*

Jay Bequette
Cody Kees
BEQUETTE BILLINGSLEY & KEES, P.A.
425 West Capitol Ave., Suite 3200
Little Rock, Arkansas 72201
Telephone:  (501) 374-1107
Facsimile:  (501) 374-5092
jbequette@bbpalaw.com
ckees@bbpalaw.com

***Attorneys for Pulaski County Special School District***